## DEPARTMENT OF EDUCATION

### 34 CFR Parts 682 and 685

**RIN 1840–AD81**

### Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The U.S. Department of Education issues final regulations governing income-contingent repayment plans by amending the Revised Pay as You Earn (REPAYE) repayment plan and restructuring and renaming the repayment plan regulations under the William D. Ford Federal Direct Loan (Direct Loan) Program, including combining the Income Contingent Repayment (ICR) and the Income-Based Repayment (IBR) plans under the umbrella term of "Income-Driven Repayment" (IDR) plans, and providing conforming edits to the FFEL Program.

**DATES:** These regulations are effective July 1, 2024. For the implementation dates of the regulatory provisions, see the Implementation Date of These Regulations in **SUPPLEMENTARY INFORMATION**.

**FOR FURTHER INFORMATION CONTACT:** Bruce Honer, U.S. Department of Education, 400 Maryland Avenue SW, 5th Floor, Washington, DC 20202. Telephone: (202) 987–0750. Email: *Bruce.Honer@ed.gov.*

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

The Secretary amends the regulations governing the income contingent repayment (ICR) and income-based repayment (IBR) plans and renames the categories of repayment plans available in the Department's Direct Loan Program. These regulations streamline and standardize the Direct Loan Program repayment regulations by categorizing existing repayment plans into three types: (1) fixed payment repayment plans, which establish monthly payment amounts based on the scheduled repayment period, loan debt, and interest rate; (2) income-driven repayment (IDR) plans, which establish monthly payment amounts based in whole or in part on the borrower's income and family size; and (3) the alternative repayment plan, which we

use on a case-by-case basis when a borrower has exceptional circumstances or has failed to recertify the information needed to calculate an IDR payment as outlined in § 685.221. We also make conforming edits to the FFEL program in § 682.215.

### Purpose of This Regulatory Action

These regulations create a stronger safety net for Federal student loan borrowers, helping more borrowers avert delinquency and default and the significant negative consequences associated with those events. They will also help low- and middle-income borrowers better afford their Federal loan payments, while also increasing homeownership, retirement savings, and small business formulation. Additionally, they simplify the process of selecting a repayment plan.

### Summary of the Major Provisions of This Regulatory Action

The final regulations—

• Expand access to affordable monthly Direct Loan payments through changes to the Revised Pay-As-You-Earn (REPAYE) repayment plan, which may also be referred to as the Saving on a Valuable Education (SAVE) plan;

• Align the definition of "family size" in the FFEL Program with the definition of "family size" in the Direct Loan Program;

• Increase the amount of income exempted from the calculation of the borrower's payment amount from 150 percent of the Federal poverty guideline or level (FPL) to 225 percent of FPL for borrowers on the REPAYE plan;

• Lower the share of discretionary income used to calculate the borrower's monthly payment for outstanding loans under REPAYE to 5 percent of discretionary income for loans for the borrower's undergraduate study and 10 percent of discretionary income for other outstanding loans; and an amount between 5 and 10 percent of discretionary income based upon the weighted average of the original principal balances for those with outstanding loans in both categories;

• Provide a shorter maximum repayment period for borrowers with low original loan principal balances;

• Eliminate burdensome and confusing regulations for borrowers using IDR plans;

• Provide that the borrower will not be charged any remaining accrued interest each month after the borrower's payment is applied under the REPAYE plan;

• Credit certain periods of deferment or forbearance toward time needed to receive loan forgiveness;

• Permit borrowers to receive credit toward forgiveness for payments made prior to consolidating their loans; and

• Reduce complexity by prohibiting or restricting new enrollment in certain existing IDR plans starting on July 1, 2024, to the extent that the law allows.

*Costs and Benefits:* As further detailed in the *Regulatory Impact Analysis* (RIA), these final regulations will significantly impact borrowers, taxpayers, and the Department.

Benefits for borrowers include more affordable and streamlined IDR plans, as well as a path to avoid delinquency and default. The streamlined repayment plans also benefit the Department due to simplified administration of the repayment plans and decreases in rates of delinquency and default.

This rule will reduce negative amortization, which will be a benefit to student loan borrowers, making it easier for individuals to successfully manage their debt. As a result, borrowers will be able to devote more resources to cover necessary expenses such as food and housing, provide for their families, invest in a home, or save for retirement.

Costs associated with the changes to the IDR plans include paying contracted student loan servicers to update their computer systems and their borrower communications. Taxpayers will incur additional costs in the form of transfers from borrowers who will pay less on their loans than under currently available repayment plans. As detailed in the RIA, the changes are estimated to have a net budget impact of $156.0 billion over 10 years across all loan cohorts through 2033.

### Implementation Date of These Regulations

Section 482(c)(1) [1] of the Higher Education Act of 1965, as amended (HEA), requires that regulations affecting programs under title IV of the HEA be published in final form by November 1 prior to the start of the award year (July 1) to which they apply. HEA section 482(c)(2) [2] also permits the Secretary to designate any regulation as one that an entity subject to the regulations may choose to implement earlier and outline the conditions for early implementation.

The Secretary is exercising his authority under HEA section 482(c) to designate certain regulatory changes to part 685 in this document for early implementation beginning on July 30, 2023. The Secretary has designated the following provisions under REPAYE for early implementation:

[1] 20 U.S.C. 1089(c)(1).
[2] 20 U.S.C. 1089(c)(2).

• Adjusting the treatment of spousal income in the REPAYE plan for married borrowers who file separately as described in § 685.209(e)(1)(i)(A) and (B);

• Increasing the income exemption to 225 percent of the applicable poverty guideline in the REPAYE plan as described in § 685.209(f);

• Not charging accrued interest to the borrower after the borrower's payment on REPAYE is applied as described in § 685.209(h); and

• Designating in § 685.209(a)(1) that REPAYE may also be referred to as the Saving on a Valuable Education (SAVE) plan.

The Secretary also designates the changes to the definition of family size for Direct Loan borrowers in IBR, ICR, PAYE, and REPAYE in § 685.209(a) to exclude the spouse when a borrower is married and files a separate tax return for early implementation on July 30, 2023.

The Secretary also designates the provision awarding credit toward forgiveness for certain periods of loan deferment prior to the effective date of July 1, 2024, as described in § 685.209(k)(4) for early implementation. The Department will implement this regulation as soon as possible after the publication date and will publish a separate notice announcing the timing of the implementation.

With the exception noted below and except for those regulations designated as available for early implementation, the final regulations in this notice are effective July 1, 2024.

Section 685.209(c)(5)(iii), which relates to eligibility for IDR plans by borrowers with Consolidation loans, will be effective for Direct Consolidation loans disbursed on or after July 1, 2025.

*Public Comment:* In response to our invitation in the Notice of Proposed Rulemaking on Improving IDR for the Direct Loan Program, published on January 11, 2023 (IDR NPRM), the Department received 13,621 comments on the proposed regulations. In this preamble, we respond to those comments.

### Analysis of Comments and Changes

We developed these regulations through negotiated rulemaking. Section 492 of the HEA [3] requires that, before publishing any proposed regulations to implement programs under title IV of the HEA, the Secretary must obtain public involvement in the development of the proposed regulations. After obtaining advice and recommendations,

the Secretary must conduct a negotiated rulemaking process to develop the proposed regulations. The Department negotiated in good faith with all parties with the goal of reaching consensus. The Committee did not reach consensus on the issue of IDR.

We group issues according to subject, with appropriate sections of the regulations referenced in parentheses. We discuss other substantive issues under the sections of the regulations to which they pertain. Generally, we do not address minor, non-substantive changes (such as renumbering paragraphs, adding a word, or typographical errors). Additionally, we generally do not address changes recommended by commenters that the statute does not authorize the Secretary to make or comments pertaining to operational processes. We generally do not address comments pertaining to issues that were not within the scope of the IDR NPRM. In particular, we note that we received many comments supporting or opposing one-time debt relief. As this topic is outside the scope of this rule, we do not discuss those comments further in this document.

An analysis of the public comments received and the changes to the regulations since publication of the IDR NPRM follows.

### Public Comment Period

*Comment:* Several commenters requested that we extend the comment period on the IDR NPRM. Some of these commenters asserted that under the principles of Executive Orders 12866 and 13563, the Department must adhere to at least a 60-day comment period.

*Discussion:* The Department believes the comment period provided sufficient time for the public to submit feedback. As noted above, we received over 13,600 written comments and considered each one that addressed the issues in the IDR NPRM. Moreover, the negotiated rulemaking process provided significantly more opportunity for public engagement and feedback than notice-and-comment rulemaking without multiple negotiation sessions. The Department began the rulemaking process by inviting public input through a series of public hearings in June 2021. We received more than 5,300 public comments as part of the public hearing process. After the hearings, the Department sought non-Federal negotiators for the negotiated rulemaking committee who represented constituencies that would be affected by our rules.[4] As part of these non-Federal negotiators' work on the rulemaking

committee, the Department asked that they reach out to the broader constituencies for feedback during the negotiation process. During each of the three negotiated rulemaking sessions, we provided opportunities for the public to comment, including after seeing draft regulatory text, which was available prior to the second and third sessions. The Department and the non-Federal negotiators considered those comments to inform further discussion at the negotiating sessions, and we used the information to create our proposed rule. The Department also first announced elements of the proposed plan in August 2022, giving stakeholders additional time to consider the merits of major elements of the regulation. Given these efforts, the Department believes that the 30-day public comment period provided sufficient time for interested parties to submit comments. The 30-day comment period on the IDR NPRM is not unique; we have used this amount of time for numerous other rules. The Department has fully complied with the appropriate Executive Orders regarding public comments. While the Executive Orders cited by the commenters direct each agency to afford the public a meaningful opportunity to comment, those Executive Orders do not require a 60-day comment period.

*Changes:* None.

### General Support for Regulations

*Comments:* Many commenters supported the Department's proposed rule to modify the IDR plans. These commenters supported the proposed revisions to § 685.209(f), which would result in lower monthly payments for borrowers on the REPAYE plan. One commenter noted that lower monthly payments are often a primary factor when borrowers select a repayment plan. Another commenter mentioned that while current IDR plans offer lower payments than the standard 10-year plan, payments under an IDR plan may still be unaffordable for some borrowers. They expressed strong support for this updated plan in hopes that it will provide much needed relief to many borrowers and would allow borrowers the flexibility to buy homes or start families. Several commenters pointed out that the new IDR plans would allow borrowers to pay down their student loans without being trapped under exorbitant monthly payments. Several commenters felt it was important that the Department commit to fully implementing this process as soon as possible to allow borrowers to benefit from the proposed regulations.

---

[3] 20 U.S.C. 1098a.

[4] See 86 FR 43609.

One commenter stated that efforts to model the effects of increasing the discretionary income threshold have demonstrated that changing the threshold of protected income had the most pronounced effect on the monthly payment amounts of low- and moderate-income borrowers over the course of their repayment term. This commenter believed that making all monthly payments under REPAYE more affordable will enable more low-income borrowers to qualify for $0 payments, help prevent defaults, protect vulnerable borrowers from the severe economic consequences of default, and alleviate the stress that student loans place on fragile budgets.

*Discussion:* We agree with the commenters' assertions that this rule will allow borrowers to pay down their student loans without being trapped under exorbitant monthly payments and that it will help many borrowers avoid delinquency, default, and their associated consequences. We understand the urgency expressed by commenters related to our implementation plans. The Department has outlined the implementation schedule in the *Implementation Date of These Regulations* section of this document.

*Changes:* None.

*Comments:* Many commenters thanked the Department for proposing to modify the REPAYE plan rather than creating another IDR plan. Commenters cited borrower confusion about the features of the different repayment plans. Commenters urged us to revise the terms and conditions of REPAYE to make them easier to understand.

*Discussion:* The Department initially contemplated creating another repayment plan. After considering concerns about the complexity of the student loan repayment system and the challenges of navigating multiple IDR plans, we instead decided to reform the current REPAYE plan to provide greater benefits to borrowers. However, given the extensive improvements made to REPAYE, we have decided to rename REPAYE as the Saving on a Valuable Education (SAVE) plan. This new name will reduce confusion for borrowers as we transition from the existing terms of the REPAYE plan. Borrowers currently enrolled on the REPAYE plan will not have to do anything to receive the benefits of the SAVE plan, and the new name will be reflected on written and electronic forms and records over time.

The Department will work to implement this naming update and borrowers may see the plan still referred to as REPAYE until the updates are complete. To reduce confusion for

readers and to recognize that all the public comments would have been discussing the REPAYE plan, the Department will refer to the SAVE plan as REPAYE throughout this final rule.

These regulations are intended to address the challenges borrowers have in navigating the complexity of the student loan repayment system by ensuring access to a more generous, streamlined IDR plan, as well as to revise the terms and conditions of the REPAYE plan to make it easier to understand.

*Changes:* We have updated § 685.209(a)(1) to note that the REPAYE plan will also now be known as the Saving on a Valuable Education (SAVE) plan.

**General Opposition to Regulations**

*Comments:* Several commenters suggested that the Department delay implementation of the rule and work with Congress to develop a final rule that would be cost neutral. Relatedly, other commenters requested that we delay implementation and wait for Congress to review our proposals as part of a broader reform or reauthorization of the HEA. Several commenters asserted that the Administration has not discussed these repayment plan proposals with Congress.

*Discussion:* We disagree with the commenters and choose not to delay the implementation of this rule. The Department is promulgating this rule under the legal authority granted to it by the HEA, and we believe these steps are necessary to achieve the goals of making the student loan repayment system work better for borrowers, including by helping to prevent borrowers from falling into delinquency or default. Furthermore, the Department took the proper steps to develop these rules to help make the repayment plans more affordable. As prescribed in section 492 of the HEA, the Department requested public involvement in the development of the proposed regulations. We followed the appropriate process and obtained and considered extensive input and recommendations from those representing affected groups. The Department also participated in three negotiated rulemaking sessions with committee members that consisted of a variety of stakeholders representing public and private institutions, financial aid administrators, veterans, borrowers, students, and other affected constituencies. Following careful consideration of the feedback received during three week-long negotiation sessions, we published proposed regulations in the **Federal Register**. We explain the rulemaking process in more

detail at *www2.ed.gov/policy/highered/ reg/hearulemaking/2021/index.html*.

Regarding the suggestion that the rule be cost neutral, we believe the overall benefits outweigh the costs as discussed in the Costs and Benefits section within the RIA section of this document. There is no requirement that regulations such as this one be cost neutral.

The Department respects its relationship with Congress and has worked and will continue to work with the legislative branch on improvements to the Federal student aid programs, including making improvements to repayment plans.

*Changes:* None.

*Comments:* Many commenters disagreed with the Department's proposed modifications to the IDR plans, particularly the amendments to REPAYE. These commenters believed that borrowers knowingly entered into an agreement to fully repay their loans and should pay the full amount due. One commenter suggested that advising borrowers that they need only repay a fraction of what they borrowed undercuts the purpose of the signed promissory note. Many of these commenters expressed concern that the REPAYE changes were unfair to those who opted not to obtain a postsecondary education due to the cost, as well as to those who obtained a postsecondary education and repaid their loans in full.

*Discussion:* The IDR plans assist borrowers who are in situations in which their post-school earnings do not put them in a situation to afford their monthly student loan payments. In some cases, this might mean helping borrowers manage their loans while entering the workforce at their initial salary. It could also mean helping borrowers through periods of unanticipated financial struggle. And in some cases, there are borrowers who experience prolonged periods of low earnings. We reference the IDR plans on the master promissory note (MPN) that borrowers sign to obtain a student loan and describe them in detail on the Borrower's Rights and Responsibilities Statement that accompanies the MPN. The changes in this final rule do not remove the obligation to make required payments. They simply set those required payments at a level the Department believes is reasonable to avoid large numbers of delinquencies and defaults, as well as to help low- and middle-income borrowers manage their payments.

We disagree with the claim that the IDR plan changes do not benefit individuals who have not attended a postsecondary institution. The new REPAYE plan will be available to both

current and future borrowers. That means an individual who has not attended a postsecondary institution in the past but now chooses to do so, could avail themselves of the benefits of this plan. Moreover, allowing borrowers to choose a repayment plan based on their income and family size will result in more affordable payments and allow those individuals to avoid default which imposes additional costs on taxpayers as well as borrowers.

*Changes:* None.

*Comments:* A few commenters argued that REPAYE is intended to be a plan for borrowers who have trouble repaying the full amount of their debt; and that REPAYE should not be what a majority of borrowers choose, but rather, an alternate plan that borrowers may choose. These commenters further argued that Congress designed the IDR plans to be for exceptional circumstances where borrowers have a partial financial hardship [5] and that it is clear that a very large proportion of borrowers who could otherwise afford their full payments would instead choose REPAYE to reduce their payments.

*Discussion:* We believe that the new REPAYE plan will provide an affordable path to repayment for most borrowers. There is nothing in the HEA that specifies or limits how many borrowers should be using a given type of student loan repayment plan. And in fact, as discussed in the RIA, a majority of recent graduate borrowers are already using IDR plans. The Department is concerned that far too many student loan borrowers are at risk of delinquency and default because they cannot afford their payments on non-IDR plans. We are concerned that returning to a situation in which more than 1 million borrowers default on loans each year is not in the best interests of borrowers or taxpayers.

Defaults have negative consequences for borrowers, including reductions in their credit scores and resulting negative effects on access to housing and employment.[6] They may also lose significant portions of key anti-poverty benefits, such as the Earned Income Tax Credit (EITC), to annual offsets. Additionally, many of these borrowers never finished postsecondary education and are unlikely to re-enroll while in default. As a result, they likely will not

receive the earning gains one would expect from completing a postsecondary credential.

We believe the changes in this final rule will create a strong safety net for student borrowers and help more borrowers successfully manage their loans. At the same time, the taxpayers and Federal Government will also receive significant benefits. For example, avoiding default could spur some borrowers to continue their postsecondary journeys and complete their programs, which will help boost wages, tax receipts, and lower dependency on the broader safety net. Overall, we think these benefits of the final rule far outweigh the costs to taxpayers.

We also do not share the commenters' concerns about borrowers who could otherwise repay their loans on an existing plan, such as the standard 10-year plan, choosing to use this plan instead. If a borrower's income is particularly high compared to their debt, their payments under REPAYE will be higher than their payments on the standard 10-year plan, which would result in them paying their loan off faster. This has an effect similar to what occurs when borrowers voluntarily choose to prepay their loans—the government receives payments sooner than expected. Prepayments without penalty have been a longstanding feature of the Federal student loan programs. On the other hand, many high-income, high-balance borrowers may not want to choose an IDR plan because it could result in a longer period of repayment. While the monthly payment amount may be lower than the standard repayment plan for some high-income, high-balance borrowers, the term for an IDR plan spans 20 to 25 years as opposed to the standard 10-year term that is the default option for borrowers. Using this plan could result in high-income, high-balance borrowers paying back for a longer period and paying back a larger total amount, given that the borrower may be making interest-only payments for some time.

*Changes:* None.

*Comments:* A few commenters raised concerns that the proposed rules would recklessly expand the qualifications for IDR plans without providing sufficient accountability measures. These commenters argued that the regulations would undermine accountability in higher education. More specifically, these commenters believed that the IDR proposals must be coupled with an aggressive accountability measure that roots out programs where borrowers do not earn an adequate return on investment. Until such accountability

measure is in effect, these commenters called on the Department to delay the IDR proposals.

*Discussion:* We discuss considerations regarding accountability in greater detail in the RIA section of this regulation. This rule is part of a larger Department effort that focuses on improving the student loan system and includes creating a robust accountability infrastructure through regulation and enforcement. Those enforcement efforts are ongoing; the regulations on borrower defense to repayment, closed school loan discharges, false certification loan discharges, and others will go into effect on July 1, 2023; and the Department has other regulatory efforts in progress. The new IDR regulations benefit borrowers and do not interfere with those accountability measures. Therefore, a delay in the implementation date is unnecessary.

*Changes:* None.

*Comment:* One commenter suggested that borrowers have difficulty repaying their debts because underprepared students enter schools with poor graduation rates.

*Discussion:* The Department works together with States and accrediting agencies as part of the regulatory triad to provide for student success upon entry into postsecondary education. The issue raised by the commenter is best addressed through the combined efforts of the triad to improve educational results for students, as well as overall improvements to the K–12 education system before entry into a postsecondary institution.

*Changes:* None.

*Comment:* One commenter argued that the Department created an overly complex ICR plan that is not contingent on income; but instead focuses on factors such as educational attainment, marital status, and tax filing method, as well as past delinquency or default.

*Discussion:* We disagree with the commenter's claim that the REPAYE plan is overly complex and not contingent on income. As with the ICR or PAYE repayment plans, repayment is based on income and family size, which affects how much discretionary income a person has available. Other changes will streamline processes for easier access, recertification, and a path to forgiveness. Because of these benefits, REPAYE will be the best plan for most borrowers. Having one plan that is clearly the best option for most borrowers will address the most concerning sources of complexity during repayment, which is that borrowers are unsure whether to use an IDR plan or which one to choose. The most complicated elements of the

---

[5] See 88 FR 1896 and 20 U.S.C. 1098e.

[6] Kiviat, B. (2019). The art of deciding with data: evidence from how employers translate credit reports into hiring decisions. Socio-Economic Review, 17(2), 283–309. So, W. (2022). Which Information Matters? Measuring Landlord Assessment of Tenant Screening Reports. Housing Policy Debate, 1–27.

REPAYE plan will be carried out by the Department, including provisions to calculate the share of discretionary income a borrower must pay on their loans based upon the relative balances of loans they took out for their undergraduate education versus other loans. We believe this plan adequately and appropriately addresses borrowers' individual and unique circumstances.

*Changes:* None.

*Comments:* Several commenters argued that the proposed regulations could challenge the primacy of the Federal Pell Grant as the Federal government's primary strategy for college affordability and lead to the increased federalization of our higher education system. They further suggested that a heavily subsidized loan repayment plan could incentivize increased borrowing, which would increase the Federal role in the governance of higher education, particularly on issues of institutional accountability, which are historically and currently a matter of State policy. Commenters asserted that the proposed rule could correspondingly discourage State spending on higher education.

*Discussion:* The Department does not agree that the new IDR rules will challenge the Federal Pell Grant as the primary Federal student aid program for college affordability. The Pell Grant continues to serve its critical purpose of reducing the cost of, and expanding access to, higher education for students from low- and moderate-income backgrounds. The Department's long-standing guidance has been that Pell Grants are the first source of aid to students and packaging Title IV funds begins with Pell Grant eligibility.[7] However, many students still rely upon student loans and so we seek to make them more affordable for borrowers to repay.

We also disagree that these regulations will incentivize increased borrowing or discourage State spending on higher education. One central goal of the final rule is to make student loans more affordable for undergraduates. However, as discussed in the RIA, the rule does not change the total amount of Federal aid available to undergraduate students. Undergraduate borrowers, who receive the greatest benefit from the rule, have strict loan limits as laid out in Section 455 of the HEA. This rule does not and cannot amend those limits. Currently, undergraduate programs are subsidized most heavily by States, and States will continue to be incentivized

to support public higher education to meet unmet need.

The rule also does not amend the underlying structure of loans for graduate students. As set by Congress in the HEA, graduate borrowers have higher loan limits than undergraduate borrowers, including the ability to take on Grad PLUS loans up to the cost of attendance. As discussed in the RIA of this final rule, about half of recent graduate borrowers are already using IDR plans. The increased amount of income protected from payments will provide a benefit to someone who borrowed only for graduate school, however borrowers with only graduate debt will not see a reduction in their payment rate as a percentage of discretionary income relative to existing plans. Someone with undergraduate and graduate debt will receive a lower payment rate only in proportion to the share of their loans that were borrowed to attend an undergraduate program. We note the existing structure of the IDR plans and the terms of the graduate loan programs set by Congress already provide incentives for graduate borrowers to repay using an IDR plan, as evidenced by existing data on IDR plan usage. We think the added incentive effects provided by this rule for graduate borrowers are incremental and smaller than the current policies established by statute.

Finally, we note that the Department is engaged in separate efforts aimed at addressing debt at programs that do not provide sufficient financial value. In particular, an NPRM issued in May 2023 (88 FR 32300) proposes to terminate aid eligibility for career training programs whose debt outcomes show they do not prepare students for gainful employment in a recognized occupation. That same regulation also proposes to enhance the transparency of debt outcomes across all programs and to require students to acknowledge key program-level information, including debt outcomes, before receiving Federal student aid for programs with high ratios of annual debt payments to earnings. Separately, the Department is also working to produce a list of the least financially valuable programs nationwide and to ask the institutions that operate those programs to generate a proposal for improving their debt outcomes.

Overall, we believe these regulations will improve the affordability of monthly payments by increasing the amount of income exempt from payments, lowering the share of discretionary income factored into the monthly payment amount for most borrowers, providing for a shorter

maximum repayment period and earlier forgiveness for some borrowers, and eliminating the imposition of unpaid monthly interest, allowing borrowers to pay less over their repayment terms.

We also disagree with the commenters that the rule increases the Federal role in the governance of higher education. We believe that we found the right balance of improving affordability and holding institutions accountable as part of our role in the triad.

*Changes:* None.

*Comments:* Several commenters suggested that the overall generosity of the program is likely to drive many non-borrowers to take out student debt, as well as encourage current borrowers to increase their marginal borrowing and elicit unscrupulous institutions to raise their tuition.

One commenter believed that our proposal to forgive loan debt creates a moral hazard for borrowers, institutions of higher learning, and taxpayers. Another commenter suggested that since IDR is paid on a debt-to-income ratio, schools that generate the worst outcomes are the most rewarded in this system. The commenter believed this was problematic even for the borrowers who ultimately receive generous forgiveness, since it will lead many to use their limited Federal Pell Grant and Direct Loan dollars to attend a school that does little to improve their earning potential.

*Discussion:* The Department believes that borrowers are seeking relief from unaffordable payments, not to increase their debt-load. As with any new regulations, we employed a cost-benefit analysis and determined that the benefits greatly outweigh the costs. Borrowers will benefit from a more affordable REPAYE plan, and the changes we are making will help borrowers avoid delinquency and default.

The Department disagrees that this plan is likely to result in significant increases in borrowing among non-borrowers or additional borrowing by those already taking on debt. For one, this plan emphasizes the benefits for undergraduate borrowers and those individuals will still be subject to the strict loan limits that are established in Sec. 455 of the HEA[8] and have not been changed since 2008. For instance, a first-year dependent student cannot borrow more than $5,500, while a first-year independent student's loan is capped at $9,500. Especially for dependent students, these amounts are far below the listed tuition price for most institutions of higher education

---

[7] See Federal Student Aid Handbook, Volume 3, Chapter 7: Packaging Aid.

[8] 20 U.S.C. 1087e.

outside of community colleges. Data from the 2017–18 National Postsecondary Student Aid Study (NPSAS) show that a majority of dependent undergraduate borrowers already borrow at the maximum.[9] So, too, do most student loan borrowers at public and private nonprofit four-year institutions. Community college borrowers are the least likely to take out the maximum amount of loan debt, which likely reflects the lower prices charged. Community colleges generally offer tuition and fee prices that can be covered entirely by the maximum Pell Grant and enroll many students that exhibit signs of being averse to debt.[10]

We note that the shortened repayment period before forgiveness for borrowers with lower balances will also provide incentives for borrowers to keep their debt levels lower to qualify for earlier forgiveness. This may be particularly important at community colleges, where lower prices make it more feasible to complete a credential with lesser amounts of debt. We also disagree with the commenters' suggestion that this rule rewards institutions with the worst outcomes and encourages institutions to raise their prices. There is no indication that institutions increased tuition prices as a direct result of the creation of the original REPAYE plan, and we do not have evidence that institutions will increase prices as a result of the changes in this rule. However, the revised REPAYE plan will allow students who need to borrow to enroll in postsecondary education, earn a degree or credential, and increase their lifetime earnings while repaying their loan without being burdened by unaffordable payments.

Another reason to doubt these commenters' assertions that this rule will result in additional borrowing is that evidence shows that borrowers generally have low knowledge or awareness of the IDR plans, suggesting that borrowers are not considering these options when making decisions about whether to borrow and how much.[11] For

example, an analysis of the 2015–16 NPSAS data showed that only 32 percent of students reported having heard on any income-driven repayment plans.[12] Additionally, many students are debt averse and may still not wish to borrow even under more generous IDR terms established by this rule.[13]

Though we believe it is unlikely, in the RIA of this final rule we discuss alternative budget scenarios as well as the costs and benefits associated with additional borrowing were it to occur. This analysis shows that increases in borrowing will increase costs but additional borrowing and those associated costs are not always inherently problematic. While scholarships would be even more helpful to students, some evidence suggests that loans can help more borrowers pay for their tuition and living expenses, reduce their hours at work, and complete their college programs. Additional borrowing is problematic when it does not provide a return on investment, for example, when it does not help borrowers complete a high-quality program, but our goal with this regulation is to make certain that borrowers have affordable debts that they are able to successfully repay, not to minimize borrowing at all costs.

We also note that the Department is engaged in separate efforts related to accountability, which are already described above. This includes the gainful employment rule NPRM released on May 19, 2023.[14]

*Changes:* None.

*Comment:* One commenter observed that our proposals lacked a discussion of monthly payments versus total payments. The commenter believed that, while there is the potential for borrowers to make lower monthly payments, the extended period of payments could result in higher total payments. In contrast, the commenter noted that a higher monthly payment in a shorter time frame could result in lower total payments. This commenter believed that we must consider the impact on both monthly and total payments—and that any meaningful discussion must include this analysis.

*Discussion:* Varied amounts of payments due and time to satisfy the loan obligation have been part of the Direct Loan program since its inception. The possibility of a higher total amount repaid over the life of the loan may be a reasonable trade-off for borrowers who struggle to repay their loans. In developing this rule, we conducted analyses both in terms of monthly and total payments. Discussions of monthly payments help the public understand the most immediate effects on what a borrower will owe in a given period. The total payments were thoroughly assessed in the RIA of the IDR NPRM and that discussion considered broad questions about which types of borrowers were most likely to receive the greatest benefits. The Department modeled the change in lifetime payments under the new plan relative to the current REPAYE plan for future cohorts of borrowers, assuming full participation and considering projected earnings, nonemployment, marriage, and childbearing. These analyses suggest that on average, borrowers' lifetime total payments would fall under the new REPAYE plan. The RIA presents this analysis. It shows projected total payments for future repayment cohorts, discounted back to their present value if future borrowers were to choose the new REPAYE plan. These are broken down by quintile of lifetime income and include separate breakdowns of estimates for whether a borrower has graduate loans. Reductions in lifetime payments are largest for low- and middle-lifetime income borrowers but, on average, all quintiles see reductions in lifetime payments.

We continue to enhance the tools on the *StudentAid.gov* website that allow borrowers to compare the different repayment plans available to them. These tools show the monthly and total payment amounts over the life of the loan as this commenter requested, as well as the date on which the borrower would satisfy their loan obligation under each different plan and any amount of the borrower's loan balance that may be forgiven at the end of the repayment period. As an example, borrowers can use the "Loan Simulator" on the site to assist them in selecting a repayment plan tailored to their needs. To use the simulator, borrowers enter their anticipated or actual salary, the amount of their estimated or actual loan debt, and other data to perform the calculation needed to achieve goals listed. These goals include paying off their loans as quickly as possible, having a low monthly payment, paying the lowest amount over time, and

---

[9] Analysis from NPSAS 2017–18 via PowerStats, table reference wrfzjv.

[10] Boatman, A., Evans, B.J., & Soliz, A. (2017). Understanding Loan Aversion in Education: Evidence from High School Seniors, Community College Students, and Adults. AERA Open, 3(1). *https://doi.org/10.1177/2332858416683649.*

[11] For example, some estimates suggest that more than 40 percent of low-income borrowers did not know about IDR, and other research demonstrates confusion or lack of awareness about borrowing more generally (*e.g.,* Akers & Chingos (2014). Are College Students Borrowing Blindly? Washington, DC: Brookings Institution; Darolia & Harper (2018). Information Use and Attention Deferment in College Student Loan Decisions: Evidence From a Debt Letter Experiment. *Educational Evaluation and Policy Analysis,* 40(1); Sattelmeyer, Caldwell &

Nguyen (2023). *Best Laid (Repayment) Plans.* Washington, DC: New America).

[12] Anderson, Drew M., Johnathan G. Conzelmann, and T. Austin Lacy, The state of financial knowledge in college: New evidence from a national survey. Santa Monica, CA: RAND Corporation, 2018. *https://www.rand.org/pubs/working_papers/WR1256.html.*

[13] Boatman, A., Evans, B.J., & Soliz, A. (2017). Understanding Loan Aversion in Education: Evidence from High School Seniors, Community College Students, and Adults.

[14] 88 FR 32300.

paying off their loans by a certain date. We believe that the tools on the *StudentAid.gov* website are user-friendly and readily available to borrowers for customized calculations that we could not provide in this rule.

*Changes:* None.

*Comments:* Several commenters raised concerns about the interaction between REPAYE payments and the SECURE 2.0 Act of 2022.[15] According to one commenter, the SECURE 2.0 Act incentivizes retirement contributions related to student loan payments. This provision allows companies to provide employees with a match on their retirement contributions for making student loan payments. This commenter was concerned that borrowers may make costly mistakes by not taking advantage of matching funds.

*Discussion:* Under section 110 of the SECURE 2.0 Act, Congress permits—but does not require—employers to treat a borrower's student loan payments as elective deferrals for purposes of matching contributions toward that borrower's retirement plan. Although commenters hypothesize that borrowers could potentially miss out on retirement matching if a borrower is on a $0 IDR monthly payment, this specific provision of the SECURE 2.0 Act will take effect for contributions for plan years beginning on or after December 31, 2023.[16] We see no basis for holding our regulations for a provision that employers have not yet—and may not—use. Even if an employer were to adopt the Sec. 110(h) provision of the SECURE 2.0 Act to treat a borrower's student loan payments as elective deferrals for purposes of retirement matching contributions, borrowers always have the opportunity to prepay or make additional payments on their loans without penalty. Such additional payments could receive the matched contribution from their employer. Finally, as we stated in the IDR NPRM, student loan debt has become a major obstacle to meeting financial goals, and we believe saving for retirement is one of those goals for many. Contrary to the commenters' belief that these regulations could result in borrowers potentially missing out on matching funds, or make other costly mistakes, we believe that these repayment plans will facilitate and result in more borrowers achieving broad financial goals such as saving for a home or, in this case, retirement.

*Changes:* None.

*Comment:* One commenter believed that our proposed changes to the IDR plan give undergraduate borrowers a grant instead of a loan. This commenter asserted that it would be better to provide the funds upfront as grants, which may positively impact access, affordability, and success. This commenter further believed that providing grants upfront could reduce the amount of overall loan debt. The commenter further cites researchers who had similar conclusions.

*Discussion:* For almost 30 years, the Department has allowed borrowers to repay their loans as a share of their earnings under IDR plans, but it has never considered these programs to be grant or scholarship programs. These student loan repayment plans are different in important respects from grants or scholarships. Many borrowers will repay their debt in full under the new plan. Only borrowers who experience persistently low incomes, relative to their debt burdens, over years will not repay their debt. Moreover, because borrowers cannot predict their future earnings, they will face significant uncertainty over what their payments will be over the full length of the repayment period. While some borrowers will receive forgiveness, many borrowers will repay their balances with interest. The IDR plans are repayment plans for Federal student loans that will provide student loan borrowers greater access to affordable repayment terms based upon their income, reduce negative amortization, and result in lower monthly payments, as well as help borrowers to avoid delinquency and defaults.

*Changes:* None.

*Comments:* Many commenters expressed the view that it is unacceptable that people who never attended a postsecondary institution or who paid their own way to attend should be expected to pay for others who took out loans to attend a postsecondary institution.

*Discussion:* We disagree with the commenters' position that the IDR plan changes do not benefit individuals who have not attended a postsecondary institution. This plan will be available to current and future borrowers, including individuals who have not attended a postsecondary institution but may in the future.

As outlined in the RIA, just because someone has not yet pursued postsecondary education also does not mean they never will. There are many students who first borrow for postsecondary education as older adults well past the age of those who go to college straight from high school.

Similarly, there are many borrowers who re-enroll in postsecondary education after having already repaid their past loans. In both cases these borrowers may take on this debt because they are looking to make a career switch, gain new skills to compete in the labor force, or for other reasons. This plan would be available for both these current and future borrowers.

We also note that investments in postsecondary education provide broader societal benefits. Increases in postsecondary attainment have spillover benefits to a broader population, including individuals who have not attended college. For instance, there is evidence that increases in college attainment increases productivity for both college-educated and non-college educated workers.[17] Increases in education levels have also been shown to increase civic participation and improve health and well-being for the next generation.[18]

*Changes:* None.

## Legal Authority

### General

*Comment:* A group of commenters argued that the proposed rule would violate statute and exceed the Department's authority which could result in additional confusion to borrowers, increase delinquencies, or increase defaults.

*Discussion:* Congress has granted the Department clear authority to create income-contingent repayment plans under the HEA. Specifically, Sec. 455(e)(4)[19] of the HEA provides that the Secretary shall issue regulations to establish income-contingent repayment schedules that require payments that vary in relation to the borrowers' annual income. The statute further states that loans on an ICR plan shall be "paid over an extended period of time prescribed by the Secretary," and that "[t]he Secretary shall establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are necessary to effectively implement income contingent repayment." These provisions intentionally grant discretion to the Secretary around how to construct the specific parameters of ICR plans. This includes discretion as to how long a borrower must pay (except that it cannot exceed 25 years). In other words, the statute sets an explicit upper

---

[15] Public Law 117–328, Division T of the Consolidated Appropriations Act of 2023.

[16] See section 110(h) of Public Law 117–328, Division T of the Consolidated Appropriations Act of 2023.

[17] Public Law 117–328, Division T of the Consolidated Appropriations Act of 2023.

[18] See section 110(h) of Public Law 117–328, Division T of the Consolidation Appropriations Act of 2023.

[19] 20 U.S.C. 1087e(e)(4).

limit, but no lower limit for the "extended period" time that a borrower must spend in repayment. The statute also gives the Secretary discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income and that the payment calculation must account for the spouse's income if the borrower is married and files a joint tax return.

This statutory language clearly grants the Secretary authority to make the changes in this rule related to the amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends. Each of those parameters has been determined independently through the rulemaking process and related analyses and will be established in regulation through this final rule, as authorized by the HEA.

The same authority governs many of the more technical elements of this rule as well. For instance, the treatment of awarding a weighted average of pre-consolidation payments and the catch-up period are the Department's implementation of requirements in Sec. 455(e)(7) of the HEA, which lays out the periods that may count toward the maximum repayment period established by the Secretary. We have crafted the regulatory language to comply with the statutory requirements while recognizing the myriad ways a borrower progresses through the range of repayment options available to them.

ED has used its authority under Sec. 455 of the HEA three times in the past: to create the first ICR plan in 1995 (59 FR 61664) (FR Doc No: 94–29260), to create PAYE in 2012 (77 FR 66087), and to create REPAYE in 2015 (80 FR 67203).[20] In each instance, the Department provided a reasoned basis for the parameters it chose, just as we have in this final rule. Congress has made minimal changes to the Department's authority relating to ICR in the intervening years, even as it has acted to create and then amend the IBR plan, first in 2007 in the College Cost Reduction and Access Act (CCRAA) (Pub. L. 110–84) and then in 2010 in the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152). The 2007 CCRAA that created IBR also expanded the types of time periods that can count toward the maximum repayment period on ICR. Congress also left the underlying terms of ICR plans in place when it improved access to

automatic sharing of Federal tax information for the purposes of calculating payments on IDR in 2019.

Sec. 455(d)(1) through (4) of the HEA also provide authority for other elements of this rule. These provisions grant the Secretary the authority to choose which plans are offered to borrowers, which we are leveraging to sunset future enrollments in the PAYE and ICR plan for student borrowers. Similarly, Sec. 455(d)(4) of the HEA provides the Secretary with discretion to craft "an alternative repayment plan," under certain circumstances. Through this rule, the Secretary is using that discretion to establish a structure for a repayment option for borrowers who fail to recertify their income information on REPAYE. For most borrowers, the alternative plan payments will be based upon how much that borrower would have to pay each month to pay off the debt with 10 years of equally sized monthly payments. This amount will be specific to each borrower, as balances and interest rates vary for each individual. This approach is necessary to design a functioning alternative repayment plan for borrowers.

The treatment of interest in this plan is authorized by a combination of authorities. Congress has granted the Secretary broad authority to promulgate regulations to administer the Direct Loan Program and to carry out his duties under Title IV. *See, e.g.,* including 20 U.S.C. 1221e–3, 1082, 3441, 3474, 3471. *See, e.g.,* 20 U.S.C. 1221e–3 ("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department"). The Secretary has determined that the regulations addressing interest will improve the Direct Loan Program and make it more equitable for borrowers. More specifically, Sec. 455(e)(5) of the HEA specifies how to calculate the amounts due on monthly payments; but allows the Secretary discretion in calculating the borrower's balance, which is exercised here to manage the accrual of interest above and beyond the interest that the borrower pays each month.

The interest benefit in this final rule is a modification of the existing interest benefit provided on the REPAYE plan. That provision has been in place since the plan's creation in 2015. It includes the statutory requirement that the Department does not charge any interest that is not covered by a borrower's monthly payment during the first three years of repayment on a subsidized loan and the Department does not charge half

of all remaining interest that is not covered by the borrower's monthly payment for all other periods in REPAYE. For unsubsidized loans, the Department does not charge half of all remaining interest that is not covered by the borrower's monthly payment as long as the loan is in REPAYE. That benefit has been part of the program for more than 7 years and the Department's authority for providing that protection has not been challenged, nor has Congress passed any legislation to change or eliminate that benefit. Though the size of the benefit in this final rule is different, the underlying rationale and authority are the same. The REPAYE plan was originally created in response to a June 2014 Presidential Memorandum directing the Department to take steps to give more borrowers access to affordable loan payments, with a focus on borrowers who would otherwise struggle to repay their loans. At that time, the Department thought the changes in REPAYE would be sufficient to accomplish this goal. However, the concerns described in that memorandum persist today, as the number of borrowers who default on their Federal loans has not appreciably declined since the REPAYE plan was created in 2015. In fact, the number of defaults in the 2019 Federal fiscal year were higher than in 2015, even as the number of annual borrowers declined over that period.[21]

Part of the Department's responsibilities in operating the Federal financial aid programs is to make certain that borrowers have available clear information on how to navigate repayment. In some cases, that means addressing tensions and ambiguity that exist in the law. For instance, under Sec. 428(c)(3) of the HEA (20 U.S.C. 1078(c)(3)) we exercised our authority to promulgate regulations to allow borrowers participating in AmeriCorps to receive a forbearance on repayment of their loans during the period they are serving in those positions.[22] At the same time, Congress has established that borrowers may pursue Public Service Loan Forgiveness if they meet certain requirements related to employment and their loan repayment plan. That confuses borrowers who must choose between pausing their payments entirely versus making progress toward forgiveness with a monthly payment that could be far less than what they owe on the standard 10-year plan, potentially as low as $0. Similarly, a borrower who is unemployed may have

[20] https://www.govinfo.gov/content/pkg/FR-1994-12-01/html/94-29260.htm

[21] https://studentaid.gov/sites/default/files/DLEnteringDefaults.xls

[22] See 34 CFR 685.205(a)(4).

a $0 payment on their IDR plan but may also be able to obtain an unemployment deferment. The Department is using its broad authority under section 410 of the General Education Provisions Act (GEPA), (20 U.S.C 1221e–3), HEA section 432,[23] and sections 301, 411, and 414 of the Department of Education Authorization Act [24] to promulgate regulations to govern the student loan programs and address such areas of inconsistency and to award credit in situations where a borrower uses certain types of deferments and forbearances that indicate a high risk of confusion or tension when choosing from among the potential for a $0 payment on an IDR plan, repayment statuses that provide credit for PSLF, and the ability to pause payments.

Some provisions in this rule derive from changes made by the 2019 Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act (Pub. L. 116–91). That legislation amended Sec. 6103 of the Internal Revenue Code (IRC) [25] to allow the Department to obtain Federal tax information from the Internal Revenue Service (IRS) if the borrower provided approval for the disclosure of such information. That authority is being used to automatically calculate a borrower's IDR payment if they have gone 75 days without making a payment or are in default and they have provided the necessary approvals to us.

Within all these authorities are implicit and explicit limiting principles. The Secretary must issue regulations that follow the requirements in the HEA. When the language grants specific discretion to the Secretary or is otherwise allows for more than one interpretation, the Department must provide a reasoned basis for the choices it makes, as we have done in this rule. For instance, the amount of income protected from payments is the greatest amount that we believe can be justified on a reasoned basis at this time. Similarly, the amount of discretionary income paid on loans for a borrower's undergraduate study reflects our analysis of the comparative benefits accrued by undergraduate and graduate borrowers under different payment calculations. We have developed this rule with the goal of getting more undergraduate borrowers, particularly those at risk of delinquency and default, to enroll in IDR plans at rates closer to the higher levels of existing graduate borrower enrollment.

As explained, the Department has the authority to promulgate this final rule. The changes made in this rule will ultimately reduce confusion and make it easier for borrowers to navigate repayment, choose whether to use an IDR plan, and avoid delinquency and default.

*Changes:* None.

*Comments:* Commenters raised a series of individual concerns about the legality of every significant proposed change in the IDR NPRM, especially increasing the income protection threshold to 225 percent of FPL, reducing payments to 5 percent of discretionary income on undergraduate loans, the treatment of unpaid monthly interest, counting periods of deferment and forbearance toward forgiveness, and providing a faster path to forgiveness for borrowers with lower original principal balances.

*Discussion:* The response to the prior comment summary discusses the overarching legal authority for the final rule. We also discuss the legality of specific provisions for individual components throughout this section. However, the Department highlights the independent nature of each of these components. This regulation is composed of a series of distinct and significant improvements to the REPAYE plan that individually provide borrowers with critical benefits. Here we identify the ones that received the greatest public attention through comments; but the same would be true for items that did not generate the highest amount of public interest, such as the treatment of pre-consolidation payments, access to IBR in default, automatic enrollment, and other parameters. Increasing the amount of income protected from 150 percent to 225 percent of the FPL will help more low-income borrowers receive a $0 payment and reduced payment amounts for borrowers above that income level that will also help middle-income borrowers. Those steps will help reduce rates of default and delinquency and help make loans more manageable for borrowers. Reducing to 5 percent the share of discretionary income put toward payments on undergraduate loans will also target reductions for borrowers with a non-zero-dollar payment. As noted in the IDR NPRM and again in this final rule, undergraduate borrowers represent the overwhelming majority of borrowers in default. These changes target the reduction in payments to undergraduate borrowers to make their payments more affordable and help them avoid delinquency and default. Ceasing the charging of interest that is not covered

by a borrower's monthly payment addresses concerns commonly raised by borrowers that quickly accruing interest can leave borrowers feeling like IDR is not working for them as their loan balances grow and they become discouraged about the possibility of repaying their loan. Providing borrowers with lower loan balances a path to forgiveness after as few as 120 monthly payments will help make IDR a more attractive option for borrowers who traditionally are at a high risk of delinquency and default. It will also provide incentives to keep borrowing low.

Each of these new provisions standing independently is clearly superior to the current terms of REPAYE or any other IDR plan. That is critical because one of the Department's goals in issuing this final rule is to create a plan that is clearly the best option for the vast majority of borrowers, which will help simplify and streamline the process for borrowers to choose whether to go onto an IDR plan as well as which plan to pick. That simplicity will help all borrowers but can particularly matter for at-risk borrowers trying to navigate the system. Each of these provisions, standing on its own, contributes significantly to that goal.

The result is that each of the components of this final rule can operate in a manner that is independent and severable of each other. The analyses used to justify their inclusion are all different. And while they help accomplish similar goals, they can contribute to those goals on their own.

Examples highlight how this is the case. Were the Department to only maintain the interest benefit in the existing REPAYE plan while still increasing the income protection, borrowers would still see significant benefits by more borrowers having a $0 payment and those above that 225 percent of FPL threshold seeing payment reductions. Their total payments over the life of the loan would change, but the most immediate concern about borrowers being unable to afford monthly obligations and slipping into default and delinquency would be preserved. Or consider the reduction in payments without the increased income protection. That would still assist borrowers with undergraduate loans and incomes between 150 and 225 percent of FPL to drive their payments down, which could help them avoid default. Similarly, the increased income protection by itself would help keep many borrowers out of default by giving more low-income borrowers a $0 payment, even if there was not additional help for borrowers above that

---

[23] 20 U.S.C. 1082.
[24] 20 U.S.C. 3441, 3471, and 3474.
[25] 26 U.S.C. 6103, *et. seq.*

225 percent FPL threshold through a reduction in the share of discretionary income that goes toward payments.

Providing forgiveness after as few as 120 payments for the lowest balance borrowers can also operate independently of other provisions. As discussed, both in the IDR NPRM and this final rule, although borrowers with lower balances have among the highest default rates, they are generally not enrolling in IDR in large numbers. A shortened period until forgiveness, even without other reductions in payments, would still make this plan more attractive for these borrowers, as a repayment term of up to 20 years provides a disincentive to enrolling in REPAYE even if that plan otherwise provides significant benefits to the borrower.

The same type of separate analysis applies to the awarding of credit toward forgiveness for periods spent in different types of deferments and forbearances. The Department considered each of the deferments and forbearances separately. For each one, we considered whether a borrower was likely to have a $0 payment, whether the borrower would be put in a situation where there would be a conflict that would be hard to understand for the borrower (such as engaging in military service and choosing between time in IDR and pausing payments), and whether that pause on payments was under the borrower's control or not (such as when they are placed in certain mandatory administrative forbearances). Moreover, a loan cannot be in two different statuses in any given month. That means it is impossible for a borrower to have two different deferments or forbearances on the same loan. Therefore, the awarding of credit toward forgiveness for any given deferment or forbearance is separate and independent of the awarding for any other. These deferments and forbearances also operate separately from the other payment benefits. A month in a deferment or forbearance is not affected by a month at any of the other provisions that affect payment amounts, including the higher FPL, reduction in discretionary income, or treatment of interest.

*Changes:* None.

*Comments:* Several commenters asserted that through this regulation the Department is advising student loan borrowers that they can expect to repay only a fraction of what they owe, which, they argue, undercuts the legislative intent of the Direct Loan program as well as the basic social contract of borrowing. Additionally, these commenters alleged that having current

borrowers fail to repay their student loans jeopardizes the entire Federal loan program.

*Discussion:* The Department has not and will not advise borrowers that they can expect to repay a fraction of what they owe. The purpose of these regulations, which implement a statutory directive to provide for repayment based on income, is to make it easier for borrowers to repay their loans while ensuring that borrowers who do not have the financial resources to repay do not suffer the lasting and harmful consequences of delinquency and default. We also note that forgiveness of remaining loan balances has long been a possibility for borrowers under different circumstances (such as Public Service Loan Forgiveness and disability discharges)[26] and under other IDR repayment plans.[27]

*Changes:* None.

### Historical Authority

*Comments:* Several commenters argued that the underlying statutory authority in sections 455(d) and (e) of the HEA cited by the Department did not establish the authority for the Department to make the proposed changes to the REPAYE plan.

Commenters argued this position in several ways. Commenters cited comments by a former Deputy Secretary of Education during debates over the passage of the 1993 HEA amendments that there would not be a long-term cost of these plans because of the interest borrowers would pay. Commenters cited that same former official as noting that any forgiveness at the end would be for some limited amounts remaining after a long period. As further support for this argument, the commenters argued that Congress did not explicitly authorize the forgiveness of loans in the statute, nor did it appropriate any funds for loan forgiveness when it created this authority.

Using this historical analysis, commenters argued that Congress never intended for the Department to create changes to REPAYE that would result in at least partial forgiveness for most student loan borrowers. Many commenters referred to this situation as turning the loan into a grant. Several commenters argued that Congress established the ICR program as revenue-neutral without authorizing cancellation of borrowers' debt.

*Discussion:* Nothing in the HEA requires ICR plans or Department regulations to be cost neutral. Congress

included the authority for ICR plans when it enacted the Direct Loan Program and left it to the Department to establish the specific provisions of the plans through regulations. Forgiveness of the remaining loan balance after an established time has been a part of the IDR plans since the creation of the Direct Loan Program in 1993–1994.[28] Over the past 30 years, Congress has not reduced opportunities for loan forgiveness, but instead has expanded them, including through IBR and Public Service Loan Forgiveness. We also note that in 1993, Congress appropriated funds to cover all cost elements of the Direct Loan Program, including the ICR authority. Therefore, there was no need to have a separate appropriation.[29] However, the Department has always thoughtfully considered the costs and benefits of our rules as reflected in the RIA.

*Changes:* None.

### History of Subsequent Congressional Action

*Comments:* Several commenters argued that the history of Congressional action with respect to IDR plans in the years since the ICR authority was created show that the proposed changes are contrary to Congressional intent. Commenters noted that since the 1993 HEA reauthorization, Congress has only made three amendments to the ICR language: (1) to allow Graduate PLUS borrowers to participate and prevent parent PLUS borrowers from doing so; (2) to allow more loan statuses to count toward the maximum repayment period; and (3) to give the Department the ability to obtain approval from a borrower to assist in the sharing of Federal tax information from the IRS. These commenters argued that if Congress had wanted the Department to make changes of the sort proposed in the IDR NPRM it would have done so during those reauthorizations.

Other commenters argued along similar lines by pointing to other statutory changes to student loan repayment options since 1993. They cited the creation of the IBR plan and Public Service Loan Forgiveness in the 2007 CCRAA, as well as subsequent amendments to the IBR plan in 2010, as proof that Congress had considered the parameters of Federal student loan repayment and forgiveness programs and created a strong presumption that Congress did not delegate that authority to the Department. In recounting this

---

[26] See *www.studentaid.gov/manage-loans/forgiveness-cancellation.*

[27] Secs. 455(d)(1)(D) and (E) and 493C of the HEA.

[28] See HEA section 455(e).

[29] Hearing of the Committee on Labor and Human Resources to Amend the Higher Education Act of 1965, 103rd Cong. (1993), 48, available at: *www.files.eric.ed.gov/fulltext/ED363187.pdf.*

history, commenters also argued that changes made in 2012 to create PAYE and in 2014 to create REPAYE were unlawful.

Other commenters cited unsuccessful attempts by Congress to pass legislation to change the repayment plans as further proof that the Department does not have the legal authority to take these actions. They mentioned attempts to pass legislation that would adjust the terms of IDR plans, forgive a set amount of outstanding debt right away, and other similar legislative efforts that did not become law as proof that had Congress wanted to act in this space it would have done so.

*Discussion:* The commenters have mischaracterized the legislative and regulatory history of the Direct Loan Program. As previously discussed, the Secretary has broad authority to develop and promulgate regulations for programs he administers, including the Direct Loan Program under section 410 of GEPA.[30] Section 455(d)(1)(D) of the HEA gives the Secretary the authority to determine the repayment period under an ICR plan with a maximum of 25 years. Congress did not specify a minimum repayment period and did not limit the Secretary's authority to do so. We also note that, over the past decades in which these plans have been available, Congress has not taken any action to eliminate the PAYE and REPAYE plans or to change their terms. ED has used this authority three times in the past: to create the first ICR plan in 1995, to create PAYE in 2012, and to create REPAYE in 2015. The only time Congress acted to constrain or adjust the Department's authority relating to ICR was in 2007 legislation when it provided more specificity over the periods that can be counted toward the maximum repayment period. Even then, it did not adjust language related to how much borrowers would pay each month. Congress also did not address these provisions when it improved access to automatic sharing of Federal tax information for the purposes of calculating payments on ICR in 2019.

Congress has also not included any language related to these plans in annual appropriations bills even as it has opined extensively on a number of other issues related to student loan servicing. For instance, appropriations bills for multiple years in a row have consistently laid out expectations for the construction of new contracts for the companies hired by the Department to service student loans. Appropriations language also created the Temporary

Expanded Public Service Loan Forgiveness Program.

*Changes:* None.

## Major Questions and Separation of Powers

*Comments:* Several commenters argued that the changes to REPAYE violate the major questions doctrine and would violate the constitutional principal of separation of powers. They pointed to the ruling in *West Virginia* v. *EPA* to argue that courts need not defer to agency interpretations of vague statutory language and there must be "clear Congressional authorization" for the contemplated action. They argued that the cost of the proposed rule showed that the regulation was a matter of economic significance without Congressional authorization. They also noted that the higher education economy affects a significant share of the U.S. economy.

Commenters also argued that the changes had political significance since they were mentioned during the Presidential campaign and as part of a larger plan laid out in August 2022 that included the announcement of one-time student debt relief. To further that argument, they pointed to additional legislative efforts by Congress to make a range of changes to the loan programs over the last several years. These include changes to make IDR more generous, cancel loan debt, create new accountability systems, make programs more targeted, make programs more flexible for workforce education, and others. Some commenters took arguments related to one-time debt relief even further, saying that because some parameters of the proposed changes to REPAYE and one-time debt relief were announced at the same time that they are inextricably linked.

The commenters then argued that neither of the two cited sources of general statutory authority—Sections 410 and 414 of GEPA—provides sufficient statutory basis for the proposed changes.

A different set of commenters said the "colorable textual basis" in the vague statutory language was not enough to authorize changes of the magnitude proposed in the IDR NPRM.

Given these considerations, commenters said that the Department must explain how the underlying statute could possibly allow changes of the magnitude contemplated in the proposed rule.

*Discussion:* The rule falls comfortably within Congress's clear and explicit statutory grant of authority to the Department to design a repayment plan based on income. *See* HEA section

455(d)–(e).[31] This is discussed in greater detail in response to the first comment summary in this subsection of the preamble.

The Department disagrees that the Supreme Court's *West Virginia* decision undermines the Department's authority to promulgate the improvements to IDR. That decision described "extraordinary cases" in which an agency asserts authority of an "unprecedented nature" to take "remarkable measures" for which it "had never relied on its authority to take," with only a "vague" statutory basis that goes "beyond what Congress could reasonably be understood to have granted." [32] The rule here does not resemble the rare circumstances described in *West Virginia*. There is nothing unprecedented or novel about the Department relying on section 455 of the HEA as statutory authority for designing and administering repayment plans based on income. In addition, under Section 493C(b) of the HEA,[33] the Secretary is authorized to carry out the income-based repayment program plan. Indeed, as previously discussed, the Code of Federal Regulations has included multiple versions of regulations governing income-driven repayment for decades.[34] Yet Congress has taken no action to limit the Secretary's discretion to develop ICR plans that protect taxpayers and best serve borrowers and their families.

As such, the rule is consistent with the Secretary's clear statutory authority to design and administer repayment plans based on income.

*Changes:* None.

## Administrative Procedure Act

*Comments:* Commenters argued that the extent of the changes proposed in the IDR NPRM exceed the Department's statutory authority and violate the Administrative Procedure Act (APA). They argued that converting loans into grants was not statutorily authorized and this proposal is instead providing what they considered to be "free college."

*Discussion:* The Department does not agree with the claim that the REPAYE plan turns a loan into a grant. Borrowers who have incomes that are above 225 percent of FPL and are high relative to their debt will repay their debt in full under the new plan. Borrowers with incomes consistently below 225 percent of FPL or with incomes that are low

---

[30] 20 U.S.C. 1221e–3.

[31] 20 U.S.C. 1087e(d)–(e).

[32] 142 S. Ct. at 2609.

[33] 20 U.S.C. 1098e(b).

[34] *See, e.g.,* 60 FR 61820 (Dec. 1, 1995); 73 FR 63258 (Oct. 23, 2008).

relative to their debt will receive some loan cancellation. In many cases, loan cancellation will come after borrowers have made interest and principal payments on the loan and, as a result, the amount cancelled will be smaller than the original loan. Many borrowers default under the current system because they cannot afford to repay their loans, and even the more aggressive collection efforts available to the Department once a borrower defaults frequently do not result in full repayment. The IDR plans are repayment plans for Federal student loans that will provide student loan borrowers greater access to affordable repayment terms based upon their income, reduce negative amortization, and result in lower monthly payments, as well help borrowers to avoid delinquency and default.

*Changes:* None.

*Comments:* Commenters argued that the rule violates the APA, because it was promulgated on a contrived reason. In making this argument, they cited *Department of Commerce* v. *New York,* in which the Supreme Court overruled attempts to add a question related to citizenship on the 2020 census because the actual reason for the change did not match the goals stated in the administrative record. The commenters argued that if the Department's goals for this rule were truly to address delinquency and default, or to make effective and affordable loan plans, we would have tailored the parameters more clearly. The commenters pointed to the fact that borrowers with incomes at what they calculated to be the 98th percentile would be the point at which it does not make sense to choose this plan, as well as protecting an amount of income at the 78th percentile for a single person between the ages of 22 to 25 as proof that it is not targeted.

The commenters argued that this lack of targeting shows that the actual goal of the plan is unstated. The commenters theorized that an unstated goal must be to create a "free college" plan by another name. They argued that the Department must more explicitly state that its goal is to replace some loans with grants or explain why it is providing such extensive untargeted subsidies.

*Discussion:* In the IDR NPRM and in this preamble, the Department provides a full explanation of the rationale for and purpose of these final rules. These final rules are consistent with, and, in fact, effectuate, Congress' intent to provide income-driven repayment plans that provide borrowers with terms that put them in a position to repay their loans without undue burden. Contrary

to the claims made by these commenters, these rules do not turn loans into grants and have no connection to legislative proposals made for free community college.

*Changes:* None.

*Vesting Clause*

*Comments:* Commenters argued that the changes to REPAYE would violate the vesting clause by creating an unconstitutional delegation of legislative power to the Department. They claimed that the Department's reading of the authority granted by the 1993 HEA provision is overly broad and lacks any sort of limiting principle to what the commenters described as unfettered and unilateral discretion of the Secretary. They argued that such an expansive view of this authority was untenable.

*Discussion:* In this rule, the Department is exercising the authority given to it by Congress in Section 455(d) and (e) of the HEA (20 U.S.C. 1087e(d) and (e)) to establish regulations for income contingent repayment plans, as it has done several times previously. The Department is further exercising its rulemaking authority under Sec. 414 of the Department of Education Organization Act (20 U.S.C. 3474) to prescribe rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Department. Finally, under Sec. 410 of GEPA (20 U.S.C. 1221e–3), the Secretary is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department. These rules further improve the IDR plans and are consistent with the Secretary's authority to administer the Direct Loan program.

Contrary to the claims by the commenters, these regulations reflect and are consistent with statutory limits on the Secretary's authority to establish rules for ICR plans under Sec. 455 of the HEA. For instance, the HEA provides that a borrower's payments must be based upon their adjusted gross income, that it must include the spouse's income if the borrower is married and files a joint tax return, and that repayment cannot last beyond 25 years. Similarly, the statutory language does not provide for partial forgiveness over a period of years as it does in other parts of the HEA. For example, under the Teacher Loan Forgiveness Program, borrowers may be eligible for forgiveness of up to $17,500 on their Federal student loans if they teach full time for 5 complete and consecutive academic years in a

low-income school or educational service agency, and meet other qualifications. *See,* HEA section 460 (20 U.S.C. 1087j).

Other limitations arise from the interaction between the HEA and the Administrative Procedure Act. When crafting a regulation, the Department must have a reasoned basis for the changes it pursues and they must be allowable under the statute. For instance, we do not believe there is a reasonable basis at this time for a regulation that protects 400 percent of FPL. We have reviewed available research, looked into signs of material distress from borrowers, and see nothing that gives us a reasoned basis to protect that level of income.

The final rule is therefore operating within the Secretary's statutory authority. We developed these regulations based upon a reasoned basis for action.

*Changes:* None.

*Appropriations Clause*

*Comments:* Commenters argued that because Congress did not specifically authorize the spending of funds for the proposed changes to REPAYE, the proposed rules would violate the appropriations clause. They argued, in particular, that cancellation of debt requires specific Congressional appropriation, and that the Department has not identified such a Congressional authorization. They argued that the treatment of unpaid monthly interest, the protection of more income, the reductions of the share of discretionary income put toward payments, and forgiveness sooner on small balances are all forms of cancellation that are not paid for. Along similar lines, other commenters argued that the proposed changes would turn the loan program into a grant and such a grant is not paid for under the HEA. These commenters pointed to language used by the Department about creating a safety net for borrowers as proof that these changes would make loans into grants. They argued that such grants would result in spending that is neither reasonable nor accountable since there is no clear expectation that amounts would be repaid.

*Discussion:* These commenters mischaracterize the Department's rules. These rules modify the REPAYE payment plan to better serve borrowers and make it easier for them to satisfy their repayment obligation. They do not change the loan to a grant. In section 455 of the HEA, Congress provided that borrowers who could not repay their loans over a period of time established by the Secretary would have the

remaining balance on the loans forgiven. That has been a part of the Direct Loan Program since its original implementation in 1994. The new rules are a modification of the prior rules to reflect changing economic conditions regarding the cost of higher education and the burden of student loan repayment on lower income borrowers. Over the years, Congress has provided for loan forgiveness or discharge in several different circumstances and, in the great majority of situations, including loan forgiveness resulting from an IDR repayment plan, the costs are paid through mandatory expenditures. The new rules simply modify the terms of an existing loan repayment plan, established under Congressional authority, and will be paid for through the same process.

The commenters similarly misunderstand the goal in highlighting this plan as a safety net for borrowers. The idea of a safety net is not to provide an upfront grant, it is to provide a protection for borrowers who are unable to repay their debt because they do not make enough money.

*Changes:* None.

### 225 Percent Income Protection Threshold

*Comments:* Commenters argued that nothing in the 1993 HEA amendments authorized the Department to protect as much as 225 percent of FPL. Along those lines, other commenters argued that Congress took action to set the income protection threshold at 100 percent of FPL in 1993, then raised it to 150 percent in 2007, and Congress did not intend to raise it higher.

*Discussion:* Section 455(e)(4) of the HEA authorizes the Secretary to establish ICR plan procedures and repayment schedules through regulations based on the appropriate portion of annual income of the borrower and the borrower's spouse, if applicable. Contrary to the assertion of the commenter, the HEA did not establish the threshold of 100 percent of FPL for ICR.

The Student Loan Reform Act of 1993 provided that loans paid under an income contingent repayment plan would have required payments measured as a percentage of the appropriate portion of the annual income of the borrower as determined by the Secretary. The decision to set that portion of income at a borrower's income minus the FPL was a choice made by the Department when it promulgated regulations for the Direct Loan Program in 1994.

In 2007, Congress passed the CCRAA, which created the IBR plan and set the income protection threshold at 150 percent of the FPL for purposes of IBR. However, Congress did not apply the same threshold to ICR. The HEA prescribes no income protection threshold for ICR. Instead, Congress retained the language in Sec. 455(e)(4) of the HEA (20 U.S.C. 1087e(e)(4)) that gives the Secretary the discretion to establish the rules for ICR repayment schedules. The Secretary is exercising that discretion here. In 2012, when we created PAYE, we raised the income protection threshold, among other provisions, to 150 percent to align with IBR.

For this rule, the Department has recognized that the economy, as well as student borrowers' debt loads and the extent to which they are able to repay have changed substantially and the Department has conducted a new analysis to establish the appropriate amount of protected income. This analysis is based upon more recent data and reflects the current situation of the student loan portfolio and the circumstances for individual student borrowers, which is unquestionably different than it was three decades ago and has even shifted in the 11 years since the Department increased the income protection threshold for an ICR plan when we created PAYE. Since 2012, the total amount of outstanding Federal student loan debt and the number of borrowers has grown by over 70 percent and 14 percent, respectively.[35] This increase in outstanding loan debt has left borrowers with fewer resources for their other expenses and impacts their ability to buy a house, save for retirement, and more. We reconsidered the threshold to provide more affordable loan payments to student borrowers. The Department chose the 225 percent income protection threshold based on an analysis of data from the U.S. Census Bureau's Survey of Income and Program Participation (SIPP) for individuals aged 18–65 who attended postsecondary institutions and who have outstanding student loan debt. The Department looked for the point at which the share of those who report material hardship—either being food insecure or behind on their utility bills—is statistically different from those whose family incomes are at or below the FPL.

*Changes:* None.

### Interest Benefits

*Comments:* Commenters argued that the underlying statutory authority does not allow for the Department's proposal to not charge unpaid monthly interest to borrowers. They argued that the ICR statutory language requires the Secretary to charge the borrower the balance due, which includes accrued interest. Similarly, they argue that the statute requires the Secretary to establish plans for repaying principal and interest of Federal loans. They also noted that the statutory text discusses how the Department may choose when to not capitalize interest, which shows that Congress considered what flexibilities to provide to the Secretary and that does not include the treatment of interest accrual. They also pointed to changes made to the HEA in the CCRAA that changed the treatment of interest accrual on subsidized loans as proof that Congress considered whether to give the Secretary more flexibility on the treatment of interest and chose not to do so. Some commenters also pointed to the fact that the previous most generous interpretation of this authority for interest benefits—the current REPAYE plan—did not go as far on not charging unpaid monthly interest as the proposed rule.

*Discussion:* Sec. 455(e)(5) of the HEA (20 U.S.C. 1087e(e)(5)) defines how to calculate the balance due on a loan repaid under an ICR plan. However, it does not restrict the Secretary's discretion to define or limit the amounts used in calculating that balance. Beyond that, section 410 of GEPA,[36] provides that ''The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department,'' which includes the Direct Loan program. Similarly, section 414 of the Department of Education Organization Act [37] authorizes the Secretary to ''prescribe such rules and regulations as the Secretary determines are necessary or appropriate to administer and manage the functions of the Secretary or the Department.'' We also note that while section 455(e)(5) of the HEA defines how to calculate the balance due on a loan repaid under an ICR plan, it does not restrict the Secretary's discretion to define or limit the amounts used in calculating that balance. These regulations reflect the Secretary's judgment as to how that balance should be calculated.

The interest benefit provided in these regulations is one aspect of the many distinct, independent, and severable changes to the REPAYE plan included

---

[35] Federal Student Aid Portfolio Summary, available at: *studentaid.gov/data-center/student/ portfolio.*

[36] 20 U.S.C. 1221e–3.
[37] 20 U.S.C. 3474.

in these rules that will allow borrowers to be in a better position to repay more of their loan debt, which is in the best interests of the taxpayers. Defaults do not benefit taxpayers or borrowers.

*Changes:* None.

*Comment:* Commenters argued that since Congress has passed laws setting the interest rate on student loans that the Department lacks the authority to not charge unpaid monthly interest because doing so is akin to setting a zero percent interest rate for some borrowers.

*Discussion:* The HEA has numerous provisions establishing different interest rates and different interest rate formulas on Federal student loans during different periods as well as limiting the amount of unpaid monthly interest that may be capitalized. See, for example, HEA sections 427A [38] and 455(e)(5).[39] Those provisions do not require that the maximum interest rate be charged to borrowers at all times during the life of the loan. The HEA and the Department's regulations [40] have long included different provisions providing that interest will not be charged in a variety of circumstances, including under income-driven repayment plans. See, for example, Sec. 428(b)(1)(M) of the HEA [41] and 34 CFR 685.204(a) (interest not charged during periods of deferment on subsidized loans); 34 CFR 685.209(a)(2)(iii) (unpaid interest not charged for first three years under PAYE); Sec. 455(a)(8) of the HEA [42] and 34 CFR 685.211(b) (interest rate can be reduced as repayment incentive); and 34 CFR 685.213(b)(7)(ii)(C) (if borrower's loan is reinstated after initial disability discharge, interest not charged during period in which payments not required). Congress has never taken action to reverse those provisions. Therefore, there is no support for the commenters' suggestion that the statutory provisions regarding the maximum interest rate are determinative of when that rate must be charged.

*Changes:* None.

*Comments:* Commenters argued that the Department did not specify whether interest that is not charged will be treated as a canceled debt or as revenue that the Secretary decided to forego. In the latter situation, the commenters argued that the Department has not established how unilaterally forgoing interest is not an abrogation of amounts owed to the U.S. Treasury, as

established in the Master Promissory Note.

*Discussion:* The determination of the accounting treatment of interest that is not charged as cancelled debt or foregone interest is not determinative of the Secretary's authority to set the terms of IDR plans.

*Changes:* None.

*Deferment and Forbearance*

*Comments:* Commenters argued that the Department lacked the statutory authority to award credit toward forgiveness for a month spent in a deferment or forbearance beyond the economic hardship deferment already identified in section 455(e)(7) of the HEA. They argued that the 2007 changes to include economic hardship deferments in ICR showed that Congress did not intend to include other statuses. They also pointed to the underlying statutory language that provides that the only periods that can count toward forgiveness are times when a borrower is not in default, is in an economic hardship deferment period, or made payments under certain repayment plans. They asserted that the Department cannot otherwise count a month toward forgiveness when a monetary payment is not made. Commenters also noted that this approach toward deferments and forbearances is inconsistent with how the Department has viewed similar language under sections 428(b)(1)(M) [43] and 493C(b)(7) [44] of the HEA.

*Discussion:* The provisions in Sec. 455(e)(7) of the HEA are not exclusive and do not restrict the Secretary's authority to establish the terms of ICR plans. That section of the HEA prescribes the rules for calculating the maximum repayment period for which an ICR plan may be in effect for the borrower and the time periods and circumstances that are used to calculate that maximum repayment period. It is not intended to define the periods under which a borrower may receive credit toward forgiveness. The commenters did not specify what they meant in terms of inconsistent treatment, but the Department is not proposing to make underlying changes to the terms and conditions related to borrower eligibility for a given deferment or forbearance or how the borrower's loans are treated during those periods in terms of the amount of interest that accumulates. Rather, we are concerned that, despite the existence of the IDR plans, borrowers are ending up in deferments or forbearances when they would have

had a $0 payment on IDR and would be gaining credit toward ultimate loan forgiveness. This concern has become more pronounced over time as the Department has taken a closer look at how payment counts toward IDR are being tracked and how successful borrowers are at navigating forgiveness programs as the first cohorts of borrowers are reaching the point when they would be eligible for relief. These problems would not have been as immediately pressing in past instances of rulemaking since borrowers would not yet have been eligible for forgiveness so the effect on borrowers getting relief would not have been readily observable. This change reflects updated information available to the Department about how to make repayment work better. Finally, we note that these changes would not be applied to FFEL loans held by lenders.

*Changes:* None.

*10-Year Cancellation*

*Comments:* Commenters argued that the creation of PSLF in 2007 showed that Congress did not intend for the Department to authorize forgiveness as soon as 10 years for borrowers not eligible for that benefit.

Other commenters argued that HEA section 455(e)(5), which states that payments must be made for "an extended period of time" implies that the time to forgiveness must be longer than 10 years' worth of monthly payments but less than 25 years.

*Discussion:* HEA section 455(d)(1)(D) requires the Secretary to offer borrowers an ICR plan that varies annual repayment amounts based upon the borrower's income and that is paid over an extended period of time, not to exceed 25 years.

For the lowest balance borrowers, we believe that 10 years of monthly payments represents an extended period of time. Borrowers with low balances are most commonly those who enrolled in postsecondary education for one academic year or less. This provision, therefore, requires that a borrower repay their loan for a period that can be 10 times longer than the duration of their enrollment in postsecondary education. The Department agrees that as balances increase, the amount of time to repay should be extended. We, therefore, used a slope that increases the amount of time to repay as balances grow, up to the maximum of 25 years' worth of monthly payments as provided in the HEA.

In response to the commenters who asserted that the proposed rule violated Congressional intent because of the varying payment caps for PSLF and

---

[38] 20 U.S.C. 1077a.

[39] 20 U.S.C. 1087(e)(5).

[40] See, for example, §§ 685.202(a), 685.209(a)(2)(iii), 685.209(c)(2)(iii)(A) and 685.221(b)(3).

[41] 20 U.S.C. 1078(b)(1)(M).

[42] 20 U.S.C. 1087e(a)(8).

[43] 20 U.S.C. 1078(b)(1)(M).

[44] 20 U.S.C. 1098e(b)(7).

non-PSLF borrowers, we disagree. PSLF is a separate program created by Congress. For most borrowers, PSLF will offer them forgiveness over a much shorter period than what they would otherwise have, even under the more generous terms created by this rule.

*Changes:* None.

*Federal Claims Collections Standards*

*Comments:* A few commenters argued that the proposed rule violated the Federal Claims Collection Standards (FCCS). They pointed to 31 U.S.C. 3711(a), which requires the heads of Federal agencies to try to collect debts owed to the United States and cited regulations stemming from that provision that also require agencies to "aggressively" collect debts owed to agencies. They argued that since the statute does not grant the Department the authority to waive, modify, or cancel these debts, that it must abide by these financial management duties. In particular, they argued that choosing not to charge unpaid monthly interest would violate those obligations.

Several commenters also argued that granting forgiveness after as few as 10 years' worth of payments violated the FCCS because those borrowers would be the ones most likely able to repay their debts due to their small loan balances. Shortened time to forgiveness would mean the Department is failing to aggressively collect debt due.

*Discussion:* The Department disagrees with these commenters. The FCCS requires agencies to try to collect money owed to them and provides guidance to agencies that functions alongside the agencies' own regulations addressing when an agency should compromise claims. The Department has broad authority to settle and compromise claims under the FCCS and as reflected in 34 CFR 30.70. The HEA also grants the Secretary authority to settle and compromise claims in Section 432(a)(6) [45] of the HEA. This IDR plan, however, is not the implementation of the Department's authority to compromise claims, it is an implementation of the Department's authority to prescribe income-contingent repayment plans under Sec. 455 of the HEA.

The Department also disagrees that low-balance borrowers are most likely to be able to repay their debts. In fact, multiple studies as well as Department administrative data establish that lower balance borrowers are at a far greater likelihood of defaulting on their loan than those with larger balances. As noted in the IDR NPRM, 63 percent of

[45] 20 U.S.C. 1082(a)(6).

borrowers in default had original loan balances of $12,000 or below. While it is true that lower balances equate to lower loan payments, the commenter fails to consider that many borrowers with lower balances either did not complete a postsecondary program or obtained only a certificate. They likely received lower financial returns and demonstrably are more likely to struggle with repaying their loans. For borrowers with persistently low income, requiring payments for 20 years would not result in substantial increases in payments. In other words, reducing the time to forgiveness for such borrowers would not lead to large amounts of forgone payments.

*Changes:* None.

**Definitions (§ 685.209(b))**

*Comments:* Several commenters suggested modifying the definition of "family size" to simplify and clarify language in the proposed regulations. One commenter suggested that we revise the definition of "family size" to better align it with the definition of a dependent or exemption on Federal income tax returns, similar to changes made to simplify the Free Application for Federal Student Aid (FAFSA) that begin in the 2024–2025 cycle. Another commenter stated that changing the definition of "family size" in this manner will streamline the IDR process and make it easier to automatically recertify a borrower's participation without needing supplemental information from the borrower.

*Discussion:* We appreciate the commenters' suggestions to change the definition of "family size" to simplify the recertification process and make the definition for FAFSA and IDR consistent. We agree that it is important that borrowers be able to use data from their Federal tax returns to establish their household size for IDR. Doing so will make it easier for borrowers to enroll and stay enrolled in IDR. For that reason, we have added additional clarifying language noting that information from Federal tax returns can be used to establish household size.

The Department notes that in the IDR NPRM we did adopt one key change in the definition of "family size" that is closer to IRS treatment and is being kept in this final rule. That change is to exclude the spouse from the household size if the borrower is married filing separately. Prior to this change it was possible for a borrower on the IBR, ICR, or PAYE plans to file separately and still include the spouse in their household. (This was not possible in the REPAYE plan because it always required the inclusion of the spouse's income

regardless of whether the borrower was married filing jointly or separately.) The Department believes that if the spouse's income is not being counted for the purpose of establishing payment amounts then the spouse should not be included in the household size, which has the effect of protecting more income from payments.

As noted in the Implementation Date of These Regulations section, the Department will be early implementing this change on July 30, 2023. Between that date and July 1, 2024, borrowers completing the electronic application will have their spouse automatically excluded from their household size if they are married and file a separate tax return. Those who file separately and wish to include their spouse in their household size will have to complete the separate alternative documentation of income process to include the spouse's income. This change will affect any IDR plan chosen by Direct Loan borrowers. It will not be early implemented for FFEL borrowers.

Beyond that change that was also in the IDR NPRM, the Department chose not to adjust the definition of "family size" to match the IRS definition because we are concerned about making the process of determining one's household size through a manual process too onerous or confusing. The family size definition we proposed in the IDR NPRM captures many of the same concepts the IRS uses in its definition of dependents. This includes considering that the individual receives more than half their support from the borrower, as well as that dependents other than children must live with the borrower. The full IRS definition includes other considerations appropriate for tax filing but that could confuse borrowers when they determine who to include in their household size for IDR. These considerations include a cap on the amount of income an individual could have to be considered a dependent and provisions for how to address which household a child of a divorced couple should be included within. By using a simplified, easy to understand definition of family size, borrowers will have the ability to accurately modify the family size data retrieved from the IRS. Additionally, the definition explains when the borrower is permitted to include the spouse in the family size for all IDR plans.

*Changes:* We added subparagraph (ii) to the definition of "family size" in § 685.209(b).

*Comments:* One commenter urged the Department to create consistent treatment for all student loan borrowers (including borrowers with Direct Loans,

FFELs and graduate and Parent PLUS borrowers in both programs) under our regulations. This commenter argued that the divisions between FFEL and Direct Loans frustrate borrowers and generate resentment. The commenter also believes these changes would reduce complexity in the student loan system and particularly help Black and Hispanic borrowers who need to borrow loans to pay for their education.

*Discussion:* The Department supports aligning program regulations for Direct Loan and FFEL borrowers where appropriate and permitted by statute and has determined it is appropriate to align the definition of "family size" in § 682.215(a)(3) of the FFEL program regulations with the definition in § 685.209(b), with the exception of § 685.209(b)(ii), which must be excluded because the FUTURE Act only permits the sharing of tax information from the IRS to the Department and not to private parties who hold FFEL loans. The alignment of the definition in § 682.215(a)(3) provides for the exclusion of the borrower's spouse from the family size calculation except for borrowers who file their Federal tax return as married filing jointly.

The Department will work with FFEL partners, including lenders and guaranty agencies, to make sure that borrowers repaying their FFEL loans under the IBR plan are treated consistently with Direct Loan borrowers with respect to borrowers' family size. Unlike the comparable changes to the Direct Loan program, this change will not be early implemented and will instead go into effect on July 1, 2024. We are treating FFEL loans differently in this case to make certain there is sufficient time to adjust systems and avoid a situation where some lenders voluntarily choose to implement this change and others do not.

*Changes:* We have revised the definition of "family size" in § 682.215(a)(3) to align with the definition of "family size" in § 685.209(b).

*Comment:* One commenter suggested that we include definitions and payment terms related to all of the IDR plans, not just REPAYE, because borrowers may be confused about which terms apply to which plans. This commenter recommended adding additional subsections in the regulations to eliminate confusion.

*Discussion:* Effective July 1, 2024, we will limit student borrowers to new enrollment in REPAYE and IBR. We do not believe that any additional changes to the other plans are necessary. Overall, we think the reorganization of the regulatory text to put all IDR plans in one place will make it easier to understand the terms of the various plans.

*Changes:* None.

**Borrower Eligibility for IDR Plans (§ 685.209(c))**

*Comments:* Many commenters supported our proposed changes to the borrower eligibility requirements for the IDR plans. However, many commenters expressed concern that we continued the existing exclusion of parent PLUS borrowers from the REPAYE plan. These commenters argued that parent PLUS borrowers struggle with repayment just as student borrowers do, and that including parents in these regulations would be a welcome relief.

Commenters also expressed concern that our proposed regulations excluded Direct Consolidation Loans that repaid a parent PLUS loan from the benefits that student borrowers would receive. These commenters noted that parents may have borrowed student loans to finance their own education in addition to taking out a parent PLUS loan to pay for their child's education.

One commenter alleged that the Direct Consolidation Loan repayment plan for parent PLUS borrowers is not as helpful compared to the other repayment plans. This commenter noted that the only IDR plan available to parent PLUS borrowers when they consolidate is the ICR plan, which uses an income protection calculation based on 100 percent of the applicable poverty guideline compared to 150 percent of the applicable poverty guideline for the other existing IDR plans. The commenter also noted that the only IDR plan available to borrowers with a Direct Consolidation Loan that repaid a parent PLUS loan requires parents to pay 20 percent of their discretionary income compared to 10 percent for the other existing IDR plans available to students. Together, these conditions make monthly payments unmanageable for parent PLUS borrowers according to this commenter.

One commenter noted that while society encourages students to obtain a college degree due to the long-term benefits of higher education, tuition is so expensive that oftentimes students are unable to attend a university or college without assistance from parents. In this commenter's view, the Department has structured an IDR plan for parent PLUS borrowers that is unfair and punitive to parents. The commenter also noted that parent PLUS borrowers who work an additional job to help with expenses will have an increase in AGI, which leads to higher monthly loan payments the following year.

One commenter said that excluding parent PLUS borrowers from most IDR plans, especially parents of students who also qualify for Pell Grants, suggested that the Department is not concerned that parents are extremely burdened by parent PLUS loan payments. Several commenters stated that if parents are still unable to access the REPAYE plan benefits, some or all of those repayment improvements should be implemented into the ICR plan available to parent PLUS borrowers.

One commenter asserted that students attending Historically Black Colleges and Universities (HBCUs) are more likely to rely on parent PLUS loans than students attending other institutions. The commenter further stated that given racial disparities in college affordability, the proposed REPAYE plan should be amended to include Direct Consolidation loans that repaid Direct or FFEL parent PLUS Loans.

*Discussion:* While we understand that some parent PLUS borrowers may struggle to repay their debts, parent PLUS loans and Direct Consolidation loans that repaid a parent PLUS loan will not be eligible for REPAYE under these final regulations. The HEA has long distinguished between parent PLUS loans and loans made to students. In fact, section 455(d)(1)(D) and (E) of the HEA prohibit the repayment of parent PLUS loans through either ICR or IBR plans.

Following changes made to the HEA by the Higher Education Reconciliation Act of 2005, the Department determined that a Direct Consolidation Loan that repaid a parent PLUS loan first disbursed on or after July 1, 2006, could be eligible for ICR.[46] The determination was partly due to data limitations that made it difficult to track the loans underlying a consolidation loan, as well as recognition of the fact that a Direct Consolidation Loan is a new loan. In granting access to ICR, the Department balanced our goal of allowing the lowest-income borrowers who took out loans for their dependents to have a path to low or $0 payments without making benefits so generous that the program would fail to acknowledge the foundational differences established by Congress between a parent who borrows for a student's education and a student who borrows for their own education. The income-driven repayment plans provide a safety net for student borrowers by allowing them to repay their loans as a share of their earnings over a number of years. Many Parent

---

[46] fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0602.pdf.

PLUS borrowers are more likely to have a clear picture of whether their loan is affordable when they borrow because they are older than student borrowers, on average, and their long-term earnings trajectory is both more known due to increased time in the labor force and more likely to be stable compared to a recent graduate starting their career. Further, because parent PLUS borrowers do not directly benefit from the educational attainment of the degree or credential achieved, the parent PLUS loan will not facilitate investments that increase the parent's own earnings. The parent's payment amounts are not likely to change significantly over the repayment period for the IDR plan. Moreover, parents can take out loans at any age, and some parent PLUS borrowers may be more likely to retire during the repayment period. Based on Department administrative data, the estimated median age of a parent PLUS borrower is 56, and the estimated 75th percentile age is 62. As such, the link to a 12-year amortization calculation in ICR reflects a time period during which these borrowers are more likely to still be working.

We appreciate and agree with the commenter's concern about racial disparities in college affordability, and we recognize that students attending HBCUs often rely on parent PLUS loans. However, we do not agree that making Direct Consolidation Loans that repaid a parent PLUS loan eligible for REPAYE is the appropriate way to address that issue. The Department supports numerous ways to improve affordability for all borrowers, including parent PLUS borrowers, and address resource inequities faced by HBCUs and the students they serve. Parent PLUS loans have benefited from the pause on payments and interest, and they are eligible for President Biden's plan to cancel to up to $20,000 in student debt. The Department delivered approximately $3 billion of additional American Rescue Plan funding to HBCUs, Tribally Controlled Colleges and Universities (TCCUs), Minority Serving Institutions (MSIs), and Strengthening Institutions Program (SIP) institutions. Additionally, the Department's proposed budget for Fiscal Year 2024 would increase investments in capacity building and student success efforts at these institutions and provide up to $4,500 in tuition assistance to students at HBCUs, TCCUs, and MSIs. The Department will continue to explore ways to make college affordable for all students and address racial disparities. We will also continue to explore all available options, including

legislative recommendations, regulatory amendments, and other means to identify ways to make certain that parent PLUS borrowers are able to successfully manage and repay their loans.

*Changes:* None.

*Comment:* One commenter emphatically stated that the Department should not under any circumstances expand this proposed rule to make parent PLUS loans eligible for REPAYE. The commenter further stated that while earnings are uncertain but likely to grow for most borrowers, parent PLUS borrowers' earnings are more established and consistent. Allowing these loans to be eligible for REPAYE would make the proposed rule far more expensive and regressive.

*Discussion:* We agree with the commenter that parents borrowing for their children are different than student borrowers and have more established and consistent earnings. As discussed previously, we know that many parent PLUS borrowers do struggle to repay their loans, but we do not believe that including consolidation loans that repaid a parent PLUS loan in REPAYE is the appropriate way to address that problem given the difference between students and parents borrowing for their child's education.

The Department is taking some additional steps in this final rule to affirm our position about the treatment of parent PLUS loans or Direct consolidation loans that repaid a parent PLUS loan being only eligible for the ICR plan In the past, limitations in Department data may have enabled a parent PLUS loan that was consolidated and then re-consolidated to enroll in any IDR plan, despite the Department's position that such loans are only eligible for the ICR plan. The Department will not adopt this clarification for borrowers in this situation currently on an IDR plan because we do not think it would be appropriate to take such a benefit away. At the same time, the Department is aware that a number of borrowers have consolidated or are in the process of consolidating in response to recent administrative actions, including the limited PSLF waiver and the one-time payment count adjustment. Because some of these borrowers may be including parent PLUS loans in those consolidations without understanding that they would need to exclude that loan type to avoid complicating their future IDR eligibility, we will be applying this clarification for any Direct Consolidation loan made on or after July 1, 2025.

*Changes:* We added § 685.209(c)(5)(iii) to provide that a

Direct Consolidation loan made on or after July 1, 2025, that repaid a parent PLUS loan or repaid a consolidation loan that at any point paid off a parent PLUS loan is not eligible for any IDR plan except ICR.

**Limitation on New Enrollments in Certain IDR Plans (§ 685.209(c)(2), (3), and (4))**

*Comments:* Several commenters raised concerns about the Department's proposal in the IDR NPRM to prevent new enrollments in PAYE and ICR for student borrowers after the effective date of the regulations. They noted that these plans are included in the MPN that borrowers signed. Several commenters pointed out that the Department has not previously eliminated access to a repayment plan for borrowers even if they are not currently enrolled on such plan. These commenters also argued that some of the plans being limited might provide lower total payments for borrowers than REPAYE, especially for graduate borrowers who could receive forgiveness after 20 years on PAYE.

One commenter suggested that we consider ceasing enrollment in IBR for new borrowers—other than borrowers in default—to simplify repayment options and possibly reduce the cost of the plan if high-income graduate borrowers use REPAYE before switching back into IBR to receive forgiveness.

*Discussion:* The MPN specifically provides that the terms and conditions of the loan are subject to change based on any changes in the Act or regulations. This provides us with the legal authority to prohibit new enrollment in PAYE and ICR. However, we do not believe it is appropriate to end a repayment plan option for borrowers currently using that plan who wish to continue to use it. Therefore, no borrower will be forced to switch from a plan they are currently using. For example, a borrower already enrolled in PAYE will be able to continue repaying under that plan after July 1, 2024.

The Department also does not think limiting new enrollment in PAYE or ICR creates an unfair limitation for student borrowers not currently enrolled in those plans. Borrowers in repayment will have a year to decide whether to enroll in PAYE. This provides them with time to decide how they want to navigate repayment. The overwhelming majority of borrowers not currently in repayment have loans that should be eligible for the version of IBR that is available to new borrowers on or after July 1, 2014. That plan has terms that are essentially identical to PAYE. Given that borrowers will have time to choose

Case 6:24-cv-01057-DDC-ADM Document 1-1 Filed 03/28/24 Page 18 of 86

their plan, have access to REPAYE, and most likely have access to IBR if they are not currently in repayment, the simplification benefits far exceed the size of this population.

Accordingly, the Department has retained the structure in the IDR NPRM. Student borrowers will not be eligible to access PAYE or ICR after July 1, 2024, although consolidation loans that repaid a parent PLUS loan will maintain access to ICR. Any borrower on PAYE or ICR as of July 1, 2024 will maintain access to those plans so long as they do not switch off those plans, and the limitation only applies to those not enrolled in those plans on that date.

In response to the commenter's suggestion to consider sunsetting new enrollment in IBR, we do not believe that sunsetting the IBR plan is permitted by section 493C(b) of the HEA which authorized the IBR plan. For the PAYE and ICR plans, both of which are authorized by the same statutory provisions that are distinct from those that establish IBR, we believe it is appropriate to limit new enrollment and to prevent re-enrollment in those plans for borrowers who choose to leave REPAYE.

In the IDR NPRM, we proposed limitations on switching plans out of concern that a borrower with graduate loans may pay for 20 years on REPAYE to receive lower payments, then switch to IBR and receive forgiveness immediately. We proposed limiting such a switch after the equivalent of 10 years of monthly payments (120 payments) so that borrowers would have adequate time to choose and not feel suddenly stuck in one plan.

However, we are changing the way the limitation on switching from REPAYE to IBR will work in this final rule. Instead of applying a cumulative payment limit, which could include time prior to July 1, 2024, we are prohibiting borrowers from switching to IBR after making the equivalent of 5 years of payments (60 months) on REPAYE starting after July 1, 2024. Applying this requirement prospectively makes certain that no borrower is inadvertently excluded from the plan and that we can properly enforce this requirement. This is especially important as the Department works to award IDR credit through the one-time payment count adjustment. However, because we are restricting this prospectively, we agree with the commenter that a shorter amount of allowable time on REPAYE is appropriate. Accordingly, we reduced the amount of time a borrower can spend on REPAYE and still change

plans to half of the time we proposed in the IDR NPRM.

*Changes:* We have clarified that only borrowers who are repaying a loan on the PAYE or ICR plan as of July 1, 2024, may continue to use those plans and that if such a borrower switches from those plans they would not be able to return to them. We maintain the exception for borrowers with a Direct Consolidation Loan that repaid a Parent PLUS loan. These borrowers will still be able to access ICR after July 1, 2024. We have amended § 685.209(c)(3)(ii) to stipulate that a borrower who makes 60 monthly payments on REPAYE after July 1, 2024, may no longer switch from REPAYE to IBR.

**Income Protection Threshold (§ 685.209(f))**

*General Support for Income Protection Threshold*

*Comments:* Many commenters supported the Department's proposal to set the income protection threshold at 225 percent of the FPL. As one commenter noted, the economic hardship caused by a global pandemic and the steady rise in the cost of living over the last 40 years have left many borrowers struggling to make ends meet resulting in less money to put toward student loans. The commenter noted that the proposed change would allow borrowers to protect a larger share of their income so that they do not have to choose between feeding their families and making student loan payments.

A few commenters agreed that providing more pathways to affordable monthly payments would reduce the overall negative impact of student debt on economic mobility. They further suggested that it would increase a borrower's ability to achieve other financial goals, such as purchasing a home or saving for emergencies. Another commenter noted that the proposed change will provide greater economic security for many borrowers and families, particularly those whose rent represents too large a share of their income,[47] and will help borrowers impacted by rising housing costs, inflation, and other living expenses.

One commenter noted that requiring payments only for those who earn more than 225 percent of FPL, as opposed to 150 percent of the FPL, will positively impact people of color attempting to thrive in the work world after completing their degree.

Another commenter considered the increased income protection a major step forward. This commenter noted

---

[47] *https://www.huduser.gov/portal/pdredge/pdr_edge_featd_article_092214.html.*

---

that early childhood educators, paraprofessionals, and other low- to moderate-wage workers often find the current income-driven payment system unaffordable, causing these individuals to often go in and out of deferment or forbearance.

*Discussion:* We thank the many commenters who supported our proposed changes. We understand that many borrowers have been struggling to make ends meet and have less money to put toward student loans. We believe these final regulations will result in more affordable monthly payments for many borrowers, particularly the borrowers who struggle the most. Providing more affordable monthly payments will in turn help reduce rates of delinquency and default among borrowers.

*Changes:* None.

*General Opposition to Income Protection Threshold*

*Comments:* According to one commenter, an increase in the threshold provides extensive benefits even to high-income borrowers. Notably, however, the commenter remarked that it also makes payments substantially more affordable for low-income borrowers.

Another commenter noted that changing the income protection threshold from 150 percent to 225 percent of the FPL was the single costliest provision of the proposed regulations and noted that the reason for the high cost was because both undergraduate and graduate loans would be eligible for the higher income protection threshold. This commenter recommended that we maintain the income protection threshold at 150 percent for graduate loans to strike a balance of targeting benefits to the neediest borrowers while also protecting taxpayers' investment.

Several commenters opposed the proposed revisions to the income protection threshold, saying that it would be wrong to force taxpayers to effectively cover the full cost of a postsecondary education. One commenter felt that the proposed changes were morally corrupt, noting that many borrowers would pay nothing under this plan, forcing taxpayers to cover the full amount. Others argued that it was unfair to set the amount of income protected at 225 percent of FPL because that amount would be substantially above the national median income for younger adults, including those who did not attend college.

*Discussion:* While it is true that the increase in the income protection threshold protects more income from

being included in payment calculations, the Department believes this change is necessary to provide that borrowers have sufficient income protected to afford basic necessities. Moreover, as noted in the IDR NPRM, this threshold captures the point at which reports of financial struggles are otherwise statistically indistinguishable from borrowers with incomes at or below the FPL. Additionally, this protection amount provides a fixed level of savings for borrowers that does not increase once a borrower earns more than 225 percent of FPL. For the highest income borrowers, the payment reductions from this increase could eventually be erased due to the lack of a payment cap equal to the amount the borrower would pay under the standard 10-year plan. This achieves the Department's goal of targeting this repayment plan to borrowers needing the most assistance. As the commenter remarked, and with which we concur, our increase of the income protection threshold to 225 percent of FPL would result in substantially more affordable payments for low-income borrowers.

In response to the commenter who opined that the shift from 150 percent of the FPL to 225 percent was the single costliest provision in these regulations, we discuss in greater detail the cost of this regulation in the RIA section of this document. We decline to adopt the commenter's recommendation of using a threshold of 150 percent of FPL for graduate borrowers because we believe this income protection threshold provides an important safety net for borrowers to make certain that they have a baseline level of resources. In choosing this threshold, we conducted an analysis of student loan borrowers and looked at the point at which the share of borrowers reporting a material hardship, either being food insecure or behind on their utility bills, was statistically indistinguishable from those whose family incomes are at or below the FPL and found that those at 225 percent of the FPL were statistically indistinguishable from those with incomes below 100 percent of the FPL. Moreover, we are concerned about the complexity of varying both the amount of income protected and the amount of unprotected income used to calculate payments based upon loan types.

We disagree with the commenter's concerns that the income protection threshold is too high because it is higher than the median income for young adults. Borrowers who fail to complete a degree or certificate will likely have similar earnings compared to borrowers who do not go to college but will have student loan debt they need to repay,

even if they did not receive a financial benefit from their additional education. In 2020, median full-time full-year income for high school graduates aged 25 to 34 was $36,600 while the discretionary income threshold at 225 FPL would have been $28,710 for a single individual.[48] Therefore, even a borrower who worked full time but did not receive any financial benefit from the education for which they borrowed would still make loan payments under the new REPAYE plan.

In response to the commenters who opposed our income protection threshold provisions on the grounds that it would be wrong to force taxpayers to pay for the borrower's education and be morally corrupt, we note that the costs associated with delinquency and default would be detrimental to both the taxpayers and the individual borrower. Moreover, we provided further discussion elsewhere in this section, *Income Protection Threshold,* as to why we remain convinced that it is appropriate set the threshold at 225 percent of the FPL.

*Changes:* None.

*Higher Income Protection Amounts*

*Comment:* Commenters argued that the proposed protection threshold of 225 percent was too low and was beneath what most non-Federal negotiators had suggested during the negotiated rulemaking sessions.

*Discussion:* As discussed during the negotiated rulemaking sessions, the Department agreed with the non-Federal negotiators that the amount of income protected under the current regulations is too low. Accordingly, in § 685.209(f)(1), the Department increased the amount of discretionary income exempted from the calculation of payments in the REPAYE plan to 225 percent of the FPL. We chose this threshold based on an analysis of data from the 2020 SIPP[49] for individuals aged 18 to 65, who attended postsecondary institutions, and had outstanding student loan debt. The Department looked for the point at which the share of those who report material hardship—either being food insecure or behind on their utility bills—was statistically different from those whose family incomes are at or below their respective FPL. The Department never proposed protecting an amount of income above 225 percent of the FPL during the negotiations, and

---

[48] nces.ed.gov/fastfacts/display.asp?id=77.
[49] www.census.gov/programs-surveys/sipp/data/datasets/2020-data/2020.html.

consensus was not reached during the negotiations.

*Changes:* None.

*Comments:* Many commenters argued for protecting a larger amount of the FPL than the Department proposed. One commenter suggested that the income protection threshold be increased to 300 to 350 percent of FPL to meet basic needs, specifically for families with young children, and increased to 400 percent for those with high medical expenses. Other commenters recommended using a threshold above 400 percent. They said this amount would better reflect borrowers' true discretionary income after they pay for housing, food, child care, elder care, health insurance premiums, utilities, and transportation bills.

Other commenters argued for increasing the amount of income protected on the grounds that the borrowers most likely to benefit from the increase disproportionately include first-generation college students, as well as those who are immigrants, Black, and Latino.

*Discussion:* The Department disagrees with the suggestions to increase the amount of income protected. We base payments on the marginal amount of income above that threshold. As a result, we determine the payment on the amount of a borrower's income above the 225 percent FPL threshold, rather than on all of their income. For someone who earns just above 225 percent of FPL, their payments will still be minimal.

Here, we illustrate the payment amount for a single borrower earning income that is $1,500 above the 225 percent FPL threshold and who holds only undergraduate loans. The borrower's payment will be approximately $10 per month (due to the rounding of minimum payment amounts), which is only 0.2 percent of their annual income. We believe that increasing the income protection threshold and reducing the payment amount for undergraduate loans, coupled with our other regulatory efforts such as auto-enrollment into IDR for delinquent borrowers will protect low-income borrowers and reduce defaults.

*Changes:* None.

*Comments:* Some commenters suggested that we apply various incremental increases—from 250 percent to over 400 percent—so that struggling borrowers can afford the most basic and fundamental living expenses like food, housing, child care, and health care, in line with the threshold used for Affordable Care Act subsidies.

*Discussion:* The Department sought to define the level of necessary income protection by assessing where rates of financial hardship are significantly lower than the rate for those in poverty. Based upon an analysis discussed in the Income Protection Threshold section of the IDR NPRM, the Department found that point to be 225 percent of FPL.

We believe the new REPAYE plan provides an important safety net for borrowers whose income falls at a point at which repaying their student loans would become difficult. Our analysis found that borrowers between 225 percent and 250 percent of the FPL have statistically different rates of material hardship compared to those below the poverty line. As such 250 percent of FPL would not be an appropriate threshold.

The comparison to the parameters of the Affordable Care Act's Premium Tax Credits is not appropriate. Under that structure, 400 percent of FPL is the level at which eligibility for any subsidy ceases. An individual up to that point can receive a tax credit such that they will not pay more than 8.5 percent of their total income. Individuals above that point receive no additional assistance. In contrast, all borrowers—including those who have incomes above 225 percent or even 400 percent of FPL—will have income equal to 225 percent FPL protected when calculating their payment. The eligibility threshold for receiving the minimum ACA premium tax credit is, therefore, not a suitable gauge of the point below which it is unreasonable to expect a borrower to make payments on their student loans.

*Changes:* None.

*Comment:* A commenter discussed the relationship of borrowers' debt-to-income ratios to the percentage of defaulted borrowers. This commenter cited their own research, which found that default rates generally level off at a discretionary income of $35,000 and above and could reasonably justify income protection of 400 percent FPL if the goal is to reduce default rates.

*Discussion:* Reducing default rates is a concern for the Department. We believe that the changes made to the REPAYE plan will reduce default rates. However, we do not believe that raising the income protection from 225 percent to 400 percent would sufficiently reduce defaults in a way that would justify the added costs. Changing the income protection to 400 percent would protect up to $58,320 for a single individual and $120,000 for a four-person household. Existing evidence on default indicates that borrowers with much lower incomes are the ones most likely

to struggle with loan repayment. For example, data from the 2012/17 Beginning Postsecondary Students Longitudinal Study show that around 1.4 percent of individuals who had incomes below the equivalent of $58,320 in 2017 dollars (about $47,700) defaulted in the previous year, and 5.7 percent ever defaulted by that point, compared to less than 1 percent (both in the previous year and ever defaulted) for those above $58,320.[50]

*Changes:* None.

*Comments:* One commenter noted that while material hardship is a valid determination for an income threshold, there are significantly more families experiencing financial hardship beyond the definition in the IDR NPRM. The commenter said that our estimation of a material hardship was inequitable by only looking at food insecurity and being behind on utility bills and suggested that we raise the threshold to incorporate other areas such as housing and health care.

*Discussion:* Our examination of the incidence of material hardship used two measures that are commonly considered in the literature on material hardship and poverty as proxies for family well-being.[51] We agree that there are other expenses that can create a financial hardship. We believe that the 225 percent threshold provides that those experiencing the greatest rates of hardship will have a $0 payment, while borrowers above that threshold will have more affordable payments.

*Changes:* None.

*Lower Income Protection Amounts*

*Comments:* The Department received a range of comments arguing for not increasing the amount of income protected to 225 percent of FPL. Some of these commenters argued that the threshold should remain at 150 percent of FPL. Others argued that the amount should be set at 175 to 200 percent of FPL because of concerns that 225 percent was higher than necessary and untargeted.

One commenter stated that leaving the income exemption at 150 percent of the FPL would still cut monthly payments in half for low-income

undergraduate borrowers, would avoid other potential problems, and would make programs without any labor market value free or nearly free for many students, but the Federal Government and taxpayers would foot the bill.

Another commenter advised that the income limit for student loan forgiveness should be set to benefit only those who are either below the poverty level or who are making less than the poverty level for a set number of working years and only if there is evidence that they are putting in effort to improve their situations.

*Discussion:* According to the Department's analysis, keeping the monthly income exemption at 150 percent of the FPL or lowering it would exclude a substantial share of borrowers who are experiencing economic hardship from the benefits of a $0 or reduced payment. The Department analyzed the share of borrowers reporting a material hardship (*i.e.,* experiencing food insecurity or behind on utility bills) and found that those at 225 percent of the FPL were statistically indistinguishable from those with incomes below 100 percent of the FPL. Requiring any monthly payment from those experiencing these hardships, even if payments are small, could put these borrowers at higher risk of delinquency or default.

The Department also disagrees with suggestions from commenters to require evidence that of borrowers are trying to financially better themselves. Such an approach would be administratively burdensome with no clear benefit.

*Changes:* None.

*Comments:* A few commenters argued for phasing out the income protection threshold altogether at a level at which a household's experience of hardship diverges markedly from households living in poverty. Other commenters argued for phasing down the amount of income protected as a borrower's earnings increased. For instance, one commenter suggested phasing down the protection first to 150 percent and then phasing it out entirely for borrowers who earn more than $100,000.

*Discussion:* One of the Department's goals in constructing this plan is to create a repayment system that is easier for borrowers to navigate, both in terms of choosing whether to enroll in IDR or not, as well as which IDR plan to choose. This simplified decision-making process is especially important to help the borrowers at the greatest risk of delinquency or default make choices that will help them avoid those outcomes. No other IDR plan has such a phase out and to adopt one here

---

[50] Analysis using Beginning Postsecondary Students (BPS) 2012/2017, PowerStats reference zqelzd.

[51] See, for instance: Mayer, S.E., & Jencks, C. (1989). *Poverty and the distribution of material hardship.* The Journal of Human Resources, 24, 88–114 Ouellette, T., Burstein, N., Long, D., & Beecroft, E. (2004). Measures of material hardship final report. Prepared for U.S. Department of Health and Human Services, ASPE. Short, K.S. (2005). *Material and financial hardship and income-based poverty measures in the USA.* Journal of Social Policy, 34, 21–38.

would risk undermining the simplification goals and the benefits that come from it. While we understand the goals of the commenters, the importance of the income protection also diminishes as borrowers' income grows. All borrowers above the income protection threshold save the same amount of money as any other borrower with the same household size. But as income grows, the percentage of their total payment reduced by this change diminishes. There is no payment cap under this plan, high-income borrowers can have larger payments that exceed the standard 10-year repayment plan. This could include situations where the payment amount above the standard 10-year repayment plan is greater than the savings the borrower would receive from the higher income protection amount.

A phased reduction would also make the plan harder to explain to borrowers. This approach, alongside the use of a weighted average to calculate loan payments, would make it significantly harder to explain likely payment amounts to borrowers and increase confusion.

*Changes:* None.

*Comments:* One commenter asserted that the 225 percent poverty line threshold is not well justified and questioned why other means-tested Federal benefit thresholds are not sufficient. The commenter further pointed out that the Supplemental Nutrition Assistance Program (SNAP) has a maximum threshold of 200 percent of the FPL, and the Free and Reduced-Price School Lunch program, also targeted at food insecurity, has a maximum threshold of 185 percent of the poverty line.

Along similar lines, a commenter noted that the taxation threshold for Social Security benefits is $25,000 and did not see the sense in protecting a higher amount of income for purposes of REPAYE payments.

*Discussion:* We disagree with the commenter's assertion that the income protection threshold is not well justified and reiterate that the data and analysis we provided in the IDR NPRM is grounded with sufficient data and sound reasoning. With respect to means-tested benefits that use a lower poverty threshold, we note fundamental differences between Federal student loan repayment plans and other Federal assistance in the form of SNAP or free-reduced lunch. First, some of these means-tested benefits have an indirect way to shelter income. SNAP, for example, uses a maximum 200 percent threshold for broad-based categorical

eligibility criteria that allows certain deductions from inclusion in income including: a 20 percent deduction from earned income, a standard deduction based on household size, dependent care deductions, and in some States, certain other deductions,[52] among others. Even though the Department of Agriculture's use of the maximum threshold is 200 percent of the FPL, the deductions from inclusion in income could result in a higher protection of income and assets than our use of an across-the-board 225 percent of the FPL. The Department does not allow other deductions from income or sheltering certain assets.

Second, it is inappropriate to compare the poverty thresholds used for means-tested benefits to the thresholds used for income protection under the REPAYE plan. Other agencies use the FPL as a baseline to determine eligibility for their benefits whereas we are using the 225 percent to calculate a monthly payment. A key consideration in our analysis and justification for using 225 percent of the FPL for the income protection threshold was identifying the point at which the share of those who reported material hardship was statistically different from those at or below the FPL.

Finally, with respect to the commenter who noted that the taxation threshold for Social Security benefits is $25,000, this provision is from the Social Security Amendments of 1983 under which 50 percent of an individual's Social Security benefits would be subject to the Federal income tax if that individual's income is above a specified threshold—$25,000 for individual filers and $32,000 for married couples filing jointly.[53] FPL thresholds simply do not apply to Social Security benefits and the comparison to REPAYE is therefore inappropriate.

*Changes:* None.

*Comments:* Another commenter encouraged the Department to limit the income protection threshold and all other elements of the rule, to undergraduate loans. They further asserted that, by allowing the higher disposable income exemption to apply to graduate debt, the rule is likely to eliminate or substantially reduce payments for many doctors, lawyers, individuals with MBAs, and other recent graduate students with very high earning potential who are in the first few years of working. Other commenters similarly recommended that the

Department maintain the income protection threshold for graduate loans at 150 percent of FPL.

*Discussion:* We decline to limit the income protection to only undergraduate borrowers or to adopt a 150 percent income protection threshold for graduate borrowers. The across-the-board 225 percent of the FPL income protection threshold provides an important safety net for borrowers to make certain they have a baseline of resources. We provide our justification in detail in the IDR NPRM.[54] In addition, a differential income protection threshold in REPAYE between undergraduate and graduate borrowers would be operationally complicated and would add confusion given the other parameters of this plan. For one, it is unclear how this suggestion would work for a borrower who is making a payment on both undergraduate and graduate loans at the same time. The Department does not think a weighted average approach would work either because it would be confusing to be protecting different amounts of income and then charging varying shares of that discretionary income for payments. And we are concerned that applying the lower threshold if the borrower has any graduate debt could put the lowest-income graduate borrowers at risk of default. Moreover, it would create challenges in simplifying repayment options because other plans also protect 150 percent of FPL and might offer other benefits that would cause graduate borrowers to choose them, such as forgiveness after 20 years instead of 25 years.

*Changes:* None.

*Cost-of-Living Adjustments*

*Comments:* Many commenters argued for adopting regional cost-of-living adjustments to the determination of the amount of income protected. Commenters said this was necessary to address disparities in cost of living across the country. Several commenters pointed to high-cost urban areas, particularly in New York City and elsewhere, as evidence that even 225 percent of FPL was insufficient for individuals to still afford basic necessities, such as rent and groceries. Commenters also pointed to differences in local tax burdens, which also affect the availability of income for loan payments and necessities. Commenters noted that this adjustment is particularly important because so many individuals who attend college tend to live in higher-cost areas.

---

[52] *www.fns.usda.gov/snap/recipient/eligibility.*

[53] The 2022 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds, June 2, 2022, at *www.ssa.gov/OACT/TR/2022/tr2022.pdf.*

[54] See 88 FR 1901–1902.

Another commenter who argued in favor of regional cost-of-living adjustments suggested using Regional Price Parities available at both the State and metropolitan area levels. This commenter stated that failure to consider this alternative would be arbitrary and capricious.

*Discussion:* The Department declines to adjust the income protection amount based upon relative differences in the cost of living in different areas outside of the existing higher thresholds used for Alaska and Hawaii.

The FPL is a widely accepted way of assessing a family's income. Many State programs use it without regional cost of living adjustments, making it difficult to choose a regional adjustment factor that would not be arbitrary. First, we have not identified a well-established and reliable method to adjust for regional differences. Examples of State agencies that use the FPL for their benefits or programs include New York's Office of Temporary and Disability Assistance, Wisconsin's health care plans, as well many other State health agencies across the country. At the Federal level, the U.S. Citizenship and Immigration Services (USCIS) allows non-citizens to request a fee reduction [55] when filing Form N–400, an Application for Naturalization if that individual's household income is greater than 150 percent but not more than 200 percent of the FPL. This fee reduction does not account for regional cost differentials where the individual resides; rather, USCIS uses an across-the-board factor to better target that benefit to those needing the most assistance to become naturalized U.S. citizens. Moreover, Federal courts in Chapter 7 bankruptcy proceedings may waive certain administrative fees if a debtor's income is less than 150 percent of the FPL.[56] Across the various cases of these State and Federal benefits, the use of the FPL is consistent after accounting that there is no reliable method to adjust for regional differences.

Second, we think it is valuable to provide a straightforward way for borrowers to understand how much income will be protected from payments. We would lose the simplicity of such an approach if we adjusted based upon the cost of living. Relatedly, it would be operationally difficult to apply a borrower's regional cost of living adjustment such as if we used the Bureau of Economic Analysis' (BEA) Regional Price Parities by State and Metropolitan area, as the commenters

suggest. It is unclear how we would determine the appropriate cost of living factor to use for income protection— whether we would use the address on file on the IDR application, where the borrower files taxes, or the State of domicile. Furthermore, use of BEA data could obligate the Department to collect data elements that would be onerous to compile and could result in borrowers failing to enroll or recertify in an IDR plan. Instead, as we have done since the inception of the ICR plans, we will use a percentage of the FPL as the baseline for income protection.

*Changes:* None.

*Comments:* Commenters suggested alternative measures that are more localized than FPL, such as State median income (SMI). They maintained that SMI better accounts for differences in cost of living and provides a more accurate reflection of an individual or family's economic condition. Commenters noted that some Federal social service programs, including the Low-Income Home Energy Assistance Program (LIHEAP) and housing programs such as Section 8 Housing Choice Vouchers, use the SMI rather than the FPL for this reason.

*Discussion:* It is important to calculate payments consistently and in a way that is easy to explain and understand. Using SMI to determine income protection would introduce confusion and variability that would be hard to explain to borrowers. Additionally, it would create operational challenges when borrowers move and lessen our ability to simplify payment calculations when we obtain approval to use a borrower's Federal tax information.

*Changes:* None.

*Periodic Reassessment*

*Comments:* Many commenters suggested that the Department reassess the income protection threshold annually or at other regular intervals. One of these commenters commended the Department for proposing these regulatory changes and asked that we periodically reassess whether the 225 percent threshold protects enough income for basic living expenses and other inflation-related expenses such as elder care.

*Discussion:* The Department declines to make any changes. The Department believes concerns about periodic reassessment are best addressed through subsequent negotiated rulemaking processes. Calculating the amount of income protected off the FPL means that the exact dollar amount protected from payment calculations will dynamically adjust each year to reflect inflation changes. However, if there are broader

societal changes that suggest the overall level of income protected based on the percentage of the FPL is too low, it would be appropriate to conduct further rulemaking to consider input from stakeholders and the public before making any changes.

*Changes:* None.

*Income Protection Threshold Methodological Justification*

*Comments:* One commenter stated that the Department acknowledged that 225 percent is insufficient because we said that the payment amount for low-income borrowers on an IDR plan using that percentage may still not be affordable. The commenter also believed that our rationale for arriving at this percentage was flawed, as it used a regression analysis with a 1 percent level of significance to show that borrowers with discretionary incomes at the 225 percent threshold exhibit an amount of material hardship that is statistically distinguishable from borrowers at or below the poverty line. These commenters stated that we did not comment on the magnitude of this difference and any difference is merely fractional.

Another commenter opined that the derivation from the 225 percent FPL threshold is not well justified. This commenter questioned the confidence level and sample size used in our calculations. The commenter believed that the choice of a confidence interval is more definitional than supported by a firm analytical basis.

*Discussion:* We disagree with the commenters' methodological critiques. Our rationale for arriving at the discretionary income percentages was based on our statistical analysis of the differences in rates of material hardship by distance to the Federal poverty threshold using data from the SIPP. We note that our figures were published in the IDR NPRM as well as our policy rationale for arriving at 225 percent of the FPL.

As we stated in the analysis, an indicator for whether an individual experienced material hardship was regressed on a constant term and a series of indicators corresponding to mutually exclusive categories of family income relative to the poverty level. The analysis sample includes individuals aged 18 to 65 who had outstanding education debt, had previously enrolled in a postsecondary institution, and who were not currently enrolled. The SIPP is a nationally representative sample and we reported standard errors using replicate weights from the Census Bureau that takes into account sample size. The Department used these data

---

[55] See Form I–942, OMB Form No. 1615–0133, *www.uscis.gov/i-942.*

[56] 28 U.S.C. 1930(f).

because they are commonly used and well-established as the best source to understand the economic well-being of individuals and households. The table notes show that two stars indicate estimated coefficients which are statistically distinguishable from zero at the 1 percent level. Using a 1 percent significance level is appropriate based on current Office of Management and Budget (OMB) guidance under the Data Quality Act (also known as the Information Quality Act).[57] The point of this analysis was to start at the premise that the commenter did not challenge, which is that someone who is at or below 100 percent of FPL should not be required to make a payment. We then looked for the point above which those rates of the individuals who reported financial hardship is statistically different from those individuals in poverty. As shown in our analysis, families with incomes above 225 percent FPL have rates of material hardship that are clearly both statistically and meaningfully different than families with incomes less than 100 percent FPL. Above the 225 percent FPL, coefficients are all statistically significantly different at the 1 percent level and range from 8.8 to 24.7 percentage points depending on the group, with the size of the coefficient generally getting larger as income increases.

We also note that the IDR NPRM included a discussion of why the 225 percent threshold is meaningful in its alignment to the minimum wage in many states. This consideration is discussed further in response to another comment in this *Income Protection Threshold* section.

*Changes:* None.

*Comments:* One commenter noted that our income protection threshold proposal of 225 percent of the FPL—$30,600 using the 2022 FPL—when compared to non-Federal data would encompass about the 65th percentile of earnings for individuals aged 22–31. Other commenters made similar claims but concluded this represented different percentiles in the income distribution. The commenter believes the Department undercounted the number of borrowers who would choose REPAYE as a result of this FPL threshold. The commenter claimed that the Department underestimated the proportion of borrowers up to age 31 who would have $0 or very low payments within this time frame, which the commenter claimed was a significant number of borrowers. The commenter said the data

needed to estimate that number are readily available from other Federal agencies, including the Census Bureau, the Bureau of Labor Statistics (BLS), and the Federal Reserve.

*Discussion:* We disagree with the commenter and affirm that our use of data from the SIPP for individuals aged 18–65 who attended college and who have outstanding student loan debt was appropriate. The commenter's analysis is incorrect in several ways: first, it presumes that the analysis should be relegated only to borrowers aged 22–31. The Department's own data[58] indicate that student loan borrowers' range in age, and we believe our use of SIPP is an appropriate data set for our analysis. Second, the reference point that the commenter proposes uses data from a non-Federal source and we cannot ascertain the validity of the survey design. In accordance with the Data Quality Act, we believe using our 225 percent income protection threshold to the data set that we used in the IDR NPRM was appropriate for the questions specific to this rule: "at which point would the share of those who reported material hardship be statistically different from those whose family incomes are at or below the FPL?" As a reminder, SIPP is a nationally representative longitudinal survey administered by the Census Bureau that provides comprehensive information on the dynamics of income, employment, household composition, and government program participation[59] and we do not believe we undercounted borrowers who would choose REPAYE.

*Changes:* None.

*Comments:* One commenter argued we should have used more objective data from the IRS instead of the SIPP. The commenter questioned why the Department chose to base its comparison on those with an income below 100 percent FPL, when it could have chosen to use 150 percent of the FPL established by Congress.

This same commenter believed the Department arrived at a statistical justification for a predetermined threshold by arbitrarily choosing the comparison group and arbitrarily choosing what to look at (*e.g.,* rates of food insecurity rather than something related to student loans like repayment rates).

*Discussion:* We reviewed various sources of data. SIPP is a longitudinal dataset administered by the Census Bureau. Information about the methodology and design are available

on the Census website.[60] We believe that the SIPP data is sound and the most appropriate dataset to use for our purposes because it contains information on student loan debt, income, and measures of material hardship. Because IRS data does not have information on material hardships, it would not be possible to conduct the analysis of the point at which the likelihood of a borrower reporting material hardship is statistically different from the likelihood for someone at or below the FPL reporting material hardship.

In response to the commenter's question why we chose the reference point to be 100 percent of the FPL rather than 150 percent, our intention was to find the point under which individuals with family incomes up to a certain percentage of the FPL would have rates of material hardship statistically indistinguishable from rates for borrowers with income at or below the FPL. Using 100 percent of the FPL is demonstrably appropriate as the Census considers someone at or below the FPL to be living in poverty.

We disagree with the commenter's suggestion that our statistical analysis was done in an arbitrary manner. As we stated in the IDR NPRM, we focused on two measures as proxies for material hardship: food insecurity and being behind on utility bills.[61] These two measures are commonly used in social science to represent material hardship. As we stated in the IDR NPRM, we regressed these measures of material hardship on a constant term and a series of indicators corresponding to categories of family income relative to the FPL.

*Changes:* None.

*Comments:* One commenter noted that the annual update of the HHS Poverty Guidelines was released after the IDR NPRM was published and suggested that the Department rely on the most recent data available because the change in the HHS Poverty Guidelines is significant enough to potentially alter some of the conclusions in the IDR NPRM.

*Discussion:* We do not believe the inflation-based updates to the FPL since the IDR NPRM was published materially change our analyses. For one, some of the analyses conducted were already using earlier years of data to reflect the best available sample data present. For instance, the analyses for the 225 percent threshold used data from the

---

[57] See Section 515 of the Consolidated Appropriations Act, 2001 (Pub. L. 106–554).

[58] *studentaid.gov/data-center/student/portfolio.*

[59] *www.census.gov/programs-surveys/sipp.html.*

[60] *www.census.gov/programs-surveys/sipp/ methodology.html.*

[61] This is not intended to suggest that individuals who do not report these two measures are not experiencing material hardship.

2020 SIPP. The analysis used to determinate the reduction of payment amounts on undergraduate loans to 5 percent of discretionary income was based upon figures from the 2015–16 National Postsecondary Student Aid Study. The analysis of the threshold for when low-balance borrowers should receive earlier forgiveness was based upon 5-year estimates from the 2019 American Community Survey. As discussed in the NPRM, we proposed that borrowers should repay for an additional 12 months for every $1,000 in principal balance above $12,000 because such a structure means the income above which a borrower would cease benefiting from the shortened forgiveness option is roughly consistent across all shortened repayment lengths. This goal of a consistent maximum earnings threshold for shortened forgiveness would not be affected by changes in the FPL.

The biggest effect of the change in the FPL would be to alter what was Table 4 in the IDR NPRM that showed the effect of the FPL increase. That table is recreated here using updated numbers. For a single-person household, the change in FPL from 2022 to 2023 results in additional savings of $9 a month if payments are assessed at 5 percent of discretionary income and $19 if payments are assessed at 10 percent of discretionary income. For a four-person household, those numbers are $21 and $42 a month, respectively.

TABLE 1—MAXIMUM MONTHLY PAYMENT SAVINGS AT DIFFERENT LEVELS OF INCOME PROTECTION, 2023 FEDERAL POVERTY GUIDELINES (FPL)

| Household Size | One | | Four | |
|---|---|---|---|---|
| | 5 | 10 | 5 | 10 |
| Payment as Percent of Discretionary Income | 5 | 10 | 5 | 10 |
| 150% FPL (Current REPAYE regulations) | $91 | $182 | $188 | $375 |
| 225% FPL (Final REPAYE regulations) | $137 | $273 | $281 | $563 |
| Final REPAYE minus Current REPAYE | $46 | $91 | $94 | $188 |

**Note:** The 2023 Federal Poverty Guideline is $14,580 for a single household and $30,000 for a house of four.

The IDR NPRM also included some discussion of the implied hourly wage for someone who earns 150 percent or 225 percent of FPL on an annual basis. Under the 2023 FPL baseline for the 48 contiguous states and the District of Columbia, that amount is $10.94 an hour instead of $10.19 an hour using the 2022 guidelines for someone whose earnings are equivalent to 150 percent of FPL for a single household and $16.40 an hour instead of $15.29 an hour at 225 percent of FPL.[62] These figures assume working 2,000 hours a year.

The change in FPL also does not materially affect the Department's analysis of how 150 percent of FPL compares to State minimum wages. In the IDR NPRM we noted that a threshold of 150 percent of FPL for a single individual is an implied annual wage that is below the minimum wage in 22 States plus the District of Columbia.[63] Those 22 States plus DC represent 50 percent of individuals nationally with at least some college.[64]

While the FPL has increased, so have several State minimum wages in the interim, though not always at the same magnitude as the FPL increase. Using 2023 FPL and minimum wage laws, 20 States, plus the District of Columbia, still have minimum wages that are above the implied hourly wage at 150 percent of FPL.[65] The change in the data is the inclusion of Florida as a state whose 2023 minimum wage exceeds the implied hourly rate at 150 percent of FPL, whereas Hawaii, Minnesota, and Nevada no longer have minimum wages that exceed the implied hourly rate at 150 percent of FPL. Because of differences in the number of individuals with at least some college across States, the net result is that using the 2023 FPL and minimum wages shows that about 53 percent of adults with some colleges are in States where the minimum wage is at or just above the implied hourly wage at 150 percent of FPL. As noted above, the equivalent figure for 2022 is 50 percent. The update therefore does not materially change any of the analyses provided in the IDR NPRM.

*Changes:* None.

*Other Issues Pertaining to Income Protection Threshold*

*Comments:* Some commenters suggested calculating discretionary income based on the borrower's net income rather than pre-tax gross income. The commenter further stated that payment amounts should be capped at no more than 10 percent of net discretionary income instead of a borrower's gross pay. This approach would base the payment percentage on the borrower's net take-home pay available for their expenses.

*Discussion:* We disagree with the commenters' suggestion to calculate the discretionary income based on the borrower's net income. Net income varies based on a variety of withholdings and deductions, some of which are elective. The definition of "income" in § 685.209(e)(1) provides a standardized definition that we use for IDR plans. The borrower's income less any income protection threshold amount is the most uniform and operationally viable method the Department could craft to consider a borrower's discretionary income for calculating a payment amount. The FPL is a widely accepted method to assess a family's income, and we believe that using 225 percent of the FPL to allocate for basic needs when determining an affordable payment amount for borrowers in an IDR plan is a reasonable approach. Our regulations still provide that a borrower may submit alternative documentation of income or family size if they otherwise meet the requirements in § 685.209(l).

*Changes:* None.

*Comments:* Several commenters recommended that we extend the increase in the percentage of discretionary income protected to all IDR plans, not just REPAYE.

*Discussion:* Under this final rule, student borrowers not already on an IDR plan will have two IDR plans from which to choose in the future—REPAYE and IBR. The HEA outlines the terms for the IBR plan that the commenters are

---

[62] For Alaska, the implied hourly wage for someone who earns 150 percent of FPL in 2022 and 2023 is $12.74 and $13.66, respectively. For Hawaii, the implied hourly wage for someone who earns 150 percent of FPL in 2022 and 2023 is $11.73 and $12.58, respectively.

[63] The analysis uses the federal minimum wage in states where minimum wages are lower than the federal minimum wage or with no minimum wage law. For Nevada, the analysis uses the minimum wage if qualifying health insurance is not offered by the employer. Based on minimum wages as of January 1, 2023 *https://www.dol.gov/agencies/whd/state/minimum-wage/history.*

[64] Based on the American Community Survey 2021 5-year estimates *https://data.census.gov/table?q=education&g=010XX00US$0400000&tid=ACSST5Y2021.S1501&tp=true.*

[65] *www.dol.gov/agencies/whd/minimum-wage/state.*

asking to alter. Specifically, section 493C(a)(3)(B) of the HEA sets the amount of income protected under IBR at 150 percent of the poverty line applicable to the borrower's family size. We cannot make the suggested changes to IBR via regulatory action. Accordingly, we do not think it would be appropriate to modify the percentage on PAYE. As explained in the section on borrower eligibility for IDR plans, we do not think it would be appropriate to change the threshold for ICR.

*Changes:* None.

*Comment:* One commenter argued that the proposal to use FPL violated the requirements outlined in Section 654 of the Treasury and Government Appropriations Act of 1999 that requires Federal agencies to conduct a family policymaking assessment before implementing policies that may affect family well-being and to assess such actions related to specified criteria.

With respect to our IDR proposals, a few commenters said that using FPL disadvantages married couples relative to single individuals because the amount of income protected for a two-person household is not double what it is for a single person household. They suggested instead setting the threshold at 152 percent of FPL for a single individual.

*Discussion:* The Department disagrees with the commenter's assessment of the applicability of section 654 of the Treasury and Government Appropriations Act of 1999 to this regulation. This regulation does not impose requirements on States or families, nor will it adversely affect family well-being as defined in the cited statutory provision. A Federal student loan borrower signed an MPN indicating their promise to repay. The Department does not require student loan borrowers to use the REPAYE plan. Instead, borrowers choose the plan under which they will repay their student loan.

Using FPL to establish eligibility or out-of-pocket payment amounts for Federal benefit programs is a commonly used practice. Moreover, the Department's use of the FPL focuses on the number of individuals in the household, not the composition of it.

In response to the comment regarding the alleged disadvantage for married borrowers, the Department notes that the one possible element that might have discouraged married borrowers from participating in the REPAYE plan was the requirement that married borrowers filing their tax returns separately include their spousal income. We have removed that provision by amending the REPAYE plan definition of "adjusted gross income" and aligning

it with the definition of "income" for the PAYE, IBR, and ICR plans. This change required us to redefine "family size" for all plans in a way that would no longer include the spouse unless the borrower filed their Federal tax returns under the married filing jointly category. We no longer allow a borrower to include the spouse in the family size when the borrower knowingly excludes the spouse's income. Otherwise, we do not agree that further changes are needed to equalize the treatment of single and married borrowers.

*Changes:* None.

*Comments:* Some commenters argued that the FPL that is used to set the income protection threshold is flawed because the FPL is based exclusively on food costs and therefore excludes important costs that families face, such as childcare and medical expenses. As a result, the resulting FPLs are far too low and the threshold we use in our regulation would need to increase to meet basic needs.

*Discussion:* We discuss our justification for setting the income protection threshold at 225 percent of the FPL elsewhere in this rule. We disagree that our use of the FPL is a flawed approach. The FPL is a widely accepted method used to assess a family's income. Moreover, setting FPL at a threshold higher than 100 percent allows us to capture other costs. We believe that using 225 percent of the FPL to allocate for basic needs when determining an affordable payment amount for borrowers in an IDR plan is a reasonable approach. While borrowers may have various financial obligations, such as childcare and medical expenses, the FPL is a consistent measure to protect income and treat similarly situated borrowers fairly in repayment. Excluding income from the IDR payment calculation in a standard way will equalize treatment of borrowers. Furthermore, the Department has consistently used the FPL as a component in determining a borrower's income under an IDR plan since the introduction of the first IDR plan.[66]

*Changes:* None.

**Payment Amounts (§ 685.209(f)(1)(ii) and (iii))**

*General Support*

*Comments:* Many commenters strongly supported the proposed REPAYE provision that would decrease the amount of discretionary income paid toward student loans to 5 percent for a borrower's outstanding loans taken

out for undergraduate study. Several commenters supported our proposal to limit the discretionary income percentage of 5 percent to only undergraduate loans to avoid expensive windfalls to those with high-income potential, namely graduate borrowers.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*General Opposition*

*Comment:* Several commenters stated that setting payments at 5 percent of discretionary income is far lower than rates in the United Kingdom and New Zealand, which are 9 and 12 percent, respectively.

*Discussion:* The Department thinks that considering the share of income that goes toward student loan payments is an insufficient way to consider cross-country comparisons. Different countries provide differing levels of support for meeting basic expenses related to food and housing. They also have different cost bases. Housing in one country might be more or less affordable than another. Relative incomes and national wealth might vary as well. As such, comparing the relative merits of the different student loan repayment structures is not as straightforward as simply comparing the share of income devoted to payments.

International comparisons would also require reckoning with differences in the prices charged for postsecondary education, which types of educations or institutions a borrower is able to obtain a loan for, and other similar considerations that are more complicated than solely looking at the back-end repayment terms. The commenters, however, did not provide any such analysis with their statements.

In the IDR NPRM and in this final rule we looked to data and information about the situation for student loan borrowers in the United States and we believe that is the proper source for making the most relevant and best-informed determinations about how to structure the changes to REPAYE in this rule.

*Changes:* None.

*Comments:* One commenter noted that they believe statutory provisions set the share of income owed on loans under the IDR plans as follows: 20 percent for ICR, 15 percent for IBR, and 10 percent for New IBR. The commenter points out that when the Department regulated on PAYE and REPAYE, we used the Congressionally-approved 10 percent threshold. The commenter argues that Congress has clearly established various thresholds and our previous regulatory provisions have respected that. The commenter states

---

[66] See 59 FR 61664. In the initial ICR plan (see 59 FR 34279), the family size adjustment was a mere $7 per dependent for up to five dependents.

that there should be a good reason for choosing the 5 percent threshold.

*Discussion:* Contrary to what the commenter asserted, Section 455(d)(1)(D) of the HEA does not prescribe a minimum threshold of what share of a borrower's income must be devoted toward payments under an ICR plan. Congress left that choice to the Secretary. And, in the past the Department has chosen to set that threshold at 20 percent of discretionary income and then 10 percent of discretionary income. We note that the Department promulgated the original REPAYE regulations in response to a June 9, 2014, Presidential Memorandum [67] to the Secretaries of Education and the Treasury that specifically noted that Direct Loan borrowers' Federal student loan payment should be set at 10 percent of income and to target struggling borrowers.[68] As we explained in the IDR NPRM, and further explain below, we decided to set payments at 5 percent of discretionary income for loans obtained by the borrower for their undergraduate study as a way to better equalize the benefits of IDR plans between undergraduate and graduate borrowers. In general, the Department is concerned that there are large numbers of undergraduate borrowers who would benefit from IDR plans but are not using these plans. Instead, they are facing unacceptably high rates of delinquency and default. By contrast, data show that graduate borrowers are currently using IDR plans at significantly higher rates. While the Department cannot know the specific reason why graduate borrowers are selecting IDR plans at greater rates than undergraduate borrowers, graduate borrowers' relatively higher loan balances mean that these individuals derive greater monthly savings from choosing an existing IDR plan than an otherwise identical undergraduate borrower with the same household size and income. As such, the Department seeks to better equalize the savings between undergraduate and graduate loans, with the goal that such increased savings for undergraduates will encourage more borrowers to use these plans and, consequently, avoid delinquency and default. As discussed in the IDR NPRM, setting payments at 5 percent of discretionary income for a borrower's undergraduate loans is the lowest integer percent where a typical undergraduate-only borrower and a typical graduate-only borrower with the same household size and income would

have similar monthly payment savings.[69]

*Changes:* None.

*Treatment of Loans for Graduate Education*

*Comments:* Many commenters suggested that borrowers should also pay 5 percent, rather than 10 percent, of their discretionary income on loans obtained for graduate study. They said requiring borrowers to pay 10 percent of their discretionary income on those loans runs contrary to the goals of the REPAYE plan and may place a substantial financial burden on these borrowers. Many commenters further suggested that we consider that many graduate borrowers are often older than their undergraduate counterparts, are heads-of-households with dependent children, have caregiving responsibilities, and are closer to retirement. Moreover, many commenters expressed their concern that this disparate treatment of graduate borrowers from undergraduate borrowers could have financial consequences on borrowers' ability to purchase homes, start businesses, care for their families, and save for retirement. One commenter stated that treating graduate borrowers differently could make them more likely to take out private loans.

*Discussion:* We acknowledge the demographics among graduate student borrowers. However, we do not agree that a payment of 5 percent of discretionary income should apply to all borrowers.

As we discussed in the IDR NPRM, we are concerned that the lack of strict loan limits for graduate student loans and the resulting higher loan balances means that there is a significant imbalance between otherwise similarly situated borrowers who only have debt for undergraduate studies versus only having debt for graduate studies. Moreover, in this final rule we are working to improve the REPAYE plan to significantly reduce the number of borrowers who face delinquency and default. As we noted in the IDR NPRM, 90 percent of borrowers in default exclusively borrowed for undergraduate study compared to just 1 percent who exclusively borrowed for graduate study.

The Department believes that allowing loans obtained for graduate study to be repaid at 5 percent of discretionary income would come at a significant additional cost while failing to advance our efforts to meet the goals of this rulemaking, including reducing

delinquency and default. We believe that the solution included in the IDR NPRM and adopted in this final rule for graduate loans is a more effective manner of achieving the Department's goal of providing borrowers access to affordable loan payments. A borrower who has both undergraduate and graduate loans will still see a reduction in the share of their discretionary income that goes toward loan payments and the treatment of loans for undergraduate study will be consistent across borrowers. Moreover, all student borrowers will also receive other benefits from the changes to REPAYE, including the protection of more income and the interest benefit. We do not believe the difference in the treatment of loans obtained for undergraduate and graduate study will make graduate borrowers more likely to take out private loans because the benefits offered by our new plan are more generous than the current IDR options, and likely more generous than the terms of private student loans.

*Changes:* None.

*Comments:* Several commenters claimed that not providing graduate borrowers the same discretionary income benefit as undergraduate borrowers disproportionately places an undue burden on Black students and other students of color. Another commenter argued that having different payment percentages for undergraduate and graduate students is unjustifiable and is likely to disproportionately harm Black and Latino borrowers, as well as women of color. Several commenters stated that requiring graduate borrowers to pay more creates an equity issue. They further cited data showing that Black students rely on financial aid for graduate school at a higher rate than White students. Moreover, the commenters explain that Black students must also earn a credential beyond a bachelor's degree to receive pay similar to their White peers who only hold a bachelor's degree. Lastly, several commenters stated that the Department's choice to exclude graduate borrowers from the 5 percent discretionary income threshold is flawed and disregards the issue of repayment through racial and economic justice lenses.

*Discussion:* Research has consistently showed that graduate borrowers with advanced degrees earn more than borrowers with just an undergraduate degree.[70] Both graduate and undergraduate borrowers are subject to the same discretionary income

---

[67] See 79 FR 33843.
[68] See 80 FR 67225.

[69] 88 FR 1902–1905.

[70] nces.ed.gov/programs/coe/indicator/cba/
annual-earnings.

threshold of 225 percent FPL. However, borrowers with graduate debt will pay 10 percent of their income above this threshold if they only hold graduate debt and a percentage between 5 and 10 if they have both graduate and undergraduate debt (weighted by the relative proportion of their original principal balance on outstanding debt from undergraduate and graduate studies). As a result, graduate borrowers will still benefit from the new REPAYE plan by having a larger share of their income protected from payment calculations than they would under the current REPAYE plan. We therefore disagree with some of the commenters that graduate borrowers would face undue burdens under this final rule. We also reiterate that while the benefits of this rule are focused on undergraduate borrowers, there will still be some benefits for graduate borrowers as a result of the changes.

The Department projected total payments per dollar of student loan payments for future cohorts of borrowers using a model that includes relevant lifecycle factors that determine IDR payments (*e.g.*, household size, the borrower's income, and spousal income when relevant) under the assumption of full participation in current REPAYE and the new REPAYE plan. The RIA discussion of the costs and benefits of the rule provides additional details on this model. The present discounted value of total payments per dollar borrowed was projected under current REPAYE and the new REPAYE plan for borrowers in different racial/ethnic groups and according to whether the borrower had completed a graduate degree or certificate. Table 2 contains these estimates, which illustrate how Black, Hispanic, and American Indian and Alaskan Native (AIAN) borrowers with a graduate degree are projected to see the largest decreases among borrowers with graduate degrees in payments per dollar borrowed under the new plan compared to all other categories of graduate completers. In conducting this analysis, the Department did not make any policy design choices specifically based upon an analysis of outcomes for different racial or ethnic groups.

TABLE 2—PROJECTED PRESENT DISCOUNTED VALUE OF PAYMENTS PER DOLLAR BORROWED FOR FUTURE REPAYMENT COHORTS OF GRADUATE COMPLETERS BY RACE/ETHNICITY, ASSUMING FULL TAKE-UP OF REPAYE

| | AIAN | API | Black | Hispanic | White | Other/Multi |
|---|---|---|---|---|---|---|
| Current REPAYE | 1.24 | 1.28 | 1.24 | 1.26 | 1.27 | 1.25 |
| Final rule REPAYE | 1.07 | 1.15 | 1.02 | 1.13 | 1.16 | 1.15 |
| Reduction | 0.17 | 0.12 | 0.22 | 0.13 | 0.11 | 0.10 |
| Percent reduction | 14% | 10% | 18% | 11% | 8% | 8% |

**Notes:** AIAN = American Indian or Alaskan Native, API = Asian or Pacific Islander.

The higher payment rate for borrowers with graduate debt is also justified based on differences in the borrowing limits for undergraduate and graduate borrowers. Graduate borrowers have higher loan limits through the Grad PLUS Loan Program and correspondingly, higher levels of student loan debt. We continue to believe it is important that borrowers with higher loan balances pay higher amounts over a longer period before receiving forgiveness. Finally, we disagree with the commenters that excluding graduate borrowers from the 5 percent discretionary income amount is flawed, as we explained our rationale for the higher discretionary income amount for graduate borrowers in the IDR NPRM. We believe that the analysis shown above, as well as what was included in the IDR NPRM and the RIA of this final rule show that the Department carefully considered the economic effects of the rule as appropriate.

*Changes:* None.

*Comments:* Many commenters emphasized that most States require a graduate or professional degree to obtain certification or licensure as a social worker, clinical psychologist, or school counselor. These commenters believed that, given such a requirement, borrowers working in these professions should be eligible to receive the same REPAYE plan benefits as undergraduate borrowers.

One commenter stated that, while some borrowers with graduate degrees will eventually become wealthy, many graduate-level borrowers will be in a low- to middle-income bracket, such as those seeking employment or who are employed in the field of social work. The commenter went on to explain that, even though teachers and social workers earn approximately the same salary, social workers will be penalized because they will have to pay a higher share of their income for a longer period of time due to their need to borrow more in graduate loans.

*Discussion:* We decline to make the changes requested by the commenters. It is true that many teachers and social workers attain graduate degrees as part of their education; according to data from the National Center for Educational Statistics, over 50 percent of public school teachers from 2017–2018 held a graduate degree.[71] And as of 2015, 45 percent of social workers held a graduate degree.[72] But teachers and social workers are also often eligible for other student loan forgiveness programs, such as PSLF, which shortens the repayment window to ten years for those who work consistently in the public or non-profit sector. Other programs include Teacher Loan Forgiveness for those who serve at least five years as a full-time teacher in an eligible low-income school. As the commenter acknowledges in the first part of their comment, many borrowers with graduate degrees will earn high incomes. For that reason, setting payments at 5 percent of discretionary income for graduate loans would raise concerns about targeting these repayment benefits to the borrowers needing the most assistance.

*Changes:* None.

*Comment:* One commenter stated that the Department's decision to calculate payments based on a weighted average between 5 percent and 10 percent of discretionary income for borrowers with graduate and undergraduate loans introduces complexity that will be difficult for borrowers to understand and make it complicated for servicers to administer.

*Discussion:* The weighted average for the share of discretionary income a borrower will pay on their loans will be automatically calculated by the Department and will be a seamless process for borrowers and servicers. The

[71] nces.ed.gov/surveys/ntps/tables/ntps1718_fltable04_t1s.asp.

[72] Salsberg, Edward, Leo Quigley, Nicholas Mehford, Kimberly Acquaviva, Karen Wyche, and Shari Sliwa. 2017. Profile of the Social Work workforce. George Washington University Health Workforce Institute and School of Nursing. *www.socialworkers.org/LinkClick.aspx?fileticket=wCttjrHq0gE%3D&portalid=0.*

Department will provide a plain language explanation of the way of calculating payments on *StudentAid.gov*. Borrowers may visit *StudentAid.gov* or contact their loan servicer for additional details of their loan payments. Moreover, we believe that this added work to explain the provision to borrowers is more cost effective than the alternative proposal to simply provide significant payment reductions on graduate loans.

*Changes:* None.

*Comments:* One commenter asserted that if we intended to discourage future borrowers from taking out graduate loans if they cannot afford them, we should simply state that. This commenter urged us to prospectively apply the provision of 10 percent of discretionary income only to new graduate borrowers as of 2023.

*Discussion:* The Department does not agree with the commenter's characterization of our discretionary income provision. Our rule is not intended to encourage or discourage borrowing or to alter the borrower's choice to attend graduate school or take out a loan. We believe the discretionary income percentage for IDR plans will target borrowers who need the assistance the most. As we stated in the IDR NPRM, the Department is not concerned that keeping the rate at 10 percent for graduate loans would incentivize graduate students to overborrow as the current 10 percent repayment rate is already in current IDR plans.

We also disagree that we should provide existing graduate borrowers with payments at 5 percent of income and only apply the weighted average approach to new graduate borrowers as of 2023. We do not think that the cost of providing the lower payments for graduate loans taken out before 2023 would justify the significant added costs that would come from such a change and we do not think there is a reasoned basis to provide payments of different levels solely based upon when a borrower obtained a loan.

*Changes:* None.

*Treatment of Parent PLUS Borrowers*

*Comments:* Many commenters expressed concern for parent PLUS borrowers. Many commenters argued that if the requirement to make payments of 5 percent discretionary income is designed to apply to undergraduate study, then parent PLUS loans—which are used only for undergraduate studies—should receive the same benefits and treatment as undergraduate borrowers. A few other commenters further suggested that the

Department did not offer parent PLUS loan borrowers a safety net to protect them when they could not afford repayment because these borrowers do not have the opportunity to benefit from the new REPAYE plan.

Several commenters, however, expressed strong support for excluding parent PLUS loans for dependent undergraduates from the 5 percent of discretionary income standard.

*Discussion:* The Department disagrees with the suggestion that Parent PLUS loans should be eligible for this plan on the basis that the student for whom the loan was obtained was an undergraduate student. As discussed elsewhere in this preamble, the HEA prohibits parent PLUS loans from being repaid under any IDR plan. We decline to allow a Direct Consolidation Loan that repaid a parent PLUS loan to access REPAYE for reasons also discussed earlier in this preamble. The Department understands that the phrasing of § 685.209(f)(1)(ii) in the IDR NPRM may have created confusion that generated comments like the one discussed here because it only discussed payments on loans obtained for undergraduate study. We have clarified the regulation to make it clear that the 5 percent of discretionary income standard will be available only on loans obtained for the borrower's own undergraduate study.

*Changes:* We have revised § 685.209(f)(1)(ii) to clarify that we refer to loans obtained for the borrower's undergraduate study.

*Comments:* None.

*Discussion:* In modeling the treatment of the reduction in payments on undergraduate loans, the Department noted that some loans in our data systems do not have an assigned academic level. These are commonly consolidation loans and may include ones where a borrower has consolidated multiple times. The Department is concerned that the language in the NPRM did not provide sufficient clarity about how loans in such a situation would be treated. Accordingly, we are revising § 685.209(f)(1)(iii) to indicate that any loan not taken out for a borrower's undergraduate education will be assigned payments equal to 10 percent of discretionary income. This broader framing will clarify how either a loan for a borrower's graduate study or one with an unknown academic level will be treated. A borrower who believes their loan was in fact obtained for their undergraduate education and should not be treated as subject to the 10 percent calculation will be able to file a complaint with the Department's Student Loan Ombudsman. The

Ombudsman's office will review the complaint and work with the borrower on next steps.

*Changes:* We have revised § 685.209(f)(1)(iii) to note that repayment on all loans not captured in § 685.209(f)(1)(ii) is calculated at 10 percent of discretionary income.

*Alternative Payment Structures*

*Comments:* Several commenters argued that the Department should adopt a progressive formula to determine the percentage of discretionary income required to go toward payments instead of a single flat one. These proposals included ideas like offering a bracket of 5 percent payments for low-income borrowers, a bracket of 10 percent payments on moderate incomes, and a bracket at 15 percent for borrowers with higher incomes. As income rises, the commenter explained, the borrower would pay a higher marginal payment rate.

These commenters wrote that the graduated rates would benefit all borrowers, including higher-income borrowers, by targeting these repayment rate structures to the borrowers needing the most assistance which could be counteracted with a higher marginal payment rate for those most able to pay.

Alternatively, one commenter specifically suggested that we could apply the payment rate of 5 percent of discretionary income to those with a discretionary income of 150 to 225 percent of the FPL and 10 percent for those whose discretionary income is above 225 percent of the FPL. The commenter compared this marginal rate structure proposal to the progressive income tax.

*Discussion:* The Department declines to adopt the more complicated bracket structures suggested by the commenters. We are concerned that doing so would undercut several of the goals of this final rule. This approach could not be combined with our intent to maintain that undergraduate loans get a greater focus than graduate loans so that we can address concerns about default and delinquency. Varying the share of discretionary income that goes toward payments by both income and undergraduate loan status would be complicated and challenging to explain. We think the weighted average structure better addresses our goals and is simpler to convey to borrowers.

*Changes:* None.

*Comments:* Some commenters argued that the Department should increase the amount of income protected and then set payments at 10 percent of discretionary income for all borrowers.

**43848** **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Rules and Regulations

They said such a rule would be more targeted and simpler.

*Discussion:* We discuss income protection, including the appropriate threshold using the FPL as a unit, under the ''Income Protection Threshold'' section in this document. As discussed, we do not think there is a compelling rationale for providing a higher amount of income protection. As discussed earlier and in the IDR NPRM, we think that loans taken out for a borrower's undergraduate study should be repaid at 5 percent of discretionary income. We believe this change will help prevent default and target the benefit at the group that includes the overwhelming majority of defaulters. Moreover, we reiterate our rationale for the differential payment amount thresholds for undergraduate and graduate loans and how the 225 percent FPL income protection threshold interacts with a borrower's payment in the IDR NPRM.

*Changes:* None.

*Comments:* Some commenters argued that borrowers who have undergraduate and graduate loans should pay 7.5 percent of their discretionary income as that would be simpler to establish and communicate. They also argued that otherwise, borrowers have an incentive to not pay off their undergraduate loans so they can use them to reduce their payment amount.

*Discussion:* We are concerned that setting payments at 7.5 percent of discretionary income for graduate loans would result in additional spending on benefits that are not aligned with our goals of preventing default and delinquency. A 7.5 percent payment amount also implies that borrowers have equal splits of undergraduate and graduate debt, which is not as likely to occur and might result in lower payments for graduate borrowers than would occur under our final rule. We do not believe the added cost that would come from such a change is necessary to achieve the Department's goals of averting default and making it easier to navigate repayment.

We disagree with the concerns raised by the commenter about whether borrowers would have an incentive to not pay off their undergraduate loans. Whether a borrower chooses to prepay their loan or not is always up to them. For scheduled payments, the borrower must pay the amount that is required by their repayment plan. If they pay less than that amount in order to avoid paying off their balance, they would become delinquent and possibly default. If they pause their payments, they would see interest accumulate (except for subsidized loans on a deferment),

which could result in them paying more over time.

*Changes:* None.

*Comments:* One commenter suggested that instead of using a percentage of discretionary income, we should revise our IDR formulas to express the payment as a percentage of total income, with no payment due for borrowers who earn less than $30,000 a year. In the commenter's example, a borrower who earns $30,000 or more per year would have a monthly payment of 5 percent of their total income.

*Discussion:* This proposed change would introduce significant operational complexity and challenges. We expect that our approach for determining the amount of discretionary income to go to loan payments based on the type of loan that the borrower has, will achieve our intended purpose: to allow borrowers to make an affordable loan payment based on their income that we can easily administer. A borrower with only undergraduate loans would already have a 5 percent loan payment as the commenter suggests and we believe that a monthly payment amount of 5 percent of the discretionary income best assures that REPAYE assists the neediest borrowers.

*Changes:* None.

*Methodological Concerns*

*Comments:* One commenter argued that the Department's reasoning for proposing that undergraduate loans be repaid at 5 percent of discretionary income was arbitrary and could be used to justify any threshold. The commenter said none of the reasons articulated pointed to 5 percent as an appropriate number. The commenter provided no detail as to why they reached those conclusions.

*Discussion:* The Department disagrees with the commenter. We have explained our rationale for setting payments at 5 percent of discretionary income on undergraduate loans as providing better parity between undergraduate and graduate borrowers based upon typical debt levels between the two, with considerations added for rounding results to whole integers that are easier to understand. The commenter offered no substantive critiques of this approach.

*Changes:* None.

*Comments:* One commenter raised concerns that the Department's justification for choosing to set undergraduate loan payments at 5 percent of discretionary income is based upon looking at equivalent benefits for undergraduate versus graduate borrowers. They said the Department never explained or justified why the

Department's goal should be to maintain parity in benefits between the two populations, noting their differences in income and debt.

Relatedly, the commenter said the Department did not explain why the goal should be for undergraduate borrowers to have equivalence with graduate borrowers rather than the other way around. They argued that since there are more undergraduate borrowers than graduate borrowers, the Department should try to seek parity with undergraduate borrowers if they could provide rational explanations that justify the approach.

The commenter also said that the Department's analysis included an assumption to choose different payment levels which relied on the same income levels for undergraduate and graduate borrowers. The commenter argued that a more likely scenario was that an undergraduate borrower would have lower earnings than a graduate borrower.

A different commenter made similar arguments, asking why the Department chose to conduct its analysis by using the debt for a graduate borrower as the baseline instead of the debt of an undergraduate borrower. The commenter noted that we could have changed the parameters of graduate debt to match that of undergraduates.

*Discussion:* The commenters seem to have misunderstood the Department's analysis and goals. One of the Department's major concerns in developing this rule is that despite the presence of IDR plans, more than 1 million borrowers defaulted on their loans each year prior to the pause on loan repayment due to the COVID–19 pandemic. And almost all of these borrowers are individuals who only borrowed for their undergraduate education. As further noted in the IDR NPRM, 90 percent of the borrowers in default only borrowed for undergraduate education.

Additionally, the Department's administrative data shows that only 28 percent of recent cohorts of undergraduate borrowers were using an IDR plan before the payment pause, despite earlier findings from Treasury that 70 percent of borrowers in default would have benefited from a reduced payment in IDR.[73] The Department is concerned that the rate at which undergraduate borrowers use IDR is far below the optimal levels necessary to achieve the goals of reducing

---

[73] U.S. Government Accountability Office, 2015. Federal Student Loans: Education Could Do More to Help Ensure Borrowers are Aware of Repayment and Forgiveness Options. GAO–15–663.

delinquency and default. While the Department lacks income and household size data on all borrowers to know the correct share of undergraduate borrowers that would benefit from being on IDR, that number is unquestionably higher than the share of borrowers in IDR today.

Because delinquent and defaulted borrowers were not enrolling in the IDR plans at the rate we expected, the Department considered changes to REPAYE that would make the borrowers at greatest risk of default more likely to enroll in and stay enrolled in these plans. Given that we have been relatively successful at enrolling graduate borrowers into these plans, we considered how to best achieve something approaching parity in the benefits accrued through IDR between borrowers with undergraduate debt as compared to borrowers with graduate debt at the same salary. This analysis highlights an inequity in the current IDR plans—if you take two borrowers with identical income and family size, the one who borrowed at the typical undergraduate level will benefit less.

*Changes:* None.

*Comments:* Some commenters took exception to the Department's methodological justification for lowering payments only on undergraduate loans to 5 percent of discretionary income and believed it should have resulted in setting payments on graduate loans at 5 percent as well. One commenter mentioned that the President campaigned on the basis that 5 percent of discretionary income would be afforded to all borrowers under IDR plans thereby dismissing our rationale for the discretionary income in the IDR NPRM as pretextual. They said that the Department should not have assumed that the undergraduate and graduate borrowers have equivalent incomes. They argued that failing to grasp this meant that the Department did not capture that graduate borrowers with higher earnings will pay more even if the method of calculating payments is the same across all types of borrowers.

A different commenter objected to the idea that an undergraduate borrower and a graduate borrower with the same incomes should be treated differently. This commenter argued that if a graduate borrower and an undergraduate borrower have the same incomes it could be a sign of struggle for the former given that graduate degrees generally result in higher incomes.

Finally, the commenter objected that the Department has prioritized reducing undergraduate defaults rather than seeking to bring default for all borrowers to zero.

*Discussion:* We affirm our decision as outlined in the IDR NPRM [74] to lower payments only on undergraduate loans to 5 percent of discretionary income. The Department is committed to taking actions to make student loans more affordable for undergraduate borrowers, the individuals who are at the greatest risk of default and who are not using the existing IDR plans at the same frequency as their peers who attended graduate school. In accomplishing this goal, the Department looked for a way to provide greater parity between the benefits of IDR for a typical undergraduate borrower with a typical graduate borrower. Historically, graduate borrowers have been more likely to make use of IDR than undergraduate borrowers, suggesting that the economic benefits provided to them under existing IDR plans help in driving their enrollment in IDR. Accordingly, using benefits provided to graduate borrowers as a baseline is a reasonable approach to trying to get more undergraduate borrowers to enroll in IDR as well. As noted in the NPRM, the Department found that at 5 percent of discretionary income, a typical undergraduate borrower would see similar savings as a typical graduate borrower. Therefore, the approach taken in the NPRM and this final rule provides greater parity and will assist the Department in its goal of getting more undergraduate borrowers to use these plans, driving down delinquency and default. Our experience with current IDR programs indicates that graduate borrowers are already willing to enroll in IDR at high rates even with payments set at 10 percent payment of discretionary income. As already discussed, we already see significant usage of the IDR plans by graduate borrowers. It is not evident to us that we need to take additional steps to encourage graduate borrowers to use IDR to lessen delinquency and default. In response to commenters' concern regarding our methodologies, we emphasize the inequities that could be created if undergraduate and graduate borrowers were treated similarly. For example, if graduate and undergraduate borrowers making same income were charged the same in monthly payments, the benefits would be substantially greater for graduate borrowers given their larger loan amounts. We provided an illustrative example of the potential benefits for graduate borrowers in the IDR NPRM, and we maintain that our reductions of the payment rate only for undergraduates is justified.

[74] See 88 FR 1902–1905.

Regarding default, the Department agrees that eliminating all default is a laudable goal and points out that many of the provisions in this rule that would significantly reduce the likelihood of undergraduate default and delinquency would benefit graduate borrowers as well. This includes the higher income protection, the interest benefit, and automatic enrollment in IDR where possible, among other benefits. The fact remains that default rates are significantly higher among undergraduate borrowers, and they are significantly overrepresented among borrowers in default. We believe the final rule strikes the proper balance of making changes that will reduce rates of delinquency and default while still requiring the borrowers who are most able to make payments to do so.

*Changes:* None.

*Comments:* Commenters argued that the Department does not explain in the analysis that supported the proposed 5 percent threshold why it would be acceptable to produce an outcome in which borrowers with the same income and family size do not have the same payment amount. Similarly, some commenters argued that treating graduate loans differently meant that the plan was less based upon income than upon degree sought.

*Discussion:* In the IDR NPRM, we explained why we proposed to set the 5 percent threshold for undergraduate borrowers. A key consideration in our proposal was to provide greater parity between an undergraduate borrower and a graduate borrower that are similarly financially situated. We do not want graduate borrowers to benefit more than borrowers with only undergraduate debt. We believe that creating this parity may make undergraduate borrowers more willing to enroll in an IDR plan, possibly at rates equal to or greater than graduate borrowers today. This is important because delinquency and default rates are significantly higher for undergraduate borrowers than they are for graduate borrowers.

In response to the comment about how the proposed rule would treat borrowers who have the same income and same family size but loans from different program levels (undergraduate versus graduate), the Department is making distinctions between types of loans the same way the HEA already does. The HEA already mandates different interest rates and loan limits based upon whether a borrower is an undergraduate or graduate borrower. The approach in this final rule simply continues to acknowledge those distinctions for repayment. Moreover, as we noted in the preamble and reaffirm

**43850** **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Rules and Regulations

here, failing to draw such a distinction could create inequities because a graduate borrower is likely to derive far greater economic benefits from the IDR plan than a similarly situated undergraduate borrower. Overall, we think this change will make the repayment options more equitable across two otherwise similar classes of borrowers.

*Changes:* None.

*Comments:* One commenter raised concerns that one of the Department's reasons for reducing payments to 5 percent of discretionary income for borrowers with undergraduate loans was a survey of just over 2,800 people. They said that is an insufficient basis for making regulatory changes of such a significant cost.

*Discussion:* The commenters misconstrued our citation of the survey from the Pew Charitable Trust-Student Borrower's survey conducted by SSRS, a market research firm. In considering whether to reduce the payment amount, we considered information from multiple sources, including negotiated rulemaking participants and public commenters, focus groups,[75] and data from the FSA Ombudsman. In these areas, borrowers consistently expressed concern with the amount of their loan payments. In the survey that we cited in the IDR NPRM, we illustrated external research that outlined specific problems that borrowers experienced while in an IDR plan. This data point was not meant to be read in isolation. The focus groups that we cited in the IDR NPRM and the data from the FSA Ombudsman[76] further reflected the concerns of borrowers experiencing problems with their loan payments.

Therefore, we believe the need for and benefits of reducing the payments for undergraduate borrowers are grounded in sufficient data and sound reasoning.

*Changes:* None.

*Comments:* One commenter argued that the weighted average approach would result in an outcome where a borrower who took on more total debt would end up with a lower payment than someone who took on less debt. For example, a borrower who takes out $30,000 for undergraduate education and $60,000 for graduate school pays 8.3 percent of their discretionary

income (one-third times 5 percent plus two-thirds times 10 percent), while a borrower who takes out $10,000 for undergraduate education and $30,000 for graduate school pays 8.75 percent of their discretionary income (one-quarter times 5 percent plus three-quarters times 10 percent). The commenter suggested that it would be more equitable to vary the payments based upon the borrower's loan balance.

*Discussion:* The commenter's suggested approach would introduce greater confusion for borrowers and be complex for the Department to administer given the differential loan limits for dependent and independent undergraduate students. Moreover, the result would be that an independent student could end up with a higher payment than their dependent undergraduate peer. Varying payments for undergraduates based upon their dependency status runs counter to the Department's goal of targeting the effects of the lowered payments on undergraduate borrowers so that there is better parity with graduate peers. The Department thinks this is important given the need to better use IDR as a tool to avert delinquency and default.

The commenter is correct that one effect of this policy is that the more debt for their undergraduate education a borrower has relative to the debt for their graduate education, the lower the share of their discretionary income the borrower must commit to their loan payments. But the commenter fails to address two important considerations of this structure. First, this creates an incentive for borrowers to keep their borrowing for their graduate education lower, as adding more debt there will increase their payments. Second, while a borrower's total balance does not affect their monthly payment in this plan, it does affect how their payment is applied. Borrowers with higher loan balances will have to pay down more interest before payments are applied toward principal. This can mean that it takes them longer to pay off the loan or will keep them in repayment for the full 25 years until they get forgiveness on a graduate loan. As a result, it is not inherently beneficial for the borrower to take on more debt to achieve the outcomes described by the commenter.

*Changes:* None.

**Adjustments to Monthly Payment Amounts (§ 685.209(g))**

*Comments:* One commenter noted that the IDR NPRM omitted provisions that exist in current regulations regarding rounding monthly IDR payments up or down when the calculated amount is low.

*Discussion:* We agree we should include the provisions treating the rounding of small monthly payments that currently exist in our regulations. We are revising the final rule to include § 685.209(a), (c), and § 685.221(b) from the current regulations for the REPAYE, PAYE, and IBR plans. These provisions stipulate that, for the REPAYE, PAYE, and IBR, plans, if a borrower's calculated payment amount is less than $5, the monthly payment is $0 and, if a calculated payment is equal to or greater than $5 but less than $10, a borrower's monthly payment is $10. We are also revising the final rule to include § 685.209(b) from current regulations, which stipulates that, for the ICR plan, if a borrower's calculated payment amount is greater than $0 but less than or equal to $5, the monthly payment is $5. We did not receive any comments that suggest we should change these provisions and have restored them without amending them.

*Changes:* For the REPAYE, PAYE, and IBR plans we added § 685.209(g)(1) to allow for an adjustment to the borrower's calculated payment amount under certain circumstances. For the ICR plan, we added paragraph § 685.209(g)(2) to allow for an adjustment to the borrower's calculated payment amount that if the borrower's calculated payment is greater than $0 but less than or equal to $5, the monthly payment is $5.

*Comment:* One commenter stated that our proposals for the revised REPAYE plan do not contain a standard payment cap and that, for some borrowers, REPAYE would be inferior compared to the IBR or PAYE plans.

*Discussion:* The commenter correctly points out—and we acknowledged in the IDR NPRM—that our new REPAYE plan does not contain a standard payment cap like those in the IBR and PAYE plans. Under both the IBR and PAYE plans, a borrower must have a calculated payment below what they would pay on the standard 10-year repayment plan to be eligible for that plan. Borrowers on this plan also see their payments capped at what they would owe on the standard 10-year repayment plan. By statute, borrowers on IBR whose calculated payment hits the standard 10-year repayment cap will see any outstanding interest capitalized.

The Department adopts the decision reflected in the NPRM to not include a cap on payments in REPAYE. Such a cap can provide a significant benefit for higher-income borrowers and can result in these individuals receiving forgiveness instead of paying off their loan through higher monthly payments. Therefore, the lack of a cap provides a

---

[75] FDR Group. Taking Out and Repaying Student Loans: A Report on Focus Groups with Struggling Student Loan Borrowers. (2015). *www.static.newamerica.org/attachments/2358-why-student-loans-are-different/FDR_Group_Updated.dc7218ab247a4650902f7afd52d6cae1.pdf.* See also, *www.pewtrusts.org/-/.*

[76] See *FY2022 FSA Annual Report,* Report of the Federal Student Aid Ombudsman, page 150. *Studentaid.gov/sites/default/files/fy2022-fsa-annual-report.pdf.*

way to better target the REPAYE benefits. Finally, we note that if a borrower is concerned about their payments going above what they would pay on the standard 10-year repayment plan, they are able to switch to another repayment plan options, but they might have to give up progress toward forgiveness in making such a choice.

*Changes:* None.

## Interest Benefits (§ 685.209(h))

*Comments:* The Department received many comments in support of the proposed change to the REPAYE plan under which the Secretary will not apply accrued interest to a borrower's account if is not covered by the borrower's payments. Many commenters suggested that the Department use its regulatory authority to provide this benefit for borrowers making IBR payments while in default, or to all borrowers while they are in any of the IDR plans.

Another commenter opined that the psychological impact of this treatment of accruing interest when borrowers repay their student loans would likely have a positive effect on default aversion.

*Discussion:* We thank the commenters for their suggestions for applying accrued interest to a defaulted borrower's account while the borrower is on an IBR plan and for borrowers on any of the IDR plans. We do not believe it would be appropriate to change the treatment of unpaid monthly interest for all borrowers on any of the other IDR plans. The Department cannot alter the terms of the interest accrual for the IBR plan, which are spelled out in Sec. 493C(b) of the HEA. We also decline to make this change for the PAYE plan because one of the Department's goals in this final rule is to streamline the number of IDR options available to borrowers in the future. Were we to include this benefit on the PAYE plan it might encourage more borrowers to remain on the PAYE plan instead of shifting to REPAYE. That would work against the Department's simplification goals. We also decline to make this change for the ICR plan. As explained earlier, the Department views that plan as being the option for borrowers who have a consolidation loan that repaid a parent PLUS loan, and we are concerned about getting the balance of benefits for those borrowers right given the fundamentally different nature of parent versus student loans.

*Changes:* None.

*Comments:* Many commenters argued that the interest capitalization on Federal student loans creates the most significant financial hardship for the

majority of borrowers. Several commenters stated that more borrowers would be inclined to pay their loans if the interest capitalization was eliminated. In addition, commenters stated that many students have been left feeling hopeless, defeated, and trapped due to the compound interest causing their loans to grow significantly larger than their initial principal. A few commenters mentioned that a waiver of unpaid monthly interest for borrowers with low earnings over the course of their career would help borrowers to avoid negative amortization.

*Discussion:* The Department eliminated interest capitalization in instances where it is not statutorily required in the Final Rule published on November 1, 2022.[77] We disagree that we need to provide a blanket waiver for unpaid monthly interest because we have already eliminated instances of interest capitalization where we have the discretion to do so.

*Changes:* None.

*Comments:* Commenters argued there was no compelling argument for waiving interest and stated that the IDR plans were designed to make payments more affordable while still collecting the necessary payments over time. These commenters further believed that our proposals would primarily benefit borrowers who have low earnings early in their careers but higher earnings later in their career.

Several commenters urged us to allow interest to accrue normally during repayment, or at the very least, allow interest to accrue during temporary periods when borrowers earn low to no earnings, such as during certain deferments or forbearances. These commenters believed that our interest benefits proposal was costly, regressive, and illegal.

*Discussion:* The Department declines to adopt the suggestions from commenters to change the treatment of unpaid monthly interest included in the proposed rule. Borrowers will still make payments based upon their income and their payment will still be applied to interest before touching principal. That preserves the possibility for borrowers to pay more in interest than they would on other repayment plans, as borrowers may continue to make interest-only payments, rather than touching their principal balance. However, this change will provide a few key benefits for borrowers. It will mean that borrowers will no longer see their outstanding amounts owed increasing even as they make their required monthly payments on REPAYE. Department data show that

70 percent of borrowers on IDR plans have payments that do not cover the full amount of their accumulating monthly interest. Apart from borrowers who only have subsidized loans and are in the first three years of repayment, these borrowers will see their balances grow. The Department is concerned that this result can provide a significant reason for borrowers to not pursue an IDR plan, can psychologically undercut the benefits of IDR for those who are on one of the plans, and those factors together may be a further reason why the most at-risk borrowers are not using IDR plans at rates sufficient to significantly drive down national numbers of borrowers who are delinquent or in default.

We also note that for borrowers whose incomes are low relative to their debt for the duration of the repayment period, this change will mean that interest that would otherwise be forgiven after 20 or 25 years is forgiven sooner. That can provide significant non-monetary benefits, such as not having borrowers feel like their debt situation is getting worse due to balance growth, and makes it easier for them to decide whether to enroll in the REPAYE plan.

We remind the commenters concerned about the effect of this benefit on borrowers whose incomes start low and then increase significantly about the lack of a cap on payments at the standard 10-year plan amount. That cap exists on the other IDR plans available to borrowers, neither of which includes an interest benefit as extensive as the one included for REPAYE. The effect of such a cap, though, is that borrowers who have seen a lot of interest accumulate over time may still not be paying it off, since the capped payment amount may not be sufficient to retire all the added interest, let alone pay down the principal. By contrast, the REPAYE plan does not include such a cap, which can mean that high-income borrowers would make larger payments that could increase the likelihood of paying off their loans entirely.

We also partly disagree with the suggestion to not implement this interest benefit for periods when a borrower has no or low earnings or when they are in certain deferment and forbearance periods. On the latter point, the Department is not changing the treatment of interest while a borrower is on a deferment or forbearance. This aligns with the commenter's request. That means that borrowers generally will not see interest accumulate on their subsidized loans while in deferment, while they will see interest charged on unsubsidized or PLUS loans, including while in a deferment or forbearance.

---

[77] 87 FR 65904.

The one exception to this is the cancer treatment deferment, which, under the statute, provides interest benefits on more types of loans than other deferments. However, we disagree with the suggestion to not provide this interest assistance to borrowers with periods of low or no earnings who are on the REPAYE plan. We are concerned that these are the borrowers who most need assistance to help avert delinquency or default and we think this change will help encourage those borrowers to select the REPAYE option and set themselves up for longer repayment success.

We discuss comments related to the legality of the interest benefit in the *Legal Authority* section of this document.

*Changes:* None.

*Comments:* One commenter noted that there is no compelling reason to forgive interest because the remaining balance is already forgiven at the end of the loan term.

Another commenter argued that the Department was incorrect on its position that interest accumulation will solve issues of borrowers being discouraged to repay their loans. They said the change coupled with other parameters means that many borrowers will never see their balance go down by even $1, which would increase frustration and make the problems the Department seeks to solve worse.

Another commenter suggested that we only apply the unpaid monthly interest accrual benefit when preventing negative amortization on undergraduate loans. The commenter suggested that this change would preserve the interest accrual benefit for those borrowers more likely to struggle economically and would protect the integrity of the loan program for all borrowers and taxpayers.

One commenter who opposed the interest benefits argued that there will be unintended consequences for high-income professionals, such as physicians and lawyers, who will have their interest cancelled rather than deferred because we calculate IDR income based on earnings reported on tax returns from nearly two years prior.

*Discussion:* The Department disagrees with the commenter who argued that there is no compelling reason to provide the interest benefit that we proposed in the NPRM because the remaining balance is already forgiven at the end of the loan term. This rule would provide borrowers with more affordable monthly payments, and borrowers need to fulfill their obligations to receive forgiveness by making their monthly payments. Twenty or twenty-five years is a very long time in repayment, especially for

someone just beginning to repay their loans. Telling these borrowers not to worry as their balances grow because they may reach forgiveness sometime in the future is unlikely to assuage their concerns as forgiveness after 20 or 25 years can feel very abstract. Borrowers may also be skeptical that the forgiveness will actually occur, concerns that are furthered because few borrowers have earned forgiveness on IDR to date and the Department has acknowledged a long history of inaccurate payment counting (which we are separately taking steps to address). We believe that addressing the accrual of unpaid interest on a monthly basis will provide significant benefits to borrowers by ensuring they don't see their balances grow while they make required payments. It will lessen the sense that a borrower is trapped on an IDR plan by the need to repay extensive amounts of accumulated interest. And we believe it is one component that will assist our larger goals of making these plans more attractive for borrowers who are otherwise highly likely to experience delinquency or default.

We disagree with the commenter who contended that addressing interest accumulation will not help to resolve the issue of borrowers being discouraged to repay their loans. As we stated in the IDR NPRM, the Department is acutely aware of how interest accrual creates psychological and financial barriers to repayment. We believe that the interest benefits is one of the benefits of REPAYE that will independently encourage enrollment in this plan, and borrowers will make progress toward repaying their loans. Contrary to that commenter's assertion, borrowers will still be required to make a payment under REPAYE and many borrowers who make a loan payment will see a reduction in their original outstanding principal balance. Additionally, by removing interest growth as a barrier to repayment, we expect it will be easier to convince borrowers who would have a $0 payment to sign up for REPAYE and thereby avoid delinquency or default because we will be removing one of the most significant downsides to choosing an IDR plan for these borrowers.

We do not agree with the suggestion that we should apply the interest benefit only when needed to prevent negative amortization on undergraduate loans. The change suggested by the commenter would introduce significant operational complexity and challenges. In addition, the Department is concerned that it would create confusion with other benefits of REPAYE.

We disagree with the suggestion that interest benefits will provide an unintended benefit for high-income professionals. Borrowers with higher incomes will make larger monthly payments than an otherwise similar individual with a lower income. If that higher income borrower also has a larger loan balance, they will also have large amounts of interest they must first pay each month before the principal balance declines. That means they will still be paying significant amounts of interest on a monthly, annual, and lifetime basis. These borrowers are also not subject to an overall cap on payments the way they are on IBR or PAYE. That means the highest-income borrowers may end up making larger total payments on REPAYE, even if they receive some interest benefits at the start of their time in repayment.

Lastly, the Department is concerned that the initial period of repayment is when a borrower might be most likely to exhibit signs of struggle and when lower incomes might place them at the greatest risk of not being able to afford payments. For borrowers such as the doctors described by the commenter, their incomes will rise after a few years and the Department will receive significant payments from them in the future. Similar reasoning applies to our decision not to adopt the proposal to only apply the interest treatment after the first few years in repayment.

*Changes:* None.

**Deferments and Forbearances (§ 685.209(k))**

*Comments:* A few commenters requested that the Department include in-school deferments in the list of periods counting toward the maximum repayment period under § 685.209(k) or allow for a buyback option for these periods of deferment. Another commenter argued that not including in-school deferments toward monthly forgiveness credit will be especially problematic for many graduate students who are employed while going to school and regularly making payments.

*Discussion:* The Department does not believe it would be appropriate to provide credit for time spent in an in-school deferment toward forgiveness. While some borrowers do work while in an in-school deferment, there are many that do not. The Department does not think it would be appropriate to award credit toward forgiveness solely because a borrower is in school. Borrowers have the option to decline the in-school deferment when they re-enroll and those who wish to make progress toward forgiveness should do so. A borrower who believes they were

incorrectly placed in an in-school deferment contrary to their request should open a case with the Federal Student Aid Ombudsman by submitting a complaint online at *www.studentaid.gov.*

*Changes:* None.

*Comment:* Several commenters suggested that once the automatic one-time payment count adjustment is completed, the Department should provide an IDR credit for anyone with a $0 payment who is in deferment or forbearance, as well as credit for time spent in an in-school deferment.

*Discussion:* The Department outlined the terms of the one-time payment count adjustment when it announced the policy in April 2022. We have continued to provide updates on that policy. The one-time payment count adjustment is a tailored response to specific issues identified in the long-term tracking of progress toward forgiveness on IDR plans as well as the usage of deferments and forbearances that should not have occurred. We believe the one-time payment count adjustment policy that we announced in 2022 and our other hold harmless provision that we discuss elsewhere throughout this document will adequately address these commenters' concerns.

*Changes:* None.

*Comments:* A few commenters suggested that we treat periods of deferment and forbearance as credit toward the shortened forgiveness periods laid out in § 685.209(k)(3) since the department already proposed to count them toward the 20 or 25 years required for forgiveness under § 685.209(k)(1) and (2). These commenters stated that we should remove the clause in § 685.209(k)(4)(i) that prohibited periods in deferment and forbearance to count toward the shortened forgiveness timeline.

*Discussion:* The Department agrees with these commenters that all months of deferment and forbearance listed in § 685.209(k)(4)(iv) should count as payments toward the shortened forgiveness period. We had originally proposed to exclude these periods because we wanted to make certain that borrowers would not try to use a deferment or forbearance to minimize the payments made before receiving forgiveness in as few as 120 months. However, we think excluding those periods from the shortened forgiveness timeline would create confusion for borrowers and operational challenges that are more problematic than the Department's initial reasons for not counting those periods. We think borrowers would have trouble

understanding why some months count toward one tally of time to forgiveness but not others. Such an approach would also create significant operational challenges as the Department would have to keep track of two different measures of progress toward forgiveness, which could increase the risk of error. Given that the periods of deferment and forbearance being counted toward forgiveness are tied to specific circumstances that will not just be available to most borrowers, we now think the overall gains from establishing one measure of progress toward forgiveness is appropriate.

*Changes:* We have revised § 685.209(k)(4)(i) to remove the phrase ''including a payment of $0, except that those periods of deferment or forbearance treated as a payment under (k)(4)(iv) of this section do not apply for forgiveness under paragraph (k)(3) of this section'' and in its place add ''or having a monthly payment obligation of $0.''

*Comment:* Other commenters suggested that the time spent in certain deferment and forbearance periods that count toward PSLF also be counted toward IDR forgiveness.

*Discussion:* The Department agrees with the commenters that all months that borrowers spent in deferment or forbearance that get credited as time toward forgiveness for PSLF should be credited as time toward forgiveness for IDR. However, the inverse is not always true. The Department will award credit toward IDR forgiveness for the unemployment and rehabilitation training deferments for which a borrower would not be able to be employed full-time and which do not count for PSLF.

*Changes:* We have revised § 685.209(k)(4)(v) to include that a payment toward a month of forgiveness in PSLF will count toward a month of forgiveness in IDR.

*Comment:* A few commenters expressed concern that the Department does not provide different forbearance status codes to lenders and loan servicers, thereby creating an operational challenge. Specifically, commenters pointed out the need to distinguish among and report the types of forbearance, as currently only one forbearance status code exists in the National Student Loan Data System (NSLDS).

*Discussion:* We agree that the Department should provide different forbearance status codes to lenders and loan servicers. This is an operational issue that does not need to be addressed in the rule. However, given the comment we wish to clarify how this

provision will be implemented for borrowers. The Department will only be implementing this treatment of crediting certain periods of forbearance for months occurring on or after July 1, 2024. This reflects the data limitations mentioned by commenters, which would otherwise result in the overawarding of credit for forbearance statuses that go beyond those we include in the rule. The Department also believes the one-time payment count adjustment will pick up many of these same periods and as a result a separate retroactive application is not necessary.

The Department will take a different approach to deferments. For those, the Department has the data needed to determine the months a borrower is in specific deferments and can count past periods. Here we note that the Department will already be crediting all periods of non-in-school deferments prior to 2013 as part of the one-time payment count adjustment so this will only apply to periods starting in 2013. The Department is currently evaluating when we will be able to implement this change and as noted earlier in this rule, we may publish a **Federal Register** notice indicating if this is going to be implemented sooner than July 1, 2024.

*Changes:* We have amended § 685.209 (k)(4)(iv) to clarify that only periods in the forbearances noted in that section on or after July 1, 2024, will be counted toward forgiveness.

*Comments:* One commenter disagreed with our proposals for considering certain deferment and forbearance periods as counting toward IDR forgiveness. This commenter believed that deferments and forbearances allow borrowers to avoid making payments and that our proposals would allow us to classify those periods of deferments or forbearance as payments.

*Discussion:* We disagree with the commenter's framing of the Department's policy. Forbearances and deferments are statutory benefits given to borrowers when they meet certain criteria, such as deferments for borrowers while they are experiencing economic hardships or forbearances for students who are servicemembers who have been called up for military duty. We have carefully reviewed all of the different forbearances and deferments available to borrowers and intentionally decided to only award credit toward IDR forgiveness for those instances where the borrower would or would be highly likely to have a $0 payment or where there is confusion about whether they should choose IDR or the opportunity to pause their payments. The former category includes situations like an unemployment deferment, while

the latter includes deferments related to service in the military, AmeriCorps, or the Peace Corps. All of these deferments and forbearances also require borrowers to complete documentation and be approved. The forbearances that we are not proposing to provide credit toward forgiveness are those where the Department is concerned about creating unintended incentives to not make payments.

*Changes:* None.

*Comments:* Several commenters proposed that borrowers who are in a forbearance while undergoing a bankruptcy proceeding should receive credit toward forgiveness. They noted that in many cases borrowers may be making payments during that proceeding. They also noted that while borrowers currently have a way to get credit toward IDR by including language in their bankruptcy agreement, that option is infrequently used and confusing for borrowers.

*Discussion:* The Department agrees with the commenters in part. A borrower in a Chapter 13 bankruptcy is on a court-approved plan to pay a trustee. However, we do not know the amount that the trustee will distribute to pay the borrower's loan, nor do we know the payment schedule. The trustee may pay on the student loan for a few months, then switch to paying down other debt. It may also take time for a borrower to have their Chapter 13 plan approved after filing for bankruptcy and not all borrowers successfully complete the plan. For those reasons, the Department is modifying the regulatory text to allow for the inclusion of periods while borrowers are making required payments under a Chapter 13 bankruptcy plan. Borrowers will only be credited for the months during which they are fulfilling their obligations. Given that the Department will not know this information in real time, we have revised the regulation to allow us to credit these periods toward forgiveness when we are notified that the borrower made the required payments on their approved bankruptcy plan. We anticipate that we will be informed about months of successful payments after the trustee distributes payments. We believe that this crediting of months well after the payments to the trustee are made will still provide benefit for borrowers as a Chapter 13 proceeding typically lasts for a few years, leaving an extended period remaining prior to forgiveness.

*Changes:* We have revised § 685.209(k)(4)(iv)(K) to provide that the Department will award credit toward IDR forgiveness for months where the Secretary determines that the borrower

made payments under an approved bankruptcy plan.

*Comments:* As a response to our request for feedback [78] on whether we should include comparable deferments for Direct Loan borrowers with outstanding balances on FFEL loans made before 1993 toward IDR forgiveness, a few commenters responded with the view that we should include time spent on these deferments toward forgiveness. Another commenter noted if we included comparable deferments, we would face data limitations and operational constraints.

*Discussion:* After further evaluation, we concur with the latter commenter. It is not operationally feasible for us to provide credit toward forgiveness for comparable deferments to Direct Loan borrowers with outstanding balances on FFEL loans made before 1993. The Department has limited data pertaining to deferments and forbearances for Direct Loan borrowers who still have an outstanding FFEL loan made before 1993. Therefore, we are unable to include comparable deferments to Direct Loan borrowers with outstanding balances on FFEL loans made before 1993 toward IDR forgiveness.

*Changes:* None.

## Catch-Up Payments (§ 685.209(k))

*Comment:* Many commenters strongly supported the Department's proposed catch-up payments provision that would allow borrowers to receive loan forgiveness credit when they make qualified payments on certain deferments and forbearances that are not otherwise credited toward forgiveness.

*Discussion:* We thank the commenters for their support. We believe this process will provide a way to make certain borrowers can continue making progress toward forgiveness even if they intentionally or unintentionally select a deferment or forbearance that is not eligible for credit toward forgiveness. By requiring borrowers to make qualifying payments for these periods we successfully balance that flexibility with ensuring borrowers do not have an incentive to intentionally pause their payments rather than join an IDR plan.

*Changes:* None.

*Comments:* Several commenters felt that requiring a borrower to document their earnings for past periods to receive catch-up credit would create an administrative burden for the borrower, as well as the Department. These commenters further suggested that we annually notify borrowers if they have eligible periods of deferment and

[78] See 88 FR 1906.

forbearance for which they are eligible for catch-up payments.

Several commenters suggested that the Department automate the hold harmless periods and give borrowers credit toward forgiveness for any period of paused payments.

Several commenters requested that the Department set the catch-up payments to allow $0 payments if we could not determine the amount of the catch-up payments.

One commenter suggested that the proposed catch-up period would be virtually unworkable for the Department and sets both borrowers and FSA up for failure. This commenter recommended eliminating or restricting this provision because the required information is too difficult for borrowers to obtain.

*Discussion:* In continuing to review the proposal from the NPRM, the Department considered how best to operationalize the process of giving borrowers an option for buying back time spent in deferment or forbearance that is not otherwise credited toward forgiveness. We also looked at ways to create a process that we can administer with minimal errors and with minimal burden on borrowers. We believe doing so will address both the operational issues raised by some commenters, as well as the concerns raised by others about borrowers being unable to take advantage of this provision or being unduly burdened in trying to do so.

In considering these issues of operational feasibility and borrower simplicity, we have decided to revise the catch-up option that was proposed in the IDR NPRM. Specifically, we will offer the catch-up option for periods beginning after July 1, 2024. This reflects the Department's assessment that we lack the operational capability to apply this benefit retroactively. Instead, we believe the one-time payment count adjustment will capture most periods that we would have otherwise captured in this process—and it will do so automatically.

In considering the comments about making this process as simple and automatic as possible, the Department determined that the best way to apply this benefit going forward is to allow borrowers to make catch-up payments at an amount equal to their current IDR payment when they seek to make up for prior periods of deferment or forbearance that are not otherwise credited. This amount will easily be known to both the borrower and the Department and minimizes the need for any additional work by the borrower. However, because we base the catch-up payment upon the current IDR payment, the Department is limiting the usage of

the catch-up period to only the months of deferment or forbearance that ended no more than three years prior to when the borrower makes the additional catch-up payment and that took place on or after July 1, 2024.

We believe this 3-year catch-up period is reasonable because IDR payments can reflect a period of up to 3 calendar years prior to when the borrower certifies their income. As an example, a borrower who signs up for IDR in 2026 before they file their tax return will likely have their monthly payments calculated using their 2024 income. The Department is providing borrowers with one additional year, for a total of three years, to make catch-up payments to allow for additional flexibility while ensuring that current IDR payments will not be used to receive credit for periods much further in the past.

Because we are structuring the catch-up period to use the current IDR payment, we are also excluding periods of in-school deferment from this provision. Borrowers may spend multiple years in an in-school deferment, graduate, and then immediately go onto IDR using their prior (or prior-prior) year tax data, which would likely make them eligible for a $0 payment if they were not working full-time while in school. Allowing borrowers to make catch-up payments for periods of in-school deferment would therefore allow recent graduates to get credit toward IDR for their entire period of enrollment without having to make any payments. While it is true that some borrowers may want to make payments while in school and may improperly end up in an in-school deferment instead, we believe these instances are best addressed through complaints to the Ombudsman rather than through the catch-up provisions in this rule.

The approach taken in this final rule will address several concerns raised by the commenters. First, the catch-up payments will always be made based upon the borrower's current IDR payment amount. That means borrowers will not face the burden of collecting documentation of past income. Second, making this policy prospective only and assigning it a clearer time limit will make it easier for the Department to make borrowers aware of the benefit. We will be able to inform borrowers each year on how many payments may be eligible for this catch-up process. That way borrowers will know how many months could be addressed through the catch-up option and when months would no longer be eligible for this approach. At the same time, it

avoids the operational issues identified by other commenters about retroactive review of accounts.

Upon further review of the operational and budgetary resources available, the Department does not believe it would be able to administer the catch-up process for earlier periods within a reasonable time frame. And we do not believe that other suggestions from commenters that would be simpler, such as giving any borrower in this situation credit for a $0 payment, would be an appropriate and fair step. There likely would be borrowers in that situation who could have made an IDR payment and we are concerned that automatically awarding a $0 payment would create an inappropriate mechanism for avoiding payments.

The Department recognizes this approach is different from what was included in the final rule for PSLF, and we note that months awarded for purposes of PSLF through that process will still count for IDR. In the final rule[79] for PSLF published on November 1, 2022, the Department proposed allowing catch-up payments for any period in the past up to the creation of the PSLF program. However, the Department believes such an approach is more feasible in the case of PSLF because the PSLF program is 13 years newer than IDR. The PSLF policy also affects a much smaller number of borrowers—about 1.3 million to date— compared to more than 8 million borrowers on IDR overall. Moreover, the PSLF program only requires 120 months of payments compared to up to 300 payments on IDR. That means the administrative burden of counting payments will be offset by the fact that the policy will move PSLF borrowers significantly closer to forgiveness on PSLF than it would on IDR. Similarly, the Department believes awarding credit for catch-up periods of in-school deferment is reasonable in PSLF because that program has a requirement that borrowers be working full-time, limiting the prospect of a borrower using lower earnings while in-school to get a $0 payment after school and then receive significant amounts of credit toward forgiveness.

*Changes:* We have amended § 685.209(k)(6)(i) to provide that the catch-up period is limited to periods excluding in-school deferments ending not more than three years prior to the payment and that the additional payment amount will be set at the amount the borrower currently must pay on an IDR plan. We have also amended § 685.209(k)(6)(ii) to note that, upon

request, the Secretary informs the borrower of the months eligible for payments under paragraph (k)(6)(i).

*Comment:* Several commenters suggested that lump sum payments should be counted as catch-up payments and treated the same in both IDR and PSLF.

*Discussion:* The Department agrees with commenters that lump sum payments in both IDR and PSLF should count toward forgiveness in the same manner. To that end, we believe that our current practice and operations are sufficient, as we already consider lump sum payments in advance of a scheduled payment to count toward IDR forgiveness. The changes made in the PSLF regulation were designed to align with the existing IDR practice.

*Changes:* None.

*Comments:* Several commenters suggested that we clarify that defaulted loans could receive loan forgiveness credit if the borrower makes catch-up payments. Furthermore, the commenters asked whether borrowers would qualify for loan forgiveness credit now if they had made $0 payments in the past.

*Discussion:* The Department will apply the catch-up option the same regardless of whether a borrower was in repayment or in default so long as they are on an IDR plan at the time they make the catch-up payment. As noted in response to other comments in this section, the catch-up payments provision will only apply to periods starting on or after July 1, 2024. Borrowers in default, like borrowers in repayment, will not be able to make catch-up payments to receive credit toward forgiveness for periods prior to that date, though they may receive credit for additional periods under the Department's one-time payment count adjustment.[80]

*Changes:* None.

## Treatment of Income and Loan Debt (§ 685.209(e))

*Comments:* Several commenters supported the Department's proposal to provide that if a married couple files separate Federal tax returns the borrower would not be required to include the spouse's income in the information used to calculate the borrower's Federal Direct loan payment. Commenters supported this provision to only consider the borrower's income when a borrower is married but filing separately to be consistent with the PAYE and IBR plans.

One commenter argued that the married filing separately option is

---

[79] See 87 FR 65904.

[80] *www.studentaid.gov/announcements-events/ idr-account-adjustment.*

seriously flawed, because filing taxes in this manner is often very costly, given the deductions and credits that married people filing separately lose out on. The commenter further asserted that borrowers should not have to choose between paying more on their taxes or their loans. They encouraged the Department to consider allowing borrowers to submit joint tax returns and all of their individual W2s and 1099s when certifying income each year.

Several other commenters argued that loan payment amounts should be tied to the individual who took out the loans. Several other commenters argued that if a spouse did not borrow the loans, it is irrelevant how much money they earned.

*Discussion:* We agree with the commenters that felt that it was appropriate to exclude the spouse's income for married borrowers who file separately when calculating monthly payments and to have more consistent regulatory requirements for all IDR plans. In addition, we sought to help borrowers avoid the complications that might be created by requesting spousal income information when married borrowers have filed their taxes separately, such as in cases of domestic abuse, separation, or divorce.

The HEA requires that we include the spouse's income if the borrower is married and files jointly. Specifically, Sec. 455(e)(2) of the HEA states that the repayment amount for a loan being repaid under the ICR plan ''shall be based on the adjusted gross income (as defined in section 62 of the Internal Revenue Code of 1986) of the borrower or, if the borrower is married and files a Federal income tax return jointly with the borrower's spouse, on the adjusted gross income of the borrower and the borrower's spouse.'' The Department must include a spouse's income for married borrowers who file joint tax returns. The new family size definition means that while we will no longer require a married borrower filing separately and repaying the loan under the REPAYE plan to provide their spouse's income, the borrower cannot include the spouse in the family size number under this status. This revised definition will apply to the PAYE, IBR, and ICR plans. Previously, borrowers repaying under IBR, PAYE, or ICR were permitted to include the spouse in family size when filing separately and borrowers repaying under REPAYE could include the spouse only if the spouse's income was provided separately. However, since borrowers will no longer be required to provide the spouse's income, all plans will require

the removal of the spouse from the family size number when the borrower is filing separately. After these new regulations are effective, the only instance in which a married borrower will include the spouse in family size is when the borrower and spouse file a joint Federal tax return. This new definition will provide more consistent treatment since borrowers will not include their spouse in the family size when excluding the spouse's income for purposes of calculating the payment amount under any of the IDR plans.

*Changes:* None.

## Borrower's Income and Family Size §§ 685.209(a)(1)(i), 685.209(c)(1)(i), and 685.221(a)(1)

*Comments:* Many commenters supported the Department's proposal to change the regulations to provide that married borrowers who file separate Federal tax returns would not be required to include their spouse's income for purposes of calculating the payment amount under REPAYE. Other commenters believed that our proposals would disadvantage married borrowers in relation to single individuals and would make couples less likely to get married or, for those borrowers already married, more likely to divorce. These commenters explained that married couples filing jointly are allowed to exclude less total income than are unmarried couples. These commenters suggest that our proposal would penalize married couples.

Another commenter expressed concern over the budgetary cost of the regulation and believed certain married borrowers would experience a windfall. This commenter believes that married borrowers could choose to file separate tax returns to reduce their student loan payments and that many borrowers will try to ''game'' the system by filing separately, particularly among households with one earning spouse. Similarly, several commenters urged us to maintain the current REPAYE regulations regarding AGI calculations for married couples.

*Discussion:* We thank the commenters who support this provision. Establishing the same requirements and procedures with respect to spousal income across all of the IDR plans will alleviate confusion among borrowers when selecting a plan that meets their needs. It will make it easier for future student loan borrowers to choose between IBR and REPAYE and may encourage some borrowers eligible for PAYE to switch into REPAYE, further simplifying the system. Excluding spousal income under all IDR plans for borrowers who file separate tax returns creates a more

streamlined process for borrowers and the Department.

Section 455(e)(2) of the HEA requires that the repayment schedule for an ICR plan be based upon the borrower and the spouse's AGI if they file a joint tax return.

Under these final regulations, married borrowers filing separately will include only that borrower's income for purposes of determining the payment amount under REPAYE. Depending on the couple's circumstances, filing separately may or may not be advantageous for the taxpayers. The married couple has the option to either file separately or file jointly as allowed by the Federal tax laws.

We already responded to comments about how the used of FPL affects marriage incentives in the *Other Issues Pertaining to Income Protection Threshold* section of this document. As also noted in that section, allowing married borrowers to file separately and exclude their spouse's income from the payment will address the more significant potential drawback to marriage that existed in the REPAYE plan. We also note that if both earners in a household have student loan debt, both of their debts are covered by the same calculated payment amount. That means if 5 percent of a household's total income is going to student loan payments, then it is in effect 2.5 percent of the household income going to one borrower's payments and the other 2.5 percent going to the other.

*Changes:* None.

## Forgiveness Timeline (§ 685.209(k))

*Comments:* Many commenters urged the Department to set a maximum forgiveness timeline of 20 years for both undergraduate and graduate borrowers in all IDR plans. A few commenters suggested that the disparity between the forgiveness timeline for undergraduate and graduate loans may discourage undergraduates from pursuing a graduate education.

*Discussion:* The Department disagrees with the suggestion and will keep the maximum time to forgiveness at 20 years for borrowers with only undergraduate loans and 25 years for borrowers with any graduate loans. Under the current REPAYE regulations published in 2015,[81] borrowers with any graduate debt are required to pay for 300 months (the equivalent of 25 years) to receive forgiveness of the remaining loan balance instead of the 240 months required for undergraduate borrowers. As discussed in the IDR NPRM [82] and

[81] See 80 FR 67204 (October 30, 2015).
[82] See 88 FR 1901–1905.

reiterated here, there are significant differences between borrowing for undergraduate versus graduate education. Congress recognized these distinctions, as well, by providing different loan limits [83] and interest subsidies [84] between undergraduate and graduate borrowers. Graduate PLUS borrowers do not have a strict dollar-based limit on their annual or lifetime borrowing in contrast to the specific loan limits that apply to loans for undergraduate programs. We believe that our 2015 decision to treat undergraduate and graduate borrowing differently was appropriate and should not be changed.[85] We appreciate the concerns expressed by the commenters and the suggested alternative approaches. However, we continue to believe that it is important to have borrowers with higher loan balances make payments over a longer period before receiving loan forgiveness. Providing loan forgiveness after 20 years of repayment for all borrowers, regardless of loan debt, would be inconsistent with this goal and, equally importantly, would result in significant additional costs to taxpayers that would not address the Department's broader goals in this rule.

We do not share the concern of some commenters that the longer forgiveness timeline for graduate borrowers will discourage students from pursuing a graduate education. In fact, in the time since REPAYE was first created, graduate enrollment has increased even as undergraduate enrollment has declined. The Department does not view having graduate debt negatively. Pursuing education beyond the bachelor's degree opens career pathways that would otherwise be unavailable to many people. Nonetheless, we remained concerned about the increasing share of loans borrowed for graduate education and how much higher loan balances of borrowers with graduate debt can affect the benefits from IDR plans. The longer repayment timeframe is the simplest way that we can equitably distribute benefits to borrowers.

*Changes:* None.

*Comments:* Several commenters suggested that we reduce the maximum time to forgiveness for borrowers. A few commenters suggested that we reduce the maximum time to forgiveness to 15 years for undergraduate borrowers and to less than 15 years for borrowers with low incomes. Several commenters

suggested that we set the maximum forgiveness thresholds at 10 years for undergraduate borrowers and 15 years for graduate borrowers.

*Discussion:* The Department's goal in developing the changes to REPAYE included in these regulations is to encourage more borrowers who are at a high risk of delinquency or default to choose the REPAYE plan and to simplify the process of selecting whether to enroll in a particular IDR plan. At the same time, the plan should not include unnecessary subsidies for borrowers that do not help accomplish those goals. We believe that the various shortened times for forgiveness proposed by these commenters would give more benefits to higher-income borrowers who can afford to repay their loans.

We believe the changes to the payment amounts under REPAYE, coupled with the opportunity for lower-balance borrowers to receive forgiveness after a shortened period, will accomplish our goals better than the suggestions from the commenters. These changes will also benefit other borrowers who borrowed higher amounts.

The Department does not think that setting a forgiveness threshold at 10 years of monthly payments would be appropriate for all undergraduate borrowers. As discussed in the IDR NPRM and in the section in this preamble on shortened forgiveness, we think a forgiveness period that starts as early as 10 years of monthly payments is appropriate only for borrowers with the lowest original principal balances. Using a 10-year timeline for all undergraduate borrowers would allow individuals with very high incomes to receive forgiveness when they would otherwise have repaid the loan. The same is true for setting forgiveness at 15 years for graduate borrowers. The Department is concerned that such a short repayment time frame for any graduate borrower regardless of balance would provide very significant benefits to high-income borrowers who might otherwise repay the loan in full between years 15 and 25. Helping borrowers with lower incomes is the Department's priority as we improve the REPAYE plan.

*Changes:* None.

*Comments:* Many commenters expressed concerns about possible tax liabilities and pointed out that the loan amount forgiven will be considered taxable income for the borrower. Several commenters argued that it would be harsh to tax the amount of the loan that is forgiven, especially because people who are struggling to repay their student

loans do not have the money to pay taxes on such a potentially large sum. One commenter noted that borrowers may be taxed on the amount of the loan that is forgiven, which may be reduced due to the interest benefit provided to the borrower. Another commenter explained that the borrower would have to enter into a payment plan with the IRS—which charges interest—and defeats the purpose of loan forgiveness.

*Discussion:* The Department does not have the authority to change the income tax laws relating to the amount of any loan that is forgiven. The IRS and the States have their own statutory and regulatory standards for what is considered taxable income—and whether that income is taxable or not. A borrower may need to consider any tax implications of their choice of repayment plan and potential loan forgiveness and any resulting taxes.

*Changes:* None.

## Shortened Forgiveness Timeline (§ 685.209(k))

### General Support

*Comments:* Many commenters supported the Department's proposal to shorten the time to forgiveness for borrowers in the REPAYE plan to as few as 10 years of monthly qualifying payments for borrowers with original loan balances of $12,000 or less which would increase by 1 year for every additional $1,000 of the borrower's original principal balance.

*Discussion:* We thank the commenters for their support. We believe that shortening the time to forgiveness for borrowers with loan balances of $12,000 or less will help to address our goal of making REPAYE a more attractive option for borrowers who are more likely to struggle to afford their loan payments and decrease the frequency of delinquency and default. This will include counting past qualifying payments for borrowers with these low loan balances.

### General Opposition

*Comments:* Several commenters opposed our proposals for shortened forgiveness timelines. They claimed that our proposal conflicts with the statute. According to these commenters, the standard repayment period under the HEA is 10 years, and while the statute permits ICR plans for loans to be repaid for an "extended period of time," the commenters suggest that loan forgiveness under an ICR plan may only be permitted after 10 years, and that loan forgiveness may not occur as soon as 10 years as we have proposed. Several other commenters believed that

---

[83] See Sec. 428H(d) of the HEA.

[84] Congress terminated the authority to make subsidized loans to graduate and professional students in 2012. See Sec. 455(a)(3) of the HEA.

[85] See 80 FR 67221.

we would violate Congress' intent by extending the 10-year forgiveness timeline, which applies to the PSLF Program, to all borrowers. These commenters believe that Congress generally established maximum repayment periods of 20 to 25 years for loans.

*Discussion:* We discuss the legal arguments about the underlying statutory criteria in the *Legal Authority* section of this document. As a policy matter, we disagree with the commenters. As noted in the IDR NPRM and in this preamble, we are concerned about high rates of delinquency and default in the student loan programs and those negative problems are particularly concentrated among these lower-balance borrowers. We believe this provision will help make REPAYE a better option for those borrowers, which will assist us in achieving our goals.

*Changes:* None.

*Comment:* Commenters argued that the Department's proposal for shortened periods to forgiveness failed to consider that a borrower eligible for this forgiveness after 10 years of monthly payments might still be able to keep paying and therefore, not need forgiveness.

*Discussion:* We disagree with the commenter. By limiting the shortened forgiveness period to borrowers with lower loan balances, borrowers with higher incomes will still pay down substantial amounts of their loan balance, if not pay it off entirely, before the end of the 120 monthly payments. This point is strengthened by the fact that forgiveness is not available until the borrower has made 10 years' worth of monthly payments, which is a point at which borrowers will start to see their income trajectories established. Moreover, Department data show that in general the borrowers who take out the debt amounts that would lead to shortened forgiveness are among those who are most likely to default. We believe this simplified approach will best address our goals of reducing default, while the strict caps on the amount borrowed for undergraduate programs protect against the type of manipulation referenced by the commenter.

*Changes:* None.

*Comments:* One commenter argued that the Department's analysis supporting the choice of thresholds for the shortened period to forgiveness was arbitrary because it would result in the median person benefiting from this policy. They argued that forgiveness should not be for the general person.

*Discussion:* The Department disagrees with the commenter. The overall policy purpose of the shortened timeline to forgiveness is to increase the likelihood that the most at-risk borrowers select an IDR plan that reduces the time spent in repayment before their loan debt is forgiven and, by doing so, reducing rates of default and delinquency.

To determine the maximum original principal balance that a borrower could receive to qualify for a shortened period of forgiveness, the Department compared the level of annual earnings a borrower would need to make to not qualify for forgiveness to the median individual and household earnings for early career adults at different levels of educational attainment. These calculations show that a borrower in a one-person household would not benefit from the shortened forgiveness if their starting income exceeded $59,257, while the median earnings for early career workers with at least some college education is $74,740. As a result, the median individual with at least some college education would not benefit from shortened forgiveness and we believe it is reasonable that a borrower with earnings above a typical college-educated individual should not benefit from the shortened period to forgiveness. The commenter did not provide a suggestion for what a different reasonable threshold might be.

We also note that the maximum earnings to benefit from the shortened forgiveness deadline is likely to be far different from the actual earnings of most individuals who ultimately benefit from this policy. Generally, borrowers with this level of debt tend to be independent students who only completed one year of postsecondary education and left without receiving a credential. These individuals tend to have earnings far below the national median figures, which is one of the reasons why they are so likely to experience delinquency and default.

*Changes:* None.

*Tying Forgiveness Thresholds to Loan Limits*

*Comments:* In the IDR NPRM, we requested comments on whether we should tie the starting point for the shortened forgiveness to the first two years of loan limits for a dependent undergraduate student to allow for an automatic adjustment. Several commenters said shortened periods until loan forgiveness should not be tied to loan limits. Some of those commenters said the starting point for shortened forgiveness should remain at $12,000. These commenters felt that if the regulations specify that higher loan limits mean earlier forgiveness, the budgetary costs of raising the loan limits will increase. Another commenter mentioned that if Congress were to raise Federal student loan limits in the future, the effectiveness of this threshold would likely be reduced for low-balance borrowers. Another point some commenters made was that tying forgiveness to the loan limit thresholds would make it harder for Congress to raise loan limits.

Other commenters argued that we should index the starting point of shortened forgiveness to the statutory loan limits for the first two of years of college for dependent students. Another commenter who supported indexing the starting point to the statutory loan limits stated that because these loan limits are not indexed to inflation there is an implicit understanding when Congress increases loan limits that they are acknowledging increases in postsecondary education costs.

*Discussion:* The Department's overall goal in crafting changes to REPAYE is to make it more attractive for borrowers who might otherwise be at a high risk of default or delinquency. In choosing the threshold for principal balances eligible for a shortened period until forgiveness, we looked at whether borrowers would have earnings that placed them below the national median of similar individuals. We then tried to relate that amount to loan limits so that it would be easier to understand for future students when making borrowing decisions. That amount happens to be equal to two years of the loan limit for dependent undergraduate students.

However, the suggestion to tie the shortened forgiveness amount to the dependent loan limits generated a number of comments suggesting that we should instead adjust the amounts to two years at the independent loan limit, an amount that is $8,000 higher than the amount included in the IDR NPRM. The Department is concerned that higher level would provide the opportunity for borrowers at incomes significantly above the national median to receive forgiveness and the result would be a benefit that is more expansive than what is needed to serve our overall goals of driving down delinquency and default. By contrast, the $12,000 threshold not only is better targeted in terms of incomes, it also aligns with the borrowing level at which we witness higher levels of adverse student loan outcomes. As previously mentioned in the IDR NPRM, 63 percent of borrowers in default borrowed $12,000 or less originally, while the share of borrowers in default with debts originally between

$12,000 and $19,000 is just 15 percent.[86]

Given that the $12,000 amount is better targeted in terms of income where borrowers would benefit and where the Department sees loan struggles, we think it is better to continue expressing the point at which a borrower could receive forgiveness after 120 monthly payments in explicit dollar terms rather than tying it to loan limits.

*Changes:* None.

*Starting Point for Shortened Forgiveness*

*Comments:* Many commenters suggested that we increase the starting amount of debt at which shortened forgiveness would occur to $20,000, which is equal to the maximum amount that an independent student can borrow for the first two years of postsecondary education. They argued that doing so would provide a shortened time to forgiveness at the maximum amount of undergraduate borrowing for two years. One commenter said that the starting point should be there because independent students are more likely to default on their loans than dependent students. Another commenter said that if we did not change the shortened forgiveness point to $20,000 for everyone, we should distinguish between dependent and independent borrowers and set the starting point for shortened forgiveness at $12,000 for dependent borrowers and $20,000 for independent borrowers.

*Discussion:* We understand why the commenters argued to set the threshold for shortened time to forgiveness at $20,000 to maintain parity between independent and dependent students if we were to establish this threshold explicitly based upon loan limits. However, as noted in the IDR NPRM, we considered adopting thresholds such as the ones suggested by the commenters but rejected them based on concerns that the incomes at which borrowers would benefit from this policy are too high and that the rates of default are significantly lower for borrowers with those higher amounts of debt, including independent borrowers. While independent students have higher loan limits than dependent students, Department data show that the repayment problems we are most concerned about occur at similar debt levels across independent and dependent students. We recognize that independent students often face additional challenges, but we believe that the $12,000 threshold still protects those borrowers most likely to struggle repaying their student loans. For

example, Department data show that, among independent borrowers with student loans in 2022, 33 percent of those who borrowed less than $12,000 in total were in default, compared to 11 percent of independent students who left higher education with higher amounts of debt.

Additionally, establishing different forgiveness thresholds based upon dependency status could also lead to substantial administrative burden and complexity for borrowers, as students can start their borrowing as dependent borrowers and then become independent. For example, of entering students classified as dependent undergraduates in the 2011–12 academic year, 53 percent of those who were enrolled five years later (in the 2016–17 academic year) were considered independent.[87] This is because an undergraduate student who turns 24, gets married, has a child, or meets certain other criteria while enrolled as an undergraduate student becomes an independent student. Also, all students in graduate school are considered independent. Further, it would be administratively difficult to consolidate debt incurred by a borrower both as a dependent and an independent student and maintain different forgiveness thresholds. Accordingly, we think a single structure for shortened forgiveness would be simpler operationally and easier for borrowers to understand. Therefore, we affirm our position of adopting a threshold starting at $12,000 in this final rule.

*Changes:* None.

*Comments:* Several commenters urged the Department to reduce the original balance threshold of $12,000 to $10,000 to receive loan forgiveness for borrowers who have satisfied 120 monthly payments. These commenters argued that associating $10,000 to 10 years is simpler. Others argued that this would make more sense since it is close to the one-year limit for independent undergraduate borrowers.

*Discussion:* As noted elsewhere in this final rule, we are not electing to tie the threshold for the shortened period for loan forgiveness to loan limits and will instead continue it to base it upon the amount originally borrowed. We appreciate the suggestions for simplification from commenters but believe the benefits for borrowers by setting the threshold at a higher level of original principal balance exceeds the simplification benefits.

*Changes:* None.

*Inflation Adjustment*

*Comments:* Several commenters suggested that the shortened forgiveness threshold should be indexed to inflation. One commenter requested that the Department publish annual inflation adjustments. Another commenter indicated that if we index the amount to inflation, we should explain how inflation adjustments would apply to borrowers who were in school versus in repayment.

Another commenter disagreed and felt that the Department should not apply inflation adjustments to the forgiveness level since the Department has already linked early loan forgiveness to loan limits and loan limits do not change that often and the value erodes. Another commenter opposed adjusting for inflation and said that, because the $12,000 is tied to the loan limits for a dependent undergraduate borrowing for the first two years, we should reconsider the terms of our plan in the event that Congress increases loan limits.

*Discussion:* The Department has decided not to apply inflation adjustments to the shortened forgiveness amount. This provision will provide the greatest benefits to borrowers with undergraduate loans and those debts are subject to strict loan limits that have not been increased since 2008. It would not be appropriate to adjust the amount of forgiveness based on inflation when the amount of money an undergraduate borrower could borrow has not changed. Doing so could result in providing shortened forgiveness to higher-income borrowers which would be inconsistent with one of the Department's primary goals of providing relief to borrowers who are most at risk of delinquency and default. Moreover, any kind of inflation adjustment would create different shortened forgiveness thresholds for borrowers based upon when they borrowed, since it would not make sense to increase the thresholds for individuals who are already in repayment.

Given that the Department is not choosing to connect the shortened forgiveness thresholds to loan limits, we similarly do not think an automatic adjustment tied to loan limits would be appropriate. Since Congress does not regularly change the amount that undergraduate students can borrow, including no changes since 2008, we agree with the commenter that it would be more appropriate to conduct an additional rulemaking process if circumstances change such that a

---

[86] See 88 FR 1909.

[87] Analysis of Beginning Postsecondary Students (BPS) 2012/2017. *nces.ed.gov/datalab/powerstats/table/maaiwf.*

different threshold for shortened forgiveness may be appropriate.

*Changes:* None.

*Alternative Formulas*

*Comment:* Many commenters urged the Department to consider providing a shorter time to forgiveness for any borrower whose income either results in a payment amount of $0 or whose payment is insufficient to reduce the principal balance for a period of time under 5 years. Some commenters also argued for an approach where borrowers would earn different amounts of credit toward forgiveness based upon their financial situation. The result is that the lowest income borrowers would earn more than a month's worth of credit for each month they spent in that status.

*Discussion:* The Department does not believe that it is appropriate to adopt either of the commenters' suggestions. We are concerned that it would put borrowers in a strange circumstance in which if they had a $0 payment for a few years in a row they would be better off in terms of loan forgiveness staying at $0 as opposed to seeking an income gain that would result in the need to make a payment. The Department similarly declines to adopt the commenters' suggestion of varying the amount of credit toward forgiveness granted each month based upon borrowers' incomes. Part of the structure of IDR plans is to create a situation where a borrower with a low income at the start of repayment will still end up paying off their loan if their income grows sufficiently over time. The differential credit proposal could work against this goal, especially for individuals who are on career trajectories where pay is very low at first and then increases substantially, such as doctors and others employed in the medical profession. Adopting such an approach could mean that those individuals pick up significant credit toward forgiveness, which then reduces the months when they might be paying off the loan in full or making very significant payments due to their higher income.

*Changes:* None.

*Comments:* A few commenters recommended that we adopt a forgiveness structure in which we discharge part of the borrowers' principal balance each year. These commenters said that the problem with the current IDR plans is that the lowest income borrowers will not see a decrease in their balances. Other commenters provided similar suggestions with forgiveness occurring monthly.

*Discussion:* As noted in the IDR NPRM, we do not believe the Department has the legal authority to make such a change. Section 455(d)(1)(D) of the HEA contemplates a single instance of forgiveness that occurs when the borrower's repayment obligation is satisfied. This means that any loan balance that remains outstanding after the borrower has made qualifying payments according to the terms of the IDR plan in which they are enrolled for a maximum repayment period is to be forgiven. An incremental forgiveness structure like that the commenters suggested would require a statutory change.

*Changes:* None.

*Comments:* One commenter proposed that the Department only make shortened forgiveness available to borrowers seeking non-degree or certificate credentials. Relatedly, several commenters urged us to limit the shortened time to forgiveness to only those borrowers who pursued sub-baccalaureate degrees.

*Discussion:* The Department disagrees with the commenters' suggestions. While we understand the concerns about not extending benefits to borrowers who are less likely to need them, we believe that a limitation like the one the commenter requested would exclude many borrowers for whom this policy would be very important. For instance, the 2004 Beginning Postsecondary Students Study, which tracked students through 2009, found that rates of default are similar between someone who finished a certificate (43.5 percent) and someone who did not finish a degree (39.7 percent). We are concerned that the commenters' suggestion could also disincentivize borrowers who might otherwise consider a baccalaureate degree program. We think keeping the point at which the shortened time to forgiveness applies better accomplishes the overall concern about targeting the benefit. Generally, these debt levels are owed by lower-income borrowers. And as shown in the RIA, we anticipate that very few graduate borrowers will have debt levels that allow them to make use of this benefit.

*Changes:* None.

*Comments:* Several commenters suggested multiple options for forgiveness timelines, such as 10 years for borrowers who had $20,000 in loan debt, 15 years for borrowers who had $57,500 in loan debt, and 20 years for all other amounts. Several other commenters suggested different forgiveness timelines for dependent versus independent students, such as that dependent students receive

forgiveness at 10 years for balances of $12,000 or less, 15 years for balances between $31,000 and $12,000, and 20 years for all amounts over $31,000. These commenters further stated that independent students should have timelines starting at 10 years for balances of $20,000 or less, 15 years for balances between $20,000 and $57,500, and 20 years for balances over $57,500.

One commenter was concerned that the proposed formula created points at which a borrower would see zero added costs from taking on additional debt. In other words, they could borrow more debt without seeing their total lifetime payments increase. This commenter suggested a few possible formulas, including ones that would provide forgiveness after as few as five or eight years of payments.

Several commenters suggested that the Department measure the periods for forgiveness in terms of months rather than years. In other words, a borrower could have a repayment timeline of 10 years and 1 month based upon the amount they borrowed.

*Discussion:* We appreciate the suggestions from commenters but decline to make changes to the shortened forgiveness formula. Regarding proposals to start the period of forgiveness sooner, the Department believes that it would not be appropriate to have the period of forgiveness be shorter than the existing standard 10-year repayment period. The Department also believes that some of the other proposals would either establish significant cliff effects or create a structure for shortened forgiveness that would be overly complicated. On the former, the Department is concerned that some suggestions to only provide forgiveness after 10, 15, or 20 years would add significant jumps in timelines such that a borrower who takes on debt just above a threshold would be paying for as long as an additional 5 years. This result is distinct from the different treatment of undergraduate and graduate debt where the latter reflects an intentional decision to borrow for an additional type of program. At the same time, the Department is concerned that calculating timelines to forgiveness that could vary by a single month or two would be too confusing for borrowers to understand and for the Department to administer. A slope of an additional year for every $1,000 borrowed creates a clear connection between the period in which the student borrowed and the repayment time frame. The equivalent of saying every $83.33 in debt adds one month would be less likely to affect how

borrowers consider how much debt to take out.

*Changes:* None.

*Other Comments*

*Comments:* Several commenters recommended that the Department clarify how we will calculate the forgiveness timeline for a borrower who starts repayment, then returns to school and takes out new loans. One commenter suggested that the Department create a provision similar to § 685.209(k)(4)(v)(B) that would address this situation to prorate the amount of forgiveness based on the weighted average of the forgiveness acquired for each of the set of loans by the original balance, as well as make the update automatic which would standardize repayment. The commenter also expressed concern that § 685.209(k)(4)(v)(B) only applies to consolidated loans.

*Discussion:* The timelines for forgiveness will be based upon the borrower's total original principal loan balance on outstanding loans. As a result, if a borrower goes back to school and borrows additional loans after some period in REPAYE, the new total loan balance would form the basis for calculating the forgiveness timeline. Absent such an approach, the Department is concerned that a borrower would have an incentive to borrow for a year, take time off and enter repayment, then re-enroll so that they have multiple loans all based upon a shorter forgiveness period, even though the total balance is higher.

Regarding questions about the time to 20- or 25-year forgiveness for a borrower with multiple unconsolidated loans, those loans may accumulate different periods toward forgiveness, even though the total amount of time until forgiveness is consistent. As an example, if a borrower repays for 10 years on one set of undergraduate loans and then borrows more undergraduate loans without consolidating with the earlier loans, the earlier loans will have 10 of the necessary 20 years for forgiveness; the newer loans would have no progress toward forgiveness. If the second set of loans were graduate loans, the borrower would have 15 years remaining on the 25-year forgiveness for the earlier loans and 25 years left for the new loans.

*Changes:* None.

**Automatic Enrollment in an IDR Plan (§ 685.209(m))**

*Comments:* Many commenters strongly supported automatic enrollment into an IDR plan for any student borrower who is at least 75 days delinquent on their loan(s). Many commenters urged the Department to allow borrowers in default who have provided approval for the disclosure of their Federal tax information to also be automatically enrolled in an IDR plan.

One commenter stated that this proposal is a significant step forward because defaulting on student loans has long-term financial consequences. One commenter urged the Department to add regulatory language requiring servicers to notify borrowers with parent PLUS loans who are 75 days delinquent about consolidating their loans and then enrolling in IDR.

*Discussion:* We agree with the commenters that this is a step forward to give borrowers an important opportunity to repay their loans instead of defaulting. While our hope is that borrowers will give us approval for disclosing their Federal tax information prior to going 75 days without a payment, we recognize that it is possible that a borrower may choose to give us their approval only after entering default. Therefore, if a borrower in default provides approval for the disclosure of their Federal tax information for the first time, we would also calculate their payment and either enroll them in IBR or remove them from default in the limited circumstances laid out in § 685.209(n). The same considerations would apply to both delinquent and defaulted borrowers in terms of the Department needing approval and the borrower needing to see a reduction in payments from going onto an IDR plan. However, we will not apply this provision for borrowers subject to administrative wage garnishment, Federal offset, or litigation by the Department without those borrowers taking affirmative steps to address their loans. Accordingly, we have broadened this provision to include borrowers whose loans are in default, with the limitation that it would not include borrowers subject to Federal offset, administrative wage garnishment or litigation by the Department. If a borrower has loans both in good standing in repayment and in default, the loans in repayment would be eligible for automatic enrollment in REPAYE.

We appreciate the suggestion that the regulations be modified to require the Department to notify parent PLUS borrowers who are delinquent about the option to consolidate their loans, which would allow them access to ICR. Currently, the Department provides borrowers with this information through numerous methods. The requirements applicable to our servicers in this area are addressed operationally and not in regulations.

*Changes:* We have revised § 685.209(m)(3) to provide that a borrower who has provided approval for the disclosure of their Federal tax information and has not made a scheduled payment on the loan for at least 75 days or is in default on the loan and is not subject to a Federal offset, administrative wage garnishment under section 488A of the Act, or a judgment secured through litigation may automatically be enrolled in an IDR plan.

*Comments:* One commenter was concerned that borrowers may be unaware of IDR plans. This commenter stated that automatically moving borrowers to an IDR plan and presenting them with an anticipated lower payment would more effectively raise awareness than additional marketing or outreach. Moreover, this commenter expressed concern that a borrower may become delinquent because their current repayment amount may be unaffordable.

*Discussion:* We thank the commenter for their concern about borrowers' awareness of the IDR plans. The Department shares this commenter's concern and anticipates having multiple communication campaigns and other methods explaining the REPAYE plan to borrowers. We agree with the commenter about the benefits of automatically enrolling borrowers and will automatically enroll borrowers who are 75 days delinquent into the IDR plan. We believe this approach will help borrowers avoid default and give them an opportunity for repayment success.

*Changes:* None.

*Comments:* Another commenter supported the automatic enrollment for borrowers who are 75 days delinquent but felt that implementation of the regulation will be burdensome because borrowers will have to provide their consent for the Department to obtain income information from the IRS. Several commenters argued that they are concerned that automatic enrollment depends on borrowers providing previous approval to disclose the borrower's Federal tax information and family size to the Department.

Another commenter stated that automatic enrollment in an IDR plan is unlikely to be effective and cannot be implemented. The commenter believed it is misleading to characterize the application or recertification process as automatic for delinquent borrowers since borrower approval for the IRS to share income information with the Department is required.

*Discussion:* It is true that a borrower must have previously provided approval for the disclosure of tax information to be automatically enrolled in an IDR plan when becoming 75 days delinquent; however, we believe that calling it automatic enrollment is appropriate because the goal is for borrowers to provide such approval when they are first in the process of taking out the loan. The result is that the enrolment in IDR can be more automatic at the time of delinquency. As the Department implements this functionality, we are working to make the process of providing such approval as simple as legally possible for the borrower.

*Changes:* None.

## Defaulted Loans (§ 685.209(d), (k), and (n))

*Comments:* Many commenters expressed strong support for the Department's proposal to allow defaulted borrowers to enroll in the IBR plan, so that they can receive credit toward forgiveness. Other commenters agreed that the IBR plan was the appropriate plan for borrowers in default, and also encouraged the Department to automatically enroll all borrowers exiting default into the lowest cost IDR plan.

*Discussion:* We agree with the commenters that enrollment in the IBR plan is the proper IDR option for borrowers in default. Allowing them to choose this one plan instead of choosing between it and REPAYE simplifies the process of selecting plans and provides borrowers with a path to accumulate progress toward forgiveness. This is particularly important for borrowers who cannot exit default through loan rehabilitation or consolidation. As we explain under the ''Automatic Enrollment in an IDR Plan'' section of this document, we will automatically enroll in IBR a borrower who is in default if they have provided us the approval for the disclosure of tax data.

We agree with the suggestion to help borrowers access other IDR plans upon leaving default if possible. To that end, we have updated the regulatory text noting that a borrower who leaves default while on IBR may be placed on REPAYE if they are eligible for the plan and doing so would generate a payment lower than or equal to their monthly payment.

*Changes:* We added a provision to § 685.210(b)(3) that a borrower who made payments under the IBR plan and successfully completed rehabilitation of a defaulted loan may chose the REPAYE plan when the loan is returned to current repayment if the borrower is otherwise eligible for the REPAYE plan

and if the monthly payment under the REPAYE plan is equal to or less than their payment on IBR.

*Comments:* Several commenters disagreed with the proposed regulations relating to defaulted borrowers. They believed that the cohort default rates (CDR) and repayment rates on Federal loans were important indicators of whether a particular institution is adequately preparing its graduates for success in the job market so that they are able to earn sufficient income to remain current on their student loan repayments. Another commenter believed that while our proposals may mitigate the risk of default for individual borrowers, our proposals would also reduce the utility of CDR rates. This commenter reasoned that if CDR were to become a useless accountability tool, we would need new methods of quality assurance for institutions. The commenter concluded that to avoid risk to the taxpayer investment, we should simultaneously draft regulations that provide affordable payments and hold institutions accountable.

In addition, several other commenters noted that consumer disclosure websites, including the Department's ''College Scorecard,'' point to CDRs and metrics describing the proportion of graduates making progress toward repayment as important quality indicators that can help families and matriculating students assess the likelihood that a particular institution offers a reasonably high return on investment.

*Discussion:* We believe that the expanded qualifications under the new REPAYE plan will afford defaulted borrowers more of an opportunity to repay their obligations because their monthly payment will be more appropriately calculated based on their current income and family size. Through other rulemaking approaches, as described in the RIA, the Department is working to implement other accountability and consumer protection measures. In the responses to comments in the RIA we have included a longer discussion of these accountability issues.

*Changes:* None.

*Comments:* Several commenters expressed support for granting access to an IDR plan to borrowers in default but said the Department should amend the terms of IBR to better align with the terms of the REPAYE plan, such as the amount of income protected from payments and the share of discretionary income that goes toward payments. Along similar lines, some commenters raised concerns that a defaulted

borrower's path through IBR is not ideal because IBR is not the most generous plan for monthly payments, particularly when compared with the additional income protections offered in the new REPAYE plan.

A few commenters argued that the Department should grant defaulted borrowers' credit toward cancellation for payments under REPAYE as long as the borrower enrolls in IBR at some point during repayment.

*Discussion:* We appreciate the commenters' support for allowing defaulted borrowers to access an IDR plan. This change will provide a much-needed path that can help reduce borrowers' payments and give them the opportunity for loan forgiveness. While we understand the requests for adjusting the terms of IBR to better match REPAYE, the Department does not have the legal authority to do so.

*Changes:* None.

*Comments:* Several commenters asked that the Department adjust the restrictions on when a borrower who has spent significant time on REPAYE be allowed to switch to IBR. They asked that if a borrower makes extensive payments on REPAYE and then defaults that they still be granted access to IBR while in default.

*Discussion:* The Department disagrees with commenters. The purpose of the restriction on switching to IBR is to prevent situations where a borrower might switch so they could get forgiveness sooner. While it is unlikely that a borrower would default to shorten their period to forgiveness, that is a possibility that we want to protect against. However, by changing the limitation on switching into IBR to only apply once a borrower has made 60 payments on REPAYE after July 1, 2024, we believe that the number of borrowers who end up in default and are affected by this restriction will be low. In general, default rates for borrowers on IDR plans are quite low and we anticipate they will remain low due to improvements in the annual recertification process.

*Changes:* None.

*Comments:* Several commenters asked the Department to allow a borrower in default who has a Direct Consolidation Loan that repaid a parent PLUS loan to access the IBR plan. Commenters further explained that while this option might not always give borrowers a lower payment in default, and it would not count toward forgiveness, it would provide more affordable payments for some borrowers.

*Discussion:* Section 493C of the HEA precludes a borrower with a Direct Consolidation Loan that repaid a parent

PLUS loan from using the IBR plan. The Department also declines to grant access to the ICR plan for a borrower in default. We are concerned that time in default does not count toward forgiveness and would not help address a borrower's long-term situation. We note that if a borrower with a Direct Consolidation Loan that repaid a parent PLUS loan rehabilitates their defaulted loan, they may access the ICR plan after getting out of default.

*Changes:* None.

*Comments:* Several commenters argued that we should waive collection fees entirely for those making payments under IDR or create a statute of limitations on collection fees. Those commenters also recommended waiving collection charges during repayment as a greater incentive to repay the loan than forgiving a portion of the loan two decades in the future.

*Discussion:* The Department understands that increasing collection fees can discourage borrowers from repaying their loans. However, the HEA generally requires borrowers to pay the costs of collection.[88] We will consider the appropriate level of collection fees for borrowers in default who make voluntary payments including payments made while enrolled in an IDR plan. These are subregulatory issues that are not addressed in this final rule.

*Changes:* None.

*Comments:* Many commenters supported the provision that allows borrowers to receive credit toward forgiveness for any amount collected through administrative wage garnishment, the Treasury Offset Program, or any other means of forced collection that is equivalent to what the borrower would have owed on the 10-year standard plan. But many of these same commenters expressed confusion about regulatory language that indicated we would award credit for forgiveness for involuntary collections based upon amounts that equaled a payment on the 10-year standard plan. They asked why a borrower would not receive credit based upon their IBR payment.

*Discussion:* The Department expects that borrowers in IBR will make payments while they are in default, but we recognize that they may face some involuntary collections. We agree with the commenters that if a borrower has provided the necessary information to calculate their IBR payment, we would treat amounts collected through involuntary methods akin to how we consider lump sum or partial payments for a borrower who is in repayment. That means if we know what they

should be paying each month under IBR, we could credit a month of progress toward forgiveness on IBR when we have collected an amount equal to their monthly IBR payment. In other words, if a borrower's monthly IBR payment is $50 and we collect $500 from Treasury offset in one year, we would credit the borrower with 10 months of credit toward forgiveness for that year. Alternatively, if the borrower's IBR payment was $50 and we collect $25 a month through administrative wage garnishment, we would credit one month of forgiveness for every two months we garnish wages. Upon further review of the proposal from the NPRM we think that only crediting the progress toward forgiveness based upon amounts equivalent to payments on the 10-year standard plan when we know that a payment based on their income would be lower is not appropriate.

This provision would also have limitations that are similar to those on lump sum payments. Namely a borrower would not be able to receive credit at the IBR payment amount for a period beyond their next recertification date. This makes certain amounts stay up to date with a borrower's income.

We do not believe this treatment of forced collections amounts as akin to lump sum payments would put borrowers in default in a better position than those who are in repayment or provide better treatment to someone who voluntarily makes a lump sum payment than someone in this situation who has not chosen to. For one, the borrowers in default would still be facing the negative consequences associated with default, including negative credit reporting. These amounts would also not be voluntarily collected. Someone who makes a lump sum payment in repayment is choosing to do so. In these situations, a borrower is not choosing the amount that is collected and it is highly likely that they would choose to not make such large payments all at once. Because the borrowers in default are not controlling the amounts collected, they cannot guarantee that the amounts collected would not be in excess of the amount at which they would stop receiving credit toward forgiveness. In other words, if 12 months of an IBR payment is $1,000 and we collect $1,500, the additional $500 would not be credited as additional months in forgiveness. By contrast, a borrower in repayment could choose to only make a lump sum payment up to the point that they would not be making payments in excess of what is needed to get credit toward forgiveness up to their next

recertification date. Given these existing downsides compared to borrowers in repayment, crediting payments at the equivalent of IBR monthly payments is a modest benefit for borrowers instead of calculating them at the 10-year standard plan. It will help borrowers earn additional credit toward forgiveness and a path out of default compared to only crediting payments at the standard 10-year amount. And the Department hopes that seeing the lower available payment may encourage some of these borrowers to take steps to make voluntary payments instead and cease being subject to forced collections.

Accordingly, we clarified the language to note that amounts collected would be credited at the amount of IBR payments if the borrower is on the IBR plan, except that a borrower cannot receive credit for an amount of payments beyond their recertification date. Borrowers who are not on IBR would be credited toward IBR forgiveness at an amount equal to the amount calculated under the 10-year standard plan. We need to credit those borrowers at that level because we do not know their income and cannot calculate an IBR payment.

*Changes:* We amended § 685.209(k)(5)(ii) to clarify that a borrower would receive credit toward forgiveness if the amount received through administrative wage garnishment or Federal Offset is equal to the amount they would owe on IBR, except that a borrower cannot receive credit for a period beyond their next recertification date. We also added subparagraph (iii) that indicates a borrower would receive credit toward forgiveness on an amount equal to the amount due under the 10-year standard plan from those same sources of involuntary collections if the IBR payment amount cannot be calculated.

*Comments:* Many commenters recommended that the Department clarify that defaulted borrowers who are enrolled in IBR will not be subject to any involuntary collections so long as they are satisfying IBR payment obligations through voluntary payments—including $0 payments for those eligible. Other commenters suggested that the Department should confirm that borrowers enrolled in IDR are either not subject to involuntary collections (such as wage garnishment, seizure of Social Security benefits, or seizure of tax refunds) at all, or at least not for any amounts that exceed their IDR payment obligation.

*Discussion:* We agree with the goals of the many commenters who asked us to cease involuntary collections once a defaulted borrower is on IBR. However,

---

[88] See Sec. 455(e)(5) of the HEA.

involuntary collections also involve the Departments of Treasury and Justice, and we do not regulate the actions of these other agencies. Instead, we will work with those agencies to implement this operational change outside of the regulatory process. We also note that we could access information about defaulted borrower wages through the involuntary collections process even for borrowers not in IBR. We will explore using those data to work with the Departments of Treasury and Justice to better align involuntary collections with what a defaulted borrower would owe under IBR.

*Changes:* None.

*Comments:* Several commenters asked us to create a path out of default based upon a borrower agreeing to repay on an IBR plan. They argued that once a borrower is placed on the IBR plan, they should be able to move back into good standing.

*Discussion:* The Department does not have the statutory authority to establish the path out of default as requested by the commenters. However, the Department recognizes that there may be borrowers who provide the information necessary to calculate an IBR payment shortly after entering default and that such information may indicate that they would have had a $0 payment for the period leading up to their default had they given the Department such information. Since those borrowers would have a $0 monthly payment upon defaulting, the Department believes it would be appropriate to return those borrowers to good standing. This policy is limited to circumstances in which the information provided by the borrower to establish their current IBR payment can also be used to determine what their IDR payment would have been at the point of default.

An example highlights how this would work. A borrower enters default in June 2025. In August 2025, they furnish their Federal tax information for the 2024 calendar year, and it shows they would have had a $0 payment. We would have calculated a $0 payment had the borrower submitted this information in June, thereby preventing the default. That borrower would be removed from default and returned to good standing. Had the same borrower who defaulted in June 2025 provided their information in 2028, they would not receive this benefit. At that point, the information provided is likely from the 2027 calendar year, and so it does not cover the period of default. The effect of this is that most borrowers will need to provide their earnings

information within a year of defaulting to benefit from this policy.

Borrowers who receive this benefit will not have the history of default or any collections that occurred before providing their income information reversed because these defaults did not occur in error. It would also not be available for borrowers with a payment higher than $0, as the Department cannot guarantee that someone who would have had a reduced payment obligation would have met that requirement the way in which we know they would have fulfilled the $0 payment requirement.

This benefit will give low-income borrowers who act swiftly in default a fast path back into good standing without exhausting either their rehabilitation or consolidation options.

*Changes:* The Department has added new paragraph § 685.209(n) to provide that a borrower will move from default to current repayment if they provide information needed to calculate an IDR payment, that payment amount is $0, and the income information used to calculate the IDR payment covers the period when the borrower's loan defaulted.

*Comments:* Many commenters called for the Department to allow previous periods of time spent in default to be retroactively counted toward forgiveness. These commenters asserted that some people in default are disadvantaged borrowers who were poorly served by the system, and that their situation is similar to past periods of deferment and forbearance that are being credited toward loan forgiveness.

*Discussion:* The Department does not agree that periods of time in default prior to the effective date of this rule should be credited toward forgiveness. To credit time toward IBR, we need to know a borrower's income and household information. We would not have that information for those past periods. Therefore, there is no way to know if the amount paid by a borrower would have been sufficient. The Department will award credit for certain periods in deferment retroactively on the grounds that most of those are situations in which the Department knows the borrower would have had a $0 payment, such as an economic hardship deferment or the rehabilitation training deferment. We do not have similar information for past periods in default.

*Changes:* None.

*Comments:* One commenter noted that many borrowers experience obstacles enrolling in an IDR plan after exiting default, especially those who choose to rehabilitate their loans. This

commenter said that research showed borrowers who have rehabilitated their loans tend to re-default.[89] They suggested that the Department should remove the stipulation of completing unnecessary and burdensome loan rehabilitation paperwork.

*Discussion:* We agree with the commenter that it is critical to make it easier for borrowers to navigate the Federal student financial aid programs and share their concerns about making sure borrowers can succeed after rehabilitating a defaulted loan. To help achieve these goals, we have added language that allows the Secretary to place a borrower who successfully rehabilitates a defaulted loan and has provided approval for the disclosure of their Federal tax information on REPAYE if the borrower is eligible for that plan and doing it would produce a monthly payment amount equal to or less than what they would pay on IBR. We feel that this streamlined approach will remove obstacles when borrowers enroll in an IDR plan, especially for those borrowers that rehabilitated their defaulted loans. In addition, this will remove unnecessary and burdensome paperwork.

The Department is adopting an additional change to also help borrowers navigate the process of rehabilitating their loans. We are revising § 685.211(f) to note that a reasonable and affordable payment for the purposes of loan rehabilitation can be equal to the IBR payment amount calculated for the borrower. The current regulations calculate the payment at the IBR amount for borrowers prior to 2014, which is 15 percent of discretionary income. Since then, borrowers have been able to make payments at 10 percent of discretionary income. This change will allow borrowers to make payments at the greater of 10 percent of discretionary income or $5 while pursuing a loan rehabilitation.

*Changes:* We have modified § 685.211(f) to provide that a reasonable and affordable payment can be equal to the borrower's IBR payment amount. We have also added a new paragraph (f)(13) to § 685.211 that allows the Secretary to move a borrower into REPAYE after the satisfaction of a loan rehabilitation agreement if the borrower is eligible for that plan and it would produce a lower or equivalent payment to the IBR plan.

---

[89] *www.pewtrusts.org/en/research-and-analysis/reports/2023/01/student-loan-default-system-needs-significant-reform.*

**Application and Annual Recertification Procedures (§ 685.209(l))**

*Comments:* Many commenters supported the Department's efforts to simplify the annual income recertification process for borrowers in IDR plans. These commenters also felt that the proposed rules would help eliminate burdensome and confusing recertification requirements and administrative hurdles for borrowers. A few commenters were concerned that administering these regulations contained inherent challenges for recertification if a borrower did not file a tax return. One commenter commended the Department for its plan to streamline IDR enrollment and recertification through IRS data sharing. Several commenters urged that we retain the current data retrieval tool with the IRS for FFEL Program borrowers who complete the electronic IDR application which is currently available on the *StudentLoans.gov* website. Another commenter suggested that a robust regulatory notification process is vital, even for borrowers already in IDR since some borrowers will opt out of data-sharing.

*Discussion:* We thank the commenters for their positive comments and suggestions for improvement regarding the application and automatic recertification processes. We understand the commenters' concern about keeping the current process for the IDR application in place. However, we believe that the process we have developed improves and streamlines our processes for borrowers. We will continue to seek additional ways to improve processes.

In response to the commenters' concern about inherent challenges non-filing borrowers face with recertification, under § 685.209(l) we provide the procedures under which we may obtain the borrower's AGI under the authorities granted to us under the FUTURE Act as well as opportunities for borrowers to provide alternate documentation of income (ADOI). Accordingly, we modified § 685.209(l) to provide examples of how borrowers, including those who do not file Federal tax returns, could approve to the disclosure of their tax information for purposes of IDR recertification.

The treatment of IRS data sharing for FFEL Program loans is not a regulatory issue and is not addressed in these rules.

*Changes:* We have modified § 685.209(l) to provide examples of how a borrower could provide approval for the disclosure of tax information for the purposes of IDR.

*Comments:* One commenter believed we should make recertification simpler and, to the maximum extent possible, update the monthly loan payment amount automatically instead of requiring annual certification for continuation in an IDR plan. This commenter believes that many borrowers, especially those borrowers who would otherwise qualify for a $0 monthly payment, do not complete the recertification process.

*Discussion:* We agree, in part, with the commenter about the difficulties borrowers face during recertification. As we acknowledged in the IDR NPRM, the current application and recertification processes create significant challenges for the Department and borrowers. As a solution, we believe that the authorities granted to us under the FUTURE Act as codified in HEA section 455(e)(8) will allow us to obtain a borrower's AGI for future years if they provide approval for the disclosure of tax information. This should ameliorate the commenter's concern about borrowers' failure to recertify. This includes borrowers who would otherwise qualify for a $0 monthly payment in subsequent years.

*Changes:* None.

**Consequences of Failing To Recertify (§ 685.209(l))**

*Comments:* Commenters noted concerns that the current process of annually recertifying participation on IDR plans is burdensome and results in many borrowers being removed from IDR plans. Other commenters argued that the Department needs to do more to protect progress toward forgiveness for those who fail to recertify, especially when the recertification was hampered by what they described as inept servicers.

*Discussion:* We thank the commenters for their support of automatic enrollment for IDR. We believe that the recertification process will enable borrowers to streamline the process toward forgiveness and reduce the burden on borrowers. We also believe that more borrowers will recertify so that they are not removed from IDR plans and that borrowers who struggle to recertify on time will not lose a few months of progress to forgiveness every year. As we explain in the IDR NPRM, due to recent statutory changes regarding disclosure of tax information in the FUTURE Act [90] (alongside subsequent amendments to this language), upon the Department obtaining the borrower's approval, we will rely on tax data to provide a borrower with a monthly payment amount and offer the borrower an opportunity to request a different payment amount if it is not reflective of the borrower's current income or family size.

*Changes:* None.

**Consolidation Loans (§ 685.209(k))**

*Comments:* Many commenters strongly supported the Department's proposal to provide that a borrower's progress toward forgiveness will not fully reset when they consolidate Direct or FFEL Program Loans into a Direct Consolidation Loan. Many commenters supported the proposed regulations, citing that we should count previous payments in all IDR plans and not reset the time to forgiveness when a person consolidates their loans because the debt is not new.

Several commenters expressed disappointment that the proposed regulations did not address how qualifying payments would be calculated for joint consolidation loans that may be separated through the Joint Consolidation Loan Separation Act,[91] which was enacted October 11, 2022, and hoped that the Department would provide more details about counting the number of qualifying payments on the loans.

*Discussion:* We thank the commenters for their support of the provision to retain the borrower's progress toward forgiveness when they consolidate Direct or FFEL Program Loans into a Direct Consolidation Loan.

We did not discuss joint consolidation separation in the IDR NPRM. However, we agree with the commenters that more clarity would be helpful. Accordingly, we have added new language noting that we will award the same periods of credit toward forgiveness on the separate consolidation loans that result from the split of a joint consolidation loan. The Department chose this path as the most operationally feasible option given that these loans are all from 2006 or earlier and it may otherwise not be possible to properly determine the amount of time each loan spent in repayment. We are also clarifying how consideration of whether the separate consolidation loans that result from the split of a joint consolidation loan would be eligible for the shortened period until forgiveness would work. Eligibility for that provision would be calculated based upon the original principal balance of

---

[90] See Public Law 116–91.

[91] Text—S.1098—117th Congress (2021–2022): Joint Consolidation Loan Separation Act. (2022, October 11). *www.congress.gov/bill/117th-congress/senate-bill/1098/text.*

the loans that have been split from a joint consolidation loan.[92]

*Changes:* We have amended § 685.209(k)(4)(vi)(C) to provide that, for borrowers whose Joint Direct Consolidation Loan is separated into individual Direct Consolidation loans, each borrower receives credit for the number of months equal to the number of months that was credited prior to the separation.

### Choice of Repayment Plan § 685.210

*Comments:* One commenter recommended that we update our regulations to provide that, when a borrower initially selects a repayment plan, the Secretary must convey to the borrower specific information about IDR plans, including the forgiveness timelines. This commenter cited a report from the GAO that flagged this area for improvement. Another group of commenters urged us to include regulatory language to make sure that borrowers are aware of the terms and conditions of their IDR plans. This group of commenters were concerned that we eliminated the detailed notices in existing regulations without proposing adequate replacements and provided examples of the notice types that they believed we should implement.

*Discussion:* We believe that our regulations at § 685.210(a) provide an adequate framework describing when the Department notifies borrowers about the repayment plans available to them when they initially select a plan prior to repayment. Moreover, § 685.209(l)(11) already provides that we will track a borrower's progress toward eligibility for IDR forgiveness. In the GAO report [93] cited by the commenter, the GAO recommended that we should provide additional information about IDR forgiveness, including what counts as a qualifying payment toward forgiveness, in communications to borrowers enrolled in IDR plans. The recommendation further noted that we could provide this information to borrowers or direct our loan servicers to provide it. In response to the GAO, we concurred with the recommendation and identified steps we would take to implement that recommendation. As part of the announcement of the one-time payment count adjustment we have also discussed how we will be making

improvements to borrowers' accounts so they will have a clearer picture of progress toward forgiveness. Moreover, we do not think we need regulatory language to accomplish what the commenter requests. We can address these issues while working with our contractors and a subregulatory approach gives us greater ability to tailor our activities to what works best for borrowers.

We similarly disagree that we need to add regulatory text around notifications as suggested by the group of commenters. As part of this regulatory effort, the Department streamlined and standardized the IDR plans. To provide uniformity across the different IDR plans, § 685.209(l)(5) specifies the repayment disclosure that we send to borrowers including: the monthly payment amount, how the payment was calculated, the terms and conditions of the repayment plan, and how to contact us if the borrower's payment does not accurately reflect the borrower's income or family size. The Department thinks it is important to preserve flexibility around how we conduct outreach and notification to borrowers, and we are concerned that overly prescriptive regulations would work against those goals.

*Changes:* None.
*Comments:* None.

*Discussion:* The IDR NPRM did not reflect the statutory requirement under section 493C(b)(8) of the HEA (20 U.S.C. 1098e(b)(8)) that provides that borrowers who choose to leave the IBR plan must repay under the standard repayment plan. This requirement is reflected in current regulations at § 685.221(d)(2)(i) and requires a borrower leaving IBR to make one payment under the standard repayment plan before requesting a change to a different repayment plan. A borrower may make a reduced payment under a forbearance for the purposes of meeting this statutory provision. This provision does not apply to borrowers leaving ICR, PAYE, or REPAYE. To clarify that this statutory provision still applies we are reflecting it in this final rule. It mirrors the Department's longstanding interpretation and implementation of this statutory requirement.

*Changes:* We have added § 685.210(b)(4) which requires a borrower leaving the IBR plan to make one payment under the standard repayment plan prior to enrolling into a different plan.

### Alternative Repayment Plan § 685.221

*Comments:* Several commenters noted that the Department's proposal to simplify the Alternative Plan is a

positive step. They believed that changing the regulations to re-amortize the remaining loan balance over 10 years would make certain that borrowers' monthly payments are lower than they would have been under the Standard 10-year Repayment Plan. A few commenters stated that the Department should count all payments on the alternative plan toward forgiveness on REPAYE, rather than just 12 months of payments. Others argued that, instead of being placed on the alternative payment plan, borrowers should be placed on the 10-year standard plan so that all the months of payments would count toward REPAYE forgiveness.

*Discussion:* We appreciate the support for the creation of a simplified alternative repayment plan. However, we disagree and decline to accept either set of recommended changes. For one, we think the policy to allow a borrower to count up to 12 months of payments on the alternative plan strikes the proper balance between giving a borrower who did not recertify their income time to get back onto REPAYE while not creating a backdoor path to lower loan payments. For some borrowers, it is possible that the alternative repayment plan could produce payments lower than what they would owe on REPAYE. Were we to credit all months on the alternative plan toward forgiveness then we would risk creating a situation where a borrower is encouraged to not recertify their income so they could receive lower payments and then get credit toward forgiveness. Doing so works against our goal to target the benefits of, and encourage enrollment in, REPAYE. It would also in effect work as a cap on payments, which the Department is intentionally not including in REPAYE.

Moreover, the Department anticipates that the number of borrowers who fail to recertify each year will decline thanks to the improvements made by the FUTURE Act. With those changes borrowers will be able to authorize the automatic updating of their payment information, limiting the likelihood that a borrower ends up on the alternative plan for failure to submit paperwork.

We similarly disagree with the suggestion to place borrowers on the 10-year standard repayment plan. Doing so creates a risk that borrowers would face extremely high unaffordable payments right away. That is because the 10-year plan calculates the payment needed for a borrower to pay off the loan within 10-years of starting repayment. For example, a borrower who spent four years on REPAYE and then went onto the 10-year standard repayment plan

---

[92] The Department has published regular updates on the Joint Consolidation Separation Act on *StudentAid.gov: www.studentaid.gov/announcements-events/joint-consolidation-loans.*

[93] U.S. Government Accountability Office, 2022. Federal Student Aid: Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness. GAO–22–103720.

would be on a plan that amortizes their entire remaining loan balance over six years. That amount could easily be hundreds of dollars more a month than what the borrower was paying on an IDR plan, increasing the risk of delinquency or default. The alternative plan is a better option that would result in less payment shock than the 10-year standard plan would, so we encourage borrowers to recertify.

*Changes:* None.

*Executive Orders 12866 and 13563*

*Regulatory Impact Analysis*

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866, as amended by Executive Order 14094, defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product), or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise legal or policy issues for which centralized review would meaningfully further the President's priorities, or the principles stated in the Executive Order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.

The Department estimates the net budget impact to be $156.0 billion in increased transfers among borrowers, institutions, and the Federal Government, with annualized transfers of $16.6 billion at 3 percent discounting and $17.9 billion at 7 percent discounting, and largely one-time administrative costs of $17.3 million, which represent annual quantified costs of $2.3 million related to administrative costs at 7 percent discounting. Therefore, this final action is subject to review by OMB under section 3(f) of Executive Order 12866 (as amended by Executive Order 14094).

Notwithstanding this determination, we have assessed the potential costs and benefits, both quantitative and qualitative, of this final regulatory action and have determined that the benefits will justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these regulations only on a reasoned determination that their benefits will justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.

We have also determined that this regulatory action will not unduly interfere with State, local, territorial,

and Tribal governments in the exercise of their governmental functions.

The Director of OMB has waived the requirements of section 263 of the Fiscal Responsibility Act of 2023 (Pub. L. 118– 5) pursuant to section 265(a)(2) of that act.

As required by OMB Circular A–4, we compare the final regulations to the current regulations. In this regulatory impact analysis, we discuss the need for regulatory action, potential costs and benefits, net budget impacts, and the regulatory alternatives we considered.

1. Congressional Review Act Designation

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated that this rule is covered under 5 U.S.C. 804(2) and (3).

2. Need for Regulatory Action

Postsecondary education provides significant individual and societal benefits. For individuals, obtaining postsecondary credentials can lead to higher lifetime earnings and increased access to other benefits like health insurance and employer-sponsored retirement accounts, and is also positively correlated with job satisfaction, homeownership, and health.[94] Our society also benefits from increased postsecondary attainment through a better educated and flexible workforce, increased civic participation, and improved health and well-being for the next generation.[95]

But postsecondary education is expensive. For many attendees, a postsecondary education will be among the most expensive and consequential purchases they make in their lifetimes. Most students cannot afford this cost out of pocket. This is particularly the case for students from low-income families, individuals who are the first in their families to go to college, adults who do not attend postsecondary education immediately after high school, and other students who face barriers to college enrollment and success. For these individuals in particular, Federal student loans are

[94] Oreopoulos, P., & Salvanes, K.G. (2011). Priceless: The Nonpecuniary Benefits of Schooling. *Journal of Economic Perspectives*, 25(1), 159–184.

[95] Moretti, E. (2004). Workers' Education, Spillovers, and Productivity: Evidence from Plant-Level Production Functions. *American Economic Review*, 94(3), 656–690.

Dee, T.S. (2004). Are There Civic Returns to Education? *Journal of Public Economics*, 88(9–10), 1697–1720.

Currie, J., & Moretti, E. (2003). Mother's Education and the Intergenerational Transmission of Human Capital: Evidence from College Openings. *Quarterly Journal of Economics*, 118(4), 1495–1532.

often a necessary component for financing college.

Student loans provide the necessary financial resources to borrowers who cannot finance their educations out of pocket, allowing them to reap the benefits from enrolling in and completing a postsecondary education, and, as a result, to repay their debt through the earnings gains resulting from their increased educational attainment. This is why student loans are often described as borrowing against one's future income.

However, in the years since the Great Recession, a greater number of students are borrowing student loans, and student loan balances have become larger. Many students are able to repay their Federal student loans from their earnings gains from postsecondary education. However, some borrowers find the amount of debt burdensome, and it may impact their decisions to buy a home, start a family, or start a new business.

Many borrowers end up significantly constrained due to loan payments that make up an unaffordable share of their income. Among undergraduate students who started higher education in 2012 and were making loan payments in 2017, at least 19 percent had monthly payments that were more than 10 percent of their total annual salary.[96]

Borrowing to pursue a postsecondary credential also involves risk. First is the risk of noncompletion. In recent years, about one-third of undergraduate borrowers did not earn a postsecondary credential.[97] These individuals are at a high risk of default, with an estimated 40 percent defaulting within 12 years of entering repayment.[98] Even among graduates, there is substantial variation in earnings across colleges, programs, and individuals. Some borrowers do not receive the expected economic returns due to programs that fail to make good on their promises or lead to jobs that provide financial security. Conditional on educational attainment, Black students take on larger amounts of debt.[99] Additionally, discrimination in the labor market may lead borrowers of color to earn less than white borrowers, even with the same level of educational

attainment.[100] Unanticipated macroeconomic shocks, such as the Great Recession, provide an additional type of risk—specifically, that borrowers' postsecondary credentials may pay off less than anticipated in the short- or even long-run due to prolonged periods of unemployment or lower wages. Finally, there is individual-level risk of unanticipated events such as a serious illness that may reduce a borrower's ability to keep up with a fixed monthly payment.

Income-driven repayment (IDR) plans are intended to help borrowers whose incomes are insufficient to sustain reasonable debt payments. The plans are created through statute and regulation and base a borrower's monthly payment on their income and family size. Under these plans, loan forgiveness occurs after a set number of years in repayment, depending on the repayment plan that is selected. Because payments are based on a borrower's income, they may be more affordable than fixed repayment options, such as those in which a borrower makes payments over a period of between 10 and 30 years. There are four repayment plans that are collectively referred to as IDR plans: (1) the income-based repayment (IBR) plan; (2) the income contingent repayment (ICR) plan; (3) the pay as you earn (PAYE) plan; and (4) the revised pay as you earn (REPAYE) plan. Within the IBR plan, there are two versions that are available to borrowers, depending on when they took out their loans. Specifically, for a new borrower with loans taken out on or after July 1, 2014, the borrower's payments are capped at 10 percent of discretionary income. For those who are not new borrowers on or after July 1, 2014, the borrower's payments are capped at 15 percent of their discretionary income.

Because payments are calculated based upon income, the IDR plans can assist borrowers who may be overly burdened at the start of their time in the workforce, those who experience a temporary period of economic hardship, and those who perpetually earn a low income. For the first and second groups, an IDR plan may be the ideal option for a few years, while the last group may need assistance for multiple decades. IDR plans simultaneously provide

protection for the borrower against the consequences of having a low income and adjust repayments to fit the borrower's changing ability to pay.[101]

Federal student loan borrowers are increasingly choosing to repay their loans using one of the currently available IDR plans.[102] Enrollment in IDR increased by about 50 percent between the end of 2016 and the start of 2022, from approximately 6 million to more than 9 million borrowers, and borrowers with collectively more than $500 billion in debt are currently enrolled in an IDR plan.[103] Similarly, the share of borrowers with Federally managed loans enrolled in an IDR plan rose from just over one-quarter to one-third during this time.[104]

While existing IDR plans have helped millions of borrowers afford their monthly payments, they have not been selected by large numbers of the most vulnerable borrowers. Despite the availability of these plans, more than 1 million borrowers a year were still defaulting on student loans prior to the national pause on repayment, interest, and collections that began in March 2020. Many other borrowers were behind on their payments and at risk of defaulting.

Research shows that undergraduate borrowers, borrowers with low incomes, and borrowers with high debt levels relative to their incomes enroll in IDR plans at lower rates than their counterparts with higher levels of education and incomes.[105] An analysis of IDR usage by the JPMorgan Chase Institute found that there are two borrowers who could potentially benefit

---

[96] Calculations using 2012 BPS data; table reference tcedtf.

[97] Calculations using 2012 BPS data; table reference icvago.

[98] Calculations using 2004/2009 BPS data; table reference lvafhq.

[99] *E.g.,* Scott-Clayton, J., & Li, J. (2016). Black-white disparity in student loan debt more than triples after graduation. Economic Studies, Volume 2 No. 3.

[100] See *https://nces.ed.gov/programs/raceindicators/indicator_RFD.asp.https://nces.ed.gov/programs/raceindicators/indicator_RFD.asp.* For an overview of research on earnings gaps by race and the role of labor market discrimination, see Altonji, J.G., & Blank, R.M. (1999). Race and gender in the labor market. Handbook of labor economics, 3, 3143–3259.

[101] Krueger, A.B., & Bowen, W.G. (1993). Policy Watch: Income-Contingent College Loans. *Journal of Economic Perspectives, 7*(3), 193–201. *doi.org/10.1257/jep.7.3.193.*

[102] Gary-Bobo, R.J., & Trannoy, A. (2015). Optimal student loans and graduate tax under moral hazard and adverse selection. The RAND Journal of Economics, 46(3), 546–576. doi.org/10.1111/1756–2171.12097.

[103] U.S. Department of Education, Federal Student Aid Data Center, Repayment Plans, available *studentaid.gov/manage-loans/repayment/plans.* Includes all Federally managed loans across all IDR plans, measured in Q4 2016 through Q1 2022.

[104] Ibid.

[105] Daniel Collier et al., Exploring the Relationship of Enrollment in IDR to Borrower Demographics and Financial Outcomes (Dec. 30, 2020); see also Seth Frotman and Christa Gibbs, Too many student loan borrowers struggling, not enough benefiting from affordable repayment options, Consumer Fin. Prot. Bureau (Aug. 16, 2017); Sarah Gunn, Nicholas Haltom, and Urvi Neelakantan, Should More Student Loan Borrowers Use Income-Driven Repayment Plans?, Federal Reserve Bank of Richmond (June 2021).

from an IDR plan for each borrower who actually enrolls in an IDR plan.[106] Moreover, the borrowers not using the IDR plans appear to have significantly lower incomes than those who are enrolled. According to a Federal Reserve Bank of Richmond report, a quarter or less of borrowers in households with incomes less than $20,000 per year were in an IDR plan, compared to 46 percent of borrowers in households with income between $60,000 and $80,000 and 38 percent in households with incomes between $80,000 and $100,000.[107] An Urban Institute analysis using the 2016 Survey of Consumer Finances found that households headed by borrowers who were receiving Federal benefits, such as support from the Supplemental Nutrition Assistance Program, were more likely to not make any payments because of forbearance, some other forgiveness program, or an inability to afford payments, than to be enrolled in an IDR plan.[108] Similarly, a one-time analysis of student loan data conducted by the U.S. Treasury and disclosed in a

GAO report found that 70 percent of defaulted borrowers had incomes that met the requirements to qualify for IBR. This means that they would have had payments lower than the 10-year standard plan had they signed up for IBR.[109] In line with evidence that Black borrowers are more likely to experience default on their loans, there is evidence of lower take-up in IDR usage among potentially-eligible Black borrowers. In particular, households headed by Black borrowers in the 2016 Survey of Consumer Finances were slightly more likely to report not making payments on their loans than to report using IDR.[110]

These trends are further borne out in the Department's administrative data on borrowers with outstanding debt who recently entered repayment.[111] Currently, just under a quarter (23 percent) of borrowers with only undergraduate loans are on an IDR plan, as compared to half (50 percent) of those who borrowed to attend a graduate program. As a result, about 79 percent of borrowers who recently entered

repayment only had undergraduate loans, but these individuals represent only 64 percent of recent borrowers on IDR plans. By contrast, 21 percent of borrowers who recently entered repayment had graduate loans, but they represent 36 percent of borrowers on an IDR plan. Usage rates are even lower among the borrowers who are likeliest to face repayment difficulties. Among undergraduate only borrowers who recently entered repayment, 22 percent of borrowers who did not complete a credential are using an IDR plan, and IDR usage increases as educational attainment increases: 24 percent of those who completed a sub-baccalaureate credential and 25 percent of those who completed a bachelor's degree but not a graduate degree are on IDR plans. About half of borrowers who completed a graduate degree and recently entered repayment are on an IDR plan. These results are shown in Table 2.1 below.

TABLE 2.1—IDR USAGE BY BORROWER CHARACTERISTICS, BORROWERS WHO ENTERED REPAYMENT BETWEEN 2015 AND 2018

| | Percentage of borrowers (%) | Percentage of IDR borrowers (%) |
|---|---|---|
| Has undergraduate loans only ................................................................................ | 79 | 64 |
| Has graduate loans ................................................................................................ | 21 | 36 |
| **Among those that have undergraduate loans only** | | |
| Did not complete any credential ............................................................................. | 47 | 44 |
| Completed a sub-baccalaureate credential ............................................................ | 20 | 20 |
| Completed a bachelor's degree but no graduate degree ....................................... | 30 | 32 |
| **Among all borrowers** | | |
| Completed a graduate degree ................................................................................ | 17 | 27 |

**Note:** Borrowers who entered repayment with only Parent PLUS loans are excluded from these analyses. IDR usage is measured as of 12/31/2019.

Even the borrowers who do use an IDR plan may continue to face challenges in repayment. Many borrowers on IDR still report concerns that their payments are too expensive. For example, one survey of student loan borrowers found that, of those currently or previously enrolled in an IDR plan, 47 percent reported that their monthly

payment was still too high.[112] Complaints from borrowers enrolled in IDR received by the Student Loan Ombudsman show that borrowers find that IDR payments are unaffordable because competing expenses, such as medical bills, housing, and groceries, cut into their discretionary income. Furthermore, borrowers in IDR still

struggle in other areas of financial health. One study showed that borrowers enrolled in IDR had less money in their checking accounts and a lower chance of participating in saving for retirement than borrowers in other repayment plans, suggesting that struggling borrowers may not obtain sufficient relief from unaffordable

[106] This analysis is restricted to borrowers with a Chase checking account who meet certain other criteria in terms of frequency of monthly transactions and amount of money deposited into the account each year. *www.jpmorganchase.com/institute/research/household-debt/student-loan-income-driven-repayment.*

[107] Sarah Gunn, Nicholas Haltom, and Urvi Neelakantan, Should More Student Loan Borrowers Use Income-Driven Repayment Plans?, Federal Reserve Bank of Richmond (June 2021).

[108] *www.urban.org/urban-wire/demographics-income-driven-student-loan-repayment.*

[109] U.S. Government Accountability Office, 2015. Federal Student Loans: Education Could Do More to Help Ensure Borrowers are Aware of Repayment and Forgiveness Options. GAO–15–663.

[110] *www.urban.org/urban-wire/demographics-income-driven-student-loan-repayment.*

[111] Based on borrowers with who had at least one loan enter repayment between 2015 and 2018,

excluding borrowers who only had Parent PLUS loans. IDR use is measured as of 12/31/2019.

[112] Plunkett, Travis, Fitzgerald, Regan, Denten, Brain, West, Lexi, Upcoming Rule-Making Process Should Redesign Student Loan Repayment (September 2021). *www.pewtrusts.org/en/research-and-analysis/articles/2021/09/24/upcoming-rule-making-process-should-redesign-student-loan-repayment.*

payments under the current IDR options to achieve financial stability.[113]

Many borrowers on IDR plans face challenges beyond the affordability of their monthly payments. Department data show that 70 percent of borrowers on IDR plans prior to March 2020 had payment amounts that did not cover their full interest payment.[114] Borrowers in those situations on existing IDR plans will see their balances grow unless they only have subsidized loans and are in the first three years of repayment. Focus groups of borrowers show that this causes borrowers on IDR stress even when they are able to afford their payments.[115]

A significant share of borrowers report their expected monthly payments will still be unaffordable when they return to repayment following the end of the payment pause. For example, 26 percent of borrowers surveyed in 2021 disagreed with the statement that they would be able to afford the same monthly amount they were paying before the pause.[116] A 2022 survey found that over a fifth of borrowers were chronically struggling with repayment before the pause and expected that they would continue to struggle when payments resume.[117]

The Department is also concerned that while borrowers using IDR have lower default rates than borrowers not on these plans, the rate of default for borrowers on IDR still remains high. According to research from the Congressional Budget Office (CBO), the default rate for borrowers in IDR is about half that of borrowers in payment plans with a fixed amortization period. However, the cumulative default rates of undergraduate borrowers who began repayment in 2012 and participated in an IDR plan in their first and/or second year of repayment still approached nearly 20 percent by 2017.[118] While the

Department cannot definitively know why these borrowers defaulted, the fact that nearly one in five of them defaulted despite the usage of IDR shows that many borrowers struggle to make their payments under the current IDR options and suggests there is still significant work to do to make sure that these plans can set borrowers up for long-term repayment success.

The improved terms of the REPAYE plan in this final rule will help address these concerns. To the extent that borrowers are still defaulting because they cannot afford their payments, this plan will provide a $0 payment for more low-income borrowers and will reduce payments for all other borrowers relative to the current REPAYE plan, making payments more manageable and reducing the risk of default. In particular, income information currently on file suggests that more than 1 million borrowers on IDR could see their payments go to $0 based upon the parameters of the plan in this final rule, including more than 400,000 that are already on REPAYE whose payment amounts would be updated automatically to $0.

The Department is also taking steps to make it easier for borrowers to stay on IDR, which will further support their long-term repayment success. In particular, this is done through the ability to automatically recalculate payments when a borrower provides approval for the sharing of their Federal tax information. Such changes are important because historically, many borrowers failed to complete the income recertification process that is required to recalculate payments and maintain enrollment in an IDR plan. Borrowers who fail to complete this process at least once a year are moved to other repayment plans and may see a significant increase in their required monthly payment. Further, the fact that it is currently easier to obtain a forbearance or deferment than to enroll in or recalculate payments under IDR may lead some borrowers to choose to enter deferment or forbearance to pause their payments temporarily, rather than enrolling in or recertifying their income on IDR to access more affordable payments following a change in their income.[119] In particular, borrowers may not have to provide income information or complete as much paperwork to obtain a pause on their loans through deferment or forbearance. Borrowers who are struggling financially and

working to address a variety of financial obligations may be particularly inclined to enter deferment or forbearance rather than navigating the IDR enrollment or recertification process, despite the fact that staying on IDR—and updating their income information to recalculate monthly payments as needed—may better set them up for long-term repayment success. For example, the Consumer Financial Protection Bureau found that delinquency rates significantly worsened for those who did not recertify their incomes on time after their first year in an IDR plan.[120] In contrast, delinquency rates for those who did recertify their incomes slowly improved.

The Department has several goals in pursuing these regulatory changes. First, we want to increase enrollment in an IDR plan among borrowers who are at significant risk of default or struggling to repay their student loans. Doing so will help reduce the number of defaults nationally and protect borrowers from the resulting negative consequences. Second, we want to make it simpler for borrowers to choose among IDR plans. This requires considering the benefits available to borrowers in other plans and minimizing the number of situations in which a borrower might have an incentive to pick a different plan. In other words, if the terms of the new REPAYE plan provide fewer benefits to a large group of borrowers compared to existing plans, it will be harder for borrowers to identify and select an IDR plan that meets their needs. Third, we want to make it easier for borrowers to navigate repayment overall. This involves addressing elements of the repayment experience in which well-meaning choices by borrowers could accidentally result in being required to repay for a significantly longer period of time. It also means simplifying the overall process for the borrower of choosing between IDR and other types of repayment plan.

Different parameters of the plan in this final rule accomplish these various goals. For instance, the provisions to protect a higher amount of income, set payments at 5 percent of discretionary income for undergraduate loans, not charge unpaid monthly interest, automatically enroll borrowers who are delinquent or in default, provide credit toward forgiveness for time spent in certain deferments and forbearances, and shorten the time to forgiveness for low balance borrowers all provide disproportionate benefits for undergraduate borrowers, particularly

[113] Collier, D.A., Fitzpatrick, D., & Marsicano, C.R. (2021). Another Lesson on Caution in IDR Analysis: Using the 2019 Survey of Consumer Finances to Examine Income-Driven Repayment and Financial Outcomes. Journal of Student Financial Aid, 50(2).

[114] Department of Education analysis of loan data for borrowers enrolled in IDR plans, conducted in FSA's Enterprise Data Warehouse, with data as of March 2020.

[115] Sattelmeyer, Sarah, Brian Denten, Spencer Orenstein, Jon Remedios, Rich Williams, Borrowers Discuss the Challenges of Student Loan Repayment (May 2020), *www.pewtrusts.org/-/media/assets/2020/05/studentloan_focusgroup_report.pdf*.

[116] Survey on Student Loan Borrowers 2021, The Pew Charitable Trusts—Student Loan Research Project. *survey-on-student-loan-borrowers-2021-topline.pdf (pewtrusts.org)*.

[117] Akana, Tom and Dubravka Ritter. 2022. Expectations of Student Loan Repayment, Forbearance, and Cancellation: Insights from Recent Survey Data. Federal Reserve Bank, Philadelphia. Consumer Finance Institute.

[118] *www.cbo.gov/publication/55968*.

[119] Consumer Financial Protection Bureau. Borrower Experiences on Income-Driven Repayment. November 2019. *files.consumerfinance.gov/f/documents/cfpb_data-point_borrower-experiences-on-IDR.pdf*.

[120] Ibid.

those at greater risk of default. That will make the IDR plans more attractive to the very groups of borrowers the Department is concerned about being at risk of delinquency or default.

The inclusion of borrowers who have graduate loans in some but not all elements of the REPAYE plan and the treatment of married borrowers who file separately in particular accomplish the second goal of making it easier to choose among IDR plans. Currently, the process of selecting among IDR plans is unnecessarily complicated. Borrowers may be better off choosing different plans depending on a variety of factors, including whether they are married, when they borrowed, and both their current and anticipated future income relative to the annual amount due on eligible loans. That makes it harder for student loan servicers to explain the different plans to borrowers when they are trying to make important financial decisions. Such complexity also complicates efforts to explain IDR to more vulnerable borrowers. Allowing borrowers with graduate loans to gain access to some of the benefits provided by REPAYE will make the REPAYE plan the best option for almost all borrowers. Absent such a structure, it would be harder to sunset new enrollment in other plans and borrowers would continue to face a confusing set of IDR choices.

Provisions around the counting of prior credit toward forgiveness

following a consolidation, not charging unpaid monthly interest, and providing credit for deferments and forbearances make it easier for borrowers to navigate repayment. The Department is concerned that the current process of navigating repayment and choosing between IDR and non-IDR plans is overly complicated. There are too many ways for borrowers to accidentally make choices that seemed reasonable at the time but result in the loss of months, if not years, of progress toward forgiveness. For example, a borrower may choose certain deferments or forbearances instead of picking an IDR plan where they would have a $0 payment. Or they may consolidate their loans because they think it would be easier to have one loan to keep track of, not knowing it would erase all prior progress toward forgiveness. Similarly, the fact that IDR plans are the only payment options available where a borrower can make their required payments and still see their balance grow makes it difficult for borrowers to understand the choices and options that are best for them. With these changes, the negative consequences associated with various repayment choices, including enrollment in REPAYE, will be minimized.

The Department believes the REPAYE plan as laid out in these final rules focuses appropriately on supporting the most at-risk borrowers, simplifying

choices within IDR, and making repayment easier to navigate. The result is a plan that targets benefits to the borrowers at the greatest risk of delinquency or default, while providing a single option that is clearly the most advantageous for the vast majority of borrowers.

The changes to REPAYE focus on borrowers who are most at risk of default: those who have low earnings, borrowed relatively small amounts, and only have undergraduate debt. This emphasis is especially salient for those who are at the start of repayment. For example, among borrowers earning less than 225 percent of the Federal poverty level five years from their first enrollment in postsecondary education, 36 percent had at least one default in the within 12 years of entering postsecondary education, compared to 24 percent of those earning more.[121] And borrowers with relatively small debts—$10,000 or less in 2009—defaulted at a rate of 43 percent 12 years after beginning postsecondary education, compared to 21 percent for those who borrowed more.[122] Finally, those who borrowed only for their undergraduate education were more than three times as likely to experience a default from 2004 to 2016 (34 percent vs. 9 percent for those with any graduate loans).[123]

3. Summary of Comments and Changes From the IDR NPRM

TABLE 3.1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS

| Provision | Regulatory section | Description of final provision |
|---|---|---|
| Adding SAVE as an alternative name for REPAYE. | § 685.209 | Indicating that REPAYE may also be referred to as Saving on a Valuable Education, or SAVE plan. |
| Family size and Federal tax data | § 685.209 | Indicating that information from Federal tax information reported to the Internal Revenue Service can be used to calculate family size for an IDR plan. |
| Minimum payment amount | § 685.209 | Rounding calculated payment amounts of less than $5 to $0 and those between $5 and $10 to $10. |
| 5% and 10% payments on REPAYE | § 685.209 | Clarifying that borrowers pay 5% of discretionary income toward loans obtained for their undergraduate study and 10% for all other loans, including those when the academic level is unknown. |
| Borrower eligibility for different IDR plans | § 685.209 | Stating that a Direct Consolidation loan disbursed on or after July 1, 2025, that repaid a Direct parent PLUS loan, a FFEL parent PLUS loan, or a Direct Consolidation Loan that repaid a consolidation loan that included a Direct PLUS or FFEL PLUS loan may only chose the ICR plan. Also states that a borrower maintains access to PAYE if they were enrolled in that plan on July 1, 2024 and does not change repayment plans. Similar language is adopted for ICR with an exception for Direct Consolidation Loans that repaid a parent PLUS loan. |
| Payments made in bankruptcy | § 685.209 | Granting the Secretary the authority to award credit toward IDR forgiveness for periods when it is determined that the borrower made payments on a confirmed bankruptcy plan. |
| Treatment of joint consolidation loans | § 685.209 | Clarifying that joint consolidation loans that are separated will receive equal credit toward IDR forgiveness. |
| Crediting involuntary collections toward forgiveness. | § 685.209 | Stating that involuntary collections are credited at amounts equal to the IBR payment, if known, for a period that cannot exceed the borrower's next recertification date. |

[121] Analysis of Beginning Postsecondary Students (BPS) 2004/2009. https://nces.ed.gov/datalab/powerstats/table/lqawqv.

[122] Ibid.

[123] Ibid.

TABLE 3.1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS—Continued

| Provision | Regulatory section | Description of final provision |
|---|---|---|
| Catch up payments | § 685.209 | Stating that catch up payments are only available for periods beginning after July 1, 2024, can only be made using the borrower's current IDR payment, and are limited to periods that ended no more than 3 years previously. |
| Providing approval for disclosure of Federal tax information. | § 685.209 | Expanding the situations in which the borrower could provide approval for obtaining their Federal tax information. |
| Removal from default | § 685.209 | Allowing the Secretary to remove a borrower from default if they enroll in an IDR plan with income information that covers the point at which they defaulted and their current IDR payment is $0. |
| Shortened time to forgiveness | § 685.209 | Stating that periods of deferment or forbearance that are credit toward IDR forgiveness may also be credited toward the shortened time to forgiveness. |
| Rehabilitation | § 685.209 | Clarifying that a reasonable and affordable payment amount for rehabilitations may be based upon the IBR formula and that a borrower on IBR who exits default may be placed on REPAYE if they are eligible for it and it would result in a lower payment. |

*Comments:* Many commenters expressed concerns about the estimated net budget impact of the REPAYE plan. Several commenters cited Executive Order 13563, which requires agencies to "propose or adopt a regulation only upon a reasoned determination that its [the regulation's] benefits justify its costs" and to "use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." Other commenters argued that the cost alone indicated that Congress should have taken this action, rather than the Department. Commenters also expressed concerns about the fairness of providing such spending to individuals who had gone to college compared to the effects on someone who never enrolled in postsecondary education.

*Discussion:* As discussed in greater detail in the Benefits of the Regulation section of this RIA, the Department believes that the benefits of this final regulation justify its costs. These changes to REPAYE will create a safety net that can help the most vulnerable borrowers avoid default and delinquency at much greater rates than they do today. Doing so is important to make certain that a student's background does not dictate their ability to access and afford postsecondary education. The Department is concerned that the struggles of current borrowers may dissuade prospective students from pursuing postsecondary education.

Importantly, these benefits are provided to existing borrowers and future ones. That means anyone who has previously not enrolled in college because they were worried about the cost or the risk of borrowing will have access to these benefits as well. In considering who these individuals might be, it is important to recall there are many people today who may seem like they are not going to enroll in

postsecondary education today who may ultimately end up doing so. Currently, 52 percent of borrowers are aged 35 or older, including 6 percent who are 62 or older.[124] The benefits of revisions to REPAYE are also available to borrowers enrolled in all types of programs, including career-oriented certificate programs and liberal arts degree programs. The additional protections provided by this rule may also encourage borrowers who did not complete a degree or certificate and are hesitant to take on more debt to re-enroll, allowing them to complete a credential that will make them better off financially.

We also note that the sheer scale of the student loan programs plays a major role in the overall estimated net budget impact. Student loans are the second largest source of consumer debt after mortgages and ahead of credit cards.[125] There is currently $1.6 trillion in outstanding student loan debt.[126] The Department estimates that another $872 billion will be lent over the coming decade. By contrast, there was $23 billion outstanding in 1993 when Congress created the ICR authority and $577 billion in 2008, the last time Congress reauthorized the Higher Education Act. This growth is not just a function of higher prices but also of a significant expansion of postsecondary enrollment. The number of students enrolled in college has increased from 12.29 million in fall 1994 to 18.66 million in fall 2021.[127] The types of

students who borrow have also changed as the composition of college students has expanded to include more individuals who are low-income, the first in their families to attend college, or working adults. The costs observed in the net budget impact are at least partly affected by the overall growth in volume and the characteristics of who is borrowing, not just the extension of certain benefits.

*Changes:* None.

*Comments:* The Department received comments expressing concern that the most expensive elements of the plan are also the ones that are the least well-targeted. For instance, the commenters pointed to estimates from the IDR NPRM showing that the most expensive components of the proposal were the increase in the amount of income protected from payments and having borrowers pay 5 percent of their discretionary income on undergraduate loans. The commenters argued that the cost of those provisions plus the extent of the benefits they provided to higher-income borrowers created an imbalance between the costs and benefits of the rule. They also argued that there is little evidence that the most expensive provisions will provide sufficient benefits to justify their costs. Several commenters argued that our proposals lack a cost and benefit analysis specific to graduate borrowers. This group of commenters claim our proposals provide uncapped subsidies for the most educated Americans.

*Discussion:* The commenters accurately identified the elements of the plan that we project have the greatest individual costs. However, we disagree with the claim that the benefits of the plan are ill-targeted. First, because payments under REPAYE are not capped, borrowers with the highest incomes will still have higher scheduled payments under the plan than under the

[124] From Q1 2023 data in *studentaid.gov/sites/default/files/fsawg/datacenter/library/Portfolio-by-Age.xls.*

[125] *https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/HHDC_2023Q1.*

[126] *https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls.*

[127] *nces.ed.gov/programs/digest/d22/tables/dt22_303.10.asp.*

standard 10-year plan. Second, graduate borrowers—who tend to have higher incomes—will only receive the 5 percent of discretionary income payment rate for the debt they took on for their undergraduate education. The Department considered the cost of providing additional relief to graduate borrowers and we believe that our plan balances our goals of protecting the borrowers most at risk of delinquency while ensuring borrowers pay back their fair share. The Department's analyses of the distributional benefits of the plan show that borrowers at the bottom of the lifetime income distribution are projected to see the largest reduction in payments per dollar borrowed.

*Changes:* None.

*Comments:* One commenter claimed that the proposed plan was regressive and benefitted wealthy borrowers more than lower-income borrowers, citing Table 7 of the IDR NPRM (the updated version of this table is now Table 5.5). This is a table that showed the breakdown of mean debt and estimated payment reductions for undergraduate and graduate borrowers by income range. A commenter argued that the expansion of eligibility for forgiveness to borrowers with higher incomes is the costliest component of the proposed regulations. This commenter claims that these regulations significantly increase the range of starting incomes that borrowers can earn and still expect to receive some type of loan forgiveness from approximately $32,000 under the current IDR plan to $55,000 under the new IDR plan.

*Discussion:* Assessing the starting incomes that could lead to forgiveness is not a one-size-fits-all endeavor. That is because the borrower's student loan balance also affects whether the borrower is likely to fully repay the loan or have some portion of their balance forgiven. For instance, a borrower who earns $55,000 as a single individual and only borrowed $5,000 would pay off the loan before receiving forgiveness. The REPAYE plan will provide many borrowers with lower payments, particularly helping low-income borrowers avoid delinquency and default while ensuring middle-income borrowers are not overburdened by unaffordable payments.

Regarding the discussion of Table 7 in the IDR NPRM (Table 5.5 in this RIA), there are a few important clarifications to recall. First, this table reflects existing differences in the usage of IDR between these groups. The new plan emphasizes its benefits toward the lower-income borrowers that do not currently use IDR at rates as high as some of their counterparts with higher incomes.

Second, many borrowers in the lowest income categories will have $0 monthly payments as part of these changes. A borrower cannot see their payments reduced below $0, so this will cap the possible reduction in payments for the lowest-income borrowers. The potentially smaller dollar savings that occur each month will still be important for them, as the marginal burden of each additional $1 in student loan payments will be greater for a lower-income borrower compared to a higher income one. We also note that an undergraduate borrower in the middle of the three income ranges still sees larger typical savings than a graduate borrower in the same range does.

Finally, it is important to recall that some of the savings that are occurring for these graduate borrowers are due to the fact that they also have undergraduate loans. That means had they never borrowed for graduate school they would still be seeing some of those savings.

*Changes:* None.

*Comments:* One commenter argued that the Department's explanation for the net budget estimate in the IDR NPRM does not match its stated goal of assisting student loan borrowers burdened by their debt. This commenter further claimed that the Department's refusal to tailor its IDR plan to the students that it purports to help demonstrates that the IDR NPRM's reasoning is contrived and violated the Administrative Procedure Act (APA). This commenter cited an analysis that claimed that the Department's proposed new IDR plan constituted a taxpayer gift to nearly all former, current, and prospective students.

The commenter further believed that the level of income protected and share of income above the protected amount that goes toward loan payments exceeds what would be needed for a targeted policy measure that solves the specific problem of young borrowers struggling with debt because borrowers below this level would have a zero-dollar payment under the IDR Plan.

*Discussion:* As noted elsewhere in this final rule, the Department has several goals for this regulatory action. Our main goal is to reduce the rates of default and delinquency by making payments more affordable and manageable for borrowers, particularly those most at risk of delinquency and default. We are also working to make the overall repayment experience simpler. This means making it easier both to decide whether to sign up for an IDR plan and which IDR plan to select. Achieving that goal requires operating within the existing IDR plans. For

example, a REPAYE plan that fully excluded all graduate borrowers would increase confusion because many borrowers carry both graduate and undergraduate loans, and there are currently many graduate borrowers using the REPAYE plan. We are concerned that added complexity would make it harder for the most at-risk borrowers to pick the best plan for them as they may be overwhelmed by choices that vary based upon highly technical details.

*Changes:* None.

*Comments:* Several commenters submitted different types of analyses of how many borrowers would fully repay their loans or what share of their loans they would repay. One commenter provided an analysis showing that they estimated that 69 percent of borrowers with certificates and associate degrees will repay less than half their loan before receiving forgiveness. They also estimated that would be the case for 49 percent of bachelor's degree recipients. These are both increases from existing plans. Several other commenters cited this analysis in their comments.

A different commenter provided their own estimate that borrowers from programs with a negative return on investment would pay 21 percent of what they originally borrowed. That same commenter said that borrowers from private for-profit colleges would repay just under 45 percent of what they borrowed.

Another commenter estimated that 85 percent of individuals with postsecondary education would benefit from lower payments based upon their assumptions about typical debt levels.

*Discussion:* As discussed in the IDR NPRM, the Department developed its own model to look at what would occur if all borrowers were to choose the proposed REPAYE plan versus the existing one. We continue to use this model for the final rule. The model includes projections of all relevant factors that determine payments in an IDR plan, including debt and earnings at repayment entry, the evolution of earnings in subsequent years, transitions into and out of nonemployment, transitions into and out of marriage, spousal earnings and student loan debt, and childbearing. The model also allows these factors to vary with educational attainment and student demographics. While simpler models that do not include these factors can provide a rough indication of payments in the plan early in the repayment process, total repayments will depend on the entire sequence of labor market outcomes and family formation outcomes for the full length of

repayment. Projections based on simplifying assumptions, such as a constant rate of income growth, or a median income for a broad set of borrowers, fail to capture the volatility of changes in earnings over time, and cannot fully capture the distribution of earnings relative to the amount of student loan debt a borrower acquires. As a result, we believe the model we designed for the IDR NPRM and used again in this final rule provides more accurate projections of the types of analyses the commenters provided.

*Changes:* None.

*Comments:* Some commenters pointed to a prior report from GAO about the Department's estimation of the cost of IDR plans to argue that the Department will not fully capture the cost of this rule.[128]

*Discussion:* The Department's student loan estimates are regularly reviewed by several entities, including GAO. The report cited by the commenter referenced the lack of modeling of repayment plan switching, resulting in upward re-estimates of IDR plan costs. The Department conducts regular re-estimates of the student loan programs to capture changes in the repayment plan distribution. This allows us to make certain we are updating our cost estimates to reflect updates to administrative data as well as changes in underlying economic indicators, such as government interest rates.

*Changes:* None.

*Comments:* Some commenters asked the Department to provide more clarity with regard to the quantified economic benefits of this rule versus its estimated costs.

*Discussion:* The Department believes we have appropriately described the economic benefits of the rule in the discussion of costs and benefits section, including the benefits to borrowers in the form of reductions in payments, decreased risk of student loan delinquency and default, and reduction in the complexity involved in choosing between different repayment plans. Included in this section is an analysis of the reduction in payments per dollar borrowed under the new plan compared to current REPAYE and the standard plan, both overall and by quintile of lifetime income and graduate debt. Many of the benefits that are provided that go beyond the reduction in payments are important but not quantifiable.

*Changes:* None.

*Comments:* Some commenters argued that the Department did not sufficiently connect the discussion of costs and

benefits to stated goals. They also questioned why, if the concern is about preventing defaults, the Department did not first conduct an analysis of who defaults to drive decisions.

*Discussion:* With respect to the concerns about who defaults, the Department has intentionally taken a number of steps in the regulation that directly reflect research and data on default. For instance, as noted in the IDR NPRM, 90 percent of borrowers who default borrowed exclusively for their undergraduate education. This is one of the reasons why we are only lowering the share of income that goes toward payments for undergraduate loans. Similarly, as noted in the IDR NPRM, 63 percent of defaulters had an original principal balance of less than $12,000, the threshold we chose for the early forgiveness provision. The raised income protection will capture more of the lowest-income borrowers, which will also help avert default, as will the provision to automatically enroll delinquent borrowers in REPAYE. As noted in the NPRM and reiterated in the preamble to this final rule, the Department decided to protect earnings up to 225 percent of FPL after conducting an analysis showing that individuals at that point reported similar rates of material hardship than those with family incomes at or below the 100 percent of the FPL. Therefore, we believe the borrowers that will now have a $0 payment from this rule are those who were going to be at the greatest risk of default.

*Changes:* None.

*Comments:* Many commenters raised concerns that the budget estimates in the IDR NPRM understated the costs of the proposals. In particular, commenters pointed to three issues that they said should have been accounted for in the budgetary estimates:

(1) Existing student loan borrowers who do not currently choose an IDR plan may choose to begin repaying on an IDR plan given the more generous terms. The result would be an overall increase in the share of borrowers and loan volume in the IDR plans.

(2) Existing student loan borrowers may choose to take on higher levels of debt. This could be driven by personal choices since the cost of repaying debt for the individual has fallen or due to increases in tuition charged by institutions. Some commenters noted that this increased borrowing may only be for living expenses.

(3) More students who would not otherwise have borrowed may choose to take on debt as a result of these changes. This could include both more students going to college who might not have

previously borrowed as well as students who would not otherwise have obtained student loans now choosing to borrow.

Commenters provided a range of estimates for how to quantify these various effects. These included estimates from the Penn Wharton Budget Model, the Urban Institute, and analyses done by Adam Looney and Preston Cooper, among others. These various analyses projected that between 70 and 90 percent of borrowers would benefit from the proposed changes to REPAYE. Commenters also included calculations using data from the National Postsecondary Student Aid Study looking at borrowers who did not take out the maximum amount of student loans available to them, data on the number of community colleges that might now choose to participate in the loan programs, data from the American Community Survey on earnings by field of study, information from the College Scorecard about typical debt and earnings levels, data from the Beginning Postsecondary Students Longitudinal Study, and trends in usage of IDR plans. Commenters also cited research from the Federal Reserve Bank of New York and Howard Bowen on possible effects on college prices.

Another commenter claimed that the Department's proposed revisions to the REPAYE plan would effectively discount the cost of college by 44 percent for the average borrower (relative to the current REPAYE plan) at a cost to taxpayers of several hundred billion dollars.

*Discussion:* The Department has updated the main budget estimate in this final rule that includes more future loan volume being repaid on the IDR plans, with most of this volume going onto the new REPAYE plan. We have also added a number of sensitivities that consider what would happen if total annual loan volume increases. These items are all explained in greater detail in the *Net Budget Impact* section of this RIA. This approach captures the fact that the degree of increases in take-up and new loan volume are subject to uncertainty. Given the timing of benefits received through IDR forgiveness and the uncertainty around many factors that would determine these benefits (*e.g.,* individual earnings trajectories and macroeconomic conditions), it is not unreasonable to assume that any price responses by higher education institutions would be muted relative to changes in prices that have been found following increases in the generosity of Federal student aid that students receive while enrolled. While we agree with the commenters that a significant majority of borrowers could benefit from the

[128] *www.gao.gov/products/gao-17-22.*

changes to the REPAYE plan, it is also true that many more borrowers who could benefit from existing IDR plans do not select them, so the highest take-up levels suggested by some analyses are unlikely to be achieved, at least as an immediate consequence of the regulation.

We have estimated the present discounted value (PDV) of the change in total payments under the new plan compared to total payments under REPAYE for borrowers representative of the 2017 repayment cohort. This includes modeling all of the factors that would affect payments (*e.g.,* future earnings and nonemployment, marriage, childbearing). Using this model, we compare the average difference in the PDV of total payments by institutional control and predominant degree (assuming all borrowers participate in each plan) and can compare this projected reduction in payments with the average cost of attendance in each sector, multiplied by 2 years for sub-baccalaureate institutions and by 4 for baccalaureate institutions. Table 3.2 shows these estimates which suggests that at most, the average reduction in payments under the new plan relative to existing REPAYE would be 13 percent of the average total cost of attendance. Among 4-year institutions, the reduction in payments never exceeds 6 percent of the average total cost of attendance. Both of these figures are well below the 44 percent figure provided by commenters.

TABLE 3.2—AVERAGE REDUCTION IN THE PRESENT DISCOUNTED VALUE OF TOTAL PAYMENTS BY SECTOR AS A PERCENTAGE OF THE AVERAGE TOTAL COST OF ATTENDANCE IN THE SECTOR

| | Associate or certificate (percent) | Baccalaureate or graduate only (percent) |
| --- | --- | --- |
| Public | 10 | 6 |
| Nonprofit | 13 | 4 |
| For-profit | 12 | 5 |

**Notes:** Average cost of attendance from Table 330.40, Digest of Education statistics, 2021–22 academic year, using off-campus living expenses. For public institutions, the average cost of attendance includes tuition and fees for in-state students. The annual average cost of attendance from the table is multiplied by 2 to get the average total cost of attendance for sub-baccalaureate institutions and by 4 to get the average total cost of attendance for baccalaureate institutions.

We also reject some of the implications by commenters that greater usage of IDR is inherently bad. As noted already, the Department is concerned about the significant number of borrowers who end up in delinquency and default each year. Past studies have shown that large numbers of these individuals would likely have a low-to-zero payment on IDR yet do not sign up. Moving all or most of this volume in default into IDR will represent a net benefit for the borrowers and for society overall as the consequences of defaulting are very damaging and can prevent borrowers from engaging in other behaviors like buying a house or starting a business.

*Changes:* The Department has increased the share of volume in IDR plans for the main budget estimate and incorporated additional analyses of IDR take-up and additional loan volume in the *Net Budget Impact* section of this RIA.

*Comments:* One commenter expressed concern with our cost estimates, which account for the Administration's one-time debt relief plan to forgive $20,000 for Pell Grant eligible borrowers and $10,000 for other borrowers. This issue remains before the Supreme Court. The commenter suggests that we should produce a secondary cost estimate in the event that the loan cancellation plan does not go into effect. The commenter further stated that our cost estimates and our analyses do not account for increased borrowing.

*Discussion:* The Department is confident in our authority to pursue debt relief and is awaiting the Supreme Court's ruling on the issue. Our cost estimates account for the Department's current and anticipated programs and policies. It is difficult to assess whether increased borrowing will occur and for which students. For example, undergraduate borrowers receive more repayment benefits under the new REPAYE plan but are also subject to annual borrowing limits which are likely to restrict any additional borrowing. Roughly 48 percent of those who borrowed for their undergraduate education in 2017–18 already borrowed at their individual maximum amount for Federal loans.[129]

*Changes:* None.

*Comments:* Some commenters argued that borrowers would use certain provisions in the rules to reduce their payments in ways that would understate potential savings to the Department and increase the overall cost of the regulation. Commenters argued that borrowers who would have higher payments on the plan would not stay on it and would instead switch onto a non-IDR plan. Commenters also argued that the proposal to allow a married borrower who files separately to not include their spouse's income would also result in more borrowers filing

separately so a non-working or otherwise lower-income spouse could have lower loan payments.

*Discussion:* We disagree with the commenters about the switching behavior of borrowers. For one, borrowers who have spent an extended time in an IDR plan would likely face large and possibly unaffordable payments if they were to switch back to the standard 10-year plan. If a borrower leaves a repayment plan and is placed on the standard plan, their balance will be amortized over however many years are remaining until the loan is repaid in a time frame equal to 10 years of time in repayment. In other words, a borrower who pays on IDR for 5 years and then switches to the 10-year standard plan would see their remaining loan balance amortized over 5 years. Realistically, the kinds of borrowers described by the commenters who might be switching are going to be doing so later in their repayment period when they have had a significant number of years of work experience. Those borrowers may no longer have access to a 10-year standard plan. At that point, if they left IDR, they would have to go onto other payment plans that do not qualify for IDR forgiveness and which result in the loan being paid off in full.

We also disagree with the assessment of what married borrowers may or may not do. For one, the ability for married borrowers to avoid having their spouse's income counted for IDR by filing taxes separately currently exists on every

[129] Powerstats analysis of the National Postsecondary Student Aid Student-Administrative Collection 2018 (NPSAS–AC). Reference table number: dfwcsn.

other IDR plan, and the different treatment in REPAYE makes the process of choosing plans more confusing. On a policy level, filing one's taxes separately as a married couple has significant consequences. According to the IRS, a married couple that files separately may pay more in combined Federal tax than they would with a joint return. This is partly because income levels for the child tax credit and retirement savings contributions credit are based on income levels half that of what is used for a joint return.[130] Married couples that file separate returns are also ineligible for the Earned Income Tax Credit. Moreover, married couples that file separately must wait several years to file jointly again. The effect is that any savings on loan payments may be offset by higher costs in taxes. We also note that this final rule does not allow a borrower who files taxes separately from their spouse to include that spouse in their household size, which reduces the amount of income protected when calculating IDR payments.

*Changes:* None.

*Comments:* Related to concerns about the effect of the plan on tuition, commenters argued that the mention in the IDR NPRM that institutions could have an incentive to raise prices created a conflict with the public statements when some parameters of the plan were announced that this rule was part of a plan to tackle prices. They argued that the Department failed to reckon with how a plan that was part of a solution to the problem of college prices could exacerbate this issue.

*Discussion:* We disagree with the commenters. A required component of the RIA is to explore every major benefit or cost that we can identify when considering the possible effect of the rule. Where possible, these elements are quantified, where not, they are at least mentioned. There are thousands of institutions of higher education that participate in the financial aid programs. Most of them already raise their cost of attendance each year, which is a major reason why concerns about student debt have grown so much in recent years. The Department thinks it is highly unlikely that significant numbers of institutions would raise their prices in response to this plan. For one, many public institutions do not have direct tuition setting authority. For another, there are many institutions whose prices are already above the combination of annual limits on Pell Grants and undergraduate loans, meaning it would not be possible to simply offset any higher price with

greater loan debt. There are also other student-related factors, such as price sensitivity and debt aversion, that influence tuition setting behavior. The mention in the IDR NPRM simply indicated that, given the sheer number of institutions operating, there is a possibility that some number could choose to raise prices. We continue to think the benefits of creating a safety net that will help the most at-risk borrowers and deliver affordable payments for middle-income borrowers far outweigh the potential costs associated with this risk.

*Changes:* None.

*Comments:* Commenters argued that the costs and benefits analysis in the IDR NPRM did not sufficiently engage with the potential effects of the rule on accountability for institutions or programs that do not provide strong returns on investment or otherwise serve students well. Some commenters calculated that the IDR NPRM would result in subsidies of nearly 80 percent for programs with negative returns on investment and more than 50 percent at private for-profit colleges. Some commenters argued that these effects could result in a race to the bottom for institutions under severe financial pressure and argued that colleges would present REPAYE as a de facto wage subsidy to recruit underprepared students. Similarly, commenters argued that the IDR NPRM should have reckoned more with the effects of the proposal on accountability measures such as cohort default rates (CDRs) and the likelihood of institutions marketing low-value programs. Commenters also argued that the request for information about creating a list of the least financially valuable programs that was released concurrent with the IDR NPRM was insufficient to address these issues.

*Discussion:* We disagree with some concerns raised by the commenters with regard to CDRs and think that other issues are best understood by considering the totality of the Department's work, not just this regulatory package.

Cohort default rates already affect a very small number of institutions on an annual basis. For the 2017 CDRs—the last set of rates that do not include time periods covered by the national pause on repayment, interest, and collections—just 12 institutions encompassing 1,358 borrowers in the corresponding repayment cohort had rates that were high enough to put them at risk of losing access to title IV aid. That represents approximately 0.03 percent of all borrowers tracked for that measure in that fiscal year. Furthermore, some of these institutions maintained

aid access through appeals created by statute and waivers granted by the Department, including those effectuated in response to language inserted in Federal appropriations bills. While paying attention to default rates is important, most colleges face no risk of negative consequences from the existing CDR measure as it does not have significant effect on eligibility for poorly performing institutions or programs.

This rule would also not diminish any potential effect CDRs have on encouraging institutions to keep their default rates generally low to avoid even the possibility of sanctions. That is because the CDR only looks at results for borrowers in their first few years in repayment and institutions face no consequences for borrowers who default outside the measurement window or face long-term repayment challenges. That is partly why there have been concerns in the past by entities such as GAO that institutions keep their default rates low by working with companies that encourage borrowers to enter forbearances.[131] Such situations create a short-term solution for the borrower and the school but do not produce the type of long-term assistance that an IDR plan provides. As such, using IDR instead of forbearance for struggling borrowers is a better long-term outcome for borrowers.

Moreover, the payment pause will continue to reduce the already minimal effects of the CDR for the next several years. Already, the cohorts that partly included the pause have seen national default rates fall from 7.3 percent to 2.3 percent between the FY 2018 and FY 2019 cohorts (the most recent rates available).[132] The effects of the payment pause on the CDR will likely continue for the next several years.

The Department has separately proposed other actions that would address the other accountability concerns raised by commenters if finalized in a form similar to the proposed versions. The first is the issue of marketing programs with lower economic returns to borrowers. The Department recognizes that there are programs currently receiving Federal student aid on the condition that they prepare students for gainful employment in a recognized occupation that nevertheless provide undesirable economic returns. This includes programs that result in typical debts that far exceed typical earnings and those that produce graduates who do see no

[130] *www.irs.gov/publications/p504.*

[131] *https://www.gao.gov/products/gao-18-163.*

[132] *fsapartners.ed.gov/knowledge-center/topics/ default-management/official-cohort-default-rates- schools.*

benefit from additional wages as a result of their postsecondary experience. To address this issue, the Gainful Employment NPRM released on May 19, 2023, (88 FR 32300) proposes new definitions for what it means for a program to provide training that prepares students for gainful employment in a recognized occupation based on the debt burden and earnings relative to those of high school graduates. We estimate in that NPRM that there are more than 700,000 students who enroll in about 1,800 of these low-financial-value career programs each year. The proposed rule would cut off eligibility for federal student aid when career programs consistently leave graduates with a monthly debt burden that exceeds 8 percent of their annual earnings or 20 percent of their discretionary earnings, or with earnings that are no greater than students with only a high school diploma.

The Department is also proposing steps to address the borrowers enrolled in programs that leave graduates with unaffordable debt burdens that would not be subject to the eligibility loss under the Gainful Employment NPRM (88 FR 32300). We are proposing that students attending programs that have high ratios of debt-to-earnings would have to complete an acknowledgment before they borrow or receive other forms of Federal student aid. We think this approach will have two effects. First, students may consider choosing a program that will produce better outcomes. Second, institutions will not want to have their programs subject to such acknowledgements and will take steps to improve their outcomes.

The Department has also announced that it intends to publish a list of the programs that provide the least financial value. The Department published a request for information around how to best define this list in January 2023 (88 FR 1567). When finalized, such a list would draw national attention to some of the biggest drivers of unaffordable student debt. The Department has also announced that it intends to ask institutions with programs on this list to provide plans to improve their outcomes.

The combined effect of these policies would be that programs which burden their students with unaffordable debt levels will be subject to additional Federal accountability, ranging from ineligibility to a student warning. Notably, these gainful employment requirements and student warnings would be applied each year. That means if an institution raises prices to the point that students take on unaffordable

levels of debt, they would face consequences as the debt levels of their students rise. Combined, these actions would represent a significant increase in accountability compared to the status quo.

*Changes:* None.

*Comments:* Commenters raised concerns about the effect of the proposed changes to REPAYE on State actions and said the IDR NPRM did not sufficiently account for them. They argued this should have triggered a greater Federalism analysis. Commenters asserted that several States rely on State tax revenue from loans that have been forgiven. As a result, they asserted that this regulation would have significant State-level budgetary implications because of the loan forgiveness provisions, such as the fact that interest that is not charged on a monthly basis would not be part of the forgiven amount at the end of the repayment period that is subject to State taxation. The commenter cited several other ways States could be affected by our regulation. These included the claim that States would choose to spend less on higher education; States would divert subsidies away from alternative pathways to family-sustaining employment; that State performance funding formulas would be weakened by new Federal spending; that States would gain less of an advantage from making significant public investments in postsecondary education; that more students would go out of State for postsecondary education; States that fund higher education on a per capita basis would see expenditures rise believing that the Federal subsidy would result in increased enrollment; and institutions would change their prices. Commenters did not provide evidence to quantify the extent of any effects mentioned.

*Discussion:* We did not identify any Federalism implications in the proposed rule and do not believe that these final regulations require a Federalism impact statement.

The Department is not persuaded by the concerns about foregone tax revenue on interest that no longer accumulates. The Federal government's reason for providing this Federal benefit is that the accrual of interest can create situations under which a borrower's loans are negatively amortized, which harms borrowers. Moreover, there is no way for the States to know with any certainty what amounts they would or would not collect in the form of foregone tax revenue. REPAYE and other IDR plans base payments on borrowers' incomes. The result is that, if a borrower's income goes up, they will repay more of their

loan, including in many cases paying off the loan entirely. In addition, some of the interest that would not be charged on this plan is interest that would otherwise have been paid by the borrower today due to the higher payment amounts on REPAYE. That interest is therefore not a transfer from the potential State tax revenue to the borrower, but rather a transfer from the Department to the borrower. Moreover, a minority of States tax student loan forgiveness, and other IDR plans also provide interest subsidies of varying amounts. Therefore, there is only a small amount of tax on the amount of increased forgiveness over what the borrower would have received on this plan versus another plan. There are also not enough borrowers who have received forgiveness through an IDR plan to date to establish that a State is relying on revenue from these plans. Because only the original ICR plan has been around long enough for borrowers to reach the required number of monthly payments for forgiveness, only a few borrowers have earned forgiveness through an IDR plan. This number will rise through planned actions like the one-time payment count adjustment, but that is not a change States could have planned for.

We are similarly unconvinced on the other arguments about federalism. For instance, the commenters have not outlined how performance-based funding systems would be affected. Only a minority of institutions nationally are subject to performance-funding systems, as not every State has a performance-funding system, most such systems only apply to public institutions, and they often represent only a portion of State dollars for postsecondary education. Beyond that, it is unclear what metrics the commenters expect would be affected in these systems, which commonly consider things like enrollment levels and completion.

The Department also disagrees that the rule would result in States spending less on postsecondary education. The rule does not change the total amount of Federal aid available for enrollment in undergraduate programs, which are the ones most heavily subsidized by States. That means funding reductions that increase prices could not necessarily be backfilled by additional loans. Such concerns also ignore how powerful sticker prices are in affecting student choice. None of those dynamics are changed by this rule.

The same goes for pricing issues raised by commenters. Most public colleges already charge out-of-state tuition that is well above what a typical

undergraduate student can borrow for postsecondary education. This rule is not changing those statutory loan limits.

*Changes:* None.

*Comments:* Commenters suggested several types of distributional analyses that they argued the Department should provide in the final rule. These included breaking down who benefits from the rule in terms of income, family background, and demographics to show that the benefits do go to low- and middle-income borrowers. Commenters also argued for separating cost estimates for undergraduate and graduate borrowers and asked the Department to provide annual estimates of gross cancellations.

*Discussion:* Undergraduate borrowers and borrowers with lower lifetime incomes are projected to see the largest reductions in total payments in the new REPAYE plan relative to the current REPAYE plan. Table 3.3 shows these projections for future cohorts of borrowers by quintiles of lifetime income (measured across all borrowers), calculated using a model that includes relevant lifecycle factors that determine IDR payments (*e.g.,* household size, income, and spousal income when relevant). This model assumes full participation in current REPAYE and the new plan. More details on the model can be found in the discussion of the costs and benefits in this RIA. For example, undergraduate borrowers in the bottom 20 percent of lifetime income (measured across all borrowers) are projected to pay $10,339 in present discounted value terms in current REPAYE, on average, but only $1,209 in the new plan, an 88 percent reduction. In contrast, undergraduate borrowers in the top 20 percent of lifetime income are projected to pay only 1 percent less in the new plan compared to the current REPAYE plan. Low- and middle-income graduate borrowers see the largest reductions in payments as well. Reductions for graduate borrowers are larger in absolute terms than reductions for undergraduates because graduate borrowers have higher average levels of outstanding debt, but the reductions for graduate borrowers are smaller in percentage terms than those for undergraduate borrowers.

TABLE 3.3—PROJECTED PRESENT DISCOUNTED VALUE OF TOTAL PAYMENTS FOR FUTURE REPAYMENT COHORTS BY QUINTILE OF LIFETIME INCOME, ASSUMING FULL TAKE-UP OF SPECIFIED PLAN

| | Quintile of lifetime income | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **Borrowers with only undergraduate debt** | | | | | |
| Current REPAYE | $10,339 | $16,388 | $17,760 | $19,649 | $19,738 |
| Final Rule REPAYE | $1,209 | $6,692 | $12,417 | $17,292 | $19,597 |
| Difference | $9,130 | $9,696 | $5,344 | $2,357 | $141 |
| Percent reduction | 88% | 59% | 30% | 12% | 1% |
| **Borrowers with any graduate debt** | | | | | |
| Current REPAYE | $49,412 | $67,072 | $75,409 | $81,662 | $95,581 |
| Final Rule REPAYE | $32,936 | $48,241 | $60,351 | $70,180 | $89,737 |
| Difference | $16,476 | $18,831 | $15,058 | $11,482 | $5,844 |
| Percent reduction | 33% | 28% | 20% | 14% | 6% |

*Changes:* None.

*Comments:* Commenters argued that the Department should have run a net budget impact figure that did not include the one-time debt relief program providing up to $20,000 in relief to make sure borrowers are not made worse off with respect to their loans as a result of the pandemic.

*Discussion:* The Department's cost estimates in the NPRM and this final rule include initial agency actions in the baseline. This includes the one-time debt relief program, the final regulations that were issued on November 1, 2022, and the extension of the payment pause. The sensitivity runs we have included represent different possible scenarios that might occur due to this regulation. We do not believe it is necessary in evaluating the effects of this rule to provide sensitivity runs related to other final policies.

*Changes:* None.

*Comments:* A commenter raised concerns about statistics used by the Department in rollout materials for the IDR NPRM that were not included in the IDR NPRM itself. These related to modeling by the Department about the potential effects of the proposal on different types of borrowers based upon their race or ethnicity. The commenter argued that the Department should make clear whether it based the proposed rule on considerations of whether certain racial or ethnic groups would be more likely to benefit. A different commenter raised similar concerns about the use of statistics related to racial groupings. They argued that making decisions on the basis of which racial groups win and lose is improper and violates the Constitution and Federal civil rights laws.

*Discussion:* The Department did not design the proposed or final rule based upon considerations of which types of racial or ethnic groups would benefit more or less from the changes. The figures used in rollout materials were from the same modeling used to produce Table 3 in the IDR NPRM's RIA (what is now Table 3.3 in this RIA). The provided figures simply give greater context of one element of the anticipated effects of the IDR NPRM.

*Changes:* None.

*Comments:* One commenter argued that the Department did not account for the connection between the net budget impact in the IDR NPRM with the statements made by the Department's financial statement auditor around certifying the Department's consolidated financial statements for FY 2022. They argued that, because components of the IDR NPRM were announced at the same time as the President's announcement of the one-time debt relief program, any issues related to scores of that program would also affect budget estimates of the IDR NPRM.

*Discussion:* The audit opinion is a result of the size and newness of the Department's one-time debt relief program and is related to the Department's evidence-based estimation of the take-up rate among borrowers eligible for that program. The IDR NPRM was not released until January 2023 and was not included in the audit. Nor did the audit address the cost

estimate of this rule. In the *Net Budget Impact* section, the Department produces cost estimates related to existing loans as well as loans to be issued in the future. One-time debt relief does not affect future loan costs because those loans are not eligible for that relief.

*Changes:* None.

*Comments:* Some commenters argued that the net budget impact did not account for other types of costs including increased spending on Pell Grants from more students enrolling in college, as well as borrowers choosing to spend more time out of the workforce due to the treatment of deferments and forbearances.

*Discussion:* The Department disagrees with the assertions related to the effect of deferments and forbearances on employment. The types of deferments and forbearances for which the Department would award credit toward forgiveness are largely ones where borrowers would be highly likely to have a $0 monthly payment if they instead enrolled in IDR. For instance, unemployment deferments fall into this category. Furthermore, Sec. 455 of the HEA already allows periods spent in economic hardship deferments to count toward the maximum repayment period. The other periods that will receive credit under this rule are limited to cases where borrowers are engaged in other specified activities like military service, AmeriCorps, or Peace Corps. None of these are situations that would discourage work.

Concerning the potential costs for Pell Grants, the Department does not generally model changes in college-going based on a policy. This is true for both elements that would add costs, as well as policies that would produce savings, such as increased overall tax revenue from a more highly educated populace. Inducement effects are highly unknown and there is not strong data available to model these potential costs and savings. Moreover, national trend data show college enrollment has generally been declining, particularly at the undergraduate level. This reflects a strong economy and fewer students in the core college-going age ranges. The Department will continue to acknowledge these costs in the discussion of costs, benefits, and transfers, but not include them in the net budget impact beyond the existing estimates in the baseline.

*Changes:* None.

*Comments:* Some commenters argued that the Department did not sufficiently consider whether the terms of the proposed REPAYE plan would result in more students choosing 4-year

institutions instead of lower-cost community colleges and technical schools.

*Discussion:* We disagree with the commenters that this final rule would result in significant changes in the types of institutions chosen by borrowers who are already enrolled in college or prospective students who are deciding to enroll in college. Moreover, we note the commenter provided no analysis to quantify such an effect. For one, the final rule makes no changes to the overall loan limits set in the Higher Education Act for undergraduate borrowers and does not change the amount of aid available to students. Second, the choice of institution, particularly for community college students, often appears to be motivated by geographic proximity. Among community college students, 50 percent chose an institution within 11 miles of their home.[133] Third, recent trends in enrollment patterns emphasize how much the choice about community college enrollment is motivated by the strength of the underlying labor market. Community college enrollment, in particular, has fallen significantly over the past several years as there are more job opportunities for these students. This rule has no effect on employment options available to these individuals. Finally, this rule does not address the sticker or net prices charged by institutions and the generally higher prices of 4-year institutions relative to two-year public institutions would persist.

*Changes:* None.

*Comments:* The Department received a few comments arguing that the estimate in the IDR NPRM that the proposal carried estimated administrative costs of $10 million was too low and that the Department had not fully accounted for the costs of implementing its proposals. Similarly, commenters noted that it was challenging to know if the effects of the rule would be a net benefit or cost to servicers based upon the number of borrowers who continue repaying compared to the number who will receive forgiveness.

*Discussion:* The publication of the IDR NPRM gave the Department a greater opportunity to engage in discussions internally to gauge the implementation cost of these regulations. Based upon those discussions, we have adjusted the implementation costs of this rule to about $4.7 million for the changes in this rule that are being early

implemented in July 2023, including renaming REPAYE to SAVE, and another $12.6 million for the changes that go into effect on July 1, 2024. We believe these are largely one-time costs. Ongoing costs for these changes would be part of the Department's ongoing servicing expenses.

With regard to effects on servicers, we think this approach will ultimately be a net positive for them. The Federal Tax Information (FTI) Module will automatically calculate IDR payments when a borrower provides approval for the sharing of their tax information, so the scope of servicers' work will be reduced to only calculations where automated processing via the FTI Module is not possible. Having one IDR plan that is clearly the best option for most borrowers will make it easier to counsel borrowers about their repayment options. We anticipate that the automatic enrollment of delinquent borrowers in IDR will keep more borrowers current and reduce the number of defaults, providing more accounts for servicers to manage. Reductions to borrowers' payment amounts and the interest benefit should also reduce the number of borrower complaints and increase customer satisfaction.

*Changes:* We have updated the estimate of administrative costs of this rule to $17.3 million.

*Comments:* The Department received comments arguing that the IDR NPRM failed to consider the potential effects of the proposed changes on inflation. This included citing one analysis produced after the August 2022 announcement of one-time debt relief and aspects of the IDR NPRM that said inflation would increase over the next year. Relatedly, some commenters said budget estimates should reflect estimated changes on net Federal interest costs.

*Discussion:* The Department disagrees with the commenters. We have captured the costs and benefits that we think are most likely to be affected by this final rule. There has been no evidence to date that Federal student loans affected larger government borrowing costs and we do not think that would change in this rule.

*Changes:* None.

*Comments:* We received comments arguing that the analysis of the effects of the IDR NPRM on small businesses was insufficient. The comments argued that the terms of the repayment plan could harm small nonprofit organizations, because borrowers may now be less inclined to pursue Public Service Loan Forgiveness (PSLF) since the greater generosity of the proposed plan would make that kind of relief less necessary.

---

[133] nces.ed.gov/pubsearch/ pubsinfo.asp?pubid=2019467.

*Discussion:* We disagree with the commenters, who did not provide any analyses of these potential effects. For one, the benefits discussed in this regulation would also be available to those seeking PSLF. That means these borrowers would also see a payment reduction during the 10-year repayment period prior to receiving forgiveness. Moreover, the typical balances forgiven in PSLF are significantly higher than the amounts that would be subject to the early forgiveness provision in this rule. The result is that most borrowers would still receive greater benefits from PSLF than the early forgiveness provision here. For those with balances not subject to early forgiveness, the shorter time to forgiveness for PSLF would make that option still more attractive than use of REPAYE for 20 or 25 years.

*Changes:* None.

*Comments:* One commenter suggested that the net budget impact should also be measured using "fair value accounting." This is an alternative approach to cost estimation that uses different interest rates and methodologies from what the Department traditionally employs.

*Discussion:* The Department disagrees. Our process for cost estimation is spelled out by policies and procedures established by the Department's Budget Service and the Office of Management and Budget. Model assumptions are approved by a mix of career and appointed Department leadership. The model is also audited on an annual basis. We do not think it would be appropriate to deviate from the consistent approach taken in all our regulatory packages.

*Changes:* None.

4. Discussion of Costs and Benefits

The final regulations would expand access to affordable monthly payments on the REPAYE plan by increasing the amount of income exempted from the calculation of payments from 150 percent of the Federal poverty guidelines to 225 percent of the Federal poverty guidelines, lowering the share of discretionary income put toward monthly payments to 5 percent for a borrower's total original loan principal volume attributable to loans received for an undergraduate program, not charging any monthly unpaid interest remaining after applying a borrower's payment, and providing for a shorter repayment period and earlier forgiveness for borrowers with smaller original principal balances (starting at 10 years for borrowers with original principal balances of $12,000 or less, and increasing by 1 year for each additional $1,000 up to 20 or 25 years).

To better understand the impact of these rules, the Department simulated how future cohorts of borrowers would benefit from enrolling in REPAYE under the new provisions. To do so, the Department used data from the College Scorecard and Integrated Postsecondary Education Data System (IPEDS) to create a synthetic cohort of borrowers that is representative of borrowers who entered repayment in 2017 in terms of institution attended, education attainment, race/ethnicity, and gender. Using Census data, the Department projected earnings and employment, marriage, spousal debt, spousal earnings, and childbearing for each borrower up to age 60. Using these projections, payments under a given loan repayment plan can be calculated for the full length of time between repayment entry and full repayment or forgiveness. To provide an estimate of how much borrowers in a given group (*e.g.,* lifetime income, education level) would benefit from enrolling in REPAYE under the new provisions, total payments per $10,000 of debt at repayment entry were calculated for each borrower in the group and compared to total payments that the borrower would make if they were to enroll in the standard 10-year repayment plan or the current REPAYE plan. Payments made after repayment entry are discounted using the Office of Management and Budget's Present Value Factors for Official Yield Curve (Budget 2023) so that the resulting amounts are all provided in present discounted terms.

These projections are different from the estimates of the budgetary costs of the changes to REPAYE. These estimates reflect changes in simulated payments that would occur if all borrowers enrolled and paid their full monthly obligation in different plans to highlight the types of borrowers who could benefit most under different repayment plans. They also do not account for the possibility of borrowers being delinquent or defaulting, which could affect assumptions of amounts repaid.

On average, if all borrowers in future cohorts were to enroll in the 10-year standard repayment plan or the current REPAYE plan and make all of their required payments on time, we estimate that borrowers would repay approximately $11,800 per $10,000 of debt at repayment entry in both the standard 10-year plan and under the current provisions of REPAYE. The changes to REPAYE will reduce the amount repaid per $10,000 of debt at repayment entry to approximately $7,000. On average, borrowers with only undergraduate debt are projected to see expected payments per $10,000 borrowed drop from $11,844 under the standard 10-year plan and $10,956 under the current REPAYE plan to $6,121 under the new REPAYE plan. The average borrower with graduate debt, whose incomes and debt levels tend to be higher, is projected to have much smaller reductions in payments per $10,000 borrowed, from $11,995 under the 10-year standard plan and $12,506 under the current REPAYE plan to $11,645.

TABLE 4.1—PROJECTED PRESENT DISCOUNTED VALUE OF TOTAL PAYMENTS PER $10,000 BORROWED FOR FUTURE REPAYMENT COHORTS, ASSUMING ALL BORROWERS ENROLL IN THE SPECIFIED REPAYMENT PLANS

| | All borrowers | Borrowers with only undergraduate debt | Borrowers with any graduate debt |
|---|---|---|---|
| Standard 10-year plan | $11,880 | $11,844 | $11,995 |
| Current REPAYE | 11,844 | 10,956 | 12,506 |
| Final Rule REPAYE | $7,069 | 6,121 | 11,645 |

The Department has also estimated how payments per $10,000 borrowed would change for borrowers in future repayment cohorts who are projected to have different levels of lifetime individual earnings. For this estimate borrowers are divided into quintiles based on projected earnings from repayment entry until age 60. Borrowers in the first quintile are projected to have lower lifetime earnings than at least 80 percent of all borrowers in the cohort,

while those in the top quintile are projected to have higher earnings than at least 80 percent of all borrowers.

On average, borrowers in every quintile of the lifetime income distribution are projected to repay less (in present discounted terms) in the new REPAYE plan than in the existing REPAYE plan. However, differences in projected payments per $10,000

borrowed are largest for borrowers with only undergraduate debt in the bottom two quintiles (*i.e.*, those with projected lifetime earnings less than at least 60 percent of all borrowers in the cohort). Borrowers with only undergraduate debt who have lifetime income in the bottom quintile are projected to repay $873 per $10,000 in the new REPAYE plan compared to $8,724 per $10,000 in the

current REPAYE plan, and borrowers in the second quintile of lifetime income with only undergraduate debt are projected to repay $4,129 per $10,000 compared to $11,813 per $10,000 in the current REPAYE plan. Borrowers in the top 40 percent of the lifetime income distribution (quintiles 4 and 5) are projected to see only small reductions in payments per $10,000 borrowed.

TABLE 4.2—PROJECTED PRESENT DISCOUNTED VALUE OF TOTAL PAYMENTS PER $10,000 BORROWED FOR FUTURE REPAYMENT COHORTS BY QUINTILE OF LIFETIME INCOME, ASSUMING ALL BORROWERS ENROLL IN SPECIFIED PLAN

| | Quintile of lifetime income | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **Borrowers with only undergraduate debt** | | | | | |
| Current REPAYE ................................................. | $8,724 | $11,813 | $11,799 | $11,654 | $11,411 |
| Final Rule REPAYE ............................................. | 873 | 4,129 | 7,825 | 10,084 | 11,151 |
| Average annual earnings in year of repayment entry ......... | 18,620 | 27,119 | 33,665 | 39,565 | 50,112 |
| Average annual family earnings in year of repayment entry | 40,600 | 42,469 | 49,312 | 53,524 | 67,748 |
| **Borrowers with any graduate debt** | | | | | |
| Current REPAYE ................................................. | $7,002 | $10,259 | $11,849 | $12,592 | $12,901 |
| Final Rule REPAYE ............................................. | 6,267 | 8,689 | 10,476 | 11,344 | 12,248 |
| Average annual earnings in year of repayment entry ......... | 19,145 | 28,099 | 35,316 | 42,226 | 54,039 |
| Average annual family earnings in year of repayment entry | 41,174 | 43,753 | 52,144 | 59,351 | 79,368 |

To compare the potential benefits for future borrowers from the new REPAYE plan, these simulations abstract from repayment plan choice and instead assume that all future borrowers enroll in a given plan (*i.e.*, the current or new REPAYE plan) and make their scheduled payments. Future borrowers' actual realized benefits will depend on the extent to which enrollment in IDR increases, which borrowers choose to enroll in IDR, and whether borrowers make their required payments. In general, the new REPAYE plan should reduce rates of delinquency and default by providing more borrowers with a $0 payment and automatically enrolling eligible borrowers into REPAYE once they are 75 days late on their payments. That said, borrowers could still end up delinquent or in default if they either owe a non-$0 payment or the Department cannot access their income information and cannot automatically enroll them in IDR.

The final regulations will make additional improvements to help borrowers navigate their repayment options by allowing more forms of deferments and forbearances to count toward IDR forgiveness. This protects borrowers from having to choose between pausing payments and earning progress toward forgiveness by making IDR payments and allows borrowers to keep progress toward forgiveness when consolidating.

The final regulations streamline and standardize the Direct Loan Program repayment regulations by housing all repayment plan provisions within sections that are listed by repayment plan type: fixed payment, income-driven, and alternative repayment plans. The regulations will also provide clarity for borrowers about their repayment plan options and reduce complexity in the student loan repayment system, including by phasing out some of the existing IDR plans to the extent the current law allows.

### 4.1 Benefits of the Regulatory Changes

The final regulations would benefit multiple groups of stakeholders, especially Federal student loan borrowers.

One of the key benefits of the changes made in the final rule to the IDR plans is to reduce the incidence of student loan default. The final rule does this in three ways. First, it increases the benefits of REPAYE in a way that would make this plan more attractive for the borrowers who are at greatest risk of delinquency and default, borrowers who are largely not using IDR plans today. Second, it simplifies the choice of whether to enroll in an IDR plan as well as which plan to select among the IDR options. That will make it easier to counsel at-risk borrowers and reduce confusion. Third, it contains operational improvements that will make it easier to

automatically enroll borrowers in REPAYE and keep them there instead of having borrowers fall out during recertification.

Increasing the amount of income protected to 225 percent of the Federal poverty guidelines is one step to better serve borrowers at risk of delinquency or default. The larger protection amount will result in more borrowers having a $0 monthly payment instead of owing relatively small payments. For instance, using the 2023 Federal poverty guidelines, an individual borrower with no dependents who makes $32,805 a year will no longer have to make a payment, with the same true of a family of four that earns $67,500 or less. By contrast, under the current REPAYE threshold of 150 percent of the Federal poverty guidelines, borrowers have to make a payment once their income exceeds $21,870 for a single individual and $45,000 for a family of four. This change protects relatively low-wage borrowers from having to make a monthly loan payment. Income information currently on file suggests that more than 1 million borrowers on IDR could see their payments go to $0 based upon the parameters of the plan in this final rule, including more than 400,000 that are already on REPAYE whose payment amounts would be updated automatically to $0.

Greater income protection will further help borrowers who may have a non-$0

monthly payment and are at risk of default. It also caps the total monthly savings, as a borrower who makes 226 percent of FPL saves the same as someone who makes 400 percent of FPL. The result is that the benefits of this change are better targeted on borrowers with incomes closer to 225 percent of FPL, since they would see larger savings as a percentage of their total income. In particular, the higher poverty threshold would provide a maximum additional savings of $91 a month for a single individual and $188 a month for a family of four compared to the existing REPAYE plan.

The targeting of reductions in the share of discretionary income that goes toward undergraduate loan payments will further assist with the goals of making loans more manageable and helping borrowers who would otherwise struggle with their payments. As noted in the IDR NPRM, Department data show that 90 percent of borrowers who are in default on their Federal student loans had only borrowed for their undergraduate education. By contrast, just 1 percent of borrowers who are in default had loans only for graduate studies. Similarly, 5 percent of borrowers who only have graduate debt are in default on their loans, compared with 19 percent of those who have debt from undergraduate programs.[134] The payment relief provided in the final rule will further help borrowers manage the loans that they are more likely to struggle to repay.

A recent study found that, among borrowers who were at least 15 days late on their payments, switching to an IDR plan reduced the likelihood of delinquency by 22 percentage points and decreased borrowers' outstanding balances over the following 8 months.[135] It is reasonable to expect that more generous IDR plans will decrease the delinquency rate further.

Reductions in delinquency and default may also lead to overall improvements in borrowers' credit scores. Higher credit scores can allow borrowers to access other forms of credit, such as for a home mortgage, and to obtain lower interest rates on other loans.[136] Further, avoiding the credit

[134] Department of Education analysis of loan data by academic level for total borrower population and defaulted borrower population, conducted in FSA's Enterprise Data Warehouse, with data as of December 31, 2021.

[135] Herbst, D. The Impact of Income-Driven Repayment on Student Borrower Outcomes. American Economic Journal: Applied Economics. *www.aeaweb.org/articles?id=10.1257/app.20200362.*

[136] Musto, David K. & Souleles, Nicholas S., 2006. "A portfolio view of consumer credit," Journal of

impacts of a sustained delinquency or default can improve a borrower's ability to obtain a lease, acquire a job, or accomplish other milestones for which a credit background check may be required. Prevention of default also allows borrowers continued access to Federal financial aid (as borrowers in default must remedy the default before they are eligible for additional Federal grants or loans), and prevents the possibility of other default consequences, such as a loss of a professional license.

The second way the final rule targets default is through a set of changes that simplify the process of choosing whether to use an IDR plan and which one to choose. This is partly accomplished by phasing out some of the existing IDR plans to the extent the current law allows. Student borrowers seeking an IDR plan will only be able to choose between the IBR Plan established by section 493C of the HEA and the REPAYE plan. Borrowers already enrolled on the PAYE or ICR plan will maintain their access to those plans. It is estimated that, because of the significantly larger benefits available through the REPAYE plan, most student borrowers will not be worse off by losing access to PAYE or ICR, especially since these would be borrowers not currently enrolled in one of those plans and not all borrowers are eligible for PAYE. The possible exceptions will generally be either graduate borrowers who would prefer higher payments in exchange for forgiveness after 20 years or borrowers who anticipate having payments based upon their income that would be above what they would pay on the 10-year standard plan. Overall, the Department thinks the benefits from simplification exceed the potential higher costs for these borrowers. For the first group, they will still have access to lower monthly payments than they would under either the standard 10-year plan or other IDR plans. For the second group, they will still have lower monthly payments until they reached an amount equal to what they would owe on the 10-year standard plan. These efforts to simplify the available IDR plans would help borrowers easily identify plans that are affordable and appropriate for their circumstances.

Additional improvements that can help borrowers make the choice about how to navigate repayment relate to benefits to borrowers in the form of

Monetary Economics, Elsevier, vol. 53(1), pages 59–84, January.

Edelberg, Wendy. Risk-based pricing of interest rates for consumer loans. Journal of Monetary Economics, Volume 53, Issue 8, November 2006, Pages 2283–2298.

more opportunities to earn credit toward forgiveness and a shorter repayment period for borrowers with smaller original loan principal balances. By counting certain deferments and forbearances toward forgiveness and allowing borrowers to maintain their progress toward forgiveness after they consolidate, borrowers will face fewer instances in which they inadvertently make choices that either give them no credit toward forgiveness or reset all progress made to date. Borrowers who benefit from these changes will receive forgiveness faster than they would have without these regulations. These changes will also reduce complexity in seeking IDR forgiveness, which could help more borrowers successfully navigate repayment and reduce the likelihood that a borrower is so overwhelmed by the process that they choose not to pursue IDR. The shorter time to forgiveness will provide small-dollar borrowers—often borrowers who did not complete college and who struggle most to afford their loans and avoid default—with a greater incentive to enroll in the IDR plan, increasing the likelihood they avoid delinquency and default. Reductions in the time for forgiveness for those who borrow smaller amounts may also generate an incentive for some borrowers to borrow only what they need, so as to minimize the amount of time in repayment under the new REPAYE plan.

The third way the final rule targets delinquency and default is through operational improvements that automatically allow the Department to enroll any borrowers who are at least 75 days delinquent on their loan payments and who have previously provided approval for the IRS to share their income information into the IDR plan that is most affordable for them. The Department believes that this will increase the likelihood that struggling borrowers will be enrolled in an IDR plan and will be able to avoid late-stage delinquency or default and the associated consequences. These changes will also reduce administrative burden on borrowers, who otherwise must complete new IDR applications at least every 12 months. Using statutory authority to automatically recalculate the IDR monthly payment amount for the borrowers who have provided approval for tax information disclosure will also help address the fact that large numbers of borrowers currently fail to recertify on time. This both puts borrowers at risk of seeing their payment suddenly jump and means that the Department and its contractors must expend resources to re-enroll borrowers

who would otherwise not struggle with their loan payments. That reduces resources that can go toward supporting and counseling the most at-risk borrowers that are not currently on an IDR plan.

The final rule will also provide broader benefits to help borrowers. A study found that borrowers who enrolled in an existing IDR plan saw their monthly payments decrease by $355 compared with a standard non-IDR plan.[137] That study also found that those borrowers saw an increase in consumer spending that was roughly equal to the decrease in monthly student loan payments.[138] The increase in consumption suggests these borrowers faced liquidity constraints before they enrolled in IDR and that the reduction in payments in IDR freed up resources for essential goods and services. Another study estimated that the benefits—the ''welfare gains''—of moving from a loan system without IDR plans to a system with IDR plans, if ideally implemented, are ''significant,'' ranging from about 0.2 percent to 0.6 percent of lifetime consumption.[139]

The increased liquidity that comes from reduced loan payments could also facilitate savings and loan eligibility for larger purchases, such as an automobile or a home. Borrowers who use IDR plans see reductions in their delinquencies and outstanding balances, compared to those not on IDR plans, and may be more likely to see increases in credit scores and mortgage rates.[140] And evidence from the student loan pause suggests that borrowers who experienced a pause in repayment were more likely to increase borrowing for mortgages and auto debt.[141] Further, decreases in the monthly payment amount under IDR could lead to a lower debt-to-income (DTI) ratio calculation for some borrowers. For example, borrowers using a Federal Housing Administration (FHA) plan, commonly used by first-time homebuyers, have a DTI ratio calculated based on actual monthly payment, rather than on the total loan amount, for borrowers who pay at least $1 monthly.[142] The REPAYE plan could as much as halve this DTI calculation for borrowers who only have student debt. For borrowers with a $0 monthly payment, DTI is calculated as 0.5 percent of the outstanding balance on the loan.[143] Given that the new REPAYE plan limits the accrual of interest through negative amortization, even borrowers who make $0 payments will also experience improvements in DTI on the new plan.

Not charging unpaid monthly interest after applying a borrower's payment will provide both financial and non-financial benefits for borrowers. For some borrowers, particularly those who have low incomes for the duration of their time in repayment, this interest benefit results in not charging interest that would otherwise be forgiven after 20 or 25 years of qualifying monthly payments. This policy also provides a non-financial benefit because borrowers will not see their balances otherwise grow.[144] Qualitative research and borrower complaints received by the Department have shown that interest growth on IDR plans is a significant concern for borrowers.[145] Research has similarly shown that interest accumulation may discourage repayment.[146] The Department expects that this benefit may encourage borrowers to keep repaying.

As discussed in the *Net Budget Impact* section, the Department's main budget estimate includes an increase in the total volume being repaid on IDR as well as several alternative budget scenarios that generally involve an increase in the amount of loans being repaid on IDR, either due to greater usage of the plan by existing borrowers, increased amounts of debt taken out by existing borrowers, or additional borrowing from individuals who would not otherwise take out loans. The benefits discussed in this section would generally remain the same under any of these scenarios. Borrowers would be protected from a greater risk of delinquency or default; they would have an easier time deciding whether to choose an IDR plan and staying enrolled on such a plan.

There are, however, some additional benefits that could possibly accrue under some of the scenarios. For instance, there are benefits to additional borrowing in the future by students who would otherwise avoid loans.[147] When student loans were packaged as part of a financial aid letter for borrowers attending a community college, students were more likely to borrow for their education. This increased borrowing—about $4,000—led to increases in GPA and completed credits among students and increased transfers by 11 percentage points.[148] When students use loans, they may be less likely to rely on higher interest credit card debt, or substitute in longer working hours; both of these choices could interfere with a student's ability to complete a degree.[149] Reduction in student loan repayment risk may also induce more institutions that previously did not package loans or offer them as part of Federal student financial aid to do so. Researchers estimate that in the 2012–13 school year, more than 5 million students attended community colleges that did not offer Federal student loans.[150]

The final rule will also provide benefits to the Federal government. The Federal government benefits from increases in borrowers' improved economic stability and potential for

[137] Mueller, H., & Yannelis, C. (2022). Increasing Enrollment in Income-Driven Student Loan Repayment Plans: Evidence from the Navient Field Experiment. The Journal of Finance, 77(1), 367–402. doi.org/10.1111/jofi.13088.

[138] Ibid.

[139] Findeisen, S., & Sachs, D. (2016). Education and optimal dynamic taxation: The role of income-contingent student loans. Journal of Public Economics, 138, 1–21. doi.org/10.1016/j.jpubeco.2016.03.009.

[140] Herbst, Daniel. 2023. ''The Impact of Income-Driven Repayment on Student Borrower Outcomes.'' *American Economic Journal: Applied Economics*, 15 (1): 1–25.

[141] Dinerstein, Michael and Yannelis, Constantine and Chen, Ching-Tse, Debt Moratoria: Evidence from Student Loan Forbearance (December 24, 2022). Available at SSRN: ssrn.com/abstract=4314984 or dx.doi.org/10.2139/ssrn.4314984, Blagg, Kristin, and Jason Cohn. ''Student Loan Borrowers and Home and Auto Loans during the Pandemic.'' (2022). Urban Institute, Washington DC, *www.urban.org/sites/default/files/2022-02/student-loan-borrowers-and-home-and-auto-loans-during-the-pandemic.pdf*.

[142] Blagg, Kristin, Jung Hyun Choi, Sandy Baum, Jason Cohn, Liam Reynolds, Fanny Terrones, and Caitlin Young. ''Student Loan Debt and Access to Homeownership for Borrowers of Color.'' (2022). Urban Institute, Washington, DC. *www.urban.org/sites/default/files/2023-02/Student%20Loan%20Debt%20and%20Access%20to%20Homeownership%20for%20Borrowers%20of%20Color.pdf*.

[143] *www.hud.gov/sites/dfiles/OCHCO/documents/2021-13hsgml.pdf*.

[144] The Pew Charitable Trusts. Borrowers Discuss the Challenges of Student Loan Repayment. (2020). *www.pewtrusts.org/en/research-and-analysis/reports/2020/05/borrowers-discuss-the-challenges-of-student-loan-repayment*.

[145] Ibid.; FDR Group. Taking Out and Repaying Student Loans: A Report on Focus Groups with Struggling Student Loan Borrowers. (2015). *static.newamerica.org/attachments/2358-why-student-loans-are-different/FDR_Group_Updated.dc7218ab247a4650902f7afd52d6cae1.pdf*. The Department has also received many comments regarding IDR or student loan interest during the rulemaking process and through the FSA Ombudsman's office.

[146] Ibid.

[147] Boatman, Angela, Brent J. Evans, and Adela Soliz. ''Understanding loan aversion in education: Evidence from high school seniors, community college students, and adults.'' *Aera Open* 3, no. 1 (2017): 2332858416683649.

[148] Marx, Benjamin M., and Lesley J. Turner. 2019. ''Student Loan Nudges: Experimental Evidence on Borrowing and Educational Attainment.'' *American Economic Journal: Economic Policy*, 11 (2): 108–41.

[149] Avery, Christopher, and Sarah Turner. ''Student loans: Do college students borrow too much—or not enough?.'' Journal of Economic Perspectives 26, no. 1 (2012): 165–192.

[150] Marx, Benjamin M., and Lesley J. Turner. 2019. ''Student Loan Nudges: Experimental Evidence on Borrowing and Educational Attainment.'' *American Economic Journal: Economic Policy*, 11 (2): 108–41.

economic growth that comes from them being less likely to default and be subject to the conditions that can constrain economic success after default, such as challenges in getting a job or securing housing.[151] These benefits are returned to taxpayers in the form of increased economic activity and growth. The improved repayment terms in the new REPAYE plan, including limitations on interest accrual, will make careers in non-profit and public service industries more appealing to borrowers who are seeking PSLF. This will be particularly relevant in instances where there is a substantial pay difference relative to the private sector. This allows State and Federal governments to better attract and retain talent in their workforces. Although the potential effects of these IDR changes are hard to project, a study of the impact of waivers for PSLF indicated that the broad take up of these waivers particularly benefited those in occupations like teaching, social work, law enforcement, and firefighting.[152]

By reducing defaults through the adoption of the new REPAYE plan, the Department will reduce the incidence of involuntary collections which inhibit the effectiveness of other government programs that act to support low-income families. For example, the Department collects more in Federal non-tax delinquent debt than any other Federal agency, collecting $14.5 billion in the 2019 fiscal year, 54 percent of the total amount collected by all agencies.[153] These debts may be collected through involuntary transfers, such as through Treasury offsets of tax refunds and benefit payments. Treasury offsets can directly reduce Federal payments intended to help lower-income households. For example, some older borrowers may have their Social Security benefits offset, sometimes to the point where their benefits are reduced to payments below 100 percent of FPL.[154] Offsets to tax refunds can

affect a household's receipt of the earned income tax credit, a benefit for low- and middle-income workers and families which has been shown to create incentives for employment, improve children's math and reading achievement, and lift some families out of poverty.[155]

Another form of involuntary payment for defaulted student debt, administrative wage garnishment, can result in the garnishment of an average of 10 percent of a worker's monthly gross pay.[156] By the end of 2019, about 0.4 percent of workers were subject to wage garnishment for at least one student loan.[157] Wage garnishment also appears to be associated with an increased rate of job turnover,[158] which could result in more volatility in earnings and in long-run career trajectory, which may cause individuals to rely more on other Federal social safety nets, such as the Supplemental Nutrition Assistance Program and Medicaid.

The Department will also benefit operationally from this final rule. While there will be costs to implement these changes, the changes to REPAYE will make it easier for the Department to counsel borrowers about their repayment options. This includes both the decision of whether to enroll in IDR or not, and then which plan to pick among the IDR options. This is a significant improvement from current rules, in which there are multiple IDR plans with very similar terms and some that have confusing tradeoffs that can be hard to explain. For example, borrowers today must decide whether to take the benefit on REPAYE that results in the Department not charging 50 percent of the monthly unpaid interest in exchange for provisions that require a married borrower who files separately to include their spouse's income. Simpler and clearer choices that establish REPAYE as the best option for essentially all undergraduate borrowers and the best payment on a monthly basis for all but

the graduate borrowers with the highest income will make it easier to guide borrowers. Moreover, the expanded interest benefit will remove a major potential downside to using IDR, which can help assuage concerns about the plan that might otherwise dissuade a borrower who needs help from reduced payments.

On net, the final regulations will likely present a benefit to servicers. They would have some upfront costs to administer the program and retrain their call center representatives, but the Department pays servicers through the contract change process when it asks them to implement new benefits. That means the cost of implementing new provisions will ultimately be paid for by the Department. After this transitionary period, servicers will be more likely to benefit. For one, the reduced payments will help more borrowers stay current, a benefit for servicers who are paid more when loans are not delinquent. The treatment of interest as well as counting progress toward forgiveness from certain deferments and forbearances will also reduce frustration and concerns from borrowers, which may mean fewer cases that need to be escalated to more experienced (and expensive) staff. While the new REPAYE plan will result in increased levels of forgiveness, we do not project that it would result immediately in significant amounts of forgiveness. That's because the one-time payment count adjustment will be providing discharges for borrowers who already have enough time in repayment to get them to the equivalent of 20 or 25 years in repayment, while only about 16 percent of all borrowers have original principal balances that make them eligible for forgiveness after as few as 120 payments, as shown in Table 5.4. Moreover, it is not a given that all these borrowers would sign up for the new REPAYE plan or that all who do would have their loans forgiven instead of being repaid within the 10-year maximum repayment period.

The Department believes that, despite the additional costs to taxpayers of the new REPAYE plan, both borrowers and the Department will greatly benefit from a plan that helps borrowers avoid delinquency and default, which are loan statuses that create negative, long-lasting challenges, costs, and administrative complexities for collection, as well as carry additional consequences for borrowers. This includes the possibility of having their wages garnished, their tax refunds or Social Security seized, and declines in their credit scores.

[151] Kiviat, B. (2019). The art of deciding with data: evidence from how employers translate credit reports into hiring decisions. Socio-Economic Review, 17(2), 283–309.

So, W. (2022). Which Information Matters? Measuring Landlord Assessment of Tenant Screening Reports. Housing Policy Debate, 1–27.

[152] Briones, Diego A., Nathaniel Ruby & Sarah Turner. (2022). Waivers for the Public Service Loan Forgiveness Program: Who Would Benefit from Takeup? Working paper 30208. *www.nber.org/ papers/w30208.*

[153] FY 2019 Report to the Congress: U.S. Government Non-Tax Receivables and Debt Collection Activities of Federal Agencies. *fiscal.treasury.gov/files/dms/debt19.pdf.*

[154] U.S. Government Accountability Office. December 2016. Social Security Offsets. Improvements to Program Design Could Better Assist Older Student Loan Borrowers with

Obtaining Permitted Relief. *www.gao.gov/assets/ 690/682476.pdf.*

[155] Schanzenbach, Diane Whitmore and Michael R. Strain. (October 2020)."Employment Effects of the Earned Income Tax Credit: Taking the Long View.'' IZA Institute of Labor Economics. *docs.iza.org/dp13818.pdf.* Dahl, Gordon B., and Lance Lochner. 2012. ''The Impact of Family Income on Child Achievement: Evidence from the Earned Income Tax Credit.'' American Economic Review, 102 (5): 1927–56. *www.aeaweb.org/ articles?id=10.1257/aer.102.5.1927.*

[156] DeFusco, Anthony A., Random M. Enriquez, and Margaret B. Yellen. (December 2022). Wage Garnishment in the United States: New Facts from Administrative Payroll Records. NBER working paper 30714. *www.nber.org/papers/w30714.*

[157] Ibid.

[158] Ibid.

In sum, borrowers will benefit from a more affordable plan that limits their loan payments, reduces the amount of time over which they need to repay, provides more protected income for borrowers to meet their family's basic needs, and reduces the chances of default. The Department and its contracted servicers will benefit from streamlining administration, and taxpayers will benefit from the lower rates of delinquent and defaulted loans.

## 4.2 Costs of the Regulatory Changes

The increased benefits on the new REPAYE plan, including reduced monthly payments, a shorter repayment period for some borrowers, and not charging unpaid monthly interest, all represent costs in the form of transfers to borrowers. This will result in transfers to borrowers currently enrolled on an IDR plan, as well as those who choose to sign up for one in the future.

This plan may also result in changes in students' decisions to borrow and how much to borrow, which could have additional future effects on the size of transfers to borrowers. This could result in increased costs to taxpayers in the form of transfers to borrowers if there is an increase in borrowing rates or amounts and those borrowers then fail to fully repay that additional debt. Some of these transfers to borrowers may be offset if the increased borrowing results in higher rates of postsecondary program completion and higher subsequent earnings, which would generate additional Federal income tax revenue.[159]

The changes to the regulations may also result in costs resulting from reduced accountability for student loan outcomes at institutions of higher education, which would show up as increased transfers to some poor-performing schools. In particular, the provisions that result in more borrowers having a $0 monthly payment and automatically enrolling borrowers who are delinquent onto an IDR plan could

significantly reduce the rate at which students default. This could in turn lead to fewer institutions losing access to Federal financial aid due to having high cohort default rates. However, the existing cohort default rate standards currently cause very few institutions to lose access to Federal aid. In the years before the national pause on repayment, only about a dozen institutions a year faced sanctions due to high cohort default rates. Most of these institutions had small enrollments, and many still maintained access to aid as a result of successful appeals. The most recent rates released in fall 2022 showed just eight institutions potentially subject to the loss of eligibility.[160] The effect of the cohort default rate will also remain small for several years into the future because of the pause on payments, interest, and collections that was put in place in March 2020.

The small reduction in accountability from the cohort default metric could be mitigated by other actions by the Department to increase accountability for programs that are required to provide training that prepares students for gainful employment in a recognized occupation, but instead leave graduates with student debt that outweighs their typical earnings or with earnings that are less than those of high school graduates. If finalized, these accountability measures would likely reduce the transfers to borrowers under the new REPAYE plan, as students would be unable to use title IV aid to enroll in career programs with low economic returns.

Additional efforts by the Department to inform students about debt burden and typical earnings for graduates from programs not subject to the gainful employment rule may also reduce transfers to poor-performing programs. As a result of additional information, students may consider choosing a program with better earnings or loan burden outcomes, and programs may take steps to reduce students' debt burdens or improve earnings after graduation.[161] Whether the new REPAYE plan, combined with accountability changes, results in an increased transfer to borrowers, and the size of that transfer, depends on the

likelihood that an aid recipient would have enrolled elsewhere and whether their alternative options would have resulted in higher or lower earnings. It also depends on institution and program action in response to the implementation of new accountability rules. An additional concern is the possibility that additional assistance for borrowers through the updated REPAYE plan may result in more aggressive recruiting by institutions that do not provide valuable returns on the premise that borrowers who do not find a job do not have to repay their loans. This concern already exists with IDR plans, but could increase with the more generous benefits available under the new REPAYE provisions. Relatedly, institutions may be more inclined to raise tuition to shift costs to students when loans are more affordable. This effect may be more pronounced at graduate-level programs than at the undergraduate level because of differences in loan limits. At the same time, this plan targets its benefits at undergraduate students, so the change in incentives for graduate schools relative to the existing IDR plans are smaller. Increases in tuition would not solely affect borrowers and, indirectly, taxpayers; students who do not borrow would face higher education costs as well.

The alternative budget scenarios discussed in the *Net Budget Impact* also have potential implications for the costs of this final rule. Similar to the discussion of this issue in the *Benefits of the Regulatory Changes* section, the costs associated with any additional borrowing will depend based upon what types of individuals take on additional debt, what outcomes are achieved with that debt, and whether it is likely to be ultimately repaid. For instance, additional borrowing that leads more students to successfully complete their education will result in lower net costs since it would produce additional benefits, such as increased earnings and higher Federal tax revenues. By contrast, additional borrowing that does not affect completion and is not repaid would carry a greater cost because there are not additional benefits to offset the expense.

The final regulations will also result in short-run administrative costs to the Department to implement the changes to the plan, which would require modifications to contracts with servicers. As discussed in the responses to comments in this RIA, we estimate that this will be approximately $17.3 million. This includes an initial cost of $4.7 million to implement the changes that will go into effect on July 30, 2023,

---

[159] Some research has found evidence that reduced borrowing results in worse academic outcomes and lower levels of retention and completion, and that increased borrowing led to better performance and higher rates of credit completion. See, for example, Barr, Andrew, Kelli Bird, and Benjamin L. Castleman, The Effect of Reduced Student Loan Borrowing on Academic Performance and Default: Evidence from a Loan Counseling Experiment, EdWorkingPaper No. 19–89 (June 2019), *www.edworkingpapers.com/sites/default/files/ai19-89.pdf;* and Marx, Benjamin M. and Turner, Lesley, Student Loan Nudges: Experimental Evidence on Borrowing and Educational Attainment (May 2019). American Economic Journal: Economic Policy, Volume 11, Issue 2, *www.aeaweb.org/articles?id=10.1257/pol.20180279.* Black et al. 2020 *www.nber.org/papers/w27658.*

[160] *www2.ed.gov/offices/OSFAP/defaultmanagement/cdr.html.*

[161] Joselynn Hawkins Fountain, 2019. "The Effect of the Gainful Employment Regulatory Uncertainty on Student Enrollment at For-Profit Institutions of Higher Education," Research in Higher Education, Springer; Association for Institutional Research, vol. 60(8), pages 1065–1089, December.; Hentschke, G.C., Parry, S.C. Innovation in Times of Regulatory Uncertainty: Responses to the Threat of "Gainful Employment". *Innov High Educ* 40, 97–109 (2015). doi.org/10.1007/s10755-014-9298-z.

including rebranding the plan from REPAYE to SAVE. The remaining $12.6 million is related to standing up other changes in time for the rest of this regulation to go into effect on July 1, 2024. Ongoing costs beyond this amount would be part of the Department's annual expenses for student loan servicing.

5. Net Budget Impacts

These regulations are estimated to have a net Federal budget impact in costs over the affected loan cohorts of $156.0 billion, consisting of a modification of $70.9 billion for loan cohorts through 2023 and estimated costs of $85.1 billion for loan cohorts 2024 to 2033. The Department's primary estimate updates the IDR NPRM estimate to include assumptions about increased undergraduate loan volume being repaid on IDR and for the President's Budget for FY 2024 with small updates. There are also additional sensitivities that address points raised in comments or the Department's internal review. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans.

IDR Plan Changes

The changes to the REPAYE plan offer borrowers a more generous IDR plan that would have a net budget impact of approximately $156.0 billion, consisting of a modification of $70.9 billion for cohorts through 2023 and $85.1 for cohorts 2024–2033. This estimate is based on the President's Budget for 2024 baseline that includes the PSLF waiver, the one-time payment count adjustment, the payment pause extension to August 2023, and the August 2022 announcement that the Department will discharge up to $20,000 in Federal student loans for borrowers who make under $125,000 as an individual or $250,000 as a family. It also includes the regulatory changes included in the final regulations for Institutional Eligibility Under the Higher Education Act of 1965, as Amended; Student Assistance General Provisions; Federal Perkins Loan Program; Federal Family Education Loan Program; and William D. Ford Federal Direct Loan Program published on November 1, 2022 (87 FR

65904), and the final regulations for Pell Grants for Prison Education Programs; Determining the Amount of Federal Education Assistance Funds Received by Institutions of Higher Education (90/10); Change in Ownership and Change in Control published on October 28, 2022 (87 FR 65426) that made changes to several other areas related to Federal student loans including interest capitalization, loan forgiveness programs, loan discharges, and the 90/10 rule.

The most significant reasons for the change in the net budget impact estimate from the IDR NPRM to the final regulations are changes that increase the share of future loan volume that we project to be repaid through the new plan. There are also underlying changes in the baseline against which the changes to IDR are costed against. In addition, the Department updated its methodology related to plan switching to reflect that approximately 25 percent of the 800,000 borrowers currently on ICR have Direct Consolidation loans that repaid a parent PLUS loan and are therefore ineligible to switch to REPAYE. Since the subsidy rate on REPAYE is greater than on ICR, this reduces costs for taxpayers by a small amount.

As noted in the IDR NPRM, the Department has significant data limitations that create challenges in estimating many of the other factors identified by commenters in the primary budget estimate. In particular, we lack information on the incomes, income trajectories, and household sizes of borrowers who are not enrolled on an IDR plan. For these reasons, the Department's past regulations under the ICR authority have not incorporated estimates in changes in the percent of volume using IDR.

We also noted in the IDR NPRM that we would continue to assess the issue of potential increased usage of IDR plans in response to this rule based upon the public comments received. We agree with the commenters that it is reasonable to expect an increase in the amount of loan volume being repaid on IDR, particularly in the revised REPAYE plan, which is now also being referred to as the SAVE plan. Such a situation is consistent with the Department's stated goals of having IDR plans better serve as protection against delinquency and default and to make certain we do not return to a world where more than 1

million borrowers default on their loans each year.

The Department is still concerned that properly determining potential take-up of the IDR plan is challenging, particularly given the difficulty in forecasting future income, family size, and marital status for borrowers who were not estimated to enroll in IDR under the baseline. The effect of provisions like the automatic enrollment of borrowers who are at least 75 days delinquent is also hard to project because it is dependent on how many borrowers provide approval for the disclosure of their Federal tax information and that functionality is not yet available.

Given these challenges, the Department decided in the final rule to adopt estimates for increased loan volume for undergraduate borrowers based upon the share of undergraduate loan volume held by borrowers that are projected to be able to benefit from lower payments under the current REPAYE plan (the most generous IDR option that is currently available to all borrowers) who actually enroll in an IDR plan. Specifically, we used the model discussed in both the IDR NPRM and this final rule that projects the present discounted value of lifetime payments for all future borrowers if they were to enroll in REPAYE, the standard 10-year plan, and the graduated repayment plan. If a borrower is projected to pay less in present discounted value terms in REPAYE than the PDV of their payments in the other two plans, then we project that they would benefit from REPAYE and calculated the share of loan volume associated these borrowers. While this analysis is based upon REPAYE, that plan is the most generous plan available to student borrowers with Direct Loans to all but some graduate borrowers with high ratios of their income to their debt.[162] We grouped these borrowers into categories that mirror the risk categories used in budget modeling. These are 2-year proprietary; 2-year nonprofit; 4-year freshman or sophomore; and 4-year junior or senior. We then looked at the share of volume from each of those risk categories that are currently enrolled in IDR. These figures can be thought as the "Current REPAYE usage rate." The results of those calculations are displayed below in Table 5.1.

---

[162] REPAYE has the same formula for calculating payments as PAYE and IBR for new borrowers, but also does not charge half of unpaid monthly

interest. REPAYE does not cap payments at the standard 10-year plan as PAYE and IBR do, but those plans have an upfront eligibility requirement

that a borrower must see a payment reduction relative to the standard 10-year plan.

TABLE 5.1—SHARE OF LOAN VOLUME HELD BY BORROWERS PROJECTED TO BENEFIT FROM REPAYE THAT ARE ESTIMATED TO ENROLL IN IDR

| Risk category and loan type | Share that would benefit from current REPAYE (percent) | Share that enroll in IDR (percent) | Estimated current IDR usage rate (percent) |
|---|---|---|---|
| 2-year proprietary, subsidized | 56 | 25 | 45 |
| 2-year proprietary, unsubsidized | 56 | 27 | 49 |
| 2-year nonprofit, subsidized | 72 | 29 | 40 |
| 2-year nonprofit, unsubsidized | 72 | 29 | 41 |
| 4-year fresh/soph, subsidized | 45 | 28 | 62 |
| 4-year fresh/soph, unsubsidized | 45 | 28 | 63 |
| 4-year junior/senior, subsidized | 45 | 30 | 67 |
| 4-year junior/senior, unsubsidized | 45 | 32 | 71 |

We next used the same model to estimate what share of volume would be associated with borrowers who are projected to have the lowest PDV of payments in the SAVE plan/the final rule version of REPAYE, again compared to the standard 10-year and graduated plans. We multiplied this percentage by the Current REPAYE usage rate to determine the percentage of future volume that we estimated would enroll in the final rule's version of REPAYE. Those numbers are shown below in Table 5.2.

TABLE 5.2—PROJECTED USAGE OF FINAL RULE REPAYE PLAN

| Risk category and loan type | Share estimated to benefit from SAVE (percent) | Estimated current IDR usage rate (percent) | Estimated share enrolling in SAVE (percent) | Increased volume in SAVE compared to current IDR volume (% points) |
|---|---|---|---|---|
| 2-year proprietary, subsidized | 89 | 45 | 40 | 15 |
| 2-year proprietary, unsubsidized | 89 | 49 | 43 | 1 |
| 2-year nonprofit, subsidized | 84 | 40 | 34 | 5 |
| 2-year nonprofit, unsubsidized | 84 | 41 | 34 | 5 |
| 4-year fresh/soph, subsidized | 72 | 62 | 45 | 17 |
| 4-year fresh/soph, unsubsidized | 72 | 63 | 46 | 17 |
| 4-year junior/senior, subsidized | 72 | 67 | 48 | 18 |
| 4-year junior/senior, unsubsidized | 72 | 71 | 51 | 19 |

The Department believes this is the best approach for estimating the possible increased usage of the plan within the limitations of the Department's data and concerns about properly estimating behavioral effects. It does not presume that borrowers use the plan at a greater rate because of a behavioral effect, but rather acknowledges that the share of volume associated with borrowers that would benefit from the plan has increased.

The Department did not apply this approach to two of its risk groups—graduate borrowers and consolidation volume. We did not include the latter because our modeling of the plan's benefits does not group borrowers in that manner. The Department also already attributes that a higher share of consolidation loan volume will be repaid in IDR than any other risk group. For instance, starting with cohort 2014 and going forward, the Department has projected that more than 70 percent of consolidated volume from subsidized loans and 80 percent of consolidated

volume from unsubsidized loans volume will be repaid in an IDR plan. These figures do not include consolidation loan volume from borrowers exiting default, which since 2015 has been projected to be more than 80 percent of loan volume. We also did not use this approach for graduate borrowers because since 2013 the Department has projected around 60 percent of graduate PLUS volume and 50 percent of unsubsidized graduate volume will be repaid in an IDR plan. These figures are higher than undergraduate borrower IDR enrollment. In fact, we already project a higher share of graduate loan volume enrolling in IDR than would come from this formula.

We believe that graduate enrollment in IDR is much higher under than undergraduate IDR enrollment under the baseline primarily for two reasons.

First, graduate borrowers—who are more likely to have been through years of interaction with Federal student aid system and institutional financial aid

offices—are likely to have a greater awareness of repayment options than undergraduate borrowers. This increased knowledge of repayment options likely contributes to higher IDR take-up under the baseline.

Second, graduate borrowers may be able to draw greater benefits from current IDR plans than undergraduate borrowers. Graduate borrowers have higher average loan balances than undergraduate borrowers—and in many cases higher interest rates—meaning that they may be more likely to benefit from greater reductions in monthly payments than undergraduate borrowers in current IDR plans. The potential for greater benefits perhaps increases the relative propensity of graduate borrowers to enroll in IDR compared to undergraduate borrowers. In other words, the structure of the existing IDR plans may provide a stronger incentive for graduate borrowers to enroll.

The changes to the REPAYE plan resulting in the new SAVE plan, meanwhile, are primarily geared toward

undergraduate borrowers. Undergraduate borrowers will owe a lower percentage of their discretionary income each month, while payments on graduate debt will remain at 10 percent. Undergraduate borrowers with low original principal balances will also be eligible for forgiveness much sooner than under existing plans. Graduate borrowers, by contrast, would be relatively less likely to have balances small enough to benefit from this provision.

While the provisions in the SAVE plan related to the higher discretionary income protection and no longer charging unpaid monthly interest apply to graduate and undergraduate borrowers, we believe that most graduate borrowers in position to substantially benefit from these provisions would already derive large benefits from existing IDR plans and therefore would already be likely to enroll in IDR under the baseline. The relative benefits of both these changes are greater for borrowers whose debt payments represent a larger share of their household income compared to those for whom their debt payments are a smaller share of their household income. But the same is true for IDR more generally. REPAYE also already had a version of the interest benefit in place. That means the magnitude of the effects of the interest benefit are greater under the SAVE plan, but the basic incentives to use this plan to receive some help with accumulating unpaid interest are the same as what currently exists.

Finally, we note that prior to this final rule, REPAYE was not the most popular IDR option for graduate borrowers. Those borrowers were more likely to choose IBR or PAYE because those plans provide forgiveness after 20 years of payments instead of the 25 years on REPAYE. They also cap payments at the 10-year standard plan, while REPAYE has no cap. While the SAVE plan will produce lower monthly payments than those other plans for most borrowers, the longer time to forgiveness and lack of a payment cap are still present in the SAVE plan. That means graduate borrowers will face a trade-off between the benefits of SAVE (*e.g.* a higher discretionary income threshold) and the less beneficial aspects of SAVE relative to IBR—particularly the longer maximum repayment period.

Undergraduate borrowers on the other hand will have the same maximum repayment period on the SAVE plan as they have under existing IDR plans—the SAVE plan is almost entirely beneficial to them relative to existing IDR plans.

Overall, we therefore expect that the final rule will create a greater change in the incentives for undergraduate borrowers to enroll in IDR relative to graduate borrowers. As noted, we already have estimates of significant IDR usage by graduate borrowers and do not think the changes in this rule appreciably change the existing incentives. There are also still some downsides to the plan in this final rule that would be most relevant for graduate borrowers. Due to all of these factors we have not increased the expected graduate volume being repaid in IDR that already exists in the baseline.

This additional IDR usage only applies to the outyears in our budget estimates. This approach best captures the effect of the plan resulting in greater usage from future borrowers. It also reflects data and modeling limitations that would overstate the effects of the IDR change if we were to move existing borrowers into an IDR plan. In the Department's current model, switching a percent of volume from one repayment plan to another applies from the time that volume entered repayment, changing the payment stream more than would be the case for borrowers changing plans several years into repayment. Given the higher subsidy costs for IDR plans, this would overstate the costs of the modification for past cohorts and cause changes to cashflows to past years, which is not possible. We have done this in one sensitivity for illustrative purposes, but do not believe it is appropriate for the primary estimate.

We have modeled other proposals from commenters related to increases in overall loan volume or changes in borrower behavior as alternative budget scenarios.

The final regulations would result in costs for taxpayers in the form of transfers to borrowers, as borrowers enrolled in the REPAYE plan would generally make lower payments on the new plan as compared to current IDR plans. The revision to the REPAYE plan will also provide that the borrower will not be charged any remaining accrued interest each month after the borrower's

payment is applied under the REPAYE plan. That provision also increases costs for taxpayers in the form of transfers, as borrowers may otherwise eventually repay some of the accumulating interest prior to forgiveness on current IDR plans. Costs to taxpayers would also increase if the availability of improved repayment options leads future cohorts of students to increase the volume and quantity of loans they obtain. The primary budget estimate assumes that there will be no change in volume or quantity of loans issued due to the improved terms. As noted in the IDR NPRM and by several commenters, additional borrowing would increase costs of the regulations, with the magnitude of the impact depending on the characteristics of those borrowing more. Data limitations make it challenging to anticipate who such borrowers would be, so the Department has developed the Low Additional Volume and High Additional volume scenarios described in the Sensitivities discussion of this Net Budget Impact section.

To estimate the effect of the rule changes, the Department revised the payment calculations in the IDR sub-model used for cost estimates for the IDR plans. Changing the percentage of income applied to a payment is a straightforward change with a significant effect on the cashflows when compared to the baseline. The element that is less clear is what decision about plan choice existing borrowers will make when the new REPAYE plan is available. As in the case of the current REPAYE plan, the new REPAYE plan does not include a standard repayment cap that limits borrowers' maximum monthly payment. In this case, the Department has run the payment calculations twice for each borrower—once under the new REPAYE option and again under the borrower's baseline plan—and assumed each borrower chooses the option with the lowest net present value (NPV) of costs. For this final rule, the Department keeps 25 percent of ICR borrowers in that plan to represent parent borrowers who will not have access to the new REPAYE plan. Table 5.3 shows the result of this plan assignment, which is that more than 93 percent of future volume that enrolls in IDR is projected to enroll in the new REPAYE plan.

TABLE 5.3—PLAN ASSIGNMENT FOR BORROWERS ENTERING REPAYMENT IN FY 2024

[Percent distribution of borrowers in baseline plan when new REPAYE is available]

| Baseline plan | ICR | IBR | PAYE | Final rule REPAYE |
|---|---|---|---|---|
| ICR | 27.27 | | | 72.73 |
| IBR | | 20.33 | | 79.67 |
| PAYE | | | 6.5 | 93.5 |
| REPAYE | | | | 100 |
| Total | 0.01 | 1.09 | 5.4 | 93.5 |

In categorizing plans, we combine the 10-percent IBR plans with PAYE borrowers, as the key characteristics of those plans are very similar. The IBR row and columns refers to those remaining in 15 percent IBR, which represents approximately 5 percent of borrowers who first borrowed prior to 2008 and entered repayment for the last time in 2024.

This approach assumes borrowers know their income and family profile trajectories over the life of their loans and choose the plan that offers the lowest lifetime, present-discounted payments. The payment comparison for plan assignment assumes borrowers do not experience any events that disrupt their time to forgiveness or payoff, such as prepayment, discharge, or default, under either the baseline or plan revisions. It does, however, consider the effect of the one-time debt relief program announced in August 2022. Possible alternatives include choosing the plan that has the most favorable monthly payments in 2023 or another near-term year, assuming a graduate borrower whose estimated income in a given year or averaged across their repayment period would result in payment at the standard repayment cap would remain in their existing plan and setting a minimum amount of payment reduction that would trigger borrowers to change plans. The Department recognizes that borrowers may use different logic when choosing a repayment plan, such as comparing near-term monthly payments, and will not have information about their future incomes and family patterns to match this type of analysis, but we believe any decision logic would result in a high percentage of borrowers electing to participate in the new REPAYE plan. By assuming IDR borrowers select the plan with the lowest long-run cost, this generates a higher-end estimate of the net budget impact of the changes for borrowers currently enrolled in IDR plans, though there are alternative budget scenarios explored that could present a higher possible cost. While it is possible that more people may be willing to take on student loan debt with the safety net of the more generous IDR plan, we have not estimated the extent to which there could be increases in loan volumes or Pell Grants from potential new students in the primary estimate. Absent evidence of the magnitude of increase, loan type distribution, risk group profiles, and future income profiles of these potential borrowers, whose postsecondary educational decisions likely involve more than just concern about repayment of debt, the net budget impact of this potential volume increase is unknown. The main budget estimate does include a projection that additional undergraduate borrowing will switch into IDR plans from non-IDR plans as explained above. We also further model other versions of plan switching in the sensitivity runs. This change in the main estimate results in projecting 45 percent of volume from four-year freshmen and sophomores being repaid on IDR, around 50 percent for four-year juniors and seniors, and just over 40 percent of future volume for two-year proprietary students. Administrative issues, lack of information, or simply sticking with the default option may be the reason many of these borrowers are not in an IDR plan already, but others may have made the choice that a non-IDR plan is preferable for them. Depending on their anticipated income profiles or comfort with their existing plan, the potential shift of these borrowers is very uncertain. That is why we have presented additional possible increases in the usage of IDR or increased borrowing in the alternative budget scenarios. We reviewed this issue in response to public comments on the NRPM and the data points and analysis received was helpful in developing the revisions to the main budget estimate and the sensitivity scenarios. Regardless, to the extent such increases in volume and increases in IDR participation are observed, they will be reflected in future loan program initial subsidy estimates and re-estimates.

With the significant budget impact from these final regulations, the Department seeks to show the effects of the various changes individually. Table 5.4 details the scores for the modification cohorts through 2023 and the outyears through 2033 when the changes are run with one or more elements kept as in the baseline. This provides an indication of the impact of the specific changes. The scores for each component will not sum to the total because of the significant interaction between elements of the changes. For example, when the change to 5 percent of income and to 225 percent of the Federal poverty level are combined, the estimated impact is $126.3 billion compared to $130.6 billion when adding the individual savings together. These estimates are removing the change from the estimate of the total package, so a negative value represents a savings from the total policy estimate. This negative value indicates that the element has a cost when included, by reducing transfers from borrowers to the government and taxpayers.

TABLE 5.4—IDR COMPONENT ESTIMATES

[$ in billions]

| | Income protection kept at 150% of FPL | No 5% of income payment | No unpaid interest benefit | No balance-based shortened forgiveness | Other provisions |
|---|---|---|---|---|---|
| Modification through cohort 2023 | ($36.55) | ($28.08) | ($6.60) | ($0.96) | ($3.77) |

TABLE 5.4—IDR COMPONENT ESTIMATES—Continued

[$ in billions]

|  | Income protection kept at 150% of FPL | No 5% of income payment | No unpaid interest benefit | No balance-based shortened forgiveness | Other provisions |
|---|---|---|---|---|---|
| Outlays for cohorts 2024–2033 ........................................... | ($35.04) | ($30.98) | ($10.59) | ($2.71) | ($4.52) |
| Total ............................................................. | ($71.59) | ($59.06) | ($17.19) | ($3.67) | ($8.29) |

**Note:** Savings are relative to the scenario in which the final rule is implemented in full, so a negative number reflects a smaller increase in costs.

As can be seen in Table 5.4, the increase in the income protection to 225 percent of the Federal poverty guidelines and the percentage of income on which payments are based are the most significant factors in the estimated impact of the changes. Borrowers' projected incomes are another important element for cost estimates for IDR plans, so we have run two sensitivity analyses that shift borrower incomes, one that increases incomes by 5 percent and the other that decreases them by 10 percent. From past sensitivity runs, we know that increasing and decreasing the incomes by the same factor results in similar changes in costs, so the different variations here provide a sense of two

different shifts in incomes. When compared to the same baseline, we estimate that regulations with a 5 percent increase in incomes would cost a total of $129.0 billion and the 10 percent decrease would cost $203.1 billion. Recall that our central estimate of the rule's net budget impact is $156.0 billion above baseline. Incomes are likely the factor in the IDR model with the greatest effect, but other aspects, such as projected family size, and events such as defaults or discharges, also affect the estimates.

We also wanted to consider the distributional effects of the changes to the extent we have information. One benefit we hope to see from the

regulations is reduced delinquency and default, which should particularly benefit lower-income borrowers, but these potential benefits are not included in the primary estimate. The sample of borrowers used to estimate costs in IDR plans have projected income profiles of 31 years of AGIs for the borrower or household, depending on tax filing status. Table 5.5 summarizes the change in payments between the President's budget baseline for FY 2024 including waivers, one-time debt relief, and recent regulatory packages and the final regulations for a representative cohort of borrowers (i.e., those entering repayment in FY 2024).

TABLE 5.5—ESTIMATED EFFECTS OF IDR PROPOSALS BY INCOME RANGE AND GRADUATE STUDENT STATUS FOR BORROWERS ENTERING REPAYMENT IN FY 2024

|  | <$65,000 | $65,000 to $100,000 | Above $100,000 |
|---|---|---|---|
| **Borrowed only as an undergraduate student** | | | |
| % of Pop. .............................................................................................. | 16.40% | 22.46% | 24.25% |
| % of Debt .............................................................................................. | 5.74% | 10.30% | 13.59% |
| Mean Debt ............................................................................................. | $26,492 | $34,681 | $42,372 |
| Mean Reduction in Payments ................................................................ | $10,270 | $18,246 | $20,065 |
| **Borrowed as both an undergraduate and graduate student** | | | |
| % of Pop. .............................................................................................. | 1.76% | 5.21% | 20.56% |
| % of Debt .............................................................................................. | 3.02% | 9.09% | 38.54% |
| Mean Debt ............................................................................................. | $129,814 | $131,995 | $141,752 |
| Mean Reduction in Payments ................................................................ | $19,693 | $25,412 | $3,675 |
| **Borrowed only as a graduate student** | | | |
| % of Pop. .............................................................................................. | 0.46% | 1.55% | 7.36% |
| % of Debt .............................................................................................. | 0.94% | 3.05% | 15.73% |
| Mean Debt ............................................................................................. | $155,844 | $148,791 | $161,673 |
| Mean Reduction in Payments ................................................................ | $12,874 | $11,293 | ($12,253) |

**Note:** Debt is measured as the outstanding balance when the borrower enters repayment, reductions in payments are measured over the life of the loan, and income is the average income over the potential repayment period for borrowers entering repayment in FY 2024.

All groups would see significant reductions in average payments, except those who borrowed as graduate students and have over $100,000 in average annual income. There are some limitations to the savings for the borrowers with earnings at or below $65,000, because a portion of these

borrowers already have a $0 payment under the current REPAYE plan. Once their payment drops to $0, they cannot receive any greater savings under the new plan. Moreover, borrowers in this category generally have lower loan balances; therefore, the amount of potential savings is also smaller.

Since graduate student borrowers have higher debt, on average, they are less likely to benefit from the reduced time to forgiveness based on a low balance, as shown in Table 5.6. The high-income, high-debt graduate students may not benefit from the rate reduction and the continued absence of

the standard payment cap on REPAYE will likely affect them more. Some may still choose the new REPAYE plan if their payments are lower in the beginning and then get higher at the end of the repayment period. Table 5.6 does not account for any timing effects, as such effects are likely to be idiosyncratic and challenging to model in a systemic manner. Payments on loans attributed to graduate programs would remain at a 10 percent discretionary income level and these borrowers have high balances so would not benefit from reduced time to forgiveness. That means two of the drivers of reductions in borrower payments from the regulations—early forgiveness and the reduction to 5 percent for payments attributed to undergraduate loans—are less likely to apply to that population. The number of expected years to forgiveness in Table 5.6 is based on the borrower's balance and does not take into account any deferments, forbearances, or early payoffs.

TABLE 5.6—YEARS TO FORGIVENESS AND DISTRIBUTION OF BALANCES FOR BORROWERS ENTERING REPAYMENT IN FY 2024 UNDER FINAL RULE

| Expected years to forgiveness | Undergraduate borrowers | Any graduate borrowing | Overall |
|---|---|---|---|
| 10 | 23.53 | 0.99 | 15.78 |
| 11 | 1.83 | 0.11 | 1.24 |
| 12 | 2.04 | 0.12 | 1.38 |
| 13 | 2.07 | 0.12 | 1.4 |
| 14 | 2.24 | 0.19 | 1.54 |
| 15 | 2.12 | 0.21 | 1.46 |
| 16 | 2.31 | 0.2 | 1.58 |
| 17 | 2.13 | 0.15 | 1.45 |
| 18 | 2.25 | 0.16 | 1.53 |
| 19 | 2.27 | 0.18 | 1.55 |
| 20 | 57.2 | 0.24 | 37.6 |
| 21 | | 0.31 | 0.11 |
| 22 | | 0.16 | 0.06 |
| 23 | | 0.27 | 0.09 |
| 24 | | 0.34 | 0.12 |
| 25 | | 96.25 | 33.12 |

As noted, the Department received a significant number of comments about the budget impact estimates in the IDR NPRM, several of which included analysis of the proposed rule. With respect to the budget impact estimate, many comments indicated the Department underestimated the effect of the rule by not accounting for increased take-up of IDR and failing to account for new borrowing.

Increased take-up would be from borrowers choosing the new plan for its lower payments, increased income protection, reduced time to forgiveness, or other benefits. The policy to switch delinquent borrowers into IDR will also contribute to increased use of the plan. Several commenters referenced the Penn-Wharton Budget model analysis that analyzed a range of IDR take-up from 70–90 percent of loan volume while another analysis found that 85 percent of borrowers could benefit from the new plan. The Department's projections of payments made by future cohorts of borrowers by institutional level and control found that 72 percent of loan volume at 4-year institutions was associated with borrowers who could benefit from the new REPAYE plan in terms of reductions in the present discounted value of total payments made. However, the same analysis suggested that 45 percent of loan volume is owed by borrowers from

4-year institutions who would benefit from the current REPAYE plan, but actual take up of any IDR plan is only around 30 percent. The results are similar for loan volume from 2-year institutions, where the Department's model estimates that approximately 56 percent of volume at 2-year proprietary institutions and 72 percent at 2-year private nonprofit institutions is owed by borrowers who would benefit from REPAYE, yet the President's FY24 baseline, which is based upon actual historical data, projects that only about 26 percent and 29 percent of volume from those types of schools, respectively, is enrolled in an IDR plan. Therefore, as described above, the Department adjusted the main budget estimate to include increased usage of IDR by undergraduate borrowers based upon assuming the share of volume associated with borrowers that would benefit from IDR enroll in those plans as is observed under current plans. This results in an increase of volume into IDR since the total amount of volume that would benefit from an IDR plan is higher under this final rule.

To further explore a range of possible outcomes in terms of take up we developed Sensitivities 1 and 2 with two take-up increases, the first increasing take-up even further for existing undergraduate and graduate cohorts and future cohorts with no

ramp-up and the second being an increase that ramps up across seven outyear cohorts to maximum levels between 67 percent and 77 percent depending on loan type and risk group.

The treatment of past cohorts varies between the two IDR take-up sensitivity runs. The Department recognizes that borrowers from past cohorts may switch to the new REPAYE plan. However, the Department's scoring model handles plan switching between non-IDR and IDR plans for past cohorts from the time when the loan enters repayment. Therefore, when we increase take-up of IDR plans for past cohort borrowers, the change is applied from the time they enter repayment and will overstate the cost of the modification. Only the first budget sensitivity shows the potential effect on past cohorts.

Analysis provided by the commenters and Department analysis indicates if every or nearly every borrower that would benefit from the new REPAYE plan joins it then IDR take-up would increase significantly to around 70–85 percent of volume. Therefore, the maximum take-up adjustment factor was calculated as the percentage point increase that would bring the baseline IDR percentage into that range. The percentage point increase applied to various cohorts for Sensitivity 1, the maximum take-up adjustment factor, is presented in Table 5.7. Baseline rates for

selected cohorts and the resulting IDR percentages are presented in Tables 5.10 and 5.11.

#### TABLE 5.7—TAKE-UP PERCENTAGE POINT INCREASE FOR SENSITIVITY 1

| Proposal: cohort range | Past cohort take-up sensitivity | | | | Outyear take-up |
|---|---|---|---|---|---|
| | Pre-2008 | 2008–2012 | 2013–2017 | 2018–2023 | 2024 and out |
| 2yr prop | No change | 0.15 | 0.3 | 0.3 | 0.4 |
| 2yr NFP | No change | 0.15 | 0.3 | 0.3 | 0.4 |
| 4yr Fr/SO | No change | 0.2 | 0.35 | 0.35 | 0.45 |
| 4yr JR/SR | No change | 0.2 | 0.35 | 0.35 | 0.45 |
| GRAD | No change | 0.2 | 0.2 | 0.2 | 0.25 |

For Sensitivity 2, the additional element determining the IDR take-up increase is the ramp-up factor shown in Table 5.8. The ramp-up factor is multiplied by the maximum take-up adjustment factor for cohorts 2024 and beyond in Table 5.7 to generate the percentage point change added to the baseline IDR percentage to get the new IDR percentage. For example, the 2-year proprietary risk group IDR percentage would be increased by 17.64 points (.4 * .4409). Added to the baseline IDR percentage of 25.37 percent, this generates the new IDR percentage of 43.01 percent for subsidized loans for cohort 2024.

#### TABLE 5.8—SENSITIVITY 2 IDR TAKE-UP RAMP-UP FACTOR

| 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|
| 44.09% | 63.85% | 74.98% | 84.14% | 91.43% | 96.52% | 99.99% | 100.0% | 100.0% | 100.0% |

The ramp-up factor is based on pre-covid information about the timing of when borrowers first change into an IDR plan with over 43 percent in year one and above 98 percent by year 7. This ramp-up is based on the timing of borrowers' first change to an IDR plan, it is not tied to introduction of new repayment plans and the effect of new plans on the percent of the portfolio choosing IDR. To evaluate if a cohort-based ramp-up was reasonable, we also looked at the baseline IDR percentages for cohorts surrounding previous IDR plan changes, especially the introduction of PAYE and REPAYE. The percent volume assumption used in the President's Budget for FY 2024 has a difference of a few percentage points in each cohort from 2008 to 2013, after which the percentage stays around 27 percent for several cohorts as seen in Table 5.9. This indicates that even years after the introduction of PAYE, a difference in the percent of volume in IDR persists across cohorts (18.85 percent for 2008 and 27.40 percent for 2014).

#### TABLE 5.9—FY2024 COHORT NON-CONSOLIDATED LOAN REPAYMENT PLAN DISTRIBUTION FOR SENSITIVITIES 1 AND 2

| Risk group | Repayment plan | Sensitivity 1: FY2024 cohort | | | Sensitivity 2: FY2024 cohort | | |
|---|---|---|---|---|---|---|---|
| | | Sub (percent) | Uns (percent) | PLUS (percent) | Sub (percent) | Uns (percent) | PLUS (percent) |
| 2 Yr Proprietary | | | | | | | |
| | Standard | 28.51 | 26.57 | 86.12 | 46.93 | 44.71 | 86.12 |
| | Extended | 0.21 | 0.22 | 1.47 | 0.35 | 0.36 | 1.47 |
| | Graduated | 5.90 | 5.98 | 12.41 | 9.71 | 10.06 | 12.41 |
| | IDR | 65.37 | 67.23 | 0.00 | 43.01 | 44.87 | 0.00 |
| 2 Yr Not for Profit | | | | | | | |
| | Standard | 25.57 | 24.74 | 86.47 | 43.97 | 42.82 | 86.47 |
| | Extended | 0.59 | 0.76 | 2.53 | 1.02 | 1.32 | 2.53 |
| | Graduated | 4.91 | 5.09 | 11.00 | 8.45 | 8.81 | 11.00 |
| | IDR | 68.92 | 69.41 | 0.00 | 46.55 | 47.05 | 0.00 |
| 4-Year FR/SO | | | | | | | |
| | Standard | 22.10 | 21.25 | 90.78 | 42.57 | 41.39 | 90.78 |
| | Extended | 0.71 | 0.86 | 2.29 | 1.37 | 1.67 | 2.29 |
| | Graduated | 4.34 | 4.44 | 6.93 | 8.37 | 8.65 | 6.93 |
| | IDR | 72.85 | 73.45 | 0.00 | 47.69 | 48.29 | 0.00 |
| 4 Yr Jr/Sr | | | | | | | |
| | Standard | 18.77 | 16.78 | 78.31 | 37.77 | 35.11 | 78.31 |
| | Extended | 0.99 | 1.20 | 5.75 | 1.99 | 2.51 | 5.75 |
| | Graduated | 5.09 | 5.05 | 15.94 | 10.25 | 10.56 | 15.94 |
| | IDR | 75.15 | 76.98 | 0.00 | 49.99 | 51.82 | 0.00 |
| Graduate | | | | | | | |
| | Standard | 100.00 | 17.33 | 11.41 | 100.00 | 27.16 | 21.89 |
| | Extended | 0.00 | 2.01 | 1.28 | 0.00 | 3.14 | 2.45 |
| | Graduated | 0.00 | 5.31 | 2.54 | 0.00 | 8.32 | 4.86 |
| | IDR | 0.00 | 75.36 | 84.77 | 0.00 | 61.38 | 70.79 |

Tables 5.10 and 5.11 provide additional information on the baseline take-up rates by loan type and risk group for selected cohorts as well as the IDR take-up rates applied to outyear cohorts in various scenarios.

TABLE 5.10—BASELINE NON-CONSOLIDATED LOAN REPAYMENT PLAN DISTRIBUTION FOR SELECTED COHORTS

| Loan type | Risk group | 2007 (percent) | 2010 (percent) | 2015 (percent) | 2020 (percent) | 2030 (percent) |
|---|---|---|---|---|---|---|
| Subsidized | | | | | | |
| | 2 Yr Proprietary ............................................... | 15.44 | 23.16 | 27.48 | 25.37 | 25.37 |
| | 2 Yr Not for Profit ............................................. | 20.09 | 26.25 | 30.77 | 28.92 | 28.92 |
| | 4 Yr Freshman Sophomore ........................... | 21.89 | 28.51 | 29.04 | 27.85 | 27.85 |
| | 4 Yr Jr/Sr ........................................................ | 21.23 | 29.95 | 32.06 | 30.15 | 30.15 |
| Unsubsidized | | | | | | |
| | 2 Yr Proprietary ............................................... | 16.74 | 24.34 | 29.07 | 27.23 | 27.23 |
| | 2 Yr Not for Profit ............................................. | 19.88 | 27.78 | 31.68 | 29.41 | 29.41 |
| | 4 Yr Freshman Sophomore ........................... | 21.47 | 28.82 | 29.66 | 28.45 | 28.45 |
| | 4 Yr Jr/Sr ........................................................ | 20.94 | 31.07 | 34.09 | 31.98 | 31.98 |
| | Graduate ......................................................... | 21.97 | 38.21 | 50.24 | 50.36 | 50.36 |
| Plus | | | | | | |
| | 2 Yr Proprietary ............................................... | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 2 Yr Not for Profit ............................................. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 4 Yr Freshman Sophomore ........................... | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 4 Yr Jr/Sr ........................................................ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Graduate ......................................................... | 23.68 | 47.43 | 60.72 | 59.77 | 59.77 |

Table 5.11:  Non-Consolidated Loan Repayment Plan Distribution
for Cohorts 2023-2033 by Loan Type, Risk Group, and Scenario

| Risk Group, Loan Type and Run | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2-year Proprietary** | | | | | | | | | | | |
| **Subsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 25.37% | 25.37% | 25.37% | 25.37% | 25.37% | 25.37% | 25.37% | 25.37% | 25.37% | 25.37% | 25.37% |
| Primary | 25.37% | 40.32% | 40.32% | 40.32% | 40.32% | 40.32% | 40.32% | 40.32% | 40.32% | 40.32% | 40.32% |
| Sens 1: Full Take-Up | 25.37% | 65.37% | 65.37% | 65.37% | 65.37% | 65.37% | 65.37% | 65.37% | 65.37% | 65.37% | 65.37% |
| Sens 2: Ramped take-up | 25.37% | 43.01% | 50.91% | 55.36% | 59.03% | 61.94% | 63.98% | 65.37% | 65.37% | 65.37% | 65.37% |
| **Unsubsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 27.23% | 27.23% | 27.23% | 27.23% | 27.23% | 27.23% | 27.23% | 27.23% | 27.23% | 27.23% | 27.23% |
| Primary | 27.23% | 43.28% | 43.28% | 43.28% | 43.28% | 43.28% | 43.28% | 43.28% | 43.28% | 43.28% | 43.28% |
| Sens 1: Full Take-Up | 27.23% | 67.23% | 67.23% | 67.23% | 67.23% | 67.23% | 67.23% | 67.23% | 67.23% | 67.23% | 67.23% |
| Sens 2: Ramped take-up | 27.23% | 44.87% | 52.77% | 57.22% | 60.89% | 63.80% | 65.84% | 67.23% | 67.23% | 67.23% | 67.23% |
| **2-year Private/Public** | | | | | | | | | | | |
| **Subsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 28.92% | 28.92% | 28.92% | 28.92% | 28.92% | 28.92% | 28.92% | 28.92% | 28.92% | 28.92% | 28.92% |
| Primary | 28.92% | 33.74% | 33.74% | 33.74% | 33.74% | 33.74% | 33.74% | 33.74% | 33.74% | 33.74% | 33.74% |
| Sens 1: Full Take-Up | 28.92% | 68.92% | 68.92% | 68.92% | 68.92% | 68.92% | 68.92% | 68.92% | 68.92% | 68.92% | 68.92% |
| Sens 2: Ramped take-up | 28.92% | 46.55% | 54.46% | 58.91% | 62.57% | 65.49% | 67.53% | 68.91% | 68.92% | 68.92% | 68.92% |
| **Unsubsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 29.41% | 29.41% | 29.41% | 29.41% | 29.41% | 29.41% | 29.41% | 29.41% | 29.41% | 29.41% | 29.41% |
| Primary | 29.41% | 34.31% | 34.31% | 34.31% | 34.31% | 34.31% | 34.31% | 34.31% | 34.31% | 34.31% | 34.31% |
| Sens 1: Full Take-Up | 29.41% | 69.41% | 69.41% | 69.41% | 69.41% | 69.41% | 69.41% | 69.41% | 69.41% | 69.41% | 69.41% |
| Sens 2: Ramped take-up | 29.41% | 47.05% | 54.95% | 59.40% | 63.07% | 65.98% | 68.02% | 69.41% | 69.41% | 69.41% | 69.41% |
| **4-year Freshman/Sophmore** | | | | | | | | | | | |
| **Subsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 27.85% | 27.85% | 27.85% | 27.85% | 27.85% | 27.85% | 27.85% | 27.85% | 27.85% | 27.85% | 27.85% |
| Primary | 27.85% | 44.56% | 44.56% | 44.56% | 44.56% | 44.56% | 44.56% | 44.56% | 44.56% | 44.56% | 44.56% |
| Sens 1: Full Take-Up | 27.85% | 72.85% | 72.85% | 72.85% | 72.85% | 72.85% | 72.85% | 72.85% | 72.85% | 72.85% | 72.85% |
| Sens 2: Ramped take-up | 27.85% | 47.69% | 56.58% | 61.59% | 65.71% | 68.99% | 71.28% | 72.85% | 72.85% | 72.85% | 72.85% |
| **Unsubsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 28.45% | 28.45% | 28.45% | 28.45% | 28.45% | 28.45% | 28.45% | 28.45% | 28.45% | 28.45% | 28.45% |
| Primary | 28.45% | 45.52% | 45.52% | 45.52% | 45.52% | 45.52% | 45.52% | 45.52% | 45.52% | 45.52% | 45.52% |
| Sens 1: Full Take-Up | 28.45% | 73.45% | 73.45% | 73.45% | 73.45% | 73.45% | 73.45% | 73.45% | 73.45% | 73.45% | 73.45% |
| Sens 2: Ramped take-up | 28.45% | 48.29% | 57.18% | 62.19% | 66.31% | 69.59% | 71.88% | 73.45% | 73.45% | 73.45% | 73.45% |
| **4-year Junior/Senior** | | | | | | | | | | | |
| **Subsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 30.15% | 30.15% | 30.15% | 30.15% | 30.15% | 30.15% | 30.15% | 30.15% | 30.15% | 30.15% | 30.15% |
| Primary | 30.15% | 48.24% | 48.24% | 48.24% | 48.24% | 48.24% | 48.24% | 48.24% | 48.24% | 48.24% | 48.24% |
| Sens 1: Full Take-Up | 30.15% | 75.15% | 75.15% | 75.15% | 75.15% | 75.15% | 75.15% | 75.15% | 75.15% | 75.15% | 75.15% |
| Sens 2: Ramped take-up | 30.15% | 49.99% | 58.89% | 63.89% | 68.02% | 71.30% | 73.59% | 75.15% | 75.15% | 75.15% | 75.15% |
| **Unsubsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 31.98% | 31.98% | 31.98% | 31.98% | 31.98% | 31.98% | 31.98% | 31.98% | 31.98% | 31.98% | 31.98% |
| Primary | 31.98% | 51.16% | 51.16% | 51.16% | 51.16% | 51.16% | 51.16% | 51.16% | 51.16% | 51.16% | 51.16% |
| Sens 1: Full Take-Up | 31.98% | 76.98% | 76.98% | 76.98% | 76.98% | 76.98% | 76.98% | 76.98% | 76.98% | 76.98% | 76.98% |
| Sens 2: Ramped take-up | 31.98% | 51.82% | 60.71% | 65.72% | 69.84% | 73.12% | 75.41% | 76.97% | 76.98% | 76.98% | 76.98% |
| **Graduate** | | | | | | | | | | | |
| **Unsubsidized** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% |
| Primary | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% | 50.36% |
| Sens 1: Full Take-Up | 50.36% | 75.36% | 75.36% | 75.36% | 75.36% | 75.36% | 75.36% | 75.36% | 75.36% | 75.36% | 75.36% |
| Sens 2: Ramped take-up | 50.36% | 61.38% | 66.32% | 69.11% | 71.40% | 73.22% | 74.49% | 75.36% | 75.36% | 75.36% | 75.36% |
| **PLUS** | | | | | | | | | | | |
| Baseline (used for NPRM run) | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% |
| Primary | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% | 59.77% |
| Sens 1: Full Take-Up | 59.77% | 84.77% | 84.77% | 84.77% | 84.77% | 84.77% | 84.77% | 84.77% | 84.77% | 84.77% | 84.77% |
| Sens 2: Ramped take-up | 59.77% | 70.79% | 75.73% | 78.52% | 80.81% | 82.63% | 83.90% | 84.77% | 84.77% | 84.77% | 84.77% |

Sensitivities 3 and 4 estimate the costs of additional borrowing related to the regulation. Additional borrowing could come from future borrowers in the baseline who take out more loans or new borrowers who substitute loans for other sources of funding because of the reduced cost of borrowing. Institutions could also raise tuition because of the lower borrowing costs, which could also increase future loan volumes. To develop the low and high additional volume options in Sensitivities 3 and 4, the Department analyzed National Student Loan Data System information

about borrowing in FY 2021 to estimate additional capacity for subsidized and unsubsidized loans. The analysis aggregated borrowers' loans by academic level and compared the total to the applicable borrowing limit for that loan type at that academic level. It accounted for additional capacity for independents and dependent borrowers whose parents were unable to obtain PLUS loans. Grad PLUS loans were not included because those students can borrow up to the cost of attendance and that information was not available in our data. Table 5.12 summarizes this additional capacity, which was the basis for the low end of our additional volume range.

TABLE 5.12—ANNUAL ADDITIONAL BORROWING CAPACITY OF EXISTING BORROWERS

[$ in billions]

| | Total subsidized and unsubsidized borrowing | Additional subsidized and unsubsidized borrowing capacity |
|---|---|---|
| 2-Year Proprietary | $2.5 | $8.1 |
| 2-Year Priv/Pub | 2.9 | 1.5 |
| 4-Year FR/SO | 13.8 | 4.1 |
| 4-Year JR/SR | 15.7 | 8.2 |
| Graduate | 26.7 | 6.1 |

As this additional capacity does not account for new borrowers or tuition increases, we developed Sensitivity 4 with higher additional volume, as seen in Table 5.13. The additional volume does increase in cohorts 2027 and beyond to allow some time for borrowers to react to the changes in the borrowing costs.

TABLE 5.13—ADDITIONAL ANNUAL VOLUME SENSITIVITY SCENARIOS

[$ in billions]

| | Sensitivity 3: low additional volume scenario | | Sensitivity 4: high additional volume scenario | |
|---|---|---|---|---|
| | 2024–26 | 2027 Out | 2024–26 | 2027 Out |
| Undergraduate | $10 | $14 | $20 | $26 |
| Graduate | 7 | 10 | 16 | 20 |

The amount of additional volume generated by the individual factors leading to the increase, such as tuition increases or new borrowers taking on loans, is not specified. The additional volume was attributed to risk groups based on the percentage of additional capacity in Table 5.13 represented by the risk group. The split between loan types was based on the percentage of total subsidized and unsubsidized loans borrowed in 2021–22 represented by each loan type, with 47 percent going to subsidized loan volume. The graduate loans were split to PLUS and unsubsidized loan volume on the same basis, with 32 percent going to additional PLUS volume.

Sensitivity 5 estimates the effects of reduced defaults from the provision that moves delinquent borrowers into IDR, where a significant percentage are expected to have low or zero payments and potentially avoid default. Additionally, within IDR, the increased income protection to 225 percent of the Federal poverty line and the lower payment of 5 percent for undergraduate loans provides relief that could allow borrowers to avoid default. To estimate the effect in IDR, we looked at the percentage of borrowers projected to default in our baseline IDR model that have incomes between 150 and 225 percent of the federal poverty level in the year of their default. This was approximately 8 percent of defaulters and we increased that to 10 percent for our default reduction sensitivity for IDR borrowers.

Switching delinquent borrowers to IDR should also reduce the default risk of those remaining in non-IDR plans. Some reduction in defaults will occur in the model estimates just from switching volume to IDR plans, which have lower default rates than the non-IDR plans. To estimate the effect of the reduced risk of remaining non-IDR borrowers, the Department reduced non-IDR defaults 25 percent as seen in Sensitivities 5.

There is a significant interaction between volume, take-up, and the default reduction, so Sensitivity 6 combines the low additional volume, ramped take-up increase, and 25 percent default reduction for an overall alternate scenario.

Finally, Sensitivity 7 removes the increases in estimated additional undergraduate volume that would be repaid on IDR. This sensitivity is roughly comparable to the main budget estimate in IDR NPRM, with the additional adjustments related to the President's budget, extension of the payment pause, and revised treatment of some ICR borrowers included.

All the cost estimates presented in this document are focused on impact of the new repayment rules, without also considering other policy changes. For example, the Department recently proposed regulations to establish a new minimum earnings threshold and a maximum debt-to-earnings ratio for career programs (88 FR 32300), which could constrain some of the additional borrowing envisioned in Sensitivities 3, 4, and 6. The Department is expanding consumer information on student debt and earnings to better inform student choices. And the President's Budget seeks hundreds of billions of dollars in new investments in Pell Grants; free community college; and tuition assistance for students at Historically Black Colleges and Universities, Tribally Controlled Colleges and Universities, and Minority-Serving Institutions. The potential effects of these proposed policy changes are not

reflected in the estimates contained in this RIA.

Table 5.14 displays the taxpayer costs associated with the various sensitivity runs.

TABLE 5.11—SENSITIVITY RUN COST ESTIMATES

| | Sens 1: Full IDR take-up increase | Sens 2: Ramped IDR take-up increase | Sens 3: Low additional volume | Sens 4: High additional volume | Sens 5: 25 percent default reduction | Sens 6: Ramped take-up, low additional volume, 25% default reduction combination | Sens 7: No increase in projected volume repaid on IDR |
|---|---|---|---|---|---|---|---|
| Modification through cohort 2023 .......................... | $75.89 | $70.91 | $70.91 | $70.91 | $70.91 | $70.91 | $70.91 |
| Outlays for cohorts 2024–2033 ............................... | 194.00 | 173.20 | 171.90 | 312.68 | 78.25 | 256.66 | 56.50 |
| Total .................................................................. | 269.89 | 244.11 | 242.81 | 383.59 | 149.16 | 327.57 | 127.40 |

6. Accounting Statement

As required by OMB Circular A–4, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these regulations. These effects occur over the lifetime of the first ten loan cohorts following implementation of this rule. The cashflows are discounted to the year of the origination cohort in the modeling process and then those amounts are discounted at 3 and 7 percent to the present year in this Accounting Statement. This table provides our best estimate of the changes in annualized monetized transfers as a result of these final regulations. Expenditures are classified as transfers from the Federal government to affected student loan borrowers.

TABLE 6.1—ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED ANNUALIZED EXPENDITURES

[in millions]

| Category | Benefits |
|---|---|
| Improved options for affordable loan repayment ........................................................................................................ | Not quantified. |
| Increased college enrollment, attainment, and degree completion ........................................................................... | Not quantified. |
| Reduced risk of delinquency and default for borrowers .............................................................................................. | Not quantified. |
| Reduced administrative burden for Department due to reduced default and collection actions ............................... | Not quantified. |

| Category | Costs | |
|---|---|---|
| | 7% | 3% |
| Costs of compliance with paperwork requirements ..................................................................................... | TBD | TBD |
| Increased administrative costs to Federal government to updates systems and contracts to implement the final regulations ...................................................................................................................................................... | $2.3 | $2.0 |

| Category | Transfers | |
|---|---|---|
| | 7% | 3% |
| Reduced transfers from IDR borrowers due to increased income protection, lower income percentage for payment, potential early forgiveness based on balance, and other IDR program changes ..................................... | 17,871.0 | 16,551.60 |

7. Alternatives Considered

The Department considered the following items, many of which are also discussed in the preamble to this final rule.

The Department considered suggestions by commenters to provide payments equal to 5 percent of discretionary income on all loan types. However, we believe that doing so would not address the Department's goals of targeting benefits on the types of loans that are most likely to experience delinquency and default. The result would be expending additional transfers to loans that have a higher likelihood of being successfully repaid.

The Department also considered whether to permit borrowers with a consolidation loan that repaid a Parent PLUS loan to access REPAYE. However, we do not believe that extending benefits to these borrowers would accomplish our goal of focusing on the loans at the greatest risk of delinquency and default. Moreover, we are concerned that extending such benefits could create a high risk of moral hazard for borrowers who are close to retirement age. Instead, we think broader reforms of the Parent PLUS loan program would be a better solution.

As noted in the IDR NPRM, we considered suggestions made during negotiated rulemaking to provide partial principal forgiveness to borrowers as they repaid. We lack the legal authority to enact such a policy change.

Relatedly, we considered alternative proposals for calculating time to forgiveness, including different formulas for early forgiveness that started sooner than 10 years, forgiveness after a shorter period for borrowers with very low incomes or those who receive public assistance, or a proposal in which borrowers would receive differing periods of credit toward forgiveness if they had lower incomes.

For the periods shorter than 10 years, we do not think it would be appropriate to provide forgiveness sooner than the 10 years offered by the standard 10-year repayment plan. For the other proposals, we are concerned about complexity, particularly any structure that would only provide benefits after a consecutive period in a status, since that could create situations where a borrower on the cusp of forgiveness would paradoxically be worse off for earning more money.

We also considered suggestions by commenters to both increase or decrease the amount of income protected from loan payments. We discuss our reasons for not changing this level upward or downward in the preamble to this final rule.

Finally, we considered suggestions by commenters to provide credit for all periods in deferment or forbearance. However, we are concerned that doing so would create disincentives for borrowers to choose IDR over other types of deferments or forbearances when they would have a non-$0 payment on IDR. For instance, a borrower might be incentivized to pick a discretionary forbearance, which can be obtained without the need to provide any documentation of hardship. Therefore, we believe the deferments and forbearances we are proposing to credit are the correct ones.

### 8. Regulatory Flexibility Act

The Secretary certifies, under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), that this final regulatory action would not have a significant economic impact on a substantial number of "small entities."

The Small Business Administration (SBA) defines "small institution" using data on revenue, market dominance, tax filing status, governing body, and population. The majority of entities to which the Office of Postsecondary Education's (OPE) regulations apply are postsecondary institutions, however, which do not report such data to the Department. As a result, for purposes of this IDR NPRM, the Department proposes to continue defining "small entities" by reference to enrollment, to allow meaningful comparison of regulatory impact across all types of higher education institutions. The enrollment standard for a small two-year institution is less than 500 full-time-equivalent (FTE) students and for a small 4-year institution, less than 1,000 FTE students.[163]

Table 8.1. Small Institutions Under Enrollment-Based Definition

|  | Small | Total | Percent |
|---|---|---|---|
| Proprietary | 1,973 | 2,331 | 85% |
| 2-year | 1,734 | 1,990 | 87% |
| 4-year | 239 | 341 | 70% |
| Private not-for-profit | 983 | 1,831 | 54% |
| 2-year | 185 | 203 | 91% |
| 4-year | 798 | 1,628 | 49% |
| Public | 380 | 1,924 | 20% |
| 2-year | 317 | 1,145 | 28% |
| 4-year | 63 | 779 | 8% |
| Total | 3,336 | 6,086 | 55% |

Source: 2020-21 IPEDS data reported to the Department.

Table 8.1 summarizes the number of institutions affected by these final regulations. The Department has determined that there would be no economic impact on small entities affected by the regulations because IDR plans are between borrowers and the Department. As seen in Table 8.2, the average total revenue at small institutions ranges from $2.3 million for proprietary institutions to $21.3 million at private institutions.

---

[163] In previous regulations, the Department categorized small businesses based on tax status. Those regulations defined "non-profit organizations" as "small organizations" if they were independently owned and operated and not dominant in their field of operation, or as "small entities" if they were institutions controlled by governmental entities with populations below 50,000. Those definitions resulted in the categorization of all private nonprofit organizations as small and no public institutions as small. Under the previous definition, proprietary institutions were considered small if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. Using FY 2017 IPEDs finance data for proprietary institutions, 50 percent of 4-year and 90 percent of 2-year or less proprietary institutions would be considered small. By contrast, an enrollment-based definition applies the same metric to all types of institutions, allowing consistent comparison across all types.

Table 8.2:  Total Revenues at Small Institutions

|  | Average | Total |
|---|---|---|
| Proprietary | 2,593,382 | 5,116,742,179 |
| 2-year | 1,782,969 | 3,091,667,694 |
| 4-year | 8,473,115 | 2,025,074,485 |
| Private not-for-profit | 16,608,849 | 16,326,498,534 |
| 2-year | 3,101,962 | 573,862,938 |
| 4-year | 19,740,145 | 15,752,635,596 |
| Public | 8,644,387 | 3,284,866,903 |
| 2-year | 4,153,842 | 1,316,767,990 |
| 4-year | 31,239,665 | 1,968,098,913 |
| Total | 7,412,502 | 24,728,107,616 |

Note:  Based on analysis of IPEDS enrollment and revenue data for 2020-21.

The IDR regulations will not have a significant impact on a substantial number of small entities because IDR plans are arrangements between the borrower and the Department. As noted in the Paperwork Reduction Act section, burden related to the final regulations will be assessed in a separate information collection process and that burden is expected to involve individuals more than institutions of any size.

9. Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps make certain that the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Section 685.209 of this final rule contains information collection requirements. Under the PRA, the Department has or will at the required time submit a copy of the section and an Information Collections Request to OMB for its review. PRA approval will be sought via a separate information collection process. The Department will publish these information collections in the **Federal Register** and seek public comment on those documents. A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

*Section 685.209—Income-driven repayment plans.*

*Requirements:* The Department amended § 685.209 to include regulations for all of the IDR plans, which are plans with monthly payments based in whole or in part on income and family size. These amendments include changes to the PAYE, REPAYE, IBR and ICR plans. Specifically, § 685.209 is amended to: modify the terms of the REPAYE plan to reduce monthly payment amounts to 5 percent of discretionary income for the percent of a borrower's total original loan volume attributable to loans received for their undergraduate study; under the modified REPAYE plan, increase the amount of discretionary income exempted from the calculation of payments to 225 percent; under the modified REPAYE plan, do not charge unpaid accrued interest each month after applying a borrower's payment; simplify the alternative repayment plan that a borrower is placed on if they fail to recertify their income and allow up to 12 payments on this plan to count toward forgiveness; reduce the time to forgiveness under the REPAYE plan for borrowers with low original loan balances; modify the IBR plan regulations to clarify that borrowers in default are eligible to make payments under the plan under some conditions; modify the regulations for all IDR plans to allow for periods under certain deferments and forbearances to count toward forgiveness; modify the regulations applicable to all IDR plans to allow borrowers an opportunity to make catch-up payments for all other periods in deferment or forbearance; modify the regulations for all IDR plans to clarify that a borrower's progress toward forgiveness does not fully reset when a borrower consolidates loans on which a borrower had previously made qualifying payments; modify the regulations for all IDR plans to provide that any borrowers who are at least 75 days delinquent on their loan payments will be automatically enrolled in the IDR plan for which the borrower is eligible and that produces the lowest monthly payments for them; and limit eligibility for the ICR plan to (1) borrowers who began repaying under the ICR plan before the effective date of the regulations, and (2) borrowers whose loans include a Direct Consolidation Loan made on or after July 1, 2006, that repaid a parent PLUS loan.

*Burden Calculation:* These changes will require an update to the current IDR plan request form used by borrowers to sign up for IDR, complete annual recertification, or have their payment amount recalculated. The form update will be completed and made

available for comment through a full public clearance package before being made available for use by the effective date of the regulations. The burden changes will be assessed to OMB Control Number 1845–0102, Income Driven Repayment Plan Request for the William D. Ford Federal Direct Loans and Federal Family Education Loan Programs.

Consistent with the discussions above, Table 9.1 describes the sections of the final regulations involving information collections, the information being collected and the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections.

TABLE 9.1—PRA INFORMATION COLLECTION

| Regulatory section | Information collection | OMB Control No. and estimated burden | Estimated cost unless otherwise noted |
|---|---|---|---|
| § 685.209 IDR Plans | The final regulations at § 685.209 will be amended to include regulations for all of the IDR plans. These amendments include changes to the PAYE, IBR, and ICR plans, and primarily to the REPAYE plan. | 1845–0102 Burden will be cleared at a later date through a separate information collection for the form. | Costs will be cleared through separate information collection for the form. |

We will prepare an Information Collection Request for the information collection requirements following the finalization of this Final Rule. A notice will be published in the **Federal Register** at that time providing a draft version of the form for public review and inviting public comment. The collection associated with this IDR NPRM is 1845–0102.

### 10. Intergovernmental Review

This program is subject to Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of the Executive Order is to foster an intergovernmental partnership and a strengthened Federalism. The Executive order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This document provides early notification of our specific plans and actions for this program.

### 11. Assessment of Education Impact

In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e–4, the Secretary particularly requests comments on whether these final regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

### 12. Federalism

Executive Order 13132 requires us to provide meaningful and timely input by State and local elected officials in the development of regulatory policies that have Federalism implications. "Federalism implications" means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The regulations do not have Federalism implications.

### Regulatory Flexibility Act Certification

Pursuant to 5 U.S.C. 601(2), the Regulatory Flexibility Act applies only to rules for which an agency publishes a general notice of proposed rulemaking.

*Accessible Format:* On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT,** individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

### List of Subjects

*34 CFR Part 682*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

*34 CFR Part 685*

Administrative practice and procedure, Colleges and universities, Education, Loan programs-education, Reporting and recordkeeping requirements, Student aid, Vocational education.

**Miguel A. Cardona,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends parts 682 and 685 of title 34 of the Code of Federal Regulations as follows:

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 1. The authority citation for part 682 continues to read as follows:

**Authority:** 20 U.S.C. 1071–1087–4, unless otherwise noted.

■ 2. Section 682.215 is amended by revising paragraph (a)(3) to read as follows:

### § 682.215  Income-based repayment plan.

(a) * * *

(3) *Family size* means the number of individuals that is determined by adding together—

(i) The borrower;

(ii) The borrower's spouse, for a married borrower filing a joint Federal income tax return;

(iii) The borrower's children, including unborn children who will be born during the year the borrower certifies family size, if the children receive more than half their support from the borrower and are not included in the family size for any other borrower except the borrower's spouse who filed jointly with the borrower; and

(iv) Other individuals if, at the time the borrower certifies family size, the

other individuals live with the borrower and receive more than half their support from the borrower and will continue to receive this support from the borrower for the year for which the borrower certifies family size.

* * * * *

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 3. The authority citation for part 685 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

■ 4. In § 685.102, in paragraph (b), the definition of "Satisfactory repayment arrangement" is amended by revising paragraph (2)(ii) to read as follows:

### § 685.102   Definitions.

* * * * *

(b) * * *

*Satisfactory repayment arrangement:*
* * *

(2) * * *

(ii) Agreeing to repay the Direct Consolidation Loan under one of the income-driven repayment plans described in § 685.209.

* * * * *

■ 5. Section 685.208 is amended by:
■ a. Revising the section heading;
■ b. Revising paragraphs (a) and (k); and
■ c. Removing paragraphs (l) and (m).
The revisions read as follows:

### § 685.208   Fixed payment repayment plans.

(a) *General.* Under a fixed payment repayment plan, the borrower's required monthly payment amount is determined based on the amount of the borrower's Direct Loans, the interest rates on the loans, and the repayment plan's maximum repayment period.

* * * * *

(k) The repayment period for any of the repayment plans described in this section does not include periods of authorized deferment or forbearance.

■ 6. Section 685.209 is revised to read as follows:

### § 685.209   Income-driven repayment plans.

(a) *General.* Income-driven repayment (IDR) plans are repayment plans that base the borrower's monthly payment amount on the borrower's income and family size. The four IDR plans are—
(1) The Revised Pay As You Earn (REPAYE) plan, which may also be referred to as the Saving on a Valuable Education (SAVE) plan;
(2) The Income-Based Repayment (IBR) plan;
(3) The Pay As You Earn (PAYE) Repayment plan; and
(4) The Income-Contingent Repayment (ICR) plan;

(b) *Definitions.* The following definitions apply to this section:
*Discretionary income* means the greater of $0 or the difference between the borrower's income as determined under paragraph (e)(1) of this section and—
(i) For the REPAYE plan, 225 percent of the applicable Federal poverty guideline;
(ii) For the IBR and PAYE plans, 150 percent of the applicable Federal poverty guideline; and
(iii) For the ICR plan, 100 percent of the applicable Federal poverty guideline.
*Eligible loan,* for purposes of determining partial financial hardship status and for adjusting the monthly payment amount in accordance with paragraph (g) of this section means—
(i) Any outstanding loan made to a borrower under the Direct Loan Program, except for a Direct PLUS Loan made to a parent borrower, or a Direct Consolidation Loan that repaid a Direct PLUS Loan or a Federal PLUS Loan made to a parent borrower; and
(ii) Any outstanding loan made to a borrower under the FFEL Program, except for a Federal PLUS Loan made to a parent borrower, or a Federal Consolidation Loan that repaid a Federal PLUS Loan or a Direct PLUS Loan made to a parent borrower.
*Family size* means, for all IDR plans, the number of individuals that is determined by adding together—
(i)(A) The borrower;
(B) The borrower's spouse, for a married borrower filing a joint Federal income tax return;
(C) The borrower's children, including unborn children who will be born during the year the borrower certifies family size, if the children receive more than half their support from the borrower and are not included in the family size for any other borrower except the borrower's spouse who filed jointly with the borrower; and
(D) Other individuals if, at the time the borrower certifies family size, the other individuals live with the borrower and receive more than half their support from the borrower and will continue to receive this support from the borrower for the year for which the borrower certifies family size.
(ii) The Department may calculate family size based on Federal tax information reported to the Internal Revenue Service.
*Income* means either—
(i) The borrower's and, if applicable, the spouse's, Adjusted Gross Income (AGI) as reported to the Internal Revenue Service; or
(ii) The amount calculated based on alternative documentation of all forms

of taxable income received by the borrower and provided to the Secretary.
*Income-driven repayment plan* means a repayment plan in which the monthly payment amount is primarily determined by the borrower's income.
*Monthly payment or the equivalent* means—
(i) A required monthly payment as determined in accordance with paragraphs (k)(4)(i) through (iii) of this section;
(ii) A month in which a borrower receives a deferment or forbearance of repayment under one of the deferment or forbearance conditions listed in paragraphs (k)(4)(iv) of this section; or
(iii) A month in which a borrower makes a payment in accordance with procedures in paragraph (k)(6) of this section.
*New borrower* means—
(i) For the purpose of the PAYE plan, an individual who—
(A) Has no outstanding balance on a Direct Loan Program loan or a FFEL Program loan as of October 1, 2007, or who has no outstanding balance on such a loan on the date the borrower receives a new loan after October 1, 2007; and
(B) Receives a disbursement of a Direct Subsidized Loan, a Direct Unsubsidized Loan, a Direct PLUS Loan made to a graduate or professional student, or a Direct Consolidation Loan on or after October 1, 2011, except that a borrower is not considered a new borrower if the Direct Consolidation Loan repaid a loan that would otherwise make the borrower ineligible under paragraph (1) of this definition.
(ii) For the purposes of the IBR plan, an individual who has no outstanding balance on a Direct Loan or FFEL Program loan on July 1, 2014, or who has no outstanding balance on such a loan on the date the borrower obtains a loan after July 1, 2014.
*Partial financial hardship* means—
(i) For an unmarried borrower or for a married borrower whose spouse's income and eligible loan debt are excluded for purposes of determining a payment amount under the IBR or PAYE plans in accordance with paragraph (e) of this section, a circumstance in which the Secretary determines that the annual amount the borrower would be required to pay on the borrower's eligible loans under the 10-year standard repayment plan is more than what the borrower would pay under the IBR or PAYE plan as determined in accordance with paragraph (f) of this section. The Secretary determines the annual amount that would be due under the 10-year Standard Repayment plan based on the greater of the balances of the borrower's eligible loans that were outstanding at

the time the borrower entered repayment on the loans or the balances on those loans that were outstanding at the time the borrower selected the IBR or PAYE plan.

(ii) For a married borrower whose spouse's income and eligible loan debt are included for purposes of determining a payment amount under the IBR or PAYE plan in accordance with paragraph (e) of this section, the Secretary's determination of partial financial hardship as described in paragraph (1) of this definition is based on the income and eligible loan debt of the borrower and the borrower's spouse.

*Poverty guideline* refers to the income categorized by State and family size in the Federal poverty guidelines published annually by the United States Department of Health and Human Services pursuant to 42 U.S.C. 9902(2). If a borrower is not a resident of a State identified in the Federal poverty guidelines, the Federal poverty guideline to be used for the borrower is the Federal poverty guideline (for the relevant family size) used for the 48 contiguous States.

*Support* includes money, gifts, loans, housing, food, clothes, car, medical and dental care, and payment of college costs.

(c) *Borrower eligibility for IDR plans.* (1) Except as provided in paragraph (d)(2) of this section, defaulted loans may not be repaid under an IDR plan.

(2) Any Direct Loan borrower may repay under the REPAYE plan if the borrower has loans eligible for repayment under the plan;

(3)(i) Except as provided in paragraph (c)(3)(ii) of this section, any Direct Loan borrower may repay under the IBR plan if the borrower has loans eligible for repayment under the plan and has a partial financial hardship when the borrower initially enters the plan;

(ii) A borrower who has made 60 or more qualifying repayments under the REPAYE plan on or after July 1, 2024, may not enroll in the IBR plan.

(4) A borrower may repay under the PAYE plan only if the borrower—

(i) Has loans eligible for repayment under the plan;

(ii) Is a new borrower;

(iii) Has a partial financial hardship when the borrower initially enters the plan; and

(iv) Was repaying a loan under the PAYE plan on July 1, 2024. A borrower who was repaying under the PAYE plan on or after July 1, 2024 and changes to a different repayment plan in accordance with § 685.210(b) may not re-enroll in the PAYE plan.

(5)(i) Except as provided in paragraph (c)(4)(ii) of this section, a borrower may repay under the ICR plan only if the borrower—

(A) Has loans eligible for repayment under the plan; and

(B) Was repaying a loan under the ICR plan on July 1, 2024. A borrower who was repaying under the ICR plan on or after July 1, 2024 and changes to a different repayment plan in accordance with § 685.210(b) may not re-enroll in the ICR plan unless they meet the criteria in paragraph (c)(4)(ii) of this section.

(ii) A borrower may choose the ICR plan to repay a Direct Consolidation Loan disbursed on or after July 1, 2006 and that repaid a parent Direct PLUS Loan or a parent Federal PLUS Loan.

(iii) A borrower who has a Direct Consolidation Loan disbursed on or after July 1, 2025, which repaid a Direct parent PLUS loan, a FFEL parent PLUS loan, or a Direct Consolidation Loan that repaid a consolidation loan that included a Direct PLUS or FFEL PLUS loan may not choose any IDR plan except the ICR plan.

(d) *Loans eligible to be repaid under an IDR plan.* (1) The following loans are eligible to be repaid under the REPAYE and PAYE plans: Direct Subsidized Loans, Direct Unsubsidized Loans, Direct PLUS Loans made to graduate or professional students, and Direct Consolidation Loans that did not repay a Direct parent PLUS Loan or a Federal parent PLUS Loan;

(2) The following loans, including defaulted loans, are eligible to be repaid under the IBR plan: Direct Subsidized Loans, Direct Unsubsidized Loans, Direct PLUS Loans made to graduate or professional students, and Direct Consolidation Loans that did not repay a Direct parent PLUS Loan or a Federal parent PLUS Loan.

(3) The following loans are eligible to be repaid under the ICR plan: Direct Subsidized Loans, Direct Unsubsidized Loans, Direct PLUS Loans made to graduate or professional students, and all Direct Consolidation Loans (including Direct Consolidation Loans that repaid Direct parent PLUS Loans or Federal parent PLUS Loans), except for Direct PLUS Consolidation Loans made before July 1, 2006.

(e) *Treatment of income and loan debt.* (1) *Income.* (i) For purposes of calculating the borrower's monthly payment amount under the REPAYE, IBR, and PAYE plans—

(A) For an unmarried borrower, a married borrower filing a separate Federal income tax return, or a married borrower filing a joint Federal tax return who certifies that the borrower is currently separated from the borrower's spouse or is currently unable to

reasonably access the spouse's income, only the borrower's income is used in the calculation.

(B) For a married borrower filing a joint Federal income tax return, except as provided in paragraph (e)(1)(i)(A) of this section, the combined income of the borrower and spouse is used in the calculation.

(ii) For purposes of calculating the monthly payment amount under the ICR plan—

(A) For an unmarried borrower, a married borrower filing a separate Federal income tax return, or a married borrower filing a joint Federal tax return who certifies that the borrower is currently separated from the borrower's spouse or is currently unable to reasonably access the spouse's income, only the borrower's income is used in the calculation.

(B) For married borrowers (regardless of tax filing status) who elect to repay their Direct Loans jointly under the ICR Plan or (except as provided in paragraph (e)(1)(ii)(A) of this section) for a married borrower filing a joint Federal income tax return, the combined income of the borrower and spouse is used in the calculation.

(2) *Loan debt.* (i) For the REPAYE, IBR, and PAYE plans, the spouse's eligible loan debt is included for the purposes of adjusting the borrower's monthly payment amount as described in paragraph (g) of this section if the spouse's income is included in the calculation of the borrower's monthly payment amount in accordance with paragraph (e)(1) of this section.

(ii) For the ICR plan, the spouse's loans that are eligible for repayment under the ICR plan in accordance with paragraph (d)(3) of this section are included in the calculation of the borrower's monthly payment amount only if the borrower and the borrower's spouse elect to repay their eligible Direct Loans jointly under the ICR plan.

(f) *Monthly payment amounts.* (1) For the REPAYE plan, the borrower's monthly payments are—

(i) $0 for the portion of the borrower's income, as determined under paragraph (e)(1) of this section, that is less than or equal to 225 percent of the applicable Federal poverty guideline; plus

(ii) 5 percent of the portion of income as determined under paragraph (e)(1) of this section that is greater than 225 percent of the applicable poverty guideline, prorated by the percentage that is the result of dividing the borrower's original total loan balance attributable to eligible loans received for the borrower's undergraduate study by the original total loan balance

attributable to all eligible loans, divided by 12; plus

(iii) For loans not subject to paragraph (f)(1)(ii) of this section, 10 percent of the portion of income as determined under paragraph (e)(1) of this section that is greater than 225 percent of the applicable Federal poverty guidelines, prorated by the percentage that is the result of dividing the borrower's original total loan balance minus the original total loan balance of loans subject to paragraph (f)(1)(ii) of this section by the borrower's original total loan balance attributable to all eligible loans, divided by 12.

(2) For new borrowers under the IBR plan and for all borrowers on the PAYE plan, the borrower's monthly payments are the lesser of—

(i) 10 percent of the borrower's discretionary income, divided by 12; or

(ii) What the borrower would have paid on a 10-year standard repayment plan based on the eligible loan balances and interest rates on the loans at the time the borrower began paying under the IBR or PAYE plans.

(3) For those who are not new borrowers under the IBR plan, the borrower's monthly payments are the lesser of—

(i) 15 percent of the borrower's discretionary income, divided by 12; or

(ii) What the borrower would have paid on a 10-year standard repayment plan based on the eligible loan balances and interest rates on the loans at the time the borrower began paying under the IBR plan.

(4)(i) For the ICR plan, the borrower's monthly payments are the lesser of—

(A) What the borrower would have paid under a repayment plan with fixed monthly payments over a 12-year repayment period, based on the amount that the borrower owed when the borrower began repaying under the ICR plan, multiplied by a percentage based on the borrower's income as established by the Secretary in a **Federal Register** notice published annually to account for inflation; or

(B) 20 percent of the borrower's discretionary income, divided by 12.

(ii)(A) Married borrowers may repay their loans jointly under the ICR plan. The outstanding balances on the loans of each borrower are added together to determine the borrowers' combined monthly payment amount under paragraph (f)(4)(i) of this section;

(B) The amount of the payment applied to each borrower's debt is the proportion of the payments that equals the same proportion as that borrower's debt to the total outstanding balance, except that the payment is credited toward outstanding interest on any loan before any payment is credited toward principal.

(g) *Adjustments to monthly payment amounts.* (1) Monthly payment amounts calculated under paragraphs (f)(1) through (3) of this section will be adjusted in the following circumstances:

(i) In cases where the spouse's loan debt is included in accordance with paragraph (e)(2)(i) of this section, the borrower's payment is adjusted by—

(A) Dividing the outstanding principal and interest balance of the borrower's eligible loans by the couple's combined outstanding principal and interest balance on eligible loans; and

(B) Multiplying the borrower's payment amount as calculated in accordance with paragraphs (f)(1) through (3) of this section by the percentage determined under paragraph (g)(1)(i) of this section.

(C) If the borrower's calculated payment amount is—

(*1*) Less than $5, the monthly payment is $0; or

(*2*) Equal to or greater than $5 but less than $10, the monthly payment is $10.

(ii) In cases where the borrower has outstanding eligible loans made under the FFEL Program, the borrower's calculated monthly payment amount, as determined in accordance with paragraphs (f)(1) through (3) of this section or, if applicable, the borrower's adjusted payment as determined in accordance with paragraph (g)(1) of this section is adjusted by—

(A) Dividing the outstanding principal and interest balance of the borrower's eligible loans that are Direct Loans by the borrower's total outstanding principal and interest balance on eligible loans; and

(B) Multiplying the borrower's payment amount as calculated in accordance with paragraphs (f)(1) through (3) of this section or the borrower's adjusted payment amount as determined in accordance with paragraph (g)(1) of this section by the percentage determined under paragraph (g)(2)(i) of this section.

(C) If the borrower's calculated payment amount is—

(*1*) Less than $5, the monthly payment is $0; or

(*2*) Equal to or greater than $5 but less than $10, the monthly payment is $10.

(2) Monthly payment amounts calculated under paragraph (f)(4) of this section will be adjusted to $5 in circumstances where the borrower's calculated payment amount is greater than $0 but less than or equal to $5.

(h) *Interest.* If a borrower's calculated monthly payment under an IDR plan is insufficient to pay the accrued interest on the borrower's loans, the Secretary charges the remaining accrued interest to the borrower in accordance with paragraphs (h)(1) through (3) of this section.

(1) Under the REPAYE plan, during all periods of repayment on all loans being repaid under the REPAYE plan, the Secretary does not charge the borrower's account any accrued interest that is not covered by the borrower's payment;

(2)(i) Under the IBR and PAYE plans, the Secretary does not charge the borrower's account with an amount equal to the amount of accrued interest on the borrower's Direct Subsidized Loans and Direct Subsidized Consolidation Loans that is not covered by the borrower's payment for the first three consecutive years of repayment under the plan, except as provided for the IBR and PAYE plans in paragraph (h)(2)(ii) of this section;

(ii) Under the IBR and PAYE plans, the 3-year period described in paragraph (h)(2)(i) of this section excludes any period during which the borrower receives an economic hardship deferment under § 685.204(g); and

(3) Under the ICR plan, the Secretary charges all accrued interest to the borrower.

(i) *Changing repayment plans.* A borrower who is repaying under an IDR plan may change at any time to any other repayment plan for which the borrower is eligible, except as otherwise provided in § 685.210(b).

(j) *Interest capitalization.* (1) Under the REPAYE, PAYE, and ICR plans, the Secretary capitalizes unpaid accrued interest in accordance with § 685.202(b).

(2) Under the IBR plan, the Secretary capitalizes unpaid accrued interest—

(i) In accordance with § 685.202(b);

(ii) When a borrower's payment is the amount described in paragraphs (f)(2)(ii) and (f)(3)(ii) of this section; and

(iii) When a borrower leaves the IBR plan.

(k) *Forgiveness timeline.* (1) In the case of a borrower repaying under the REPAYE plan who is repaying at least one loan received for graduate or professional study, or a Direct Consolidation Loan that repaid one or more loans received for graduate or professional study, a borrower repaying under the IBR plan who is not a new borrower, or a borrower repaying under the ICR plan, the borrower receives forgiveness of the remaining balance of the borrower's loan after the borrower has satisfied 300 monthly payments or the equivalent in accordance with paragraph (k)(4) of this section over a period of at least 25 years;

(2) In the case of a borrower repaying under the REPAYE plan who is repaying

only loans received for undergraduate study, or a Direct Consolidation Loan that repaid only loans received for undergraduate study, a borrower repaying under the IBR plan who is a new borrower, or a borrower repaying under the PAYE plan, the borrower receives forgiveness of the remaining balance of the borrower's loans after the borrower has satisfied 240 monthly payments or the equivalent in accordance with paragraph (k)(4) of this section over a period of at least 20 years;

(3) Notwithstanding paragraphs (k)(1) and (k)(2) of this section, a borrower receives forgiveness if the borrower's total original principal balance on all loans that are being paid under the REPAYE plan was less than or equal to $12,000, after the borrower has satisfied 120 monthly payments or the equivalent, plus an additional 12 monthly payments or the equivalent over a period of at least 1 year for every $1,000 if the total original principal balance is above $12,000.

(4) For all IDR plans, a borrower receives a month of credit toward forgiveness by—

(i) Making a payment under an IDR plan or having a monthly payment obligation of $0;

(ii) Making a payment under the 10-year standard repayment plan under § 685.208(b);

(iii) Making a payment under a repayment plan with payments that are as least as much as they would have been under the 10-year standard repayment plan under § 685.208(b), except that no more than 12 payments made under paragraph (l)(9)(iii) of this section may count toward forgiveness under the REPAYE plan;

(iv) Deferring or forbearing monthly payments under the following provisions:

(A) A cancer treatment deferment under section 455(f)(3) of the Act;

(B) A rehabilitation training program deferment under § 685.204(e);

(C) An unemployment deferment under § 685.204(f);

(D) An economic hardship deferment under § 685.204(g), which includes volunteer service in the Peace Corps as an economic hardship condition;

(E) A military service deferment under § 685.204(h);

(F) A post active-duty student deferment under § 685.204(i);

(G) A national service forbearance under § 685.205(a)(4) on or after July 1, 2024;

(H) A national guard duty forbearance under § 685.205(a)(7) on or after July 1, 2024;

(I) A Department of Defense Student Loan Repayment forbearance under § 685.205(a)(9) on or after July 1, 2024;

(J) An administrative forbearance under § 685.205(b)(8) or (9) on or after July 1, 2024; or

(K) A bankruptcy forbearance under § 685.205(b)(6)(viii) on or after July 1, 2024 if the borrower made the required payments on a confirmed bankruptcy plan.

(v) Making a qualifying payment as described under § 685.219(c)(2),

(vi) (A) Counting payments a borrower of a Direct Consolidation Loan made on the Direct Loans or FFEL program loans repaid by the Direct Consolidation Loan if the payments met the criteria in paragraph (k)(4) of this section, the criteria in § 682.209(a)(6)(vi) that were based on a 10-year repayment period, or the criteria in § 682.215.

(B) For a borrower whose Direct Consolidation Loan repaid loans with more than one period of qualifying payments, the borrower receives credit for the number of months equal to the weighted average of qualifying payments made rounded up to the nearest whole month.

(C) For borrowers whose Joint Direct Consolidation Loan is separated into individual Direct Consolidation loans, each borrower receives credit for the number of months equal to the number of months that was credited prior to the separation; or,

(vii) Making payments under paragraph (k)(6) of this section.

(5) For the IBR plan only, a monthly repayment obligation for the purposes of forgiveness includes—

(i) A payment made pursuant to paragraph (k)(4)(i) or (k)(4)(ii) of this section on a loan in default;

(ii) An amount collected through administrative wage garnishment or Federal Offset that is equivalent to the amount a borrower would owe under paragraph (k)(4)(i) of this section, except that the number of monthly payment obligations satisfied by the borrower cannot exceed the number of months from the Secretary's receipt of the collected amount until the borrower's next annual repayment plan recertification date under IBR; or

(iii) An amount collected through administrative wage garnishment or Federal Offset that is equivalent to the amount a borrower would owe on the 10-year standard plan.

(6)(i) A borrower may obtain credit toward forgiveness as defined in paragraph (k) of this section for any months in which a borrower was in a deferment or forbearance not listed in paragraph (k)(4)(iv) of this section by making an additional payment equal to

or greater than their current IDR payment, including a payment of $0, for a deferment or forbearance that ended within 3 years of the additional repayment date and occurred after July 1, 2024.

(ii) Upon request, the Secretary informs the borrower of the months for which the borrower can make payments under paragraph (k)(6)(i) of this section.

(l) *Application and annual recertification procedures.* (1) To initially enter or recertify their intent to repay under an IDR plan, a borrower provides approval for the disclosure of applicable tax information to the Secretary either as part of the process of completing a Direct Loan Master Promissory Note or a Direct Consolidation Loan Application and Promissory Note in accordance with sections 455(e)(8) and 493C(c)(2) of the Act or on application form approved by the Secretary;

(2) If a borrower does not provide approval for the disclosure of applicable tax information under sections 455(e)(8) and 493C(c)(2) of the Act when completing the promissory note or on the application form for an IDR plan, the borrower must provide documentation of the borrower's income and family size to the Secretary;

(3) If the Secretary has received approval for disclosure of applicable tax information, but cannot obtain the borrower's AGI and family size from the Internal Revenue Service, the borrower and, if applicable, the borrower's spouse, must provide documentation of income and family size to the Secretary;

(4) After the Secretary obtains sufficient information to calculate the borrower's monthly payment amount, the Secretary calculates the borrower's payment and establishes the 12-month period during which the borrower will be obligated to make a payment in that amount;

(5) The Secretary then sends to the borrower a repayment disclosure that—

(i) Specifies the borrower's calculated monthly payment amount;

(ii) Explains how the payment was calculated;

(iii) Informs the borrower of the terms and conditions of the borrower's selected repayment plan; and

(iv) Informs the borrower of how to contact the Secretary if the calculated payment amount is not reflective of the borrower's current income or family size;

(6) If the borrower believes that the payment amount is not reflective of the borrower's current income or family size, the borrower may request that the Secretary recalculate the payment amount. To support the request, the

borrower must also submit alternative documentation of income or family size not based on tax information to account for circumstances such as a decrease in income since the borrower last filed a tax return, the borrower's separation from a spouse with whom the borrower had previously filed a joint tax return, the birth or impending birth of a child, or other comparable circumstances;

(7) If the borrower provides alternative documentation under paragraph (l)(6) of this section or if the Secretary obtains documentation from the borrower or spouse under paragraph (l)(3) of this section, the Secretary grants forbearance under § 685.205(b)(9) to provide time for the Secretary to recalculate the borrower's monthly payment amount based on the documentation obtained from the borrower or spouse;

(8) Once the borrower has 3 monthly payments remaining under the 12-month period specified in paragraph (l)(4) of this section, the Secretary follows the procedures in paragraphs (l)(3) through (l)(7) of this section.

(9) If the Secretary requires information from the borrower under paragraph (l)(3) of this section to recalculate the borrower's monthly repayment amount under paragraph (l)(8) of this section, and the borrower does not provide the necessary documentation to the Secretary by the time the last payment is due under the 12-month period specified under paragraph (l)(4) of this section—

(i) For the IBR and PAYE plans, the borrower's monthly payment amount is the amount determined under paragraph (f)(2)(ii) or (f)(3)(ii) of this section;

(ii) For the ICR plan, the borrower's monthly payment amount is the amount the borrower would have paid under a 10-year standard repayment plan based on the total balance of the loans being repaid under the ICR Plan when the borrower initially entered the ICR Plan; and

(iii) For the REPAYE plan, the Secretary removes the borrower from the REPAYE plan and places the borrower on an alternative repayment plan under which the borrower's required monthly payment is the amount the borrower would have paid on a 10-year standard repayment plan based on the current loan balances and interest rates on the loans at the time the borrower is removed from the REPAYE plan.

(10) At any point during the 12-month period specified under paragraph (l)(4) of this section, the borrower may request that the Secretary recalculate the borrower's payment earlier than would have otherwise been the case to account

for a change in the borrower's circumstances, such as a loss of income or employment or divorce. In such cases, the 12-month period specified under paragraph (l)(4) of this section is reset based on the borrower's new information.

(11) The Secretary tracks a borrower's progress toward eligibility for forgiveness under paragraph (k) of this section and forgives loans that meet the criteria under paragraph (k) of this section without the need for an application or documentation from the borrower.

(m) *Automatic enrollment in an IDR plan.* The Secretary places a borrower on the IDR plan under this section that results in the lowest monthly payment based on the borrower's income and family size if—

(1) The borrower is otherwise eligible for the plan;

(2) The borrower has approved the disclosure of tax information under paragraph (l)(1) or (l)(2) of this section;

(3) The borrower has not made a scheduled payment on the loan for at least 75 days or is in default on the loan and is not subject to a Federal offset, administrative wage garnishment under section 488A of the Act, or to a judgment secured through litigation; and

(4) The Secretary determines that the borrower's payment under the IDR plan would be lower than or equal to the payment on the plan in which the borrower is enrolled.

(n) *Removal from default.* The Secretary will no longer consider a borrower in default on a loan if—

(1) The borrower provides information necessary to calculate a payment under paragraph (f) of this section;

(2) The payment calculated pursuant to paragraph (f) of this section is $0; and

(3) The income information used to calculate the payment under paragraph (f) of this section includes the point at which the loan defaulted.

■ 7. Section 685.210 is revised to read as follows:

### § 685.210 Choice of repayment plan.

(a) *Initial selection of a repayment plan.* (1) Before a Direct Loan enters into repayment, the Secretary provides a borrower with a description of the available repayment plans and requests that the borrower select one. A borrower may select a repayment plan before the loan enters repayment by notifying the Secretary of the borrower's selection in writing.

(2) If a borrower does not select a repayment plan, the Secretary designates the standard repayment plan

described in § 685.208(b) or (c) for the borrower, as applicable.

(3) All Direct Loans obtained by one borrower must be repaid together under the same repayment plan, except that—

(i) A borrower of a Direct PLUS Loan or a Direct Consolidation Loan that is not eligible for repayment under an IDR plan may repay the Direct PLUS Loan or Direct Consolidation Loan separately from other Direct Loans obtained by the borrower; and

(ii) A borrower of a Direct PLUS Consolidation Loan that entered repayment before July 1, 2006, may repay the Direct PLUS Consolidation Loan separately from other Direct Loans obtained by that borrower.

(b) *Changing repayment plans.* (1) A borrower who has entered repayment may change to any other repayment plan for which the borrower is eligible at any time by notifying the Secretary. However, a borrower who is repaying a defaulted loan under the IBR plan or who is repaying a Direct Consolidation Loan under an IDR plan in accordance with § 685.220(d)(1)(i)(A)(*3*) may not change to another repayment plan unless—

(i) The borrower was required to and did make a payment under the IBR plan or other IDR plan in each of the prior three months; or

(ii) The borrower was not required to make payments but made three reasonable and affordable payments in each of the prior 3 months; and

(iii) The borrower makes, and the Secretary approves, a request to change plans.

(2)(i) A borrower may not change to a repayment plan that would cause the borrower to have a remaining repayment period that is less than zero months, except that an eligible borrower may change to an IDR plan under § 685.209 at any time.

(ii) For the purposes of paragraph (b)(2)(i) of this section, the remaining repayment period is—

(A) For a fixed repayment plan under § 685.208 or an alternative repayment plan under § 685.221, the maximum repayment period for the repayment plan the borrower is seeking to enter, less the period of time since the loan has entered repayment, plus any periods of deferment and forbearance; and

(B) For an IDR plan under § 685.209, as determined under § 685.209(k).

(3) A borrower who made payments under the IBR plan and successfully completed rehabilitation of a defaulted loan may chose the REPAYE plan when the loan is returned to current repayment if the borrower is otherwise eligible for the REPAYE plan and if the monthly payment under the REPAYE

plan is equal to or less than their payment on IBR.

(4)(i) If a borrower no longer wishes to pay under the IBR plan, the borrower must pay under the standard repayment plan and the Secretary recalculates the borrower's monthly payment based on—

(A) For a Direct Subsidized Loan, a Direct Unsubsidized Loan, or a Direct PLUS Loan, the time remaining under the maximum ten-year repayment period for the amount of the borrower's loans that were outstanding at the time the borrower discontinued paying under the IBR plan; or

(B) For a Direct Consolidation Loan, the time remaining under the applicable repayment period as initially determined under § 685.208(j) and the amount of that loan that was outstanding at the time the borrower discontinued paying under the IBR plan.

(ii) A borrower who no longer wishes to repay under the IBR plan and who is required to repay under the Direct Loan standard repayment plan in accordance with paragraph (b)(4)(i) of this section may request a change to a different repayment plan after making one monthly payment under the Direct Loan standard repayment plan. For this purpose, a monthly payment may include one payment made under a forbearance that provides for accepting smaller payments than previously scheduled, in accordance with § 685.205(a).

■ 8. Section 685.211 is amended by:
■ a. Revising paragraph (a)(1);
■ b. Revising paragraph (f)(1)(i);
■ c. Revising paragraph (f)(3)(ii); and
■ d. Adding paragraph (f)(13).

The revisions and addition read as follows:

### § 685.211  Miscellaneous repayment provisions.

(a) *Payment application and prepayment.* (1)(i) Except as provided for the Income-Based Repayment plan in paragraph (a)(1)(ii) of this section, the Secretary applies any payment in the following order:

(A) Accrued charges and collection costs.
(B) Outstanding interest.
(C) Outstanding principal.

(ii) The Secretary applies any payment made under the Income-Based Repayment plan in the following order:

(A) Accrued interest.
(B) Collection costs.
(C) Late charges.
(D) Loan principal.

*        *        *        *        *

(f) * * *
(1) * * *
(i) The Secretary initially considers the borrower's reasonable and affordable payment amount to be an amount equal to the minimum payment required under the IBR plan, except that if this amount is less than $5, the borrower's monthly payment is $5.

*        *        *        *        *

(3) * * *
(ii) Family size as defined in § 685.209; and

*        *        *        *        *

(13) A borrower who has a Direct Loan that is rehabilitated and which has been returned to repayment status on or after July 1, 2024, may be transferred to REPAYE by the Secretary if the borrower's minimum payment amount on REPAYE would be equal to or less than the minimum payment amount on the Income-Based Repayment Plan.

■ 9. Amend § 685.219 by:
■ a. Revising paragraph (i) of the definition of "Qualifying repayment plan" in paragraph (b).
■ b. Revising paragraph (c)(2)(iii).
■ c. Revising paragraph (g)(6)(ii).

The revisions read as follows:

### § 685.219  Public Service Loan Forgiveness Program (PSLF).

*        *        *        *        *

(b) * * *
*Qualifying repayment plan* * * *
(i) An income-driven repayment plan under § 685.209;

*        *        *        *        *

(c) * * *
(2) * * *
(iii) For a borrower on an income-driven repayment plan under § 685.209, paying a lump sum or monthly payment amount that is equal to or greater than the full scheduled amount in advance of the borrower's scheduled payment due date for a period of months not to exceed the period from the Secretary's receipt of the payment until the borrower's next annual repayment plan recertification date under the qualifying repayment plan in which the borrower is enrolled;

*        *        *        *        *

(g) * * *
(6) * * *
(ii) Otherwise qualified for a $0 payment on an income-driven repayment plan under § 685.209.

### § 685.220  [Amended]

■ 10. In § 685.220 amend paragraph (h) by adding "§ 685.209, and § 685.221," after "§ 685.208,".

■ 11. Section 685.221 is revised to read as follows:

### § 685.221  Alternative repayment plan.

(a) The Secretary may provide an alternative repayment plan to a borrower who demonstrates to the Secretary's satisfaction that the terms and conditions of the repayment plans specified in §§ 685.208 and 685.209 are not adequate to accommodate the borrower's exceptional circumstances.

(b) The Secretary may require a borrower to provide evidence of the borrower's exceptional circumstances before permitting the borrower to repay a loan under an alternative repayment plan.

(c) If the Secretary agrees to permit a borrower to repay a loan under an alternative repayment plan, the Secretary notifies the borrower in writing of the terms of the plan. After the borrower receives notification of the terms of the plan, the borrower may accept the plan or choose another repayment plan.

(d) A borrower must repay a loan under an alternative repayment plan within 30 years of the date the loan entered repayment, not including periods of deferment and forbearance.

■ 12. Section 685.222 is amended by revising paragraph (e)(2)(ii) to read as follows:

### § 685.222  Borrower defenses and procedures for loans first disbursed on or after July 1, 2017, and before July 1, 2020, and procedures for loans first disbursed prior to July 1, 2017.

*        *        *        *        *

(e) * * *
(2) * * *
(ii) Provides the borrower with information about the availability of the income-driven repayment plans under § 685.209;

*        *        *        *        *

■ 13. Amend § 685.403 by revising paragraph (d)(1) to read as follows:

### § 685.403  Individual process for borrower defense.

*        *        *        *        *

(d) * * *
(1) Provides the borrower with information about the availability of the income-driven repayment plans under § 685.209;

*        *        *        *        *

[FR Doc. 2023–13112 Filed 7–3–23; 8:45 am]
**BILLING CODE 4000–01–P**