IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 2024-CV-1057-DDC-ADM |
| | § | |
| JOSEPH R. BIDEN, in his official | § | |
| capacity as President of the United States, | § | |
| et al., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

This case is about an administration that is hell-bent on pursuing unlawful administrative action mainly for political gain. Defendants are seeking to forgive hundreds of billions of dollars in student debt with the stroke of a pen. Their first attempt to do the same thing was struck down by the Supreme Court just last summer.

While no one wants a system where people carry large amounts of student debt well into their adult years, any major changes to the program—particularly changes involving the expenditure of hundreds of billions in taxpayer dollars—require Congressional authorization. Instead of acknowledging the constitutional limits of their power, Defendants decided to violate federal law and cancel debt unilaterally.

Although the Final Rule (commonly known as the SAVE plan) is branded with a different name and different authority from what the Supreme Court struck down in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), it is just as unlawful. The new rule was promulgated just ten days after the Supreme Court invalidated Defendants' first attempt to unilaterally cancel student debt.

1

But in their rush to curry political favor as the election cycle was beginning, Defendants issued a slapdash rule committing multiple fundamental errors. Defendants' cost estimates are impossible to reconcile with reality. But even if such estimates were correct, the $156 billion cost Defendants put on the program tags it as a major policy question that needs clear Congressional authorization (which Defendants lack). And the rushed nature of the rule also resulted in multiple procedural violations of the Administrative Procedure Act (APA). The result is that the final rule is unlawful from top to bottom.  It conflicts with the Higher Education Act (HEA) in multiple respects, the justifications for the rule are arbitrary and capricious, and Defendants violated APA notice-and-comment procedures in issuing it.

This unlawful executive action has harmed the Plaintiff States. The States stand to lose millions of dollars in tax revenue, lose much-needed talent in the state employment system, and suffer pocketbook injuries to their state instrumentalities or quasi-instrumentalities. These injuries result from Defendants' unlawful actions and are mounting daily. The States can only stop this irreparable harm with another court order blocking this second illegal debt forgiveness. Plaintiffs therefore ask this Court to grant a preliminary injunction.

BACKGROUND

## I.   History of the Higher Education Act

In 1965, Congress enacted the HEA to address (among other things) the increasing cost of higher education. Among other things, the HEA created a government-backed student loan program. *See* Higher Education Act of 1965, Pub. L. No. 89-329 §§ 421–35, 79 Stat. 1219, 1236–49 (1965). Congress amended the HEA in 1993 to authorize direct loans to students from the federal government and allowed the Department of Education to offer plans to repay those student loans. Congress also gave the Department authority to create an "income-contingent repayment" (ICR) plan that based repayment terms on the income of the borrower. Such plans allowed borrowers to repay over an extended period of time, not to exceed twenty-five years. *See* 20 U.S.C. § 1087e(d)(1)(D). Two years later, the Department implemented this amendment and

2

designed the first income-contingent repayment plan, which limited annual loan payments to 20% of a borrower's income that exceeds the federal poverty line. *See* 59 Fed. Reg. 66,132 (Dec. 22, 1994). Congress has not amended § 1087(d)(1)(D) since its creation in 1993.

In 2007, Congress amended the HEA again, this time creating "income-based repayment" (IBR) plans for borrowers with "partial financial hardship." *See* College Cost Reduction and Access Act, Pub. L. No. 110-84, § 203, 121 Stat. 784, 792–95 (2007) (codified as amended at 20 U.S.C. § 1098e). "Partial financial hardship" relief was defined as applying to borrowers whose annual total payment "based on a 10-year repayment period; exceeds . . . 15 percent of . . . the amount by which—the borrower's, and the borrower's spouse's (if applicable), adjusted gross income; exceeds . . . 150 percent of the [applicable] poverty line." § 1098e(a)(3). Congress explicitly authorized the Department to "repay or cancel any outstanding balance of principal and interest due" under certain conditions and after "a period of time prescribed by the Secretary, not to exceed 25 years." § 1098e(b)(7).

That same year, Congress established the Public Service Loan Forgiveness (PSLF) Program, which allowed those who enter public service to have their loans canceled after ten years instead of twenty-five. 20 U.S.C. § 1087e(1)(B). The PSLF Program "is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans." 34 C.F.R. § 685.219(a).

In 2010, Congress changed the cap on payments for income-based plans to 10% of income exceeding 150% of the poverty line for loans made after 2014 and decreased the maximum repayment period to twenty years. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 § 1098e(e)). After that, the Department (through the rulemaking process) established first the PAYE Program, and then the REPAYE program, extending the 2010 amendments to all borrowers regardless of when they took out the loans. 77 Fed. Reg. 66,088 (Jul. 1, 2013); 80 Fed. Reg. 67,204, 67,236–42 (Oct. 30, 2015).

3

Apart from the PSLF Program, Congress authorized the Department to reduce or cancel loans in only three other narrow circumstances: (1) when the borrower has "died or been permanently and totally disabled, such that they cannot engage in any substantial gainful activity"; (2) when the borrower has become bankrupt; and (3) when the borrower was falsely certified by their schools, when the borrowers' schools close down, or when the schools failed to pay loan proceeds they owed to lenders. *Biden*, 143 S. Ct. at 2363 (internal quotes omitted) (citing 20 U.S.C. § 1087).

## II.   The Three-Part Biden Loan Forgiveness Gambit

In 2022, facing activists who were not content with the limited avenues of loan forgiveness authorized by Congress, Defendant Biden announced a massive student loan forgiveness program to be created through executive action.[1] There are three phases of his plan, each claiming to be based on different statutes. The first phase was tied to the HEROES Act, a statute Congress passed in the wake of 9/11 that allowed Defendants to "modify" student loans in the event of a national emergency. Defendants argued that canceling $10,000–$20,000 of student debt per person was a "modification" of the loans. The total cost of the plan to taxpayers was to be approximately $430 billion.

Step two is the final rule that Plaintiffs have challenged here—the so-called SAVE Plan. Defendants estimate (with questionable credibility) that this plan will cost "only" $156 billion. The final step, which has not yet reached a final rule, is the proposed regulatory insertion of "hardship" into 20 U.S.C. § 1082(a)(6).[2]

## III.   *Biden v. Nebraska*

Six states (including some of the Plaintiff States here) challenged the HEROES loan

---

[1] Press Release, The White House, Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most (Aug. 24, 2022), https://tinyurl.com/mtscpw2k.

[2] *See* Arlette Saenz & Betsy Klein, *Biden Administration Preparing to Announce New Proposals to Reduce, Cancel Student Loan Debt*, CNN, Apr. 5, 2024, https://tinyurl.com/mr2apj2u.

forgiveness plan, arguing that canceling the debts was no mere "modification" of the loans, and so the action lacked Congressional authorization. The Supreme Court agreed. Concluding that the major questions doctrine applied, the Court held Defendants could not cancel $430 billion in student debt without clear authorization from Congress. *Biden*, 143 S. Ct. at 2375–76. Nothing in the HEROES Act provided that requisite clear authorization, so Defendants were without authority to "modify" loans by canceling them. *Id.* The Court vacated the rule, and Defendants were prevented from canceling the debt as they had planned.

## IV.   SAVE Plan

While the HEROES Act litigation was ongoing, Defendants announced phase two of their debt forgiveness program: the SAVE Plan. *See* 88 Fed. Reg. 1,894 (Jan. 11, 2023). Under the SAVE Plan, Defendants proposed to revise the REPAYE Plan in two significant ways. First, the SAVE Plan changes how much borrowers are required to repay each month by increasing the statutory definition of discretionary income exceeding 225% of the federal poverty guidelines and reducing the cap on payments for undergraduate debt from 10% of income exceeding the poverty guidelines to 5% of the excess. Second, it cancels loans for everyone with a principal at or below $12,000 after ten years of payments. And for balances above $12,000, it adds a year to the period for each $1,000. For example, a principal of $13,000 could be canceled after eleven years.

At the time of the proposed rule, Defendants anticipated that the SAVE Plan would cost $137.9 billion over ten years. *Id.* at 1,895. That estimate assumed that many loans would already be partially or completely forgiven under the HEROES Act, and it therefore did not account for the $430 billion in student debt that their HEROES plan was meant to eradicate. *See* 88 Fed. Reg. 43,820, 43,897 (July 10, 2023). The proposed rule provided only thirty days for comments. 88 Fed. Reg. at 1930.

During the comment period, one commenter recommended that the Department conduct an alternate cost estimate to account for the possibility that the Supreme Court could reject

Defendants' HEROES Act forgiveness plan. *See* 88 Fed. Reg. at 43,875; *see also* Comments from Def. of Freedom Inst. (attached as Ex. 1). Defendants brushed aside these concerns in the final rule, stating that they were "confident in [their] authority to pursue debt relief" even though they were "awaiting the Supreme Court's ruling on the issue." 88 Fed. Reg. at 43,875. Therefore, they would not attempt to update their cost estimates for the SAVE Plan. *Id.* However, this statement was published in the Federal Register *ten days after* Defendants had already lost *Biden v. Nebraska.* Defendants have not updated their cost estimate since.

The final rule waved away other meaningful concerns as well. As to the effect the SAVE Plan might have on PSLF forgiveness, Defendants explained that the PSLF Program was a creature of a different statute and in some cases was "more generous." *Id.* at 43,833–34. They did not address the fact that State and local government agencies across the country rely on the ability to offer loan forgiveness to attract employees who would otherwise take higher-paying private sector jobs. Nor did they consider the impact of the SAVE Plan on State tax revenue. *See id., passim.*

While the major provisions of the Final Rule are set to take effect on July 1, 2024, Defendants have already started forgiving massive numbers of student loans. *Accord id.* at 43,820. The total amount of loan forgiveness so far in 2024—before the rule even "officially" goes into effect—has been $1.2 billion spread among 152,880 (former) borrowers.[3] Among Plaintiff States, a total of 28,350 borrowers had $225.4 million in debt canceled.[4]

## APPLICABLE LEGAL STANDARD

A party moving for a preliminary injunction must show: "(1) he is likely to succeed on the merits of his claim; (2) he will suffer irreparable harm if the injunction is denied; (3) his

---

[3] Press Release, U.S. Dep't of Ed., Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness (Feb. 23, 2024), *available at* https://tinyurl.com/2j42estw [hereinafter "SAVE Plan Breakdown"].

[4] Among states with an income tax, that amount is $107.4 million. *Id.*

threatened injury outweighs the harm the grant of the injunction will cause the opposing party; and (4) if issued, the injunction will not adversely affect the public interest." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1252 (10th Cir. 2018). Each element is required for a preliminary injunction to issue. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). The Court has the power under the APA to issue such a preliminary order. 5 U.S.C. § 705.

## ARGUMENT

### I.    Plaintiffs Have Standing.

The States have standing to challenge the Final Rule. "Under Article III of the Constitution, a plaintiff needs a personal stake in the case." *Biden*, 143 S. Ct. at 2365 (internal quotes omitted). "That is, the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit. If at least one plaintiff has standing, the suit may proceed." *Id.* (citation omitted). The States enjoy "special solicitude" in standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). That special solicitude relaxes the traceability and redressability prongs of standing. *Id.* at 523–26; *accord Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016).

Here, the States have suffered the requisite injury in fact in four ways. *First*, many of them will lose tax revenue because of Defendants' unlawful rule. Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah conform their definition of "adjusted gross income," "taxable income," or other definitions related to income to the Internal Revenue Code.[5] *See, e.g.*, Kan. Stat. Ann. 79-32,117; Ala. Code § 40-18-14(a)(3)(h); Idaho Code § 63-3004;

---

[5] Such conformity comes in two flavors: static and rolling. Static-conformity states set their definitions to the Internal Revenue Code as of a certain date. Rolling-conformity states automatically update their definitions as the federal definitions change.

Iowa Code § 422.7; La. Stat. Ann. § 47:293(1); Mont. Code Ann. § 15-30-2102; Neb. Rev. Stat. § 77-2714; S.C. Code Ann. § 12-6-1110; Utah Code § 59-10-103. Conformity simplifies filing and causes less confusion for taxpayers. Any revision of these statutes would not only require action from the state legislatures themselves, but would also impose administrative costs on the States and their citizens.

The loan forgiveness at issue in the SAVE Plan—which is a financial award to each debtor—ordinarily would be taxable as income under federal law. 26 U.S.C. §§ 61(a)(11), 63(a). But, in 2021 Congress excluded from the definition of taxable income any forgiveness of student debt between December 31, 2020, and January 1, 2026.  *See* 26 U.S.C. § 108(f)(5). By law, this exclusion applies both in rolling-conformity States (such as Kansas, Alabama, Iowa, Louisiana, Montana, Nebraska, and Utah) and in States with a static conformity date after tax year 2020 (such as Idaho and South Carolina). As a result, these States will not receive income-tax receipts from student debt forgiveness during that period.

The Final Rule means that loans, especially those with balances of $12,000 or less, will be forgiven much earlier than previously possible—which means that much of that forgiveness will fall in the federal and State tax forgiveness holiday. For example, a $12,000 loan on which the borrower has made ten years or more of payments can be forgiven today, while previously it would not have been eligible for forgiveness until 2026 to 2039, depending on the number of years that have been paid.[6] Consequently, Defendants are forgiving more loans during the untaxable period than they otherwise would have.

The States not only stand to lose revenue because of Defendants' loan-forgiveness scheme, they already are losing such revenue. On March 27, 2024, the Department boasted that

---

[6] If a borrower started making payments in 2006, for example, he ordinarily would not be eligible for relief until at least 2026 (assuming, among other things, that he made payments during the entire time period).

Defendants had already forgiven $9.9 million in student debt in Kansas.[7] Because Kansas conforms to the federal definition of taxable income, it will not be able to tax any of this, and consequently lost tax revenue. Other States are similarly harmed, and these harms are sufficient to establish an injury-in-fact for Article III standing. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448, 454 (1992).

This harm is, of course, traceable to Defendants. By unlawfully shifting forward loan forgiveness to the tax-free period, Defendants have pulled the rug out from under States, exempting millions of dollars of debt forgiveness from State taxation. This would not have happened but for Defendants' unlawful final rule.

The second form of injury in fact suffered by the States is damage to the recruiting, hiring, and retention of State- and local-government employees. As the Department's regulations acknowledge, the PSLF Program was expressly created for the benefit of government employers[8] and non-profit entities. 34 C.F.R. § 685.219(a). Knowing that public and non-profit employers would not be able to offer the same high salaries or attractive benefit packages as the for-profit sector, Congress provided a recruitment advantage for public and non-profit employers by letting their employees get loans forgiven earlier.

Plaintiff States have benefited from this program, as they are entitled (and were expected) to do. For example, Kansas publishes notice of the PSLF Program on its State job website, alerting potential employees about the program. *See* Gish Aff. ¶ 6 (attached as Ex. 3). Hiring managers discuss the program with job candidates in interviews. *Id.* ¶ 7. Many Kansas state employees are active in the PSLF program. For example, many employees in the State's Office of the Attorney General are enrolled in, and actively pursuing, loan forgiveness through PSLF.

---

[7] SAVE Plan Breakdown, *supra*.

[8] This Court advertised PSLF as a benefit in a recent job posting. *See* Ex. 2 at 3 (job posting for a Human Resource Specialist in D. Kan.).

Similarly, the Office of the Texas Attorney General advertises the PSLF Program and its employees are enrolled in it. *See* Garza Dec. ¶¶ 4, 10, 11 (attached as Ex. 4). Similarly, South Carolina advertises PSLF as a way to encourage people to teach in the State. S.C. Dep't of Edu., Recruitment and Recognition, https://tinyurl.com/32besjkf (last visited Apr. 5, 2024).

This has been a powerful benefit to Plaintiffs. Each state's legislature and local governing bodies appropriates a necessarily limited amount of taxpayer dollars to its agencies. That is the agency's budget for the year, and such budgets rarely—if ever—can support salaries comparable to those in the private sector. Without PSLF offering a special benefit to those who work in public service careers, the states' ability to attract and retain employees will deteriorate.

This harm is attributable to Defendants. By promulgating the Final Rule, Defendants are forgiving *all* eligible borrowers' loans after only ten years of payments, even if they chose to work for private, for-profit employers. Under the final rule, one of the distinguishing benefits of working in a public service position disappears.

A third form of injury to the states is harm to their state instrumentalities or quasi-instrumentalities. Plaintiff states have such instrumentalities, and they will suffer irreparable financial harm as a result of the final rule. Cmpl. ¶¶ 108-12.[9] Harm to those instrumentalities is harm to the Plaintiff states.

## II.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Plaintiffs are likely to succeed on their claims that (1) the final rule exceeds Defendants' authority under the HEA, (2) the final rule is arbitrary and capricious, and (3) the rule's thirty-day comment period violated the APA.

### A.   The final rule violates the major questions doctrine.

Over the past several years, the Supreme Court has applied a new label to a doctrine that has developed over decades: the "major questions doctrine." *See Biden*, 143 S. Ct. at 2374. The

---

[9] Plaintiffs anticipate having proof of these facts at the time of any hearing scheduled on this motion.

doctrine requires "clear congressional authorization" for agency action in cases where an agency invokes broad authority over matters of great economic or political significance. *See West Virginia v. EPA*, 142 S. Ct. 697, 721–22 (2022). If Congress has given no such authorization, then the agency's action must be set aside or enjoined. The relevant question in assessing whether the question is a major one is "the breadth of the authority that the agency has asserted." *Id.* at 2608. Thus, if an agency asserts the authority to expend $1 trillion unilaterally without Congressional approval, but only writes a check for $100, the relevant number to analyze under the doctrine is $1 trillion—not $100. *See id.*

Many circumstances may trigger the major questions doctrine, including the economic or political effect of the agency action. *See Biden*, 143 S. Ct. at 2375 (applying doctrine to mass student debt cancellation); *West Virginia*, 597 U.S. at 724 (applying doctrine to EPA regulation restructuring energy market). Although these considerations "need not be present in every major-questions case, they are among the things that cause [a court] to hesitate and look for clear congressional authorization before proceeding." *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 297 (4th Cir. 2023). It ultimately boils down to "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), and goes back to the fundamental idea that Congress ordinarily legislates on the "important subjects" while delegating to the executive branch only the authority to "fill up the details." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825).

When the doctrine is triggered, "a decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to clear delegation from that representative body." *West Virginia*, 597 U.S. at 735. The burden is on *the agency* to demonstrate is has the necessary clear authorization. *See Biden*, 143 S. Ct. at 2375 ("In such circumstances, we have required the Secretary to point to clear congressional authorization to justify the challenged program." (internal quotes omitted)). And a "colorable" or "plausible" textual basis is not sufficient. *West*

*Virginia*, 597 U.S. at 723. As Justice Scalia famously said, Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Although no precise formula establishes what clear authorization looks like, there are several factors a court should consider, including (1) where the legislative provision the agency relies on fits within the broader statutory scheme, (2) the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address, and (3) the agency's past interpretation of the relevant statute. *West Virginia*, 597 U.S. 746–48 (Gorsuch, J., concurring).

Defendants' asserted authority for the Final Rule—*i.e.*, the authority to unilaterally forgive at least a hundred billion dollars in student debt under a highly strained interpretation of the HEA—triggers the major questions doctrine for several reasons. *First*, the rule is of vast economic significance. The rule estimates the cost of the program to be $156 billion. This is more than three times the amount that the Court found triggered the doctrine in 2021. *See Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021). Inflation has been high the past few years, but it hasn't been *that* high.

Indeed, $156 billion is likely a severe underestimate because the final rule presumed as a baseline the $430 billion of debt forgiveness that never occurred due to the decision in *Biden*. Private estimates that do account for the correct baseline numbers put the expected cost at approximately $475 billion.[10] This more accurate cost estimate would be *higher* than the amount in *Biden*, which the Supreme Court found was well beyond the threshold necessary to trigger major-questions analysis, 143 S. Ct. at 2373. Regardless of whether the program costs $156 billion or $475 billion, it is plainly a matter of vast economic significance. And "the breadth of the authority that the agency has asserted," *West Virginia*, 142 S. Ct. at 2608, is significantly broader than the $156 billion or $475 billion cost. Defendants are claiming the power to cancel

---

[10] Univ. of Penn, Penn Warton Budget Model, Biden's New Income-Driven Repayment ("Save") Plan: Budgetary Cost Estimate Update, July 17, 2023, https://tinyurl.com/4u33f5du [hereinafter Wharton Model].

essentially *all* student debt, *see infra* pp. 15-16, 23—which amounts to $1.6 trillion currently and at least another $872 billion that "will be lent over the coming decade," 88 Fed. Reg. at 43,781. Defendants are thus arrogating to themselves the power to abolish, unilaterally, more than $2.4 trillion dollars in debt. If whether Defendants possess such awesome unilateral authority to spend federal dollars is not a "major" question, it is doubtful that any agency assertion of power ever would be.

Beyond the economic significance of the program, it is also an issue of vast political significance. Indeed, the Supreme Court has already recognized that "the basic and consequential tradeoffs inherent in a mass debt cancellation program" present major questions, due in part to their political significance. *Biden*, 143 S. Ct. at 2375 (cleaned up). The tradeoffs in requiring taxpayers—including a large portion who did not attend college, worked their way through college, or responsibly paid off their own loans—to assume the debt burdens of a minority of the populace are profound. Implementing such a program is a controversial and value-laden political judgment that only Congress can make. Furthermore, just as in *Biden*, *West Virginia*, and *Alabama Realtors*, the political significance here is underscored by the fact that "the Secretary's assertion of administrative authority has 'conveniently enabled him to enact a program' that Congress has chosen not to enact itself." *Biden*, 143 S. Ct. at 2373 (quoting *West Virginia*, 142 S. Ct. at 2587). As the *Biden* Court noted, "more than 80 student loan forgiveness bills" were introduced in the 116th Congress alone. 143 S. Ct. at 2373 (internal quotes omitted). Such congressional inaction is as telling here.[11]

It is clear, then, that whether the Department possesses the power to forgive an unlimited amount of student debt is a major question. The relevant inquiry thus becomes whether there is clear authorization from Congress for the Department exercise such power.

---

[11] Perhaps more so in the wake of *Biden*, when it has become certain that Defendants lack the broad forgiveness authority they crave. Surely, if Congress wanted Defendants to have that authority, it would have acted by now.

B.    **The final rule exceeds the Department's statutory authority.**

Because the major questions doctrine applies, the Final Rule is lawful only if the HEA provides "clear congressional authorization" to forgive hundreds of billions of dollars of student debt, including the principal owed by millions of borrowers. *Biden*, 143 S. Ct. at 2375. But the section the Department relies on, § 455(d), does not authorize debt forgiveness at all, let alone give "clear . . . authorization" for it. That lack of authority is apparent in the provision's text, context, the applicable canons of construction, and in the severe constitutional doubts that the Department's interpretation creates.

i.    *Section 455(d)'s Plain Text*

Defendants' asserted authority relies on § 455(d)(1)(D) of the HEA — a section that does not authorize loan forgiveness. That section instead allows the Department to create "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D).

The Department asserts that § 455(d)(1)(D) gives it "discretion as to how much a borrower must pay," with the *only* limitations being that repayment period "cannot exceed 25 years" and the amount repaid "must be set based upon the borrower's annual adjusted gross income and that the payment calculation must account for the spouse's income if the borrower is married and files a joint tax return." 88 Fed. Reg. at 43,826–27.

But the Department's interpretation ignores the crucial word "repayment"—which, rather than supplying the requisite "clear congressional authorization" to abolish debt, *affirmatively precludes* massive debt forgiveness. "Repayment" is the noun form of "repay," which means "to pay back," with a fitting example being "repaid a debt." Repay, *American Heritage Dictionary* (4th ed. 2001) (definition 1). It similarly means "to pay back (money)." Repay, *American Heritage Dictionary* (new college ed. 1976) [hereinafter *New College Edition*].

The upshot of these straightforward definitions is that "repayment" requires the actual

14

*paying back* of the principal borrowed, with interest—not (1) abolition or forgiveness of the debt or (2) transformation of the debt into a partial grant/gift. Neither of those is "repayment." They are its antithesis: forgiveness, *non*-repayment.

That "repayment" in § 455(d)(1)(D) means actual *repayment* is underscored by the preceding text of § 455(d), which provides that the Department "shall offer . . . a variety of plans for repayment of such loan, *including principal and interest* on the loan." 20 U.S.C. § 1087e(d) (emphasis added). Congress thus *specifically insisted* that "repayment" "includ[e] principal and interest on the loan," which demonstrates Congress' unequivocal intent that borrowers repay the principal of the loan and at least some amount of interest. *Id.* But where debt is forgiven outright under the Final Rule, there is little to no repayment of interest, and the borrower falls short of repaying the principal, contrary to § 455(d)'s demand. That result is underscored by Congress including the word "paid" in § 455(d)(1)(D)—an antonym of forgiven/not paid.

The plain meaning of "loan" further supports the states here, since § 455(d) demands repayment of the "loan." The word "loan" has a well-understood meaning: "A sum of money lent at interest." Loan, *New College Edition* (definition 1); *accord* Loan, *American Heritage* (definition 2: "A sum of money lent at interest.").

Under § 455(d)'s plain text, then, the Department can devise only plans that provide *repayment* of the loan amounts—*not* ones that forgive some borrowed amounts entirely. Perhaps the Secretary could take actions such as varying the payment amounts that are due if a requisite reduction in a borrower's income occurs—*i.e.*, creating plans for "repayment" that are "income contingent." *Id.* § 1087e(d). Or perhaps the Secretary could defer the timing of repayment, contingent on a borrower's income falling below a threshold. But the Secretary has no power to alter the statute's fundamental requirement: *repayment*, "including principal and interest on the loan." *Id.* § 1087e(d). The Final Rule's construction thus violates the HEA's repeated mandate of "repayment." And the Department's abrupt cancellation of debt for borrowers that have already made ten years of payments and have balances under $12,000

necessarily fails for the same reasons—because it rests on the same faulty construction of the income-contingent repayment plan authorization in § 455(d)(1)(D).

Of course, a loan can be forgiven or cancelled. But when Congress authorizes such forgiveness or cancellation, it does so explicitly. The HEA expressly allows for loan forgiveness in certain specific circumstances—but "repayment" under § 455(d) is not one of them. *Biden*, 143 S. Ct. at 2358 (citing 20 U.S.C. § 1087); *see also* 20 U.S.C. § 1087e(m) (authorizing "cancel[lation]" and "forgiveness" of loans under the PSLF). Thus, the interpretive canon of *expressio unius est exclusio alterius* (also known as the negative-implication canon) defeats the Department's interpretation of the HEA. Under this "familiar maxim . . . , when a statute expresses certain exceptions to a general rule, other exceptions are necessarily excluded.'" *White v. W. Title Ins.*, 710 P.2d 309, 314 n.4 (Cal. 1985); *accord* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012). This makes it implausible that there was clear authorization for Defendants to undertake loan forgiveness, cancellation, or discharge under additional circumstances outside of those expressly authorized by Congress. Congress has spoken clearly within the broader statutory scheme, so there is no reason to hide the elephant Defendants insist they have discovered in the § 455(d) mousehole. *Accord infra*, pp. 18–19.

The Department's non-responsive response to these obvious issues was to offer the straw-man contention that "[n]othing in the HEA requires [income-contingent repayment] plans or Department regulations to be cost neutral." 88 Fed. Reg. at 43,829. But the States are not insisting on cost neutrality. Rather, the States are merely seeking a Rule that complies with what § 455(d) already mandates explicitly: *i.e.*, a "repayment" plan that actually requires repayment.

All earlier rules establishing income-contingent repayment plans under § 455(d)(1)(D) were at least arguably consistent with the repayment mandate. Under those earlier approaches, "borrowers with only undergraduate debt" would on average pay "per $10,000 borrowed . . .

16

$11,844 under the standard 10-year plan and $10,956 under . . . REPAYE." 88 Fed. Reg. at 43,880. In other words, borrowers repaid their student loan principals with some interest. The numbers are similar for student debt overall (including graduate-school debt): "for every $10,000 in debt taken out, the amount repaid under the standard 10-year plan is $11,880, [and] $11,844 under the current REPAYE plan." *Id.*

Thus, in the aggregate, the Department's prior income-contingent plans preserved the requirement of repaying all principal borrowed, along with at least some amount of interest. The Final Rule, however, obliterates § 455(d)'s mandate that income-contingent plans provide for "repayment . . . including principal and interest." 20 U.S.C. § 455(d)(1). Under the Department's own estimates for undergraduate-only debt, "expected payments per $10,000 borrowed drop from $11,844 under the standard 10-year plan and $10,956 under the current REPAYE plan to $6,121 under the new REPAYE plan." 88 Fed. Reg. at 43,880. The numbers are similar where overall student debt (not just undergraduate) is considered. For every $10,000 in debt taken out, the amount repaid drops to just $7069. *Id.* In other words, the Rule not only ignores the concept of paying interest, it also blots out the obligation to repay principal. It effectively transforms more than one-third of all federal dollars "loaned" into an outright gift.

And these are just the numbers in aggregate. By focusing on particular subgroups, the final rule's violation of § 455(d)'s requirement of "repayment . . . including principal and interest" becomes even starker. The Department predicts that: "Borrowers with only undergraduate debt who have lifetime income in the bottom quintile are projected to repay $873 per $10,000 in the new REPAYE plan compared to $8,724 per $10,000 in the current REPAYE plan." 88 Fed. Reg. at 43,881. For those borrowers, the new rule thus reduces repayment of principal by approximately 90%—less than a dime on the dollar. And for many borrowers, the Department dispenses with the pretext of repayment entirely: "more than 1 million borrowers . . . could see their payments go to $0 based upon the parameters of the plan in this final rule." 88 Fed. Reg. at 43,870. Indeed, under the Department's own estimates, 57% of the 7.5 million borrowers under the SAVE plan

would have $0 payments.[12] But a $0 payment by its very definition cannot possibly qualify as a payment.

Thus, far from providing clear congressional authorization for the Rule, § 455(d) plainly precludes the massive debt forgiveness the Final Rule attempts to effectuate.

  **ii.**   *Context*

That § 455(d)(1) means exactly what it says—*i.e.*, that the Department's plans must provide for "repayment . . . including principal and interest"—is further confirmed by the statutory context. Two aspects of the HEA underscore the fact that § 455(d)(1)(D) does not provide sweeping authority to forgive the principal of student debt and abolish interest payments.

*First*, Congress has already spoken to the precise issue of forgiving debt based on limited incomes, creating the "partial hardship exemption" in the very next subsection, § 455(d)(1)(E). The partial hardship exception applies to individuals for whom the "annual amount due" exceeds "15 percent" of their income exceeding "150 percent of the poverty line." 20 U.S.C. § 1098e(a)(3)(B), (b)(1). By creating a particular provision for debt relief based on economic/income-based hardship, and by defining the income thresholds precisely, Congress impliedly denied the Department authority to create its own exceptions to the repayment requirement and likewise denied the Department authority to modify the income thresholds for the hardship relief Congress did authorize. *See Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) ("We have long held that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (internal quotes omitted)); *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other

---

[12] Press Release, U.S. Dep't of Educ., Biden-Harris Administration Announces Nearly 5.5 Million Borrowers Are Enrolled in the SAVE Plan (Nov. 8, 2023), https://tinyurl.com/4h9kxje9.

mode." (internal quotation omitted)). What's more, the fact that Congress tied the thresholds to the inflation-adjusted federal poverty line shows that Congress did not expect the Department to alter that formula.

*Second*, the Department's interpretation ignores Congress' careful separation between loans and grants, which § 455 reflects. Section 455 twice refers to "Federal Pell Grants" in subsections (j)(2), (k)(3), and Congress has separately provided extensive provisions governing grants, *see* 20 U.S.C. §§ 1070a–1070a-6. Unlike loans, a "grant" is "[a] giving of funds for a specific purpose." Grant, *American Heritage Dictionary*, *supra*. By carefully creating separate programs for "loans" and "grants," Congress demonstrated its intent that these crucial differences be respected. The Final Rule, however, effectively transforms student loans into partial grants by ensuring that much of the principal of the loans are never paid back.

      iii.     *Canons of Construction*

Defendants' belief that § 455 gives them authority to cancel hundreds of billions of dollars in debt also violates several canons of construction. Four are particularly relevant here.

**First, the canon of *expressio unius est exclusio alterius*.** As noted above, this canon of construction prohibits Defendants from creating any additional circumstances under which student loan debts can be discharged, other than the ones expressly listed in the statute.

**Second, the presumption against radical changes from past practice.** Courts have routinely recognized "that Congress is unlikely to intend any radical departures from past practice without making a point of saying so." *Jones v. United States*, 526 U.S. 227, 234 (1999). The massive transformation of student debt into outright grants would be just such a "radical departure[] from past practice." *Id.*

**Third, the canon of *in pari materia*.** Defendants' interpretation violates the canon "that courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part." *Branch v. Smith*, 538 U.S. 254, 281 (2003). Section 455 thus must be read in conjunction with other statutes governing debts and obligations owed to the federal

government. *Id.* Other federal statutes make clear that federal agencies are required to pursue debts owed to the federal government diligently, and cannot simply discharge or cancel those debts for policy (or political) reasons. For example, the Federal Claims Collection Act mandates that federal agencies "try to collect a claim of the United States Government for money . . . arising out of the activities of, or referred to, the agency," and further severely restricts the authority of such agencies to compromise or otherwise settle such debts. *See* 31 U.S.C. § 3711(a). The statute's implementing regulations also require that agencies "aggressively collect all debts." 31 C.F.R. 901.1(a). Against that backdrop, an agency having the power to cancel hundreds of billions of dollars in debt is an enormous aberration and one that Congress likely did not intend.

**Fourth, the constitutional-doubt canon.** Defendants' interpretation of § 455 invites doubts as to the statute's constitutionality. This Court is thus obliged to construe the statute otherwise to avoid those constitutional doubts. *See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994). These substantial doubts are present here for three reasons.

*First,* "[a]mong Congress's most important authorities is its control of the purse." *Biden,* 143 S. Ct. at 2375. Indeed, the Constitution itself prohibits any government expenditures that are not authorized by Congress. U.S. Const., art. I, § 9. But under Defendants' interpretation, an executive branch agency could unilaterally abolish over $2.4 trillion in student debt in a single stroke of the pen—substantially exceeding "the [federal] Government's $1.7 trillion in annual discretionary spending." *Biden,* 143 S. Ct. at 2373. In other words, under Defendants' construction, the Department could exercise its own asserted power of the purse in a single rule to an extent greater than Congress does in an omnibus bill providing for all discretionary spending for the entire government for an entire fiscal year. Given the Supreme Court's treatment of a similar attempt in *Biden,* this effort is of doubtful constitutionality.

*Second,* with the exception of the first round of mass student debt cancellation—swiftly invalidated by the Court in *Biden*—there are *no* precedents for an agency rule expending over $100 billion dollars without Congressional authorization. Such a lack of any historical analogues

is often "the most telling indication of [a] severe constitutional problem." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

*Third*, Defendants' interpretation creates substantial doubts as to whether § 455 satisfies the non-delegation doctrine. If § 455 truly gives the Department power to cancel hundreds of billions of dollars of debt, it supplies no obvious intelligible principle to guide how that awesome power should be exercised.

Under Defendants' reading, the Secretary enjoys near-absolute discretion to cancel as much or as little student debt as he wishes as long as he (in Defendants' view) complies with the minimal requirement that Defendants' plans (1) do not exceed 25 years in length and (2) set repayment "based upon the borrower's annual adjusted gross income" including "the spouse's income if the borrower is married and files a joint tax return." 88 Fed. Reg. at 43,827. Defendants recognize no other limitations—and do not consider themselves bound by the income thresholds that Congress set for the "partial hardship exemption." *Supra*, pp. 4, 13–14. The constitutional-doubt canon requires this Court to interpret the Final Rule in a way that avoids these severe constitutional problems.

### C.   The final rule is arbitrary and capricious.

The States are also likely to prevail on their claim that the Final Rule is arbitrary and capricious, thereby violating the APA. 5 U.S.C. § 706(2).

An agency action is arbitrary or capricious if, among other things, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), or otherwise did not "engage[] in reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Here, the final rule is arbitrary and capricious for several reasons, including that Defendants purposefully failed to account for up to $430 billion in costs and failed to consider the states' reliance interests.

   **i.**  *Defendants Failed to Consider a $430 Billion Aspect of the Problem.*

Defendants' estimate of the cost of the Final Rule never accounts for up to $430 billion in costs. To justify the Final Rule, Defendants ignore the *Biden* decision's effects and other "important relevant factors," *Nw. Pipeline Corp. v. FERC*, 61 F.3d 1479, 1485–86 (10th Cir. 1995). The Final Rule is a loan-cancellation program, so its cost to the federal government must be considered carefully. But the cost estimate provided here is particularly suspect. At the time the Final Rule was announced, Defendants presumed that some $430 billion in student loans already would have been forgiven under another program. *See* 88 Fed. Reg. 43,875. But the Supreme Court had struck down that other program *before* the final rule issued. *See Biden*, 143 S. Ct. at 2374. Many borrowers who would have had their loans forgiven under the HEROES plan are now eligible to have their loans forgiven under the Final Rule.[13]

Even though Defendants published the Rule *after Biden* was decided, and thus were forewarned that these debts remained outstanding, Defendants forged ahead and published the Final Rule anyway, as if they existed in an alternate reality. *See* 88 Fed. Reg. 43,875 ("The Department is confident in our authority to pursue debt relief and is awaiting the Supreme Court's ruling on the issue. Our cost estimates account for the Department's current and anticipated programs and policies."); *id.* at 43,886 (assuming some debt would have been forgiven under HEROES authority). As a result of Defendants' arbitrary and capricious failure to consider the impact of *Biden*—a preexisting and well-publicized decision that Defendants

---

[13] For example, HEROES forgiveness was intended to eliminate up to $10,000 for every borrower who had not received a Pell Grant. *Biden*, 143 S. Ct. at 2364. Under that plan, a borrower with a $12,000 original principal balance would have had all but $2000 canceled. If that borrower had made ten years of payments, he would be eligible to have the remaining $2000 forgiven under SAVE. However, because HEROES was found to be unlawful, none of those loans were canceled. The borrower still holds a $12,000 debt, all of which can be forgiven under SAVE, and which is $10,000 more than what Defendants included in their estimates.

undoubtedly knew about[14]—the cost of forgiving existing loans will be much higher than the final rule estimates. Thus, Defendants plainly failed to consider "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up). It is unfathomable that Defendants did not include this in their estimates; it is certainly arbitrary and capricious.

Nonpartisan third-parties recognized that Defendants' slapdash estimates were off. The Wharton School at the University of Pennsylvania estimates the plan is likely to cost closer to $475 billion over ten years.[15] This estimate *does* account for the *Biden* decision, *id.*, and it shows how impossibly low Defendants' estimate actually is. Given this, and given the fact that Defendants' previous accounting was so full of errors that it could not be corroborated by an auditor,[16] the Court should not rely on Defendants' estimate in any way. Rather, the Court should find that the estimate was not adequately explained or supported and was thus arbitrary and capricious.

> ii.   *Defendants Failed to Consider Plaintiff States' Reliance Interests.*

Defendants also failed to consider the States' reliance interests on tax revenue from forgiven student loans and the recruiting and retention benefits of the PSFL program. As explained above, *supra*, pp. 7–9, Plaintiffs ordinarily tax the income that is realized when student loans are discharged. But after passage of the American Rescue Plan, Pub. L. No. 117-2, 135 Stat. 4 (2021), they will not do so until January 1, 2026. Any loan that is forgiven between now and that date is untaxable. Because Defendants are now attempting to forgive loans after

---

[14] Indeed, they were parties to the case.

[15] Wharton Model, *supra*.

[16] Defendants engaged accounting firm KPMG to audit the Department's loan program. *See* KPMG Audit (attached as Ex. 6). KPMG accountants informed Defendants they "identified errors in the underlying data used to develop assumptions used to calculate the subsidy re-estimates for the Department's direct loan and loan guaranty programs." *Id.* Due to a lack of "sufficient appropriate audit evidence," KPMG was "unable to determine the extent of the impact of these issues on the balance sheet and related notes." *Id.*

only ten years of payment—instead of twenty to twenty-five years as before—many of the loans that would otherwise be forgiven after December 31, 2025, are being forgiven now. This deprives the States of expected revenue. That negative effect on the States did not receive an adequate consideration or explanation in the Final Rule.

Relatedly, the Final Rule also fails to consider the States' reliance on the PSLF program. Again, as explained above, *supra*, pp. 9–10, state- and local-government agencies generally offer college graduates lower salaries than they could earn in the private sector. To offset those lower salaries in public service, and to encourage more employees to work for them, those governments use and advertise PSLF. *Id.* Under the Final Rule, however, borrowers can have their loans discharged after ten years irrespective of whether they work in a public service position. This will likely result in fewer qualified applicants for state and local governments. And employers are not able to quickly adapt to this change. Government agencies operate off yearly budgets that are passed by the legislature or a local government body. *Id.* They are not able to adjust those budgets until a new budget is passed (if they are able to do so at all). This failure to consider the States' reliance interests renders the rule arbitrary and capricious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. . . . It [is] arbitrary and capricious to ignore such matters." (internal quotes omitted)).

      iii.    *The Final Rule is Arbitrary and Capricious for Other Reasons.*

The failure to consider the *Biden* decision or the reliance interests of state and local governments are substantial and glaring reasons to strike down the Final Rule. But it is arbitrary and capricious in less obvious ways as well.

For example, the Final Rule also changes course from nearly thirty years of Department practice on loan forgiveness. Never before have the terms of loan repayment been transformed into loan forgiveness so that the average undergraduate borrower repays only $6121 for every

$10,000 borrowed. Yet rather than admit the departure from practice, Defendants justify the Final Rule by pointing to similar past actions, which were not challenged. However, while an agency's "longstanding practice . . . in implementing the relevant statutory authorities" is relevant to ascertaining the meaning of those statutory authorities, it cannot be the only evidence used to evaluate an agency's power to act under a statute. *Career Colleges & Sch. of Texas v. U.S. Dep't of Edu.*, No. 23-50491, 2024 WL 1461737, at *13 (5th Cir. Apr. 4, 2024). Allowing the agency to rely exclusively on past practices "would greenlight the aggregation of Executive power through adverse possession by engaging in a consistent and unchallenged practice over a long period of time" and "is irreconcilable with the judicial obligation to interpret the statute that Congress actually enacted." *Id.* (internal citations omitted).

Legal merits aside, the PAYE and REPAYE programs required the average undergraduate borrower pay back more than they were loaned. *See supra*, pp. 17–18. This is the first time Defendants have set the term of repayment at a level at which the average borrower pays significantly less than what he borrowed. Courts have been suspicious when an agency stretches past practice into something unprecedented. *Career Colleges*, 2024 WL 1461737, at *14. Defendants assert broad authority to use the terms of repayment to allow the average borrower under an income driven repayment plan to pay back almost 40% less than what they owe, an authority they have never asserted before. Doing so without even acknowledging the departure is arbitrary and capricious.

The rule also contains internal contradictions. For example, it repeatedly states that it is designed to avoid delinquencies and defaults. 88 Fed. Reg. 43,820. However, the rule also states that the last change to the income-driven repayment plan (which lowered payments for individuals) was accompanied by an *increase* in delinquencies and defaults. *See id.* at 43,827. In addition, the rule acknowledges that the majority of those who default on loans have low original balances. *See id.* at 43,820-01. However, the final rule provides payments as low as $0 a month for *any* borrower below a certain income threshold regardless of loan balance or risk of

default. *See id.* at 43,840 It seems, therefore, that the justifications for the rule may just be post-hoc reasoning to justify what Defendants wanted to do anyway.

Finally, the rule is arbitrary and capricious because it fails to consider meaningfully its inflationary effects, both specifically in the secondary education market and more generally for the entire U.S. economy.[17] Those enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to evaluate. *Michigan*, 576 U.S. at 750–52 (cleaned up). They failed to do so and thereby violated the APA.

      D.     **The rule's short comment period violated the APA.**

The final rule also violates the APA because of the brevity of the comment period that the Department provided for the proposed rule. In light of the complexity of the rule and its enormous importance, more time was necessary.

Here, the Final Rule was subject to the APA's notice-and-comment requirement. This requirement was "enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984); *see also Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment "ensures fairness to affected parties[] and provides a well-developed record that enhances the quality of judicial review").

Here, Defendants only permitted thirty days for comments on the proposed rule. *See* 88 Fed. Reg. at 43,821. This limited time period violated the APA. "When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citation omitted). "Indeed, a thirty-day period is, in the Administrative Conference's view, 'an inadequate time to

---

[17] *See, e.g.*, Nick Perry, *College Will Cost Up to $95,000 This Fall. Schools Say It's OK, Financial Aid Can Numb Sticker Shock*, Associated Press (Apr. 2, 2024), https://tinyurl.com/8xyfw3mz.

allow people to respond to proposals that are complex or based on scientific or technical data.' The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable *minimum* time for comment.'" *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (quoting Admin. Conf. of the U.S., *A Guide to Federal Agency Rulemaking* 124 (1983)).

 For these reasons, most other agencies routinely provide at least sixty days of commenting.[18] That is particularly true for major, far-reaching rules—and this rule is about as far-reaching as they come.

 Here the rule is both complex and enormously important—tens or hundreds of billions of dollars turn on each of its major parameters. In these circumstances, "a sixty-day period [w]as a more reasonable *minimum* time for comment," *Petry*, 737 F.2d at 1201 (internal quotes omitted). Indeed, the Final Rule even by its own counter-factual cost estimates would cost $156 billion. 88 Fed. Reg. at 43,866. That is more than the Department's entire annual budget,[19] and may be the most expensive rule issued by the Department under notice-and-comment rulemaking in its *entire history*. If *any* rule issued by the Department ever required at least sixty days of commenting, this one did. By providing only thirty days, Defendants violated the APA.

 The unusually short nature of the thirty-day period is particularly apparent, given the fact that multiple Presidents have instructed agencies to provide at least sixty days of commenting on *all* rules (not just major ones). President Clinton, for example, directed that "agenc[ies] should afford the public a meaningful opportunity to comment on any proposed regulation, *which in most cases should include a comment period of not less than 60 days.*" Exec. Order No. 12,866 § 6(a)(2), 58 Fed. Reg. 51,735, 51,740 (Sept. 30, 1993) (emphasis added). President Obama similarly mandated that agencies "[t]o the extent feasible and permitted by law, . . . afford the

---

[18] Regulations.gov, "Learn About the Regulatory Process," https://tinyurl.com/4cjbr7cp.

[19] *See* Off. of Mgmt. & Budget, Budget of the U.S. Government Fiscal Year 2023, at 57 (attached as Ex. 5).

public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that *should generally be at least 60 days*." Exec. Order No. 13,563 § 2(b), 76 Fed. Reg. 3,281, 3,821–22 (Jan. 21, 2011) (emphasis added).

Although the Department acknowledged these Executive Orders, it never even attempted to argue that a sixty-day period was not feasible or was somehow not permitted by law. *See* 88 Fed. Reg. 43,821. Instead, it offered only vague generalities, asserting that "the Department believes that the 30-day public comment period provided sufficient time for interested parties to submit comments." *Id.* That rationale does not suffice. And the fact that the Final Rule was rushed out so quickly after *Biden* came out—even though it was premised on the Supreme Court *upholding* the HEROES Act loan forgiveness plan—underscores the unnecessarily rushed and consequently slapdash nature of the rule's adoption.

The Department points to the negotiated rulemaking sessions it conducted as justification for a shorter notice period. *Id.* But neither the APA, nor the two executive orders discussed above, recognizes any such exception for negotiated rulemakings. Moreover, given the enormous stakes of the final rule—expending hundreds of billions of dollars—the idea that its contours could be shaped after a few public meetings is farfetched. Instead, proper notice-and-comment procedures, with appropriate time for a major and complicated rule, were required here.

This short comment period contrasts to prior rulemakings in which the Department promulgated rules under § 455. In 1994, the Department provided fifty-one days (from August 18 to October 3, 1994) to comment on the proposed rule. *See* 59 Fed. Reg. 42,646 (Aug. 18, 1994). Similarly, in 2015 the Department provided forty-five days to comment (from May 18 to July 2, 2015). *See* 80 Fed. Reg. 28,484 (May 18, 2015). The amount of debt relief involved here, as well as the complexity of the Final Rule, *vastly* exceeds that of the 1994 and 2015 rules. The Department thus should have provided *at least* 45 days to comment on the proposed rule.  Indeed, it should have followed the approach of the Administrative Conference and Executive Orders 12,866 and 13,563 and permitted at least sixty days of comments.

28

By providing only thirty days, the Department violated the APA. This error had a prejudicial effect because it prevented the States from developing their arguments regarding reliance interests and the Department's wildly inaccurate cost estimates. *See, e.g., Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (2002) (holding that "failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure").

E.   **The remaining requirements for a preliminary injunction are met here.**

i.   *Without Relief, the States Will Suffer Irreparable Harm.*

"Although irreparable harm does not readily lend itself to definition, a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *N.M. Dep't of Game & Fish v. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017) (quotation marks omitted). Plaintiff States will clearly suffer irreparable harm if the Court does not grant immediate injunctive relief.

Defendants have sent and are sending notices to borrowers informing them that their loans have been "forgiven" under this plan.[20] It is unrealistic to think that any loan forgiveness that occurs during this litigation will ever be clawed back. Thus, the States that ordinarily tax loan forgiveness (but for the current pause on such taxation) are losing out on future tax revenue that cannot realistically be recovered.

One cannot unscramble this egg; loan forgiveness has an "irreversible impact." *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022). Plaintiff States cannot obtain money damages from the federal government due to sovereign immunity. As such, these are irrecoverable injuries, which constitute irreparable harm. *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994).

States are also suffering, and will continue to suffer, irreparable harm to the hiring and

---

[20] SAVE Plan Breakdown, *supra.*

retention of State and local government employees. Once an employee has left public service for a job in the private sector, or has turned down a public-service position, this Court cannot later provide relief that compels that employee to work in public service. Employees that are no longer enticed by the PSLF Program are precisely the sort of irreparable injury that preliminary injunctions are intended to address.

      **ii.**     *The Balance of Harms and Public Interest Favor Preliminary Relief.*

A party requesting a preliminary injunction must also show that the balance of equities tips in its favor. *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 980 (10th Cir. 2004). The Court should consider the harms each party would suffer if returned to the status quo. The status quo—"the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing," *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005)—is the time before Defendants began unlawfully forgiving loans.

Plaintiff States face an imminent, irreversible, and substantial loss of tax revenue and hiring and retention ability, as well as harm to their state and quasi-state instrumentalities. Yet an injunction will cause "little or no harm" to Defendants. *Moore v. Brown*, 448 U.S. 1335, 1339 (1980). Defendants have no interest in enforcing a rule that completely bypasses constitutional separation of powers principles. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). Nor can Defendants count as harm the desire of borrowers to receive this colossal gift from the Department. The agency's interests are defined by Congress and cannot include the violation of federal law. Furthermore, even if Plaintiffs are wrong and, in the final weighing, the rule is lawful, Defendants could simply put it into effect after the Court makes that ruling, with no apparent injury suffered by Defendants in the meantime.

The public interest also weighs heavily in favor of injunctive relief. The public have an interest in making sure the only rules federal agencies are allowed to enact are lawful ones. *See Free the Nipple-Fort Collins*, 916 F.3d at 806. They have a strong interest in making sure that, at the very least, Defendants properly account for the money—the taxpayer money—they plan to

spend. Finally, while some borrowers will have their debts forgiven completely or their payments greatly reduced, any individual savings pale in comparison to the hundreds of billions of dollars taxpayers will have to provide if the unlawful rule is not enjoined.

### III.   If This Court Enters a Preliminary Injunction, that Injunction Should Apply Nationwide.

This Court should grant a nationwide injunction and prevent Defendants from unlawfully forgiving hundreds of billions in loans, pending a final decision on the merits. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989). "Courts have, thus, found a nationwide injunction appropriate in such cases." *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 397 (M.D.N.C. 2019) (collecting cases); *accord Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931, at *4 (D. Colo. Oct. 4, 2007). Indeed, the APA itself allows a reviewing court to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), a power that is consistent with a nationwide injunction.

There are practical reasons to extend the injunction nationwide as well. "[T]ailoring an injunction to address the alleged harms to the . . . States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Biden*, 52 F.4th at 1048. Further, an injunction that is limited to eleven states creates perverse incentives for those who are able to change their addresses to a different state (or could hurt Plaintiffs more by enticing their citizens to leave). A nationwide injunction would also prevent unfairness—there is no good reason for the Defendant to forgive the student loans of a resident of Kansas City, Missouri, while an otherwise identical resident of Kansas City, Kansas, must still pay his.

In conclusion, the Final Rule is unlawful and should be set aside for multiple reasons. There is no good reason to allow Defendants to continue to unlawfully discharge billions of dollars of student debt while this litigation is underway, shifting the massive cost of those loans

from those who willingly undertook it (and reaped the benefits) to taxpayers who did not. The final rule should be stayed across the country while this Court examines the legality of Defendants' actions.

CONCLUSION

For all these reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 5th day of April, 2024.

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ Erin B. Gaide*
Erin B. Gaide, Kan. SC No. 29691
*Assistant Attorney General*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

Drew C. Ensign, pro hac vice
Holtzman Vogel Baran Torchinsky
  & Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Email: densign@holtzmanvogel.com
*Counsel for Plaintiff State of Kansas*

/s/ Edmund LaCour
Edmund LaCour*
Solicitor General
OFFICE OF THE ALABAMA
 ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
edmund.lacour@alabamaag.gov
Counsel for Plaintiff State of Alabama


/s/ Bill Milks
Bill Milks*
Chief Assistant Attorney General
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
bill.milks@alaska.gov
Counsel for Plaintiff State of Alaska


/s/ Joshua Turner
Joshua Turner, pro hac vice
Chief of Constitutional Litigation & Policy
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov
Counsel for Plaintiff State of Idaho

/s/ Eric H. Wessan
Eric H. Wessan, pro hac vice
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
Counsel for Plaintiff State of Iowa


/s/ Kelsey Smith
Kelsey Smith*
Deputy Solicitor General
OFFICE OF THE LOUISIANA ATTORNEY
 GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 506-3746
smithkel@ag.louisiana.gov
Counsel for Plaintiff State of Louisiana


/s/ Christian B. Corrigan
Christian B. Corrigan, Kan. SC No. 25622
Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
Counsel for Plaintiff State of Montana

33

/s/ Lincoln J. Korell                                          *pro hac vice forthcoming
Lincoln J. Korell, pro hac vice
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
 OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*


/s/ Joseph D. Spate
Joseph D. Spate, *pro hac vice*
*Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
*Counsel for Plaintiff State of South Carolina*


/s/ Charles K. Eldred
Charles K. Eldred, *pro hac vice*
Chief, Legal Strategy Division
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100 charles.eldred@oag.texas.gov
*Counsel for Plaintiff State of Texas*


/s/ Lance F. Sorenson
Lance F. Sorenson*
*Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov
*Counsel for Plaintiff State of Utah*