# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, *et al.*,

           Plaintiffs,

      v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

           Defendants.

Case No. 24-1057-DDC-ADM

## DEFENDANTS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARCIA BERMAN
*Assistant Branch Director*

STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    A.   The Higher Education Act and Prior Income-Contingent Repayment Plans ........................2

    B.   The SAVE Plan ..........................................................................................................4

    C.   Loan Forgiveness and Litigation Under the HEROES Act .........................................5

    D.   This Lawsuit .............................................................................................................7

ARGUMENT .......................................................................................................................8

I.   THE CASE SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING ...9

    A.   Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent. .............9

    B.   Plaintiffs' recruiting theory is speculative and unsupported. ...................................12

    C.   Plaintiffs' state-instrumentality theory fails. ............................................................15

    D.   Plaintiffs' theory of increased law-enforcement costs is abandoned, speculative, and foreclosed by precedent. ...............................................................................................16

II.   THE PRELIMINARY-INJUNCTION MOTION SHOULD BE DENIED. ...............17

    A.   Plaintiffs are not likely to succeed on the merits of their statutory-authority claims ............18

        1.   The Final Rule is authorized by the Higher Education Act. ............................18

        2.   The major-questions doctrine does not warrant a different result. ..................26

        3.   There is no constitutional doubt that warrants departure from the statutory text. ............................................................................................................29

    B.   Plaintiffs are not likely to succeed on their other APA claims. ..............................31

        1.   Policy disagreements with the agency do not support an arbitrary-and-capricious claim. ...................................................................................................31

        2.   The agency provided notice and an opportunity to comment. .......................37

    C.   Plaintiffs have not shown irreparable harm. ..........................................................39

    D.   A preliminary injunction would be contrary to the public interest. ........................41

III.   PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD. ........................................42

    A.   Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing. ..............................................................................42

    B.   The Final Rule is severable. ....................................................................................44

    C.   The Court lacks authority to enter relief directly against the President. ..................45

CONCLUSION .....................................................................................................................46

## TABLE OF AUTHORITIES

### Cases

*Affordable Bio Feedstock, Inc. v. United States,*
    42 F.4th 1288 (11th Cir. 2022) ....................................................................................30

*Air Transp. Ass'n v. FAA,*
    169 F.3d 1 (D.C. Cir. 1999) .........................................................................................33

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) .....................................................................................................29

*Allen v. Wright,*
    468 U.S. 737 (1984) .......................................................................................................9

*Am. Ass'n of People with Disabilities v. Herrera,*
    580 F. Supp. 2d 1195 (D.N.M. 2008) ...........................................................................41

*Am. Petroleum Inst. v. Dep't of Interior,*
    81 F.4th 1048 (10th Cir. 2023) ...............................................................................34, 36

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
    452 U.S. 490 (1981) .....................................................................................................32

*Ariz. Pub. Serv. Co. v. EPA,*
    562 F.3d 1116 (10th Cir. 2009) ..............................................................................44, 45

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ........................................................................................43

*Bartenwerfer v. Buckley,*
    598 U.S. 69 (2023) ..................................................................................................18, 27

*Benisek v. Lamone,*
    585 U.S. 155 (2018) .....................................................................................................40

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ...........................................................................................*passim*

*Biden v. Texas,*
    597 U.S. 785 (2022) .....................................................................................................22

*Big Time Vapes, Inc. v. FDA,*
    963 F.3d 436 (5th Cir. 2020) .......................................................................................31

*Biodiversity Conservation All. v. Jiron,*
    762 F.3d 1036 (10th Cir. 2014) ...................................................................................32

*Bostock v. Clayton County,*
  590 U.S. 644 (2020)........................................................................................................22

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos,*
  344 F. Supp. 3d 158 (D.D.C. 2018)...............................................................................39

*Califano v. Yamasaki,*
  442 U.S. 682 (1979).......................................................................................................42

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024)..........................................................................................36

*Cato Inst. v. Cardona,*
  No. 1:23-cv-11906, --- F. Supp. 3d ----, 2023 WL 5232910 (E.D. Mich. Aug. 14, 2023)..................14

*Chevron USA, Inc. v. Echazabal,*
  536 U.S. 73 (2002).........................................................................................................24

*Citizens Comm. to Save Our Canyons v. Krueger,*
  513 F.3d 1169 (10th Cir. 2008)......................................................................................32

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)..............................................................................................12, 13, 14

*ClearOne Commc'ns, Inc. v. Bowers,*
  643 F.3d 735 (10th Cir. 2011)........................................................................................42

*Colorado v. EPA,*
  989 F.3d 874 (10th Cir. 2021)...................................................................................39, 40

*Combat Veterans for Cong. Pol. Action Comm. v. FEC,*
  795 F.3d 151 (D.C. Cir. 2015).......................................................................................34

*Conn. Light & Power Co. v. NRC,*
  673 F.2d 525 (D.C. Cir. 1982).......................................................................................38

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992).......................................................................................................19

*Ctr. for Biological Diversity v. Dep't of the Interior,*
  72 F.4th 1166 (10th Cir. 2023).......................................................................................32

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006)..........................................................................................................9

*Dep't of Educ. v. Brown,*
  600 U.S. 551 (2023)................................................................................................*passim*

*DHS v. Regents of the Univ. of Cal.,*
   140 S. Ct. 1891 (2020) ...................................................................................... 33

*DHS v. Thuraissigiam,*
   591 U.S. 103 (2020) ......................................................................................... 30

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
   356 F.3d 1256 (10th Cir. 2004) ................................................................ 17, 29

*Facebook, Inc. v. Duguid,*
   592 U.S. 395 (2021) ......................................................................................... 24

*FCC v. Fox Television Stations,*
   556 U.S. 502 (2009) .................................................................................. 31, 36

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) .................................................................................. 31, 37

*FEC v. Cruz,*
   596 U.S. 289 (2022) ......................................................................................... 10

*Florida v. Mellon,*
   273 U.S. 12 (1927) ..................................................................................... 11, 12

*FPC v. Hope Nat. Gas Co.,*
   320 U.S. 591 (1944) ......................................................................................... 31

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ......................................................................................... 46

*Garrison v. Baker Hughes Oilfield Operations, Inc.,*
   287 F.3d 955 (10th Cir. 2002) .......................................................................... 42

*Garrison v. Dep't of Educ.,*
   636 F. Supp. 3d 935 (S.D. Ind. 2022) .............................................................. 10

*GeoMetWatch Corp. v. Behunin,*
   38 F.4th 1183 (10th Cir. 2022) ........................................................................ 29

*Gill v. Whitford,*
   585 U.S. 48 (2018) ........................................................................................... 42

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ......................................................................................... 44

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
   527 U.S. 308 (1999) ......................................................................................... 42

*GTE Corp. v. Williams,*
  731 F.2d 676 (10th Cir. 1984) ................................................................................40

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ..............................................................................................11

*Habecker v. Town of Estes Park,*
  518 F.3d 1217 (10th Cir. 2008) ............................................................................13

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ............................................................................17

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) ..............................................................14, 16, 18

*Jones v. Hendrix,*
  599 U.S. 465 (2023) ..............................................................................................19

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.,*
  31 F.3d 1536 (10th Cir. 1994) ..............................................................................40

*Keyes v. Sch. Dist. No. 1,*
  895 F.2d 659 (10th Cir. 1990) ..............................................................................44

*Labrador v. Poe,*
  144 S. Ct. 921 (Mem.) ...........................................................................................43

*Lewis v. Casey,*
  518 U.S. 343 (1996) .........................................................................................42, 43

*Little Sisters of the Poor v. Pennsylvania,*
  591 U.S. 657 (2020) ..............................................................................22, 34, 38

*Lomax v. Ortiz-Marquez,*
  140 S. Ct. 1721 (2020) ..........................................................................................22

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .......................................................................................9, 12, 14

*Marx v. Gen. Revenue Corp.,*
  568 U.S. 371 (2013) ..............................................................................................24

*MD/DC/DE Broads. Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001) ................................................................................45

*MD/DC/DE Broads. Ass'n v. FCC,*
  253 F.3d 732 (D.C. Cir. 2001) ..............................................................................45

*Michigan v. EPA,*
    576 U.S. 743 (2015)..................................................................................... 32, 33

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ................................................................................46

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).......................................................................................... 32, 34

*N. Haven Bd. of Educ. v. Bell,*
    456 U.S. 512 (1982) ...........................................................................................20

*NFIB v. OSHA,*
    595 U.S. 109 (2022) ...........................................................................................29

*N.M. Health Connections v. HHS,*
    946 F.3d 1138 (10th Cir. 2019) .........................................................................33

*N.Y. Cent. Sec. Corp. v. United States,*
    287 U.S. 12 (1932) .............................................................................................31

*N.Y. Tr. Co. v. Eisner,*
    256 U.S. 345 (1921) ...........................................................................................19

*Nat'l Broad. Co. v. United States,*
    319 U.S. 190 (1943) ...........................................................................................31

*Nat'l Truck Equip. Ass'n v. NHTSA,*
    711 F.3d 662 (6th Cir. 2013) .............................................................................32

*Nebraska v. Biden,*
    52 F.4th 1044 (8th Cir. 2022) ................................................................7, 43, 44

*Nebraska v. Biden,*
    636 F. Supp. 3d 991 (E.D. Mo. 2022).................................................................7

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) .........................................................................46

*Nitro-Lift Techs., LLC v. Howard,*
    568 U.S. 17 (2012).............................................................................................26

*Nken v. Holder,*
    556 U.S. 418 (2009)..................................................................................... 17, 41

*Nova Health Sys. v. Edmondson,*
    460 F.3d 1295 (10th Cir. 2006) .........................................................................14

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) ...........................................................................42

*Oklahoma v. Biden*,
    577 F. Supp. 3d 1245 (W.D. Okla. 2021) .........................................................46

*Oklahoma v. Castro-Huerta*,
    142 S. Ct. 2486 (2022)......................................................................................18

*OPM v. Richmond*,
    496 U.S. 414 (1990).........................................................................................30

*PDK Lab'ys, Inc. v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) ................................................................... 34, 39

*Pennaco Energy, Inc. v. Dep't of Interior*,
    377 F.3d 1147 (10th Cir. 2004) .........................................................................37

*Pennsylvania v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ..........................................................................11

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976).........................................................................................10

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)...........................................................................................37

*Petry v. Block*,
    737 F.2d 1193 (D.C. Cir. 1984) ........................................................................38

*Phillips Petroleum Co. v. EPA*,
    803 F.2d 545 (10th Cir. 1986) ..........................................................................38

*Prairie Band Pottawatomie Nation v. FHA*,
    684 F.3d 1002 (10th Cir. 2012) .........................................................................34

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
    872 F.2d 75 (4th Cir. 1989).............................................................................40

*Raines v. Byrd*,
    521 U.S. 811 (1997).........................................................................................17

*Rezac Livestock Comm'n Co. v. Pinnacle Bank*,
    255 F. Supp. 3d 1150 (D. Kan. 2017)...............................................................16

*Rocky Mountain Gun Owners v. Polis*,
    No. 23-cv-01077, --- F. Supp. 3d ---, 2023 WL 5017253 (D. Colo. Aug. 7, 2023)..............................17

*RoDa Drilling Co. v. Siegal,*
  552 F.3d 1203 (10th Cir. 2009) ...........................................................................40

*Rotkiske v. Klemm,*
  589 U.S. 8 (2019) ................................................................................... 19, 22

*Salient Power Sols., LLC v. Cullari Indus.,* LLC,
  No. 1:23-cv-479, 2023 WL 3847307 (D. Colo. June 6, 2023) .............................41

*Salinas v. United States,*
  522 U.S. 52 (1997) ..............................................................................................30

*Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.,*
  320 F.3d 1081 (10th Cir. 2003) ...........................................................................40

*San Juan Citizens All. v. Stiles,*
  654 F.3d 1038 (10th Cir. 2011) ...........................................................................32

*Schrier v. Univ. of Colo.,*
  427 F.3d 1253 (10th Cir. 2005) ...........................................................................39

*Sebelius v. Cloer,*
  569 U.S. 369 (2013) ............................................................................................25

*Shaffer v. Globe Prot., Inc.,*
  721 F.2d 1121 (7th Cir. 1983) .............................................................................41

*Shinseki v. Sanders,*
  556 U.S. 396 (2009) ............................................................................................34

*Simon v. E. Ky. Welfare Rts. Org.,*
  426 U.S. 26 (1976) ..............................................................................................15

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ...................................................................................... 9, 16

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ..............................................................................................8

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ............................................................................................43

*Tyson Foods, Inc. v. Bouaphakeo,*
  577 U.S. 442 (2016) ............................................................................................43

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
  590 U.S. 604 (2020) ............................................................................................23

*U.S. Navy SEALs 1-26 v. Biden,*
    578 F. Supp. 3d 822 (N.D. Tex. 2022) .................................................................. 46

*United States v. Brown,*
    348 F.3d 1200 (10th Cir. 2003) ........................................................................... 31

*United States v. Grimaud,*
    220 U.S. 506 (1911) ............................................................................................. 31

*United States v. Richardson,*
    418 U.S. 166 (1974) ............................................................................................. 11

*United States v. Texas,*
    599 U.S. 670 (2023) ....................................................................................... *passim*

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ............................................................................................. 42

*Utah Gospel Mission v. Salt Lake City Corp.,*
    316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd,* 425 F.3d 1249 (10th Cir. 2005) .......... 41

*Va. Uranium v. Warren,*
    139 S. Ct. 1894 (2019) ......................................................................................... 21

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ......................................................................................... 37, 38

*Walker v. UPS,*
    240 F.3d 1268 (10th Cir. 2001) ........................................................................... 19

*Warth v. Seldin,*
    422 U.S. 490 (1975) ......................................................................................... 13, 16

*Weight Watchers Int'l v. Luigino's,*
    423 F.3d 137 (2d Cir. 2005) ................................................................................ 40

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ......................................................................................... 26, 27

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ............................................................................................. 31

*Willis v. HHS,*
    38 F. Supp. 3d 1274 (W.D. Okla. 2014) ............................................................... 46

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ......................................................................................... *passim*

*Wreal, LLC v. Amazon.com, Inc.,*
   840 F.3d 1244 (11th Cir. 2016) ........................................................................40

*Wyoming v. Dep't of Interior,*
   674 F.3d 1220 (10th Cir. 2012) ........................................................................12

*Wyoming v. Oklahoma,*
   502 U.S. 437 (1992).................................................................................... 6, 12

*Wyoming v. USDA,*
   661 F.3d 1209 (10th Cir. 2011) ........................................................................38

*Yakus v. United States,*
   321 U.S. 414 (1944)........................................................................................31

*Youngberg v. Gen. Motors LLC,*
   No. 22-7047, 2023 WL 7126422 (10th Cir. Oct. 30, 2023) ...............................29

**<u>U.S. Constitution</u>**

U.S. Const., art. I, § 9, cl. 7............................................................................30

**<u>Statutes</u>**

2 U.S.C. § 661c ..............................................................................................30

5 U.S.C. § 553 ...............................................................................................37

5 U.S.C. § 706 ...................................................................................31, 34, 37

20 U.S.C. § 1078-1 ........................................................................................25

20 U.S.C. § 1087a ..........................................................................................30

20 U.S.C. § 1087b ..........................................................................................30

20 U.S.C. § 1087e ....................................................................................*passim*

20 U.S.C. § 1087i ...........................................................................................25

20 U.S.C. § 1089.............................................................................................5

20 U.S.C. § 1098bb ...............................................................................6, 27, 29

26 U.S.C. § 61 ...............................................................................................10

26 U.S.C. § 108..............................................................................................10

31 U.S.C. § 3711 ................................................................................................................................26

Mo. Rev. Stat. § 173.360 ...................................................................................................................7

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ........................................................................................2

Pub. L. No. 102-325, 106 Stat. 448 (1992) .......................................................................................2

Pub. L. No. 103-66, 107 Stat. 312 (1993)..........................................................................................3

Pub. L. No. 118-5, 137 Stat. 10 (2023) .............................................................................................6

**Rules**

Fed. R. Civ. P. 12.......................................................................................................................17, 46

**Regulations**

34 C.F.R. § 685.208 ..........................................................................................................................20

34 C.F.R. § 685.219 ..........................................................................................................................13

59 Fed. Reg. 61,664 (Dec. 1, 1994) ..................................................................................3, 4, 20, 28

77 Fed. Reg. 66,088 (Nov. 1, 2012) .................................................................................3, 4, 20, 28

80 Fed. Reg. 67,204 (Oct. 30, 2015) ...............................................................................3, 4, 20, 28

85 Fed. Reg. 79,856, (Dec. 11, 2020) ...............................................................................................6

86 Fed. Reg. 28,299 (May 26, 2021)..................................................................................................4

87 Fed. Reg. 61,512 (Oct. 12, 2022) ...........................................................................................6, 34

88 Fed. Reg. 1894 (Jan. 11, 2023).............................................................................................4, 33, 34

88 Fed. Reg. 43,820 (July 10, 2023)..........................................................................................*passim*

Executive Order 12,866 ........................................................................................................32, 33, 38

Executive Order 13,563 ...................................................................................................................38

**Other Authorities**

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ....................................22

Kate Stith, *Congress' Power of the Purse*,
    97 Yale L.J. 1343 (1988) ...........................................................................................................30

Kris W. Kobach, *Why Kansas Plans To Sue the Biden Administration Over the Latest Student Loan Gambit*, Washington Free Beacon (Feb. 28, 2024), https://perma.cc/B67K-H6ZE .......................................7

*Press Release, White House, FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022), https://perma.cc/R2ND-6RQI ....................................................34

Repay, *American Heritage Dictionary* (4th ed. 2001).........................................................................22

Tax Foundation, *State Individual Income Tax Rates, 2024* (Feb. 20, 2024), https://perma.cc/CU4A-5LT2........................................................................................................10

U.S. Dep't of Educ., *Combined Public Service Loan Forgiveness Form Report* (June 30, 2023), https://perma.cc/R87N-PQBX.....................................................................................................14

**INTRODUCTION**

With respect to federal student loans, Congress has long provided, and the Secretary of Education has long exercised, clear statutory authority to create "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years."  20 U.S.C. § 1087e(d)(1)(D).  This lawsuit challenges the creation of exactly that sort of plan.  That is all the Court needs to know to resolve the merits of most of Plaintiffs' claims.

But the Court should not reach the merits at all, because Plaintiffs have not carried their burden to establish Article III standing.  Plaintiffs clearly have policy and legal disagreements with the Secretary's approach to student loans, but their standing theories give them no basis to air those grievances in federal court.  Their complaint seems to reference as many as five different standing theories.  *See* Compl. ¶ 113, ECF No. 1.   Their preliminary-injunction motion says that "the States have suffered the requisite injury in fact in four ways," but then lists only three.  Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Br.") at 7, ECF No. 24.  And one of those three theories—that is, injury to state instrumentalities, which is the only theory that the Supreme Court accepted in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023)—is accompanied by an extraordinary concession: that, rather than alleging facts to show Article III standing in the complaint, Plaintiffs "anticipate having proof of these facts at the time of any hearing scheduled on this motion." Pls.' Br. at 10 n.9.  But "Article III standing is not merely a troublesome hurdle to be overcome if possible so as to reach the merits of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *United States v. Texas*, 599 U.S. 670, 675 (2023) (quotations omitted).  Because Plaintiffs have not carried their burden on that critical threshold issue, their complaint should be dismissed, and their preliminary-injunction motion should be denied.

Regardless, even if Plaintiffs had alleged Article III standing, they are not likely to succeed on the merits of any of their claims.  Plaintiffs' basic submission is that the relevant provision of the Higher Education Act (HEA) "does not authorize debt forgiveness *at all*."  Pls.' Br. at 14 (emphasis added).  But that interpretation is hard to square with the text of the statute, which expressly authorizes

creation of "an income contingent repayment plan" just like this one.  20 U.S.C. § 1087e(d)(1)(D).  Plaintiffs jumble together various canons of construction in an effort to show that, notwithstanding the plain text, Congress somehow "impliedly denied" this authority to the agency, Pls.' Br. at 18, but those arguments cannot overcome the straightforward statutory text, and are also meritless on their own terms.  In fact, *every* Secretary since the enactment of this authority has offered plans that allow forgiveness of the remaining balance after a borrower has paid his or her loans for "an extended period of time" that is "not to exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D).  So what Plaintiffs caricature as a "radical departure[] from past practice," Pls.' Br. at 19, in fact reflects the consistent position of the Department of Education under Presidents Clinton, Bush, Obama, Trump, and Biden.  Ultimately, even if the major-questions doctrine applies, the HEA is sufficiently clear to satisfy it.

Plaintiffs' remaining merits arguments fare no better.  They contend the Department "failed to consider" an accurate estimate of the Rule's cost, States' reliance interests on the loans it will forgive, and inflationary effects, despite the Rule's explanation of the Department's resolution of these issues.  Pls.' Br. at 21-24, 26.  The limited scope of arbitrary-and-capricious review under the Administrative Procedure Act (APA) asks whether the agency's decision was reasoned, however, not whether Plaintiffs' policy views should trump the Department's.  So these, and Plaintiffs' sundry other APA arguments, are doomed to fail.  Finally, Plaintiffs also quibble with the length of the comment period.  But the APA does not specify any required timing, and precedent from the Supreme Court and the Tenth Circuit confirms that these procedural details are left to the agency's discretion.

This case should be dismissed, and Plaintiffs' motion should be denied.

## BACKGROUND

### A.    The Higher Education Act and Prior Income-Contingent Repayment Plans

The Higher Education Act was signed into law by President Lyndon B. Johnson in 1965 "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Pub. L. No. 89-329, 79 Stat. 1219 (1965).  In 1992, bipartisan majorities in both Houses of Congress reauthorized and amended the statute, in revisions that were signed into law by President George H.W. Bush.  Pub. L. No. 102-325,

106 Stat. 448 (1992).  A year later, Congress enacted the Student Loan Reform Act as part of the Omnibus Budget Reconciliation Act of 1993, which was signed into law by President Bill Clinton. Pub. L. No. 103-66, 107 Stat. 312 (1993).  Those amendments, for the first time, provided for issuance of federal student loans directly from the Department of Education, and authorized the creation of income-contingent repayment plans, in language that (after additional reauthorizations and amendments over the years) is now codified at 20 U.S.C. § 1087e.

Under the HEA, the Secretary "shall offer a borrower" five different types of repayment plans from which "[t]he borrower may choose," 20 U.S.C. § 1087e(d)(1), including "a standard repayment plan," *id.* § 1087e(d)(1)(A), "a graduated repayment plan," *id.* § 1087e(d)(1)(B), "an extended repayment plan," *id.* § 1087e(d)(1)(C), "an income contingent repayment plan," *id.* § 1087e(d)(1)(D), and "an income-based repayment plan," *id.* § 1087e(d)(1)(E).  As relevant here, § 1087e(d)(1)(D) provides for:

> an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS loan made on behalf of a dependent student[.]

Before the agency action at issue in this case, the Secretary had used this authority three times: (1) to create the first income-contingent repayment plan in 1994, *see William D. Ford Direct Loan Program*, 59 Fed. Reg. 61,664 (Dec. 1, 1994); (2) to create the PAYE plan in 2012, *see Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 77 Fed. Reg. 66,088 (Nov. 1, 2012); and (3) to create the REPAYE plan in 2015, *see Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 80 Fed. Reg. 67,204 (Oct. 30, 2015).  The parameters varied, but each plan involved determinations by the Secretary about the "amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends." *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43,820, 43,827 (July 10, 2023).  And

3

each included significant loan forgiveness at the end of the plan, as long as a borrower had already completed a specified period of time making payments. *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the ICR plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. at 67,209 ("[T]he REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

"Congress has made minimal changes to the Department's authority relating to [income-contingent repayment] in the intervening years, even as" the agency "has acted to create and then amend" those prior plans, 88 Fed. Reg. at 43,827.  Congress has never curtailed that authority.

## B.    The SAVE Plan

Almost three years ago, the Department announced the establishment of negotiated rulemaking committees that would debate numerous changes to student financial aid programs, including to income-driven repayment (IDR) plans.[1]  *Negotiated Rulemaking Committee; Public Hearings*, 86 Fed. Reg. 28,299, 28,300 (May 26, 2021).  Then, fifteen months ago, the Department published a notice of proposed rulemaking (NPRM) soliciting comments on its intended changes to the IDR regulations.  88 Fed. Reg. 1894 (Jan. 11, 2023).  Citing the immense (and growing) deleterious effects of student-loan debt on American borrowers, the NPRM took aim at elements of the repayment rules then in effect that inhibited borrowers' ability to repay.  *Id.*  Among the anticipated changes, relevant here were several alterations to the REPAYE plan: an increase in the amount of income exempt from the calculation of monthly payments; a decrease in the share of discretionary income borrowers must pay monthly; a shorter maximum repayment window for borrowers with low original balances (to be followed by discharge of remaining balances at the end of that window); the cessation of accrued interest charges in certain circumstances; and modifications to allow borrowers increased credit toward qualifying for loan forgiveness.  *Id.* at 1895 (summarizing these changes).

---

[1]  Income-Driven Repayment is the "umbrella term" that the agency now uses instead of Income Contingent Repayment (ICR) or Income-Based Repayment (IBR).  88 Fed. Reg. at 43,820.

In July 2023, nine months before this lawsuit was filed, the Department published the Final Rule, which created the "Saving on a Valuable Education" or "SAVE" Plan. 88 Fed. Reg. at 43,820. The Secretary signed the Rule and the Department sent it to the Federal Register for publication on June 14, 2023; it was published on July 10, 2023. *Id.*; Decl. of Levon Schlichter (Schlichter Decl.), Ex. 1 ¶ 3. Following the Department's transmission of the Rule to the Federal Register but before its publication, the Supreme Court issued its decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

The Rule's operative provisions track the broad contours the NPRM identified. In particular, the Rule decreases monthly payments for REPAYE borrowers and limits that plan's repayment window to ten years (from 20 or 25) of qualifying payments for loans with original balances of $12,000 or less.[2] The Rule also addressed input on the NPRM from a wide range of commenters. 88 Fed. Reg. at 43,821-80. Of the 13,621 comments received, none came from Plaintiffs. *See id.* at 43,821.

The HEA requires that proposed regulations be published by November 1 of the year preceding the award year (which begins July 1) those regulations will take effect. 20 U.S.C. § 1089(c)(1). The Rule, published in July 2023, thus provided an additional four months' notice beyond what the statute requires. The HEA also provides, however, that the Secretary may designate certain provisions for early implementation before July 1 of the following year. *Id.* § 1089(c)(2). As announced in the Rule and a series of specific Federal Register notices published months in advance, the Secretary has exercised early implementation authority with respect to several provisions of the Rule, including the changed provision governing credit toward loan forgiveness eligibility. 88 Fed. Reg. at 43,820-21. The result is that repayment plans have been modified and some loan balances have been forgiven under the SAVE Plan as early as February 23, 2024, well before this lawsuit was filed.

## C.    Loan Forgiveness and Litigation Under the HEROES Act

During the COVID-19 pandemic, Congress and the Executive Branch took many steps to alleviate burdens on student-loan borrowers. On March 20, 2020, the Secretary of Education

---

[2] The Rule provides for forgiveness after one additional year for each additional $1,000 in original loan balance above $12,000, up to the statutory 25-year maximum. 88 Fed. Reg. at 43,903; 20 U.S.C. § 1087e(d)(1)(D). A REPAYE borrower whose original balance was $14,000, for example, would be eligible for forgiveness after 12 years of qualifying payments.

announced the suspension of interest accrual and repayment obligations on federal student loans. *Federal Student Aid Programs*, 85 Fed. Reg. 79,856, 79,862 (Dec. 11, 2020). In taking this step, the Secretary relied not on the HEA, but instead on distinct authority under the Higher Education Relief Opportunities for Students Act (HEROES Act) to "waive or modify any provision . . . applicable to the student financial assistance programs" during a "national emergency." 20 U.S.C. § 1098bb(a)(2), (1). In the Coronavirus Aid, Relief, and Economic Security Act, Congress extended both pauses through October 2020. 85 Fed. Reg. at 79,857. After that action lapsed, the Secretary invoked the HEROES Act on several occasions, ultimately suspending interest accrual and repayment obligations until August 28, 2023. Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 271, 137 Stat. 10, 33.

To minimize disruption for borrowers who would transition back to repayment after a long period of suspension, the Secretary announced in August 2022 that the Department would provide additional forms of debt relief. Specifically, Pell Grant recipients earning less than $125,000 annually (or $250,000 in household income for married recipients) were eligible for $20,000 in federal debt cancellation. *Id.* For non-Pell Grant recipients satisfying the same income threshold, $10,000 in relief was announced. *Id.* Later that year, the Secretary again published a notice identifying the waivers and modifications of the statutory and regulatory requirements needed to implement those policies, in accordance with the HEROES Act. *Federal Student Aid Programs*, 87 Fed. Reg. 61,512 (Oct. 12, 2022).

A group of six States challenged that HEROES Act loan relief in the Eastern District of Missouri. *Nebraska v. Biden*, 4:22-cv-1040 (E.D. Mo. filed Sept. 29, 2022). Missouri asserted standing vicariously through the Higher Education Loan Authority of the State of Missouri (MOHELA), a servicer of federally held student loans, which Missouri argued was injured by the reduction of fees MOHELA stood otherwise to receive by servicing loans that were forgiven. In addition, the *Nebraska* plaintiffs put forward alternative theories of injuries to the States themselves. Four claimed a "direct injury in the form of a loss of specific tax revenues," Pls.' Mem. in Supp. of Mots. for TRO & Prelim. Inj. at 20, ECF No. 5 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992)), in that their tax codes defined "income" with reference to the federal definition, which Congress had temporarily altered to exclude student loan debt discharge. *Id.* at 21. The plaintiffs also alleged inchoate injuries to their

"sovereign and quasi-sovereign" interests, including to Missouri's "chosen . . . regulatory scheme for accomplishing its constitutional prerogatives" and its "educational system," and to Nebraska's "interest in protecting the well-being of its public employees," through the harms MOHELA and a Nebraska analogue stood to suffer. *Id.* at 22, 23, 24.

The district court denied the motion for a preliminary injunction, holding that no State had shown standing. *Nebraska v. Biden*, 636 F. Supp. 3d 991, 1002 (E.D. Mo. 2022). The Eighth Circuit entered an emergency injunction pending appeal. *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). Two weeks later, the Supreme Court granted certiorari before judgment and set the case for expedited argument. In its subsequent opinion, the Court held for the States. *Nebraska*, 143 S. Ct. at 2376. On standing, the Court held that Missouri could claim injury through MOHELA, which had alleged a financial injury through the loss of servicing revenues. *Id.* at 2366. And Missouri could claim MOHELA's injury as its own, as MOHELA was a "public instrumentality" of the state. *Id.* (quoting Mo. Rev. Stat. § 173.360). The Court's analysis of the relationship between Missouri and MOHELA went beyond state-law labels into a fact-bound, functional analysis of MOHELA's origins, purpose, governing structure, and reporting scheme. *See id.* Finding standing, the Court went on to conclude that the agency's action exceeded the authority in the HEROES Act. *Id.* at 2368-76.

## D.    This Lawsuit

Plaintiffs—the States of Alabama, Alaska, Idaho, Iowa, Kansas, Louisiana, Montana, Nebraska, South Carolina, Texas, and Utah—announced their intent to file this lawsuit in an online editorial on February 28, 2024, *see* Kris W. Kobach, *Why Kansas Plans To Sue the Biden Administration Over the Latest Student Loan Gambit*, Washington Free Beacon (Feb. 28, 2024), https://perma.cc/B67K-H6ZE, though they waited another month before they actually filed it, on March 28, 2024, *see* Compl. Plaintiffs named three Defendants: President Biden in his official capacity, the Department of Education, and Dr. Miguel A. Cardona in his official capacity as Secretary of Education. The complaint includes four counts: Counts I and II allege that the agency exceeded its statutory authority in issuing the Rule (with the only material distinction being references to the major-questions doctrine in Count I), *see* Compl. ¶¶ 116-55; Count III alleges that the Rule was arbitrary and capricious under

the APA, *see id.* ¶¶ 157-97; and Count IV alleges that the agency violated the APA by providing a 30-day comment period instead of a 60-day comment period, *see id.* ¶¶ 198-209.

## **ARGUMENT**

Plaintiffs clearly believe that the SAVE Plan is both unwise as a policy matter and unlawful as a legal matter. But it is the Secretary of Education, not Plaintiff States, to whom Congress has delegated both the authority and the responsibility to manage the large and growing burdens of federal student-loan debt faced by millions of Americans. Ultimately, Plaintiffs want this Court to supplant both Congress's judgment and the Secretary's about how to address these issues. But not every question of law or policy is to be resolved by the judiciary, and the central premise of Article III standing is that the "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). This case can and should be resolved on that bedrock principle of federal jurisdiction.

If the Court does reach the merits, it should reach the same conclusion reached by every Secretary of Education since 1993, under Presidents Clinton, Bush, Obama, Trump, and Biden: that Congress meant what it said when it authorized the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D)—no more, and no less. Because this plan satisfies all criteria listed in the statute, it is lawful—even if Plaintiffs would prefer, for policy reasons, additional restrictions that Congress omitted from the text. As for Plaintiffs' other APA claims, they seek judicial second-guessing of both the agency's detailed explanation for its policy choices and the procedures used during the rulemaking. Both attempts fail on their own terms and are also inconsistent with the APA's deferential standard of review, particularly on questions of policy and agency procedure. And the remaining equitable factors for preliminary relief weigh strongly against this eleventh-hour attempt to halt further implementation of a rule that was published last summer, and that has already been implemented in part.

The case should be dismissed; the motion for a preliminary injunction should be denied.

I.      **THE CASE SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING.**[3]

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff who seeks to show standing "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements," which "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. More than a mere "troublesome hurdle to be overcome" in racing to adjudicate the merits of a case, standing "is 'built on a single basic idea—the idea of separation of powers.'" *Texas*, 599 U.S. at 675 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)).

A party generally lacks standing to challenge the provision of benefits to a third party. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006). And States do not have any direct or personal stake in the account balances of student-loan borrowers. So although many alternative theories of standing were on the table in the litigation arising out of the Secretary's prior debt relief action, in the end, only Missouri's state-instrumentality theory prevailed in *Nebraska*, 143 S. Ct. at 2365. But here, despite filing their complaint nine months after the Rule's publication, Plaintiffs have not identified any analogue to MOHELA, and Missouri is not a plaintiff.[4] Their remaining theories are legally deficient and speculative, meriting dismissal for lack of standing—just as many challenges to HEROES Act debt relief were dismissed. *See, e.g.*, *Dep't of Educ. v. Brown*, 600 U.S. 551 (2023).

A.      **Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent.**

Nine of the eleven Plaintiff States assert that the plan will diminish their tax revenues. *See* Compl. ¶¶ 87-97; Pls.' Br. at 7-9.[5] They contend that some student loans that might have been

---

[3] Part I, which supports Defendants' Motion to Dismiss, spans approximately nine pages. In conjunction with the portions of the Introduction and Background that also apply to the Motion to Dismiss (with the remainder about the preliminary-injunction motion), this length complies with the Court's April 16 order about page limits. *See* Mem. & Order, ECF No. 44, at 4 n.3.

[4] Missouri has filed its own lawsuit. *See Missouri v. Biden*, No. 4:24-cv-00520 (E.D. Mo.).

[5] That includes South Carolina. To be precise, the complaint does not allege that South Carolina will suffer harm based on this theory, *see* Compl. ¶ 172, but the preliminary-injunction motion does, Pls.' Br. at 7. Nothing turns on this discrepancy, because the theory is meritless.

discharged in the future will instead be discharged under the plan.  *See id.*  That hypothesized shift in timing matters, they say, because the Internal Revenue Code normally treats "discharge of indebtedness" as a form of "gross income," 26 U.S.C. § 61(a)(11), but a temporary provision excludes discharges of student loans from 2021 to 2025, *see* 26 U.S.C. § 108(f)(5).  *See* Pls.' Br. at 7-9.  These nine States argue that, because they have chosen to incorporate the Internal Revenue Code's definition of "gross income" into their own state tax codes, a change in the timing of discharges will diminish their revenues.  *Id.*  That roundabout standing theory is incorrect for multiple independent reasons.

First, these States' alleged harm results from their own choice to tie their tax laws to the Internal Revenue Code.  The Supreme Court's decision in *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), squarely forecloses a State's effort to claim standing on such a self-generated basis. There, Pennsylvania sought to show standing to challenge a New Jersey tax by arguing that, because Pennsylvania provided a credit for taxes paid to other States, a tax increase in New Jersey could lead to a loss of tax revenue in Pennsylvania.  *Id.* at 664-65.  The Supreme Court rejected that theory, explaining that nothing required Pennsylvania to extend the credit, that any harm to Pennsylvania was thus "self-inflicted," and that "[n]o State can be heard to complain about damage inflicted by its own hand."  *Id.* at 664; *see also FEC v. Cruz*, 596 U.S. 289, 297 (2022) (summarizing *Pennsylvania*).

Any reduction in the States' tax revenues here is self-inflicted in the same way.  States need not use the same definition of gross income as the federal government does, and in fact they routinely exercise their independence in this area by defining income in a variety of different ways.  Plaintiffs Alaska and Texas, for example, choose not to tax personal income at all.  *See* Tax Foundation, *State Individual Income Tax Rates, 2024* (Feb. 20, 2024), https://perma.cc/CU4A-5LT2.  All other States are likewise free to depart from the Internal Revenue Code's approach and to treat student-loan discharges from 2021 to 2025 as taxable state income.  If they choose not to, any resulting reduction in their tax revenues is fairly traceable not to the Secretary's plan, but instead, as in *Pennsylvania*, to "decisions by their respective state legislatures" about how to structure their own tax laws.  426 U.S. at 664; *see also Garrison v. Dep't of Educ.*, 636 F. Supp. 3d 935, 937 (S.D. Ind. 2022) (no standing to challenge debt relief based on "an increased state tax burden" because "the Federal Government's student loan relief

program did not injure" plaintiffs, rather, "[t]he State's legislative decision did").

Second, even apart from the self-inflicted nature of the States' asserted harm, the Supreme Court's decision in *Florida v. Mellon*, 273 U.S. 12 (1927), establishes that a federal policy's incidental effects on state tax revenues are not judicially cognizable injuries. There, Florida sought to establish standing to challenge a federal inheritance tax by arguing that the tax would prompt the "withdrawal of property" from the State, diminishing its tax base. *Id.* at 18. The Supreme Court rejected that argument, explaining that Florida was required to show a "direct injury" and that any harm caused by the federal tax was, "at most, only remote and indirect." *Id.* (emphasis omitted). That analysis equally applies here: Just as Florida could not establish standing by claiming that state tax revenues would decline because of a federal policy, the States here cannot do so either.

Plaintiffs' contrary view has dramatic implications. Virtually all federal actions—from prosecuting crime to imposing taxes to managing property—have some incidental effects on state finances. If such incidental effects suffice for standing, every State would have standing to challenge almost any federal policy. That would flout Article III's case-or-controversy requirement and convert the federal courts into "an open forum for the resolution of political or ideological disputes." *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring); *see Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing."). The Supreme Court has repeatedly acknowledged those sorts of concerns in rebuffing broad theories of Article III standing, including in other recent litigation between States and the United States. *Cf., e.g., Texas*, 599 U.S. at 670.[6]

Third, the States' theory of reduced tax revenues is speculative. "Standing is not 'an ingenious academic exercise in the conceivable'"; rather, a plaintiff must show that its asserted injury is "certainly

---

[6] To that end, Plaintiffs' complaint (but not their preliminary-injunction motion) contains unexplained references to their "sovereign" and "quasi-sovereign" interests. Compl. ¶¶ 8-40. To the extent that Plaintiffs mean to half-heartedly invoke some sort of *parens patriae* theory, it is settled that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (citation omitted).

impending." *Lujan*, 504 U.S. at 564 n.2, 566 (citations omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs' hypothesized loss of tax revenues starting in 2026 is neither certain nor impending. Instead, it depends on the assumption that if borrowers did not receive discharges under the plan, they would receive discharges for other reasons; that those discharges would not occur until 2026 or later; and that neither state nor federal law would change in the meantime. *See* Compl. ¶¶ 87-97. The States' theory thus depends on a "speculative chain of possibilities," which does not suffice to establish standing. *Clapper*, 568 U.S. at 410.

The only authority Plaintiffs cite in support of their tax-revenue standing theory, *Wyoming v. Oklahoma*, 502 U.S. at 448, 454, is not to the contrary. In *Wyoming*, there was "unrebutted evidence" of a loss of "hundreds of thousands of dollars in severance taxes" as a direct result of the challenged Oklahoma regulations, which had been adopted with the avowed purpose of reducing purchases of coal from Wyoming. *Id.* at 443. Wyoming thus had standing to invoke the Supreme Court's original jurisdiction and challenge the Oklahoma laws under the Commerce Clause because it had suffered "a direct injury in the form of a loss of specific [coal] tax revenues." *Id.* at 448. This is not a suit by one State against another in the forum the Constitution provides for resolving such disputes. Nor do the States claim that the Secretary targeted or discriminated against them. They allege, at most, that the SAVE Plan will have incidental effects on their general tax revenues. That is not enough. *See Florida*, 273 U.S. at 18; *Wyoming v. Dep't of Interior*, 674 F.3d 1220, 1234-35 (10th Cir. 2012) (summarizing Supreme Court's decision in *Wyoming* and reiterating that "merely speculative" "assertions of future lost tax revenues" are insufficient).

### B. Plaintiffs' recruiting theory is speculative and unsupported.

Plaintiffs next point to a purported competitive disadvantage in "recruiting, hiring, and retention" of state and local employees that they predict will result from the Rule. Pls.' Br. at 9-10.[7]

---

[7] As the source of Plaintiffs' purported harm, the preliminary-injunction motion cites only the Rule's forgiveness of eligible borrowers' loans after ten years. Pls.' Br. at 9; *see* 88 Fed. Reg. at 43,903. As discussed elsewhere in this brief, however, the Rule enacts myriad regulatory changes apart from the loan-forgiveness provision. Following Plaintiffs' framing, the government responds here only to the notion that the loan-forgiveness provisions have harmed Plaintiffs.

The existence of the Public Service Loan Forgiveness (PSLF) program, the theory goes, incentivizes graduates burdened by student-loan debt to accept state and local public-service jobs that they could otherwise not afford to take. And the Rule, Plaintiffs say, will eliminate "one of the distinguishing benefits" of those jobs by forgiving loans for "*all* eligible borrowers" in public and private sector jobs alike. *Id.* at 10 (emphasis in original). Accepting the recruitment theory means crediting two assertions: (1) that the Rule makes the PSLF program less attractive to borrowers, and (2) that public-sector recruitment will actually suffer as a result.

Both links in this causal chain are riddled with exactly the sort of logical inconsistency and speculation on which Article III does not permit a federal case to rest. *Clapper*, 568 U.S. at 409. Moreover, the second standing element, traceability, requires "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citation omitted). Where the causation chain alleged runs through an independent third party, the burden of demonstrating standing rises: "That an injury is indirect does not necessarily defeat standing, 'but it may make it substantially more difficult to establish that, in fact, the asserted injury was the consequence of the defendants' actions.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975)). Plaintiffs' "speculative inferences" do not surmount that bar here. *See id.*

Start with the notion that the Rule inhibits the attractiveness of the PSLF program. Under PSLF, a borrower is eligible for forgiveness of direct loan balances of any amount after she has made the equivalent of 120 qualifying monthly payments under a qualifying plan while working full-time for an eligible employer in public service. 34 C.F.R. § 685.219(c), (d). In contrast, borrowers enrolled in the SAVE Plan will receive forgiveness of direct loan balances after ten years of regular monthly payments so long as the total original principal balance of the loan did not exceed $12,000. 88 Fed. Reg. at 43,903. For direct loans with original balances exceeding $12,000, the required years of regular monthly payments increases with each additional $1,000 of original principal balance. *Id.* In other words, the PSLF program allows for forgiveness of (1) a greater loan balance (2) after a shorter period of time (3) on a broader range of repayment plans. That means the PSLF program retains significant

benefits for public-service employment beyond what the SAVE Plan makes available.[8]  *See* 88 Fed. Reg. at 43,834, 43,880.  So it is not only speculative, but counterintuitive, to assume that the Rule will materially diminish the PSLF program's appeal.  *Lujan*, 504 U.S. at 560-61.[9]

What about the rest of the Rule?  There are good reasons to think that it incentivizes *more* public-service work, not less.  As detailed above, a borrower intending to avail herself of the PSLF program may enroll in SAVE, thereby obtaining discharge of certain loan balances on a faster timetable.  In addition, that borrower will benefit from lower monthly payments and limited interest accrual under SAVE, smoothing the road to PSLF forgiveness.  88 Fed. Reg. at 43,888 ("[T]he SAVE plan will produce lower monthly payments than those other plans for most borrowers[.]"); *id.* at 43,952 ("[A]ddressing the accrual of unpaid interest on a monthly basis will provide significant benefits to borrowers by ensuring they don't see their balances grow while they make required payments.").

---

[8] In fact, as of June 2023, the average balance of a borrower seeking PSLF was approximately $88,000—more than seven times the SAVE Plan's forgiveness threshold.  U.S. Dep't of Educ., *Combined Public Service Loan Forgiveness Form Report* (June 30, 2023), https://perma.cc/R87N-PQBX.

[9] This theory is even more meritless when considered in the context of Plaintiffs' motion for a preliminary injunction.  After all, standing to obtain a preliminary injunction requires more than conceivable allegations in the complaint alone.  *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006) ("A preliminary injunction is an extraordinary remedy, and thus the right to relief must be clear and unequivocal." (quotation omitted)); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring in part) ("[A]t the preliminary injunction stage, the [plaintiffs] must make a 'clear showing' that they have standing." (citation omitted)).

PSLF's *actual* utility in recruiting, intuitive or not, is a proposition wholly without evidentiary support in this record.  Plaintiffs attach to their motion the affidavit of the human resources director at the Kansas Attorney General's office to show the relevance of PSLF availability to her recruiting efforts.  Decl. of Leslie Gish (Gish Decl.), ECF No. 24-4.  The affidavit, however, identifies no employee who accepted a job in the attorney general's office because of PSLF availability.  Nor does it even point to an individual employee, or candidate, to whom PSLF availability was meaningful in hiring.  Rather, the director asserts that she advertises PSLF to candidates, ¶ 5, explains the PSLF program to new employees, ¶ 7, and has signed "approximately three" PSLF eligibility forms, ¶ 8.  And she says nothing at all about how (or why) she expects any of this to change if the SAVE plan goes into effect.  The declaration submitted by the equivalent director at the Texas Attorney General's office is to the same effect.  Decl. of Henry de la Garza (De la Garza Decl.), ECF No. 24-5.

As a result, one is left with only a speculative connection between PSLF and hiring in two of the eleven Plaintiff States.  *Clapper*, 568 U.S. at 409; *Cato Inst. v. Cardona*, No. 1:23-cv-11906, --- F. Supp. 3d ----, 2023 WL 5232910, at *7 (E.D. Mich. Aug. 14, 2023) ("Plaintiffs' presidents' own declarations do not suggest that any employee was *actually impacted* by the [challenged action].  Their declarations merely assert that Plaintiffs plan to recruit PSLF participants in the future, some of whom may be impacted by the Adjustment.  This is far too speculative for standing." (citations omitted)).

More fundamentally, Plaintiffs' entire theory of standing based on PSLF is premised on the idea that student-loan debt makes public-sector employment less attractive than higher-paid private-sector work, if not downright infeasible. Pls.' Br. at 9. It stands to reason, then, that additional relief from such burdens—whether labeled "PSLF," the "SAVE Plan," or something else entirely—would make it *easier* for a borrower to pursue lower-paying jobs in the public sector. Plaintiffs do not explain or account for this logical inconsistency in their own theory, even though it was discussed at length in the Rule itself. *See* 88 Fed. Reg. at 43,884. Ultimately, the relief they request might *exacerbate* any recruiting problems related to student debt, which is fatal to their reliance on this theory to establish Article III standing—as a matter of injury, causation, *and* redressability. *Cf.* Pls.' Br. at 31 (asserting that "an injunction limited to" the borders of Plaintiff States would "entic[e] their citizens to leave").

At day's end, many factors affect a job candidate's choice of where to work, and an employee's choice of whether to stay or leave in a role. To be viable, Plaintiffs' theory of recruitment harm would need to simplify this multivariate equation through plausible allegations—and to obtain a preliminary injunction, a clear evidentiary showing—that any drop in recruitment can reasonably be attributed to the Rule, rather than unsupported speculation about "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). They have not done so.

## C.   Plaintiffs' state-instrumentality theory fails.

Taking a lesson from Missouri's success in establishing standing in *Nebraska* via injury to MOHELA, Plaintiffs allege that Louisiana has "a state instrumentality or quasi instrumentality that provides student loans" to its residents. Compl. ¶ 108; *see also* Pls.' Br. at 10 ("Plaintiff states have [state] instrumentalities, and they will suffer irreparable financial harm as a result of the final rule."). The name of that instrumentality, though, is unstated. And the complaint does not even allege that this undefined instrumentality services federal student loans, like MOHELA did. Rather, nine months after the Rule's publication, Plaintiffs say only that they "anticipate having proof of" the existence of such instrumentalities "at the time of any hearing scheduled on this motion." Pls.' Br. at 10 n.9.

The Constitution and the Federal Rules require more than a "you'll-find-out" allegation of standing. To invoke this Court's jurisdiction, Plaintiffs were required to "clearly allege facts

demonstrating" each element of standing, in the complaint.[10]  *Spokeo*, 578 U.S. at 338 (quoting *Warth*, 422 U.S. at 518).  Their failure to name any affected state instrumentality is fatal.

### D.   Plaintiffs' theory of increased law-enforcement costs is abandoned, speculative, and foreclosed by precedent.

In two brief paragraphs in their complaint, Plaintiffs faintly sketch a fourth standing theory: that the Rule's eventual downstream effects on the broader American economy will require them to increase their consumer-protection and anti-fraud law-enforcement costs.  *See* Compl. ¶ 113-14.  This argument's absence from the preliminary-injunction motion strongly suggests that Plaintiffs have abandoned it.  *See Rezac Livestock Comm'n Co. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1158 (D. Kan. 2017).  For good reason—this theory is far too speculative to support Article III standing.  Accepting for argument's sake the (entirely unsupported) prediction that loan discharge will one day result in fraud attempts on a greater scale, Compl. ¶ 113, it is not at all self-evident that state enforcement efforts will actually increase, or come at a higher cost.  Indeed, even putting aside that a State's enforcement costs are ascribable to its own budgetary choices, not federal regulation, Plaintiffs do not even allege that they in fact intend to expend greater resources on anti-fraud law enforcement if the Rule goes into full effect as planned.  Plaintiffs have thus not carried their burden.

On top of all that, the Supreme Court's recent decision in *United States v. Texas*, 599 U.S. 670 (2023), reinforces the need for courts to scrutinize standing carefully even in cases brought by States. In that case, Texas and its co-plaintiffs sued for an injunction altering the federal government's 2021 immigration enforcement guidelines, with which they were dissatisfied.  *Id.* at 673.  To support standing, the States alleged monetary harms stemming from the need to incarcerate and supply social services to noncitizens whom, in their view, the immigration laws obligated the federal government to arrest.  *Id.* at 674.  The Supreme Court rejected that theory.  "Monetary costs," the Court reasoned, "are of course an injury."  *Id.* at 676.  But increased costs alone would not suffice to open the federal courthouse door.  Rather, the plaintiffs also had to show that the dispute was "traditionally thought

---

[10] Equity, of course, demands even more.  *Hobby Lobby Stores*, 723 F.3d at 1185 (Matheson, J., concurring in part) (preliminary injunctions require a "clear showing" of standing).

to be capable of resolution through the judicial process." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  And because the States had shown no "precedent, history, or tradition of courts" ordering the type of relief requested, they lacked standing.  *Id.* at 677.

*Texas* thus not only reaffirms core principles of Article III standing as applied to the States, but also confirms that where the alleged harm is limited to the costs that a State might otherwise incur as a sovereign, something more—a "precedent, history, or tradition" of judicial involvement in the type of federal-state dispute at issue—is required.  *Id.*  Beyond not raising their claim of financial harm above the level of speculation, Plaintiffs have not made that additional showing here.

## II.      THE PRELIMINARY-INJUNCTION MOTION SHOULD BE DENIED.

Because Plaintiffs have not carried their burden to plead Article III standing, this suit can and should be dismissed on that basis, in its entirety.  *See* Fed. R. Civ. P. 12(b)(1), (h)(3).  Plaintiffs' preliminary-injunction motion should then be denied as moot.  But even if the Court separately considers Plaintiffs' motion, it is meritless.

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S 7, 24 (2008), and may only issue when the movant's entitlement to relief is "clear and unequivocal," *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (citation omitted).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  Where, as here, the federal government is the defendant, the third and fourth factors merge into a consideration of the public interest.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). "It is the movant's burden to establish that each of these factors tips in his or her favor." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).

Plaintiffs are not likely to succeed on the merits of any of their claims.  That is not only because they are meritless (for the reasons below), but also because of their standing problems (for the reasons above).  Indeed, the burden to show standing to obtain a preliminary injunction is higher than it is to survive a motion to dismiss.  *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077,

--- F. Supp. 3d ---, 2023 WL 5017253, at *4 (D. Colo. Aug. 7, 2023) (citing *Hobby Lobby Stores*, 723 F.3d at 1185 (Matheson, J., concurring) (requiring a "clear showing" of standing)); *see supra* at 14 n.9. Plaintiffs also fail to show irreparable harm that would justify this "extraordinary remedy." *Winter*, 555 U.S. at 24, and the public interest weighs strongly against an injunction—particularly the sweeping nationwide relief that Plaintiffs request here, at the eleventh hour. Plaintiffs' motion should be denied.

### A.   Plaintiffs are not likely to succeed on the merits of their statutory-authority claims.

Relying heavily on *Nebraska*, Plaintiffs argue that the Rule "conflicts with the Higher Education Act (HEA) in multiple respects." Pls.' Br. at 2. But *Nebraska* was a statutory-interpretation case about a different statute, and the Supreme Court has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA." *Brown*, 600 U.S. at 565 n.2. Applying the traditional tools of statutory construction—most importantly, by reading the statute's plain text—the Rule fits comfortably within Congress's grant of authority to the Secretary in the HEA. And, to the extent necessary under the major-questions doctrine, that statutory authorization is "clear"—which is why the Department of Education has consistently interpreted it that way in enacting similar (albeit smaller) programs, for the past three decades, across five Presidential Administrations.

#### 1.   *The Final Rule is authorized by the Higher Education Act.*

Statutory interpretation starts, as always, "with the text of the statute." *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023). After all, "[t]he Court may not replace the actual text with speculation as to Congress' intent. Rather, the Court [should] presume more modestly that the legislature says what it means and means what it says." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496-97 (2022).

a.   The text of the HEA explicitly calls for the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The authority to set the "repayment schedules" for such a plan is delegated to the Secretary: "Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the

annual income of the borrower (and the borrower's spouse, if applicable) as determined by the Secretary." *Id.* § 1087e(e)(4). Congress also directed the Secretary to "establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment." *Id.* § 1087e(e)(1).

The Rule is an exercise of this clear statutory authority. It sets "[i]ncome contingent repayment schedules" for federal student loans. *Id.* § 1087e(e)(4). It does so via "regulations promulgated by the Secretary." *Id.* Those regulations "require payments that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary." *Id.* Those "varying annual repayment amounts" are "paid over an extended period of time prescribed by the Secretary." *Id.* § 1087e(d)(1)(D). That "extended period of time" does not "exceed 25 years." *Id.* And "the borrower's repayment obligation on that loan for such year" is "determin[ed]" by "procedures" created by the Secretary. *Id.* § 1087e(e)(1). No more was required, under the plain text of the statute.

**b.** Where, as here, "the words of a statute are unambiguous, th[e] first step of the interpretive inquiry is" also the "last." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). Nevertheless, "[i]n understanding this statutory text, 'a page of history is worth a volume of logic.'" *See Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921))—and here, the relevant history further supports Defendants' interpretation of the plain text. Since this statutory authority was first enacted in 1993, the agency has consistently created "income contingent repayment plan[s]" structured like this one—that is, by setting "annual repayment amounts based on the income of the borrower," determining the "extended period of time for repayment," and then, at the end of that period (which is "not to exceed 25 years") forgiving the balance that remains. 20 U.S.C. § 1087e(d)(1)(D); *see supra* at 3-4 (discussing previous income-driven repayment plans). Congress has been fully on notice of this consistent and well-established practice. But despite making other adjustments to these programs over the years, Congress has never sought to limit the agency's consistent approach. *See, e.g.*, *Walker v. UPS*, 240 F.3d 1268, 1276 (10th Cir. 2001) ("Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the

statute in other respects, then presumably the legislative intent has been correctly discerned.") (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982)).[11]

Despite this long-settled understanding, Plaintiffs' position is that 20 U.S.C. § 1087e(d)(1)(D) "does not authorize debt forgiveness at all." Pls.' Br. at 14. That position proves too much. After all, the statute explicitly authorizes the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, *not to exceed 25 years*." 20 U.S.C. § 1087e(d)(1)(D) (emphasis added). And such plans exist as an alternative to standard repayment plans, *id.* § 1087e(d)(1)(A), which require borrowers to repay on fixed schedules in equal amounts that total the entire principal and interest accrued thereon. 34 C.F.R. § 685.208(b)(1). On Plaintiffs' view, one wonders, what is supposed to happen to any outstanding loan balance after 25 years? They do not say. In fact, what has always happened—under consistent interpretations by the Department of Education under Presidents Clinton, Bush, Obama, Trump, and Biden—is that any outstanding balance is then forgiven. *See* 59 Fed. Reg. at 61,664; 77 Fed. Reg. at 66,088; 80 Fed. Reg. at 67,204. After all, any payment obligations beyond that time would effectively result in a "repayment plan" that *does* "exceed 25 years," which Congress explicitly prohibited. 20 U.S.C. § 1087e(d)(1)(D). So Plaintiffs' position cannot be correct.

**c.** Plaintiffs' remaining arguments are similarly atextual—that is, they largely reflect implicit limitations that Plaintiffs think *should* be in the statute. For example, Plaintiffs repeatedly object to the provision of the plan that forgives debt "for borrowers that have already made ten years of payments and have balances under $12,000," Pls.' Br. at 15, emphasizing that "Defendants are now attempting to forgive loans after only ten years of payment—instead of twenty to twenty-five years," as in prior plans. But again, all the statute says about timing is that the "extended period of time prescribed by the Secretary" is "not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Ten years is an "extended period of time" that does not "exceed 25 years." *Id.*; *accord* 88 Fed. Reg. at 43,826-27 ("[T]he statute

---

[11] "The only time Congress acted to constrain or adjust the Department's authority relating to [income-contingent repayment plans] was in 2007 legislation when it provided more specificity over the periods that can be counted toward the maximum repayment period. Even then, it did not adjust language related to how much borrowers would pay each month." 88 Fed. Reg. at 43,830.

sets an explicit upper limit, but no lower limit for the 'extended period' [of] time that a borrower must spend in repayment."). That is sufficient.

Likewise, Plaintiffs clearly feel strongly that the plan is too expensive. *See* Pls.' Br. at 18 (arguing that the statute "plainly precludes" any "massive debt forgiveness"); *id.* at 4, 6, 14, 19, 31 (repeatedly using the word "massive"). But there is nothing in the statute that limits the Secretary to small or medium-sized relief (as the Secretary has provided several times before), rather than larger-scale relief. This Court should "respect not only what Congress wrote but, as importantly, what it didn't write," *Va. Uranium v. Warren*, 139 S. Ct. 1894, 1900 (2019)—and Congress did not codify Plaintiffs' policy preferences about the size or cost of these programs.

Plaintiffs also rely heavily on a statutory reference to "plans for repayment of such loan, including principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). In Plaintiffs' telling, that language "demonstrates Congress' unequivocal intent that borrowers repay the principal of the loan and at least some amount of interest." Pls.' Br. at 15. Again, although Congress could have said exactly what Plaintiffs wish it did, Congress instead chose language that is (at least) equally consistent with repayment plans that call for repayment of *some*, but not all, "principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). That is because a plan for *partial* repayment of a loan or *slower* repayment of a loan are both still "plans for repayment of such loan, including principal and interest on the loan." *Id.* If Congress intended to authorize only "plans for" *full* or *complete* "repayment of such loan," it could have used those words in the statute. It did not.

Plaintiffs next turn to the word "paid" in 20 U.S.C. § 1087e(d)(1)(D), calling it "an antonym of forgiven/not paid." Pls.' Br. at 15. Sure. But the word "paid," standing alone, says nothing about *how much* must be paid, or *when*. The surrounding statutory text that Plaintiffs ignore, however, does exactly that. As for how much, the answer is "varying annual repayment amounts based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D). As for when, the answer is "over an extended period of time prescribed by the Secretary, not to exceed 25 years." *Id.* The plan satisfies those criteria.

All of Plaintiffs' atextual limitations should be rejected. After all, "'[i]t is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.' This

principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020) (quoting *Rotkiske*, 589 U.S. at 14 (in turn quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012))). Plaintiffs might prefer that the statute were written differently, but the courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020); *accord Bostock v. Clayton County*, 590 U.S. 644, 654-55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives."). Many of Plaintiffs' arguments are foreclosed by this bedrock interpretive principle.

    **d.**  Plaintiffs also assert that Congress revealed its intent to prohibit loan forgiveness (without saying so explicitly) by using the word "repayment," which "affirmatively precludes massive debt forgiveness." Pls.' Br. at 14 (emphasis omitted). How so? On Plaintiffs' telling, simply because "'[r]epayment' is the noun form of 'repay,' which means 'to pay back.'" Pls.' Br. at 14 (citing Repay, *American Heritage Dictionary* (4th ed. 2001) (definition 1)). But "[i]f Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022). This argument also continues to ignore that a plan for *partial* repayment is still a "repayment plan."

    In any event, the premise of Plaintiffs' "repayment" argument is that, by calling something a "repayment plan" in 20 U.S.C. §§ 1087e(d) and (e), Congress has necessarily taken loan forgiveness off the table. That premise is demonstrably mistaken. Consider 20 U.S.C. § 1087e(m)—which creates the PSLF program—notably titled "Repayment plan for public service employees." The "repayment plans" at issue in that sub-section, however, do not just *contemplate* loan forgiveness, they affirmatively *require* it, at least in some circumstances. *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due . . . ."). So it cannot be right that Congress's use of the phrase "repayment plan," standing alone, confirms that loan forgiveness is off the table. If anything, just the opposite—20 U.S.C. § 1087e(m) shows that when Congress talks about a "repayment plan" in 20

U.S.C. § 1087e, it knows that loan forgiveness is *on* the table.  After all, courts "do not lightly assume that Congress silently attaches different meanings to the same term in the same statute."  *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 614 (2020) (quotation omitted).

Plaintiffs would support their wooden reading of "repayment" with reference to the agency's own statistical projections.  They point to the Rule's prediction that an average borrower (and an average borrower with only undergraduate loans) will pay more than the loan principal under the old REPAYE plan and less than the principal on the SAVE Plan as proof that prior plans abided by the atextual reading of "repayment" they would now impose onto the statute, and to do otherwise would "obliterate" the "repayment" requirement.  Pls.' Br. at 17.  But Plaintiffs never explain why the agency's projections for the "average" borrower, considered "in the aggregate," *id.* at 16-17, have any legal significance.  If the HEA authorizes loan forgiveness, then it authorizes loan forgiveness—for both typical and atypical borrowers, as long as they meet its criteria.

The logical problems with this aggregation theory are laid bare by Plaintiffs' convenient choice to focus only on "undergraduate-only debt" and "overall student debt," Pls.' Br. at 17—which occupy only two of the three columns on the chart that they cite.  Plaintiffs ignore the numbers for borrowers "with any graduate debt," which cut sharply against their narrative, even otherwise accepting Plaintiffs' theory.  *See* 88 Fed. Reg. at 43,880-81 ($11,645 in total payments, on average, for every $10,000 borrowed).  Ultimately, projected outcomes for the "average" borrower considered "in the aggregate," Pls.' Br. at 16-17, have nothing to do with the statutory-interpretation question at issue here.

Plaintiffs also contend that the agency's "interpretation ignores Congress' careful separation between loans and grants."  Pls.' Br. at 19.  Plaintiffs do not actually establish any such "careful separation" in their brief.  *See id.* (citing unrelated provisions largely without explanation).  But regardless, partial loan forgiveness is not at all inconsistent with the concept of a "loan"—particularly after "an extended period of time" has passed.  20 U.S.C. § 1087e(d)(1)(D).  As Plaintiffs eventually acknowledge, loans are sometimes forgiven, in both the public and the private sectors, without anyone thinking that the forgiven loan was not actually a "loan" at all.  In Plaintiffs' words: "Of course, a loan

can be forgiven or cancelled." Pls.' Br. at 16. So nothing in this case turns on the meaning of the words "loan" or "grant" standing in isolation.

**e.** Plaintiffs argue more generally that Defendants' interpretation "violates several canons of construction." Pls.' Br. at 19. But "[l]inguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 n.5 (2021). None is useful to Plaintiffs here.

First, Plaintiffs argue that Congress's creation of the PSLF program "defeats the Department's interpretation of the HEA" due to the "the interpretive canon of *expressio unius est exclusio alterius* (also known as the negative-implication canon)." Pls.' Br. at 16, 19. On Plaintiffs' telling, "[t]he HEA expressly allows for loan forgiveness in certain specific circumstances," such as the PSLF program, but "'repayment' under § 455(d) is not one of them." Pls.' Br. at 16. This argument fails.

"The interpretive canon, *expressio unius est exclusio alterius*, means expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 80 (2002). "The force of any negative implication, however, depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). And here, the statutory structure and context—and the text itself—undermines Plaintiffs' arguments about the applicability of this canon.

Loan forgiveness under the PSLF program is mandatory, as a matter of statute—that is, the Secretary does not have discretion to provide a PSLF program *without* loan forgiveness. *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due . . . for a borrower who . . . ."). By contrast, the Secretary does have the discretion to design an "income contingent repayment plan" without loan forgiveness (at least for the first 25 years of the plan). *See id.* § 1087e(d)(1)(D) (requiring only "varying annual repayment amounts"). For that reason, Congress had to enact 20 U.S.C. § 1087e(m) to create a permanent PSLF program—without that sub-section, the agency would have no statutory obligation to implement such a generous program, including loan forgiveness within 10 years. In other words, it is imprecise to say (as Plaintiffs do) that "[t]he HEA expressly *allows* for loan forgiveness in certain specific circumstances," Pls.' Br. at 16 (emphasis added)—in fact, the HEA expressly *requires* loan forgiveness in certain circumstances (*i.e.*, under 20

U.S.C. § 1087e(m)(1), which creates PSLF. Defendants do not rely on any statutory provision that *requires* loan forgiveness (at least, not within 10 years), so Plaintiffs' *expressio unius* argument fails.

Similarly, Plaintiffs argue that Congress "impliedly denied" the agency authority to act under 20 U.S.C. § 1087e(d)(1)(D) when it enacted 20 U.S.C. § 1087e(d)(1)(E), which created a "partial hardship exception" with certain specific requirements. Pls.' Br. at 18. But the sorts of repayment plans listed in 20 U.S.C. § 1087e(d)(1)(A)-(E) create a menu of five partially overlapping options, all to be designed by the Secretary, from which "[t]he borrower may choose." Each comes with different statutory (and regulatory) authority, criteria, and limits. So the restrictions on the "partial hardship exception" authority in § 1087e(d)(1)(E)—in particular, how far above or below the poverty line the Secretary may go in modifying repayment obligations under that exception, *see* Pls.' Br. at 18—do not apply to the other four options. Plaintiffs' own authority supports this common-sense approach. *See id.* at 18 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013))).

If anything, taking the *expressio unius* canon seriously favors Defendants' position. That is because there are several places in the HEA that *do* include the sort of cost limitations that do not appear in (but that Plaintiffs want this Court to read into) the text of the provisions at issue in this case. For example, 20 U.S.C. § 1087e(d)(4) allows for the creation of "an alternative repayment plan," but also requires "the Secretary [to] ensure that such plans do not exceed the cost to the Federal Government . . . of loans made using" certain other plans. Other examples abound. *See, e.g.*, 20 U.S.C. § 1078-1(b)(2)(B) ("[I]n no case may the cost to the Secretary of the agreement . . . exceed the cost to the Secretary . . . in the absence of the agreement."); *id.* § 1087e(b)(9)(A) ("may be offered only if the Secretary determines the reductions are cost neutral"); *id.* § 1087e(b)(9)(B) ("The Secretary shall not prescribe such regulations in final form unless an official report from the Director of the Office of Management and Budget to the Secretary and a comparable report from the Director of the Congressional Budget Office to the Congress each certify that any such reductions will be completely cost neutral."); *id.* § 1087i (authorizing the Secretary "to sell loans," but then providing that "any such

sale shall not result in any cost to the Federal Government"). It is Plaintiffs, not Defendants, who rely on implicit cost limitations "other than the ones expressly listed in the statute." Pls.' Br. at 19.

Plaintiffs' second canon is what they call "the presumption against radical changes from past practice." *Id.* (citing one case). That is simply a repackaged version of Plaintiffs' arguments about the major-questions doctrine, which Defendants address more fully below. *See infra* at 26-29. For now, it suffices to say that the factual premise is incorrect—the plan does not reflect any "radical change[] from past practice," given the long history of income-contingent repayment plans created by the Secretary, which have always included loan forgiveness. *See supra* at 3-4.

Third, Plaintiffs argue that the HEA "must be read in conjunction with other statutes governing debts and obligations owed to the federal government," Pls.' Br. at 19-20, though they only identify one: the Federal Claims Collection Act (FCCA). That statute, as a general matter, provides that all federal agencies "[s]hall try to collect a claim of the United States Government," though it also acknowledges circumstances in which an agency "may compromise" such a claim. 31 U.S.C. § 3711(a). But the SAVE Plan "is not the implementation of the Department's authority to compromise claims, it is an implementation of the Department's authority to prescribe income contingent repayment plans," 88 Fed. Reg. at 43,834, which is governed by the far more specific language in 20 U.S.C. § 1087e(d)(1)(D). *See Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21-22 (2012) (discussing "the ancient interpretive principle that the specific governs the general").

### 2.   *The major-questions doctrine does not warrant a different result.*

The normal tools of statutory interpretation thus favor the Secretary's reading. But Plaintiffs move the goalposts, arguing that the major-questions doctrine requires not just congressional authorization, but "*clear* congressional authorization" for the Secretary's action. Pls.' Br. at 10-11 (emphasis added). That is because, on Plaintiffs' view, the agency has "invoke[d] broad authority over" a "matter[] of great economic or political significance." *Id.* at 11 (citing *West Virginia v. EPA*, 597 U.S. 697, 721-22 (2022)). But whether or not that doctrine applies here, Plaintiffs' claims still fail.

**a.** For all the reasons above, Congress *did* provide sufficiently "clear" authorization for the Rule, by authorizing the creation of "an income contingent repayment plan," with certain specified

textual requirements, all of which are satisfied here.  20 U.S.C. § 1087e(d)(1)(D).  So the Court could—and, in Defendants' view, should—resolve this case by holding that, whether or not the major-questions doctrine applies, there is sufficiently "clear congressional authorization" to satisfy it.  After all, the "the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation."  *Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring).

      **b.**  *Biden v. Nebraska*—a statutory-interpretation case about a different statute—is not to the contrary.  Defendants acknowledge the Supreme Court's statement that "[t]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* at 2375 (quoting *West Virginia*, 597 U.S. at 730).  For that reason, the Court stated that the major-questions doctrine applied to the Secretary's invocation of different statutory authority to adopt a different loan-forgiveness plan, which the Court held exceeded the agency's authority under that statute.  *See id.*  But the majority also made clear that its holding was limited to the program before the Court, which relied on the HEROES Act.  *See Nebraska*, 143 S. Ct. at 2371 n.5 ("We decide only the case before us.").  And in another case decided the same day, a unanimous Supreme Court correctly explained that "HEROES Act loan relief and HEA loan relief function independently of each other."  *Brown*, 600 U.S. at 567.  So the Supreme Court has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA."  *Id.* at 565 n.2.

      In addition, there are several material distinctions between *Nebraska* and this case.  The most obvious is the starting point of the analysis, which is "the text of the statute."  *Bartenwerfer*, 598 U.S. at 74.  "The HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to'" certain student-loan programs "'in connection with a war or other military operation or national emergency.'"  *Nebraska*, 143 S. Ct. at 2368 (quoting 20 U.S.C. § 1098bb(a)(1)).  The word "modify," the Court held, "does not authorize basic and fundamental changes."  *Id.*  "Instead, that term carries 'a connotation of increment or limitation,' and must be read to mean 'to change moderately or in minor fashion.'"  *Id.* (citation omitted).  But none of that is true of the relevant HEA provision, 20 U.S.C. § 1087e(d)(1)(D), which is not constrained by words like "modify," which carry any comparable "connotation of increment or limitation."  *Id.* at 2368.

Second, much of the Court's analysis in *Nebraska* was about the unprecedented nature of the "waivers and modifications" issued by the Secretary under the HEROES Act, which differed in kind—not just in dollar amount—from previous invocations of that authority. As the Court explained, "[p]rior to the COVID-19 pandemic, 'modifications' issued under the [HEROES] Act implemented only minor changes, most of which were procedural." *Id.* at 2369. "Examples include reducing the number of tax forms borrowers are required to file, extending time periods in which borrowers must take certain actions, and allowing oral rather than written authorizations." *Id.* In the plan at issue in *Nebraska*, however, in the Court's view, the Secretary had "created a novel and fundamentally different loan forgiveness program." *Id.*; *see also id.* ("The Secretary's plan has 'modified' the cited provisions only in the same sense that the French Revolution 'modified' the status of the French nobility—it has abolished them and supplanted them with a new regime entirely.").

Again, none of that is true here. Before the SAVE Plan, the agency had used this HEA authority three times since its enactment: (1) to create the first income-contingent repayment plan in 1994, *see* 59 Fed. Reg. at 61,664; (2) to create the PAYE plan in 2012, *see* 77 Fed. Reg. at 66,088; and (3) to create the REPAYE plan in 2015, *see* 80 Fed. Reg. at 67,204. To be sure, those programs were smaller in scope than the SAVE Plan. But all three included similar and significant loan forgiveness, after a borrower completed a designated period in repayment. *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the ICR plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period. In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. at 67,209 ("[T]he REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven."). In other words, this is not "a novel and fundamentally different loan forgiveness program" that differs in kind from prior agency practice. *Nebraska*, 143 S. Ct. at 2369. Indeed, it is ultimately a revision to the REPAYE plan itself, which has been in effect for nearly a decade.

Third, *Nebraska* turned, at least in part, on the Supreme Court's skepticism that COVID-19—at least as the "pandemic wind[ed] down to its end," 143 S. Ct. at 2374—was the sort of "war or other

military operation or national emergency" that Congress had in mind, 20 U.S.C. § 1098bb(a)(1), when it enacted the HEROES Act in the aftermath of September 11th.  *Compare Nebraska*, 143 S. Ct. at 2364 (referencing President Biden's statement that "the pandemic is over"), *with id.* at 2363 (multiple references to "the September 11 terrorist attacks"); *see also* Pls.' Br. at 4 (calling the HEROES Act a "statute Congress passed in the wake of 9/11").  In that sense, it is of a piece with a series of pandemic-era opinions in which the Supreme Court scrutinized Executive Branch invocation of "emergency" powers.  *See, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 113 (2022) (OSHA vaccine mandate); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021) (CDC eviction moratorium).

Yet again, none of those concerns apply here.  This Rule has nothing to do with any "national emergency" authority, *Nebraska*, 143 S. Ct. at 2364, nor did any of three similar rules that the Secretary previously issued under this statute.  For all these reasons, this Court should take the Supreme Court at its word: it has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA." *Brown*, 600 U.S. at 565 n.2.

**3.**     *There is no constitutional doubt that warrants departure from the statutory text.*

After developing their statutory-interpretation arguments, Plaintiffs cram three constitutional objections into the final page of their statutory merits argument, arguing that "[t]he constitutional-doubt canon requires this Court to interpret the Final Rule in a way that avoids these severe constitutional problems."  Pls.' Br. at 21.

Plaintiffs' drive-by constitutional arguments should be rejected.  As a threshold matter, such a cursory and undeveloped presentation is insufficient to preserve these arguments, which are thus forfeited.  *See, e.g.*, *Youngberg v. Gen. Motors LLC*, No. 22-7047, 2023 WL 7126422, at *4 (10th Cir. Oct. 30, 2023) ("cursory references" to an argument "did not adequately raise the issue before the district court"); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1207 (10th Cir. 2022) (even if a litigant "did proffer some sort of a general, underdeveloped . . . theory in the district court," it "has still forfeited the theory by its skeletal and inadequate presentation").  Particularly in the context of a motion in which Plaintiffs bear the burden to show they have a "clear and unequivocal" right to relief, *Dominion*

*Video*, 356 F.3d at 1261, one paragraph per embedded constitutional sub-theory is a thin reed on which to rest a request for nationwide relief.

In addition, the constitutional avoidance canon has no application where, as here, there is no relevant statutory ambiguity. *See, e.g.*, *DHS v. Thuraissigiam*, 591 U.S. 103, 133 (2020); *see supra* at 18-19. After all, although "[s]tatutes should be construed to avoid constitutional questions," "this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature." *Salinas v. United States*, 522 U.S. 52, 59-60 (1997) (quotation omitted).

Regardless, if the Court wishes to engage on any or all of Plaintiffs' constitutional-doubt arguments, each is meritless. First, without explicitly identifying it by name or citation, Plaintiffs seem to invoke the Appropriations Clause, paraphrasing it to mean that "the Constitution . . . prohibits any government expenditures that are not authorized by Congress." Pls.' Br. at 20. In fact, the text of the Appropriations Clause is more specific: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. Importantly though, "'[t]he Treasury' does not consist of all potential government revenue." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1359 (1988). Although the Supreme Court and others have recognized this distinction, Plaintiffs ignore it. *See, e.g.*, *OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress." (quotation omitted)); *Affordable Bio Feedstock, Inc. v. United States*, 42 F.4th 1288, 1292 (11th Cir. 2022) ("[t]he only relevant fact is that this money is currently within the Federal Treasury"). And here, the discharge of student-loan debt does not require any "Money" to "be drawn from the Treasury." U.S. Const., art. I, § 9, cl. 7. At least under the Appropriations Clause, that is dispositive. In any event, Congress *has* authorized the agency actions at issue here, *see supra* at 18-26, including by "ma[king] available . . . such sums as may be necessary" for the administration of the federal student-loan program. 20 U.S.C. § 1087a(a); *see also id.* §§ 1087b, 1087e(h), (m); 2 U.S.C. § 661c(c). That is enough to satisfy the Appropriations Clause, if it applies.

Second, Plaintiffs assert that "there are no precedents for an agency rule expending over $100 billion dollars without Congressional authorization." Pls.' Br. at 20. The question of congressional

authorization goes to Plaintiffs' other arguments, which Defendants have already addressed.  But as for the price tag, even accepting Plaintiffs' cost estimate, they never identify any constitutional provision that would be violated solely on the basis that the agency's action is expensive.

Third, over two sentences and citing no authority, Plaintiffs assert that there are "substantial doubts as to whether § 455 satisfies the non-delegation doctrine" because, in their view, it "supplies no obvious intelligible principle."  *Id.* at 21.  This argument is foreclosed by binding precedent. Although Congress has delegated authority "[f]rom the beginning of the government," *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020) (quoting *United States v. Grimaud*, 220 U.S. 506, 517 (1911)), the Supreme Court "has invalidated statutes under the nondelegation doctrine only twice, both times in 1935." *United States v. Brown*, 348 F.3d 1200, 1216-17 (10th Cir. 2003).  In the intervening 90 years, the Supreme Court has upheld every delegation it has confronted, including delegations to regulate in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932)); to set "fair and equitable" prices and "just and reasonable" rates, *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944), *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944)); and to issue whatever air quality standards are "requisite to protect the public health," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting 42 U.S.C. § 7409(b)(1)).  The relevant delegations here are far more specific and circumscribed than those that have been upheld by the Supreme Court—which is why the parties have devoted so many pages to debating their intricacies. *See supra* at 18-26; Pls.' Br. at 14-21.

### B.    Plaintiffs are not likely to succeed on their other APA claims.

#### 1.    *Policy disagreements with the agency do not support an arbitrary-and-capricious claim.*

The APA directs that an agency action be set aside if it is arbitrary or capricious.  5 U.S.C. § 706(2)(A).  Plaintiffs' efforts notwithstanding, the APA does not permit the courts to become arenas of policymaking of second resort.  Nor does it permit a court to substitute its own—or a plaintiff's— judgment for that of the agency.  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Rather, the scope of inquiry is "narrow."  *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009).  A reviewing court's task is only to determine whether an agency has engaged in "reasoned decisionmaking,"

*Michigan v. EPA*, 576 U.S. 743, 750 (2015), by asking if the agency considered "the relevant factors and whether there has been a clear error of judgment." *Ctr. for Biological Diversity v. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023) (quoting *Citizens Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)).  The burden of persuasion falls on the challenger, as the agency's decision is entitled to a presumption of regularity. *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) (quoting *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011)).

 Plaintiffs try to wedge their substantive policy disagreements with the agency into the APA's narrow lane for arbitrary-or-capricious review, taking aim at the Final Rule's consideration of costs, at its treatment of state reliance interests, and with assorted "other reasons." Pls.' Br. at 22-26.  The Court should rebuff these attempts.

 **a.**  One variety of arbitrary-and-capricious decisionmaking arises when an agency "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Plaintiffs assert that the Department committed such an error when it failed to consider the downstream cost effects of the Supreme Court's decision in *Nebraska*—which the Court handed down after the Secretary signed the Final Rule and sent it to the Federal Register for publication, but before that publication took place.  Schlichter Decl. ¶ 3.  On Plaintiffs' view, "[m]any borrowers who would have had their loans forgiven under the HEROES plan are now eligible to have their loans forgiven under the Final Rule," the Department supposedly erred in not accounting for the costs of the former program in its cost-benefit analysis. Pls.' Br. at 22.

 A threshold obstacle to this argument lies in its unreviewability.  The HEA itself does not require *any* cost-benefit analysis, let alone a perfect one. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981) ("When Congress has intended that an agency engage in cost-benefit analysis, it has [generally] clearly indicated such intent on the face of the statute.").  Here, the only reason the agency was obligated to conduct a cost-benefit analysis at all was for internal Executive Branch purposes, in accordance with Executive Order 12,866. *See* 88 Fed. Reg. at 43,867.  But Executive Order 12,866 creates no rights enforceable by litigation plaintiffs outside the Executive Branch.  E.O. 12,866, prmbl.  Accordingly, that analysis is not subject to judicial review. *See, e.g., Nat'l Truck Equip.*

*Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013) ("Executive Order 12,866 does not create judicially enforcement rights, nor does it provide a basis for rejecting final agency action."); *Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (rejecting plaintiff's argument that "it does not seek to assert rights under the order but is merely referencing it to provide evidence of the arbitrary and capricious nature of the . . . decision," calling it "nothing more than an indirect—and impermissible—attempt to enforce private rights under the order"). So any errors in that analysis cannot be the basis for a conclusion that the Rule is arbitrary and capricious under the APA.

Even were the cost-benefit argument reviewable, it fails on the merits. To start, the Secretary signed the Final Rule on June 14, 2023, and his subordinates sent it to the Federal Register for publication later that day. Schlichter Decl. ¶ 3. Because that was two weeks before *Nebraska* was released, the factual development that Plaintiffs claim the agency failed to consider had not even happened yet, as of the date that the Rule was finalized and signed by the Secretary. Subsequent factual developments cannot be held against the agency through the lens of hindsight. Instead, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan*, 576 U.S. at 758); *see also, e.g.*, *N.M. Health Connections v. HHS*, 946 F.3d 1138, 1161-62 (10th Cir. 2019) ("Our review is limited to the administrative record, including all materials compiled by the agency that were before the agency at the time the decision was made.").[12]

In any event, Plaintiffs' argument is without merit. Pls.' Br. at 22. In its summary of comments pertaining to the HEROES Act plan and the *Nebraska* litigation, the Department expressly noted that one commenter suggested producing "a secondary cost estimate in the event that the loan cancellation plan does not go into effect." 88 Fed. Reg. at 43,875. The Department responded, "[o]ur cost estimates account for the Department's current and anticipated programs and policies." *Id.* The Department thus explicitly considered and declined an invitation to prepare an alternative cost-benefit

---

[12] This timeline further refutes Plaintiffs' overheated rhetoric about how the SAVE Plan was issued in "defiance of the Supreme Court," Compl. at 3—again, the NPRM was published in January 2023, 88 Fed. Reg. 1894, and the agency completed its work on the Rule in mid-June 2023, Schlichter Decl. ¶ 3, both well before *Nebraska*.

analysis, instead referring to its extensive considerations of cost and reaffirming the Secretary's multipart effort to reduce student-loan burdens. *See State Farm*, 463 U.S. at 43; *Am. Petroleum Inst. v. Dep't of Interior*, 81 F.4th 1048, 1063 (10th Cir. 2023). That the Department expressed confidence in its chances of prevailing in *Nebraska* is unsurprising and legally irrelevant, even if that confidence turned out in hindsight to be misplaced. Pls.' Br. at 22; 88 Fed. Reg. at 43,875.

In the alternative, were the Court inclined to disagree, to grant relief it would also be required to find that prejudice resulted from this error. *Prairie Band Pottawatomie Nation v. FHA*, 684 F.3d 1002, 1008 (10th Cir. 2012) (citing 5 U.S.C. § 706). That is because the APA provides that "due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706, which is like "an administrative law harmless error rule," *Little Sisters of the Poor*, 591 U.S. at 684 (alteration and citation omitted). Accordingly, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand." *PDK Lab'ys, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). "The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence." *Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015); *see also Shinseki v. Sanders*, 556 U.S. 396, 409-11 (2009) (explaining that the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").

To find the agency's consideration of cost prejudicially erroneous here would effectively require the assumption that the Department was unaware that its overall debt-relief program would come at a large financial cost. That assumption defies common sense. For both the President and the Secretary, reducing the crushing burdens of student-loan debt is an important priority, and the Department undertook this rulemaking and its prior action under the HEROES Act as part of a multiprong effort to alleviate those burdens. 88 Fed. Reg. at 1894; *Press Release, White House, FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022), https://perma.cc/R2ND-6RQJ. The HEROES Act plan held unlawful in *Nebraska* and the SAVE Plan at issue here both reflect efforts to advance those policy priorities. 88 Fed. Reg. at 43,820; 87 Fed. Reg. at 61,512. There is little reason to think, then, that the Secretary would have found the additional costs not to be worthwhile if they were tied to this Rule, rather than to the prior plan.

**b.**  Changing tack, Plaintiffs assert that the Department failed to consider their reliance interests on tax revenue and on the recruitment benefits of the PSLF program, as well as on the inflationary effects of the Final Rule, rendering its action arbitrary and capricious.  Pls.' Br. at 23-24, 26.  Those contentions are without merit.

As the Rule details at some length, the agency received comments from individuals concerned that the plan would have "significant State-level budgetary implications because of the loan forgiveness provisions."  88 Fed. Reg. at 43,877.  It also noted comments from individuals concerned that "borrowers may now be less inclined to pursue Public Service Loan Forgiveness (PSLF) since the greater generosity of the proposed plan would make that kind of relief less necessary."  *Id.* at 43,879.  Likewise, the Department documented comments "arguing that the IDR NPRM failed to consider the potential effects of the proposed changes on inflation."  *Id.*

In each instance, the agency responded to the comments raising these issues.  In declining to make any responsive changes regarding tax revenues, it explained that "a minority of States tax student loan forgiveness," and that the small number of borrowers on IDR plans to date had not established, in the agency's view, any significant evidence of those States' reliance on tax revenues that might be lost under the SAVE Plan.  *Id.* at 43,877.  And "[b]ecause only the original ICR plan has been around long enough for borrowers to reach the required number of monthly payments for forgiveness, only a few borrowers have earned forgiveness through an IDR plan."  *Id.*  Accordingly, there existed no meaningful reliance interest, as States could not have accounted for a rise in that number.  *Id.*

The same is true for the Department's consideration of impacts the Rule might have on the PSLF program and on inflation.  Pls.' Br. at 23-24, 26.  The Department considered but was unconvinced by concerns about PSLF, explaining that the commenters had provided no analysis of these purported effects, that revised repayment provisions of the Rule would benefit PSLF program participants, and that PSLF remained a program with valuable potential benefits to borrowers, the SAVE Plan's benefits notwithstanding.  88 Fed. Reg. at 43,880.  In the same vein, the Department referred commenters concerned about inflation to its regulatory impact analysis, which "captured the costs and benefits that [it thought were] most likely to be affected by this final rule."  *Id.* at 43,879.

These discussions more than satisfy any legal obligation the agency had to consider state reliance on tax revenues from forgiven loans, on PSLF as a recruitment tool, and on inflation. *Am. Petroleum Inst.*, 81 F.4th at 1063 ("Reasonable minds may differ on the desirability of proceeding with the decision despite these costs, but that is not enough to show that [the agency] 'failed to *consider* an important aspect of the problem' or the relevant factors." (quotation omitted)).

    **c.** Plaintiffs end their assertions of arbitrary-and-capricious decisionmaking with various arguments recast from other sections of their motion into procedural terms. Pls.' Br. at 24-26. First, they aver, the Rule "changes course from nearly thirty years of Department practice on loan forgiveness." *Id.* at 24. Even assuming the truth of that (incorrect) statement, this theory fails—it is black-letter administrative law that agencies are permitted to depart from prior policies so long as they reasonably explain such departures. *Fox Television Stations*, 556 U.S. at 514. Even so, the historical record, which was detailed in the Final Rule, flatly contradicts the notion that the Rule represents an aberration from past practice. *See, e.g.*, 88 Fed. Reg. at 43,829 ("Forgiveness of the remaining loan balance after an established time has been a part of the IDR plans since the creation of the Direct Loan Program in 1993-1994." (footnote omitted)); *supra*, at 3-4.

    On the subject of historical practice, Plaintiffs' brief is ultimately at war with itself. Eventually conceding the existence of this past agency precedent, Plaintiffs change course and insist that allowing an agency "to rely exclusively on past practices 'would greenlight the aggregation of Executive power through adverse possession.'" Pls.' Br. at 25 (quoting *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 241 (5th Cir. 2024)). In other words, on Plaintiffs' view, unprecedented agency actions are unlawful, but prior agency precedent is also meaningless—heads Plaintiffs win, tails Defendants lose. Moreover, they add, unprecedented agency action should raise questions about the agency's authority to act at all. *Id.* The Court should (at best) treat these arguments as challenges to the Department's legal authority, *see supra* at 18-31, and analyze them accordingly.

    Finally, Plaintiffs try to raise "internal contradictions" in the rule. Pls.' Br. at 25-26. Again, neither the law nor the facts are on Plaintiffs' side. "The fact that the administrative record contains some evidence arguably contrary to the [agency's] findings . . . does not render [its] decision arbitrary

and capricious." *Pennaco Energy, Inc. v. Dep't of Interior*, 377 F.3d 1147, 1159 (10th Cir. 2004). And a court does not sit as a factfinder of first resort in an APA case. Rather, it must uphold the agency's factual findings so long as they are supported by substantial evidence. *Id.* at 1156; 5 U.S.C. § 706.

In any event, here, no contradiction lies in any of the facts Plaintiffs cite. Plaintiffs fault the agency for seeking to reduce future delinquencies and defaults while acknowledging that prior changes to the income-driven repayment plan have not fully succeeded in doing so. Pls.' Br. at 25. That one set of changes to REPAYE in 2015 did not reduce defaults thereafter has no bearing on the changes outlined in the Rule, which are distinct. Nor does that fact undermine the need for further revisions to assist borrowers; if anything, it underscores a continuing need. But even if the Court perceived a contradiction, the Department's finding that reducing monthly payments reduces the likelihood of default is supported by substantial evidence (indeed, it is a matter of common sense). *Prometheus Radio Project*, 592 U.S. at 426; 88 Fed. Reg. at 43,881-85. That is enough.

### 2.    *The agency provided notice and an opportunity to comment.*

a.    The APA "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "First, the agency must issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register." *Id.* (quoting 5 U.S.C. § 553(b)). Second, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'" *Id.* (quoting 5 U.S.C. § 553(c)). "Third, when the agency promulgates the final rule, it must include . . . 'a concise general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. § 553(c)). The Supreme Court has "held that generally speaking this section of the [APA] established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). Although "[a]gencies are free to grant additional procedural rights in the exercise of their discretion," "reviewing courts are generally not free to impose them if the agencies have not chosen to grant them." *Id.*

The *Vermont Yankee* principle is fatal to Plaintiffs' notice-and-comment claim, which quibbles with the length of the agency's comment period. The APA "does not specify a minimum time for submission of comments in an informal rulemaking." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984). To the contrary, as the Tenth Circuit has explained, some "opportunity to participate is all that the APA requires." *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986). Therefore, courts generally lack the authority to arbitrarily impose some minimum required comment-period length. *See id.* (citing *Vt. Yankee*, 435 U.S. at 543); *Wyoming v. USDA*, 661 F.3d 1209, 1239 (10th Cir. 2011) (a court-ordered extension of a time period "would violate the well-settled principle articulated by the Supreme Court in *Vermont Yankee* 'that the formulation of procedure is to be basically left within the discretion of the agencies'" (quoting *Phillips*, 803 F.2d at 559)); *see also, e.g.*, *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 534 (D.C. Cir. 1982) ("We cannot say that the NRC's choice of a [30-day] comment period was unreasonable. Neither statute nor regulation mandates that the agency do more.").

Plaintiffs rely on out-of-circuit authority and forty-year-old nonbinding guidance from the Administrative Conference of the United States for the proposition that the agency should have "permitted at least sixty days of comments." Pls.' Br. at 28. But although it goes unmentioned in Plaintiffs' brief, that is not the law in the Tenth Circuit, which has recognized that "[c]ourts have uniformly upheld comment periods of 45 days or less." *Phillips*, 803 F.2d at 559 (citing *Conn. Light & Power Co.*, 673 F.2d at 534 (30 days)). That precedent is binding here, whether or not the agency could have offered a longer comment period, in its discretion.[13]

**b.** In the alternative, any procedural notice-and-comment error was harmless. *See Little Sisters of the Poor*, 591 U.S. at 684. Nothing material would have changed had the agency offered a 60-day comment period instead of a 30-day comment period. In fact, none of these Plaintiffs even bothered to comment at all, and they nowhere suggest that their failure to participate had anything to do with the need for another 30 days. While Plaintiffs sat on the sidelines, the agency "received over 13,600

---

[13] Plaintiffs also cite (at 27-28) Executive Orders issued by Presidents Clinton and Obama. But those Executive Orders did not create judicially enforceable obligations, *see* Exec. Order 12,866 § 10; Exec. Order 13,563 § 7, *supra* at 32-33, and in any event they "do not require a 60-day comment period," as the agency explained in the Final Rule, 88 Fed. Reg. at 43,821.

written comments," 88 Fed. Reg. at 43,821, including about issues that are now the subject of this litigation.  That is all in addition to the "5,300 public comments" that the agency received "as part of the public hearing process" required by the HEA's negotiated-rulemaking provisions, *id.*—which Plaintiffs do not dispute that the agency complied with fully, and that the Supreme Court has described as "a lengthy deliberative process involving many stakeholders." *Brown*, 600 U.S. at 557.  Plaintiffs identify no novel issues that they (or anyone) would have raised during a longer comment period.

Plaintiffs do assert, in one conclusory sentence, that the length of the comment period "prevented the States from developing their arguments regarding reliance interests and the Department's wildly inaccurate cost estimates."  Pls.' Br. at 28-29.  That factual assertion is accompanied by no sworn statement, nor any explanation of why not one of these eleven States had time to comment within 30 days—that is, on an action that they now describe as raising "major questions" that require expeditious attention from this Court.  But even if the statement is true, those issues were aired before the agency, which addressed each of them at length in the Rule.  *See supra* at 31-36.  So "it would be senseless to vacate and remand" (or issue an injunction) on this basis, just to force the agency to say the same things again.  *PDK Lab'ys*, 362 F.3d at 799.

### C.    Plaintiffs have not shown irreparable harm.

**1.**  A preliminary injunction requires more than a mere possibility of irreparable harm.  *Winter*, 555 U.S. at 22.  Plaintiffs must show certainly impending injury "of such imminence that there is a clear and present need for equitable relief."  *Colorado v. EPA*, 989 F.3d 874, 884 (10th Cir. 2021) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005)).  Here however, despite the requirement to show (not just allege) irreparable harm, Plaintiffs rest on the same threadbare allegations and meager exhibits that fail even to establish standing.  In fact, they narrow their claims of irreparable injury to two:  lost tax revenue and missed recruitment and retention opportunities.  Pls.' Br. at 29-30; *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (describing the irreparable-injury showing as more stringent than injury-in-fact).  Once again, those assertions are insufficient.

Take the tax-revenue argument first.  Self-inflicted injuries do not establish irreparable harm for a preliminary injunction.  *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).  As explained above, the States possess the ability to alter their tax codes (now or later) to tax the income they claim they fear they will lose forever.  *See supra* at 9-12.  Nor do speculative injuries fit the bill.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  Plaintiffs have not shown that the Final Rule will have any obvious effect on the attractiveness of their state and local public-service positions, *see supra* at 12-15, much less the "clear and unequivocal showing" of likely and imminent irreparable harm that equity demands.  *Colorado*, 989 F.3d at 886.

**2.**  Plaintiffs' claim of irreparable harm fails for an additional, independent reason: their significant delay in seeking this purportedly time-sensitive relief.  "[A] party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  For that reason, "delay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction."  *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984); *accord RoDa Drilling Co.*, 552 F.3d at 1211 ("[C]ase law dictates that 'delay in seeking preliminary relief cuts against finding irreparable injury.'" (quoting *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543-44 (10th Cir. 1994))).

Plaintiffs challenge an agency rule that was published in the Federal Register over nine months ago, on July 10, 2023.  *See* 88 Fed. Reg. at 43,820.  And even *after* Plaintiffs' counsel announced an intent to file the lawsuit in an online editorial, Plaintiffs waited an additional month to actually sue. *See supra* at 7.  Courts within the Tenth Circuit and around the country have rejected claims of irreparable harm because of delays that are comparable to (or shorter than) Plaintiffs' nine-month delay here.  *See, e.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."); *Weight Watchers Int'l v. Luigino's*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction.") (citation omitted); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction,

calling six months "a long delay in seeking relief" that "indicates that speedy action is not required") (citation omitted); *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (affirming denial of preliminary-injunction after plaintiffs "wait[ed] two months . . . to make the request," because "[s]uch a delay is inconsistent with a claim of irreparable injury"); *Salient Power Sols., LLC v. Cullari Indus.*, LLC, No. 1:23-cv-479, 2023 WL 3847307, at *3 (D. Colo. June 6, 2023) (plaintiffs' "considerable three-month delay in filing this TRO motion undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury"); *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1246 (D.N.M. 2008) (two-week delay from filing lawsuit to seeking preliminary injunction "considerably undercut[ ] their allegation of irreparable harm"); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004) ("The court finds that Plaintiffs' [five-month] delay belies any irreparable injury to their rights."), *aff'd*, 425 F.3d 1249 (10th Cir. 2005).

Plaintiffs' nine-month delay here likewise weighs against their request for extraordinary time-sensitive relief. *See* Mem. & Order, ECF No. 17, *Missouri v. Biden*, No. 4:24-cv-00520 (E.D. Mo. April 24, 2024) (in resolving a scheduling dispute in another lawsuit challenging this program, pointing to a similar delay in "find[ing] that Plaintiffs' urgency is of their own making").

### D.    A preliminary injunction would be contrary to the public interest.

Where the federal government is the defendant in a suit seeking a preliminary injunction, the two latter factors of the *Winter* test merge into a single consideration: would an injunction, on balance, serve the public interest? *Nken*, 556 U.S. at 435. The public interest in this case favors Defendants. Certain harm to borrowers and, by extension, to the American public would result from putting the Rule's forgiveness provisions—debuted, it bears repeating, almost a year ago—on hold now. Unlike Plaintiffs, Defendants have identified certainly impending, serious harms in the form of student-loan defaults, 88 Fed. Reg. at 43,881, delinquency, *id.* at 43,882, adverse effects on credit scores, *id.*, decreased liquidity for important purchases, *id.*, decreased enrollment in higher education, *id.* at 43,883, drags on national economic growth, *id.* at 43,884, and increased reliance on federal welfare programs, *id.* The public can expect to suffer more of these harms without the Rule's timely implementation.

Weighed against, say, uncertain injuries to an unidentified instrumentality in an unknown state, it is easy to see where the public interest lies. *See Winter*, 555 U.S. at 23-24, 26 (finding harm to the public interest dispositive in denial of a preliminary injunction).

Moreover, the public interest would not be served by a preliminary injunction modifying the status quo. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held"); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc) (preliminary injunctions altering the status quo are "historically disfavored"). As much as Plaintiffs would like to cast themselves as white knights arriving just in time, in reality the Secretary began to implement early loan forgiveness in February, just as the public was notified that he would. 88 Fed. Reg. at 43,821. An injunction disrupting this ongoing plan would result in chaos and uncertainty.

## III.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

For the reasons above, the Rule is lawful. Nevertheless, should the Court conclude otherwise, the relief that Plaintiffs request is overbroad, for several independent reasons.

### A.    Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing.

Plaintiffs call on the Court to exceed longstanding constitutional and historical limits on its equitable powers by issuing a nationwide injunction. Pls.' Br. at 1, 31-32. The Court should decline that invitation, even if Plaintiffs were to prevail on every other issue.

Article III demands that "a plaintiff's remedy . . . be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 752 (10th Cir. 2011) ("It is well settled that an injunction must be narrowly tailored to remedy the harm shown." (quoting *Garrison v.*

*Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002))).  Thus, English and early American courts of equity typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).  These same principles suggest that any equitable relief issued here must be limited to any Plaintiff State that can establish standing, doubtful though that proposition may be.  *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *see also Labrador v. Poe*, 144 S. Ct. 921, 923 (Mem.) (2024) (Gorsuch, J., concurring) ("The district court's universal injunction defied [equity's] foundational principles.  It did not just vindicate the plaintiffs' access to the drug treatments they sought.  It purported to bar the enforcement of 'any provision' of the law against anyone." (internal citation omitted)); *see also Texas*, 599 U.S. at 693-702 (Gorsuch, J., concurring) (suggesting that the same limitations apply to actions seeking vacatur under the APA); *Arizona v. Biden*, 40 F.4th 375, 396-97 (6th Cir. 2022) (Sutton, C.J., concurring) (similar).

Honoring the remedial bounds of equity in this case would also mean limiting any injunctive relief not only to any Plaintiff State that can show standing, but to the specific provisions of the Rule allegedly causing harm.  *Lewis*, 518 U.S. at 357 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").  Here, the only relevant provision shortens the maximum repayment period for REPAYE loans, thus accelerating loan forgiveness.  88 Fed. Reg. at 43,903.  And Plaintiffs have not offered any serious argument that any other features of the Rule are unlawful, so the Court should leave them intact for that reason alone.

All of Plaintiffs' arguments to the contrary lack merit.  Quoting the Eighth Circuit's decision in the HEROES Act litigation, they appear to claim that "contested facts" render tailoring an injunction to the Plaintiff States alone unworkable under these circumstances.  Pls.' Br. at 31 (quoting *Nebraska*, 52 F.4th at 1048).  But what precisely those facts are, or why they present difficulties at this juncture, is left to the imagination.  To the contrary, an injunction excluding residents of any Plaintiff States with standing from the Final Rule's loan forgiveness provisions (or with respect to any

borrowers whose loans are serviced by the unnamed Louisiana instrumentality) would be more workable than a nationwide injunction.

Moreover, Plaintiffs' failure to identify any instrumentality akin to MOHELA makes any present assessment of workability only speculative. Central to the Eighth Circuit's tailoring of relief was MOHELA's "national role in servicing" federal student loan accounts, a role that purportedly made it "one of the largest nonprofit student loan secondary markets in America." *Nebraska*, 52 F.4th at 1048. Plaintiffs identify no similar facts here. Nor would undue unfairness follow from an injunction limited to Plaintiffs. They offer no evidence that would-be beneficiaries of the Final Rule would move across state lines to avail themselves of the Final Rule's coverage. Pls.' Br. at 31. As for the contention that an injunction would disadvantage Plaintiffs' own residents, such a consequence is attributable to no more than the States' own decision to bring this lawsuit. That our federal system makes the States answerable to citizens for the policy choices of the former is a feature, not a bug. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("This federalist structure . . . makes government more responsive by putting the States in competition for a mobile citizenry."). The Court should not shift that practical burden onto the federal government (including the federal judiciary).[14]

### B.      The Final Rule is severable.

At a minimum, to the extent the Court concludes that only some portions of the Rule are unlawful (or that only some portions cause Plaintiffs a cognizable Article III injury) it should still decline Plaintiffs' invitation to enjoin the Rule in its entirety. *See Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009) ("We may partially set aside a regulation if the invalid portion is severable."). Typically, "[w]hether the offending portion of a regulation is severable depends upon

---

[14] Plaintiffs' brief requests and argues for a nationwide preliminary injunction against the Final Rule. *See* Pls.' Br. at 31-32 ("The final rule should be stayed across the country while this Court examines the legality of Defendants' actions."). The cover motion, however, includes even broader language, seeking a nationwide injunction against the Rule, as well as "any form of student debt relief not expressly authorized by Congress." Pls.' Mot. for a Prelim. Inj. at 1, ECF No. 23. Plaintiffs have not even attempted to justify that additional measure of broad and amorphous relief, so Defendants do not address it further—other than to say that it resembles a request for an impermissible obey-the-law injunction. *See, e.g.*, *Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 668 (10th Cir. 1990).

[1] the intent of the agency and [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Ariz. Pub. Serv. Co.*, 562 F.3d at 1122 (same). This Rule satisfies both requirements.

As for "the intent of the agency," *MD/DC/DE Broads.*, 236 F.3d at 22, the Rule contains a lengthy discussion of the agency's explicit intent that the rule be severable. *See* 88 Fed. Reg. at 43,828-29. It "is composed of a series of distinct and significant improvements . . . that individually provide borrowers with critical benefits." *Id.* at 43,828. And, in the agency's view, "[e]ach of these new provisions standing independently is clearly superior to the current terms of REPAYE or any other IDR plan." *Id.* So the intent of the agency plainly favors severability.

The second and final severability question is "whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads.*, 236 F.3d at 22. Here again, the agency made explicit and detailed findings about why "each of the components of this final rule can operate in a manner that is independent and severable of each other." 88 Fed. Reg. at 43,828. And it provided specific "[e]xamples" that "highlight how this is the case," addressing virtually all significant features of the rule in various combinations. *Id.*; *see also, e.g., id.* ("increasing the income protection" while "maintain[ing] the interest benefit in the existing REPAYE plan"); *id.* ("consider the reduction in payments without the increased income protection"); *id.* ("the increased income protection by itself"); *id.* at 43,829 ("[p]roviding forgiveness after as few as 120 payments for the lowest balance borrowers"); *id.* ("the awarding of credit toward forgiveness for periods spent in different types of deferments and forbearances"). Plaintiffs offer no basis to question the agency's reasonable resolution of any of these complicated and policy-laden judgments about how parts of the Rule could function independently. Therefore, because enjoining only a portion of the Rule would still "leave a sensible regulation in place," *MD/DC/DE Broads. Ass'n v. FCC*, 253 F.3d 732, 735 (D.C. Cir. 2001), the Court should sever any unlawful portions of the Final Rule from the lawful remainder.

## C.   The Court lacks authority to enter relief directly against the President.

Plaintiffs have named President Biden as a defendant. Compl. ¶ 41. But "[w]ith regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President

to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866). Accordingly, if the Court does not dismiss the case in its entirety, it should at least dismiss the President as a defendant, and likewise should not include him within the scope of any injunction. *See, e.g., Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1254 (W.D. Okla. 2021); *Willis v. HHS*, 38 F. Supp. 3d 1274, 1278 (W.D. Okla. 2014); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 829 (N.D. Tex. 2022).

## **CONCLUSION**

For these reasons, the Court should grant Defendants' motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and deny Plaintiffs' motion for a preliminary injunction.

Dated: April 26, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*