# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS
# WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *et al.*, | ) | Civil Action No. 2024-CV-1057- |
| | ) | DDC- ADM |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOSEPH R. BIDEN, in his official capacity | ) | |
| as President of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

◆

## *AMICUS CURIAE* BRIEF OF THE BUCKEYE INSTITUTE
## IN SUPPORT OF PLAINTIFFS

◆

JEFF SHAW
Kan. Bar No. 29767
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Telephone: (913) 213-5018
Jeff@KansasJusticeInstitute.org

David C. Tryon*
Alex M. Certo*
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org
A.Certo@BuckeyeInstitute.org

*Pro Hac Vice Pending*

*Counsel for Amicus Curiae*
*The Buckeye Institute*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ................................................... 1

INTRODUCTION ............................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 4

ARGUMENT ....................................................................................................................... 5

    I.    Student loan borrowers are contractually bound to repay their loans—in full—by the terms of their Master Promissory Notes, and there is no statutory exception in this situation ........................................................................................................... 5

    II.   The Department lacks the statutory authority to institute its Loan Forgiveness Program ............................................................................................................... 9

    III. The Department's Loan Forgiveness Program violates the Appropriations Clause and the Property Clause by spending money and disposing of property belonging to the United States Treasury without congressional approval .......................... 12

        A.  Congress did not appropriate any funds for the Loan Forgiveness Program .............. 12

        B.  Only Congress can dispose of the student loan accounts receivable owned by the Treasury ...................................................................................................... 15

CONCLUSION .................................................................................................................. 16

CERTIFICATE OF SERVICE .......................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. United States*,
　526 F.2d 1127 (Ct. Cl. 1975) ............................................................................ 9, 16

*Biden v. Nebraska*,
　143 S. Ct. 2355 (2023) ........................................................................................ 1

*California v. Texas*,
　141 S. Ct. 2104 (2021) ........................................................................................ 8

*Cincinnati Soap Co. v. United States*,
　301 U.S. 308 (1937) ........................................................................................... 13

*Community Financial Services Ass'n of Am. v. CFPB*,
　51 F.4th 616 (5th Cir. 2022) ................................................................... 13, 14, 15

*Fansteel Metallurgical Corp. v. United States*,
　172 F.Supp. 268 (Ct. Cl. 1959) ........................................................................... 9

*Heckler v. Cmty. Health Servs. Of Crawford Cnty., Inc.*,
　467 U.S. 51 (1984) ............................................................................................. 8

*INS v. Chadha*,
　462 U.S. 919 (1983) ........................................................................................... 15

*Int'l Harvester Co v. United States*,
　342 F.2d 432 (Ct. Cl. 1965) ................................................................................. 9

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*,
　512 U.S. 218 (1994) ............................................................................................ 9

*Morison v. Olson*,
　487 U.S. 654 (1988) ........................................................................................... 15

*Office of Pers. Mgmt. v. Richmond*,
　496 U.S. 414 (1990) ........................................................................................... 13

*Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*,
　599 F.3d 1165 (10th Cir. 2010) ........................................................................... 15

*Royal Indem. Co. v. United States*,
　313 U.S. 289 (1941) .................................................................................. 8, 15, 16

*Texas Educ. Agency v. U.S. Dep't of Educ.*,
  992 F.3d 350 (5th Cir. 2021) ................................................................ 12

*Utah Power & Light Co. v. United States*,
  243 U.S. 389 (1917) ............................................................................. 8

*Whitman v. Am. Trucking Associations*,
  531 U.S. 457 (2001) ............................................................................. 9

**Statutes**

2 U.S.C. § 661c(a) .................................................................................. 14

20 U.S.C. § 1078–10 ............................................................................... 2

20 U.S.C. § 1078–11(a)(1)(B) ................................................................ 2

20 U.S.C. § 1087a(a) ............................................................................. 13

20 U.S.C. § 1087e(d)(1)(D) ............................................................... 9, 10

20 U.S.C. § 1087e(e) ............................................................................... 9

20 U.S.C. § 1087e(m)(1) .......................................................................... 2

20 U.S.C. § 1098e(a)(3) ......................................................................... 11

20 U.S.C. § 1098e(b) ............................................................................. 11

20 U.S.C. § 1098e(b)(7) ..................................................................... 2, 11

20 U.S.C. § 1987e(e)(5) ..................................................................... 9, 10

20 U.S.C. 1087e(h) .................................................................................. 7

20 U.S.C.A. § 1087e(f) ............................................................................ 3

20 U.S.C.A. § 1087e(l)(2) ........................................................................ 3

31 U.S.C. § 1301(a) ............................................................................... 13

31 U.S.C. § 1301(d) ............................................................................... 16

31 U.S.C. § 3701(b) ................................................................................. 8

31 U.S.C. § 3711(a) ................................................................................. 8

Omnibus Budget Reconciliation Act, § 4, 20 U.S.C. § 1087a (1993) ....................................... 1, 13

The Higher Education Act, 20 U.S.C.A. § 1070 et seq. .................................................................... 5

**Other Authorities**

2 *The Works of Alexander Hamilton* (Henry Cabot Lodge ed., 1904) ......................................... 15

Compl. Ex. A, *Latta v. U.S. Dep't of Educ.*, No. 2:22-cv-04255 (S.D. Ohio Dec. 1, 2022) ...... 5, 6

The Federalist No. 47 (James Madison) ........................................................................................ 15

The Federalist No. 48 (James Madison) ........................................................................................ 12

The Federalist No. 78 (Alexander Hamilton) ............................................................................... 12

U.S. Dep't of Educ., *Collections on Defaulted Loans*, Federal Student Aid,
    https://tinyurl.com/EDCollections ............................................................................................ 14

U.S. Dep't of Educ., *Default Rates*, Federal Student Aid, http://tinyurl.com/2w3pyf3d .............. 9

U.S. Dep't of Educ., *Issue Paper #6: Borrower Defenses to Repayment* (2021),
    http://tinyurl.com/32jwn43y ...................................................................................................... 7

U.S. Dep't of Educ., *Student Loan Delinquency and Default*, Federal Student Aid,
    http://tinyurl.com/yc6bn3vn ....................................................................................................... 7

U.S. Dep't of Educ., *Student Loan Forgiveness*, Federal Student Aid,
    https://studentaid.gov/manage-loans/forgiveness-cancellation .................................................. 12

*U.S. Department of Education Estimate: Biden-Harris Student Debt Relief to Cost an
    Average of $30 Billion Annually Over Next Decade*, U.S. Dep't of Educ. (Sep. 29,
    2022), https://tinyurl.com/2r2rwxjd .......................................................................................... 14

U.S. General Accountability Office, *The Government's Duty and Authority to Collect
    Debts Owed to it*, 2008 WL 6969346 ....................................................................................... 12

*U.S. Secretary of Education Miquel Cardona Statement on Fiscal Year 2023 Omnibus
    Appropriations*, U.S. Dep't of Educ. (Dec. 23, 2022), https://tinyurl.com/DOEFY2023 ......... 14

**Regulations**

31 C.F.R. § 901.1(a) ....................................................................................................................... 8

34 C.F.R. § 685.206 ....................................................................................................................... 7

34 C.F.R. § 685.222 ....................................................................................................................... 7

Improving Income Driven Repayment, 88 Fed. Reg. 43,820 (July 10, 2024) (to be
    codified at 34 C.F.R. §§ 682, 685) ...................................................................... 3, 4, 10, 11, 15

**Constitutions**

Const. art. I, § 9, cl. 7 ................................................................................................ 4, 12

Const. art. IV, § 3, cl. 2 ................................................................................................ 15

## STATEMENT OF INTERESTS OF *AMICUS CURIAE*

*Amicus curiae*, The Buckeye Institute, was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy in the states. The staff at Buckeye accomplish the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating sound free-market policy solutions, and promoting those policy solutions for implementation in Ohio and replication throughout the country. The Buckeye Institute is a non-partisan, non-profit, tax-exempt organization, as defined by I.R.C. section 501(c)(3). The Buckeye Institute's Legal Center files and joins *amicus* briefs that are consistent with its mission. The Buckeye Institute advocates for the constitutional doctrine of separation of powers and following the rule of law and opposes agency overreach. This case involves a loan forgiveness program that infringes on Congress's power of the purse, violates the separation of powers, and involves improper agency overreach. The Buckeye Institute previously filed *amicus* briefs with the Supreme Court in the case of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

## INTRODUCTION

The Constitution gives Congress the power of the purse. Through its appropriation powers, Congress enacted, among others, the William D. Ford Federal Direct Loan Program to loan students money to help fund their post-secondary education. Omnibus Budget Reconciliation Act, § 4, 20 U.S.C. § 1087a (1993). When Congress authorized these loans, it did so with the intent that student borrowers would repay the loans in accordance with the terms of the promissory note each student signs when receiving the government funds. Congress authorized the Secretary (the "Secretary") of the Department of Education (the "Department") to forgive or cancel student loans in only a few specified situations.

- Congress directed that the Secretary "shall cancel the balance of interest and principal

due" on any public service employees' eligible federal direct loan after the borrower met specific guidelines set by Congress. 20 U.S.C. § 1087e(m)(1).[1]

- Congress directed the Secretary to cancel student debt of borrowers suffering financial hardship that met the very specific requirements. 20 U.S.C. § 1098e(b)(7).[2] The loan forgiveness program addressed in this case does not satisfy these requirements and the Department does not claim that this statute authorized this new program.

- Congress directed the Secretary to forgive loans for those employed full-time in an area of national need. 20 U.S.C. § 1078–11(a)(1)(B).[3]

- Congress authorized loan forgiveness for teachers with another type of loan if the teachers work in specified locations for a certain amount of time. 20 U.S.C. § 1078–10.[4]

---

[1] "The Secretary shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default for a borrower who—(A) has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to any one or a combination of the following—(i) payments under an income-based repayment plan under section 1098e of this title; (ii) payments under a standard repayment plan under subsection (d)(1)(A), based on a 10-year repayment period; (iii) monthly payments under a repayment plan under subsection (d)(1) or (g) of not less than the monthly amount calculated under subsection (d)(1)(A), based on a 10-year repayment period; or (iv) payments under an income contingent repayment plan under subsection (d)(1)(D); and (B) (i) is employed in a public service job at the time of such forgiveness; and (ii) has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A)."

[2] "[T]he Secretary shall repay or cancel any outstanding balance of principal and interest due on all loans made under part B or D (other than a loan under section 1078–2 of this title or a Federal Direct PLUS Loan) to a borrower who— (A) at any time, elected to participate in income-based repayment . . . ; and (B)for a period of time prescribed by the Secretary, not to exceed 25 years, meets 1 or more of the following requirements— (i) has made reduced monthly payments under paragraph (1) or paragraph (6); (ii) has made monthly payments of not less than the monthly amount calculated under section 1078(b)(9)(A)(i) or 1087e(d)(1)(A) of this title, based on a 10-year repayment period, when the borrower first made the election described in this subsection; (iii) has made payments of not less than the payments required under a standard repayment plan under section 1078(b)(9)(A)(i) or 1087e(d)(1)(A) of this title with a repayment period of 10 years; (iv) has made payments under an income-contingent repayment plan under section 1087e(d)(1)(D) of this title; or (v) has been in deferment due to an economic hardship described in section 1085(o) of this title."

[3] "The Secretary shall forgive . . . the qualified loan amount . . . of the student loan obligation of a borrower who— (A)is employed full-time in an area of national need . . . ; and (B)is not in default on a loan for which the borrower seeks forgiveness."

[4] "The Secretary shall carry out a program, through the holder of the loan, of assuming the obligation to repay a qualified loan amount for a loan made under section 1078 or 1078–8 of this title, . . . for any new borrower on or after

Congress also designated specific situations where the Secretary could forbear on the loan repayments or allow borrowers to extend repayment:

- Forbearance is permitted for certain military service members, directing the Secretary to "grant the [service member] borrower forbearance, in the form of a temporary cessation of all payments on the loan other than the payments of interest on the loan . . . ." 20 U.S.C.A. § 1087e(l)(2).

- Congress authorized loan repayment deferment, but not cancellation "for borrowers receiving cancer treatment" or "dislocated military spouses." 20 U.S.C.A. § 1087e(f).

Despite the clear congressional limitations on when and how student loan borrowers may obtain forgiveness or cancellation of their direct loans, the Department has fabricated a new student loan forgiveness program without Congress's approval. Improving Income Driven Repayment, 88 Fed. Reg. 43,820 (July 10, 2024) (to be codified at 34 C.F.R. §§ 682, 685) (Loan Forgiveness Program).

The Department's new—unauthorized—Loan Forgiveness Program, creatively named the Revised Pay-As-You-Earn (REPAYE) plan, increases the amount of income exempted from the calculation of the borrower's discretionary income from 150 percent of the Federal poverty guideline or level to 225 percent. *Id.* At the same time, the Loan Forgiveness Program "[l]owers the share of discretionary income used to calculate the borrower's monthly payment for outstanding loans under REPAYE to 5 percent of discretionary income for loans for the borrower's undergraduate study . . . ." *Id.* "[I]n the past the Department has chosen to set that threshold at 20

---

October 1, 1998, who—(1) has been employed as a full-time teacher for 5 consecutive complete school years— (A) in a school or location that qualifies under section 1087ee(a)(2)(A) of this title for loan cancellation for Perkins loan recipients who teach in such schools or locations; and (B) if employed as an elementary school or secondary school teacher, is highly qualified as defined in section 9101 of the Elementary Secondary Education Act of 1965, or meets the requirements of subsection (g)(3); and (2) is not in default on a loan for which the borrower seeks forgiveness."

percent of discretionary income and then 10 percent of discretionary income." *Id.* at 43,845. The result of these changes is that many borrowers' monthly payments will be greatly reduced. This may be a policy preference, but the next part of the plan is not—it triggers unauthorized loan forgiveness. Under the Loan Forgiveness Program, these borrowers—who promised to repay their loans and are getting a break on the monthly payments—will not have to repay any outstanding debt after making reduced payments for 120 months. This program is a give-a-way of at least $156 billion of accounts receivable—Treasury assets. Compl. ¶ 158–59.

Congress did enact an "income contingent repayment plan" that authorized the Department to reduce monthly payments depending on the borrower's income and other criterion. But that program did not grant the Department the power to forgive these direct loans, and the statute anticipates that the borrowers will eventually repay their loans. By setting borrowers' payments to an amount that will significantly reduce the amount paid back and then outright forgiving the remaining balance, the Loan Forgiveness Program violates the law and contravenes Congress's intent to have the loans paid back.

The Department lacks the constitutional or statutory authority to implement its new program. The Constitution does not allow the executive to unilaterally give away the Nation's assets. Const. art. I, § 9, cl. 7. And Congress did not authorize this new loan forgiveness program.

## SUMMARY OF ARGUMENT

As with any loan, student borrowers enter into a legally binding contract with the Department. This contract establishes the borrower's repayment obligations and the government's right to collect. Unlike other loan contracts, if the government modifies the contract without legal authority, and then attempts to collect, the borrower has no legal defense. Those who deal with the government may not rely on the conduct of government agents that is contrary to law. Thus, borrowers will not be able to utilize the doctrine of equitable estoppel to avoid future repayment

if a new administration or a court determines that the loans were unlawfully forgiven. Allowing an invalid loan forgiveness program to proceed places borrowers at even greater future risk.

The Higher Education Act, 20 U.S.C.A. § 1070 et seq., sets very specific guidelines for how loans should be made and when they can be forgiven. The Department, however, has read a 25-year limit on the income-contingent repayment plan to authorize it to forgive loans once that 25 years, or a shorter time set by the Secretary, is up. The statute does not authorize such forgiveness. Instead, it limits how long a borrower may utilize that repayment plan to ensure that the borrower does not stay on the plan indefinitely and that the loan is eventually repaid.

Further, the Constitution mandates that only Congress can appropriate funds and dispose of property belonging to the United States. Through its appropriations powers, Congress authorized the direct loan program. It did not, however, appropriate funds to be given away without the possibility of repayment. Additionally, by forgiving the loans, the Department has disposed of the property, accounts receivable, belonging to the United States. The Constitution leaves these decisions to Congress, not the Department.

Therefore, the Court should find that the Loan Forgiveness Plan is invalid and unlawful.

## ARGUMENT

**I.  Student loan borrowers are contractually bound to repay their loans—in full—by the terms of their Master Promissory Notes, and there is no statutory exception in this situation.**

To obtain a student loan from the government, borrowers must enter a legally binding contract with the Department of Education. When student loan borrowers sign their Master Promissory Note (MPN), they agree to repay their loans in full. *See* Compl. Ex. A, *Latta v. U.S. Dep't of Educ.*, No. 2:22-cv-04255 (S.D. Ohio Dec. 1, 2022). Borrowers "promise to pay to ED all loan amounts disbursed under the terms of th[e] MPN, plus interest and other charges and fees that may become due . . . ." *Id.* at 2. The MPN directs that the borrowers "must repay the full amount

of the loans made under th[e] MPN, plus accrued interest." *Id*. at 4. If they fail to pay the entire amount disbursed plus interest and other charges and fees, they will be liable for "reasonable collection costs, including but not limited to attorney fees, court costs, and other fees." *Id*. at 2. The MPN further states:

> LATE CHARGES AND COLLECTION COSTS: We may collect from you: A late charge of not more than six cents for each dollar of each late payment if you do not make any part of a required installment payment within 30 days after it becomes due, and any other charges and fees that are permitted by the Act related to the collection of your loans. If you default on a loan, you must pay reasonable collection costs, plus court costs and attorney fees.

*Id*. at 4.

Additionally, if the borrower defaults on his or her loan, the Department can require the borrower to pay the entire unpaid balance of the loan at once, plus a six percent late fee, and a capitalization of interest (which will bear interest, also known as interest on interest). *Id*.

The MPN further states, "If we do not enforce or insist on compliance with any term of th[e] MPN, it does not waive any of our rights. No provision of th[e] MPN may be modified or waived, unless we do so in writing." *Id*. The only other provision allowing modifications to the MPN provides that "[a]ny [legal] amendment to the [Higher Education Act of 1965 (HEA)] that affects the terms of th[e] MPN will be applied to your loans . . . ." *Id*. at 6. However, the Loan Forgiveness Program does not legally amend the HEA.

The MPN also explains the impact on the borrower's credit score if he or she defaults: "If you default, the default will be reported to nationwide consumer reporting agencies (credit bureaus) and will significantly and adversely affect your credit history. A default will have additional adverse consequences as explained in the Borrower's Rights and Responsibilities Statement." *Id*. at 4. Indeed, the Department's website explicitly warns that those who default may suffer damage to their credit rating and it "may take years to reestablish a good credit rating." *See*

U.S. Dep't of Educ., *Student Loan Delinquency and Default*, Federal Student Aid, http://tinyurl.com/yc6bn3vn (last visited Apr. 19, 2024). Finally, if borrowers default on the loans, they will "lose eligibility for additional federal student aid" for further education. *Id*.

The Code of Federal Regulations has specific provisions for what defenses a borrower may assert for non-payment of a student loan. Specifically, 34 C.F.R. § 685.206(c) and (e), and 34 C.F.R. § 685.222 govern defenses to repayment, as authorized by 20 U.S.C. 1087e(h).[5] Each of these defenses to repayment generally applies only when an educational institution which the borrower attended had engaged in an illegal act, such as "a misrepresentation . . . of material fact upon which the borrower reasonably relied in deciding to obtain a Direct Loan . . . ." 34 C.F.R. § 685.206(e)(2)(i). The details of "[t]hose defense[s] to repayment standards have changed multiple times in recent years" via the appropriate and lawful Administrative Procedure Act process. U.S. Dep't of Educ., *Issue Paper #6: Borrower Defenses to Repayment* (2021), http://tinyurl.com/32jwn43y. But the concept behind these defenses remained the same—fraud and similar action by the educational institution. Unsurprisingly, the Loan Forgiveness Program is not part of the C.F.R. defenses, the Loan Forgiveness Program does not purport to amend those provisions, and there are no pending proposed rules under the Administrative Procedure Act that would modify those C.F.R. sections. Instead, the Department has decided to forgive student loans without congressional approval.

Accordingly, any loan forgiveness supposedly granted under the Loan Forgiveness Program will not legally change borrowers' payment obligations and will not be enforceable as against the government.

---

[5] "[T]he Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan."

Moreover, borrowers cannot utilize the doctrine of equitable estoppel to avoid future repayment (and penalties, fines, increased interest, and collection costs) because equitable estoppel generally cannot be asserted against the government. *Heckler v. Cmty. Health Servs. Of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984). "[T]he United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917); *see also Royal Indem. Co. v. United States*, 313 U.S. 289, 294–95 (1941). "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law," and "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler*, 467 U.S. at 63.

Despite the Department's announcement of unilateral debt forgiveness, the government is and will be, obligated to collect those loans. "The head of an executive, judicial, or legislative agency—(1) *shall* try to collect a *claim* of the United States Government for money or property arising out of the activities of, or referred to, the agency . . . ." 31 U.S.C. § 3711(a) (emphasis added). "A claim includes, without limitation—(A) funds owed on account of loans made, insured, or guaranteed by the Government . . . ." 31 U.S.C. § 3701(b). The implementing regulation further requires that "[f]ederal agencies shall *aggressively* collect all debts arising out of activities of, or referred or transferred for collection services to, that agency." 31 C.F.R. § 901.1(a) (emphasis added). And "'[s]hall' typically means must, not should." *California v. Texas*, 141 S. Ct. 2104, 2137 (2021) (Alito, J., dissenting) (citation omitted).

Because the Loan Forgiveness Program is unlawful, as discussed *infra*, the Department is currently—and perpetually—required to collect the debts. Courts have recognized the obligation to collect as a constitutional mandate—in other words, it is not optional. "(W)hen a payment is

erroneously or illegally made it is in direct violation of article IV, section 3, clause 2, of the Constitution. Under these circumstances it is not only lawful but the duty of the Government to sue for a refund thereof . . . ." *Aetna Cas. & Sur. Co. v. United States*, 526 F.2d 1127, 1130 (Ct. Cl. 1975) (citing *Fansteel Metallurgical Corp. v. United States*, 172 F.Supp. 268, 270 (Ct. Cl. 1959)); *see also Int'l Harvester Co v. United States*, 342 F.2d 432, 442 (Ct. Cl. 1965) (It is the "duty of the Government to recover [erroneously made] payments").

The expectation of full-blown collection efforts is hardly speculative. Before the pandemic payment pause, the Department vigorously enforced loan repayments. From January 2018 through September 2018, it retrieved over $5.4 billion in defaulted loans. *See* U.S. Dep't of Educ., *Default Rates*, Federal Student Aid, http://tinyurl.com/2w3pyf3d (last visited Apr. 19, 2024). $662 million of that was from wage garnishments. *Id.*

While some may applaud the President's and the Secretary's generous giveaway of the Treasury assets, the Loan Forgiveness Program does not legally relieve the borrowers of their duty to pay and does not excuse the government from its duty to collect the outstanding loans.

## II.  The Department lacks the statutory authority to institute its Loan Forgiveness Program.

The Department claims that 20 U.S.C. § 1987e(e)(5) gives it the statutory authority to implement its Loan Forgiveness Program. It does not. The Department dreamt up the authority through illusory readings of the HEA. But Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) (citing *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231 (1994)).

Under 20 U.S.C. § 1087e(e), the Secretary may create an income-contingent repayment plan, which a borrower may elect to enter under § 1087e(d)(1)(D). The Department claims that §

1087e(e)(5) gives the Secretary the authority to determine the balance of a loan as he sees fit. *E.g.,* 88 Fed. Reg. at 43,832. That is false. Under that section of the HEA, "The Secretary may promulgate regulations limiting [only] the amount of interest that may be capitalized on such loan, and the timing of any such capitalization." 20 U.S.C. § 1087e(e)(5). In fact, that section specifically says that "[t]he balance due on a loan made under this part that is repaid pursuant to income contingent repayment *shall equal the unpaid principal amount of the loan*, any accrued interest, and any fees, such as late charges, assessed on such loan." *Id.* (emphasis added). It is beyond a stretch of the imagination for the Department to read this section and conclude that "it does not restrict the Secretary's discretion to define or limit the amounts used in calculating that balance," 88 Fed. Reg. at 43,832, when the unambiguous language of 20 U.S.C. § 1987e(e)(5) clearly restricts the Secretary's discretion by requiring the inclusion of the unpaid principal amount of the loan.

The Department relies on a second erroneous reading of the HEA to conclude that it may forgive student loans. The HEA allows the borrower to elect to enter into an income-contingent repayment plan, whereby the borrower pays the loan "over an extended period of time prescribed by the Secretary, not to exceed 25 years . . . ." 20 U.S.C. § 1087e(d)(1)(D). The Department has claimed that this section means that if a loan is not paid by the time set by the Secretary, not to exceed 25 years, that the loan is magically forgiven. But that is not how the statute works. All this section does is say that the borrower may enter into that plan, but once the 25-year mark (or a lower number of years set by the Secretary) has been met, the borrower may no longer use the income-contingent plan and must enter into a different repayment plan. The 25-year limit is Congress making sure that the loan is repaid by preventing someone from staying on the plan indefinitely. It does not, as the Department argues, grant the Secretary the authority to forgive loans

at any time he chooses within 25 years.

To try and justify its erroneous reading of the HEA, the Department points to other statutory sections where Congress has granted the authority to forgive student loans. *E.g.,* 88 Fed. Reg. at 43,830 (citing Section 493C(b) of the HEA, codified at 20 U.S.C. § 1098e(b)). However, the other statutory sections that expressly grant the Secretary authority to forgive specific loans show that had Congress wanted to give the Secretary that authority for income-contingent repayment plans, it would have done so explicitly.

Under 20 U.S.C. § 1098e(b)(7), the Secretary must forgive loans if an individual entered and made certain payments towards an income-contingent repayment plan. However, that section requires the individual to have previously elected to participate in "income-based repayment," which differs from income-contingent repayment. Importantly, before such forgiveness could be given, Congress made the borrower meet specific statutory requirements, including suffering partial financial hardship. As such, Congress requires a borrower to show that their loan payments exceed 15 percent of their adjusted gross income, which is the borrower's income over 150 percent of the poverty line. 20 U.S.C. § 1098e(a)(3). This reasoned decision by Congress ensured that loan forgiveness would be used in limited, exceptional circumstances.

The Department's Loan Forgiveness Program, on the other hand, does not require any showing of financial hardship. The Department has determined that borrowers can make payments equaling 5 percent of their discretionary income, which is the borrower's income over 225 percent of the federal poverty guideline. The Department will then forgive the remainder of the loan after 120 months of these low monthly payments are made. The low monthly payments the Department has created are the opposite of the financial hardship that Congress decided was sufficient for loan forgiveness. Because the Department could not fit its forgiveness program into what Congress has

specifically required, it created its own vast forgiveness. The Loan Forgiveness Program greatly exceeds what Congress thought was acceptable and does so without any statutory authority.

The Department's Loan Forgiveness Program not only relies on statutory authority that does not exist, but it goes far beyond limited, exceptional circumstances. It would be astonishing if Congress decided to carefully craft several very limited loan forgiveness programs but then gave the Department free reign to create its own broad programs. *See* U.S. Dep't of Educ., *Student Loan Forgiveness*, Federal Student Aid, https://studentaid.gov/manage-loans/forgiveness-cancellation (last visited Apr. 19, 2024). "It follows [from *Royal Indemnity*] that, without a clear statutory basis, an agency has no authority to forgive indebtedness or to waive recovery." U.S. General Accountability Office, *The Government's Duty and Authority to Collect Debts Owed to it*, 2008 WL 6969346, at *1. The HEA simply does not authorize the Loan Forgiveness Program.

## III. The Department's Loan Forgiveness Program violates the Appropriations Clause and the Property Clause by spending money and disposing of property belonging to the United States Treasury without congressional approval.

While Congress authorized the Secretary to issue loans as part of its appropriation powers, that appropriation did not authorize outright forgiveness of those loans. Further, only Congress can dispose of government property, and it has not delegated the authority to the Secretary to discharge billions of dollars in accounts receivable.

### A. Congress did not appropriate any funds for the Loan Forgiveness Program

Article I, section 9, of the Constitution provides, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law." This Clause reflects the Framers' decision to "carefully separate[] the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (quoting The Federalist No. 78 (Alexander Hamilton)); *see also* The Federalist No. 48 (James Madison) ("[T]he legislative department alone has access to the pockets of the

people."). The Constitution precludes Congress from divesting its power of the purse to an executive agency. *Community Financial Services Ass'n of Am. v. CFPB*, 51 F.4th 616, 638–642 (5th Cir. 2022). Moreover, this Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

The Omnibus Budget Reconciliation Act of 1993 authorized open-ended funding of the William D. Ford Federal Direct Loan Program only for limited purposes. Omnibus Budget Reconciliation Act, § 4, 20 U.S.C. § 1087a (1993). As amended, 20 U.S.C. § 1087a(a) provides that:

> There are hereby made available, in accordance with the provisions of this part, such sums as may be necessary (1) *to make loans* to all eligible students (and the eligible parents of such students) in attendance at participating institutions of higher education selected by the Secretary, to enable such students to pursue their courses of study at such institutions during the period beginning July 1, 1994; and (2) *for purchasing loans* under section 1087i–1 of this title.

(Emphasis added).

Congress did not authorize or appropriate funds for the purpose of the forgiveness or cancellation of the Ford Direct Loans. Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). In other words, while Congress appropriated seemingly unlimited funds for the purpose of lending money to students, its appropriation did not include the purpose of forgiving those loans. Thus, a separate cancellation or forgiveness of existing loans involving federal funds requires a separate act of Congress.

Further, starting in 1992, Congress required that the President's budget "shall reflect the costs of direct loan . . . programs." 2 U.S.C. § 661c(a). The President's budget for the fiscal year 2023 increased the Department of Education's budget by billions of dollars but did not include any funding for the Loan Forgiveness Program. *See U.S. Secretary of Education Miquel Cardona Statement on Fiscal Year 2023 Omnibus Appropriations*, U.S. Dep't of Educ. (Dec. 23, 2022), https://tinyurl.com/DOEFY2023. The Secretary cannot wield the congressional power of the purse by unilaterally forgiving billions in student debt, which would "reduce amounts that would otherwise flow to the general fund of the Treasury." *Community Financial Services Ass'n of Am.*, 51 F.4th at 638. The Department has effectively recognized that the funds to be repaid are not part of the funds appropriated for the loans the Department is authorized to distribute—rather, the funds to be repaid belong to the Treasury. *See U.S. Department of Education Estimate: Biden-Harris Student Debt Relief to Cost an Average of $30 Billion Annually Over Next Decade*, U.S. Dep't of Educ. (Sep. 29, 2022), https://tinyurl.com/2r2rwxjd (the Department recognizes that "in terms of reduced cash flows into the government" the Loan Forgiveness Program will cost "roughly $305 billion"). The Department explains that failure to pay can result in a "Treasury offset" against government benefits, such as tax refunds and social security payments, in order to repay "defaulted federal student loan[s]." U.S. Dep't of Educ., *Collections on Defaulted Loans*, Federal Student Aid, https://tinyurl.com/EDCollections (last visited Jan. 23, 2023).

The Department's argument that it can both lend as much as it wants and then cancel as much debt as it wants is not consistent with either the power of the purse or the loan programs' statutory authority. The Department's actions are "the epitome of the unification of the purse and the sword in the executive—an abomination the Framers warned 'would destroy that division of powers on which political liberty is founded.'" *Community Financial Services Ass'n of Am.*, 51

F.4th at 640 (quoting 2 *The Works of Alexander Hamilton* 61 (Henry Cabot Lodge ed., 1904)).

Without the separation of powers, the rights of American citizens would be "worthless." *Morison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

The Department's attempt to appropriate money without regard to Congress's appropriation powers upends the separation of powers. "The accumulation of all powers, legislative, executive, and judiciary, in the very same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison). The separation of powers is "not simply an abstract generalization" but is instead "woven throughout the Constitution." *INS v. Chadha*, 462 U.S. 919, 946 (1983) (citation omitted). The Loan Forgiveness Program simply cannot withstand constitutional scrutiny.

**B. Only Congress can dispose of the student loan accounts receivable owned by the Treasury.**

Separately, the Property Clause provides, "The Congress shall have Power to dispose of . . . Property belonging to the United States." Const. art. IV, § 3, cl. 2. A loan is an accounts receivable asset, which—of course—is property. It is indisputable that the subject student loans constitute "Property belonging to the United States." And only Congress has the "[p]ower to release or otherwise dispose of the rights and property of the United States . . . ." *Royal Indem. Co.*, 313 U.S. at 294.

Congress has not conferred the unrestrained power to dispose of student loans upon the Secretary or the Department. Nor has there been a "formal agency ruling or adjudication stating that the United States abandoned its claim" to repayment of the loans. *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1187 (10th Cir. 2010). In fact, while the Secretary has some authority to compromise claims, the Department unambiguously disclaimed reliance on that authority. 88 Fed. Reg. at 43,834 ("This IDR plan, however, is not the

15

implementation of the Department's authority to compromise claims, it is an implementation of the Department's authority to prescribe income-contingent repayment plans under Sec. 455 of the HEA."). Even if the discharge of debt did not require a separate Congressional appropriation, it is barred by the Property Clause. The Secretary cannot point to any provision allowing the legal disposal of hundreds of billions of dollars of government property.

The threat to the Constitution's separation of powers stemming from agencies establishing their own appropriation procedures independent of Congress and the novel nature of the Department's Loan Forgiveness Program are important reasons for this Court to strike down Defendants' actions. These loan forgiveness actions, whether "erroneously or illegally made," are "in direct violation of article IV, section 3, clause 2, of the Constitution." *Aetna Cas. & Sur. Co.*, 526 F.2d at 1130. Because there is no act of Congress that either "specifically states that an appropriation is made," 31 U.S.C. § 1301(d), or "confer[s] upon," *Royal Indem. Co.*, 313 U.S. at 294, the Secretary the right to cancel hundreds of billions of dollars of student-loan accounts receivable, the Loan Forgiveness Program is unconstitutional and exceeds the Secretary's statutory authority.

**CONCLUSION**

For the foregoing reasons, this Court should find that the Loan Forgiveness Program is invalid and unlawful.

Respectfully submitted,

 /s/ Jeff Shaw
JEFF SHAW
Kan. Bar No. 29767
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Telephone: (913) 213-5018
Jeff@KansasJusticeInstitute.org

David C. Tryon*
Alex M. Certo*
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org
A.Certo@BuckeyeInstitute.org

*Pro Hac Vice Pending*

*Counsel for Amicus Curiae*
*The Buckeye Institute*

May 10, 2024

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Amicus Curiae* Brief of The Buckeye Institute in Support of Plaintiffs was served on all counsel of record via the court's electronic filing system this 10th day of May 2024.

Respectfully submitted,

 /s/ Jeff Shaw
JEFF SHAW
Kan. Bar No. 29767
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Telephone: (913) 213-5018
Jeff@KansasJusticeInstitute.org

*Counsel for Amicus Curiae*
*The Buckeye Institute*

18