IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, et al., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, et al.; | § | Civil Action No. 6:24-cv-01057-DDC- |
| | § | ADM |
| *Defendants.* | § | |
| | § | |

**PLAINTIFF STATES' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS[1]**

---

[1] Per the Court's order in Dkt. 44, Plaintiffs complied with the page limits. The portions of the brief related to the motion to dismiss (to include the introduction) within the 15-page limit. Similarly, the portions of the brief related to the preliminary injunction are within the 10-page limit.

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

MOTION TO DISMISS RESPONSE .............................................................................. 3

   I.    THE STATES HAVE STANDING ON MULTIPLE BASES. ............................ 3

      A.    The States May Support Their Standing Here with Declarations in Response to Defendants' Motion to Dismiss. ............................................................ 3

      B.    The States' Loss of Tax Revenue Establishes Article III Standing. ....................... 4

      C.    The States Will Suffer Competitive Harm to Their Ability to Recruit and Retain Employees. ................................................................................... 9

      D.    State Instrumentalities ................................................................................. 13

PRELIMINARY INJUNCTION REPLY ...................................................................... 15

   II.    Plaintiffs are likely to succeed on the Merits. ............................................. 15

      A.    The Final Rule Exceeds the Department's Statutory Authority .......................... 15

      B.    The Final Rule is Arbitrary and Capricious. ............................................. 18

      C.    Defendants' Remaining APA Arguments Are Unavailing. ....................... 20

   III.    The Department's Truncated 30-Day Notice Period Violated the APA ................ 21

   IV.    The Remaining Requirements for Equitable Relief are Met Here. .......................... 22

      A.    Without Relief from this Court, the States Will Suffer Irreparable Harm. ........ 22

      B.    The Balance of Harms and Public Interest Favor Relief Here. .............................. 23

   V.    The Preliminary Injunction Should Apply Nationwide. ............................................ 23

CONCLUSION ................................................................................................................ 24

APPENDIX ................................................................................................................... A

## TABLE OF AUTHORITES

**Cases**

*Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592 (1982) .................................. 6

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .......................................... 16

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023).................................... 3, 13, 15

*Bull v. United States*, 295 U.S. 247 (1935) .............................................. 20

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................ 23

*Citizens for Const. Integrity v. United States*, 70 F.4th 1289 (10th Cir. 2023) ........................... 18

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ................................ 8, 13, 18, 19

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................................ 19

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*, No. 21-1414, slip op. (10th Cir. May 7, 2024) ............. 14

*Florida v. Mellon*, 273 U.S. 12 (1927)................................................. 2, 8

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) .......................... 17

*Hinojos v. United States*, 2024 U.S. Dist. LEXIS 71821 (D. Kan. Apr. 19, 2024)................................. 3

*Holt v. United States*, 46 F.3d 1000 (10th Cir. 1995) ........................................ 4

*Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564 (D.C. Cir. 2022) .................................... 18

*Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*,

31 F.3d 1536 (10th Cir. 1994) ........................................................... 22

*Kentucky v. Biden*,

23 F.4th 585 (5th Cir. 2022) ............................................................. 17

*Lujan v. Defs. of Wildlife*,

504 U.S. 555 (1992) ................................................................... 11, 12

*Michigan v. EPA*, 576 U.S. 743 (2015) ................................................... 19

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983)............................ 1

*Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994) ........................................... 7

*Nat'l Fed. Indp. Bus. v. OSHA*, 142 S. Ct. 661 (2022) ........................................... 23

*New York v. DHS*, 969 F.3d 42 (2d Cir. 2020) ........................................... 12

*NRDC v. Perry*, 940 F.3d 1071 (9th Cir. 2019) ........................................... 18

*Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285 (10th Cir. 2005) ........................................... 4

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) ........................................... 6

*Phillips Petroleum Co. v. EPA*, 803 F.2d 545 (10th Cir. 1986) ........................................... 21

*Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002) ........................................... 3

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ........................................... 21

*Sherley v. Sebelius*, 776 F. Supp. 2d 1 (D.D.C. 2011) ........................................... 20

*Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772 (10th Cir. 2006) ........................................... 22

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) ........................................... 4

*Sprint Corp. v. FCC*, 315 F.3d 369 (D.C. Cir. 2003) ........................................... 22

*Texas v. New Mexico*, 462 U.S. 554 (1983) ........................................... 7

*United States v. Texas*, 143 S. Ct. 1964 (2023) ........................................... 8

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) ........................................... 21

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ........................................... 15

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ........................................... 16

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ........................................... 7

**Statutes**

20 U.S.C. § 1087e ........................................... 15, 16

S.C. Code Ann. § 59-115-40 ........................................... 14

**Other Authorities**

Richard D. Freer & Edward H. Cooper, 13B Federal Practice & Procedure § 3531.11.1 (3d ed.) ..... 7

*Wright & Miller*, § 3531.4 Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.) ................ 11

## INTRODUCTION

Defendants believe this Court's authority to exercise review over the challenged rule abolishing *hundreds of billions of dollars* of student debt is non-existent or so narrow as to be outright toothless. Take arbitrary-and-capricious review. Here, the challenged Final Rule did not merely "fail[]to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Instead, the Final Rule operates in an alternative reality. The Final Rule is premised on the Department's authority to waive *$430 billion* of student debt under the HEROES ACT being so entirely unassailable that contingencies need not be considered and victory at the Supreme Court in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) was an absolute certainty (even though it was already enjoined nationwide by the 8th Circuit and the Supreme Court had refused to stay that injunction). But when the Final Rule was published, the Department had *already* decisively *lost* in *Biden*. Yet the Department chose to press ahead under the reality-defying premise that it had actually *won* that case. And it doesn't even bother to deny that it possessed *absolute authority* to withdraw the Final Rule *pre-publication* to correct its fundamental error. It simply *chose* not to do so.

As a fallback argument, Defendants resort to a "close enough for government work" claim: in Defendants' view, because the HEA does not specifically mandate consideration of costs, it is ultimately completely irrelevant whether the Final Rule will cost the $156 billion that the Rule claims or the more realistic *half trillion dollars* accounting for *Biden*. Thus, the Department did not need to expend a scintilla of thought as to what the Final Rule's actual cost would be post-*Biden*. In the Department's view, it can satisfy the APA's reasoned-decision-making mandate *even though* it does not have a clue how much debt the Final Rule will abolish and its *only cost estimate* was concededly indefensible at the time it was published. But if this can satisfy arbitrary-and-capricious review, federal courts owe the APA a formal burial.

Given the substantive indefensibility of the Final Rule's merits, Defendants predictably attempt to evade judicial review by fixating on standing arguments to preclude this Court's examination of the Final Rule's severely deficient merits. But those arguments fail. The States

here have Article III standing on at least three independent bases.

First, the States will suffer lost tax revenues. Defendants do not dispute the basic factual premise that accelerating any debt cancellation from the years 2026-on into the 2024-25 period will cost the States tax revenues. And if a single debt cancellation in any of the Plaintiff States is thus moved up, the States have Article III standing.

Defendants raise various objections, which all ring hollow. They first argue the States' injuries are "speculative." But Defendants' own admissions make plain that $107.4 million from 13,650 borrowers has *already been cancelled* in the Plaintiff States and continues. If even a dollar of that debt cancellation would have otherwise occurred after 2025, the States have standing. Defendants further contend that the States' injuries are "self-inflicted." Not so. The States' longstanding decisions to conform to the federal definition of income have nothing to do with the Final Rule, and Defendants do not even allege as much. Nor do Plaintiffs have any "option" to avoid injury, thus defeating the "self-inflicted" premise: either the States maintain their conformity, and thus suffer lost tax revenue, or they break the link to the federal definition, and suffer new administrative costs. Either way, the fact of injury resulting from the Final Rule is an inescapable reality. Finally, Defendants rely on the long dormant decision in *Florida v. Mellon*, 273 U.S. 12 (1927)—which predates all modern standing precedents—as somehow precluding the States' standing. But *Mellon* is nowhere near as broad as Defendants contend.

The States also have standing because the Final Rule will inflict competitive harms to their ability to recruit and retain employees under the Public Service Loan Forgiveness ("PSLF") Program. As a matter of rudimentary economics, borrowers with an original principal balance of $12,000 or less will lose a significant incentive to stay in lower paying public service jobs if they can have that debt forgiven in the same amount of time wherever they go. Even if the States lose or fail to recruit one employee as a result of this Final Rule, they will be harmed. That is not just unassailable economic logic but borne out by the States' actual evidence.

In contrast, Defendants refused to offer even a scintilla of evidence themselves. Instead, they castigate the States' harms as "speculative"—ironically, based on nothing more than

Defendants' *own counter-intuitive speculation*. Rather than supplying actual evidence or citations, Defendants' arguments devolve into transparent speculation: contending (at 14-15), for example, without citation that "there are good reasons to think…." and "[i]t stands to reason." Such citation-less musings cannot outweigh the actual evidence supplied by the States.

*Third*, States will suffer harm to their instrumentalities. South Carolina, Alaska, and Texas have instrumentalities that each hold a federal family education loan ("FFEL") program portfolio. *See* Exs. E-G. The interest and fees these loans generate provide direct benefits to those states. *Id.* The Final Rule's benefits do not extend to FFEL loans and a borrower would have to consolidate directly with the federal government to receive the benefits. This consolidation will reduce those States' FFEL portfolio and the accompanying interest and fees. *Id.* Harm to these entities are harms to their respective states. *See Biden*, 143 S. Ct. at 2366. ("This acknowledged harm to MOHELA in the performance of its public function is necessarily a direct injury to Missouri itself.")

**MOTION TO DISMISS RESPONSE**

I.     **THE STATES HAVE STANDING ON MULTIPLE BASES.**

Plaintiff States have demonstrated sufficient Article III standing to bring this suit. Their injuries are concrete and imminent, and would not occur but for the Final Rule.

A.   **The States May Support Their Standing Here with Declarations in Response to Defendants' Motion to Dismiss.**

Motions to dismiss under Rule 12(b)(1) "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). For facial attacks, "the district court must accept all [factual] allegations as true." *Hinojos v. United States*, 2024 U.S. Dist. LEXIS 71821, at *4 (D. Kan. Apr. 19, 2024). By contrast, "the analysis differs if the movant goes beyond the complaint's allegations and challenges the facts on which subject matter jurisdiction depends." *Id.* "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the

truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (citations omitted).

Here, Defendants have lodged a factual attack on the States' standing, questioning whether the harms that Plaintiffs have alleged are likely to occur in reality. *See* Opp. at 9–17. Hence, the Court is not only permitted but *required* to "look beyond the complaint and has wide discretion to allow documentary and even testimonial evidence under Rule 12(b)(1)." *Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005). To that end, Plaintiffs have attached the Tran, Abrams, Kraly, Yost, Spate, Keyton, and Efird Declarations as Exhibits A-G, respectively, in support of their Article III standing, in addition to those previously submitted.

**B.   The States' Loss of Tax Revenue Establishes Article III Standing.**

Unsurprisingly given the *enormous* amount of money at issue, the Final Rule will affect the amount of tax revenues that Plaintiffs will collect. While Defendants contend (at 11) that any such injuries would be "self-inflicted," "not judicially cognizable," and "speculative," all of those arguments fail.

As an initial matter, Defendants' arguments are badly miscast and distort the governing legal standard. While Defendants frequently fixate as to putative uncertainty as to the *quantity* of harm, this case does *not* involve any issue as to the certainty or ascertainability of damages— which are not available here due to sovereign immunity. Instead, the relevant factual question is solely the *existence* of any *injury* whatsoever—not the extent of damages. And even a "a dollar or two" of injury suffices to establish Article III standing. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). Moreover, only a single State need establish standing here for this Court to have jurisdiction. *See, e.g., Massachusetts*, 549 U.S. at 518 ("Only one of the [parties] needs to have standing to permit us to consider [the merits.]"). Nor do Defendants bother to dispute the States' basic premise that advancing *any* cancellation of student debt whatsoever from the 2026-

beyond period to 2024-25 would result in decreased State tax revenue in any State that conforms to the federal definition of income. *See also* Exhibits A-D (explaining States' harms from lost tax revenues).

If the Final Rule advances the cancellation of *any debt whatsoever* from the 2026-beyond window to 2024-25 in *any one* of Plaintiff States that conform to the federal definition of income, then the States have standing. And because the applicable burden of proof is a preponderance of the evidence, it need only be 50.1% likely that the Final Rule would so accelerate even a *single debt forgiveness* in *any one* of Plaintiff States.

Measured against this proper legal standard, Defendants' objections that the States' tax-revenue standing arguments are "speculative" badly miss the mark. That the States will suffer *some* amount of injury from loss of tax revenues here is a mathematical certainty, rather than the product of less-likely-than-not speculation. One need look no further than *Defendants' own publications/admissions* to see why that is so. Defendants gleefully published a state-by-state breakdown of $1.2 billion in debt from 153,000 borrowers that had already been forgiven under the Rule as of February 23, 2024.[2]

Of that abolished debt, $107.4 million from 13,650 borrowers is for residents of the Plaintiff States that ordinarily tax student loan debt cancellation as income. *See id.*. And the prospect that *none* of that debt from 13,650 borrowers would have otherwise been forgiven from 2026 to the indefinite future, but is now accelerated into the tax-free 2024-25 period, rests on nothing more than Defendants' own rank speculation. And what holds true for that $1.2 billion applies equally to the $156 billion or more in forthcoming total debt forgiveness that the Rule projects (which is a dramatic underestimate, given the indefensible we-will-win-*Biden* central premise).

Shifting tacks from challenging the States' injuries as a factual matter, Defendants instead contend (at 10-11) that the States' injuries are "self-inflicted" because they putatively

---

[2]  *See* Department of Education, *Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness* (Feb. 23, 2024) *available at* https://www.ed.gov/news/press-releases/biden-harris-administration-releases-state-state-breakdown-12-billion-save-plan-forgiveness.  This is also set forth in the Appendix here.

"result[] from their own choice to tie their tax laws to the Internal Revenue Code," relying principally on *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976). That contention is unavailing because the States will suffer financial injury under the Rule no matter what putative "choice" they make. Because the Final Rule presents no injury-free option, it necessarily follows that the resulting injuries are attributable to the Final Rule and the Hobbesian choice it foisted upon the States, rather than any "self-inflicted" injury.

To begin with, Defendants drastically overstate the States' actual freedom of choice here. Given economic and administrative realities, *36 States* use either federal adjusted gross income or federal taxable income to calculate state income tax liability.[3] This is the national norm, not an aberration—a reality that predates the Final Rule and has nothing to do with it. Defendants' apparent position that the Final Rule obliged the States to change the widely-prevailing practice of conformation itself represents a form of sovereign injury—depriving the States of their sovereign choice to set their own tax policy. *See Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 601 (1982) (States have "sovereign power … to create and enforce a legal code."). Furthermore, *Pennsylvania* involved a *State's* attempt to invoke the Privileges and Immunities Clause and Equal Protection Clauses—even though *both* "protect people, not States." 426 U.S. at 665. Here the States do not attempt to invoke any personal rights held by their citizens as the basis for their standing, but rather invoke their *own* sovereign and proprietary interests.

Moreover, there is an even more significant difference between *Pennsylvania* and this case: as Defendants admit (at 12) "[t]his is not a suit by one state against another in the forum the Constitution provides for resolving such disputes." In fact, the word "standing" appears only once in *Pennsylvania* and only in reference to a State's authority to bring a *parens patriae* suit— which this suit incontestably is not. *Id. Pennsylvania* should be understood as a product of the context from which it arose: an original action filed in the Supreme Court pursuant to its "original and exclusive jurisdiction of all controversies between two or more States," 28 U.S.C.

---

[3] Tax Policy Center, *Tax Policy Center Briefing Book: State and Local Tax Policies* (Jan. 2024) *available at* https://tinyurl.com/yc67h33t

§ 1251(a)—a milieu that implicates "special concerns" that "do not provide a sure basis for analogous reasoning in other areas of state standing." Richard D. Freer & Edward H. Cooper, 13B Federal Practice & Procedure § 3531.11.1 (3d ed.). Supreme Court original jurisdiction is reserved for "a dispute between States of such seriousness that it would amount to *casus belli* if the States were fully sovereign." *Texas v. New Mexico*, 462 U.S. 554, 570 n.18 (1983). Needless to say, a *casus belli* is a higher threshold than the States' burden here under the governing "special solicitude."

In any event, even in the context of original state-versus-state actions—where jurisdiction is much more severely circumscribed—"a direct injury in the form of a loss of specific tax revenues" is judicially cognizable. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). And the Tenth Circuit has further confirmed that governmental entities have Article III standing where they "ha[ve] been injured by a loss of … tax monies, and these injuries are traceable to the [Defendant]'s decision[.]" *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994). Such losses of tax injuries are redressable by invaliding the challenged regulations, "because the [States] would again collect a portion of … [the] taxes" that would otherwise be lost from the challenged rule. *Id.*

But even assuming that the Constitution otherwise compelled the States to break their policy choice to conform to the federal definition of income to preserve their rights, such a coerced choice to define income independently would *itself* inflict cognizable injuries upon Plaintiff States. Conforming to the federal definition of income provides significant administrative efficiencies that would otherwise be destroyed: that the States would incur administrative costs from breaking the link to the federal definition of income is an incontestable reality that Defendants do not even attempt to dispute.

Injuries to the States' tax collections are certain if they retain their existing tax laws that conform to the federal definition of income. *See* Exs. A-B, D. But the fact of injury is equally certain if all of the Plaintiff States are forced to break free from the federal definition of income. *See* llo. A ¶¶7, 10; Ex. B ¶¶9-10; Ex. D ¶¶5-6. Thus, while the Final Rule might theoretically leave

the States "free" to pick their proverbial poison, the Final Rule leaves them with no poison-free—*i.e.*, injury-free—option. The Final Rule therefore inflicts concrete injury upon the States that confers Article III standing.

As a final retreat, Defendants argue that the States' injuries are not cognizable under the ancient precedent of *Florida v. Mellon*, 273 U.S. 12. But *Mellon* is nowhere near as broad as Defendants contend—as the ensuing 97 years have made plain (as does Defendants' inability to cite any precedent applying that 1927 precedent in the manner they suggest in the ensuing century confirms). The Supreme Court recently clarified the scope of *Mellon*'s holding, explaining that "federal policies frequently generate indirect effects on state revenues or state spending" and a "State's claim for standing *can* become more attenuated" when it asserts "that a federal law has produced *only those kinds* of indirect effects." *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023) (emphases added). But the harm here is clearly more direct than that alleged in *Mellon*. In that case, Florida's theory of standing relied on an unproven assumption about the actions of independent third parties—namely, Florida residents who may have "withdraw[n] property from the state" in response to a new federal statute, "thereby diminishing the subjects upon which the state power of taxation may operate." 273 U.S. at 17–18. In contrast here, however, the States' tax-revenue-based harms do not rely on any similar assumptions about the actions of third parties not before the Court; it is the Final Rule alone that will reduce taxable income without any additional action any third party.

More recently the Supreme Court unanimously held that States had Article III standing to challenge inclusion of a citizenship question on the census because they alleged that they would "lose out on federal funds" as a result. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). Such a loss of federal funds because of agency action is economically indistinguishable from agency-cause loss of state tax revenues—both involve decreases in funds flowing into State treasuries as a result of challenged federal actions. Just as New York had standing in *Department of Commerce*, so too do the States here.

Defendants argue that even if the States suffer real declines in revenue that are

attributable to the Final Rule, there are still consequentialist reasons to deny standing because of the danger that "every State would have standing to challenge almost any federal policy." Defs.' Br. at 11. But that naked policy-based reasoning cannot change what Article III means. Nor did it carry the day in either *Massachusetts* or *Department of Commerce*. Either a party has Article III standing or it does not. Policy considerations are irrelevant. In this case, Plaintiff States have established Article III standing.

### C. The States Will Suffer Competitive Harm to Their Ability to Recruit and Retain Employees.

The States also have Article III standing to challenge the Final Rule because it will harm their ability to recruit and retain employees under the PSLF Program. *See* PI at 9-10. That harm flows from two basic premises that are unassailable as a matter of basic economic logic: (1) the availability of loan forgiveness under the PSLF program is a powerful recruiting tool for States and (2) the magnitude of that recruiting incentive to potential employees has a relationship to the amount of student debt that could be forgiven (*i.e.*, a would-be employee with $10,000 in student debt would find potential total debt forgiveness under the PSLF less of an inducement than a would-be employee with $100,000 in student debt). From those two propositions the States' resulting injuries and Article III standing flow inexorably.

Defendants do not appear to dispute the first proposition: *i.e.*, that availability of student debt cancellation under the PSLF program is an important and powerful recruiting tool for the States and public-interest organizations. Public service jobs, especially at the state and local level, cannot pay as much as the private sector. A strong inventive for potential employees to make that sacrifice in compensation is the promise of public service loan forgiveness after ten years. Indeed, Defendants themselves contend "the PSLF program *retains* significant benefits for public-service employment," thereby admitting that it provided such recruiting benefits pre-Rule too. Opp. at 13-14 (emphasis added).

Somewhat amazingly, Defendants do contest the second principle. But that effort is unavailing. As a matter of elementary economics, public service employment will no longer be as

attractive an option to those with a lower amount of debt because of the direct effects of the Final Rule. This applies to both current and prospective state employees. Take for example, a current employee who had an original loan balance of $12,000 and has been in public service for 8 years. Without the Final Rule, he would have a strong incentive to stay in public service for 2 more years. However, because of the Final Rule, he would get his debt canceled in the same amount of time regardless of where he's employed. Relatedly, a college senior with $12,000 in debt will naturally be less inclined to take a public service position if he knows his debt will be canceled in ten years regardless of where he accepts a job. This presents imminent harm to the States because it is more likely than not that at least one person would leave public service early or not pursue it at all as a direct result of the Final Rule.

Rejecting the concept of economic incentives altogether, Defendants castigate such basic economic reasoning (at 12) as "speculative." In doing so, the Department appears to be projecting its own warped reasoning onto student debt holders: Defendants admit (at 34) that they were entirely indifferent as to the Final Rule's actual cost and would have adopted it whether it cost $1 billion or $1 trillion. But unlike the Department, borrowers *do* weigh actual costs and benefits, and the value that they place on potential PSLF debt relief is proportional to the amount of debt relief that is available and alternative options for obtaining the same relief. The States previously submitted declarations explaining as much, which confirm the basic economic rationality of their actual and potential employees. *See* PI. at 9-10 & Exs. 3-4; *see also* Ex. C.

In stark contrast, Defendants do not submit *any* actual evidence of their own. Instead, rather ironically, they offer nothing more than their own speculation that the ordinary principles of economics will somehow uniformly fail to work here. "Incentives are totally irrelevant" may fly in Defendants' parallel universe in which they also won at the Supreme Court in *Biden*, but it defies economics and logic in ours. Recall the governing standard here: if even a *single* Plaintiff State suffers *any* injury to its recruiting efforts, that establishes Article III standing. So, if even a one employee or potential employee reject incentives, that would result in cognizable injury

here.

Furthermore, standing requirements are relaxed because the States are Plaintiffs. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). The States argued as much (at 7), and Defendants made no effort to deny that special solicitude applies, thereby conceding the issue. This "special solicitude" has significant bite. In *Massachusetts*, the Commonwealth premised standing on EPA's non-regulation of carbon emissions in the transportation sector over the course of the next *century*, which would allegedly affect Massachusetts's coastline in unknowable amounts and places, in the teeth of international carbon emissions beyond the scope of any conceivable federal regulation; moreover, the regulations that EPA would issue if Massachusetts won were completely unknown and unknowable (and still not all that clear 17 years later); but *all* of that uncertainty did not preclude Article III standing. *Massachusetts*, 549 U.S. at 521–26.

Standing requirements are relaxed a second time here because the States are asserting "procedural right[s] to protect [their] concrete interests." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). The States can thus assert their procedural rights under the APA "'without meeting all the normal standards for redressability and immediacy.'" *Massachusetts*, 549 U.S. at 498 (quoting *Lujan*, 504 U.S. at 573 n.7). Thus, for example, as the dam-adjacent resident in the *Lujan* example did not need to trace his dam-construction-caused harms through the deficient environmental analysis, the States similarly need not demonstrate that, if the Department conducted a defensible cost estimate or provided a sufficient notice period, the result would be any different.  *Lujan*, 504 U.S. at 573 n.7.

Defendants' protests that the States' harms are speculative ring particularly hollow given the double relaxation of Article III standing requirements that applies here. *Supra* at 10–11. Indeed, Defendants do not even *attempt* to argue that their "speculative" objections can be reconciled with the special solicitude owed to the States. And the States' recruiting injuries here are *far* less speculative than the potential loss of coastlines over the course of a century that Massachusetts posited in *Massachusetts*. Indeed, Defendants' contentions about "this causal chain" (at 13) are deeply unserious without addressing the relaxation of the causal chain that

*Massachusetts* mandates here. Defendants were not at liberty to ignore that binding precedent. Yet one can scour Defendants' brief in vain for the slightest acknowledgment of that case.

Lacking any serious argument that the States will not suffer competitive harms to their ability to recruit employees, Defendants offer a lengthy contention (at 14 & n.9) that those implicitly acknowledged harms will be offset by other provisions of the Final Rule (i.e., "the rest of the Final Rule"). That fallback position is unavailing for three reasons.

*First*, Defendants' "net benefits" arguments do not defeat Article III standing. "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury." *Wright & Miller*, § 3531.4 Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.). Thus, "the fact that an injury may be outweighed by other benefits … does not negate standing.'" *Accord New York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020) (citation omitted)).

*Second*, Defendants' contention founders on basic legal logic. If those *other* provisions would provide a net benefit to the States, this Court could simply decline to enjoin *those other provisions* and instead enjoin only those provisions that cause the States injuries. Such tailored relief would easily satisfy any Article III redressability concerns as enjoining only those harm-causing provisions would make it "'likely,' … that the [States'] injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citation omitted). That is particularly so as redressability requirements are doubly relaxed here. *Supra* at 10-11.[4]

*Third*, Defendants couch their arguments in explicitly speculative terms, all offered without citation or legal support. For example, Defendants offer this Court citation-less arguments (at 14-15) that "there are good reasons to think…." and "[i]t stands to reason." Defendants are thus casting "speculative" stones from a glass house. While the States have

---

[4] This question is largely academic here, however, since Defendants make no effort to parse out *which specific provisions* in "the rest of the [Final] Rule" would actually benefit the States and purported outweigh the competitive harms to recruiting efforts caused by the Final Rule's primary provisions. Should Defendants identify such provisions with specificity, the States would be happy to consider narrower relief that does not include them

provided actual evidence supporting standing on competitive recruiting harms, Defendants offer no actual evidence themselves. Instead, they advance only cries of "speculation" that, rather ironically, are premised on nothing but speculation. Such speculation-based objections do not defeat the States' Article III standing. Nor do Defendants even *attempt* to explain how the States' injuries here are *more* speculative than the Commonwealth's in *Massachusetts*—which nonetheless was not so speculative as to defeat Article III standing.

Defendants' stark and telling refusal to address *Massachusetts* thus silently concedes Article III standing. But in fairness to Defendants, what could they say? Their calculated decision that "nothing" was more persuasive than any actual response they could offer should tell this Court all that it needs to know.

### D.  State Instrumentalities

The States also have standing based on their instrumentalities and quasi-instrumentalities. In Biden, MOHELA, "an instrumentality of Missouri," was harmed "in the performance of its public function" by the first round of debt forgiveness under the HEROES Act. <u>143 S. Ct. at 2365-68</u>. That debt cancellation "harm[ed] MOHELA and thereby directly injure[d] Missouri [therefore] conferring standing on that State." *Id.* at 2365 (cleaned up). And because "at least one plaintiff has standing, the suit [could] proceed." *Id.*

Specifically, MOHELA owned a portfolio of FFELP loans and "receive[d] an administrative fee for each of the" loans it serviced. *Id.* And because the Department's debt cancellation plan would result in discharge of debts that MOHELA serviced, MOHELA would lose "fees that it otherwise would have earned." *Id.* at 2366. That was sufficient to confer standing on Missouri, particularly as MOHELA's "profits help fund education in Missouri" and MOHELA was "subject to the State's supervision and control." *Id.*

The States have standing here on that same basis. Alaska, Texas, and South Carolina all have similar public instrumentalities that would suffer decreased income under the Final Rule. Each entity holds a portfolio of FFELP loans, and the interest/fees that they receive from those portfolios is directly proportional to their portfolio's size. Because some debtors will

undoubtedly consolidate those FFELP loans to direct federal loans so that they can take advantage of the extremely (and intentionally) generous terms of the Final Rule, these entities will see their debt portfolios, and thus resulting income, decrease. That is particularly true as States (and others) may premise Article III standing on the "predictable effect of Government action on the decisions of third parties," and "Article III 'requires no more than *de facto* causality.'" *Dep't of Com.*, 139 S. Ct. at 2566. Indeed, the Final Rule specifically added "more clarity" that borrowers "retain the borrower's progress toward forgiveness when they consolidate Direct or FFEL Program Loans into a Direct Consolidation Loan," 88 Fed. Reg. at 43,865—making conversion of FFELP loans to direct federal loans even more attractive.

Take South Carolina first, which established the State Education Assistance Authority ("SEAA") as a "public instrumentality of the State." S.C. Code Ann. § 59-115-40. "[T]he exercise by the authority of any power" conferred by the State is "deemed and held to be the performance of an essential public function." *Id.* SEAA, in turn, relies on the South Carolina Student Loan Corporation ("SCSLC") to service its FFELP loan portfolio. *See* Ex. E Ex. 2. Already, since 2011, the portfolio has already decreased from $31 million to $6 million, which has reduced the amount of income generated. *Id.* The Final Rule will decrease the size of SEAA's portfolio further as borrowers convert FFELP loans to take advantage of available debt forgiveness. *See also* Ex. G ¶¶6-8. This, in turn, will result in further loss of revenue to South Carolina.

The same essential story holds true for each of Alaska and Texas. For example, "To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue." Ex. F ¶4. Similarly, Alaska "estimates that the SAVE Plan will result in [the State instrumentality] losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." Ex. G ¶11. And if even a single one of those state instrumentalities would suffer harm from the Final Rule, the States have Article III standing here.

PRELIMINARY INJUNCTION REPLY

II.    **Plaintiffs are likely to succeed on the Merits**

While each theory on its own is enough to grant the injunction, there is an even stronger argument for preliminary relief when they are viewed in combination.  *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, No. 21-1414, slip op at 11 (10th Cir. May 7, 2024). Plaintiffs are likely to succeed here on multiple grounds because the Final Rule: (1) exceeds the Department's statutory authority, (2) is arbitrary and capricious, and (3) violated the procedural mandates of the APA.

A.    **The Final Rule Exceeds the Department's Statutory Authority**

The Final Rule exceeds Defendants' authority under §455. Defendants' response makes two concessions that make that statutory violation clear: (1) they do not genuinely dispute that the major questions doctrine applies and thus *clear congressional authorization* is required to justify the Final Rule, and (2) they never dispute that their construction of the HEA has *no limiting principle whatsoever*, and would thus permit them to abolish *all student debt* and expend more than a *trillion dollars* in a single rule. As in *Biden*, the HEA "provides no authorization for the Secretary's plan even when examined using the ordinary tools of statutory interpretation—let alone 'clear congressional authorization' for such a program." 143 S. Ct. at 2375.

1. **The Statute Doesn't Clearly Authorize Unlimited Debt Cancellation**

As the States previously explained (at 14-18), Congress in §455 explicitly required actual "repayment," which specifically "includ[es] principal *and interest*." 20 U.S.C. § 1087e(d) (emphasis added). Indeed, Defendants' carefully chosen pejorative (at 23) that the States' interpretation is "wooden" effectively concedes that the *literal* meanings of "repayment" including "principal and interest" are exactly what the States read them to mean—and that some more "creative" and impressionistic reading is required to reach Defendants' desired construction that "repayment" actually means "forgiveness" and that "principal and interest" means that *not even all principal* be repaid, *let alone interest*. Such Newspeak would make even Orwell blush. In Defendants' view, Congress's reiterated requirements of "repayment" that "includ[es] principal and interest" impose *no restrictions whatsoever* on Defendants' putative authority to cancel *any and all student debt*.

Indeed, Defendants go so far as to contend that "[i]f Congress had wanted the provision [§455] to have that effect, it could have said so in words far simpler than those that it wrote.'" Opp. at 22 (quoting *Biden v. Texas*, <u>597 U.S. 785, 798</u> (2022)). But there are few simpler ways to require repayment of student debt including interest than mandating "repayment" to "includ[e] principal and interest." <u>20 U.S.C. § 1087e(d)</u>.

More fundamentally though, this far-simpler-way-to-say principle is readily turned on—and fatal to—Defendants' interpretation. If Congress intended to give the Department *unbounded and unlimited* power to cancel essentially *all* student debt in the United States, why not say so directly? Why hide such awesome power in "'oblique,'" "'subtle devices,'" and "modest words'" of "repayment" including "principal and interest"—to which debt cancellation is the antithesis? *West Virginia v. EPA*, <u>142 S. Ct. 2587, 2609</u> (2022) (cleaned up).

Defendants' refusal to acknowledge *any* limiting principle confirms the stakes here and just how unlikely it is that Congress meant to authorize Defendants' actions here. Under Defendants' interpretation, they could abolish more than *$2.4 trillion* dollars in student debt if they wanted to in a single rule. That exceeds *all annual federal discretionary spending*. That is not merely like "hid[ing] elephants in mouseholes," but rather the entire federal budget. *Whitman v. Am. Trucking Ass'ns*, <u>531 U.S. 457, 468</u> (2001).[5]

## 2. Context Further Militates Against Defendants' Interpretation

The HEA's context further demonstrates that Defendants lack clear congressional authorization for three reasons. *First*, Congress's *explicit* authorization and mandate that the Department engage in "cancel[lation]" and "forgiveness" of PSLF loans in §455(m)—and refusal to provide any equivalent explicit authority in §455(d)—makes plain that Congress did not supply clear authorization in §455(d). Defendants' interpretation that the differing language in §455(m) and (d) should be read to give it identical debt cancellation authority (or perhaps even

---

[5] Defendants' also split hairs (at 23-24) about whether Plaintiffs' interpretation of "repayment" would operate at the level of individual loans or in the aggregate. That distinction is immaterial here, however, given that the Final Rule eliminates the obligation of "repayment ... includ[ing] ... principal and interest" at both levels. The Final Rule changes the aggregate character from true debt into one of partial grants—requiring, on average, repayment of only $7,069 per $10,000 in debt on average. <u>88 Fed. Reg. at 43,880</u>.

broader authority in §455(d)) is untenable. *See, e.g., Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally[.]").

*Second*, Congress's specific definition of hardship thresholds (*see* § 1098e(a)(3)) makes it particularly unlikely it meant for the Department to be able to upend those thresholds at will with its own preferred definitions—especially where the resulting cost could exceed $1 trillion.

*Third*, Congress's creation of separate programs for *grants* under the Pell Grant system and student *loans* is simply incompatible with Defendants' construction that they can transform *all* student loans into grants at will with the stroke of a pen. And Defendants' contention (at 23) that "loans are sometimes forgiven" hardly means that they necessarily must possess the power to forgive *all* such loans, which is the limitless authority they arrogate to themselves here.

### 3.   Defendants' Construction Creates Severe Constitutional Doubts

Defendants' response does little to address the severe constitutional doubts their interpretation would create. Defendants have no answer (at 30-31) to the States' demonstration that there are *no historical analogs* for Defendants' claimed power to spend more than the *entire federal discretionary budget* at will in a single rule, which is "the most telling indication of a severe constitutional problem." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (citation omitted) (cleaned up). Such "severe constitutional" doubts oblige this Court to read §455(d) in a more constitutionally sound manner.

*Second*, Defendants' construction of §455 creates substantial non-delegation concerns. *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) is particularly instructive. There, accepting the President's interpretation that he could "do essentially whatever he want[ed] so long as he determines it necessary to make federal contractors more 'economical and efficient' ... *certainly* would present non-delegation concerns." *Id.* at 606 n.14. Here, however, the HEA does not provide even such minimal "economical and efficient" guidance to advise the Secretary how to exercise his putatively unlimited power to cancel *any and all* student debt. Such unguided and unlimited power "certainly ... presents non-delegation concerns" here too. *Id.*

**B.   The Final Rule is Arbitrary and Capricious.**

As the States have previously explained, the Final Rule rests on a central premise that is not only indefensible but outright reality-defying: *i.e.*, that Defendants' were certain to prevail in *Biden v. Nebraska*, which they had just unequivocally lost 10 days previously. On that basis alone the Department refused to analyze the cost of the Rule in light of the $430 billion in debt that would no longer be cancelled. Further, the Department simply has *no idea how much* student debt the Final Rule will cancel—yet continues to insist that it is meticulously calibrated and the "right" amount. That is arbitrary and capricious decision-making.

Defendants' attempt (at 33) to evade these indefensible APA violations by resetting the clock to June 14, when it dispatched the Rule to the Office of the Federal Register ("OFR"). But it is well established that agencies have complete discretion to withdraw or alter rules submitted to OFR at least until they are made available for public inspection (and likely published in the Federal Register).[6] That occurred here on either July 7 or July 10, 2023—7 or 10 days after *Nebraska* was decided.[7]

Even more troublingly, Defendant Cardona explicitly declared on June 30—hours *after Biden* was decided—that the Department "*today … finalized* our new [Rule]."[8] That "today … finalized" statement is *flatly inconsistent* with the Schlichter Declaration, and further confirms that the Department retained authority to amend or withdraw the Final Rule after June 13. Indeed, Defendant Cardona himself did not regard the rule as finalized until *after Biden* was decided—and publicly declared that fact that Defendants now deny.  Given that absolute authority to withdraw or amend the Final Rule, the Department gravely abused its discretion by pressing forward. Defendants tellingly do not cite any precedent permitting them to ignore such

---

[6]  *Compare Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 570 (D.C. Cir. 2022) (holding that the "critical date … [is] the date a rule is filed for public inspection") *with NRDC v. Perry*, 940 F.3d 1071 (9th Cir. 2019) ("[A]gencies are free to withdraw a proposed rule before it has been published in the Federal Register, even if the rule has received final agency approval."); *accord Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1306–07 (10th Cir. 2023) (approvingly citing *Perry*).

[7]  *See* https://www.federalregister.gov/public-inspection/2023/07/07#regular-filing (July 7, 2023) (July 7 Public Inspection Issue in which the Final Rule first appeared, which indicates a "07/03/2023 at 8:45 am" "filed on" time).

[8]  *See* Department of Education, *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan* (June 30, 2023) (emphasis added) *available at* https://tinyurl.com/2jeyaapa

pivotal, central-assumption-destroying developments that occurred prior to publication.

It is also worth noting what Defendants' declaration tellingly does not say: it makes no effort to deny the obvious implication that the Department sensed that it was likely to lose *Biden* and thus furiously attempted to rush its Final Rule out *before* the Supreme Court could issue its decision. *See generally* Doc. 46-1. Why else would the Department not wait a single week to obtain the *highest* court's definitive answer for a rule with an effective date more than a *year away* on July 1, 2024? Accepting that Defendants just coincidentally happened to send the Final Rule to OFR mere days before *Biden* was certain to come down would require this Court to "'exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com.*, 139 S. Ct. at 2575 (citation omitted). Given the obviously pretextual nature of Defendants' actions here, it cannot survive APA review. *Id.* at 2574–76.

Regardless, the Final Rule was arbitrary and capricious even when judged by the state of the world on (or before) June 14, 2023: the Eighth Circuit had issued a nationwide injunction pending appeal, which the Supreme Court refused to stay. 143 S. Ct. 5177 (2022). In fact, the Proposed Rule came out on January 11, 2023—*after* this injunction was in place. *See* 88 Fed. Reg. 1,894. There was never a point in time where it was reasonable for the Department to believe the HEROES Act forgiveness would occur; they relied solely on the Supreme Court intervening to save it. Victory was hardly so obvious that the agency could reasonably place all of its eggs in the basket of winning *Biden*. But that was the Final Rule's *only* rationale on that front. 88 Fed. Reg. at 4,387. The Final Rule's singular "we will win" *Biden* premise was thus arbitrary and capricious from the time the proposed rule was published until it was final.

Defendants also argue (at 32–33) that the HEA does not impose any requirement that the Final Rule consider costs. This is irrelevant—and waived—because *the Final Rule* did not offer any such rationale—instead placing all the agency's proverbial eggs in the we-will-win-*Biden* basket. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("[*P*]*ost hoc* rationalizations of the agency cannot serve as a sufficient predicate for agency action." (cleaned up) (citation omitted)). This argument fails on the merits too. The cost of the Final Rule—*i.e.*, the amount of

debt forgiven—is an "'important aspect of the problem.'" *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). "Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Id.* at 752–53. The Department thus could not entirely ignore costs. Indeed, there is every reason to believe—given the Department's stated goals—that the Final Rule's provisions *should* vary if they produced $1 million rather than $1 trillion in debt cancellation. Calibrating an appropriate amount of debt relief necessarily requires *some* comprehension of how much debt would actually be cancelled to satisfy the APA's mandate that "agencies … [must] engage in 'reasoned decisionmaking.'" *Id.* at 750 (citation omitted).

Sensing the untenability of their arguments, Defendants resort (at 34) to arguing harmless error: contending that they would have adopted the Final Rule *no matter what it cost*. But that is a *confession* rather than a *defense*: one demonstrating an incurably closed mind incapable of the reasoned decision-making that the APA demands. *See, e.g.*, *Sherley v. Sebelius*, 776 F. Supp. 2d 1, 21 (D.D.C. 2011) ("The APA's procedural requirements would [] be rendered meaningless if an agency [] had 'an unalterably closed mind'" (citation omitted)). The APA fairly demanded that the Department have *some clue* as to the cost of the Final Rule—and thus how much student debt it would be cancelling/its objective that it would be achieving. And an accurate cost is necessary for the States to know the amount of tax revenue they stand to lose. Defendants' confession that they had no such clue post-*Biden*—but would have adopted the Final Rule in precisely the same form no matter whether its cost was a two- or *twelve*-digit number—fails to establish harmless error and shows the severity of the APA violation.

## C.  Defendants' Remaining APA Arguments Are Unavailing

The Final Rule is also arbitrary and capricious because it failed to consider harm to the States and their reliance interests, and further rests on internal contradictions. As to lost tax revenues, Defendants do not contend that the Rule made *any* effort to analyze the magnitude of the tax losses to the States *whatsoever*. Instead, they argue only (at 35) that the States had "no meaningful reliance interest" in lost tax revenues as a matter of law. That is legally indefensible: "*taxes are the life-blood of government*, and their prompt and certain availability an *imperious need*." *Bull*

*v. United States*, 295 U.S. 247, 259 (1935) (emphases added). Defendants' blithe dismissal that the States lack any "meaningful reliance interest" in their tax revenue streams flouts the APA. The Federal Government would never be so blasé if its *own* tax revenues were on the line.

Defendants also contend the Final Rule satisfies the APA with respect to impacts on the PSLF program and inflation by pointing to the Final Rule's analysis of "'costs and benefits.'" Opp. at 35-36 (quoting 88 Fed. Reg. at 43,879). But as explained above and previously, that analysis of costs is indefensible since it relied on the reality-defying premise that they would win *Biden*—which they had already lost. Without defensible estimate of actual costs post-*Biden*, the Final Rule's analysis of these issues is necessarily arbitrary and capricious.

Finally, the Final Rule is arbitrary and capricious because it (1) never denies that it is more of the same as the 2015 Rule, (2) admits the 2015 Rule failed to decrease delinquencies and defaults, and (3) never explains how the Final Rule's more-of-the-same relief here would produce a different result. Rather than satisfying the APA, the Final Rule's analysis is the very definition of "'insanity'": *i.e.*, "'doing the same thing over and over again, but expecting different results.'" *Sessions v. Dimaya*, 584 U.S. 148, 174 (2018) (cleaned up). Defendants' vague and unexplained "this time is different" rationale does not satisfy the APA.

III.   **The Department's Truncated 30-Day Notice Period Violated the APA**

Defendants' provision of just a 30-day notice period violated the APA. No court has ever upheld such a short notice period for a rule of equivalent importance and cost. Defendants provide no reason for this Court to be the first. Defendants' reliance (at 37–38) on *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) is misplaced. *Vermont Yankee* stands for the unexceptional principle that "reviewing courts are generally not free to impose" "additional procedural rights" beyond what APA provides. *Id.* at 524. But the APA *itself* mandates a reasonable notice period in §553, which is thus not a court-imposed "additional procedural right." Moreover, Defendants' overreading (at 38) of *Vermont Yankee* as "fatal" to any notice-period challenge proves far too much. Under Defendants' absolutist arguments here, courts would be compelled to bless a seven-day or even *seven-hour* notice period. But that is not—and never has

been—the law. Defendants cite *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986) to argue that "[c]ourts have uniformly upheld comment periods of 45 days or less." Opp. at 38. But Defendants did not provide 45 days here, but rather only 30. They do they even attempt to argue why such a truncated period was necessary when the Final Rule was released *nearly a year* before its July 1, 2024 effective date. The apparent motivation was to *reduce* the number of comments.

Defendants also wrongly discount the import of the *two* Executive Orders that the Department violated here. While EOs are not privately enforceable, they reflect the prevailing understanding of the APA's requirements and agency norms. There is a reason that the Department cannot point to 30-day-notice period for any comparable rule and why there is a dearth of case law on this subject: other agencies follow the widespread practice the EOs mandate. Those agencies honor their obligations under the APA and avoid the legal risks that the Department's 30-day-notice-period occasioned here. Should federal courts indulge Defendants' transgressive gambit here, they should expect many more agencies to follow suit.

Defendants' fallback reliance on harmless error is equally unavailing. In the APA context, it applies "only 'when a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance of the decision reached.'" *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 786 n.6 (10th Cir. 2006) (citation omitted) (cleaned up). Here, the length of the notice period unequivocally had significant "bearing on the procedure used." Moreover, an APA notice-and-comment violation "'cannot be harmless if there is any uncertainty at all as to the effect of that failure;'" since any more-lenient standard would "virtually repeal section 553's requirements." *Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003) (citation omitted).

IV.    **The Remaining Requirements for Equitable Relief are Met Here.**

A.  **Without Relief from this Court, the States Will Suffer Irreparable Harm.**

Plaintiff States cannot obtain money damages from the federal government due to sovereign immunity.  Their injuries are irrecoverable injuries, which constitute irreparable harm. *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994). The same harms that establish standing here thus necessarily also constitute irreparable harm.

Those harms are not just imminent but have happened and are ongoing.

Defendants do not contest genuinely that if the States' harms exist, that they would be irreparable. Instead, they rely (at 40-41) on putative delay to discount those harms. But the cases they cite are inapposite (including trademark cases). More generally, the purported "delay" here is nonsensical: here the statute of limitations is six years, *see* 28 U.S.C. § 2401(a), so Defendants' contention that the harms at issue somehow became entirely irremediable by this Court after not even 13% of that time passed is untenable. Moreover, the States filed this suit more than three months before the Final Rule's stated effective date. That is not delay, and Defendants do not cite a single case where a court has found material delay in equivalent circumstances.

## B. The Balance of Harms and Public Interest Favor Relief Here.

Defendants' contentions (at 41-42) that the public interest requires that the Rule be allowed to be implemented *even if* it is unlawful is simply not the law. Where, as here, the agency lacks authority, "the equities do not justify withholding interim relief." *Nat'l Fed. Indp. Bus. v. OSHA*, 142 S. Ct. 661, 666 (2022). That was so even when the agency claimed its action would "save over 6,500 lives." *Id.* Here the Department cannot claim any remotely equivalent interest.

## V.     The Preliminary Injunction Should Apply Nationwide.

Finally, Defendants' objections to a nationwide injunction are ill-taken, since a more limited injunction would not provide the requisite "complete relief" to the States. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) The United States is a nation with tremendous internal migration. For example, the single greatest intra-state movement is from non-Plaintiff California to Plaintiff Texas.[9] This undeniable demographic reality makes plain the irreparable harms that would flow from a narrower injunction: cancelled student debt of individuals currently in other States who will move to Plaintiff States will result in lower tax revenues from 2026 on as a result of the Final Rule. Similarly, because States recruit employees from beyond their borders, the competitive harms to their recruiting efforts from cancelled debt in other States is already

---

[9] *See, e.g.*, https://www2.census.gov/programs-surveys/demo/tables/geographic-mobility/2022/state-to-state-migration/State_to_State_Migration_Table_2022_T13.xlsx.

occurring and ongoing. And because some individuals with FFELP loans serviced by Plaintiff States' entities have necessarily already moved to other States, they too will suffer irreparable injury from a narrower injunction.

In addition, a narrower injunction would raise enormous equity issues and may even violate the Constitution. If Defendants had attempted to cancel debt only in *some* States (*e.g.*, battleground states) that would likely violate the APA (lacking a defensible rationale) and the Equal Protection Clause (by irrationally discriminating against residents of some States). This Court should not adopt a remedy that would be illegal and inequitable. Tellingly, *everything* that Defendants argue here against nationwide scope was also advanced to the Supreme Court in *Biden*, where the United States sought an outright stay or narrowing to the Plaintiff States. *See https://shorturl.at/mtCIT*. To no avail: the Supreme Court rejected those arguments and refused to narrow the injunction. 143 S. Ct. 5177 (2022). The same result should happen here.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff States' Motion for Preliminary Injunction and deny Defendants' motion to dismiss.

Respectfully submitted,

**KRIS W. KOBACH**
**Attorney General of Kansas**

/s/ Abhishek S. Kambli
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
Erin B. Gaide, Kan. SC No. 29691
Assistant Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

Drew C. Ensign, *pro hac vice*
Holtzman Vogel Baran Torchinsky
 & Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Email: densign@holtzmanvogel.com

*Counsel for Plaintiff State of Kansas*

/s/ Edmund LaCour
Edmund LaCour, *pro hac vice*
*Solicitor General*
OFFICE OF THE ALABAMA
 ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
edmund.lacour@alabamaag.gov
*Counsel for Plaintiff State of Alabama*


/s/ Bill Milks
Bill Milks, *pro hac vice*
*Chief Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
bill.milks@alaska.gov
*Counsel for Plaintiff State of Alaska*


/s/ Joshua Turner
Joshua Turner, *pro hac vice*
*Chief of Constitutional Litigation & Policy*
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov
*Counsel for Plaintiff State of Idaho*

/s/ Eric H. Wessan
Eric H. Wessan, *pro hac vice*
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
*Counsel for Plaintiff State of Iowa*


/s/ Kelsey Smith
Kelsey Smith, *pro hac vice*
*Deputy Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY
 GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 506-3746
smithkel@ag.louisiana.gov
*Counsel for Plaintiff State of Louisiana*


/s/ Christian B. Corrigan
Christian B. Corrigan, Kan. SC No. 25622
*Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
*Counsel for Plaintiff State of Montana*

/s/ Lincoln J. Korell
Lincoln J. Korell, *pro hac vice*
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
 OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*


/s/ Joseph D. Spate
Joseph D. Spate, *pro hac vice*
*Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
*Counsel for Plaintiff State of South Carolina*

/s/ Charles K. Eldred
Charles K. Eldred, *pro hac vice*
Chief, Legal Strategy Division
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100 charles.eldred@oag.texas.gov
*Counsel for Plaintiff State of Texas*


/s/ Lance F. Sorenson
Lance F. Sorenson, *pro hac vice*
*Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov
*Counsel for Plaintiff State of Utah*

APPENDIX

**State-By-State Breakout of Debt Cancelled Under Final Rule as of Mid-February 2024**

Source: Department of Education, *Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness* (Feb. 23, 2024) *available at* https://www.ed.gov/news/press-releases/biden-harris-administration-releases-state-state-breakdown-12-billion-save-plan-forgiveness

## Borrowers Identified for Early SAVE Forgiveness by Location

| State | Borrower Count | Amount Forgiven (in millions) |
|---|---|---|
| Alabama | 2,550 | $20.80 |
| Alaska | 190 | $1.40 |
| Arizona | 3,990 | $33.00 |
| Arkansas | 1,190 | $8.70 |
| California | 13,580 | $114.80 |
| Colorado | 2,530 | $19.80 |
| Connecticut | 1,600 | $13.70 |
| Delaware | 650 | $5.30 |
| District of Columbia | 350 | $2.90 |
| Florida | 12,790 | $105.40 |
| Georgia | 6,050 | $49.70 |
| Hawaii | 280 | $1.90 |
| Idaho | 1,130 | $9.20 |
| Illinois | 5,560 | $43.80 |
| Indiana | 3,330 | $26.00 |
| Iowa | 2,120 | $17.30 |
| Kansas | 1,270 | $9.90 |
| Kentucky | 2,110 | $16.10 |
| Louisiana | 2,160 | $16.30 |
| Maine | 700 | $5.30 |
| Maryland | 2,680 | $22.70 |
| Massachusetts | 2,490 | $19.50 |
| Michigan | 6,040 | $47.00 |
| Minnesota | 2,060 | $14.50 |
| Mississippi | 1,790 | $13.30 |
| Missouri | 2,780 | $22.40 |

| | | |
|---|---|---|
| Montana | 300 | $2.20 |
| Nebraska | 750 | $5.30 |
| Nevada | 1,650 | $13.90 |
| New Hampshire | 490 | $3.60 |
| New Jersey | 4,180 | $35.30 |
| New Mexico | 860 | $6.80 |
| New York | 8,190 | $63.40 |
| North Carolina | 4,170 | $33.30 |
| North Dakota | 220 | $1.60 |
| Ohio | 7,540 | $60.00 |
| Oklahoma | 1,690 | $12.90 |
| Oregon | 2,220 | $17.40 |
| Pennsylvania | 5,600 | $45.10 |
| Puerto Rico | 1,060 | $6.10 |
| Rhode Island | 450 | $3.40 |
| South Carolina | 2,520 | $20.60 |
| South Dakota | 270 | $1.90 |
| Tennessee | 3,340 | $25.70 |
| Texas | 14,510 | $116.60 |
| Utah | 850 | $5.80 |
| Vermont | 190 | $1.30 |
| Virginia | 3,040 | $24.60 |
| Washington | 2,630 | $20.10 |
| West Virginia | 1,070 | $8.80 |
| Wisconsin | 1,990 | $13.80 |
| Wyoming | 150 | $1.00 |
| All Other Locations | 990 | $7.40 |
| **Total** | **152,880** | **$1,218.10** |

B