**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**WICHITA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, | § | |
| STATE OF ALABAMA, | § | |
| STATE OF ALASKA, | § | |
| STATE OF IDAHO, | § | |
| STATE OF IOWA, | § | |
| STATE OF LOUISIANA | § | |
| STATE OF MONTANA, | § | Civil Action No. 6:24-cv-01057-DDC- |
| STATE OF NEBRASKA, | § | ADM |
| STATE OF SOUTH CAROLINA, | § | |
| STATE OF TEXAS, | § | |
| STATE OF UTAH, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN IN HIS OFFICIAL | § | |
| CAPACITY AS PRESIDENT OF THE | § | |
| UNITED STATES, | § | |
| MIGUEL CARDONA IN HIS OFFICIAL | § | |
| CAPACITY AS SECRETARY OF | § | |
| EDUCATION, | | |
| UNITED STATES DEPARTMENT OF | | |
| EDUCATION; | | |
| | | |
| *Defendants*. | | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

In 2022, Defendant Joseph R. Biden attempted to unilaterally cancel student loans for millions of borrowers to the tune of $430 billion, relying on a strained interpretation of the HEROES Act. Six states sued in federal court to block this unlawful action. They succeeded. In the landmark case of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court rejected Defendant Biden's assertion that he could utilize an inapplicable provision of the HEROES Act as a pretext to burden the public with hundreds of billions of dollars in student debt.

1

Now, a coalition of States sues Defendant Biden, as well as co-defendants the Department of Education and Secretary of Education Miguel Cardona, to stop a second attempt to avoid Congress and pass an illegal student debt forgiveness. Last time Defendants tried this the Supreme Court said that this action was illegal. Nothing since then has changed, other than introducing more legal errors into this Rule's underlying analysis.

Just ten days after the Supreme Court's rebuke, Defendants released a Rule purporting to abolish at least $156 billion in student debt, with a new "SAVE Plan" as its centerpiece. Defendants proposed the SAVE plan to be step two of three in their massive student loan forgiveness scheme. The first step was the illegal loan cancellation based on the HEROES Act, with which Defendants tried to cancel $430 billion in loans and that the Supreme Court rejected as unconstitutional.[1] Because the SAVE Plan included the assumption that $430 billion in student loans would be forgiven before it kicked in, Defendants expressly did not consider that would-have-been forgiven $430 billion in their cost estimate. But the Supreme Court struck down HEROES loan forgiveness in *Biden v. Nebraska*. After that, Defendants' cost estimate was completely incorrect. Despite the failure to adjust the cost part of the Save Plan's justification, Defendants rushed to push through the SAVE Plan to salvage political capital. They failed to update the cost estimate of the SAVE Plan to reflect the fact that their baseline numbers were off by $430 billion. Because of that, the Rule severely underestimates the SAVE Plan's true cost. $156 billion is a floor—the Rule itself does not analyze how much of the $430 billion it assumed was already forgiven will be affected.

---

[1] Defendants announced the third "phase" last month. *See* Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program, 89 Fed. Reg. 27,564 (Apr. 17, 2024).

Even worse, Defendants' Rule justifying the Save Plan left in sections prepared prior to *Biden v. Nebraska* being issued. That includes statements from Defendants that they are "confident in our authority to pursue debt relief" and that they are "awaiting the Supreme Court's ruling on the issue." These absurdities highlight the arbitrary and capricious nature of issuing a rule based on the assumed constitutionality of a different rule that the Supreme Court found to be unlawful are just the tip of the iceberg in a plan that is not only poor policy but poorly thought out.

The Rule is set to take effect July 1, 2024. But not content to wait for it to take effect, Defendants assumed the authority to engage in rolling loan forgiveness for individuals who had under some loans for at least 10 years and have begun doing so even before the Rule's effective date. A major round of this "forgiveness" occurred on February 21, 2024, when the Department of Education unilaterally erased the debt of 153,000 borrowers. Defendant Biden openly boasted about his defiance of the Supreme Court with this move, stating in Jacksonian fashion: "the Supreme Court blocked it. They blocked it. But that didn't stop me."[2] This lawsuit is now necessary to prevent Defendants from continuing to flout the law, which includes ignoring Supreme Court decisions.

This is not the first time Defendant Biden has taken actions that he publicly admits are likely unlawful. This is an administration that rules by will, not by law. For example, in extending the CDC's eviction moratorium, Defendant Biden stated, "the bulk of constitutional

---

[2]  Remarks by President Biden on the Saving on a Valuable Education Plan, Culver City, CA, The White House (Feb. 21, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/02/21/remarks-by-president-biden-on-the-saving-on-a-valuable-education-plan-culver-city-ca/.

scholars say it's not likely to pass constitutional muster."[3]  But he ordered CDC to extend it anyway, boasting that delays in judicial review would mean that he could impose his will for at least a time.[4]  The constitutional scholars were correct; the Supreme Court set aside as unconstitutional the obviously illegal program in *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021).

Defendant Biden is attempting the same lawless maneuver here.  Although this round of unilateral debt nullification takes on a new name, with a different putative authority, it is every bit as improper as his first unlawful attempt at debt forgiveness in *Biden v. Nebraska*.  Indeed, as the Defendants scrape ever deeper into the barrel for legal pretexts to abolish student debts, the illegality of those artifices becomes more obvious.

The authority that Defendants claim now lacks any substantive limits and amounts to claiming that they can abolish all student debt at any time by rulemaking alone.  For example, under Defendants' absurd interpretation of the Higher Education Act of 1965, they could limit student debt repayment to 5% of borrowers' income above $5,000,000 for five years and thereby abolish all remaining debt.  Defendants do so under the pretense that such debt forgiveness or debt erasure is merely modifying the terms of the loan repayment.  That is the power claimed—and challenged—in this suit.

The timing of these actions also makes plain their pretextual nature.  The first round of debt relief was rushed out in time for the 2022 elections in a transparent bread-and-circuses attempt to boost base turnout and, in essence, buy votes with federal funds.  This second round of

---

[3]  Jeff Stein & Tyler Pager, Seung Min Kim, Tony Romm, *Ban on Evictions is Back*, Washington Post (Aug. 4, 2021), https://www.washingtonpost.com/politics/2021/08/04/bidens-novel-evictions-defense-maybe-its-illegal-its-worth-it/.
[4] *Id.*

debt cancellation also—by remarkable coincidence—manages to take effect shortly before the 2024 election.  Had Defendants taken the complex and multipart rule back to the drawing board after *Biden v. Nebraska*, they would likely not be able to promulgate and finalize a rule before November 2024. So, they did not.  Accepting the propositions that the timing of these actions is mere coincidence and that neither is essentially a multi-hundred-billion-dollar vote-buying scheme would require this Court "to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted). Regardless of the suspicious timing, the Court should still set aside this executive action as unlawful.

Because this second round of debt nullification is as plainly unlawful as the first invalidated by the Supreme Court in *Nebraska v. Biden*, Plaintiffs are suing to vindicate their interests and ensure that this lawlessness does not stand.

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has federal question jurisdiction over this case under 28 U.S.C. § 1331 because this case concerns whether the Department acted in compliance with the United States Constitution and federal law, including the Higher Education Act of 1965 and the Administrative Procedure Act ("APA").

2.      This Court also has jurisdiction pursuant to 5 U.S.C. §§ 701–706 (the APA) and 28 U.S.C. § 1361.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff State of Kansas resides in this judicial district, (2) Kansas agencies harmed by the Final Rule reside in this District, (3) no real property is involved in this action.

4.      There is a present and actual controversy between the parties.

5.      Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704.

6. This Court may grant Plaintiffs the relief they request under the Administrative Procedure Act, 5 U.S.C. §§ 705-06 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

7. Plaintiffs request the United States District Court for the District of Kansas, Wichita Division, located at 401 N. Market, Wichita, Kansas 67202, for trial, if any.

## THE PARTIES

**A. Plaintiffs**

8. Plaintiff State of Kansas is a sovereign State of the United States of America.

9. Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including protecting the reliance interests of state and local agencies.

10. Kansas brings this suit through its attorney general Kris W. Kobach. He is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court. Kan. Stat. Ann. 75-702(a).

11. Plaintiff State of Alabama is a sovereign State of the United States of America.

12. Alabama sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including protecting the reliance interests of state and local agencies.

13. Alabama brings this suit through its attorney general Steve Marshall. He is the chief legal officer for the State of Alabama and has the authority to represent Alabama if federal court. Ala. Code § 36-15-1(2).

14. Plaintiff State of Alaska is a sovereign State of the United States of America.

15. Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.

16.     Alaska brings this suit through its attorney general, Treg Taylor.  He is the chief legal officer of the State of Alaska and has authority to institute any legal action on behalf of the state.  Alaska Statute 44.23.020.

17.     Plaintiff State of Idaho is a sovereign State of the United States of America.

18.     Idaho sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.  The Final Rule will harm Idaho and its citizens.

19.     Idaho brings this suit through its attorney general, Raúl Labrador, the State's chief legal officer.  He is authorized by Idaho law to sue on the State's behalf under Idaho Code § 67-1401.  His address is 700 W. Jefferson St., Suite 210, P.O. Box 83720, Boise, Idaho 83720.

20.     Plaintiff State of Iowa is a sovereign State of the United States of America.

21.     Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens.

22.     Iowa brings this suit through its attorney ggeneral, Brenna Bird.  She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.  Her address is 1305 E. Walnut St., Des Moines, Iowa 50309.  The aattorney ggeneral believes Iowa will be harmed by the Final Rule, and therefore joins.

23.     Plaintiff Louisiana is a sovereign State of the United States of America.

24.     Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

25.     Louisiana brings this suit through its attorney general, Liz Murrill.  She is the chief legal officer of the State of Louisiana and has authority to institute any civil action.  LA Constitution Art. IV, § 8.

26.     Plaintiff Montana is a sovereign State of the United States of America.  The Final Rule will harm Montana and its citizens.

27.     Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

28.     This action is brought by the State in its sovereign capacity through its attorney general, Austin Knudsen, who is the chief legal officer of the State.  Mont. Const. art VI, § 4(4).  He is authorized to bring legal actions to protect the interests of the State of Montana and its citizens. His offices are located at 215 N. Sanders St., Helena, MT 59601.

29.     Plaintiff State of Nebraska is a sovereign State of the United States of America.

30.     Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

31.     Mike Hilgers is the attorney general of Nebraska.  General Hilgers is the chief legal officer of the State of Nebraska and has the authority to represent Nebraska in federal court. Neb. Rev. Stat. § 84-203.

32.     Plaintiff South Carolina is a sovereign State of the United States of America.

33.     South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

34.     South Carolina brings this suit through its attorney general, Alan Wilson.  He is the chief legal officer of the State of South Carolina and has the authority to represent South Carolina in federal court.  *State ex rel. Condon v. Hodges*, 349 S.C. 232, 239–40, 562 S.E.2d 623, 627 (2002) (the South Carolina attorney general "'may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights.*'" (emphasis in original)) (quoting

*State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd* 282 U.S. 187 (1930)).

35.    Plaintiff State of Texas is a sovereign State of the United States of America.

36.    Texas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

37.    Texas brings this suit through its attorney general Ken Paxton.  He is the chief legal officer of the State of Texas and has the authority to represent Texas in civil litigation. *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001).

38.    Plaintiff State of Utah is a sovereign State of the United States of America.

39.    Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

40.    Sean D. Reyes is the Attorney General of Utah. He is authorized by Utah law to sue on Utah's behalf.  *See, e.g.*, Utah Const. art. VII, § 16; Utah Code § 67-5-1(1)(b).

**B.  Defendants**

41.    Defendant Joseph R. Biden, Jr. is the president of the United States of America. He is sued in his official capacity.  Defendant Biden instructed the Department of Education to take the actions challenged here.

42.    Defendant Department of Education is an executive agency of the federal government tasked with administering the federal student loan program.

43.    Defendant Miguel Cardona is the United States Secretary of Education and is responsible for the operation of the Department, including the issuance of the challenged rule. 20 U.S.C. § 3411.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**A.  The Higher Education Act of 1965 and its Amendments**

44.    Congress enacted the Higher Education Act of 1965 (the "HEA" or "Act") "to increase educational opportunities and 'assist in making available the benefits of postsecondary

education to eligible students in institutions of higher education.'" *Biden*, 143 S. Ct. at 2362 (quoting 20 U.S.C. § 1070(a) (cleaned up)).

45.     Among other things, the HEA provided for two different forms of financial assistance: grants and loans.  *See* 20 U.S.C. § 1070-1070h, § 1071-1087-4.

46.     Initially, the HEA did not authorize directly loaning money to students; rather, the federal government guaranteed private loans.  However, Congress amended the HEA in 1993 to authorize direct loans to students from the federal government and allowed the Department to offer a variety plans for repayment of student loans.

47.     Among the repayment plans authorized by the 1993 amendments was an income-contingent repayment plan that based repayment amounts based on the income of the borrower, paid over an extended period of time not to exceed twenty-five years.  *See* 20 U.S.C. § 1087e(d)(1)(D).

48.     The premise of direct government lending was that there would be no ultimate cost to the government because the loans would accrue interest and eventually get paid back.[5] The cancelation of the remaining balance (if any) at the end of the 25-year period was designed to be a narrow and rare exception rather than the rule.[6]

49.     In 1994, the Department designed (by regulation) the first income-contingent repayment plan, which limited annual loan payments to 20% of a borrower's income that

---

[5] *Hearing of the Committee on Labor and Human Resources to Amend the Higher Education Act of 1965*, 103rd
Cong. (1993), 48, available at: https://files.eric.ed.gov/fulltext/ED363187.pdf.
[6] *Id.*

exceeds the federal poverty line.  It also established that if any amount of the loan remained after twenty-five years of payments, that remainder would be cancelled entirely.[7]

50.      In 2007, Congress authorized two major changes.  First, Congress established an income-based repayment plan (which is distinct under the HEA from income-*contingent* repayment plans) that provided relief for borrowers facing a temporary financial hardship by reducing the annual repayment cap to 15% of income above 150% of the federal poverty guideline.  *See* 20 U.S.C. §§ 1098e(a)(3)(B), (b)(1).  It also explicitly authorized cancellation of debt after 25 years.  *Id.* § 1098e(b)(7).  Income-based repayment plans are expressly limited to individuals with "partial financial hardship," *id.* § 1098e(d)(1)(E), which is defined by 20 U.S.C. § 1098e.

51.      The 2007 amendments also established the Public Service Loan Forgiveness ("PSLF") program, which allowed those who enter public service to have their loans canceled after ten years instead of twenty-five.  20 U.S.C. § 1087e(1)(B).

52.      In 2010, the last significant statutory changes were made to loan repayment.  That year, Congress lowered the cap of annual repayment to 10% of income above 150% of the federal poverty guideline and capped the timeline for loan cancelation at twenty years for income-based repayment.  This only applied to loans taken out after 2014.  20 U.S.C. § 1098e(e).

53.      Congress has set very specific limits on loan forgiveness.  Nevertheless, the Department has tried to give itself the power to set its own lower thresholds.  The Department has attempted to unilaterally override some of these statutory provisions through the rulemaking process to make them more generous.  First, in 2012 the Department established the Pay as You

---

[7] CRS, *The Federal Direct Student Loan Program* 10 (1995), available at: https://files.eric.ed.gov/fulltext/ED378875.pdf.

Earn (PAYE) plan, which extended the 2010 amendments to loans taken out as far back as 2007. *See* 77 Fed. Reg. 66,088.

54.    In 2015, the Department established the REPAYE Plan, extending the 2010 amendments to all borrowers regardless of when they took out the loans.  80 Fed. Reg. 67,204.

55.    Despite that, the average individual under the current REPAYE plan would ultimately pay back more than the amount that they took out in loans (*i.e.*, pay back the entire amount of principal plus at least some amount of interest), 88 Fed Reg. 43,880, which arguably broadly follows the contours of other repayment plans established by Congress.

**B.    The Proposed Rule**

56.    Not satisfied with the specified thresholds and criteria set by Congress for debt cancellation, the Department has contrived to set its own through the challenged rule.

57.    Defendants issued a *Notice of Proposed Rulemaking on Improving IDR for the Direct Loan Program* to that effect on January 11, 2023.  88 Fed. Reg 1,895 (Jan. 11, 2023).

58.    The NPRM allowed for only a thirty-day comment period.  *Id.*

59.    The Proposed Rule estimated that the net budget impact would be $137.9 billion across all loan cohorts through 2032.  *Id.*  This number assumed as part of its baseline estimate that the HEROES forgiveness at issue in *Biden v. Nebraska* would be upheld.

**C.    Commenting on the Proposed Rule**

60.    Despite the significance of the Proposed Rule, the Department denied all requests for extensions beyond the thirty-day period it had originally established.  88 Fed. Reg 43,821.

61.    As a result of the condensed timeline, some number of people who would have otherwise provided comment did not do so.  Similarly, other individuals and entities that

ultimately submitted comments were unable to develop their arguments adequately due to the truncated period.

62.     Regardless, there were some commenters who raised legal issues that were addressed by the Department in the Final Rule.

63.     Multiple commenters challenged the legal authority of Defendants to implement these regulations, to include: (1) acting in excess of statutory authority, (2) implicating the major questions doctrine, and (3) promulgating a rule that is arbitrary and capricious.  *See generally* 88 Fed. Reg. 43,820-905.

64.     One commenter noted that the true cost of the program was underestimated because Defendants presumed that the $430 billion of loan forgiveness at issue in *Biden v. Nebraska* would be upheld.  *Id.*

65.     The Congressional Budget Office ("CBO") was also aware of this issue.  While the CBO was not able to produce a cost estimate within the short 30-day comment period allowed by Defendants,[8] the ultimate estimate did consider the contingency that step one of Defendants' scheme, HEROES forgiveness, would be invalidated.[9]

66.     The CBO estimate also noted that Defendants' estimate "assum[ed] that there would be no increase in enrollment in the proposed IDR plan among current or future borrowers and no increase in borrowing among eligible students in the future."[10]

---

[8] *See* Congressional Budget Office, *Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans*, March 13, 2023, located at https://www.cbo.gov/system/files/2023-03/58983-IDR.pdf.
[9] *Id.* at 10 n.5.
[10] *Id.* at 7–8.

### D.    The Final Rule

67.    Following the comment period, the Department opted to ignore the statutory limitations on its authority and press forward with the Final Rule.

68.    On July 10, 2023, the Department issued a final administrative rule titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan ("FFEL Program")" (the "Final Rule" or "Rule").  The Final Rule was published in the Federal Register at 88 Fed. Reg. 43,820-905.  A true and correct copy of the Final Rule is attached as Exhibit 1 in ECF #1.

69.    The Final Rule amends 34 C.F.R. § 685.  88 Fed. Reg. at 43,900.

70.    The Final Rule makes several significant changes to preexisting regulations: for the "REPAYE" or "SAVE" Plan, the Final Rule (1) defines "discretionary income" to be income above 225% of the applicable Federal poverty guideline, (2) sets the monthly payment amount at $0 if the borrower's income falls below that threshold, (3) caps the monthly payment amount at 5% of the borrower's income that goes above that threshold for undergraduate loans, and (4) cancels all loans where the original principal balance was $12,000 or less after the borrower has made 120 monthly payments or the equivalent.

71.    Under the guise of modifying the terms of loan repayment, the Final Rule will in fact forgive billions of dollars in student debt.

72.    The Final Rule emphasized that the goal of these changes was to help more borrowers avert delinquency and default, as well as the negative consequences associated with those events, 88 Fed. Reg. 43,280, and not to create a grant, *id.* at 43,832.

73.     However, the data within the Final Rule demonstrates that the average undergraduate borrower under this new "SAVE" Plan would pay only about $6,121 for every $10,000 borrowed.  *Id.* at 43,880.

74.     Under the current/pre-Final Rule "REPAYE" Plan, that amount is $10,956 for every $10,000 borrowed.  *Id.*

75.     In effect, the Rule transforms the REPAYE Plan into a system of massive federal grants whereby borrowers pay only a fraction of the amount borrowed from the government. The remainder of the loan is forgiven.  Thus, while styled as "loans," the Final Rule partially transforms many or most loans into outright grants from the federal government—without any appropriation from Congress for the resulting tens or hundreds of billions of dollars in additional federal spending.

76.     The Final Rule brushes off most of the challenges to the Department's legal authority by taking the position that the statute "sets an explicit upper limit, but no lower limit for the 'extended period' time that a borrower must spend in repayment" and that the Secretary has "discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income."  *Id.* at 43,826–27.

77.     The Final Rule asserts that the Secretary has the "authority to make the changes in this rule related to the amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends."  *Id.* at 43,827.

78.     The only limitation the Final Rule envisions is that the Department provide a "reasoned basis for the parameters it chose."  *Id.*

79.     Aside from the APA's procedural requirement of providing a rationale, the Final Rule does not acknowledge ***any*** limiting principle on the Secretary's authority to abolish debts. It recognizes no substantive limit in the assigned statutory authority under the HEA whatsoever.

80.     To put this in perspective, there is ***nothing*** in the Secretary's interpretation of the HEA that would prevent him from limiting debt repayment on income-driven repayment plans to 1% of income over $1,000,000 for 1 year only, with all remaining debt—typically 100%—cancelled by the federal government.

81.     The Final Rule brushes off comments that the proposed program was a matter of economic significance that did not have clear Congressional authorization by stating that there is not anything "unprecedented or novel about the Department relying on section 455 of the HEA as statutory authority for designing and administering repayment plans based on income." 88 Fed. Reg. 43,830.

82.     But by the Department's own estimates, the Final Rule would abolish over one hundred billion dollars in student debt—something that is incontestably "unprecedented [and] novel"—save for the first debt cancellation invalidated by the Supreme Court in *Biden v. Nebraska.*

83.     There was no legitimate discussion on the part of Defendants about whether the Final Rule was an issue of economic or political significance that required clear Congressional authorization.

84.     The Final Rule estimates that the cost of the program would be $156 billion[11] across the span of ten years. 88 Fed. Reg. 43,820.  As with the proposed rule, this presumed a

---

[11] Although the final rule increased the cost estimate, that increase was due to factors other than the debt forgiveness struck down in *Biden v. Nebraska.*

baseline with $430 billion of debt already being eliminated.  But that did not happen as a result of *Biden v. Nebraska*.  *Id.*

85.    The Final Rule never updated the cost based on *Biden v. Nebraska*, even though it came out ten days later than the Supreme Court decision.  As a result, no one knows the true cost of the program.

**E.    The Final Rule Irreparably Harms Plaintiffs**

86.    The Final Rule irreparably harms Plaintiffs in several independent ways.

87.    The Final Rule will cause financial harm for Plaintiff States including Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah through loss of state tax revenue.

88.    Student loan forgiveness under income-driven repayment plans (other than public service loan forgiveness) is normally considered taxable income for federal purposes.

89.    The American Rescue Plan Act of 2021 contained a provision that made all student loan forgiveness, regardless of the program, not count toward the federal definition of taxable income until December 31, 2025.

90.    Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah automatically base their definition of taxable income on the federal definition of income or adjusted gross income from the Internal Revenue Code, as amended.  The States automatically update their definitions of taxable income to reflect changes in federal law.

91.    As a result of the Final Rule, Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah cannot count forgiveness of loans under income-driven repayment plans as taxable income for state tax purposes until December 31, 2025.

92.     The Final Rule accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years for certain loan balances.

93.     Under the prior Final Rule, these loans would not be forgiven for twenty to twenty-five years.

94.     Under the pre-Final Rule plans, the Government Accountability Office (GAO) estimates that by 2030, "about 1.5 million loans held by about 600,000 borrowers" would be eligible for loan cancellation.[12]  Of those loans, roughly 1.2 million would be canceled between 2026 and 2030.[13]

95.     Thus, but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025 for residents of the Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina and Utah. This would result in taxable income being recognized from the loan cancelation and thus payment of income taxes to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah.

96.     The challenged Final Rule, however, will reduce income tax revenue by decreasing the amount of outstanding student loan debt.  It does so because one of its effects is to shift forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income (*i.e.*, December 31, 2025 and on) into a period where it is not taxable (*i.e.*, 2024-25).  As a result, the Defendants' actions will cost Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah tax revenue.

---

[12] U.S. Gov't Accountability Office, GAO-22-103720, Federal Student Aid: Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness 15 (2022), https://tinyurl.com/bdhzca8z.
[13] *See id.* at 16 fig. 3.

97.     In fact, Defendants' representatives publicly announced, "In Kansas, nearly 1,300 borrowers have already received $9.9 million in debt relief under the Biden-Harris Administration's SAVE plan."[14]  Plaintiff Kansas cannot collect income taxes on any of this $9.9 million.  Most of this amount would not have been forgiven prior to January 1, 2026.

98.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah have no option to avoid harm from the Final Rule.  Even if they were to break their linkage to the federal definition of income and separately tax student debt cancellation for 2024 and 2025, they would incur significant administrative costs as a result.  At a bare minimum, these States would have to expend sums to amend all of their tax forms—since they could no longer simply use federal income as the starting point.  These States likely would also have to promulgate guidance and expend sums enforcing the new requirements, which would likely confuse their taxpayers (who are otherwise used to having their state income taxes based on their federal income).

99.     More fundamentally, a Final-Rule-induced divorce from the federal definition of income is likely to cause significant and costly administrative complexity and confusion. There is a reason that the *vast* majority of States with income taxes conform to the federal definition of income.  *See* Tax Policy Center, *Tax Policy Center Briefing Book: State and Local Tax Policies* (Jan. 2024) *available at* https://www.taxpolicycenter.org/briefing-book/how-do-state-individual-income-taxes-conform-federal-income-taxes.  There are enormous economies and efficiencies to be had from such conformity.  That is why so many States follow the federal definition income.

---

[14] Haisten Willis, *Kansas Attorney General Will Sue Biden Administration Over Student Loans*, Washington Examiner, Mar. 27, 2024, https://www.washingtonexaminer.com/news/white-house/2942016/kansas-attorney-general-will-sue-biden-administration-over-student-loans/.

100.    Nor does that conformity to the federal definition of income have anything to do with taxation of student debt cancellation.  Each of Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah adopted their conformation policies for reasons other than taxation relating to student debt.

101.    If the States are forced to break their linkage to the federal definition of income, they will lose the efficiency and economic benefits that have long been a mainstay of state tax policy.  Such losses of efficiency and economic benefits is cognizable injury.

102.    If the Final Rule were to coerce States into changing their income tax systems to avoid harms from that Rule, that would also inflict sovereign injury: States have "sovereign power . . . to create and enforce a legal code."  *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 601 (1982).  Coercing States to adopting different laws other than their actual preferences, solely to avoid injuries inflicted upon them by unlawful federal regulations, thus inflicts sovereign injuries upon the States.

103.    In addition to loss of tax revenue, the Final Rule harms Plaintiffs' ability to recruit and retain talent, including legal talent in state attorney general offices.  State agencies typically cannot pay as much to recruit and retain talent as private sector employers.  One of the benefits they rely on to attract and maintain talent is the PSLF program established in the HEA.

104.    For example, the Kansas Office of the Attorney General ("OAG") and other Kansas state agencies rely upon the availability of other student debt forgiveness programs to recruit legal talent.  Indeed, they currently have many employees eligible for relief under the PSLF program for undergraduate and graduate student loans.

105.    South Carolina schools also rely on the PSLF program to aid with recruitment and retention of teachers.  According to the South Carolina Department of Education, "[t]he issue of

loan forgiveness directly relates to the issue of salary, as teachers report they often do not make enough money to afford monthly student loan payments upon graduation forcing them to pursue careers outside of education. . . . Our ability to recruit future educators to the field of education, specifically public education, is dependent upon financial support of pre-service candidates interested in entering the field."  S.C. DEPARTMENT OF EDUCATION, *Teacher Recruitment and Retention Task Force Recommendations*, at 11, May 2023 (https://ed.sc.gov/newsroom/teacher-recruitment-and-retention-task-force-recommendations/).

106.    South Carolina struggles with a growing teacher shortage.  At the start of the 2022-2023 school year, there were 1,474 vacant teaching positions, a 39% increase in vacancies over the previous year.  *Id.* at 2.  That same year, 6,134 teachers left the profession, up from 5,359 the previous year.  *Id.*  Recruiting and retaining talent is difficult enough; removing the incentive of PSLF would strike another crushing blow to the South Carolina public education system.

107.    Similarly, the Alaska Attorney General's office relies on the PSLF Program as a tool for recruiting and retaining employees.

108.    Put simply, the value of the PSLF Program as a recruiting and retention tool is directly proportional to the amount of student debt that a current or potential employee holds: *i.e.*, the more debt that can be forgiven under the PSLF Program, the more powerful of an inducement it is. Conversely, if the amount of student debt held by current and potential employees decreases, the relative attractiveness of public employment for the Plaintiff States decreases.

109.    These premises flow from rudimentary economic principles of supply-and-demand and incentives. The inducement of the PSLF Program is cancellation of all remaining

student debt. Thus: less debt equals less incentive to accept a job with the States or continue to work for them.

110.    By unilaterally writing off enormous amounts of debts—including student debt that is disproportionately held by law school graduates and other prospective State employees—the Final Rule harms the state's ability to recruit talent, and directly makes it less lucrative for current and prospective employees to work for the state. *See*, *e.g.*, *Louisiana Energy & Power Auth. V. Fed. Energy Regul. Comm'n*, 141 F.3d 364, 367 (D.C. Cir. 1998) (A party "suffer[s] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them.").

111.    Similarly, other Plaintiff States rely on the availability of loan forgiveness under the PSLF program to recruit and retain employees.  The Final Rule harms them by reducing the attractiveness of that incentive to work for Plaintiff States.

112.    During the early roll out phase of the Final Rule, hundreds of thousands of borrowers who had loan balances below a certain amount after ten years had their loans retroactively forgiven even if they never performed public service.

113.    Once the Final Rule takes effect, additional individuals who have $12,000 or less in loans will have them forgiven after ten years of repayment—the same amount of time required for public service loan forgiveness.

114.    Once the Final Rule takes effect, most individuals on an income-driven repayment plan will have monthly payments that equal $0 per month.  As a result, they would receive less benefit from the PSLF Program, which makes working for state agencies less attractive.  Many will therefore leave their jobs with agencies of the Plaintiff States because one of the primary financial benefits for them to remain will have been eliminated by the Final Rule.

115.    Therefore, state and local government employers in Plaintiff States will be harmed in their ability to recruit and retain talent.

116.    Plaintiff States also have state instrumentalities or quasi instrumentalities that (1) provide student loans to residents of the state, (2) hold loans issued under the Federal Family Education Loan Program ("FFELP loans"), and/or (3) service student debt taken out by residents, former residents, and out-of-state students.

117.    These entities derive income from their loan portfolios, such as through collecting interest owed or service fees.

118.    That income is typically either provided directly to their respective States or spent on items for which the State would otherwise have to expend its own funds.

119.    The amount of income thus collected is directly proportional to the size of the debt portfolio: *i.e.*, decreasing the size of the portfolio will decrease the income collected by the instrumentalities/quasi-instrumentalities.

120.    The Final Rule is virtually certain to decrease the size of these student-debt portfolios by inducing individuals to consolidate their FFELP loans into direct federal loans in order to take advantage of the extraordinary (and unlawful) generosity of the Final Rule. The Final Rule itself predicts as much and further sought to make such consolidation more attractive by providing "more clarity" that borrowers "retain the borrower's progress toward forgiveness when they consolidate Direct or FFEL Program Loans into a Direct Consolidation Loan," 88 Fed. Reg. at 43,865.

121.    South Carolina has one such affected entity, the State Education Assistance Authority ("SEAA"), which is a "public instrumentality of the State."  S.C. Code Ann. § 59-115-40.  "[T]he exercise by the authority of any power" conferred by the State is "deemed and held to

be the performance of an essential public function." *Id.* SEAA, in turn, relies on the South Carolina Student Loan Corporation ("SCSLC") to service its FFELP loan portfolio.

122.     Already, since 2011, SEAA's portfolio has decreased from approximately $31.3 million to $6.4 million, which has reduced the amount of income generated for South Carolina's benefit from approximately $1.173 million to around $433,000. The Final Rule will further decrease the size of SEAA's portfolio as borrowers convert FFELP loans to take advantage of available debt forgiveness. This, in turn, will result in additional losses of revenue to South Carolina, thereby causing cognizable injury and irreparable harm.

123.     Similarly, Alaska has the Alaska Student Loan Corporation ("ASLC") that performs a similar role. ASLC is a public corporation and enterprise instrumentality of the State of Alaska that was created by statute. *See* Alaska Stat. § 14.42.100. It is run by a Board of Directors, each of whom is appointed by the Governor of Alaska. *Id.* § 14.42.120.

124.     As of March 2024, ASLC owns over $16.8 million in Federal Family Education Loan Program (FFELP) loans. Through these loans, ASLC collects $1.9 million in interest and other FFELP portfolio income annually.

125.     The Final Rule will cause Alaska to lose significant revenues.

126.     ASLC estimates that the Final Rule will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP loan holder.

127.     Texas also has a student debt servicing public entity, the Texas Higher Education Coordinating Board ("THECB").

128.     The THECB is an agency of the State of Texas and was created by statute. *See* Tex. Educ. Code. § 61.021.

129.    THECB is run by a nine-member governing board, each of whom are appointed by the Governor of Texas with the advice and consent of the Senate of Texas.

130.    As of May 1, 2024, THECB owns over $1,1295,236 in FFELP loans. Through these loans, THECB collected $114,479 in interest in 2023.

131.    If the Final Rule were to decrease the size of that student debt portfolio, the amount of income that the THECB would collect would decrease.

132.    As set forth above, the Final Rule will cause such a decrease, thereby decreasing the income collected by the THECB, and causing harm to Texas.

## CLAIMS FOR RELIEF

### COUNT I
**Agency Action in Excess of Statutory Jurisdiction and in Violation of the Separation of Powers**
**U.S. Const. art. I, § 1**

133.    Paragraphs 1–132 are realleged as if fully set out herein.

134.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

135.    The Final Rule is final agency action subject to judicial review.  *Id*. § 704.

136.    The Final Rule is a "rule[]" under the APA.  *Id*. § 701(b)(2).

137.    The Department is an "agency" under the APA.  *Id*. § 701(b)(1).

138.    Separation-of-powers principles prohibit an agency from deciding questions of great economic or political significance, or issues traditionally governed by state or local law,

absent clear authorization from Congress to do so. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (discussing the "major questions" doctrine).

139.    The major questions doctrine is triggered when an agency invokes broad authority over matters of great economic and political significance. *See id.* at 721-22.

140.    The Rule triggers the doctrine because forgiving hundreds of billions of dollars in student loans for thousands of borrowers is an issue of vast political significance. *Biden*, 143 S. Ct. at 2375 (2023).

141.    The Final Rule also invokes the major questions doctrine because the cost of the program makes it an issue of vast economic significance. When all of the aspects of the Final Rule are taken together, the average undergraduate borrower repays only $6,121 for every $10,000 borrowed. 88 Fed. Reg. 43,880.

142.    In practice, this has created a situation where 4.3 million out of 7.8 million borrowers under the income-driven repayment plan from the Final Rule have a monthly payment of $0 on their loans. Their loans are completely forgiven.

143.    This results in a price tag of $156 billion according to the Final Rule. However, this number came with a baseline assumption that $430 billion of student loan debt at issue in *Biden v. Nebraska* would already be forgiven. It was not. As a result, the actual cost of the program is much higher.

144.    The Final Rule violates the major questions doctrine because questions regarding the nature and scope of student loan forgiveness are issues of vast political significance subject to earnest and profound debate across the country.

145.   Departure from longstanding practice without new authorization from Congress is strong evidence the agency is acting without Congressional authorization.  *See Nat'l Fed'n Indp. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) [hereinafter *NFIB*].

146.   The Final Rule also departs from Defendants' nearly thirty-year definition of "income contingent repayment plan" by effectively turning a repayment plan into an outright grant in the form of loan forgiveness without new authorization from Congress.

147.   In fact, nothing in the HEA or any of its amendments gives Defendants the authority to turn the terms of income-driven loan repayment into a grant.

148.   Nothing in the HEA nor its amendments gives Defendants the authorization to spend significantly more than $156 billion.

149.   As noted in *Biden*, the HEA does give Defendants express authorization to forgive loans in four other instances: (1) loans held by public servants, *see* 20 U.S.C. §§ 1078–10, 1087j, 1087ee, (2) borrowers who have become "permanently and totally" disabled, *id.* § 1087(a)(1), (3) borrowers who are bankrupt, *id.* § 1087(b), and (4) borrowers whose schools falsely certify them, close down, or fail to pay lenders, *id.* § 1087(c).  143 S. Ct. at 2363.

150.   That Defendants chose to rely on a completely different provision, 20 U.S.C. §§ 1087e(d) and (e)), strongly suggests Congress did not authorize this action.  Congress does not "hide elephants in mouseholes," *Witman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001), or authorize by implication where it has does so expressly elsewhere.

151.   Even if the Final Rule did not implicate the major questions doctrine, it would still violate the separation of powers.  Congress only gave the Department authority to cancel student loans in some very limited scenarios.  *See Biden*, 143 S. Ct. at 2362-63.

152.    And while Congress is no doubt aware of the issue, it has chosen not to rewrite the HEA by adding a new category of loan forgiveness as the Department has unilaterally done. By doing so unilaterally, Defendants have "seiz[ed]he power of the Legislature." *Id.* at 2373.

153.    Members of Congress have introduced legislation that would accomplish this or similar goals, *see, e.g.*, S.3953 (2022); H.R. 3027 (2019), but Congress has chosen not to enact such legislation.

154.    The Department therefore has no authorization to forgive student loans in this context, and the Department exceeded its authority when it issued the Final Rule. Because the Final Rule violates the separation of powers, it should be set aside.

## COUNT II
### Agency Action That Is In Excess of Statutory Authority
### 5 U.S.C. § 706

155.    Paragraphs 1–132 are realleged as if fully set forth herein.

156.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

157.    The Final Rule is contrary to law and exceeds the Department's statutory authority.

158.    The HEA and its amendments separate grants and loans into separate chapters. The income-driven repayment plan is in the chapter that addresses loans and by its nature anticipates actual ***repayment*** of the principal borrowed.

159.    Defendants have some discretion in setting the terms of loan repayment under the statute, and there are circumstances where someone on this program would pay less than they would otherwise owe. However, the broad nature of Defendants' actions in the Final Rule make it so that the average undergraduate borrower only repays $6,121 for every $10,000 borrowed.

160.    At this point, the loan becomes at least a partial grant because, rather than paying back loans with interest, most borrowers will pay back significantly less than the principal they borrowed.

161.    Congress already spoke in a separate chapter of the HEA and its amendments about what qualifies as a grant.  There is no authority for the proposition that Congress intended to turn the terms of a loan into an outright grant.

162.    The HEA also states that the standard term of loan repayment is ten years or less.  The statute that authorizes income-driven repayment requires payment over an *extended* period of time.  20 U.S.C. § 1087e(d)(1)(D).  However, the Final Rule allows borrowers with loans balances of $12,000 or less to have their loans canceled after only ten years.

163.    This erases any meaningful difference between a standard repayment plan and an extended repayment plan because an extended repayment plan necessarily envisions a longer repayment period than the standard repayment plan.

164.    Because the Final Rule conflicts with what Congress explicitly spoke on in the HEA, it should be set aside.

165.    Furthermore, Congress already defined the terms of repayment for someone facing a partial financial hardship as payments capped at 10% of income above 150% of the federal poverty line.

166.    The Final Rule caps undergraduate payments at 5% of income above 225% of the federal poverty line.  No authority suggests that Congress intended most borrowers have a plan more generous than those who are experiencing a partial financial hardship.

167.    By setting the applicable income thresholds for financial hardship itself, Congress precluded Defendants from adopting their own more-generous thresholds.

168.    Congress has already given Defendants very limited ability to "waive" loans with regard to FFEL loans.  *See* 20 U.S.C. § 1082(a)(6).  This provision shows the limits of what Congress authorized the Secretary to do with respect to "waiving" student loans.  Defendants disclaimed reliance on this provision.  88 Fed. Reg. 43,834.  By cancelling loan debt on a mass basis through the income-driven loan repayment plan, Defendants are sidestepping those limits and flouting their statutory authority.

169.    Finally, Congress only provided one avenue where a borrower can receive loan forgiveness after ten years of repayment.  That is through the PSLF program.  CITE.

170.    Debates surrounding the bill that authorized public service loan forgiveness emphasized the importance of forgiving loans through this program because of the need to gear specific relief for those who pursue a career in public service.

171.    This Final Rule provides forgiveness after ten years for anyone who has an original balance of $12,000 or less.  In fact, Defendants have already retroactively forgiven hundreds of thousands of such loans regardless of the amount of interest accumulated on the principal balance.

172.    No authority suggests that anyone—regardless of career, income, or even unemployment—would have the same timeline for loan forgiveness as those who dedicated a decade of their career to public service.

173.    The Final Rule is contrary to the HEA and its amendments.  It should be set aside.

**COUNT III**
**Arbitrary and Capricious Agency Action**
**5 U.S.C. § 706**

174.    Paragraphs 1–132 are realleged as if fully set forth herein.

175.    The final Rule is arbitrary and capricious for a number of independent reasons. In short, Defendants failed to consider numerous important factors, including the full cost of the rule and important reliance interests.  Despite being aware of the shortcomings, Defendants declined to address them in the Final Rule or provided wholly inadequate explanations, brushing off concerns.  Elsewhere, the Final Rule's explanation is internally inconsistent.

176.    The Final Rule is arbitrary and capricious in that it fails to capture, account for, or report the full cost.  The Proposed Rule estimated it would cost $137.9 billion.  This estimate was increased to $156 billion in the Final Rule.

177.    This is without a doubt a severe underestimation.  The Final Rule states that the baseline used to compute this number included an assumption that $430 billion in student loans that were at issue in *Biden v. Nebraska* would be forgiven.  That was not the case.

178.    The reality is that no one, including Defendants calculated the true cost of the program, but they pushed it through anyway.

179.    The Final Rule was released 10 days after the decision in *Biden v. Nebraska* was issued.  Defendants knew or should have known prior to the Final Rule being released that their estimates were way off.  In fact, at least one commenter warned them about it.

180.    Defendants themselves noted, "One commenter expressed concern with our cost estimates, which account for the Administration's one-time debt relief plan to forgive $20,000 for Pell Grant eligible borrowers and $10,000 for other borrowers.  This issue remains before the Supreme Court.  The commenter suggests that we should produce a secondary cost estimate in the event that the loan cancellation plan does not go into effect."  88 Fed. Reg. 48,375.

181.    The CBO also warned of this issue.

182.     Instead of heeding that warning, Defendants cavalierly responded, "the Department is confident in our authority to pursue debt relief and is awaiting the Supreme Court's ruling on the issue."  *Id.*  This was, again, 10 days ***after*** the Court in *Biden v. Nebraska* had already informed Defendants that their confidence in their authority to pursue debt relief was misplaced.

183.     Ultimately, Defendants made no change to their estimates despite having ample warning that their estimates were off by a wide margin.  *Id.*

184.     This is a violation of Defendants' statutory duty to "reasonably explain" the Rule, including by responding "significant points" raised by the comments.  *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343-344 (D.C. Cir. 2019).  The Rule's estimate was just wrong.

185.     The Defendants cost estimate also does not anticipate the increased costs that will come when more borrowers, both present and future, sign up for what is likely to be a very attractive program.  This despite expressly noting that future borrowers would be also to take advantage of its terms.  88 Fed. Reg. 43,822–23.

186.     The CBO warned of this as well.

187.     Furthermore, the Final Rule is also arbitrary and capricious because it fails to consider the reliance interests of the Plaintiffs and their entities.  *See*, *e.g.*, *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (cleaned up) (citation omitted)).

188.     *First*, the Final Rule did not consider Plaintiff reliance interest on tax revenue from loan forgiveness.

189.     Normally, "forgiveness" through income-driven repayment is considered taxable income by the Internal Revenue service.

190.     Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah follow the federal definitions when defining taxable income tax for state purposes. Therefore, income-driven repayment "forgiveness" is normally taxable income at the state level for these states.

191.     However, the American Rescue Act of 2021 barred states from collecting taxes on any loan forgiveness until December 31, 2025.

192.     Despite being aware of this law, Defendants still unilaterally forgave hundreds of thousands of loans retroactively as they roll out this program.  At least some of those loans would have been forgiven after December 31, 2025, forcing Plaintiff States to lose tax revenue.

193.     The Final Rule ignored this and forgave the loans anyway.

194.     *Second*, the Rule failed to consider the Plaintiffs' reliance interest in using PSLF to recruit talent and remain competitive.  *See XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*, 963 F.3d 244, 251 (2d Cir. 2020).  State and local government employers cannot pay as much as private sector employers because they are primarily funded by taxpayer dollars and operate on yearly, limited budgets.

195.     One of the tools they rely on to recruit and retain talent is public service loan forgiveness.

196.     This Final Rule eliminates that incentive through a combination of awaiting most borrowers regardless of loan size with $0 monthly payments and awarding anyone with a loan balance of less than $12,000 with loan forgiveness after 10 years, regardless of career choice or unemployment.

197.    Commentators also warned of this issue, but Defendant cavalierly brushed aside concerns despite noting "the benefits discussed in this regulation would also be available to those seeking PSL[F]." 88 Fed. Reg. 43,880.

198.    The Final Rule did not consider the Plaintiffs' reliance interest in this important program and therefore it is arbitrary and capricious.

199.    Furthermore, the Final Rule is also arbitrary and capricious because it changes course from nearly 30 years of Defendants' practice on loan forgiveness.  Never before have the terms of loan repayment been transformed into loan forgiveness so that the average undergraduate borrower repays only $6,121 for every $10,000 borrowed.  These borrowers no longer have to repay the full principal of their debts.  This is a huge change of course.

200.    Defendants have not only changed course without explanation, but also, they are denying they are changing course at all.  They state that they have taken actions similar to this in the past through the PAYE and REPAYE programs and were never challenged on it.

201.    Regardless of the legality of past actions (and the fact that the absence of a challenge does not create legality), their own data demonstrate that this is not true. Prior to this change, the average undergraduate borrower paid more than what they owed.  This is arguably consistent with other loan programs Congress established.  This makes sense because they are loans that collect interest.

202.    This is the first time that loan repayment has reached the level at which the average borrower pays almost 40% less than the principal he borrowed.  This is a huge change of course that Defendants refuse to acknowledge.

203.    In addition, Defendants also changed course on the timing of loan cancelation. Previously, all income-driven loan repayment plans allow cancelation after twenty to twenty-five years.  Only public service loan cancelation had a ten-year repayment timeline.

204.    The Final Rule changes course by allowing anyone with $12,000 or less of an original balance to receive loan forgiveness after ten years.  This is a significant deviation from past practice.

205.    Defendants refuse to acknowledge this change of course and instead claims that always had this authority.

206.    Furthermore, the Final Rule is also arbitrary and capricious because it contains numerous internal contradictions.  For example, the Final Rule repeatedly states that it is designed to avoid delinquencies and defaults.  Defendants believe this is done through offering a more generous income-driven repayment plan.

207.    However, the Final Rule also states that the last change to the income-driven repayment plan that lowered payments for individuals resulted in an increase is delinquencies and defaults.

208.    In addition, the Final Rule acknowledges that the majority of those who default on loans had low original balances.

209.    However, a major portion of the Final Rule provides payments as low as $0 a month for any borrower below a certain income threshold regardless of loan balance.

210.    Furthermore, the Final Rule is also arbitrary and capricious because it failed to consider meaningfully the inflationary effects that the Rule will have, both specifically in the secondary education market and more generally for the entire U.S. economy.  The enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to

evaluate.  *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up).  They failed to do so and thereby violated the APA.

211.    The Final Rule insists it is not offering a grant but merely reducing defaults.  This is belied by their own data demonstrating that most, under the Final Rule, undergraduate borrowers will pay back significantly less than what they owe, regardless of whether they are suffering financial hardship or are at risk of default.  That is clearly a grant.

212.    This only makes sense when viewed through the lens of Defendants using these justifications as a pretext and post hoc justification for political ends.

213.    This Final Rule is not the product of a well-reasoned decision.  It was a rushed product to evasively do what the Supreme Court already told Defendants they cannot do.

214.    The Final Rule came out ten days after that the Supreme Court in *Biden v. Nebraska* struck down Defendants' last ill-considered attempt at loan forgiveness.  Defendant Biden stated that "the Supreme Court blocked it.  They blocked it.  But that didn't stop [him]."  In addition, Defendant Cordona stated in an interview that if this Final Rule was not challenged in court they were not trying hard enough.

215.    For all these reasons, the Final Rule is arbitrary and capricious.

**COUNT IV**
**Agency Action in Violation of APA Procedures**
**5 U.S.C. § 706(2)(D)**

216.    The allegations in Paragraphs 1–132 are reincorporated herein.

217.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

218.    The APA requires agencies to publish notice of all "proposed rulemaking" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the

rule making through submission of written data, views, or arguments," *id.* § 553(c).  The Rule, therefore, only can be issued, if at all, pursuant to notice-and-comment rulemaking under the APA.  5 U.S.C. § 553.

219.    Here, Defendants only permitted 30 days for comments on the proposed rule. This limited time period violated the APA.

220.    The Rule is not an interpretive rule or a  general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.  Rather, the Rule is a substantive rule for APA purposes.  5 U.S.C. § 551(4)–(5). Further, it is a final rule because it represents the culmination of the agency's consideration and affects rights and obligations.

221.    "[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals ***that are complex*** or based on scientific or technical data.'  The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable ***minimum*** time for comment.'"  *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (cleaned up) (emphases added).

222.    Executive Orders 12866 and 13563 both state that comment periods should generally be at least 60 days.  *See* 58 Fed. Reg. 51735 (Sept. 30, 1995) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of ***not less than*** 60 days." (emphasis added)); 76 Fed. Reg. 3821-22 (Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be ***at least*** 60 days." (emphasis added)).  The proposed rule asks for the public's help in "complying with the specific

requirements" of these Executive Orders, 88 Fed. Reg. 1,895, then ignores what these orders actually say with respect to the comment period.

223.    For these reasons, most other agencies routinely provide at least a sixty-day comment period for major rules.

224.    Providing only thirty days for commenting on a major rule such as this one is an outlier—and one for which Defendants offered no meaningful explanation.

225.    Here the Final Rule is both complex and enormously impactful—tens or hundreds of billions of dollars turn on each of its major components.

226.    In these circumstances, Defendants violated the APA by providing only thirty days for comment.

227.    This error was prejudicial and denied the public (including Plaintiffs) an adequate opportunity to comment adequately on the proposed rule.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request the following relief:

(1)    A declaratory judgment holding the Final Rule unlawful;

(2)    A declaratory judgment holding that Defendants lacked authority to issue the Final Rule;

(3)    A judgment vacating and setting aside the Final Rule;

(4)    A permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule; and

(5)    An award to Plaintiffs of their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(6)    Such additional and further relief as the Court may deem just and proper.

Respectfully submitted this the 16th day of May, 2024.

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
  *Deputy Attorney General*
Erin B. Gaide, Kan. SC No. 29691
  *Assistant Attorney General*
OFFICE OF THE KANSAS
ATTORNEY GENERAL
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
        erin.gaide@ag.ks.gov

Drew C. Ensign*
Holtzman Vogel Baran Torchinsky
& Josefiak PLLC
2575 E. Camelback Road, #860
Phoenix, Arizona 85016
Phone: (602) 388-1262
Fax: (540) 341-8809
Email: densign@holtzmanvogel.com

*Counsel for the State of Kansas*

**STEVE MARSHALL**
**Attorney General of Alabama**

*/s/ Edmund LaCour*
Edmund LaCour*
  *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
(334) 353-2196
(334) 353-8400 (fax)
edmund.lacour@alabamaag.gov

*Counsel for Plaintiff State of Alabama*


**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Bill Milks*
Bill Milks*
  *Chief Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
bill.milks@alaska.gov

*Counsel for Plaintiff State of Alaska*

**RAÚL LABRADOR**
**Attorney General of Idaho**

*/s/ Joshua Turner*
Joshua Turner*
  *Chief of Constitutional Litigation and
Policy*
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov


*Counsel for Plaintiff State of Idaho*

**BRENNA BIRD**
**Attorney General of Iowa**

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

/s/ *J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

**AUSTIN KNUDSEN**
**Attorney General of Montana**

*/s/ Christian B. Corrigan*
Christian B. Corrigan, Kan. SC No. 25622
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Plaintiff State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ *Lincoln J. Korell*
Lincoln J. Korell*
  *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*


**ALAN WILSON**
**Attorney General of South Carolina**

/s/ *Joseph D. Spate*
Joseph D. Spate*
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State of South Carolina*

**KEN PAXTON**
**Attorney General of Texas**
BRENT WEBSTER
First Assistant
Attorney General of Texas
RALPH MOLINA
Deputy Attorney General
for Legal Strategy

/s/ *Charles K. Eldred*
Charles K. Eldred*
  *Chief, Legal Strategy Division*
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2100
charles.eldred@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**SEAN REYES**
**Attorney General of Utah**

/s/ *Lance F. Sorenson*
Lance F. Sorenson*
  *Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

*Counsel for Plaintiff State of Utah*


*\*Pro hac vice*