# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, *et al.*,

                Plaintiffs,

    v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States,
*et al.*,

                Defendants.

Case No. 24-1057-DDC-ADM

## <u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-2705
Email: simon.g.jerome@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................1

    A.   Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent. ..............................1

    B.   Plaintiffs have not established any injury to their recruiting interests.......................................5

    C.   Plaintiffs' shifting state-instrumentality theories remain speculative and unsupported. ........7

CONCLUSION ...................................................................................................................10

**<u>TABLE OF AUTHORITIES</u>**

<u>**Cases**</u>

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ...................................................................................4

*Biden v. Nebraska,*
    600 U.S. 477 (2023)..............................................................................................7, 8

*California v. Texas,*
    593 U.S. 659 (2021)..............................................................................................3, 6

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)........................................................................................*passim*

*Colo. Outfitters Ass'n v. Hickenlooper,*
    823 F.3d 537 (10th Cir. 2016) ...............................................................................10

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) .................................................................................3

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) .............................................................................................4

*Dep't of Educ. v. Brown,*
    600 U.S. 551 (2023)..................................................................................................1

*FEC v. Cruz,*
    596 U.S. 289 (2022)..............................................................................................1, 3

*Florida v. Mellon,*
    273 U.S. 12 (1927)...................................................................................................3

*Garrison v. Dep't of Educ.,*
    636 F. Supp. 3d 935 (S.D. Ind. 2022) .....................................................................1

*Haaland v. Brackeen,*
    599 U.S. 255 (2023)..................................................................................................3

*Habecker v. Town of Estes Park,*
    518 F.3d 1217 (10th Cir. 2008) ...............................................................................8

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..............................................................................................3, 5

*Mackinac Ctr. for Pub. Pol'y v. Cardona,*
    No. 23-1736, --- F.4th ----, 2024 WL 2237667 (6th Cir. May 17, 2024)................5

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ...................................................................................................... 6

*Missouri v. Yellen,*
    39 F.4th 1063 (8th Cir. 2022) ...................................................................................... 2

*Mount Evans Co. v. Madigan,*
    14 F.3d 1444 (10th Cir. 1994) .................................................................................... 4

*Nova Health Sys. v. Gandy,*
    416 F.3d 1149 (10th Cir. 2005) .................................................................................. 3

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) .................................................................................... 4

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ............................................................................................ 1, 2, 3

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) ...................................................................................................... 8

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................ 4, 5, 6

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .................................................................................................... 3

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................................................. 3, 6

*Utah Div. of Consumer Prot. v. Stevens,*
    398 F. Supp. 3d 1139 (D. Utah 2019) ...................................................................... 6

*Valley Forge Christian Coll. v. Ams. Utd. for Separation of Church & State,*
    454 U.S. 464 (1982) .................................................................................................... 6

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) .................................................................................................... 3

*Wyoming v. Dep't of Interior,*
    674 F.3d 1220 (10th Cir. 2012) .............................................................................. 4, 6

**Statutes**

20 U.S.C. § 1077a ............................................................................................................ 10

20 U.S.C. § 1078-3 ...................................................................................................... 9, 10

**Rules**

Federal Rule of Civil Procedure 12 .................................................................................................10

**Regulations**

34 C.F.R. § 682.202 ..........................................................................................................................9

34 C.F.R. § 682.406 ..........................................................................................................................9

34 C.F.R. § 685.220 ........................................................................................................................10

88 Fed. Reg. 43,820 (July 10, 2023)...............................................................................................10

**Other Authorities**

Br. for Respondents, *Biden v. Nebraska*, 600 U.S. 477 (2023) (No. 22-506) ...............................7

## INTRODUCTION

On the threshold, jurisdictional issue of Article III standing, Plaintiffs' theories "have not always been readily ascertainable—or consistently described—during this litigation." *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023). Alongside vague, speculative, and legally foreclosed allegations of harm to their own interests, Plaintiffs also asserted that an unnamed "state instrumentality" in Louisiana would be injured. *See* Compl. ¶¶ 108-13, ECF No. 1. But Louisiana vanished from the preliminary-injunction papers, replaced by the assurance that Plaintiffs "anticipate[d] having proof" of instrumentality-related facts later in the litigation. Pls.' Mem. in Supp. of Mot. for Prelim. Inj. (Pls.' Br.) at 10 n.9, ECF No. 24. This improvisational approach to standing has concluded with the late-breaking addition, in Plaintiffs' motion-to-dismiss opposition and an Amended Complaint, of three entities—none in Louisiana—that, in one declarant's words, "*could*" suffer injury from the SAVE Plan. Declaration of Sarah Keyton (Keyton Decl.) ¶ 5, ECF No. 50-7 (emphasis added). But "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). This case should be dismissed.

## ARGUMENT

### A. Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent.

**1.** Most of the Plaintiff States continue to assert (at 4-9) that the SAVE Plan will have indirect effects on their state income-tax revenues. But *Pennsylvania v. New Jersey* holds that any harm to the States caused by application of their own tax code is "self-inflicted, resulting from decisions by their respective state legislatures." 426 U.S. 660, 664 (1976). That is dispositive, as "[n]o State can be heard to complain about damage inflicted by its own hand." *Id.*; *see also FEC v. Cruz*, 596 U.S. 289, 297 (2022) (describing the tax laws in *Pennsylvania* as created by "unilateral decisions by a group of States," which were thus "not a basis to attack the legality of" the challenged policy affecting state revenues). The only court to reach this issue during the HEROES Act litigation adopted this precise reasoning. *See Garrison v. Dep't of Educ.*, 636 F. Supp. 3d 935, 942 (S.D. Ind. 2022) (no standing to challenge debt relief because "[t]he Department of Education does not give silent approval to Indiana's tax code; those decisions are entirely within the discretion of the Indiana legislature").

In opposition, Plaintiffs seem to argue that they do not in fact set their own tax policy, contending that "Defendants drastically overstate the States' actual freedom of choice here." Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj. & Mem. in Opp'n to Mot. to Dismiss (Pls.' Opp'n) at 6, ECF No. 50. As support for that proposition, Plaintiffs emphasize that "*36 States* use either federal adjusted gross income or federal taxable income to calculate state income tax liability." *Id.* But there are 50 States. That nearly one third of them do not adhere to the federal definition of taxable income—including Plaintiffs Alaska and Texas, which do not tax personal income at all—proves Defendants' point. Just as in *Pennsylvania*, "[n]othing required" the States to adopt in full the federal definition of gross income, and "nothing prevents" them from tweaking that definition now. 426 U.S. at 664. That is fatal to this theory of standing.

Plaintiffs next argue—in some tension with the argument above—that the federal government is "depriving the States of their sovereign choice to set their own tax policy," which "itself represents a form of sovereign injury." Pls.' Opp'n at 6. But the States retain that "sovereign choice" in full, *id.*—nothing in the SAVE Plan (nor any provision of federal law) requires any State to include or exclude loan forgiveness from its state-law definition of taxable income.[1] It is not that Plaintiffs are "compelled" to "break their policy choice to conform to the federal definition of income to preserve their rights," as they say—Plaintiffs cannot claim an Article III injury from "*their* policy choice" in the first place. *Id.* at 7 (emphasis added).

That is why it also does not matter if "the States would incur administrative costs from breaking the link to the federal definition of income." *Id.*; Am. Compl. ¶¶ 98-99, ECF No. 57. Any such administrative costs would still be attributable to state legislative choices, not to the Department

---

[1] Plaintiffs' declarants assert that the American Rescue Plan Act (ARPA) "*prohibits* such debt cancelation from counting towards gross income from January 1, 2021 to December 31, 2025" and imply that as a result, "[t]his cancelation *cannot* be taxed." Declaration of Hoa Phu Tran ¶¶ 9, 15, ECF No. 50-2 (emphases added); *see also* Declaration of Kathleen Abrams ¶¶ 8, 18, ECF No. 50-3; Declaration of Aaron Yost ¶¶ 8, 13, ECF No. 50-5. And the Amended Complaint asserts (with no citation) that "the American Rescue Act of 2021 barred states from collecting taxes on any loan forgiveness until December 31, 2025." Am. Compl. ¶ 191. But ARPA contains no such legal prohibition with respect to state law, Plaintiffs do not cite any, and Defendants are aware of none. *Cf. Missouri v. Yellen*, 39 F.4th 1063, 1070 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 734 (2023).

of Education.  Surely it would not have been costless for the States in *Pennsylvania* to change their tax codes either.  What matters is that any "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures" about state tax law.  *Pennsylvania*, 426 U.S. at 664.

Plaintiffs try to distinguish *Pennsylvania* by pointing out that "the word 'standing' appears only once in" the opinion.  Pls.' Opp'n at 6.  But once is enough, given the Supreme Court's conclusion that none of the States could "demonstrate that the injury for which it seeks redress was directly caused by the actions of another" sovereign, rather than by "its own hand."  *Pennsylvania*, 426 U.S. at 663.  And although Plaintiffs emphasize that *Pennsylvania* was filed under the Supreme Court's original jurisdiction, *see* Pls.' Opp'n at 6-7, its holding about this sort of self-inflicted harm being insufficient to establish "a (justiciable) controversy" is equally applicable here.  426 U.S. at 663.  That is why both the Supreme Court and the Tenth Circuit have relied on *Pennsylvania* in the context of more routine standing disputes, including in suits filed by States against the federal government.  *See, e.g.*, *Cruz*, 596 U.S. at 290; *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 n.8 (10th Cir. 2005).

**2.**  As for *Florida v. Mellon*, 273 U.S. 12 (1927), Plaintiffs disparage it as an "ancient precedent." Pls.' Opp'n at 8.  That is an odd charge; old Supreme Court precedent is equally binding as new.  To the extent that Article III standing doctrine has shifted in "the ensuing 97 years," *id.*, modern standing doctrine is stricter, *see, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Clapper*, 568 U.S. at 398; *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)—including in suits between the States and the United States, *see, e.g.*, *United States v. Texas*, 599 U.S. 670 (2023); *Haaland v. Brackeen*, 599 U.S. 255 (2023); *California v. Texas*, 593 U.S. 659 (2021).[2]

Plaintiffs also again cite (at 7) *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), but Defendants already distinguished that case, including by reliance on Tenth Circuit precedent interpreting it.  *See* Defs.'

---

[2] Via italics (at 8), Plaintiffs distort the meaning of footnote three of *United States v. Texas*—which cites *Florida v. Mellon* favorably, as part of an explicit warning that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer."  599 U.S. at 680 n.3.  That the Supreme Court also acknowledged that "States sometimes have standing to sue the United States" is hardly an endorsement of Plaintiffs' theory.  *Id.*

Mem. in Opp'n to Mot. for Prelim. Inj. & in Supp. of Mot. to Dismiss (Defs.' Br.) at 12 (citing *Wyoming v. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012)).  Plaintiffs offered no response to those arguments, which apply equally to their reliance on *Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994) (discussed in *Wyoming*, 674 F.3d at 1234-35).  In short, the Tenth Circuit requires "a 'fairly direct link between the state's status as a recipient of revenues and the legislative or administrative action being challenged.'" *Wyoming*, 674 F.3d at 1234 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).  The SAVE Plan is (at most) indirectly related to state tax receipts.

Plaintiffs still fail to identify any meaningful limit to their contrary view.  Virtually every federal policy has incidental effects on state tax revenues.  Labor policy affects incomes (and hence state income taxes); agricultural policy affects food prices (and hence state sales taxes); foreign policy affects oil prices (and hence state gasoline taxes); and housing policy affects real-estate values (and hence state property taxes).  A system where any State can challenge any federal policy that incidentally affects its tax revenues would "make a mockery" of Article III.  *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.).  Plaintiffs dismiss these concerns as "naked policy-based reasoning," Pls.' Opp'n at 9, but they reflect binding precedent.  As the Tenth Circuit has warned, "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing."  *Wyoming*, 674 F.3d at 1234 (quoting *Kleppe*, 533 F.2d at 672).[3]

**3.**  Defendants also explained why Plaintiffs' tax-revenue theory depends on an impermissibly "speculative chain of possibilities."  *Clapper*, 568 U.S. at 410; *see* Defs.' Br. at 11-12.  Plaintiffs respond by baldly declaring that their prediction "is a mathematical certainty," Pls.' Opp'n at 5, but that *ipse dixit* is no help to the Court.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (rejecting such

---

[3] Plaintiffs also assert that a "loss of state tax revenues" is "economically indistinguishable" from the injury proven at trial in *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019), a case in which States established standing based on their "los[ing] out on federal funds."  Pls.' Opp'n at 8.  But losses of *federal* grant money due to *federal* government choices, like those at issue in *Department of Commerce*, are neither self-inflicted (under *Pennsylvania*) nor unduly attenuated (under *Florida*).

a statistical theory).  And dismissing Defendants' arguments as "Defendants' own rank speculation," *id.*, forgets that it is Plaintiffs alone who bear the burden to show standing.  *Lujan*, 504 U.S. at 561.

**B.    Plaintiffs have not established any injury to their recruiting interests.**

Defendants' opening brief established that Plaintiffs' theory that they are harmed by the Rule because it offers loan forgiveness to borrowers in public- and private-sector jobs, and thus reduces the benefit Plaintiffs obtain as public-sector employers under the Public Service Loan Forgiveness program (PSLF), is far too speculative and uncertain to satisfy Article III's requirement of an imminent injury traceable to the Rule.  Defs.' Br. at 13-15.  In opposition, Plaintiffs claim that "basic economic logic" supports this theory of harm and is sufficient, Pls.' Opp'n at 9, but just last week the Sixth Circuit rejected a version of Plaintiffs' theory, in holding that two other public-service employers, the Mackinac Center for Public Policy and the Cato Institute, who were also opposed to a Department of Education policy, lacked standing to challenge a one-time account adjustment that would count months or years that borrowers spent in excessive forbearance toward debt forgiveness.  *Mackinac Ctr. for Pub. Pol'y v. Cardona*, No. 23-1736, --- F.4th ----, 2024 WL 2237667 (6th Cir. May 17, 2024).

Just like Plaintiffs here, Mackinac and Cato claimed that the PSLF program and its benefits to public-service employers gave them standing to challenge loan forgiveness provided under another program on the theory that the availability of loan forgiveness to public- and private-sector employees under the other program reduced the competitive benefits the plaintiffs enjoyed under PSLF.  *Id.* at *5.  The court pointed to the many factors influencing the decisions of third-party student borrowers and held that the plaintiffs failed to allege "'specific, concrete facts' to show that the adjustment has caused or will cause [the plaintiffs] competitive injury."  *Id.* at *5.  "At bottom, how the adjustment impacts Plaintiffs is up to individuals who are not parties to this lawsuit."  *Id.* at *8.

Plaintiffs' Amended Complaint suffers from the very same flaws.  Like Mackinac and Cato, Plaintiffs "have not alleged that any employees have stopped working for them (or stated an intention to do so) based on the [Rule]," *id.* at *6, despite the Rule being published ten months ago and implemented (in part) more than two months ago.  Instead, Plaintiffs offer the examples of *hypothetical* current and prospective employees and predict, based on "the concept of economic incentives," how

they might act.  Pls.' Opp'n at 10.  Economic assumptions alone were not enough for the Sixth Circuit, nor, for that matter, for the Supreme Court.  *E.g.*, *Clapper*, 568 U.S. at 409; *Summers*, 555 U.S. at 498-99 ("statistical probability" theory of organizational standing would "make a mockery" of Supreme Court case law); *Valley Forge Christian Coll. v. Ams. Utd. for Separation of Church & State*, 454 U.S. 464, 489 (1982) ("The law of averages is not a substitute for standing.").  They should not be enough for this Court, either.  At base, career-related decisions are complicated, and PSLF is not the sole incentive in this economic picture.  Plaintiffs would have Defendants and the Court sort out this complexity on their behalf.  Pls.' Opp'n at 9.  But standing is their burden alone, and they have not carried it here.

Plaintiffs' reliance on *Massachusetts v. EPA*, 549 U.S. 497 (2007), is also misplaced.  Decisions from the Supreme Court and Tenth Circuit create significant doubt that *Massachusetts*'s fleeting reference to "special solicitude" applies here, let alone that the phrase has "significant bite," Pls.' Opp'n at 11.  *E.g.*, *California*, 593 U.S. at 687-88 (Alito, J., dissenting) (only mention of *Massachusetts* appearing in dissent); *Texas*, 599 U.S. at 688-89 (Gorsuch, J., concurring) ("Nor has "special solicitude" played a meaningful role in this Court's decisions in the years since."); *Wyoming*, 674 F.3d at 1230.  *Massachusetts* certainly does not mean that State plaintiffs enjoy "relaxed" standing rules across the board.  Pls.' Opp'n at 11; *Texas*, 599 U.S. at 676; *Wyoming*, 674 F.3d at 1238 ("This much . . . is clear: '[t]his special solicitude does not eliminate the state petitioner's obligation to establish a concrete injury[.]'").

Nor do the facts here provide any reason to relax standing requirements.  *Massachusetts* arose out of a challenge by States to executive *inaction* through a statute enacted for that very purpose, the inverse of this situation.  *See Texas*, 599 U.S. at 685 n.6 (so distinguishing *Massachusetts*).  And the interests the Supreme Court found Massachusetts had standing to vindicate were quasi-sovereign.  *Massachusetts*, 549 U.S. at 520.  Such interests are absent here.  So Plaintiffs must "establish standing in the same way as similarly situated private parties."  *Utah Div. of Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1143 (D. Utah 2019).  That means, at a minimum, showing non-speculative injury.

Plaintiffs' remaining arguments likewise lack merit.  Plaintiffs assert that the Court should not consider whether they have enjoyed any benefits that "outweigh[]" their injury.  Pls.' Opp'n at 12.  But the notion of offsetting benefits is a red herring.  Plaintiffs' theory is that the SAVE Plan will make

borrowers less likely to take public-sector jobs.  To test that assertion, it is necessary and appropriate to inquire into the Rule's net effects, not only the provisions that Plaintiffs cite.  Plaintiffs' argument (at 12) that the Court need only enjoin those provisions that discourage borrowers from pursuing PSLF also fails for similar reasons.  Defendants do not contend that some provisions of the Rule help Plaintiffs, while others might hurt them.  The argument instead is that given the Rule's many provisions, Plaintiffs have not demonstrated that the overall effect on recruiting will be to their detriment, rather than to their benefit.  That is fatal to this theory.

**C.    Plaintiffs' shifting state-instrumentality theories remain speculative and unsupported.**

In their original Complaint, Plaintiffs stated that Louisiana had an (unnamed) "state instrumentality or quasi instrumentality" that would "suffer irreparable harm as a result of the Final Rule."  Compl. ¶¶ 108-09.  Then, in their preliminary-injunction motion, they left Louisiana's mysterious instrumentality behind—but coyly hinted at a forthcoming standing ace-in-the-hole.  In due course, they promised, they would have evidence of an instrumentality to be injured by the Final Rule, whose injury could be attributed to a Plaintiff State itself.  *See* Pls.' Br. at 10 n.9.  The passage of time has not borne fruit.  Three Plaintiffs now point to entities in their states that own Federal Family Education Loan Program (FFEL) loans and claim that the Final Rule will spur borrowers to consolidate those loans, decreasing the returns on their FFEL portfolios and thereby harming those three States.  Am. Compl. ¶¶ 116-32; Pls.' Opp'n at 13-14.  But despite the late-breaking addition of several pages to their Amended Complaint, nothing of substance has changed—any harm to these entities is theoretical at best.  Compounding the error, Plaintiffs incorrectly analogize these entities to MOHELA.  The Court should reject these deficient, shapeshifting theories of speculative harm.

At the outset, any comparison to MOHELA (and thus *Nebraska*) is wholly without merit, at least on the facts in this record.  The *Nebraska* plaintiffs advanced two distinct theories of instrumentality harm: (1) loss of direct loan servicing revenues and (2) FFEL loan consolidation.  Br. for Respondents at 15-16, 26-29, *Biden v. Nebraska*, 600 U.S. 477 (2023) (No. 22-506).  The Supreme Court accepted only the former.  *See Nebraska*, 600 U.S. at 489-90.  Plaintiffs now—through chopped up quotations—try to graft the Court's reasoning onto the latter, unaddressed theory, stating that

"MOHELA owned a portfolio of FFELP loans" and incorrectly implying that it "receive[d] an administrative fee for each of" those loans.  Pls. Opp'n at 13 (quoting *Nebraska*, 600 U.S. at 489-90). The result is a mischaracterization of *Nebraska*'s holding: although Plaintiffs' brief suggests otherwise, FFEL loans had no connection to the Supreme Court's conclusion that MOHELA had standing in *Nebraska*.

As for the facts before this Court, Plaintiffs offer next to nothing to suggest that (1) the Rule will actually increase consolidation or (2) any such consolidation will harm these entities—both essential predicates for the conclusion that Plaintiffs' theory is more than a "speculative chain of possibilities." *Clapper*, 568 U.S. at 410.  To show the first premise, Plaintiffs offer that the SAVE Plan is "extremely . . . generous," and so some borrowers will "undoubtedly consolidate" their FFEL loans to take advantage of its terms, Pls.' Opp'n at 13-14; *see also* Declaration of Sana Efird (Efird Decl.) ¶ 6, ECF No. 50-8 (labeling the plan "enticing"); Am. Compl. ¶ 120 (consolidation is "virtually certain" due to the SAVE Plan's "extraordinary . . . generosity").

The question is not, however, whether the SAVE Plan is attractive in a vacuum.  Nor is it whether the government has advertised consolidation as an option for borrowers, *see* Efird Decl. ¶ 9, the causative effect of which is dubious, *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42-43 (1976), and which would not be traceable to the Rule (rather than to those separate advertisements) in any event. The question instead is whether Plaintiffs have shown that any future increased consolidation, which could occur for myriad reasons, is "fairly traceable" to the SAVE Plan.  *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008).  In fact, Plaintiffs' own evidence shows that a large volume of consolidation is already occurring, making traceability more difficult to show.  Pls.' Opp'n at 14 (citing a decrease of $25 million, or 80 percent, in South Carolina's FFEL portfolio since 2011).  Moreover, Plaintiffs do not explain the relevance of the statement from South Carolina's Student Loan Corporation that annual consolidation payments between 2010 and the present have ranged from $1,365,846.14 to $174,407.04, or address whether prior repayment rule changes caused that variation or what (if anything) that portends for the SAVE Plan.  Letter from David A. Simon to Joseph Spate,

ECF No. 50-6.  Indeed, one declarant skims over consolidation entirely.  Keyton Decl. ¶ 4 ("To the extent that federal policy results in borrowers consolidating their loans . . . .").

Plaintiffs advance no further the contention that increased consolidation, even assuming it does occur and is traceable to the Final Rule, will actually harm them.  Their on-the-fly attempts to fill in the details of the original complaint's "coming-soon" theory of instrumentality injury have yielded less, not more, clarity about the specific harms they claim the newly added entities will suffer.  One declaration, for example, nakedly states that Alaska's Student Loan Corporation stands to lose "approximately $100,000 over just the next two years" because of the SAVE Plan, without explaining how or why.  Efird Decl. ¶ 11; *see also* Am. Compl. ¶ 126.

More broadly, Plaintiffs now seem to rely primarily on the assumption that consolidation will cause loss of *interest* income, Pls.' Opp'n at 13-14; Am. Compl. ¶¶ 117, 120, 124, 130, but elsewhere haphazardly introduce terms with no apparent relationship to consolidation or interest.  Supposed loss of "fees," for instance, makes a repeated appearance.  Pls.' Opp'n at 13; Am. Compl. ¶ 117.  But what fees?  Holders of FFEL loans own those assets outright, and are not paid by the government to service them, unlike the direct loan servicers (like MOHELA) that Plaintiffs conflate with FFEL holders, *supra* at 7-8.  If anything, the opposite is true: federal law requires FFEL holders to *pay* rebate fees on certain FFEL loans to the government, fees they are prohibited from passing on to the borrower.  20 U.S.C. § 1078-3(f); 34 C.F.R. §§ 682.406(a)(12), 682.202.  Elsewhere, Plaintiffs note in passing that in addition to holding FFEL loans, the named entities "provide student loans to residents of the state" and "service student debt taken out by residents, former residents, and out-of-state students."  Am. Compl. ¶ 116.  What relevance these facts might have to the consolidation-decreases-interest theory is left unsaid.

But Plaintiffs cannot show that their FFEL holders will suffer imminent harm under their theory of interest income loss (assuming that is, in fact, their theory).  To start, a FFEL loan in no way guarantees interest income.  Many FFEL borrowers are on income-based repayment plans under which they pay $0 monthly.  And a FFEL borrower is as susceptible to default as any other.  In fact, relying on "basic economic logic," one might surmise (as the Department found) that the FFEL

borrowers who would stand to benefit the most—and thus who would mostly likely consolidate—would tend to be those borrowers at highest risk of delinquency and default, events that would reduce the entities' revenues. *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program*, 88 Fed. Reg. 43,820, 43,826 (July 10, 2023).  In contrast, when a FFEL loan is consolidated, its prior owner receives payment for the full value of the loan's principal and outstanding interest. 20 U.S.C. § 1078-3(b)(1)(D); 34 C.F.R. § 685.220(f)(1).

Accordingly, to show standing, Plaintiffs would need to show that a potential loss of uncertain interest revenues to these entities is not outweighed by the certain profits of consolidation—including guaranteed payment and the elimination of rebate fees—to say nothing of the potential for reinvestment of the cash value of the loan at higher market interest rates, *see* 20 U.S.C. § 1077a(k), (l) (setting FFEL interest rates).  They have done no such thing.

In the end, Plaintiffs' latest attempt at an instrumentality-based standing theory takes them back to where they started—speculation.  If more borrowers consolidate loans held by entities in these three states because of the SAVE Plan, and if that consolidation does not in fact put the FFEL holders in a better financial position, three of the Plaintiff States *could* be injured.  Plaintiffs' own declarant, in fact, can apparently say no more than that, swearing only that "[t]he SAVE Plan *could* cause pecuniary harm to the State of Texas."  Keyton Decl. ¶ 5 (emphasis added).  Article III demands more than "could."[4]

## CONCLUSION

For these reasons and the reasons in Defendants' opening brief, the Court should dismiss this case for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

---

[4] Plaintiffs have not attempted to resuscitate either of their previously abandoned standing theories, about alleged increased law-enforcement costs and *parens patriae* standing.  *See* Defs.' Br. at 11 n.6, 16.  And they explicitly confirm that "this suit incontestably is not" a *parens patriae* suit.  Pls.' Opp'n at 6.  So the Court should not consider those theories.  *See, e.g., Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) ("[O]ur duty to consider unargued obstacles to subject matter jurisdiction does not affect our discretion to decline to consider waived arguments that might have supported such jurisdiction.").

Dated: May 24, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Simon G. Jerome*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-2705
Email: simon.g.jerome@usdoj.gov

*Counsel for Defendants*

11