## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STATE OF ALASKA, et al.,

                          Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
EDUCATION, et al.,

                          Defendants.

Case No. 24-1057-DDC-ADM

## MEMORANDUM AND ORDER

Plaintiffs have moved the court for a preliminary injunction that would prevent defendants from implementing their student loan regulations, known as the SAVE Plan. Doc. 23. The SAVE Plan lowers monthly payments for eligible borrowers and reduces the maximum repayment period for eligible borrowers who took out loans with low original balances. To resolve plaintiffs' motion, the court must answer three questions.

*First*: does defendants' SAVE Plan present a "major question"—one of such economic and political significance that defendants must show that Congress clearly authorized the SAVE Plan? In *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court answered this question. This recent, binding Supreme Court decision holds "that the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375 (quotation cleaned up). So, this is an easy yes.

*Second*, given that the case presents a major question, have defendants shown that the Higher Education Act clearly authorizes their SAVE Plan? *Biden v. Nebraska* doesn't answer

this question because that case addressed a different statute with a different regulatory history. While it's a close and difficult question, the court answers this second question no. Defendants have offered colorable, plausible interpretations of the Higher Education Act that could authorize the SAVE Plan, but those interpretations fall short of *clear* congressional authorization.

*Last*, the court must decide whether the preliminary injunction should apply nationwide. Scope aside, part of plaintiffs' requested injunction is unworkable, and so the court denies it. But, for the workable part of plaintiffs' injunction, the court reluctantly answers yes—it should apply nationwide. Nationwide injunctions are the subject of much controversy, and this court is less than enthusiastic about entering one.

With these three answers, the court grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23). The court enjoins the SAVE Plan—in part—nationwide. It declines, however, to unwind the parts of the SAVE Plan already in effect because plaintiffs have failed to demonstrate those provisions caused irreparable harm. Plaintiffs brought this lawsuit long after defendants already had implemented those aspects of the SAVE Plan, so the court doesn't see how plaintiffs can complain of irreparable harm from them. Nor have plaintiffs explained how a preliminary injunction could unwind the parts of the SAVE Plan already in effect. But the court grants plaintiffs' request to enjoin those aspects of the SAVE Plan not yet implemented.

The court emphasizes one more thing about its decision. This Order does not decide whether student loan forgiveness is good policy or bad policy. The popularly elected branches of our government—the President and the Congress—properly control that decision. Thus, no one should read this Order to take a position on that question because our Constitution doesn't assign any part of it to the federal courts.

The court explains each one of its decisions, below, beginning with the relevant background.

## I.      Background

The court begins with a fly-over of student loan repayment legislation and the Secretary of Education's role in it.

Congress enacted the Higher Education Act (HEA) in 1965 to "strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219 (1965). Twenty-eight years later, Congress passed the "Student Loan Reform Act," and allowed the Secretary of Education to issue federal student loans directly from the Department. Pub. L. No. 103-66, § 4011–21, 107 Stat. 312 (1993). The Student Loan Reform Act also created income-contingent repayment plans—the repayment plans at issue here. *Id.* at § 4021 (codified at 20 U.S.C. § 1087e(d)(1)(D)).

Here's the statutory provision establishing income-contingent repayment plans, which serves as this case's axis:

> Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D).

Before the action challenged here, the Secretary of Education—"the Secretary" in the remainder of this Order—has invoked this statutory authority three times:

1. In 1994, the Secretary created the first income-contingent repayment plan. William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664 (Dec. 1, 1994) (codified at 34 C.F.R. pt. 685).

2.  In 2012, the Secretary created the PAYE Plan.  Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 77 Fed. Reg. 66,088 (Nov. 1, 2012) (codified at 34 C.F.R. pts. 674, 682, 685).

3.  In 2015, the Secretary created the REPAYE Plan.  Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67,204 (Oct. 30, 2015) (codified at 34 C.F.R. pts. 668, 682, 685).

Each time, the Secretary imagined forgiving the remaining loan balance after a borrower had made payments for a specific period of time.  *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period.  However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans.  We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

With this background about income-driven repayment plans, the court next explains relevant details about a different kind of repayment plan:  income-*based* repayment plans.

### *Income-Based Repayment (IBR) Plans*

In 2007, Congress amended the HEA and created income-based repayment plans for borrowers with "partial financial hardship."  Pub. L. No. 110-84, 121 Stat. 784 (2007).  The statute defines "partial financial hardship" to mean the borrower's annual total loan payment,

based on a 10-year repayment period, exceeds 15% of the amount by which "the borrower's and the borrower's spouse's . . . adjusted gross income[] exceeds" 150% of the applicable poverty line.  20 U.S.C. § 1098e(a)(3).  And the statute explicitly authorized the Secretary to "repay or cancel any outstanding balance of principal and interest due on all loans made" under certain conditions after "a period time prescribed the Secretary, not to exceed 25 years[.]"  *Id.* § 1098e(b)(7).

In 2010, Congress amended the IBR statute.  Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)).  For borrowers taking out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%.  20 U.S.C. § 1098e(e)(1).  And for those same borrowers, Congress reduced the maximum payment time window to 20 years—down from 25 years.  *Id.* § 1098e(e)(2).  The Secretary then applied these IBR updates to all student loans.

Five years later, in 2015, the Secretary created the REPAYE Plan by rulemaking and applied the 10% payment cap to all borrowers, regardless of when they took out loans.  80 Fed. Reg. 67,204.  The REPAYE Plan also lowered the repayment window for borrowers with undergraduate debt from 25 years to 20 years.  *Id.* at 67,205 ("For a borrower who only has loans received to pay for undergraduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 20 years of qualifying payments.").  The REPAYE Plan set the repayment window for borrowers with graduate debt at 25 years.  *Id.* ("For a borrower who has at least one loan received to pay for graduate study, provide that the remaining balance of the borrower's loans that have been repaid under the REPAYE plan is forgiven after 25 years of qualifying payments.").

***The SAVE Plan***

In 2023, the Secretary issued regulations creating the SAVE Plan—the plan challenged here.  Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).  First, a few notes about the SAVE Plan's terminology.  The SAVE Plan seeks to combine income-contingent repayment plans and income-based repayment plans under one umbrella term:  income-driven repayment plans.  *Id.* at 43,820.  And the SAVE Plan is the new name for the REPAYE plan.  *Id.*

The SAVE Plan first emerged in January 2023, when the Department issued a Notice of Proposed Rulemaking (NPRM).  Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the corresponding comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Here, plaintiffs attack several pieces of the Final Rule.[1]  Specifically, they challenge the following changes to income contingent repayment plans:

- those changes defining discretionary income as income above 225% of the applicable federal poverty guideline;

- those changes setting a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

---

[1]     This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

- those changes capping, for undergraduate loans, a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- those changes cancelling, for borrowers whose original principal balance was $12,000 or less, the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  So, summarizing, the Final Rule raises the floor of discretionary income, decreases borrowers' monthly payments, and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

### *This Lawsuit*

According to plaintiffs, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act (APA).  They bring four claims targeting this purportedly unlawful conduct:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act; (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).  Relying on these legal theories, plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the" SAVE Plan.  Doc. 23.

## II.      Legal Standard

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary injunctions.  The courts enjoy broad discretion when deciding whether to grant a preliminary injunction.  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted).

The relief afforded under Rule 65 embraces a limited purpose—a preliminary injunction serves "merely to preserve the relative positions of the parties until a trial on the merits can be

held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The Tenth Circuit instructs that the moving party—here plaintiffs—must satisfy four factors to deserve a preliminary injunction: "'(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest.'"  *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013)).  When the government is the party opposing the preliminary injunction— as here—the third and fourth factors merge.  *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), *abrogated on other grounds*, *Garland v. Cargill*, No. 22-976, 2024 WL 2981505 (U.S. 2024).

"A preliminary injunction is an extraordinary remedy[.]"  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  So, the moving party must demonstrate a "'clear and unequivocal'" right to such relief.  *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics*, 562 F.3d at 1070).  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'"  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## III.    Analysis

The court's analysis of plaintiffs' Motion for Preliminary Injunction unfolds in this fashion:  it evaluates the three preliminary injunction factors, in turn.  Then, after concluding that all three factors favor entry of a preliminary injunction, the court considers the scope of the relief warranted.  The court begins with the first preliminary injunction factor:  plaintiffs' likelihood of success on the merits.

A.      **Likelihood of Success on the Merits**

Plaintiffs assert they are likely to succeed on their statutory-based claims and their APA claims.  "Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits of one of the claims."  *George v. Davis Sch. Dist.*, No. 23-cv-00139, 2023 WL 5000989, at *6 (D. Utah Aug. 4, 2023) (citation and internal quotation marks omitted).  The court's analysis of this factor begins and ends with plaintiffs' statutory claims[2]—ones asserting that the SAVE Plan exceeds defendants' authority under the HEA.  To show that their claims are likely to succeed, plaintiffs argue the SAVE Plan violates the "Major Questions Doctrine."

To apply the Major Questions Doctrine (MQD), the court must engage in a two-step analysis.  *First*, the court must determine whether this case presents a major question.  *Second*, if it does, the court must determine whether the statute the agency invokes provides clear congressional authorization for the challenged agency action.  The court takes up each question, in turn, below.

---

[2]      There's a slight discrepancy between plaintiffs' Motion for Preliminary Injunction and their First Amended Complaint.

Plaintiffs' First Amended Complaint asserts four claims for relief.  In Count I, plaintiffs assert defendants violated Article I of the Constitution by taking an agency action in excess of statutory jurisdiction and in violation of the separation of powers.  Doc. 57 at 25–28 (1st Am. Compl. ¶¶ 133–54).  In Count II, plaintiffs assert defendants took an agency action in excess of their statutory authority, violating the APA.  *Id.* at 28–30 (1st Am. Compl. ¶¶ 155–73).  Count III asserts defendants took an arbitrary and capricious agency action, violating the APA.  *Id.* at 30–36 (1st Am. Compl. ¶¶ 174–215).  And in Count IV, plaintiffs assert defendants violated APA procedures.  *Id.* at 36–38 (1st Am. Compl. ¶¶ 216–27).

In contrast, plaintiffs' brief asserts plaintiffs are likely to succeed on the merits of *three* claims: "(1) the final rule exceeds Defendants' authority under the HEA, (2) the final rule is arbitrary and capricious, and (3) the rule's thirty-day comment period violated the APA."  Doc. 24 at 10.  The court assumes that this first "statutory" claim mentioned in plaintiffs' brief supporting their Motion for Preliminary Injunction includes Count I and Count II from the First Amended Complaint.

1.      **The MQD Applies Because the SAVE Plan has Vast Economic and Political Significance.**

The "so-called Major Questions Doctrine applies where 'an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy"' or make 'decisions of vast "economic and political significance."'" *Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 725 (10th Cir. 2024) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S 120, 159–60 (2000))).  "Although courts generally enforce plain and unambiguous statutory language according to its terms, where the statute at issue is one that confers authority upon an administrative agency, there are certain extraordinary cases that provide a reason to hesitate before concluding that Congress meant to confer such authority."  *Id.* at 726 (quotation cleaned up).  If the case is an "extraordinary" one, then "the agency must point to clear congressional authorization for the proposed regulation."  *Id.* (internal quotation marks, citation, and ellipsis omitted).  In *West Virginia v. EPA*, the Supreme Court labelled several of its prior decisions as Major Question cases.  597 U.S. 697, 721 (2022).  The court reviews some of these examples, below, to demonstrate how the MQD works.

In *Brown & Williamson*, the Supreme Court rejected the FDA's attempt to regulate tobacco products under its authority to regulate "drugs" and "devices."  529 U.S. at 159–60.  It did so because the Court was "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  *Id.* at 160.

In *Alabama Association of Realtors v. Department of Health & Human Services*, the Court rejected the CDC's authority to issue a nationwide eviction moratorium in response to the COVID-19 pandemic.  594 U.S. 758, 759–60 (2021).  The CDC had claimed this kind of

authority under a provision of the Public Health Service Act because it allowed the CDC to "'make and enforce . . . regulations'" that it deemed "'necessary to prevent the introduction, transmission, or spread of communicable diseases[.]'" *Id.* at 760–61 (quoting 42 U.S.C. § 264(a)).  The Court called the CDC's "claim of expansive authority" under this statute "unprecedented" and found the statute "a wafer-thin reed on which to rest such sweeping power." *Id.* at 765.  The Court emphasized that the eviction moratorium covered millions at risk for eviction and likely had an economic impact around $50 billion.  *Id.* at 764.

In *Utility Air Regulatory Group v. EPA*, the Court rejected the agency's attempt to include greenhouse gases under the Clean Air Act's definition of "air pollutant."  573 U.S. at 321.  The Court concluded EPA's interpretation "would be incompatible with the substance of Congress' regulatory scheme," *id.* at 322 (quotation cleaned up), because EPA's interpretation relied on "ambiguous statutory text[,]" *id.* at 324.  And, the Court emphasized, EPA's claimed authority would give it "unheralded power to regulate 'a significant portion of the American economy[.]'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159).  Against this broader backdrop, the court turns to an MQD case involving student loans:  *Biden v. Nebraska*.

*Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern for student loan borrowers in the wake of the September 11 terrorist attacks.  143 S. Ct. at 2363.  The HEROES Act allows the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" during a "national emergency[.]"  20 U.S.C. § 1098bb(a)(1).  In August 2022, the Secretary cancelled student loan debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic.

*Biden v. Nebraska*, 143 S. Ct. at 2364.  This plan sought "to reduce and eliminate student debts directly."  *Id.*  Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower.  Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this student loan forgiveness plan based on the HEROES Act.  *Id.* at 2365.  The Supreme Court—after determining that at least one state had standing—then applied the MQD.  That is, the Court concluded the "economic and political significance of the [HEROES Act plan was] staggering by any measure."  *Id.* at 2373 (citation and internal quotation marks omitted).  Given the significance of the Secretary's HEROES Act loan forgiveness, the Court found a "reason to hesitate before concluding that Congress meant to confer such authority."  *Id.* at 2372 (citation and internal quotation marks omitted).  The Court thus searched—in vain, as it turned out—for "clear congressional authorization for such a program."  *Id.* at 2375 (internal quotation marks omitted).  And the Court concluded with this: "[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* (citation and internal quotation marks omitted).

Here, defendants correctly point out that this case differs from *Biden v. Nebraska*.  As the Supreme Court already has noted, "HEROES Act loan relief and HEA loan relief function independently of each other."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 567 (2023).  Indeed, the Supreme Court specified that its HEROES Act decision did "not opine on the substantive lawfulness of any action the Department might take under the HEA[.]"  *Id.* at 565 n.2.  This difference notwithstanding, *Biden v. Nebraska* definitively answers the question:  is the SAVE

Plan a major question?  The SAVE Plan, like the HEROES Act loan forgiveness, has "staggering" "'economic and political significance[.]'"  *Biden v. Nebraska*, 143 S. Ct. at 2373 (quoting *West Virginia v. EPA*, 597 U.S. at 721).  And so, the answer must be yes.

The Supreme Court has determined that student loan debt cancellation plans that forgive enormous amounts of debt are major questions.  *Id.* at 2375 ("[T]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." (citation and internal quotation marks omitted)).  Defendants estimate the net federal budget effect of the SAVE Plan at $156 billion.  88 Fed. Reg. at 43,886.  Recall that the $50 billion cost of the CDC's eviction moratorium triggered the MQD in *Alabama Association of Realtors*, 594 U.S. at 764.  The court thus easily concludes that the SAVE Plan—with a price tag three times as high—is a "decision[] of vast economic and political significance."  *Bradford*, 101 F.4th at 725 (citation and internal quotation marks omitted).  And so, the court must proceed to step two of the MQD, scouring the HEA for clear congressional authorization.

### 2.    The Statute Doesn't Provide Clear Congressional Authorization for the SAVE Plan.

Step two is where things get tricky.  So, what, exactly, does "clear congressional authorization" mean?  The Supreme Court has dedicated much of its MQD analysis to defining what doesn't qualify as clear congressional authorization.[3]  But the Supreme Court's decisions to date have used a two-part approach.  First, the cases evaluate the statute's plain text.  Second, they consider the statute's context.  *See West Virginia v. EPA*, 597 U.S. at 721–23.  The court's analysis here, below, uses the same approach.

---

[3]    The court is not aware of, nor have the parties cited any MQD case where the Supreme Court has found clear congressional authorization.  Does this absence suggest that the Supreme Court views the MQD as the equivalent of strict scrutiny for regulations?  Our Circuit has answered no.  In *Bradford*, our Circuit assumed without deciding that the MQD applied and found clear congressional authorization for the challenged regulation.  101 F.4th at 725–28.  More on *Bradford* later.

### a.   The HEA's Plain Text Authorizes the SAVE Plan.

*Biden v. Nebraska* doesn't answer this case's statutory interpretation question—at least not directly—because that case involved an entirely different statute.  But it nonetheless illustrates the kind of routine textual analysis the Supreme Court directs district courts to conduct when applying the MQD.  For example, the HEROES Act authorizes the Secretary to "waive or modify" student loan programs in connection with a national emergency.  20 U.S.C. § 1098bb(a)(1).  The *Biden v. Nebraska* Court carefully considered the meaning of both words. 143 S. Ct. at 2368–69.

*First*, the Court held that the word "modify" "does not authorize basic and fundamental changes[.]"  *Id.* at 2368 (citation and internal quotation marks omitted).  Instead, the Court explained, modify "carries a connotation of increment or limitation, and must be read to mean to change moderately or in minor fashion."  *Id.* (citation and internal quotation marks omitted). The Court rejected the change imposed under the HEROES Act loan forgiveness as a modification.  It "modified the cited provisions only in the same sense that the French Revolution modified the status of the French nobility—it has abolished them and supplanted them with a new regime entirely."  *Id.* at 2369 (citation and internal quotation marks omitted).

*Second*, the Court rejected the Secretary's reliance on the word "waiver" in the statute. Previously, the Secretary had used his waiver power to identify particular legal requirements— *i.e.*, "the requirement that a student provide a written request for a leave of absence"—and waive such requirements.  *Id.* at 2370.  But, under the HEROES Act loan forgiveness, the Secretary never identified a particular legal requirement he had waived.  *Id.*  Ultimately, the Court held that what the Secretary had "actually done [was] draft a new section of the Education Act from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text."  *Id.* at 2371.  The Court thus invalidated the HEROES Act plan because the HEROES

14

Act text—allowing the Secretary to "waive or modify"—didn't clearly authorize student loan forgiveness. *Id.* at 2375. So, step two of the MQD analysis begins like any other statutory interpretation exercise: with the statute's text.

In the HEA, Congress gave the Secretary the following authority to set income-contingent repayment plans:

> Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]

20 U.S.C. § 1087e(d)(1)(D). Plaintiffs argue this statute doesn't clearly authorize the SAVE Plan because it consistently uses the word "repayment." Doc. 24 at 14. According to plaintiffs, the statute's operative term—"repayment"—*affirmatively precludes* massive debt forgiveness." *Id.* (emphasis in original).

Plaintiffs argue that repay means "to pay back." Doc. 24 at 14 (citing Repay, *American Heritage Dictionary* (4th ed. 2001)); *see also Repay*, *Black's Law Dictionary* (6th ed. 1990) (defining repay first as "[t]o pay back"); Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 428 (2013) (approving use of *Black's Law Dictionary* sixth edition for legal terms from 1951–2000). Taking one more step, plaintiffs argue that repay means to pay back the entirety of the principal borrowed, with some interest. Doc. 24 at 14–15. Plaintiffs also point out that the statute requires "repayment . . . including principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). Plaintiffs see the statutory terms "principal" and "interest" as signals that Congress intended for borrowers to repay the entire principal and at least some interest. But plaintiffs' argument ignores the rest of the statute.

The statute also requires annual payments "paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).  What happens when 25 years' worth of payments doesn't "repay[]" a loan?  Loan forgiveness.  Indeed, every Secretary of Education since the HEA's enactment has interpreted this provision to mean that the Secretary must forgive the remaining balance of the loan after 25 years.  59 Fed. Reg. at 61,666 ("Some borrowers in the [income-contingent repayment] plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. 67,209 ("We agree that borrowers are responsible for repaying their student loans, and we believe that most borrowers repaying their loans under the REPAYE plan will be successful in repaying their loans, in many cases before the end of the 20- or 25-year repayment period.  However, we also believe the REPAYE plan will provide relief to struggling borrowers who experience financial difficulties that prevent them from repaying their loans.  We note that the REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

In the court's view, the Secretary's longstanding interpretation of the statute is the correct one.  The statute sets an upper limit for repayments.  Congress wanted borrowers on income-contingent repayment plans to make payments for no more than 25 years.  As defendants aptly put it, "a plan for *partial* repayment of a loan or *slower* repayment of a loan are both still 'plans for repayment of such loan, including principal and interest on the loan.'"  Doc. 47 at 34 (emphases in original) (quoting 20 U.S.C. § 1087e(d)(1)).  Plaintiffs' interpretation inserts the word "full" in the statute, rendering it to require "full repayment" of the loan's principal and

some interest.  But that's just not what the statute says.  The court thus agrees with the

Secretary's time-honored interpretation that the statute imagines repayment for less than 25

years, with forgiveness at the end.  *See Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1276

(10th Cir. 2001) ("'Where an agency's statutory construction has been fully brought to the

attention of the public and the Congress, and the latter has not sought to alter that interpretation

although it has amended the statute in other respects, then presumably the legislative intent has

been correctly discerned.'" (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982))).

The court doesn't buy plaintiffs' argument about the HEA's plain text.  It next addresses

plaintiffs' arguments about the statute's context.

### b.    The HEA's Context Does Not Provide Clear Congressional Authorization for the SAVE Plan.

The Justices have emphasized that a statute's context plays an important role in the MQD

analysis.  *See West Virginia v. EPA*, 597 U.S. at 721 (emphasizing that "the words of a statute

must be read in their context and with a view to their place in the overall statutory scheme" and,

in ordinary cases, "context has no great effect on the appropriate analysis" but "there are

'extraordinary cases' that call for a different approach" (quotation cleaned up)); *see also Biden v.*

*Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring) (responding to "the charge that the [Major

Questions] doctrine is inconsistent with textualism" by "understand[ing] it to emphasize the

importance of *context* when a court interprets a delegation to an administrative agency"

(emphasis in original) (citation omitted)).  To that end, a statute's context can tell the court a lot

about Congress's authorization in an MQD case.  As avid footnote readers already know, our

Circuit addressed this very issue in *Bradford*, 101 F.4th at 725–28.[4]

_____

[4]        None of the parties here cited *Bradford* in its papers.  *See* Doc. 24; Doc. 47; Doc. 50.  The court's
analysis nonetheless uses *Bradford* because it's binding Circuit precedent and it provides a helpful
framework for a developing doctrine.  As the court already mentioned, the Supreme Court has directed

In *Bradford*, the Tenth Circuit assumed without deciding that the MQD applied to a Department of Labor rule requiring recreational service outfitters operating on federal land to pay their employees a $15 minimum wage, rescinding an exemption the outfitters previously enjoyed. *Id.* at 713. After assuming the MQD applied, the Circuit asked whether the Congress clearly had authorized the Department of Labor's rule. In its clear congressional authorization analysis, the Circuit identified four touchstones: (1) whether the agency "seeks to locate expansive authority in modest words, vague terms or ancillary provisions[;]" (2) whether the rule is "an enormous and transformative expansion in regulatory authority without clear congressional authorization[;]" (3) whether the agency is "claim[ing] to discover regulatory authority for the first time in a long-extant statute[;]" and (4) whether "the agency issuing the . . . rule lacks expertise in the relevant area of policymaking."[5] *Id.* at 725–28 (quotation cleaned

---

most of its MQD efforts to deciding what is *not* clear congressional authorization. *Bradford*, on the other hand, demonstrates what *is* clear congressional authorization. And, in any event, the parties' papers make arguments that fall well within *Bradford*, though they don't structure them in *Bradford*'s style.

[5] The court recognizes that our Circuit didn't explicitly name these four touchstones as considerations for the clear congressional authorization analysis. The court nonetheless interprets *Bradford* this way because these four touchstones resemble Justice Gorsuch's four "clues" for a clear congressional authorization analysis, as laid out in his *West Virginia v. EPA* concurrence. *West Virginia v. EPA*, 597 U.S. at 746–49 (Gorsuch, J., concurring). There, Justice Gorsuch identified four "telling clues" for a court's clear congressional authorization inquiry: (1) whether the agency relies on "[o]blique or elliptical language" or "seek[s] to hide elephants in mouseholes[;]" (2) "the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address[;]" (3) "the agency's past interpretations of the relevant statute[;]" and (4) whether "there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise." *Id.* at 746–48 (Gorsuch, J., concurring) (citations and internal quotation marks omitted).

Justice Gorsuch's four "clues" don't match our Circuit's four *Bradford* touchstones perfectly, but they're awfully close:

up).  The court applies each of these touchstones, below, to discern whether the Congress clearly

has authorized the measures adopted in the SAVE Plan.

*First*, the court considers whether the Department of Education's SAVE Plan "seeks to

locate expansive authority in 'modest words,' 'vague terms or ancillary provisions.'"  *Id.* at 725

(citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).  Even if a regulation has "a

colorable textual basis[,]" a statute's context can make "it very unlikely that Congress" delegated

such expansive power to the agency.  *West Virginia v. EPA*, 597 U.S. at 722–23.  "Extraordinary

grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or

'subtle devices.'"  *Id.* at 723 (brackets omitted) (quoting *Whitman*, 531 U.S. at 468).  To survive

MQD scrutiny, the Secretary must show "something more than a merely plausible textual basis

for the agency action[.]"  *Id.*

Here, defendants haven't shown that something more.  As demonstrated above,

defendants have identified a colorable, even plausible textual basis for the SAVE Plan.  The

|   | **Touchstones from *Bradford v. U.S. Dep't of Labor*, 101 F.4th at 725–28.** | **"Clues" in *West Virginia v. EPA*, 597 U.S. at 746–49 (Gorsuch, J., concurring).** |
|---|---|---|
| 1 | Whether the agency "seeks **to locate expansive authority in modest words**, vague terms or ancillary provisions." | Whether the agency relies on "[o]**blique or elliptical language**[.]" |
| 2 | Whether the challenged rule is "an **enormous and transformative expansion in regulatory authority** without clear congressional authorization." | "[E]xamine **the age and focus of the statute** the agency invokes in relation to the problem the agency seeks to address. . . .  [I]t is unlikely that Congress will make **extraordinary grants of regulatory authority** through vague language in a long-extant statute." |
| 3 | Whether the agency is "claim[ing] **to discover regulatory authority for the first time** in a long-extant statute." | "[C]ourts may examine the agency's **past interpretations** of the relevant statute." |
| 4 | Whether "the agency issuing the . . . rule **lacks expertise** in the relevant area of policymaking." | "[S]kepticism may be merited where there is **a mismatch** between an agency's challenged action and its congressionally assigned **mission** and **expertise**." |

The court thus applies these four touchstones in its clear congressional authority analysis.

SAVE Plan creates "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]"  20 U.S.C. § 1087e(d)(1)(D).  While it's plausible to interpret the SAVE Plan to comply with the statute, plausibility won't suffice.  Take, for example, "not to exceed 25 years[.]"  *Id.*  Recall that the SAVE Plan limits some borrowers' repayment window to 10 years.  To be sure, 10 years of repayments doesn't exceed 25.  And the Secretary's discretion to set a repayment time window is constrained by the phrase "*extended period of time*[.]"  20 U.S.C. § 1087e(d)(1)(D) (emphasis added).  But defendants' plausible textual basis doesn't rise to the level of "clear."  The statute sets a clear ceiling, but not a clear floor.  That is why the statute's language is, at most, a "subtle device[]" and so, it can't support an "[e]xtraordinary grant[] of regulatory authority[.]"  *West Virginia v. EPA*, 597 U.S. at 723 (internal quotation marks and citation omitted).  Without a clear floor—only a plausible floor and a "subtle device"—the court can't find clear congressional authorization for the SAVE Plan.

*Second*, the court asks whether the SAVE Plan is "an 'enormous and transformative expansion in regulatory authority without clear congressional authorization.'"  *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*, 573 U.S. at 324).  In *Utility Air*, summarized above, the Supreme Court struck down the EPA's interpretation of the term "air pollutant" because—though plausible—the interpretation gave the EPA "unheralded power to regulate a significant portion of the American economy[.]"  573 U.S. at 324 (citation and internal quotation marks omitted).

Here, defendants estimate the SAVE Plan will cost $156 billion over 10 years.  88 Fed. Reg. at 43,820.  But, when defendants calculated that number, they assumed the Supreme Court would uphold the HEROES Act loan forgiveness.  The Supreme Court invalidated the HEROES

Act loan forgiveness in *Biden v. Nebraska*, and none of those loans were cancelled.  And that has

significant implications for the SAVE Plan's cost.  Plaintiffs proffer a new SAVE Plan cost

estimate that accounts for *Biden v. Nebraska*, and that cost is $475 billion over ten years.  Doc.

24 at 23 (citing Penn Wharton, *Biden's New Income-Driven Repayment ("SAVE") Plan:*

*Budgetary Cost Estimate Update*, University of Pennsylvania (July 17, 2023),

https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income-driven-repayment-

budget-update).  As points of reference, the REPAYE Plan cost an estimated $15.4 billion.  80

Fed. Reg. at 67,225.  This difference—$475 billion versus $15.4 billion—expands agency

authority to such an extent that it alters it.[6]  So, the court concludes that the SAVE Plan

represents "an 'enormous and transformative expansion in regulatory authority without clear

congressional authorization.'"  *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*,

573 U.S. at 324).

---

[6]     The court recognizes that this second *Bradford* touchstone seems to overlap with step one of the
MQD analysis.  The court differentiates between the two this way:  step one of the MQD analysis asks
about the sheer size of the regulatory action—*i.e.*, is it one of huge economic and political significance?
The second *Bradford* touchstone asks, in contrast, not only whether the regulatory action is enormous but,
crucially, whether the regulatory action is *transformative*.  This requires the court's context analysis to
look back at the agency's previous actions and compare them to the challenged action.

Justice Barrett provided a helpful example in her *Biden v. Nebraska* concurrence, where she
explained the importance of context:

> [I]magine a grocer instructs a clerk to "go to the orchard and buy apples for the store."
> Though this grant of apple-purchasing authority sounds unqualified, a reasonable clerk
> would know that there are limits.  For example, if the grocer usually keeps 200 apples on
> hand, the clerk does not have actual authority to buy 1,000—the grocer would have spoken
> more directly if she meant to authorize such an out-of-the-ordinary purchase.

143 S. Ct. at 513 (Barrett, J., concurring).  So, comparing prior apple orders to the existing apple orders
provided important context.  And the court must look for "out-of-the-ordinary" grants of authority.  All
this is to say:  the sheer cost of the SAVE Plan is relevant to MQD step one; the cost of the SAVE Plan
compared to the cost of the REPAYE Plan is relevant to *Bradford*'s second touchstone.

Beyond cost, the SAVE Plan is a transformative expansion in regulatory authority in another important way:  it represents the first time the Secretary has gone beyond the number set by Congress.  Recall that Congress modified the laws for income-based repayment programs in 2010.  Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2213, 124 Stat. 1029, 1081 (2010) (codified at 20 U.S.C. § 1098e(e)).  For borrowers who had taken out a loan on or after July 1, 2014, Congress lowered the cap on payments for IBR plans to 10%—down from 15%.  20 U.S.C. § 1098e(e)(1).  And for those same borrowers, Congress reduced the maximum repayment window to 20 years—down from 25 years.  *Id.* § 1098e(e)(2).  In 2015, the REPAYE Plan took these numbers—10% instead of 15% and 20 years instead of 25 years—and applied them to eligible loans taken out before July 2014.[7]  Putting it another way, the REPAYE Plan took Congress's generosity with income-based repayment plans from § 1098e(e) and applied that generosity to some income-driven repayment plans.  So, the REPAYE Plan took Congressionally-blessed numbers and applied them more broadly.

Not so here.  Both the monthly payment cap and the payment period limitation overreach any generosity Congress has authorized before.  Here, the SAVE Plan caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline.  Congress has gone as low as 10%, but it's never gone as low as 5%.  The SAVE Plan also cancels the remaining balance after the borrower has made 120 monthly payments for borrowers whose original principal balance was $12,000 or less.  Congress has gone as low as 20 years, but it's never gone as low as 10 years.  Because the Final Rule goes beyond Congress's limits—for the first time—the SAVE Plan is a "'transformative expansion in regulatory authority

---

[7]     Borrowers with graduate debt were excepted.  The REPAYE Plan still required those borrowers to pay for 25 years.

without clear congressional authorization.'" *Bradford*, 101 F.4th at 726 (ellipsis omitted) (quoting *Utility Air*, 573 U.S. at 324).

*Third*, the court asks whether the Secretary is "claim[ing] to discover regulatory authority for the first time in a long-extant statute." *Id.* at 726–27 (citation and internal quotation marks omitted). This *Bradford* touchstone favors defendants. The Secretary has used its HEA authority three times before: to create the first income-contingent repayment plan, to create the PAYE Plan, and to create the REPAYE Plan.

*Last*, the court considers whether the Department of Education "lacks 'expertise' in the relevant area of policymaking." *Id.* at 728. That is not the case here. The current record demonstrates that the Department of Education has a great deal of expertise in the area of student loans. This final touchstone also favors defendants.

In sum, two of the touchstones guiding the MQD favor plaintiffs. Two favor defendants. But this calculus doesn't produce a dead heat. That's so because one of the touchstones favors plaintiffs so compellingly that it overpowers the others. It's the second factor: whether the SAVE Plan represents "an enormous and transformative expansion in statutory authority without clear congressional authorization." *Bradford*, 101 F.4th at 726 (quotation cleaned up). Unquestionably it does.

The record here contains just one estimate of the price tag for the SAVE Plan's forgiveness: $475 billion, over ten years. *Biden v. Nebraska* reported the total value of all outstanding federal student loans at $1.6 trillion. 143 S. Ct. at 2362. So, the SAVE Plan forgives nearly one-third of all student loan debt. And while this $1.6 trillion figure is a 2022 number—the record here doesn't contain a current figure—the court has no doubt that $475 billion in forgiveness qualifies as "enormous" and a "transformative expansion." *Bradford*, 101

F.4th at 726 (quotation cleaned up).  Indeed, the SAVE Plan's forgiveness towers over earlier iterations.  For instance, the REPAYE Plan cost $15.4 billion.

This unprecedented and dramatic expansion shifts the overall balance of *Bradford*'s four touchstones in favor of plaintiffs.  The court finds that plaintiffs are likely to prevail on the first of their statutory claims, *i.e.*, that the SAVE Plan exceeds the Secretary's authority under the HEA.  The court so finds even though defendants have mustered a plausible construction suggesting that Congress conferred such authority.  But they haven't assembled what *Biden v. Nebraska* and the MQD require:  a clear showing of such authority.  The court thus concludes that plaintiffs are likely to prevail on the merits of their bellwether claim.

Next, the court analyzes the second preliminary injunction factor.

### B.     Irreparable Harm

At the hearing on this motion, plaintiffs emphasized that the SAVE Plan will cause irreparable harm to their public instrumentalities.  A "plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  According to plaintiffs, their public instrumentalities hold FFEL loans, and the SAVE Plan incentivizes student loan borrowers to consolidate their loans away from FFEL loans.  And, according to plaintiffs, borrowers already have consolidated their loans, seeking to reap the benefits of the SAVE Plan.  Once a borrower consolidates an FFEL loan, that loan is gone, depriving the public instrumentalities of interest income.  And plaintiffs can't recover money damages from defendants due to sovereign immunity.  So, plaintiffs argue, they've suffered an irreparable harm.

As an initial matter, the court must reiterate its concerns about plaintiffs' evidence of the harms to their public instrumentalities.  As mentioned in the Memorandum and Order deciding defendants' Motion to Dismiss, South Carolina's evidence about its public instrumentality doesn't demonstrate that the SAVE Plan is leading to FFEL loan consolidation, nor does it show that FFEL loan consolidation leads to decreased interest revenue.  Doc. 68 at 18–20.  And Texas's evidence merely shows that—*assuming* borrowers consolidate their loans—loan consolidation will cause revenue loss to Texas's public instrumentality *in the future*.  *See* Doc. 53-7 at 2 (Keyton Decl. ¶ 4) ("*To the extent that* federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue." (emphasis added)).  Only Alaska's evidence adduces evidence of a *current* harm to its public instrumentality.  *See* Doc. 53-8 at 3 (Efird Decl. ¶ 9) ("[T]he enticed consolidation has already harmed and will continue to harm ASLC[.]").  So, plaintiffs' theories of irreparable harm aren't all that substantial.

Defendants argue that plaintiffs' delay in seeking a preliminary injunction further undermines their claims of irreparable harm.  To evaluate this argument, the court divides its analysis of plaintiffs' irreparable harm in two:  (i) irreparable harm from the SAVE Plan provisions already in effect and (ii) irreparable harm from the SAVE Plan provisions set to go into effect on July 1.

### 1.   Plaintiffs Have Failed to Show an Irreparable Harm from SAVE Plan Provisions Already in Effect.

Defendants point out that the Secretary published the Final Rule in July 2023—nine months before plaintiffs filed suit in March 2024.  A party's "delay in seeking preliminary relief cuts against finding irreparable injury."  *RoDa Drilling*, 552 F.3d at 1211 (citation and internal quotation marks omitted).  In response, plaintiffs emphasize that the Final Rule is scheduled to

go into effect on July 1, 2024. For that reason, plaintiffs argue, they didn't delay their suit at all. But plaintiffs' argument misses an important point: parts of the SAVE Plan already took effect in February 2024, and plaintiffs didn't file their lawsuit until March 28, 2024.[8] Doc. 1.

Specifically, two provisions of the SAVE Plan already are in effect: (i) the increase in the discretionary income line from 150% to 225% of the federal poverty line and (ii) the shorter path to forgiveness for borrowers who took out small loans—*i.e.*, ten years of payments for a borrower who took out $12,000 or less. Indeed, plaintiffs' First Amended Complaint confirms that the Department began implementing the rule in February. Doc. 57 at 3 (1st Am. Compl.). The Secretary implemented this outcome by using his authority to designate provisions for early implementation—authority plaintiffs don't challenge here. And defendants published advance warning that they would implement these provisions early. When the Final Rule was published on July 23, 2023, it specifically tagged the increase to 225% of the federal poverty line for early implementation. 88 Fed. Reg. at 43,821. And, according to defendants, they announced early implementation of forgiveness for borrowers with low original balances a month in advance. All of this is to ask why: if these parts of the SAVE Plan promised an irreparable harm to plaintiffs, why didn't they move to enjoin the SAVE Plan *before* they took effect?

Plaintiffs attributed the delay to their need to gather data on FFEL loan consolidation. Otherwise, they reason, they would've had to rely on speculative, insufficient harm. The court isn't persuaded. Plaintiffs didn't include any allegations about FFEL loan consolidation when

---

[8]  Defendants argue that the SAVE Plan is severable. So, defendants assert, "to the extent the Court concludes that only some portions of the Rule are unlawful . . . [the court] should still decline Plaintiffs' invitation to enjoin the Rule in its entirety." Doc. 47 at 57. Plaintiffs' brief never responds to this argument. Plaintiffs argued against severability at the court's hearing on this motion, but the court considers this argument waived. *Murphy v. City of Tulsa*, 950 F.3d 641, 645 n.4 (10th Cir. 2019) ("'[A]rguments made for the first time at oral argument are waived.'" (quoting *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1294 (10th Cir. 2017))).

they filed their Complaint.  *See generally* Doc. 1.  Plaintiffs' original Complaint alleged

Louisiana has a state instrumentality that would suffer irreparable harm from the SAVE Plan

"because broader loan cancellation under the SAVE plan would decrease demand for its

services."  Doc. 1 at 21 (Compl. ¶¶ 108– 11).  Plaintiffs didn't assert their FFEL loan

consolidation theory for plaintiffs South Carolina, Texas, and Alaska until May 10, 2024.  Doc.

50.  And plaintiffs ultimately abandoned their theory based on harm to Louisiana's public

instrumentality.  So, if plaintiffs delayed filing this lawsuit to gather information about FFEL

loan consolidations to supply factual assertions in their declarations, that information didn't

actually find its way into the March 2024 Complaint.  The court declines to excuse plaintiffs'

delay on this basis.

Nor does the court credit plaintiffs' assertion that they needed time to develop their tax

revenue theory of harm.  Here's an overview of plaintiffs' tax revenue theory:  nine states tie

their definition of taxable income to the federal definition of income or adjusted gross income.

Doc. 57 at 17 (1st Am. Compl. ¶ 90).  And the federal tax code defines taxable income to include

student loan forgiveness granted under income-driven repayment plans.  But the American

Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the

federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl.

¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.  Plaintiffs alleged

the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student

loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule

accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years

for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92).  Under the old version of the rule, the

federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for

the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states. *Id.* (1st Am. Compl. ¶ 95) (emphasis in original).  In this but-for world, the relevant states would have more student loan forgiveness income to tax. *Id.*  The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]"  *Id.* (1st Am. Compl. ¶ 96).

Plaintiffs assert that they delayed filing suit so that this tax revenue theory of harm could coalesce and thus become less speculative.  The court isn't convinced.  All pieces of this tax revenue theory—the states' income tax definition, the American Rescue Plan, and the SAVE Plan's shift in forgiveness—were present long before plaintiffs filed their Complaint in March 2024.

Plaintiffs thus have failed to proffer a reasonable explanation for the delay.  "'[D]elay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction.'"  *Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-cv-00581, 2022 WL 1061906, at *5 (D. Colo. Apr. 8, 2022) (collecting cases) (quoting *GTE Corp.*, 731 F.2d at 679); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2024) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").  The court is not impressed by plaintiffs' timing.  The delay—combined with plaintiffs' abstractions about harm—fail to establish an irreparable harm.  The court thus concludes that plaintiffs haven't demonstrated irreparable harm attributable to the parts of the SAVE Plan already in effect.

## 2. Plaintiffs Have Shown an Irreparable Harm from the SAVE Plan Provisions Not Yet in Effect.

The court reaches a different conclusion for the parts of the SAVE Plan that have yet to go into effect. Plaintiffs haven't delayed their lawsuit challenging the SAVE Plan's unimplemented parts, so their delay doesn't prevent a finding of irreparable harm. And plaintiffs correctly point out that their harms are "irrecoverable." Doc. 24 at 29. That is so because the sovereign immunity bars plaintiffs from recovering monetary damages from the federal government. *See Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages, and the court concluded no adequate state administrative remedy existed, the court held that plaintiffs' injury was irreparable. We agree.").

Plaintiffs also point out that "[o]ne cannot unscramble this egg; loan forgiveness has an 'irreversible impact.'" Doc. 24 at 29 (quoting *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022)). Indeed, before the case reached the Supreme Court, the Eighth Circuit concluded that the HEROES Act student loan forgiveness posed irreparable harm "considering the irreversible impact the Secretary's debt forgiveness action would have[.]"[9] *Nebraska v. Biden*, 52 F.4th at

---

[9]     *Nebraska v. Biden* provides more support for differentiating between parts of the SAVE Plan already in effect and those parts set to go into effect on July 1. In that case, the Eighth Circuit enjoined the HEROES Act student loan forgiveness before it went into effect. The Circuit explained,

> the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness would have as compared to the lack of harm an injunction would presently impose. Among the considerations is the fact that collection of student loan payments as well as accrual of interest on student loans have both been suspended.

*Nebraska v. Biden*, 52 F.4th at 1047–48. Not so here—the SAVE Plan is far from suspended. Plaintiffs ask the court to enjoin defendants "from implementing or acting pursuant to the Final Rule[.]" Doc. 23 at 1. Yet they acknowledge that the Department already has "unilaterally erased the debt of 153,000 borrowers." Doc. 57 at 3 (1st Am. Compl.). And, as plaintiffs elegantly phrase it, "[o]ne cannot unscramble this egg; loan forgiveness has an irreversible impact." Doc. 24 at 29 (quotation cleaned up). As explained below, when considering the scope of the preliminary injunction, plaintiffs' failure to take

1047.  The court thus concludes that plaintiffs have shown an irreparable harm if the SAVE Plan
is allowed to take full effect on July 1, 2024.

### C.     Public Interest

As the final merged factor in the preliminary injunction analysis, the court must examine
whether plaintiffs have shown that their "threatened injury outweighs the harms that the
preliminary injunction will cause the government or that the injunction, if issued, will not
adversely affect the public interest."  *Aposhian*, 958 F.3d at 990.  Plaintiffs argue they've
satisfied this standard because they face harm to their public instrumentalities and defendants
"have no interest in enforcing a rule that completely bypasses constitutional separation of powers
principles."  Doc. 24 at 30.  Defendants respond that the SAVE Plan serves the public interest
because it solves a long list of harms:  student loan defaults and delinquencies; adverse effects on
credit scores; decreased liquidity for large purchases; decreased enrollment in higher education;
drags on national growth; and increased reliance on federal welfare programs.  Doc. 47 at 54.
How to weigh these competing interests?

The Supreme Court's decision in *National Federation of Independent Business v.
Department of Labor, Occupational Safety & Health Administration*, 595 U.S. 109 (2022), is
helpful here.  It involved a challenge to OSHA's COVID-19 vaccine mandate.  *Id.* at 112–13.
Several entities filed petitions for review and moved for a stay pending judicial review[10] of
OSHA's mandate.  *Id.* at 113.

---

into account the loan forgiveness already in effect makes their proposed injunction unworkable.  *See
below*, § III.D.2.

[10]     Of course, a stay pending judicial review is a different procedural creature than a preliminary
injunction.  *Compare* Fed. R. Civ. P. 62, *and* Fed. R. App. P. 8(a), *with* Fed. R. Civ. P. 65.  But the
standard governing a stay still requires the court to weigh the public interest.  The stay factors include:

Petitioners maintained "that OSHA's mandate w[ould] force them to incur billions of dollars in unrecoverable compliance costs and w[ould] cause hundreds of thousands of employees to leave their jobs." *Id.* The federal government countered "that the mandate w[ould] save over 6,500 lives and prevent hundreds of thousands of hospitalizations." *Id.* at 120. The Court declined to compare the two: "It is not our role to weigh such tradeoffs." *Id.* And the Court emphasized that Congress hadn't given OSHA the power it sought to exercise. *Id.* The Court thus agreed with petitioners that they were entitled to a stay, because, among other things, the Court concluded the "equities do not justify withholding interim relief."

The court can't weigh the tradeoffs here either. A layperson might wonder how Alaska's relatively meager harm—$100,000 in lost FFEL loan interest over two years—can justify blocking millions of student loan borrowers nationwide from getting billions in debt relief. But in "our system of government," weighing these tradeoffs "is the responsibility of those chosen by the people through democratic processes." *Id.* In the court's view, Congress—a branch of government elected by the people—didn't delegate to the Secretary clear power to enact the SAVE Plan. The equities thus favor a preliminary injunction of some sort. But what sort of injunction do they favor? That's a more daunting question, and the court takes it up next.

---

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Supreme Court applied this standard in *National Federation of Independent Businesses*, which means that it had to evaluate the public interest and balance the equities. 595 U.S. at 120. So, even though *National Federation of Independent Businesses* occupied a different procedural posture and thus applied a different procedural standard, the Supreme Court still weighed the public interest—exactly what the court must do here.

### D.      Scope of Relief

Having concluded that plaintiffs have shouldered their burden under the preliminary injunction standard, the court must fashion an injunction with an appropriate scope.  Rule 65(d)(1)(C) requires the court to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  The Supreme Court has emphasized that "the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citation omitted).

Plaintiffs' Motion for Preliminary Injunction requests two forms of injunctive relief. *One*, it asks the court to enjoin defendants "their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  And *two*, it seeks to enjoin defendants "from undertaking any form of student debt relief not expressly authorized by Congress."  *Id.*  The court begins with plaintiffs' second request.

This vague request—asking the court to enjoin defendants from undertaking any form of unlawful debt relief—is not helpful.  Indeed, plaintiffs never mention it in their supporting briefs. *See generally* Doc. 24; Doc. 50.  Our Circuit has held that "injunctions simply requiring the defendant to obey the law are too vague" to enforce and they thus violate Fed. R. Civ. P. 65(d). *Keyes v. Sch Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990); *see also* 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2955 (3d ed. 2024) ("[O]rders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement.").  The court will not enter such a broad, unguided injunction.  The court thus denies this part of plaintiffs' motion.

32

The court next evaluates plaintiffs' request that the court enjoin defendants from implementing the SAVE Plan.  It divides this analysis into two considerations:  whether to issue a nationwide injunction and whether to enjoin the SAVE Plan in its entirety.  The analysis concludes by considering whether the court may enjoin the President of the United States, a defendant and a target of plaintiffs' motion.

### 1.    The Injunction Should Apply Nationwide.

Plaintiffs request a nationwide injunction.[11]  The court must tread carefully here because a nationwide injunction risks an overbroad injunction.  "Traditionally, when a federal court finds

---

[11]     The proper terminology for this request is unsettled.  Some, like the parties here, use the term "nationwide injunction" because plaintiffs seek an injunction that applies nationwide.  Others, like Justice Jackson and Justice Gorsuch, use the term "universal injunction."  *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 936 (2024) (Jackson, J., dissenting) ("Idaho maintains that this case is certworthy because it raises the question of whether a district court can issue an injunction that grants relief directed to all potentially impacted parties—a so-called 'universal injunction.'"); *United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring) ("[T]he routine issuance of universal injunctions has proven unworkable, sowing chaos for litigants, the government, courts, and all those affected by these sometimes conflicting decrees." (citation, internal quotation marks, and brackets omitted)).  Here, the court uses the parties' term—nationwide injunction.

Plaintiffs' request for a nationwide injunction is a loaded one.  Nationwide injunctions are the subject of much debate.  Justice Gorsuch has questioned whether nationwide injunctions are consistent with separation of powers principles and Supreme Court precedent.  *United States v. Texas*, 599 U.S. at 694–95 (Gorsuch, J., concurring) ("Universal injunctions continue to intrude on powers reserved for the elected branches."); *see also Labrador*, 144 S. Ct. at 926–27 (Gorsuch, J., concurring) (calling "universal" injunctions "a relatively new phenomenon" that "virtually guarantee[] that a rising number of 'high-profile' cases will find their way to" the Supreme Court and lamenting that "universal injunction practice is almost by design a fast and furious business").  Justice Thomas shares the same concerns.  *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) ("I am skeptical that district courts have the authority to enter universal injunctions.  These injunctions did not emerge until a century and a half after the founding.  And they appear to be inconsistent with longstanding limits on equitable relief and the power of Article III counts.").

The debate rages outside the Supreme Court, too.  "Some scholars, jurists, and attorneys criticize the practice of district courts issuing nationwide injunctions as an inappropriate abuse of power.  Others defend nationwide injunctions as a powerful way to check federal agency overreach and ensure robust relief for plaintiffs."  *District Court Reform:  Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1702 (Apr. 2024).

The court wades into this controversy reluctantly, and with caution.

a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring).  In contrast, a nationwide injunction forbids a defendant from taking some action against *everyone*—not just plaintiffs.  With the gravity of this request in mind, the court briefly outlines the parties' arguments for and against a nationwide injunction.

Plaintiffs' First Amended Complaint asks the court to "set aside" the SAVE Plan.  Doc. 57 at 28, 30 (1st Am. Compl. ¶¶ 154, 173).  This language comes from the APA, which allows courts to "hold unlawful and set aside agency action[.]"  5 U.S.C. § 706(2).  Plaintiffs assert that when "'a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"[12]  Doc. 24 at 31 (quoting *Harmon v. Thornburg*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  And when a court finds agency action unlawful, it often issues a nationwide injunction. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 768–69 (5th Cir. 2015) (affirming district court's nationwide injunction of program benefitting undocumented immigrant parents of American citizens in suit where the state of Texas—and only Texas—had standing because there was "a substantial likelihood that a partial injunction would be ineffective because [program] beneficiaries would be free to move between states"); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478

---

[12]      The court acknowledges the controversial nature of this proposition—and, indeed, other propositions throughout this Order:

> Courts have supposed that the APA's instruction to "set aside" agency action authorizes vacatur.  There are, however, good reasons to conclude that "set aside," properly understood, merely instructs a court to ignore an illegal agency action for the purpose of resolving the case before it—much like a court ignores (rather than vacates or erases) an unconstitutional statute when resolving a case.  At oral argument, the Chief Justice responded to this rather shocking assault on a long accepted, foundational aspect of judicial control of agency action with an understated "[w]ow."

33 Richard Murphy et al., *Federal Practice & Procedure* § 8381 (2d ed. 2024).

(E.D. Wisc. 2021) (applying "universal" injunction to Department of Agriculture program forgiving debts of Black farmers); *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 384–85, 397–98 (M.D.N.C. 2019) (issuing nationwide injunction against U.S. Citizenship and Immigration Services' policy memorandum changing USCIS policy on calculating unlawful presence under the Immigration and Nationality Act); *Texas v. United States*, 201 F. Supp. 3d 810, 815–16, 836 (N.D. Tex. 2016) (applying nationwide injunction to federal policy requiring that "all persons must be afforded the opportunity to have access to restrooms, locker rooms, showers, and other intimate facilities which match their gender identity rather than their biological sex").

In support of their nationwide injunction, plaintiffs also invoke the Eighth Circuit's opinion in *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022). This decision became the ruling reviewed by the Supreme Court in *Biden v. Nebraska*. The Eighth Circuit reversed a district court's decision denying a preliminary injunction against loan forgiveness based on the HEROES Act. *Nebraska v. Biden*, 52 F.4th at 1045–46, *rev'g* 636 F. Supp. 3d 991 (E.D. Mo. 2022). The Eighth Circuit then granted a preliminary injunction pending appeal, concluding, after "balancing the equities," that "the merits of the appeal before this court involve substantial questions of law which remain to be resolved, but the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose." *Id.* at 1047 (citation and internal quotation marks omitted). The Circuit thus imposed the requested injunction pending future orders by that court or the Supreme Court. *Id.* at 1048.

The President and his fellow defendants quickly petitioned the Supreme Court, asking it to vacate the injunction entered by the Eighth Circuit. The Court declined in a Memorandum

Decision issued by Justice Kavanaugh. *Biden v. Nebraska*, 143 S. Ct. 477 (2022) (Mem.). The Justice's Memorandum Decision elected to treat the application to vacate the injunction as also amounting to a petition for a writ of certiorari before judgment. *Id.* The Court granted that request. *Id.* And ultimately, of course, the Supreme Court's decision on the merits held for plaintiffs. The Court thus reversed the "judgment of the Eastern District of Missouri" and denied as moot defendants' "application to vacate the Eighth Circuit's injunction[.]" *Biden v. Nebraska*, 143 S. Ct. at 2376.

This series of appellate decisions embraced the proposition that the HEROES Act student loan forgiveness program required a nationwide injunction. *Id.* at 1048. The Circuit explained that "an injunction limited to the plaintiff States, or even more broadly to student loans affecting the States, would be impractical and would fail to provide complete relief to the plaintiffs." *Id.* The Circuit emphasized that MOHELA—Missouri's public instrumentality that conferred standing on the state of Missouri because of impending harm to MOHELA's service fees—was "purportedly one of the largest nonprofit student loan secondary markets in America." *Id.* Because of "MOHELA's national role in servicing accounts," the Eighth Circuit could "discern no workable path in this emergency posture for narrowing the scope of relief." *Id.* Plaintiffs ask the court to apply the same analysis here and reach the same result.

Defendants, for their part, Doc. 46 at 55, emphasize the Supreme Court's bedrock principle "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs[,]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And defendants emphasize two things. The Eighth Circuit's decision doesn't control our court. And the Supreme Court's decision never addressed the propriety of a nationwide injunction. *Biden v. Nebraska*, 143 S. Ct. at 2355. They're right about the first part. Eighth Circuit

36

decisions aren't binding precedent here.  But the court's not so sure about defendants' second point.  The Eighth Circuit plainly enjoined the Secretary from implementing his "debt forgiveness action."  *Nebraska v. Biden*, 52 F.4th at 1047.  And the Supreme Court explicitly reversed the district court's decision denying an injunction.  *Biden v. Nebraska*, 143 S. Ct. at 2376.

Defendants also emphasize that the Eighth Circuit relied on MOHELA's national role in finding a preliminary injunction necessary, and plaintiffs haven't proffered any evidence that their public instrumentalities play a similarly important national role.  Defendants are right about that point, too.  But ultimately, defendants' arguments can't carry the day.

The court concludes that it must issue a nationwide injunction.  A broad rule, like the SAVE Plan, requires a broad injunction, given the compelling need for nationwide uniformity in the Department's administration of student loan programs.  *See Nebraska v. Biden*, 52 F.4th at 1048 (worrying that "tailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness").  Also, a limited injunction like the one defendants promote would stand the court's conclusion here on its head.  Imagine the scenario advanced by defendants.  In it, the court would confine its injunction to the three states with standing to sue.  This scenario would free the Secretary to implement the SAVE Plan in the other 47 states.  Thus, the Secretary could grant loan forgiveness to students under a regulation that the Secretary—under this court's conclusion, at least—lacked legal authority to promulgate.  Defendants have articulated no good reason why student debtors in 47 states should do better than those in the three plaintiff states with standing to sue.  And the court can imagine no such reason.

## 2.     The Court Doesn't Enjoin the SAVE Plan in its Entirety.

The court has concluded that a nationwide injunction should issue, and now it must decide what the injunction should, well, enjoin.  Plaintiffs move the court "for a Preliminary Injunction enjoining Defendants . . . , their agents, employees, and attorneys from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But as discussed already, there's a problem with this request:  defendants already have implemented parts of the SAVE Plan.  Plaintiffs' papers fail to account for this reality.[13]  And so plaintiffs have failed to present the court with any meaningful direction—*i.e.*, what a preliminary injunction undoing the already-active parts of the SAVE Plan would look like.  This presents a formidable problem for the court.

Plaintiffs' First Amended Complaint explicitly mentions that defendants "unilaterally erased the debt of 153,000 borrowers" in February 2024.  Doc. 57 at 3 (1st Am. Compl.).  To enjoin the entire SAVE Plan thus would require defendants to unwind those actions, modifying the status quo.  To be sure, usually, the "status quo refers to the last peaceable uncontested status existing between the parties before the dispute developed."  *Am. Civil Liberties Union of Kan. and W. Mo. v. Praeger*, 815 F. Supp. 2d 1204, 1208 (D. Kan. 2011) (citing *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006)).  But by this point, the SAVE Plan has been in effect for months.  *See Louisiana ex rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022) ("The Interim Estimates were published in February 2021.  This lawsuit was filed in April 2021.  The Plaintiff States moved for a preliminary injunction in July 2021.  And the preliminary injunction was entered in February 2022.  By the time the

---

[13]     Plaintiffs' briefing devotes most of its requested relief to arguing that any injunction should apply nationwide.  *See* Doc. 24 at 31–32; Doc. 50 at 27–28.  And when arguing about their delay in bringing suit, plaintiffs emphasize that they brought suit before the Final Rule's July 2024 effective date, without acknowledging that parts of the Final Rule already have taken effect.  Doc. 50 at 27.  Their approach grossly oversimplifies the state of play.

preliminary injunction was entered, the Interim Estimates had been in place for one year.  The status quo at this point is the continued use of the Interim Estimates.").  And plaintiffs never dispute that defendants gave them explicit advance warning of their early implementation of the SAVE Plan.

The court thus declines to enjoin the parts of the SAVE Plan defendants already have implemented.  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).  The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation and internal quotation marks omitted).  The equities of this case simply don't favor unwinding the parts of the SAVE Plan that defendants already have implemented.  Plaintiffs waited until defendants already had done so to bring suit.  And, because of this delay, plaintiffs have failed to show an irreparable injury from the parts of the SAVE Plan already in effect that a preliminary injunction could forestall.  *See above* § III.B.

Even without the delay, the court would decline to enjoin the entire SAVE Plan because plaintiffs have failed to present a workable injunction.  Plaintiffs ask for an injunction barring defendants "from implementing or acting pursuant to the Final Rule[.]"  Doc. 23 at 1.  But defendants already have "implement[ed]" a part of the Final Rule and "act[ed] pursuant to the Final Rule[.]"  *Id.*  Defendants have persuaded the court that, at this point, a preliminary injunction that would enjoin the entire SAVE Plan would create pointless uncertainty.  Such a disruptive preliminary injunction is disfavored, and the court won't enter one here.  *RoDa Drilling*, 552 F.3d at 1208 n.3 ("Certain types of preliminary injunctions are disfavored:  (1)

preliminary injunctions that alter the status quo, (2) mandatory preliminary injunctions, and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial." (citation omitted)).  This outcome may not qualify as a perfect one.  But it's the best one the court can craft based on the information supplied to date.

The court thus will enter a preliminary injunction that forbids defendants from implementing the parts of the Final Rule set to take effect on July 1, 2024.  Such a preliminary injunction will "preserve the relative positions of the parties until a trial on the merits can be held."  *Camenisch*, 451 U.S. at 395.

### 3.    The Court Lacks Jurisdiction Over the President.

Defendants assert that this court lacks authority to enjoin the President, whom plaintiffs have named as a defendant.  Doc. 47 at 58–59.  They're right.  "With regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief[.]"  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (first citing *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), then citing *Franklin v. Massachusetts*, 505 U.S. 788, 827–28 (1992)).  Plaintiffs never dispute this proposition.  *See generally* Doc. 50.  The court thus dismisses the President of the United States as a party defendant in this action.  The court also directs the Clerk to recaption the case so that it doesn't portray the President as a defendant.

## IV.    Conclusion and Next Steps

The courts grants in part and denies in part plaintiffs' Motion for Preliminary Injunction (Doc. 23).  The court will enter the following preliminary injunction:  Defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family

Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.[14]

The court is mindful of the gravity of this ruling.  Drawing the legal conclusions leading to it required the court to apply a developing legal doctrine to complex legislative and regulatory terrain.  And all on a limited evidentiary record.

The court is equally mindful that human infallibility is what it is.  It thus temporarily stays the effective date of this Preliminary Injunction to permit the parties to seek any appellate relief they deem appropriate.  *See, e.g.*, *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1152 (D. Kan. 2016) (staying preliminary injunction for 14 days to give parties time to appeal).  Absent further order by this court or any reviewing court, this court's injunction will take effect at ten o'clock p.m. Central Daylight Time on June 30, 2024.

As a final note, the court emphasizes that any decision about a preliminary injunction is just that:  preliminary.  Given the importance of the issues in this case, the court orders the parties immediately to confer and seek a scheduling conference with United States Magistrate Judge Angel D. Mitchell.  The court orders the parties to formulate and present to Judge Mitchell a schedule that will enable the court to reach a final decision (including a trial on the merits, if one is required) as soon as practicable.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Preliminary Injunction (Doc. 23) is granted in part and denied in part, as set forth in full in this Order.

---

[14]    To comply with the separate document rule, the court will enter plaintiffs' preliminary injunction separately.  *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922, 923 (7th Cir. 2019) (remanding for district court to enter preliminary injunction on separate document); *Beukema's Petrol. Co. v. Admiral Petrol. Co.*, 613 F.2d 626, 627 (6th Cir. 1979) ("[I]t appears to the court that the express provisions of Rule 58 for entry of judgment on a separate document applies not only to final judgments in the ordinary sense but also to preliminary injunctions entered pursuant to Rule 65[.]").

**IT IS FURTHER ORDERED THAT** defendants United States Department of Education and United States Secretary of Education Miguel Cardona, and their agents, employees, and attorneys, are enjoined from implementing or acting pursuant to the parts of Final Rule—promulgated by the Department of Education titled "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," 88 Fed. Reg. 43,820—set to become effective on July 1, 2024.

**IT IS FURTHER ORDERED THAT** the injunction will take effect at 10:00 PM Central Daylight Time on June 30, 2024.

**IT IS FURTHER ORDERED THAT** defendant Joseph R. Biden, in his official capacity as the President of the United States, is dismissed from the case for lack of jurisdiction.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

42