# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| |
|---|
| STATE OF ALASKA, *et al.*, |
| Plaintiffs, |
| v. |
| MIGUEL A. CARDONA, in his official capacity as Secretary of Education, *et al.*, |
| Defendants. |

Case No. 24-1057-DDC-ADM

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR EMERGENCY MOTION FOR A STAY PENDING APPEAL

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARCIA BERMAN
*Assistant Branch Director*

STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT .......................................................................................................................4

I.   THE INJUNCTION SHOULD BE STAYED PENDING APPEAL. ...........................4

    A.   Defendants are likely to succeed on appeal. ..............................................................4

    B.   The injunction will cause significant and irreparable harm. .....................................10

    C.   The public interest and the balance of the equities favor a stay. ..............................12

II.  IN THE ALTERNATIVE, THE INJUNCTION SHOULD BE NARROWED..........12

CONCLUSION ...................................................................................................................15

## <u>INTRODUCTION</u>

In its opinion granting in part and denying in part Defendants' motion to dismiss, the Court concluded that Plaintiffs' only surviving standing theory "is different—and weaker—than the public instrumentality harm that prevailed in *Biden v. Nebraska*." Mem. & Order at 13 ("Standing Op."), ECF No. 68. Subsequently granting in part and denying in part Plaintiffs' motion for a preliminary injunction, the Court also "agree[d] with the Secretary's time-honored interpretation that the statute imagines repayment for less than 25 years, with forgiveness at the end." Mem. & Order at 17 ("Merits Op."), ECF No. 76. Even so, the Court entered a nationwide preliminary injunction that forbids Defendants from implementing significant portions of the Final Rule—including many provisions, large and small, that Plaintiffs never even argued caused them (or anyone) any Article III injury, let alone were unlawful. If the injunction takes effect, it will inflict irreparable harm on the federal government in the form of unrecoverable disruption costs and create extraordinary confusion and chaos for borrowers. On the other side of the ledger, though the Court accepted (for now) Plaintiffs' theory of harm to three state instrumentalities, it also recognized that their theory is not "all that substantial," *id.*, and purports to show only a "relatively meager harm," *id.* at 31, in any event.

Accordingly, the Solicitor General of the United States has now authorized both an immediate appeal and the filing of this motion for a stay pending appeal. For the reasons that follow, Defendants respectfully request that the preliminary injunction (1) be stayed pending resolution of their appeal, or (2), in the alternative, be narrowed in a manner that seeks only to remedy the injuries of the three remaining Plaintiffs (*e.g.*, by prohibiting Defendants from processing any further consolidation of FFEL loans held by the three relevant state instrumentalities). Due to the imminent irreparable harm that will be suffered if this injunction takes full effect before the United States may exercise its appellate rights, Defendants respectfully request a ruling on this motion no later than 3:00 PM CDT on Friday, June 28, so that Defendants may promptly seek appellate relief, if necessary. At a minimum, Defendants respectfully request a temporary administrative stay to allow this Court (and, if necessary, the Tenth Circuit) to consider, and issue a ruling on, Defendants' stay request.

## BACKGROUND

The Department of Education published the Final Rule at issue in this case nearly one year ago. *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program*, 88 Fed. Reg. 43,820 (July 10, 2023). The Final Rule makes myriad changes to the Department's income-driven repayment (IDR) plans for federal student loans. Plaintiffs have focused their attention on four of those changes in the SAVE Plan (formerly "REPAYE"): (1) an increase in the share of a borrower's income exempt from inclusion in her monthly payment calculation, from 150 percent of the Federal Poverty Level (FPL) to 225 percent; (2) $0 monthly payments for a borrower whose income falls below 225 percent of the FPL; (3) a decrease in the cap on monthly payments from 10 percent to 5 percent of a borrower's discretionary income exceeding 225 percent of the FPL for undergraduate loans; and (4) forgiveness of original loan balances of $12,000 or less after 120 qualifying payments or the equivalent, with additional forgiveness of $1,000 available during each subsequent year of qualifying payments or the equivalent. Am. Compl. ¶ 70, ECF No. 57; *see also* Merits Op. at 6-7. But the Final Rule also does many other things. For example, it modifies the definitions of important ICR-related terms affecting monthly payment amounts, like the definition of "family size." 88 Fed. Reg. at 43,820. It simplifies certain "burdensome and confusing regulations" through provisions like automatic annual income recertification for borrowers who opt into sharing of their tax information. *Id.* It waives interest charges not covered by a borrower's monthly payment. *Id.* And it credits certain periods of deferment and forbearance, including for borrowers engaged in military service or receiving cancer treatment, toward eventual loan forgiveness on a range of repayment plans. *Id.*

In general, the Final Rule was set to take effect on July 1, 2024. *Id.* But the Secretary also exercised his statutory authority (unchallenged here) to designate certain provisions for early implementation. *See* 20 U.S.C. § 1089(c)(2). The following provisions were effective on July 30, 2023: a change in the treatment of certain spousal income, the increase in the income exemption to 225 percent of FPL, the interest waiver, and the change in the "family size" definition. 88 Fed. Reg. at 43,820. Subsequently, in February 2024, the Department implemented the shortened-timeline-to-forgiveness provision. *See* 89 Fed. Reg. at 2489.

The Plaintiff States, then eleven in number, sued in March to enjoin the Department's implementation of the Final Rule. *See generally* Compl., ECF No. 1. They asserted three theories of standing: lost tax revenues, impaired recruitment abilities, and harm to state instrumentalities in three States through increased incentives for consolidation of the instrumentalities' Federal Family Education Loans (FFEL loans) into federal direct loans. Pls.' Br. at 7-10, ECF No. 24; Pls.' Reply at 13-14, ECF No. 50 (attempting to further develop this state-instrumentality theory). On the merits, they alleged that the Final Rule exceeded the Secretary of Education's statutory authority to promulgate regulations establishing repayment plans, 20 U.S.C. § 1087e(d)(1), and that the Final Rule also violated the Administrative Procedure Act. Pls.' Br. at 10-29.

As for Article III standing, the Court accepted the state-instrumentality theory as to Alaska, South Carolina, and Texas, rejected Plaintiffs' other standing theories, and dismissed the eight other Plaintiffs for lack of subject-matter jurisdiction. Standing Op. at 14-28, 31-45, 45-46. The Court credited Plaintiffs' evidence for two propositions: that certain elements of the SAVE Plan would encourage borrowers to consolidate, and that the resulting consolidation would cause financial injury to the three instrumentalities. *Id.* at 14-28. With respect to the first—that SAVE would cause consolidation—the Court found that Plaintiffs met their burden via one declaration about Alaska's Student Loan Corporation (ASLC). Specifically, the ASLC declarant cited three provisions of SAVE that would encourage consolidation: the cap on monthly payments at 5 percent of discretionary income for undergraduate loans, the interest waiver, and the shortened timeline to forgiveness. *Id.* at 22 (citing Declaration of Sana Efird ¶¶ 6-8 (Efird Decl.), ECF No. 50-8).

Earlier this week, the Court entered a preliminary injunction against certain provisions of the Final Rule. *See generally* Merits Op. The Court held that Plaintiffs had shown a likelihood of success on the merits of their claim that the Higher Education Act (HEA) did not clearly authorize the SAVE Plan, focusing on SAVE's changes to monthly payment calculations and the shortened timeline to forgiveness. *Id.* at 24, 20, 22. But in analyzing Plaintiffs' assertions of irreparable harm, and in an effort to avoid unnecessary disruption to the status quo, the Court observed that "parts of the SAVE Plan" were already in effect due to early implementation. *Id.* at 38. The Court thus enjoined only "the

3

parts of the Final Rule set to take effect on July 1, 2024." *Id.* at 40; *accord* Prelim. Inj. at 1, ECF No. 77. Accordingly, the Department will continue to implement those provisions already in effect, including the income exemption at 225 percent of FPL, the interest benefit, and several others. But "[a]bsent further order by this court or any reviewing court," the injunction will soon prohibit (as of June 30 at 10:00 PM Central Daylight Time) the Department from effectuating the monthly payment cap at 5 percent of discretionary income, as well as the Final Rule's many other provisions that were not designated for early implementation. Merits Op. at 41.

Separately, as required by another preliminary injunction entered the same day in parallel litigation, the Department has also ceased implementing the SAVE Plan's shortened timeline to forgiveness. *See* Mem. & Order at 61, ECF No. 35, *Missouri v. Biden*, 4:24-cv-520 (E.D. Mo. June 24, 2024) ("Defendants are preliminarily enjoined from any further loan forgiveness for borrowers under the Final Rule's SAVE plan until such time as this Court can decide the case on the merits."). The Solicitor General has also authorized an appeal in *Missouri*.

Before filing this motion, counsel for the parties conferred. Plaintiffs oppose this motion.

## <u>ARGUMENT</u>

### I.     **THE INJUNCTION SHOULD BE STAYED PENDING APPEAL.**

Federal Rule of Civil Procedure 62(d) explicitly empowers a district court to "suspend" or "modify" an injunction "[w]hile an appeal is pending," to safeguard "the opposing party's rights." Fed. R. Civ. P. 62(d); *Marie v. Moser*, 65 F. Supp. 3d 1175, 1205 (D. Kan. 2014) (Crabtree, J.); *see also* Fed. R. App. P. 8(a)(1)(A), (C). A motion for a stay pending appeal is evaluated under the same four-factor test as a motion for a preliminary injunction. *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015).

#### A.     **Defendants are likely to succeed on appeal.**

Defendants are likely to succeed on appeal for at least three reasons: (1) Plaintiffs have failed to carry their burden to show Article III standing; (2) the plain text of the HEA is sufficiently clear to authorize the SAVE Plan; and (3) Plaintiffs have not demonstrated their entitlement to the extraordinary remedy of a preliminary injunction, as a matter of equity. Each of these reasons, standing alone, would be enough to warrant reversal. Considering all three together, it is likely that

Defendants will succeed on appeal via at least one of these three independent paths.

**1.**   As for Article III standing, the Court has already rejected most of Plaintiffs' standing arguments, holding that at least eight of the eleven original Plaintiffs "simply have no skin in the game." Standing Op. at 3. And even in partially denying Defendants' motion to dismiss, the Court correctly acknowledged that Plaintiffs' one thus-far-successful theory "is different—and weaker— than the public instrumentality harm that prevailed in *Biden v. Nebraska*." *Id.* at 13.

Even on that theory, the Court identified several significant shortcomings with Plaintiffs' evidence. For example, South Carolina's "evidence casts doubt on plaintiffs' allegation that the SAVE Plan makes FFEL loan consolidation more likely," because "borrowers already were consolidating their loans long before the SAVE Plan's incentives," which "poses a causation problem for plaintiffs." *Id.* at 18. Evidence from Texas and South Carolina directly "contradict[ed]" each other. *Id.* at 21. And the Court found "some truth to defendants' criticism" about the conclusory and speculative nature of Alaska's only declaration. *Id.* at 23. Nevertheless, because *Defendants* "proffered no evidence of their own," the Court denied the motion to dismiss in relevant part. *Id.* Respectfully, that approach was mistaken—because it was Plaintiffs' burden alone to demonstrate Article III standing, *see, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), Defendants had no obligation to "proffer[]" any "evidence of their own." Standing Op. at 23.

Even setting aside the matter of Plaintiffs' burden, the law on these standing issues has only gotten stronger for Defendants in the weeks following this Court's standing opinion. First, in *FDA v. Alliance for Hippocratic Medicine*, No. 23-235, 602 U.S. ----, 2024 WL 2964140 (U.S. June 13, 2024), the Supreme Court unanimously held that the plaintiffs—doctors and medical associations—lacked Article III standing to challenge the FDA's decisions to relax certain regulatory requirements. *Alliance* underscores the tenuous nature of Plaintiffs' state-instrumentality theory here, which "is simply too speculative or too attenuated to support Article III standing." *Id.* at *12.

In *Alliance*, the Supreme Court first reaffirmed that a plaintiff "does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally," *id.* at *6, which "means that the federal courts decide some contested legal questions later

rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process." *Id.* The Court also reiterated that standing is "ordinarily substantially more difficult to establish" where, as here, "a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else.*" *Id.* at \*7 (quotation marks omitted). And the Court rejected the plaintiffs' speculative allegations of indirect "monetary" harm from the government's lack of regulation of certain medication. *Id.* at \*11.

Like the *Alliance* plaintiffs, Alaska, South Carolina, and Texas "advance several complicated causation theories to connect [the government's] actions to the plaintiffs' alleged injuries in fact." *Id.* at \*9. Also like the *Alliance* plaintiffs, these Plaintiffs assert standing based on indirect monetary injury from a federal policy they allege is unlawfully lax. But just as "[t]eachers in border states" may not "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms," *id.* at \*12, neither may Plaintiffs sue whenever a federal policy increases, even indirectly, the incentives for third-party student borrowers to consolidate their loans, thereby causing some possible downstream "monetary" harm to state instrumentalities. Plaintiffs' logic—a speculative and attenuated theory of indirect financial harm via third-party incentives, with no concrete example of the feared harm occurring—"would seemingly not end until" the States "had standing to challenge virtually every government action that they do not like," an outcome that is "flatly inconsistent with Article III." *Id.*

Second, just yesterday, the Supreme Court reiterated the "bedrock principle" of standing "that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, No. 23-411, 2024 WL 3165801, at \*8 (U.S. June 26, 2024) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)). "In keeping with this principle," the Supreme Court has long "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* Here, as in *Murthy*, Plaintiffs' state-instrumentality theory does little more than "speculat[e] about the decisions of third parties" not before the Court—here, borrowers, who might consolidate their loans, for a variety of reasons, which may or may not include the SAVE Plan. *Id.* at \*15. That sort of speculation about third parties did not work in *Murthy*, and it should not work here.

Relatedly, the critical declaration relied upon by the Court to find standing in this case makes essentially the same error that the Supreme Court has since identified in *Murthy*. Plaintiffs' sparse evidence relies almost exclusively on statistics regarding *past* loan consolidation, accompanied by Plaintiffs' (and some of their declarants') evidence-free speculation about what they assume that past loan consolidation portends for the future. But "the past is relevant only insofar as it predicts the future," and "this weak record gives [Plaintiffs] little momentum going forward" in establishing how independent, third-party student borrowers will respond to the SAVE Plan. *Id.* at *15; *see also id.* at *10 ("[P]laintiffs rely on allegations of past Government censorship as evidence that future censorship is likely. But they fail, by and large, to link their past social-media restrictions to the defendants' communications with the platforms."). As this Court correctly explained, "Plaintiffs haven't adduced any evidence that purports to suss out the amount of consolidation caused by the HEROES Act, the SAVE Plan, and general market forces individually." Standing Op. at 19.

That was their burden to survive a motion to dismiss, but Plaintiffs' failing is even more plain "[a]t the preliminary injunction stage," when the standard is higher: "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy*, 2024 WL 3165801, at *8 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Plaintiffs' failure to make that "clear showing" is likely to result in Defendants' success on appeal. *Id.* After all, "[r]eview of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it." *Munaf v. Geren*, 553 U.S. 674, 691 (2008).

**2.** Turning to the merits, the Court did not "buy plaintiffs' argument about the HEA's plain text," and in fact "agree[d] with the Secretary's time-honored interpretation that the statute imagines repayment for less than 25 years, with forgiveness at the end." Merits Op. at 17. Nevertheless, although the Court held that "[t]he HEA's [p]lain [t]ext [a]uthorizes the SAVE Plan," *id.* at 14, it still concluded that "plaintiffs are likely to prevail on the first of their statutory claims, *i.e.*, that the SAVE Plan exceeds the Secretary's authority under the HEA." *Id.* at 24.

But in doing so, the Court mistakenly allowed subjective inferences about statutory context to trump the statute's plain text. There are few principles that find more robust support in Supreme Court precedent—both before and after minting of the major-questions doctrine—than the idea that the plain text of a statute is paramount. *See, e.g.*, *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) ("[I]t is . . . our job to apply faithfully the law Congress has written, and we cannot replace the actual text with speculation as to Congress' intent."); *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) ("[A]s we have stressed over and over again in recent years, statutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says."); *Bostock v. Clayton County*, 590 U.S. 644, 673-74 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."); *Culbertson v. Berryhill*, 139 S. Ct. 517, 521 (2019) ("We begin with the language of the statute itself, and that is also where the inquiry should end, for the statute's language is plain."); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."); *Dunn v. CFTC*, 519 U.S. 465, 474 (1997) ("[T]he purposes underlying the [statute in issue] are most properly fulfilled by giving effect to the plain meaning of the language as Congress enacted it.").

*Biden v. Nebraska* is not to the contrary. Even setting aside all the distinctions that Defendants identified in prior briefing, *see* Defs.' Br. at 27-29, ECF No. 22, that case offers no support for the idea that judicial intuitions about congressional intent should overcome plain statutory text—indeed, the Supreme Court held that "the statutory text alone precludes the Secretary's program." *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 n.9 (2023). After all, "the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation." *Id.* at 2376 (Barrett, J., concurring). And of all the major-questions precedent from the Supreme Court and the Tenth Circuit, to Defendants' knowledge, "none purports to depart from the best interpretation of the text," *id.* at 2378, in the way that this Court's opinion did. That "the HEA's [p]lain [t]ext [a]uthorizes the SAVE Plan," Merits Op. at 14, should have been enough to reject Plaintiffs' statutory-authority claim.

As for *Bradford v. Department of Labor*, 101 F.4th 707 (10th Cir. 2024), respectfully, the Court was mistaken to say that the Tenth Circuit "assumed without deciding that the [major-questions doctrine] applied" in that case.  Merits Op. at 18; *see also id.* at 13 n.3.  In fact, *Bradford* "decline[d] to apply" the major-questions doctrine because that case "differ[ed] markedly from those in which the Supreme Court" had applied it. 101 F.4th at 728.  Much the same could be said here, for reasons explained in detail both in Defendants' prior briefing, Defs.' Br. 27-29, as well as this Court's opinion, Merits Op. at 23 (acknowledging that "[t]he Secretary has used its HEA authority three times before"); *see also* 88 Fed. Reg. at 43,829 ("[F]orgiveness of the remaining loan balance after an established time has been a part of the IDR plans since the creation of the Direct Loan Program in 1993-1994.").

**3.**  Defendants are also likely to succeed with respect to the remaining injunction factors.  As plaintiffs have not shown any concrete injury sufficient for standing, they necessarily have not shown irreparable harm necessary to obtain preliminary relief.  *See supra* at 5-7.  But even if the three States with public instrumentalities would (just barely) suffer cognizable harm from loan consolidation, their interests are plainly outweighed by certainly impending harms to the Department arising from the preliminary injunction.  *See infra* at 10-12.  As this Court has already concluded, "plaintiffs' theories of irreparable harm aren't all that substantial," Merits Op. at 25, and they at most have made a showing of a "relatively meager harm," *id.* at 31.  That cannot justify the extraordinary remedy of a preliminary injunction, even if plaintiffs' injuries are irreparable.  *See Winter*, 555 U.S. at 23.

The Court seems to have declined to balance the equities, however, because of its merits holding that Congress "didn't delegate to the Secretary clear power to enact the SAVE Plan."  *See* Merits Op. at 31 ("The equities thus favor a preliminary injunction of some sort.").  That approach was erroneous.  Even if a plaintiff has shown a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course."  *Benisek v. Lamone*, 585 U.S. 155, 158 (2018); *see also, e.g.*, *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.").  Indeed, the equities—standing alone—can suffice to deny a preliminary injunction regardless of the likelihood of success on the merits.  *See*

*Winter*, 555 U.S. at 23 (holding that any irreparable injury shown by the plaintiffs "is outweighed by the public interest and the Navy's interest," and that "consideration of these factors alone requires denial of the requested injunctive relief").

The Court seemed to view *National Federation of Independent Business v. OSHA* ("*NFIB*"), 595 U.S. 109 (2022) (per curiam), as precluding it from balancing the parties' asserted harms. *See* Merits Op. at 31. But that opinion need not and should not be read as having overturned, *sub silentio*, decades of precedent and "several hundred years" of historical practice that requires weighing the equities before issuing a preliminary injunction. *Starbucks Corp. v. McKinney*, No. 23-367, 2024 WL 2964141, at *4 (U.S. June 13, 2024). Though the equities may not have "justif[ied] withholding interim relief" under the circumstances of *NFIB*, 595 U.S. at 120, the Supreme Court has never jettisoned the traditional and longstanding equitable requirements for obtaining a preliminary injunction.

*   *   *

Defendants acknowledge that the Court has ruled against them on several of these issues. Nevertheless, because Defendants have several independent paths to victory on appeal, the Court's prior conclusions—right or wrong—do not warrant denial of this motion. Indeed, the Court acknowledged that Plaintiffs "just barely" showed standing, Standing Op. at 2, and that the statutory question is "tricky," Merits Op. at 13. For all these reasons, Defendants are likely to succeed on appeal.

**B.      The injunction will cause significant and irreparable harm.**

In shaping the contours of the injunction, the Court appropriately sought to avoid unnecessary disruption to the status quo, recognizing that parts of the Final Rule had "been in effect for months." Merits Op. at 38. It thus declined to "unwind" actions already taken to put the Rule into effect. *Id.* Unfortunately, despite the Court's efforts, the injunction will cause just the sort of "pointless uncertainty" and "disrupti[on]," *id.* at 39, that the Court appropriately tried to avoid. This is so because although the relief ordered is prospective in a technical sense, it in fact upsets months of preparation by the Department and its servicers to implement the outstanding provisions of SAVE—preparation that cannot be undone in one week. The resulting chaos, confusion, and unrecoverable cost should be avoided.

10

All but one of the Department's contracted loan servicers services between 7 and 14 million borrowers.  Declaration of Denise Carter ¶ 7 (Carter Decl.), Ex. 1.  To calculate monthly amounts due, prepare billing notices, and process payments, the servicers rely not only on their own databases, which are built on complex software with custom code, *id.* ¶ 8, but also on code linking their databases with the Department's own, *id.* ¶ 11.  Development and testing of that code is extraordinarily resource- and time-intensive.  *Id.* ¶¶ 3, 9-13.  To revert back to the pre-SAVE approach, both FSA and the servicers will be required to recode their systems to recalculate monthly payments.  *Id.* ¶¶ 15-18.  Absent judicial relief, during that process, which will take at least several months, *id.* ¶¶ 3, 19, the Department will have no choice but to place a large number of SAVE borrowers into forbearance, until its servicers' systems can service loans with a correct calculation of payments due.  *Id.* ¶ 22.

The Department will incur considerable, unrecoverable costs when it takes these steps.  Many labor hours will be spent supervising and implementing the technical changes required to update servicers' systems (and the corresponding changes to the Department's own systems).  *Id.* ¶¶ 15, 26.  In turn, that time will not be spent advancing the Department's other important priorities.  *Id.* ¶ 26.  Servicers, too, will feel the impact of the injunction.  In addition to incurring labor and engineering costs associated with rebuilding their databases, servicers will be obligated to train their technical staff and customer support representatives on the updated systems.  *Id.* ¶ 17.  The customer relations tasks associated with servicing will become more difficult because of the injunction—not only because staff must learn new information, *id.*, but because they must do so in the face of a foreseeable onslaught of borrower inquiries about the impact of the injunction on SAVE, Declaration of Lorelei Salas ¶ 26 (Salas Decl.), Ex. 2, which has been publicized for months, Carter Decl. ¶ 28.  And even if the government eventually prevails on appeal, these harms will be impossible to remedy.

Borrowers also stand to suffer significant and unrecoverable harm.  Despite the seeming benefit of a temporary reprieve from the obligation to make loan payments (during a period in which interest will not accrue), forbearance also comes with significant costs.  Most notably, periods of forbearance-related nonpayment will not be counted toward forgiveness under income-driven repayment plans, thus delaying any eventual loan forgiveness under those programs.  *Id.* ¶ 31.  And

when forbearance eventually gives way to recalculated (and higher) payments, SAVE enrollees will be obligated to pay up to double what they expected to under the Final Rule. *Id.* ¶ 28.

Alongside these pocketbook harms, borrowers will be forced to grapple with widespread uncertainty and confusion. Approximately 124,000 borrowers have already received billing notices calculated with the soon-to-be-enjoined 5 percent cap, *id.* ¶ 29; those notices will surely confound borrowers. Furthermore, SAVE's benefits have been publicized for months—the nationwide prominence of the injunctions in this case and in *Missouri* will cause many borrowers to seek clarification of their rights and obligations from their servicers (not only SAVE enrollees, but other borrowers as well, Salas Decl. ¶¶ 26, 28). As explained in a detailed declaration from the Consumer Financial Protection Bureau, historically, such a large and sudden increase in volume has overwhelmed servicers, leading to high call wait times, provision of inaccurate information, and dropped calls. *Id.* ¶¶ 26, 34 (noting processing delays of almost a year after a PSLF-related change). And harm begets harm: as borrowers are unable to receive accurate, timely information about their loans, they risk missing payments and adverse impacts on their credit, *id.* ¶ 35.

### C.  The public interest and the balance of the equities favor a stay.

The public interest and the balance of the equities likewise favor a stay pending appeal. Again, as this Court has already concluded, "plaintiffs' theories of irreparable harm aren't all that substantial," Merits Op. at 25, and they at most have made a showing of a "relatively meager harm," *id.* at 31. Weighed against the significant and irreparable harm facing the government and student-loan borrowers around the country, *see supra* at 10-12—including borrowers with no relationship whatsoever to the relevant state instrumentalities in Alaska, South Carolina, and Texas whose alleged injuries are nominally at stake—Defendants are entitled to a stay pending appeal.

## II.  IN THE ALTERNATIVE, THE INJUNCTION SHOULD BE NARROWED.

A preliminary "injunction must be narrowly tailored to remedy the harm shown." *Citizen Band Potawatomi Tribe v. Okla. Tax Comm'n*, 969 F.2d 943, 948 (10th Cir. 1992) (citation omitted). Correspondingly, injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Gill*

*v. Whitford*, 585 U.S. 48, 66 (2018) ("[A] plaintiff's remedy must be 'limited to the inadequacy that produced his injury in fact.'" (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)) (alteration omitted)).

Although the Court acknowledged these "bedrock principle[s]," Merits Op. at 36, it failed to follow them appropriately in crafting relief for these Plaintiffs. The theory of injury that Plaintiffs advanced and the Court accepted is limited to three States (Alaska, South Carolina, and Texas) and to particular provisions of the SAVE Plan (the 5 percent cap on payments, the interest benefit, and the shortened timeline to forgiveness, Standing Op. at 21-22). But the preliminary injunction grants relief far beyond what is necessary to remedy these specific harms, in at least two respects.

**a.** First, it applies on a nationwide basis—that is, for *all* borrowers—requiring costly and time-consuming compliance efforts by the Department and causing corresponding confusion on the part of borrowers. Even if such broad relief were within the bounds of the judicial power, *but see* Defs.' Br. at 42-43, the availability of narrower alternatives renders such breadth a poor fit for the "equities of [this] given case." *Trump*, 582 U.S. at 579. Indeed, the Court could (and should) instead order that the Department not process any further FFEL consolidations from the relevant Alaska, South Carolina, and Texas instrumentalities. Doing so would entirely nullify the injury complained of while simultaneously avoiding the tremendous upheaval (for the Department, servicers, and borrowers alike) associated with a nationwide injunction against all of the SAVE Plan's not-yet-implemented provisions. *See supra* at 10-12; *see also North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (including "workab[ility]" among salient considerations in fashioning injunctive relief). That approach would also be far more consistent with the Court's disposition of Defendants' motion to dismiss, in which the Court appropriately took great care to avoid a result in which uninjured plaintiffs without Article III standing could try and "piggyback on the injured plaintiffs' standing." Standing Op. at 31. The relief ordered by this Court ultimately rewards that same sort of piggybacking and renders largely meaningless the Court's decision to dismiss eight Plaintiffs for lack of subject-matter jurisdiction.

The HEROES Act litigation gives no reason to doubt the workability of this proposal. There, six plaintiffs complained of harm, including theories rejected in this case, from the debt relief action at issue. *Nebraska v. Biden*, 636 F. Supp. 3d 991, 998-1002 (E.D. Mo. 2022). On appeal, the Eighth

Circuit considered only Missouri's standing, which the court deemed existed through the State's Higher Education Loan Authority, or MOHELA. *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022). In the unique posture of a motion for emergency injunctive relief, the Eighth Circuit deemed it impracticable to fashion relief that would both prevent harm to all plaintiffs while also accounting for the difficulties stemming from MOHELA's role as a nationwide servicer. *Id.* But those complexities are absent here. The Court's careful consideration of standing, on the front end, now allows it to confront one simple theory of harm to three particular entities, on the back end: increased incentives to consolidate because of SAVE. Remedying that alleged harm does not require "delving into complex issues and contested facts." *Id.* To the contrary, full relief may be afforded through an injunction against consolidation of additional loans held by the three relevant state instrumentalities.

As for the notion that narrower relief would "stand [its] conclusion here on its head," Merits Op. at 37, preliminary injunctions are just that—*preliminary* assessments. As this Court has recognized, "human fallibility is what it is." *Marie*, 65 F. Supp. 3d at 1206. That reality counsels caution, particularly where serious doubt exists as to Plaintiffs' standing to bring the suit at all. *See id.* ("[D]efendants' arguments have required the Court to make several jurisdictional and justiciability determinations . . . the Circuit may come to a different conclusion about one of these threshold determinations. On balance, the Court concludes that a short-term stay is the safer and wiser course.").

**b.** The preliminary injunction's second form of overbreadth lies in its applicability to *all* provisions of the Final Rule that were slated to take effect on July 1—not just those that the Court considers to be unlawful, and not just those that are causing one of the three remaining Plaintiffs an Article III injury. *See, e.g.*, *Missouri*, Mem. & Order at 60 (holding that it is "appropriate to limit a preliminary injunction to only those provisions of the SAVE plan that permit loan forgiveness," because "Plaintiffs have not shown that [any other] provisions harm them" and "the only argument for which Plaintiffs are likely to be successful on the merits is that the Secretary lacks the requisite congressional authority to forgive loans under the SAVE plan").

Here, citing Plaintiffs' unexplained delay, the Court properly excluded from the ambit of its

relief those provisions the Department has already implemented.  Merits Op. at 39.  Of the three provisions Plaintiffs claimed would injure their instrumentalities, Efird Decl. ¶ 6, only the 5 percent cap has not already taken effect.  So, further in the alternative, and although this would not (standing alone) obviate the need for time-sensitive appellate relief, the Court should also limit its order to an injunction of implementation of the 5 percent cap, permitting the Final Rule's numerous other provisions (which have never been linked to Plaintiffs' consolidation theory) to go into effect.  *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 762 (1994) ("[T]he court . . . is charged with fashioning a remedy for a *specific* deprivation[.]" (emphasis added)).  Absent such relief, the Court's injunction will needlessly prevent implementation of a variety of other provisions of the Final Rule—which Plaintiffs never expressly challenged, which cause them no cognizable Article III injury, and for which there is no arguable basis to conclude that they exceed the agency's statutory authority.  *See, e.g.*, 88 Fed. Reg. at 43,903 (enabling borrowers receiving cancer treatment or serving in the military to receive credit toward forgiveness for certain periods of time); *id.* at 43,865 (effectuating automatic annual income recertification by allowing disclosure of federal tax information to the Department); *id.* at 43,866, 43905 (simplifying the rules relating to the alternative repayment plan); *id.* at 43,862 (allowing borrowers in default to enroll in the income-based repayment plan).

## CONCLUSION

For these reasons, the Court should stay the preliminary injunction pending appeal.  In the alternative, the Court should narrow the scope of the injunction to a prohibition on (1) consolidation of FFEL loans held by the three relevant state instrumentalities, or (2) implementation of the 5 percent cap.  Defendants respectfully request a ruling on this motion no later than 3:00 PM CDT on Friday, June 28, so that Defendants may promptly seek appellate relief, if necessary.  At a minimum, Defendants respectfully request a temporary administrative stay to allow this Court (and, if necessary, the Tenth Circuit) to consider and issue a ruling on Defendants' stay request.

Dated: June 27, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*