**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| STATE OF ALASKA, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>MIGUEL A. CARDONA, in his official capacity as Secretary of Education, *et al.*,<br><br>　　　　　　Defendants. | Case No. 24-1057-DDC-ADM |

# EXHIBIT 1:

## Declaration of Denise L. Carter
## Department of Education

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF ALASKA, *et al.*,

      *Plaintiffs*,

    v.

MIGUEL A. CARDONA, in his official capacity as Secretary of Education, *et al.*,

      *Defendants*.

Case No. 24-1057-DDC-ADM

## DECLARATION OF DENISE L. CARTER

I, Denise L. Carter, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate:

1. I am the Principal Deputy Chief Operating Officer at Federal Student Aid ("FSA") in the United States Department of Education. In this role, my responsibilities include the coordination of major policies, programs, and activities related to federal student aid. This includes, but is not limited to, overseeing the administration of the student loan programs, including the SAVE plan. As such, I am familiar with the systems and processes used to administer the SAVE plan and other loan repayment plans. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

2. As described below, student loan repayment involves multiple complex systems that require many steps and significant time to create and change. Small changes affect many people and systems; large changes, even more so.

3. Complying with the injunction will require the Department and its servicers to implement significant technical changes to their student loan databases, following over a year of preparation to implement SAVE. This will entail reprogramming all the systems that process new enrollees in Income Driven Repayment plans. During this process, which is anticipated to take at least several months and which will be quite costly, the Department will have to halt electronic applications for IDR and for consolidation loans for roughly 6 weeks, during which the Department will only be able to accept paper applications. The Department and its loan servicers will also have to make technical changes for many borrowers currently enrolled in SAVE, and will need to place SAVE borrowers whose

payment amount is affected by the injunction into forbearance.  Overall, these compliance measures will create significant disruptions to loan servicing, require wasteful and costly stop-gap measures, and create widespread borrower confusion.

A. **Loan Servicing & Repayment Plans**

4. Administering a borrower's loan on an Income Driven Repayment ("IDR") Plan such as SAVE begins with the borrower choosing a repayment plan and submitting information to FSA to determine eligibility and the terms of repayment.  This is the process for new enrollees going forward.  There is another process for transitioning the repayment plans of current SAVE enrollees described in paragraph 14 below.  For new enrollees, applications are submitted through StudentAid.gov and then processed through the Department's Digital and Customer Care ("DCC") platform.  DCC is a system that is maintained by FSA through a vendor.

5. For borrowers who permit FSA to obtain their data from the Internal Revenue Service, FSA determines the borrower's eligibility for her chosen repayment plan and monthly payment amount, drawing on information in the following database systems:

    a. The Common Origination and Disbursement ("COD") system, which is the Department's system that facilitates the disbursement of loans.  COD is maintained by FSA through a vendor.

    b. The National Student Loan Database System ("NSLDS"), which is a database system that records and stores information about federal student loans and grants.  NSLDS is maintained by FSA through a vendor.

    c. For Direct loan borrowers only who provide their consent, the Federal Tax Information Module ("FTIM"), which is a system that securely pulls information from the IRS and uses that information to make income- and repayment-related calculations. The FTI module is maintained by FSA through a vendor.  The database system from which the FTI module pulls tax information is maintained by the IRS.

6. The borrower may also opt to forgo the automated process and submit records with income-related information. FFEL loan borrowers do not have the option of going through the automated process and must submit their own income-related information. In these cases, records are submitted directly to the servicer, which processes the records to determine the borrower's eligibility and the repayment plan's terms, time period, and other details.

7. Once these eligibility and repayment determinations described in paragraphs 5-6 above are completed, the borrower's information is packaged and sent to the borrower's

servicer in a data file.  The tasks of servicing the loan then fall to the borrower's servicer, contracted by the Department to administer many aspects of the federal student loan programs.  The servicer processes the repayment-plan details in that data file; confirms the borrower's eligibility for the plan; communicates with the borrower to confirm the plan; begins managing borrower's repayment (including calculating monthly payment amounts, sending borrowers bills and collecting payments; interacting with borrowers to provide them information and support; and maintaining borrower accounts, including information about the loan status and progress toward any eligible forgiveness program); and regularly updates NSLDS throughout these processes. The Department currently employs five student loan servicers that service SAVE enrollees. Apart from CRI, which services 41,000 borrowers, each of the other servicers services between 7 and 14 million borrowers.

8. To complete the tasks described in paragraphs 4-7, the Department and servicers rely on database systems.  These systems are technically complex in their own right, as are the bridges linking them together (that is, between servicers' databases and the Department's).  To implement a repayment plan, the Department and its servicers write a considerable volume of computer code that is specific to each repayment plan.  That is, when a borrower who opts to use IRS data selects a particular plan on StudentAid.gov, the relevant information is recorded in DCC; then that information is processed through COD, NSLDS, and the FTIM, which includes FTIM pulling any relevant tax information from the IRS; the result of that processing is a determination that the borrower is eligible for the selected repayment plan under certain terms; that information is packaged in a data file and sent to the servicer; and the servicer uses that information to calculate payment amounts, send bills, and collect payments.  Each system (and the interfaces between them) contains computer code for each available payment plan so that the borrower gets billed the right amounts and so, eventually, the loan is processed according to the right plan.

B. **Implementation of SAVE & the Final Rule**

9. To make changes in those systems, the Department proceeds through a "change-request" (CR) process with specific parameters required by contract.

10. The CR process is a multi-step process that involves FSA drafting requirements and an Independent Government Cost Estimate ("IGCE") and issuing a CR to the vendor; an iterative question-and-answer process to reach consensus with the vendor on the CR's requirements; an impact analysis and cost proposal from the vendor that estimates the time and cost needed to implement the CR; FSA securing funding; and FSA finalizing the CR.  Once the CR is finalized, FSA gives the vendor the authority to proceed with implementing it.

3

11. The first main category of the Department's work to implement SAVE and the Final Rule involved borrowers who want to enroll in or switch to SAVE after July 1, 2024. To do this, the Department, its system contractors, and its servicers utilized the CR process to create functionalities in all the above-referenced systems according to SAVE's particular terms. In all, the engineering and testing processes required to coordinate and operationalize the systems under SAVE's parameters took more than a year. More specifically, the development process required designing the platform and determining the necessary requirements for a vendor to build the platform; documenting these requirements in instructions to the vendor through a contractual change-management process; working with the vendor to develop the platform; overseeing the vendor's implementation of the platform; and testing all of the systems to ensure they operate and interact properly through an application programming interface (API).

12. FSA and its vendors have been working to build systems that accommodate the SAVE provisions scheduled to take effect July 1, 2024, since the draft plan was first announced in January 2023, and have been working to implement SAVE's specific repayment provisions since the rule was finalized in July 2023. That is, it has required more than a year of work on the relevant systems' functionalities so that, on July 1, 2024, when a borrower enrolls in SAVE, the repayment plan administered is consistent with provisions that take effect on July 1. In tandem with these technical and engineering steps required to implement SAVE, the Department and its servicers have trained their staff and customer service representatives on the new regulations and new systems.

13. FSA had to undergo the same process with each servicer. FSA provided CRs to each of the servicers to implement these changes. The servicers provided time and cost estimates to FSA, which FSA approved or negotiated and then approved. The servicers then updated their systems and trained their staff and customer service representatives.

14. The second main category of the Department's work to implement SAVE applies to borrowers currently enrolled in SAVE. For these borrowers, the Department and its vendors have prepared the systems so that these borrowers' repayment plans transition to the reflect the new SAVE provisions set to go into effect July 1. For these borrowers, the servicers programmed their systems to begin calculating new payment amounts for SAVE enrollees for the month of July. Before issuance of the preliminary injunction in this case, the servicers had already been in the process of recalculating these borrowers' payment amounts to reflect the 5% rate that SAVE provides instead of the previous rate. For many of these borrowers, the servicers' systems had already recalculated and implemented their new rate for July payments, and the servicers' systems are processing the remaining enrolled borrowers' rates on a daily basis. Many borrowers whose rates have been recalculated have already received bills for July that reflect the new payment amount.

C.      **Compliance with the Court's Injunction & Harms Absent a Stay of the Injunction**

15. To comply with the court's injunction, and its prohibition on implementing the SAVE plan's provisions that cover a borrower's repayment plan, FSA must go through the process of implementing a new IDR payment plan all over again.

16. To change the system for new enrollees, FSA will first need to reprogram its own computer systems, such as NSLDS, FTIM, DCC and COD, to establish borrower's repayment plan eligibility and amount according to the parameters for prior payment plans that were slated to be phased out after July 1 and that were not built into the functionalities that have been created to implement the FUTURE Act and new USDS servicing framework.  This will require submitting CRs to vendors, responding to their questions, approving their cost estimates, and providing them Authority to Proceed ("ATP").  The vendors will then need to craft their own system requirements, program the systems for the new payment plan criteria, and do the required testing.  Once FSA's internal systems have been reprogrammed, FSA will need to communicate its determination concerning borrower eligibility and repayment amount to servicers.

17. FSA also needs to communicate the new system requirements to servicers, who need to update their computer systems by going through the full new cycle of development.  This will again include CRs, cost estimates, issuance of ATPs, crafting new system requirements, programming, and testing.  The servicers will also need to write new manuals and train their staff.

18. After the servicers have reprogrammed their systems, servicers will need to test them against FSA systems.  Servicers will also need to notify the borrowers of their new repayment terms.

19. Reprogramming the code changes that were slated to be implemented beginning on July 1 and calculating the new rates will take at least several months. This is so because all of FSA's and servicers' systems had to be programmed to match the new SAVE requirements and will need to be reprogrammed to revert back to the pre-SAVE rates.

20. In order to bring the process for new enrollees into compliance with the injunction, the Department will have to halt the electronic submissions of IDR applications and the electronic applications for consolidation loans, because these processes and the systems that facilitate them are all programmed to account for the SAVE provisions scheduled to take effect July 1.  The Department estimates it will take at least 6 weeks to implement a stop-gap measure that will accommodate electronic IDR applications and consolidations. During that time the Department will only be able to accept paper applications for IDR and consolidations.

21. The Department will also be forced to make significant changes for borrowers who are already enrolled in SAVE.  For borrowers who are already enrolled in SAVE and whose rates have been recalculated, recalculating these borrowers' payment amounts in order to collect accurate payments will require a change carried out through the change-management process and cannot be done on a short timeframe.  It will be particularly difficult to collect correct payment amounts for the recalculated borrowers who have already received bills for their July payments.  The Department cannot simply change a borrower's payment and collect a new payment immediately and without notice.  In addition to the time needed for these new payment amounts are recalculated, to demand the new payment amount, these borrowers must be given notice weeks in advance so that they know the accurate amount to pay.  The Department estimates it will take at least several months for the servicers to reprogram their systems in order to recalculate these borrowers' payment amounts so that they revert back to the pre-July 1 SAVE parameters.

22. As a result of these administrative impracticalities and the short amount of time available before this Court's injunction takes effect, during the time it will take the Department and its servicers to recalculate monthly payments and bill borrowers with the correct amounts, the Department will be required to place borrowers whose payment amount is affected by the injunction into forbearance.  Rapid changes to systems can lead to erroneous billing, and without such a forbearance, the Department would be unable to bill many of these borrowers at the appropriate amount and unable to avoid even greater borrower confusion.

23. During this period of forbearance, although interest will not accrue, these borrowers will not make payments and thus will not have any payments counted toward IDR forgiveness.

24. The process of conforming the Department's and servicers' database systems to the modified repayment rules applicable under the Court's injunction, alongside the forbearance necessary while that process is ongoing, will cause significant and irreparable harm to the Department, its servicers, and borrowers.

   1. **Costs to the Department and Servicers**

25. Complying with the injunction will cause the Department to incur significant additional costs – some of the same types of costs it has already incurred in implementing the SAVE plan.

26. Rebuilding the framework to comply with the *Alaska* injunction will consume considerable staff time, interfering with other critical Department priorities including: the launch of the 2025-26 FAFSA Form; implementing the IDR payment count adjustment; managing the transition to the USDS servicing platform, which is the first such transition

in years; and implementation of the Gainful Employment and Financial Value Transparency rules.

27. Deprogramming the not-yet-implemented July 1 provisions out of ED systems would also affect millions of other student loan borrowers not on SAVE because of interdependencies across systems. For example, the system that counts time toward SAVE forgiveness also affects the forgiveness count for other IDR plans.

### 2. Costs to Borrowers

28. The steps required to comply with the injunction will cause intense confusion among borrowers, stemming from several sources.  The SAVE plan's general contours have been public since the Notice of Proposed Rulemaking's publication in January of 2023, creating expectations among borrowers that its provisions—including lower payments—will go into effect.  These expectations will not be met when borrowers are placed into forbearance and eventually (after forbearance is completed) charged up to twice what they expected to pay monthly.

29. Additional confusion will result among the 124,000 borrowers who have already received billing notices calculated under the now-enjoined provisions of SAVE as of June 26, 2024.

30. The confusion experienced by borrowers will cause significant difficulties for servicers (already burdened by the technical adaptations required to update their database systems) as they are overwhelmed with email and phone inquiries from borrowers seeking information about the modified terms of SAVE under the injunction.

31. Forbearance will harm borrowers because months spent in forbearance will not count toward forgiveness under income-driven repayment plans, thus delaying any eventual loan forgiveness.

32. The measures necessary to comply with the injunction will impact borrowers who are not even enrolled in SAVE.

    a.    Complying with the injunction will also significantly impact many borrowers who are not enrolled in SAVE, because many elements of the Final Rule set for implementation on July 1 applied to other or multiple IDR plans. There are many provisions of the rule that are not part of the SAVE plan itself and have significant effects on the non-SAVE IDR plans, and those are also now affected.

    b.    For instance, borrowers who are in deferment on their loans while receiving treatment for cancer or serving in the military will now stop getting credit toward forgiveness on *any* IDR plan.

7

   c. A statutorily-mandated provision to allow automatic recertification of borrower income on all income-driven repayment plans is also among the suspended provisions.

   d. The injunction will impact other non-SAVE specific provisions in the final rule that were effective July 1, 2024, which include but are not limited to:

     i. Providing borrowers who are diligently making payments on their confirmed bankruptcy plans credit toward loan forgiveness.

     ii. Changing how payments prior to a loan consolidation are counted so that borrowers do not lose all credit toward IDR forgiveness if they consolidate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of June 2024.

DENISE CARTER  
Digitally signed by DENISE CARTER  
Date: 2024.06.27 23:13:35 -04'00'

Denise L. Carter