UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF ALASKA, *et al.*,<br><br>               Plaintiffs,<br><br>      v.<br><br>MIGUEL A. CARDONA, in his official capacity as Secretary of Education, *et al.*,<br><br>              Defendants. | Case No. 24-1057-DDC-ADM |

# EXHIBIT 2:

## Declaration of Lorelei Salas
## Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF ALASKA, *et al.*,<br><br>                    Plaintiffs,<br><br>       v.<br><br>MIGUEL A. CARDONA, in his official capacity as Secretary of Education, *et al.*,<br><br>                    Defendants. | Case No. 24-1057-DDC-ADM |

**DECLARATION OF LORELEI SALAS**

I, Lorelei Salas, hereby declare as follows:

*Biographical Information*

1. I am the Supervision Director at the Consumer Financial Protection Bureau (CFPB) and have held that position since November 7, 2021. During this time, I have also held the titles of Assistant Director of the Office of Supervision Policy and Acting Assistant Director for the Office of Supervision Examinations, but my official duties have not changed. I am an attorney barred in New York State with a J.D. from Benjamin N. Cardozo Law School. I make this declaration based on my personal knowledge and on information available to me in my official capacity.

2. The CFPB's jurisdiction and responsibilities are set forth in Title X of the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5301 *et seq.*, also known as the Consumer Financial Protection Act (CFPA). The CFPB was created to provide a single point of accountability for enforcing federal consumer financial laws,

1

protecting consumers in the financial marketplace, and facilitating transparent and competitive markets for consumer financial products and services. Previously, that responsibility was divided among multiple federal agencies. Consequently, the CFPA vests the CFPB with rulemaking, supervisory, and enforcement authority over 18 enumerated federal consumer financial protection laws and transferred to the Bureau supervisory authority over certain depository institutions as to consumer financial protection.

3. The CFPB is currently organized into seven functional areas that carry out or assist in carrying out the mandates of the CFPA: Supervision; Enforcement; Consumer Response & Education; Research, Monitoring & Regulations; Legal; External Affairs; and Operations.

4. I am the senior official overseeing the CFPB's supervisory functions. I have direct or indirect oversight of all activities of the offices that conduct supervisory work: the Office of Supervision Examinations and the Office of Supervision Policy (collectively "Supervision"). My responsibilities include overseeing the planning and conducting of the Bureau's supervisory activities, including examinations of supervised entities, managing operations and policy decisions, and leading a staff of more than 500 attorneys, examiners, analysts, and other employees charged with ensuring compliance with federal consumer financial laws.

5. Supervision performs examinations of large depository institutions and their affiliates and certain non-depository consumer financial service companies as provided for in the CFPA. The CFPA gives the CFPB supervisory authority over non-depository institutions in three ways. First, it provides authority over non-depository institutions that offer or provide three specific types of consumer financial products or services (consumer real estate loan origination, brokerage, or servicing, or loan modification or foreclosure relief services in

connection with such loans; private education loans; and payday loans).[1] Second, it authorizes the CFPB to supervise non-depository institutions on the basis of conduct that poses risks to consumers.[2] Third, it grants supervisory authority over a non-depository institution that "is a larger participant of a market for other consumer financial products or services, as defined by rule[.]"[3] The CFPB has promulgated regulations defining larger participants in five markets: consumer reporting, debt collection, student loan servicing, international money transfer, and automobile financing.

6. Through examinations and other supervisory work, the office assesses compliance with federal consumer financial laws, obtains information about supervised entities' activities and compliance systems or procedures, and detects and assesses risks to consumers and to the functioning of the markets for consumer financial products and services. Supervision communicates findings to the supervised entities and directs corrective action where appropriate, all within the traditional supervisory framework of institutional confidentiality.

*Background on Supervision of Student Loan Servicers*

7. Pursuant to the CFPA, as well as the CFPB's rules defining "larger participants" in markets for consumer financial products or services,[4] the CFPB regularly supervises both bank and non-bank financial services entities in numerous markets, including student loan servicing.

8. The CFPB regularly performs supervisory examinations of servicers (including for-profit companies and not-for-profit entities) handling federal student loans—both those loans owned directly by the United States Department of Education (ED), including Direct

---

[1] 12 U.S.C. § 5514(a)(1)(A).
[2] 12 U.S.C. § 5514(a)(1)(C).
[3] 12 U.S.C. § 5514(a)(1)(B).
[4] *See* 12 C.F.R. § 1090.106.

Program loans and ED-held Federal Family Education Loan (FFEL) Program loans, and those loans that are federally-guaranteed but commercially-held (commercial FFEL loans).

9. During a student loan servicing examination, CFPB staff conduct a weeks- to months-long engagement with the servicer in order to obtain information about specific topics relating to the servicer's activities and the impact of those activities on consumers. These topics can include billing practices, payment processing, payment application and allocation, communications about repayment options including income-driven repayment, processing of applications for repayment options including income-driven repayment, consumer reporting on student loans, debt collection practices, and servicing transfers (*i.e.*, the movement of loans on or off a servicer's systems).

10. The information requested can include responses to written questions, copies of policies and procedures, samples of borrower account-level information, consumer-facing written communications or call recordings, and statistics relating to servicer performance and borrower experiences, among other things. CFPB staff analyze this information in order to assess compliance with federal consumer financial law, obtain information about these companies' compliance systems or procedures, and detect and address risks to consumers and markets.[5] After this analysis, CFPB staff share preliminary findings with servicer representatives, intake any additional information that the servicer chooses to share, and may determine whether a servicer has engaged in a violation of federal consumer financial law, or has engaged in practices that create a risk of a violation.[6]

---

[5] 12 U.S.C. § 5514 (b)(1).
[6] *See* Consumer Financial Protection Bureau, CFPB Supervision and Examination Manual (Sept. 2023), *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_2023-09.pdf; *see also* Consumer Financial Protection Bureau, *Supervisory Highlights,* Issue 9, Fall 2015, at 2.5 *available at*

4

*Background on Income-Driven Repayment Plans*

11. Under federal law and regulation, federal student loan borrowers are entitled to important protections against delinquency and default that are broadly called income-driven repayment plans. These programs, enacted under Title IV of the Higher Education Act and implemented via regulations promulgated by ED beginning in the 1990s,[7] index a student loan borrower's monthly payments to their family size and discretionary income,[8] including by providing for $0 payments when a borrower's income falls below certain levels.[9] Under an income-driven repayment plan, a borrower can also obtain an interest subsidy in which the government covers interest-based costs in the event the borrower's monthly payment does not cover

---

https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf (finding that servicers processed auto-debits at the wrong time; allocated payments in a way that increased fees and deprived borrowers of effective choice in how to allocate payments; made deceptive statements about fees; violated the Fair Credit Reporting Act's implementing Regulation V); *Supervisory Highlights,* Issue 13, Fall 2016, at 2.5 *available at* https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf (finding improper denial of income-driven repayment applications; wide-reaching systems errors that caused the servicer to bill and collect the wrong payment amount); *Supervisory Highlights,* Issue 15, Spring 2017, at 2.3 *available at* https://files.consumerfinance.gov/f/documents/201704_cfpb_Supervisory-Highlights_Issue-15.pdf (finding premature termination of deferments and improper interest capitalization; deceptive statements regarding interest capitalization); *Supervisory Highlights,* Issue 23, Winter 2021, at 3.3 *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-23_2021-01.pdf (finding improper auto-debits; payment allocation errors; failure to inform borrowers of their available repayment options); *Supervisory Highlights,* Issue 24, Summer 2021, at 2.10, *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf (finding deceptive statements relating to Public Service Loan Forgiveness; billing and collecting inaccurate monthly payment amounts); *Supervisory Highlights,* Issue 27, Fall 2022, at 4, *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf (finding wrongful denials for forgiveness programs; providing incorrect payment counts and estimated eligibility dates for forgiveness; excessive delays in processing forgiveness applications).
[7] *See, e.g.*, 60 Fed. Reg. at 61820 (Dec. 1, 1995).
[8] *See* Office of Federal Student Aid, Income-Driven Repayment Plans, *available at* https://studentaid.gov/manage-loans/repayment/plans/income-driven (last visited June 27, 2024).
[9] *See id*.

5

them.[10] By enrolling in income-driven repayment, a borrower can lower their monthly federal student loan payment to potentially $0, stay current on their loans, and avoid their loans going into delinquency and potentially default.

12. Generally, delinquency on federal student loans results in derogatory reporting on a consumer's credit report after 89 days.[11] Usually after 270 days of delinquency, unpaid loans enter default, which can result in further derogatory reporting; the imposition of fees; and garnishment of wages, tax refunds, or Social Security payments.[12] Unlike with garnishment by private creditors, these garnishment procedures can occur without court orders.[13]

13. Different income-driven repayment plans set different guidelines for what percentage of a borrower's discretionary income the plan requires to be paid toward a borrower's monthly student loan payment, and as well as different thresholds for the income floor that will trigger a borrower's monthly payment to be set at $0.[14] Because of these differences across plans, a borrower's monthly payment will not only vary based on whether they are in the 10-year standard payment or enrolled in income-driven repayment; it will also vary based on which income-driven repayment plan a borrower enters.

---

[10] *See* Office of Federal Student Aid, About Income-Driven Repayment (IDR) Plan Calculations, *available at* https://studentaid.gov/idr/application/assumptions (last visited June 27, 2024).
[11] Federal Student Aid, Student Loan Delinquency and Default, *available at* https://studentaid.gov/manage-loans/default (last visited June 26, 2024). ED has announced that during the return to repayment, some of the consequences of missing payments have been temporarily suspended or mitigated. *See* Federal Student Aid, Restarting Student Loan Payments, *available at* https://studentaid.gov/manage-loans/repayment/prepare-payments-restart (last visited June 27, 2024).
[12] *Id*.
[13] Procedural requirements for such garnishment, known as "administrative offset," can be found at 31 U.S.C. § 3716.
[14] *See supra* at n.4.

6

14. On July 10, 2023, ED published a final rule with a new income-driven repayment plan, called the Saving on a Valuable Education plan (SAVE), Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820, 43901 (July 10, 2023) (SAVE Final Rule).

***Prior CFPB Findings on Federal Student Loan Servicing***

15. The CFPB has received complaints about student loan servicers from borrowers seeking to enroll in income-driven repayment plans since the CFPB began taking complaints.[15] In the decade that the CFPB has supervised federal student loan servicers, Supervision has observed a large number of violations of federal consumer financial law and harm experienced by student loan borrowers as a result of those violations.[16] And over the last two years, Supervision has observed particular weaknesses in the execution of servicing activities related to income-driven repayment plans, even for longstanding plans that predate SAVE. Supervision has documented a series of violations of federal consumer financial law, including the CFPA, relating to the servicing of accounts where borrowers were seeking or enrolled in income-driven repayment plans, suggesting that some servicers are already struggling with providing income-driven repayment plans to borrowers in accordance with federal law and regulation.[17]

---

[15] Consumer Financial Protection Bureau, *Supervisory Highlights,* Issue 13, Fall 2016, at 2.5.1 *available at* https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[16] *See supra* at n.2.

[17] Consumer Financial Protection Bureau, *Supervisory Highlights Student Loan Servicing Special Edition*, Issue 27, Fall 2022, at Sec. 4.3, *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.

16. For example, Supervision has found that servicers have: wrongfully denied borrowers' applications for income-driven repayment plans; wrongfully inflated the payments borrowers owe under their income-driven repayment plans; failed to inform borrowers of documentation required for their income-driven repayment plans; sent misleading denial letters to borrowers recertifying their income-driven repayment plans; and wrongly told borrowers their loan types were not eligible for income-driven repayment when they actually were.[18]

17. Notably, our examination findings suggest that servicing-driven barriers to income-driven repayment plans can preclude significant shares of borrowers from accessing those plans.[19] For example, when a servicer failed to adequately communicate to borrowers certain requirements of an income-driven repayment plan's application, 88% of applicants were denied for missing the uncommunicated requirement. Of those, 74% were delinquent six months later, compared with 23% of borrowers who had successfully enrolled in the plan.[20]

18. Two recent events have highlighted the ways in which large-scale shifts in the federal student loan servicing portfolio are often followed by servicing breakdowns and heightened risks to borrowers. First, after the COVID-19 emergency payment pause expired, the entire federal student loan portfolio was returned to repayment. The CFPB determined that the return to repayment of federally owned student loans presents significant consumer risks and initiated

---

[18] *Id*.
[19] The Government Accountability Office has also issued consistent findings. *See* United States Government Accountability Office, Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness (March 2022), GAO-22-103720, *available at* https://www.gao.gov/assets/gao-22-103720.pdf.
[20] Consumer Financial Protection Bureau, Supervisory Highlights Student Loan Servicing Special Edition, Issue 27, Fall 2022, at 23, *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.

8

its supervisory response.[21] While this work is ongoing, the CFPB has already identified three significant, widespread risks to consumers and potential violations of federal and state consumer law. During the return to repayment, servicers sent billing statements with inaccurate due dates and payment amounts to borrowers, including borrowers with approved loan discharges in process. In addition, servicers struggled to handle the volume of borrower inquiries that accompanied the return to repayment, resulting in borrowers experiencing hours-long call wait times and the backlog of income-driven repayment applications grew to over 1.25 million.

19. Second, in 2021, two major federal student loan servicers exited their contracts with ED, triggering the transfer of more than 25 million borrowers' accounts from one servicer to another. The CFPB conducted near-real-time supervision of these transfers alongside ED's Office of Federal Student Aid and state regulators.[22] Through this work, the CFPB identified widespread servicing failures that affected basic loan information provided to hundreds of thousands of borrowers, including servicers sending incorrect information about payment amounts, due dates, capitalization history, or paid-ahead status.[23]

20. In both cases, these events and subsequent servicing breakdowns revealed servicing systems with a long history of inaccurate and missing data.[24]

***Kansas Injunction Effects and Consumer Impacts***

---

[21] Consumer Financial Protection Bureau, *Issue Spotlight: Federal Student Loan Return to Repayment*, January 2024, *available at* https://files.consumerfinance.gov/f/documents/cfpb_federal-student-loan-return-to-repayment-report_2024-01.pdf.
[22] *Id*. at 11.
[23] *Id*. At the same time, call volume and applications for payment relief increased. Some servicers were inadequately staffed, making them unable to effectively manage this volume. *Id*.
[24] *Id*. at 11.

9

21. The injunction entered by the United States District Court for the District of Kansas enjoins ED from implementing those provisions of the SAVE plan that had been "set to become effective on July 1, 2024."[25]

22. Among other provisions, it appears that the injunction prohibits ED from implementing a planned decrease in borrowers' monthly payments under the SAVE plan that would cut those payments in half: from 10% of the borrower's income above 225% of the federal poverty line to 5% of the borrower's income above 225% of the federal poverty line, for borrowers with undergraduate loans only.[26] For borrowers with graduate and undergraduate loans, borrowers would pay a weighted average of between 5% and 10% of their discretionary income based on the original principal balances of their loans taken to attend school.[27] This anticipated decrease had been announced publicly, was contained in the proposed and final rules implementing the SAVE plan, and communicated in individual borrower communications.

23. Our experience supervising student loan servicers as described above suggests that implementing the injunction (by not implementing the planned reduction in monthly payments) significantly raises the risk that monthly payments are not accurately calculated, payment systems are not operated in compliance with federal consumer financial law, and that servicers might fail to provide accurate and actionable information to consumers about the status of their loans and their other payment options.

*Impacts on Borrowers Currently Enrolled in SAVE*

---

[25] Doc. 77.
[26] SAVE Final Rule, 88 Fed. Reg. at 43901; *see also* https://studentaid.gov/announcements-events/save-plan ("Starting next summer, borrowers on the SAVE Plan will have their payments on undergraduate loans cut in half (reduced from 10% to 5% of income above 225% of the poverty line).").
[27] SAVE Final Rule, 88 Fed. Reg. at 43902 (July 10, 2023).

24. For borrowers who have already enrolled in SAVE, market intelligence received by the CFPB suggests the federal student loan servicing system, including ED and its servicing contractors, has already been adjusting operations to recalculate monthly payments and send borrowers communications in anticipation of their post-July payment amounts. Based on consumer complaints, many borrowers were already notified that their accounts were placed into a forbearance for the month of July while their payment amounts are adjusted.

25. Based on my experience as the head of Supervision, I have serious concerns about the ability of servicers to pivot away from the anticipated new payment amounts in a way that does not incur significant risk of harm to federal student loan borrowers whose accounts they service, on the timeline the injunction appears to contemplate. It is the CFPB's understanding that efforts have been underway for months, both at ED and its servicing contractors, to implement the new payment amounts in July 2024 and the changing of payment amounts normally occurs through processes that are more foreseeable and processed on lengthier timelines than the one that the injunction appears to contemplate.[28]

26. Given the substantial change in borrowers' expected monthly payments, a significant number of borrowers will likely reach out to their servicer for information (for example, about their monthly payment amounts, income-driven repayment plan options, ways to avoid delinquency and default, or servicing errors). A change in borrowers' anticipated monthly payments is likely to prompt a significant volume of outreach from student loan borrowers to servicers and other institutions in the student loan ecosystem. Many borrowers already enrolled in the SAVE plan have received direct communications informing them of the

---

[28] As noted above, *see supra* n.2, even under more typical circumstances, we have observed that servicers struggle to implement accurate payment amounts.

11

anticipated decrease in their monthly payments, and they may have also seen widespread public descriptions of the upcoming payment change. For some borrowers, 5% of their discretionary income might have been an affordable long-term monthly expense, while 10% might not. For some borrowers, 10% of their discretionary income might amount to a higher payment than the 10-year permanent standard payment they would incur were they not enrolled in SAVE. For these and other reasons, borrowers processing the effect of the injunction may need clarification on information about their student loans in order to make informed decisions regarding repayment—and those borrowers may reach out to their servicer for help. Based on my experience as the head of Supervision, I believe that borrowers seeking information (for example, about their monthly payment amounts, income-driven repayment plan options, ways to avoid delinquency and default, or servicing errors) are likely to encounter significantly increased call wait times, inaccurate information, and dropped calls, all of which will harm borrowers.

27. Given that more than 8 million borrowers are enrolled in SAVE already, enjoining the decrease in monthly payment amounts (alongside the other provisions of the Final Rule subject to the Court's preliminary injunction) set to be implemented in July will impact millions of Americans. Based on our experience through supervisory observations, this unanticipated change is likely to prompt a surge in borrower-side demand for contact with their servicers, with borrowers likely to seek accurate, individualized information on what their future monthly payment amounts will be, and what their options are if they find them unaffordable.[29]

---

[29] *Issue Spotlight supra* at n.12, p 4 (observing that the return to repayment of federal student loans prompted numerous borrowers to contact their servicer to "apply for income-driven

*Impacts on Borrowers Not Currently Enrolled in SAVE*

28. Beyond those borrowers already enrolled in SAVE, borrowers who are contemplating enrolling in SAVE and borrowers on other income-driven repayment plans may also reach out to servicers with questions about the injunction and its effects on their monthly payment amounts, accrual of qualifying months toward forgiveness, and repayment options. For example, borrowers may consider enrolling in SAVE even when they have not previously because they have newly entered repayment because they have recently graduated, or have been in repayment but have experienced losses in income. Whether or not the injunction carries implications for these borrowers, the complexity of the interaction between the Final Rule and the injunction's scope may raise questions among borrowers as to whether and how their student loan repayment options have changed. Borrowers who have exclusively Direct Loans, and who are not currently enrolled in SAVE, may also have questions arising from ambiguity about what their monthly payment amount would be under the SAVE plan in light of the injunction, and whether they can enroll in the plan at all.

29. Moreover, some of the provisions of the SAVE Final Rule scheduled to be implemented on July 1, 2024 apply to income-driven repayment plans other than SAVE. For example, the SAVE Final Rule addresses how federal student loans made under the FFEL Program (a precursor to the Direct Loan Program) and Direct Loans are treated for purposes of calculating credit toward forgiveness when a borrower consolidates their FFEL Loans or Direct Loans into a Direct Consolidation Loan. Prior rules provided that the time spent in repayment prior to consolidation would not count toward forgiveness under income-driven

---

repayment, make payments, understand their loan-cancellation or discharge options, or resolve disputes").

repayment plans. These provisions of the SAVE Final Rule count time spent in eligible repayment plans prior to consolidation towards any other income-driven repayment program, not just SAVE.[30] Whether or not these periods of time count toward forgiveness—and ambiguity about the status of those provisions—is highly material information for borrowers considering consolidation.

30. For these and other reasons, borrowers may have questions about whether and how the injunction may affect their student loan repayment options. Based on our experience, we anticipate that borrowers who are not enrolled in SAVE but whose decisions might be affected by whether particular provisions of the Final Rule are implemented might contact their servicers to determine how the injunction will impact their eligibility for forgiveness under income-driven repayment programs. Accordingly, the total population of borrowers who may seek clarification about the effect of the injunction exceeds the 8 million borrowers enrolled in SAVE.

*Systems Impacts Affecting All Borrowers*

31. In Supervision's experience in student loan servicing supervisory examinations, surges in demand for servicer contact are often followed by breakdowns in the servicing system. CFPB examinations detected servicing breakdowns following analogous widespread changes in the terms or activities of federal student loan repayment. Even when the servicing system had significantly more advanced notice, opportunity to prepare, and clarity on the nature of upcoming changes, those changes were followed by widespread failures on the part of servicers to provide borrowers with accurate, timely, complete, and actionable information

---

[30] *See* 34 C.F.R. § 685.209(k)(4)(iv)(K)(vi)(A).

about their loans and to take critical account actions for borrowers like enrollment in repayment plans and accurately crediting time toward loan forgiveness.[31]

32. For example, as described in paragraph 18, Supervision has been monitoring the return to repayment of federal student loans, wherein borrowers have had to resume making payments following a 3.5-year COVID-19 repayment pause. This required borrowers to set up new auto-debits, consider loan consolidations, and apply for new payment plans when prior plans no longer met their needs, among other things. As discussed in the CFPB's January 2024 *Issue Spotlight*, the return to repayment prompted numerous borrowers to contact their loan servicers to seek updated, individualized information about their loans and to obtain counseling on their repayment options.[32]

33. Supervision observed that certain servicers were not prepared for the increased level of borrower interaction during periods of the return to repayment. In 2022, federal student loan servicers had an average speed to answer of nearly 6 minutes and a 10.4 percent abandonment rate.[33] But in October 2023, the average federal loan servicer's call hold time increased to over an hour, causing 47 percent of borrowers to abandon the call before ever reaching an agent to get the information they needed. In some cases, borrowers waited for several hours on hold to reach their servicers. Because several servicers failed to meet borrowers' needs for contact, borrowers went without important information about their repayment status, payment amounts, and available options for obtaining affordable student

---

[31] Consumer Financial Protection Bureau, Supervisory Highlights Student Loan Servicing Special Edition, Issue 27, Fall 2022, *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.
[32] *Issue Spotlight supra* at n.12.
[33] Federal Student Aid, FY 2022 Annual Report, p. 54, January 23, 2023, *available at* https://www2.ed.gov/about/reports/annual/2022report/fsa-report.pdf.

loan payments. Borrowers also were unable to get particularized information about errors in calculating their new income-driven repayment plan payments or resolve those errors.

34. Supervision has also observed these dynamics in the context of large-scale shifts relating to forgiveness programs. For example, in October 2021, ED announced the Public Service Loan Forgiveness (PSLF) Waiver program, which modified what periods of repayment were considered eligible for credit toward forgiveness under the PSLF program and opened a pathway for previously-excluded borrowers to become eligible for the program. The Waiver imposed a deadline of October 2022 for borrowers to take action in order to receive benefits under the Waiver. Prior to the October 2022 deadline, servicers received hundreds of thousands of new PSLF-related applications. Servicers were not prepared to adequately handle the volume of applications that they received, and applicants experienced excessive processing delays well beyond the expected processing time. In some cases, these delays lasted nearly a year.[34] A lack of certainty about the status of forgiveness-related applications carries implications for a host of financial decisions borrowers need to make, including which student loan repayment plan to pursue, whether or not they could make other significant financial expenditures (such as buying a home), and whether they could change jobs.

35. When the federal student loan servicing system fails to meet surges in borrower demand for individualized information, borrowers can experience harm beyond the confusion, frustration, and time and energy that they expend seeking clarity on their student loan status. Borrowers risk missing payments and other negative consequences, such as derogatory credit reporting, when they do not have adequate avenues to communicate with servicers or

---

[34] *Id.* at 19.

perform the tasks they need on their servicers' websites, such as verifying their payment amounts, making payments electronically, or applying for payment relief options like income-driven repayment, deferment, or forbearance. Indeed, the loan servicing failures during the return to repayment likely contributed to the fact that 30 percent of borrowers were delinquent on their loan payment by the end of 2024—3 months after the return to repayment. By comparison, only 15 percent of borrowers were delinquent after the first quarter of 2020, which was the last period of active repayment prior to the COVID-19 payment pause.[35]

36. Based on the CFPB's observations as described above, I would anticipate that the effects of a shift in expected federal student loan activities resulting from the injunction entered by this Court would be compounded by the uncertainty prompted by the injunction entered by the United States District Court for the Eastern District of Missouri, which differs in scope and will prompt additional requests for clarification from federal student loan borrowers.

37. Whether they are currently enrolled in the SAVE plan or not, borrowers may reasonably have questions about the effect of each injunction on their plans for paying their federal student loans. Because the injunction entered by the United States District Court for the Eastern District of Missouri concerns the availability of loan discharge under the SAVE plan, and the availability and timeline of discharge is a highly material element of income-driven repayment plans, borrowers are likely to seek clarification about the impact of the Missouri injunction in addition to the impact of the injunction entered by this Court. This additional

---

[35] Federal Student Aid Data Center, Federal Student Loan Portfolio, Portfolio by Delinquency Status, https://studentaid.gov/data-center/student/portfolio. *See also* Kvaal, James, A First Look at Student Loan Repayment After the Payment Pause, U.S. Department of Education (Dec. 15, 2023). https://blog.ed.gov/2023/12/a-first-look-at-student-loan-repayment-after-the-payment-pause/#more-32203.

complexity would further increase demand for servicer contact and exacerbate the risk of servicing breakdowns that adversely affect borrowers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 27, 2024 at Washington, D.C.

LORELEI SALAS

Supervision Director

Consumer Financial Protection Bureau